**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI
KANSAS CITY DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| INTERSTATE BAKERIES | ) | Case No. 04-45814 (JWV) |
| CORPORATION, et al., | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

**DISCLOSURE STATEMENT WITH RESPECT TO AMENDED JOINT PLAN OF
REORGANIZATION OF INTERSTATE BAKERIES CORPORATION AND ITS AFFILIATED
DEBTORS AND DEBTORS-IN-POSSESSION DATED OCTOBER 31, 2008**

J. Eric Ivester (ARDC No. 06215581)
Samuel S. Ory (Missouri Bar No. 43293)
SKADDEN ARPS SLATE MEAGHER
& FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606-1285
Telephone: (312) 407-0700
Facsimile: (312) 407-0411
e-mail: ibcinfo@skadden.com

-and-

J. Gregory Milmoe (JM 0919)
SKADDEN ARPS SLATE MEAGHER
& FLOM LLP
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

Paul M. Hoffmann (Missouri Bar No. 31922)
STINSON MORRISON HECKER LLP
1201 Walnut, Suite 2900
Kansas City, Missouri 64106-2150
Telephone: (816) 691-2746
Facsimile: (888) 691-1191
e-mail: phoffmann@stinson.com

Attorneys for Debtors and Debtors-in-Possession

Dated:  October 31, 2008

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THIS "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE AMENDED JOINT PLAN OF REORGANIZATION OF INTERSTATE BAKERIES CORPORATION AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION DATED OCTOBER 31, 2008 (THE "PLAN") AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF INTERSTATE BAKERIES CORPORATION OR ANY OF ITS AFFILIATES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, INTERSTATE BAKERIES CORPORATION OR ANY OF ITS AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.

**SUMMARY OF PLAN**

The following introduction and summary is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement with respect to the Amended Joint Plan of Reorganization of Interstate Bakeries Corporation and its Affiliated Debtors and Debtors-in-Possession Dated October 31, 2008 (the "Plan") being proposed by Interstate Bakeries Corporation and eight of its subsidiaries and affiliates, debtors and debtors in possession (collectively, the "Debtors," "IBC" or the "Company") in their jointly-administered chapter 11 bankruptcy cases pending in the United States Bankruptcy Court for the Western District of Missouri, Kansas City Division (the "Bankruptcy Court"). All capitalized terms not defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan. A copy of the Plan is annexed hereto as Appendix A.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan. Certain provisions of the Plan, and thus the descriptions and summaries contained herein, may be the subject of continuing negotiations among the Debtors and various parties, have not been finally agreed upon, and may be modified.

A.    **Business Overview and Events Leading to Commitment Letter**

Collectively, the Debtors are one of the largest wholesale bakers and distributors of fresh baked bread and sweet goods in the United States. The Debtors produce, market and distribute a wide range of breads, rolls, croutons, snack cakes, donuts, sweet rolls and related products under national brand names such as "Wonder®," "Hostess®," "Baker's Inn®," "Home Pride®," and "Mrs. Cubbison's®" as well as regional brand names such as "Butternut®," "Dolly Madison®," "Drake's®" and "Merita®."

The Debtors currently operate 41 bakeries and approximately 740 bakery outlets (known as "thrift stores") located in strategic markets throughout the United States. The Company's sale force delivers baked goods from approximately 600 distribution centers on approximately 6,000 delivery routes. Net sales for the Company's 2008 fiscal year were approximately $2,798,337,000.

IBC's need to restructure its business through a chapter 11 reorganization proceeding arose due to the combined effects of several challenges that hindered its ability to successfully compete in the markets in which it operates. Without limitation, these challenges include declining sales, high fixed-cost structure, excess industry capacity, rising employee healthcare and pension costs and higher costs for ingredients and energy. Notwithstanding the Company's efforts to address the competitive challenges they faced, the Debtors experienced certain specific and compounding events in the summer of 2004, including the need to increase their reserve for workers' compensation and taking a charge to pretax income of approximately $40 million, which contributed to the Debtors' liquidity and operational challenges.

In light of these business issues and the limited sources of liquidity available to the Company, IBC determined that chapter 11 would afford it the best opportunity for restructuring its affairs and for developing and implementing a long-term, go-forward, business strategy. In the initial stage of the chapter 11 restructuring, the Debtors focused on quickly identifying opportunities for cost reductions that did not require fundamental operational changes. These efforts decreased the Company's operating costs, but they did not directly address or sufficiently offset the continuing decline in sales revenue, its high fixed-cost structure or the other factors that led to its chapter 11 filing.

In the second stage of its restructuring, the Company undertook an extensive review of each of its 10 profit centers ("PCs"), identifying areas for improvement in efficiency and profitability. The PCs were created on June 1, 2004, not long before the bankruptcy filings, when the Company transformed its organizational structure from 54 decentralized bakeries into 10 geographically structured groupings of bakeries, depots, routes and bakery outlets. The PC restructuring was intended to eliminate unprofitable products and routes, streamline distribution, rationalize the number of brands and stock-keeping units and eliminate excess capacity.

The Company implemented its restructuring plans in each of its 10 PCs, closed a total of 9 bakeries, approximately 200 distribution centers and 300 bakery outlets, and reduced its overall workforce by approximately 7,000. The PC review and restructuring process also resulted in the rationalization of IBC's delivery route network, reducing the number of routes by approximately 30 percent, from approximately 9,100 delivery routes to approximately 6,400, while serving roughly the same number of customers nationwide.

In this phase of the restructuring, the Company also addressed inflationary pressures related to employee costs, commencing negotiations of long-term extensions with respect to most of its over 400 collective bargaining agreements with union-represented employees.  The negotiations resulted in ratification by employees or agreements reached in principle, subject to ratification by employees, of most of the Company's collective bargaining agreements.

In addition to these efforts to address cost and efficiency issues, at around the same time IBC initiated an aggressive marketing program designed to offset consistent revenue declines. The underlying focus of the marketing program, which is ongoing, is to develop protocols to better anticipate and meet changing consumer demand by developing a consistent flow of new products.  Toward this end, in August 2005, IBC hired Richard Seban as Chief Marketing Officer. Mr. Seban has 30 years of experience in sales, marketing and new product development in consumer packaged goods, including tenure as president and chief operating officer of Canadian seafood company High Liner Foods and several positions at Sara Lee Bakery, an IBC competitor.

The Company's marketing efforts included the re-launching of the Company's iconic Wonder® bread brand on a national basis as Wonder® Classic together with the launch in January 2006 of three new Wonder® bread products: "Wonder® made with Whole Grain White," "Wonder® Kids," and "Wonder® White Bread Fans® 100% Whole Grain." On April 1, 2006, the Company also introduced new products for its buns and rolls product segment, including Wonder® wheat hamburger and hot dog buns and Wonder® buns made with whole grains.

The Company continues to work on other programs and additional new product launches. On the sweet goods side of the business, the Company launched an updated packaging redesign for the entire Hostess® line as well as a major promotional and public relations campaign in connection with the 75th anniversary of the introduction of Twinkies®.  IBC has also focused on introducing and expanding upon new products such as the highly successful Hostess® 100 Calorie Packs which were a new product launched in February 2007.  Furthermore, the Company has executed various holiday, movie and sports promotion tie-ins and related opportunistic marketing initiatives.

In addition, the Company focused on improving its manufacturing processes in its bakeries and improving service to customers through its field sales force and rationalizing its field and corporate infrastructure to ensure that those costs were in line with the restructured PC configuration.

Despite their successes, the Debtors continued to encounter several obstacles. In addition to inflationary pressures caused by rising ingredient, fuel and labor costs, the impediments to profitability that have plagued the Company for the last several years – decentralized operations, lack of innovation (in marketing, products and delivery structure) and increased competition – continued to affect the Company's profitability, resulting in earnings before interest, tax, depreciation and amortization ("EBITDA") of $48.5 million for fiscal 2005 (ending May 28, 2005) and of approximately $4.0 million for fiscal 2006 (ending June 3, 2006).

Accordingly, in June 2006, shortly after the end of the 2006 fiscal year, and due in part to the Company's continued financial decline, several of the Debtors' constituents instigated certain actions seeking to install new management and a reconstituted board of directors (the "Board"), with the goal of bringing fresh ideas and new perspectives to the Debtors' operational and financial prospects.

As a result, in February 2007, with the input of the Creditors' Committee (as hereinafter defined), the Equity Committee (as hereinafter defined), the Debtors' postpetition lenders and the Prepetition Lenders, the Debtors hired Craig D. Jung as CEO to establish a vision of the future of IBC, and lead the management team, employees and the parties in interest in this case to the fulfillment of that vision. Specifically, Mr. Jung was charged with creating a viable five (5) year business plan that would form the basis for emergence from chapter 11. Mr. Jung immediately began those efforts, and hired world-class talent to augment the Debtors' existing management team and led the Company's efforts to: (1) fix the Company's cost structure to grow margins; (2) accelerate innovation to realize attractive revenue growth; (3) drive productivity to improve margins; and (4) create a performance culture.

To implement these four priorities, IBC undertook or determined to undertake certain initiatives. First, IBC set out to implement a distribution system with different delivery options for its customers based on customer size, growth potential and service needs to lower its cost structure and profitably grow the top line. Second, IBC took steps to implement a lean manufacturing program to drive productivity. Third, IBC focused on improving brand management and innovation, including long term plans to increase investment in marketing IBC's brands. Lastly, IBC committed to redefining its organization to remove unnecessary layers of management and implement a matrix structure to improve communications, leadership and accountability.

On June 28, 2007, the Company submitted its then current business plan (as further revised, the "Business Plan") to the Creditors' Committee, the Equity Committee and the steering committee for the Prepetition Lenders (collectively, the "Key Constituents") for their review and input. The Business Plan contemplated implementing proven changes both in the manner by which the Debtors manufacture their products and, ultimately, deliver them to their consumers. Specifically, with respect to delivery, the Business Plan proposed that the Debtors abandon their historical high-cost, "one-size-fits-all" traditional route delivery structure in favor of an advanced path-to-market structure with the goal of creating better jobs for sales employees and, in doing so, significantly increase selling and delivery productivity.

In order to implement the Business Plan, the Company realized that the decades-old delivery and sales system which was largely protected through the multitude of then-existing union agreements simply did not allow the Debtors to compete profitably. Accordingly, the Debtors undertook to achieve, among other things, agreement for additional concessions from IBC's unionized employees. To this end, in June 2007 the Company initiated talks with representatives of the two labor organizations representing approximately 91% of their unionized employees: the Bakery, Confectionery, Tobacco Workers & Grain Millers International Union (the "BCTGM") and the International Brotherhood of Teamsters (the "IBT"). Among other things, IBC asked each of these unions for greater flexibility in the method and manner of product distribution to customers and cost reductions related to health and welfare

v

programs.  In addition to the IBT and the BCTGM, ten other unions represent the remaining 9% of their unionized employees.

In September 2007, as a result of Mr. Jung and senior management's evaluation of how IBC could operate most efficiently and sustainably, the Company announced its intention to realign its organization in a new cross-functional matrix structure.  The Debtors replaced the ten (10) previously existing PCs with eight (8) business units.  At the same time, the Company collapsed its sales management structure by eliminating two layers of sales management and approximately 200 sales management positions.  The Company also determined that it was necessary to exit the bread market in southern California, resulting in the closure of four bakeries, elimination of 325 routes, and closure of 17 distribution centers and 19 outlet stores on October 29, 2007.

Using the Business Plan, in July 2007 the Company began to assess the basis for one or more plans of reorganization, including reasonable ranges of values for its reorganized business and capital structure upon emergence.  IBC discussed its options with the Key Constituents as well as other potential sources that IBC believed could provide debt and equity financing to capitalize the Company for emergence from chapter 11.  These efforts led to the Debtors filing the Joint Plan of Reorganization of Interstate Bakeries Corporation and its Affiliated Debtors and Debtors in Possession on November 5, 2007.  After additional negotiations with the Key Constituents, such plan was amended resulting in the First Amended Joint Plan of Reorganization of Interstate Bakeries Corporation and its Affiliated Debtors and Debtors in Possession (the "First Amended Plan").

A key component of the First Amended Plan was an exit facility commitment letter and related agreements for up to $400 million in exit financing (the "Silver Point Commitment") with Silver Point Finance, LLC ("Silver Point").  The Silver Point Commitment was comprised of a $120 million senior secured revolving credit facility, a $60 million senior secured term loan facility and a $220 million letter of credit facility.  The Silver Point Commitment contained various conditions to the commitments contemplated thereunder, including the ratification of amendments to the collective bargaining agreements governing the relationship between the Debtors and their unionized workforce necessary to implement the Business Plan and the condition that an order by the Bankruptcy Court confirming the First Amended Plan be entered no later than March 14, 2008.

The Debtors reached an agreement with the BCTGM, which is in effect for all of its local bargaining units.  In addition, the Debtors reached agreements with all but two of the other unions representing its employees, which agreements are in effect.  However, as of March 7, 2008, the Debtors had not reached a deal with the IBT.  On March 7, 2008, the Debtors filed the Motion to Continue Hearings on First Amended Joint Plan of Reorganization of Interstate Bakeries Corporation and its Affiliated Debtors and Debtors-in-Possession and Certain Plan-Related Matters and, pursuant to that motion, the Bankruptcy Court entered an order continuing the hearing to confirm the First Amended Plan until April 23, 2008.  As a consequence of the continuance, an order confirming the First Amended Plan was not entered by March 14, 2008, and the Silver Point Commitment expired in accordance with its terms.

Following the expiration of the Silver Point Commitment, the Debtors and their advisors embarked on a dual-path to maximize value for all constituents.  One path involved discussions between the Debtors and multiple potential investors, including certain existing creditors as well as Ripplewood Holdings L.L.C. (together with its affiliates, "Ripplewood"), about modifications to the First Amended Plan or an investment and related financing to serve as the basis for a new stand-alone plan of reorganization.  The other path involved restarting the sale process originally undertaken in 2007, including the solicitation of indications of interest to purchase all or portions of the Debtors' businesses or assets on a going-concern basis.  As part of these efforts, the Debtors' investment banker and financial

advisor, Miller Buckfire & Co., LLC ("Miller Buckfire"), contacted approximately 55 strategic buyers and provided interested parties with a significant amount of detailed information, while also conducting numerous site visits, meetings and conference calls to facilitate their diligence.  As a result, the Debtors received multiple indications of interest from potential buyers.

During March of 2008, the Debtors were informed that the IBT had reached agreement in principle with Ripplewood on concessions and work rule changes that the union would give to the Debtors if Ripplewood became a majority investor in the Reorganized Company.  The IBT's concessions with Ripplewood not only included the work rules to permit the Debtors' "path to market" delivery and selling concept, but also included other significant concessions required by the Debtors to implement the Business Plan.

Leading up to and while the Debtors were working on the dual-path emergence strategy, the business and industry experienced record high increases in the cost of key commodities, including wheat and fuel.  While a significant portion of the cost inflation was passed along through price increases, the Debtors' operational performance declined and they required an increase in the DIP Facility to fund continuing operating losses and the resulting cash burn.  As a result, on May 9, 2008, the Debtors increased the amount available for borrowing under the DIP Facility from $200 million to $249.7 million and extended the maturity date to September 30, 2008.

Mindful of the need to either emerge from bankruptcy pursuant to a confirmed stand-alone plan or sell their assets by the September 30, 2008 maturity date as required by the DIP Facility, the Debtors contacted Ripplewood and the other parties working to put together a feasible stand-alone plan and asked that they provide, by May 19, 2008, a fully-committed proposal, including (i) committed financing; (ii) support of at least two-thirds in amount of the Prepetition Lenders; (iii) a solution for a post-emergence management team; and (iv) specific identification of any remaining contingencies (collectively, a "Firm Plan Proposal").  The Debtors informed these parties and their major constituencies that if a Firm Plan Proposal was not received by May 19, 2008, the Debtors would have no choice but to begin the sale process in earnest in order to complete it by September 30, 2008 and thereby maximize value for all constituencies.

The Debtors did not receive a Firm Plan Proposal by May 19, 2008 and, as a result, shifted much of their focus and resources to maximizing value through the sales effort.  However, certain parties, including Ripplewood, continued to express interest in funding a stand-alone plan, and Silver Point continued to express interest in financing a stand-alone plan, and the Debtors continued to assist such parties as they conducted additional due diligence.

In early June 2008, Miller Buckfire sent a detailed letter along with bid packages to each of the parties interested in purchasing some or all of the Debtors' assets, requesting that they submit final proposals by June 25, 2008.  The bid packages contained a proposed asset purchase agreement, bidding procedures and order approving such bidding procedures.  While the Debtors received multiple asset purchase proposals for various parts of their businesses and assets by the June 25, 2008 deadline, only one asset purchase proposal contemplated continuing a substantial portion of the businesses as a going concern (such proposal, the "Going Concern Proposal").  Therefore, the Debtors and their advisors focused on negotiating and developing the Going Concern Proposal, since it would have provided the greatest recovery for the Debtors' estates if a stand-alone plan of reorganization was not achievable.

After receiving the Going Concern Proposal and other asset purchase proposals, the Debtors again reached out to the parties potentially interested in pursuing a stand-alone plan of reorganization, including Ripplewood and certain Prepetition Lenders, requesting them to submit a Firm Plan Proposal by July 10, 2008.  The Debtors indicated that if a Firm Plan Proposal was not submitted by

then, the Debtors would file motions to sell their saleable assets and wind-down their operations at their earliest opportunity.  No such proposals were forthcoming.

Following extensive negotiations between the Debtors and the proposed purchaser under the Going Concern Proposal, in late July 2008, the proposed purchaser determined that it was no longer interested in pursuing the Going Concern Proposal.  With no other Firm Plan Proposals forthcoming, and a deepening strain on the Debtors' employees and liquidity after nearly four years in bankruptcy, the Debtors began preparation for a liquidation and orderly wind-down of their operations.  The Debtors continued, however, to facilitate due diligence with Ripplewood and certain Prepetition Lenders as well as financing discussions with Silver Point in the hopes of achieving a stand-alone plan of reorganization.

On July 17, 2008, Ripplewood presented the Debtors with an initial proposal for an equity investment by one of its affiliates, coupled with proposed debt financing, to fund the Debtors' emergence from bankruptcy.  Following receipt of such proposal, the Debtors and their advisors engaged in extensive negotiations and held numerous meetings with Ripplewood, certain of the Prepetition Lenders, including Silver Point, Monarch Alternative Capital L.P. ("Monarch"), and McDonnell Investment Management LLC ("McDonnell," together with Silver Point and Monarch, the "Prepetition Investors") and other parties in efforts to further develop such proposal.  These efforts led to the filing of a motion to enter into a commitment letter by and between the Debtors and IBC Investors I, LLC ("Equity Investors") which would provide the basis for the Plan.  On October 3, 2008 the Bankruptcy Court approved that certain equity commitment letter dated September 12, 2008, by and between the Debtors and Equity Investors (collectively with all annexes, schedules and exhibits thereto, the "Commitment Letter").  In connection with the consummation of the Plan, and all related transactions contemplated by the Plan and the Commitment Letter (collectively, the "Transaction"), (i) Equity Investors agrees to, on the Effective Date, (a) invest $44.2 million in cash in the Reorganized Company in exchange for 4,420,000 shares of common stock of the Reorganized Company (the "New Common Stock"), and (b) purchase $85.8 million in new fourth lien convertible secured notes (the "New Convertible Secured Notes"), which will be issued by the Reorganized Company and be convertible into New Common Stock; (ii) General Electric Capital Corporation ("GECC") and GE Capital Markets, Inc. ("GECM") agree to structure, arrange and syndicate a $125,000,000 asset-based senior secured revolving credit facility (the "ABL Facility"); (iii) Silver Point and Monarch Master Funding Ltd agree to structure, arrange and syndicate a $344,000,000 term loan credit facility, consistent with the terms set forth in the Plan and as more fully described in the Commitment Letter (the "Term Loan Facility"); and (iv) the Prepetition Lenders will convert their Allowed Prepetition Lender Claims into $142.3 million of the New Third Lien Term Loan (subject to adjustment pursuant to the terms of the Commitment Letter), $85.8 million of New Convertible Secured Notes and Series E Warrants with a strike price of $0.01 and representing 1.5% of the fully-diluted equity interests of Reorganized IBC (calculated as of the Effective Date).  Pursuant to the Investment Agreement, Equity Investors will also receive Series A Warrants with a strike price of $12.50 and representing 13.5% of the New Common Stock on a fully-diluted basis (calculated as of the Effective Date).  In addition, Equity Investors will be issued Series D Warrants with a strike price of $12.50 and representing 1.5% of the fully-diluted equity interests of Reorganized IBC (calculated as of the Effective Date).  On the Effective Date, the lenders under the Term Loan Facility (or their Permitted Affiliates) will be issued 4,420,000 shares of the New Common Stock, Series B Warrants with a strike price of $12.50 and representing 1.917% of the New Common Stock on a fully-diluted basis (calculated as of the Effective Date), and Series C Warrants with a strike price of $10.00 and representing 2.837% of the New Common Stock on a fully diluted basis (calculated as of the Effective Date).

The Transaction is subject to various conditions and contingencies including, without limitation, that no material adverse change will have occurred.  In addition, the Transaction is contingent upon ratification of amendments to collective bargaining agreements governing the relationship between

the Debtors and their unionized workforce necessary to implement the Business Plan, as referenced in the Commitment Letter. To date, all such ratifications have not occurred.

Although IBC has accomplished many important goals through the tools afforded by chapter 11, IBC believes that the prospects for further operational improvement will be best achieved outside of chapter 11. There are continued costs of remaining in chapter 11 that IBC believes warrant emergence at this time, including the administrative costs of the chapter 11 process and the continued diversion of management time by the chapter 11 proceedings.

Several factors have led to a decline in value available to constituents including (i) significant commodity and fuel price increases, (ii) increased costs of financing, (iii) the general economic downturn, (iv) the delay in implementing the cost-saving and revenue-enhancing initiatives contained in the Business Plan and (v) the cumulative costs and expenses of the Debtors' lengthy stay in chapter 11. Notwithstanding these difficulties, the Company's financial performance has, in recent periods, stabilized and indeed shown some improvement. Nonetheless, IBC's emergence and implementation of the Business Plan are subject to a number of risks and uncertainties. Certain of such risks are discussed in detail in <u>Article VIII</u> of this Disclosure Statement, which should be reviewed in its entirety.

**B.      Summary of Intercreditor Settlement**

The Debtors worked closely with the Creditors' Committee and the Prepetition Lenders to resolve certain disputes with respect to their respective rights in, and claims against, the Debtors' assets. Litigation of these disputes would have been extremely time-consuming and costly. Most importantly, litigation of these issues (as opposed to settlement), threatened to jeopardize the Debtors' ability to reorganize under the structure set forth in the Commitment Letter. As a result, on October 3, 2008, the Debtors, the Prepetition Lenders and the Creditors' Committee reached a fair and reasonable compromise.

The compromise reached with the Creditors' Committee, which is subject to definitive documentation and approval of the Court, provides for, among other things, the establishment of the Creditors' Trust upon the Debtors' emergence from Chapter 11 for the benefit of General Unsecured Creditors. The Creditors' Trust will be funded through a cash payment of $5.0 million. Costs of administering the Creditors' Trust will be paid from the Trust Assets. The Creditors' Trust will also receive rights to pursue certain litigation claims at the expense of the Creditors' Trust, including the D&O Claims and the Trust Avoidance Claims. Finally, the Creditors' Trust will receive cash-settled stock appreciation rights, with a strike price equal to $15.00, equaling 3% of the fully-diluted equity interests of the Reorganized Company as of the Effective Date (with such 3% dilution to be borne equally by Equity Investors and the Prepetition Lenders in a manner agreed upon by Equity Investors and the Prepetition Lenders) (the "Trust Stock Appreciation Rights"). There can be no assurance that the Trust Claims or the potential cash payment associated with the Trust Stock Appreciation Rights will result in any distributable value for general unsecured creditors.

As consideration for the creation of the Creditors' Trust, the Debtors, the Prepetition Lenders and the Creditors' Committee agree to the full and complete release and satisfaction of any and all claims of the Debtors (and those claiming derivatively through the Debtors) against the Prepetition Lenders, in their capacities as such, including, but not limited to: (i) claims against the Prepetition Lenders asserted or that could have been asserted by the Debtors in the Prepetition Lender Actions, (ii) challenges with respect to the extent, amount, validity and priority of the Prepetition Lenders' liens and security interests, and (iii) allegations or claims that the adequate protection payments made to the Prepetition Lenders during the Chapter 11 Cases should be "recharacterized" as principal payments and applied to reduce the Prepetition Lenders' secured claims. As part of the Intercreditor Settlement, the Prepetition Lender Actions will be dismissed with prejudice.

In addition, the Debtors, the Prepetition Lenders, the Creditors' Committee, and its members, and the Old Convertible Note Indenture Trustee agree that the transfer of the Trust Assets to the Creditors' Trust and the satisfaction of the Old Convertible Note Indenture Trustee Fee Claim shall also be in full and complete release and satisfaction of any and all claims that could be prosecuted by any party in interest in the Chapter 11 Cases including the Debtors, the Creditors' Committee, its members, the Prepetition Lenders and the Old Convertible Note Indenture Trustee with respect to the non-substantive consolidation of the Debtors' bankruptcy estates under the Plan.

Finally, the Debtors, the Prepetition Lenders, the Creditors' Committee and the Old Convertible Note Indenture Trustee agree that any provision contained in the Old Convertible Note Indenture purporting to subordinate the right of payment of holders of Old Convertible Notes to the rights of Prepetition Lenders shall be null and void and all Prepetition Lenders shall waive any right to enforce such a provision solely for purposes of the settlement described therein.

All documents implementing the terms of the Intercreditor Settlement, including the Trust Stock Appreciation Rights, shall be in form and substance reasonably satisfactory to Equity Investors, the Prepetition Investors and the Creditors' Committee.

As a result of the compromise, the Creditors' Committee withdrew its previously-filed objection to the Debtors' efforts to obtain Bankruptcy Court approval of the proposed commitments under the Commitment Letter and agreed to support the Plan as amended to reflect the compromise.

C.      **General Basis for the Plan**

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Plan contains separate classes and proposes recoveries for holders of Claims against and Interests in the Debtors.  The Plan, though proposed jointly, constitutes a separate plan proposed by each Debtor.  Therefore, except as expressly provided in Section 3.3 of the Plan, the classifications set forth in Section 3.2 of the Plan shall be deemed to apply separately with respect to each plan proposed by each Debtor.  After careful review of the Debtors' current business operations, estimated recoveries in a liquidation scenario, and the prospects of ongoing business, the Debtors have concluded that the recovery to the Debtors' creditors will be maximized by the reorganization of IBC as contemplated by the Plan.

Specifically, the Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  According to the implied valuation of Reorganized IBC prepared by Miller Buckfire based on the Transaction, the liquidation analysis prepared by management with the assistance of the Debtors' restructuring advisors, Alvarez & Marsal North America, LLC ("A&M"), and the other analyses prepared by the Debtors with the assistance of their advisors, the Debtors believe that the value of the Estates of the Debtors is significantly greater in the proposed reorganization than it would be in a liquidation.

Moreover, consistent with the charge given by the Debtors' reconstituted board of directors to new management in early 2007, the Debtors have considered other alternatives to proceeding with the Business Plan, the Transaction and the Plan.  These alternatives include: (a) separation of the bread and snack/cake business segments, selling one or the other of these businesses and reorganization of the remaining business segment; (b) proceeding with elements of the Business Plan but not including several of the transformational aspects of the Business Plan including, without limitation, the "path-to-market" initiative and further union concessions; (c) sale of certain less profitable business segments and a reorganization based upon the remaining business segments, but not including "path-to-market" and further union concessions; and (d) a sale or sales of the Debtors' assets and/or business segments in one or

x

more transactions either as going concerns sales or otherwise.  In addition, the Debtors considered a possible reorganization of their direct store delivery structure without implementation of the path to market initiative through an independent operator structure whereby the Debtors would eliminate route delivery drivers employed by the Debtors and related costs.  The Debtors' analysis of the foregoing included substantial experience gained through the Debtors having undertaken efforts to find alternatives to the Transaction and their attempts to sell certain business segments.  The Debtors have identified numerous obstacles to the implementation of those alternatives set forth above that contemplate the Debtors' reorganization including several operational impediments and a lack of available financing.  Moreover, it is likely that pursuit of any one of these alternatives would result in significant (a) additional claims asserted against the Estates; (b) job loss among the Debtors' union and non-union employees; and (c) elimination of go-forward pension contributions with respect to such union employees and resulting withdrawal liability claims which could significantly undermine the financial strength of certain of the Debtors' multiple employer pension plans and jeopardize the continued existence of those plans.  Accordingly, the Debtors believe the Business Plan, the Transaction and the Plan that implements them maximize the value of the Debtors and represent the best alternative for the Debtors, their Estates and their constituencies.

**D.        Summary of the Plan Structure**

The Plan contemplates the reorganization of each of the Debtors upon consummation of the Plan and the resolution of the outstanding Claims against and Interests in the Debtors pursuant to sections 1123, 1129 and 1141 of the Bankruptcy Code.  The Plan further contemplates that holders of Prepetition Lender Claims will receive a distribution consisting of the New Third Lien Term Loan, $85,800,000 in aggregate principal amount of the New Convertible Secured Notes and the Series E Warrants with a strike price of $0.01 and representing 1.5% of the fully-diluted equity interests of Reorganized IBC (calculated as of the Effective Date).  Holders of General Unsecured Claims against the Main Debtors will not receive any distribution under the Plan.  However, pursuant to the settlement and compromise contemplated by the Intercreditor Settlement described herein, among other things, the Trust Assets shall be transferred to the Creditors' Trust on the Effective Date and, in exchange, the Creditors' Committee has agreed to release any and all claims against the Prepetition Lenders.  As a result, the Creditors' Committee has agreed to support the Plan.  Furthermore, the existing common stock of the Company will be cancelled and the holders of Existing Securities will not receive a distribution under the Plan.

Subject to the Restructuring Transactions, IBC, Brands, IBC Sales Corporation, IBC Services, LLC, IBC Trucking, LLC, Baker's Inn Quality Baked Goods, LLC, will seek approval of their chapter 11 Plans pursuant to the classification structure and treatment set forth in sections 3.2 and 4.1 of the Plan.  Subject to the Restructuring Transactions, Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery will seek approval of their  chapter 11 Plans pursuant to the classification structure and treatment set forth in sections 3.3 and 4.2 of the Plan.

**E.        Summary of Treatment of Claims and Interests Under the Plan**

The Plan, though proposed jointly, constitutes a separate plan proposed by each Debtor The Plan contains separate classes for holders of Claims against and Interests in each of the Debtors.  As required by the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified.

The tables below summarize the classification and treatment of the principal prepetition Claims and Interests in the Plan with respect to both the Main Debtors and Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery.  The classification and treatment for all Classes are described in more detail in <u>Article VII</u> of this Disclosure Statement.  The tables below also set forth the

Debtors' estimates of the amount of Claims that will ultimately become Allowed in each Class based upon review by the Debtors of all Claims scheduled by the Debtors and as modified by the Court through the numerous omnibus hearings, and consideration of the provisions of the Plan that affect the allowance of certain Claims, as well as an estimated percentage recovery for holders of Claims in each Class.  With respect to the Claims against the Main Debtors, the Claims and estimated percentage recoveries set forth in the tables below are on a consolidated basis.  With respect to the Claims against Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery, the Claims and estimated percentage recoveries set forth below apply only with respect to those Debtors.  For purposes of estimating the percentage recoveries as set forth below, the New Third Lien Term Loan and New Convertible Secured Notes to be issued pursuant to the Plan were assumed to be valued as provided for in the valuation analysis contained in Section X.D hereof.  The portion of estimated percentage recoveries set forth below that are based upon the value of the New Common Stock issuable upon conversion of New Convertible Secured Notes were calculated pursuant to the valuation contained in Article X hereof.

The Debtors' investment banker and financial advisor, Miller Buckfire, performed a valuation of the Reorganized Debtors and the New Common Stock based on information and financial projections provided by the Debtors.  The valuation assumptions include, among other things, an assumption that the results projected for the Reorganized Debtors will be achieved in all material respects.  However, no assurance can be given that the projected results will be achieved.  To the extent that the valuation assumptions are dependent upon the achievement of the results projected by the Debtors, the valuation assumptions must be considered speculative.  The valuation assumptions also consider, among other matters, (i) market valuation information concerning certain publicly traded securities of certain other companies that are considered relevant, (ii) certain general economic and industry information considered relevant to the business of the Reorganized Debtors, and (iii) such other investigations and analyses as were deemed necessary or appropriate.  The Debtors and Miller Buckfire believe these valuation assumptions are reasonable.  The foregoing valuation assumptions are not a prediction or reflection of post-Confirmation trading prices of the New Convertible Secured Notes, the New Common Stock or any other securities or debt instruments.  Such instruments may trade at substantially higher or lower prices because of a number of factors, including those discussed below and in Article VIII of this Disclosure Statement.  The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.

**CLAIMS AGAINST AND INTERESTS IN THE MAIN DEBTORS:**

| Class Description | Treatment Under Plan |
|---|---|
| **Class 1 - Secured Tax Claims** | A Secured Tax Claim includes any Secured Claim arising prior to the Petition Date against any of the Debtors for taxes owed to a governmental unit secured by a Lien on property in which Debtors have an interest.  Under the Plan, each Secured Tax Claim holder shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Secured Tax Claim, (x) Cash equal to the amount of such Allowed Secured Tax Claim or (y) such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder shall have agreed in writing, provided that such treatment is not more favorable than the treatment in clause (x) above. |
| | **Estimated Amount of Claims:**  $276,119 |
| | **Estimated Percentage Recovery:**  100% |

| | |
|---|---|
| **Class 2 - Secured Claims** | A Secured Claim includes any Claim (other than the Prepetition Lender Claims) in any separate subclass of Claims, each subclass which is deemed to be a separate class, secured by a Lien on property in which Debtors have an interest.  A Secured Claim also includes a Claim that is subject to setoff under section 553 of the Bankruptcy Code.  Under the Plan, the legal, equitable, and contractual rights of each holder of a Secured Claim will be reinstated, which means that such Claimholders' rights will be unaltered and that IBC will cure outstanding payment defaults.  Additionally, the Liens will survive the Chapter 11 Cases and will continue in accordance with the contractual terms of the parties' underlying agreements until the Claims are paid in full.  As alternatives to the foregoing, under the Plan, the Debtors (or the Reorganized Debtors) may (i) pay off a Lien in Cash, with the amount of the payment equal to the value of the collateral; (ii) surrender the collateral to the Claimholder,;or (iii) agree to some other arrangement with the holder of the Lien. |

> **Estimated Amount of Claims:**      **$158,367**

> **Estimated Percentage Recovery:**      **100%**

| | |
|---|---|
| **Class 3 - Other Priority Claims** | Other Priority Claims are primarily Claims held by current and former employees for unpaid wages, salaries, bonuses, severance pay, vacation pay, and other unpaid employee benefits.  Upon commencement of the Chapter 11 Cases, IBC obtained authority from the Bankruptcy Court to pay such amounts in the ordinary course of business.  IBC believes that it has paid the majority of Other Priority Claims and that there should not be a significant amount of such Claims which will remain unpaid.  However, in the event there are any valid Claims for unpaid wages, salaries, and other employee compensation, the Debtors (or the Reorganized Debtors) will either pay such Claims in full in Cash or, if necessary, agree with the Claimholder to some other mutually agreeable compensation arrangement; provided that such agreement is not more favorable than the foregoing. |

> **Estimated Amount of Claims:**      **$493,327**

> **Estimated Percentage Recovery:**      **100%**

| | |
|---|---|
| **Class 4 - Intercompany Claims** | An Intercompany Claim is a Claim by any Debtor or an Affiliate of a Debtor against a Main Debtor on account of various matters, including management services obligations, employee leasing obligations, royalty obligations and obligations on account of purchased inventory.  Each Intercompany Claim will, in the sole discretion of the applicable Debtor or Reorganized Debtor holding such Claim, be (a) released, waived and discharged as of the Effective Date; (b) contributed to the capital of the obligor corporation; (c) dividended; or (d) remain unimpaired. |
| **Class 5 - Workers' Compensation Claims** | Workers' Compensation Claims are comprised of Claims held by an employee or former employee of the Debtors for workers' compensation coverage under the workers' compensation program applicable in the particular state in which the employee is employed by the Debtors.  The Reorganized Debtors shall pay all Workers' Compensation Claims that are determined to be valid under applicable state law and the corresponding programs maintained by the |

Debtors, in accordance with the terms and conditions of such state law and such programs. Workers' Compensation Claims are Unimpaired under the Plan. The Debtor's estimate that Workers' Compensation Claims will be in the approximate aggregate amount of $62 million. As described more fully in Section VI.G, the Debtors' liabilities under the Workers' Compensation Programs are generally secured by letters of credit and bonds posted with the Company's insurers and with the state authorities that govern those self insurance programs in which the Company participates. If the Workers' Compensation Claims were Impaired under the Plan, rather than treated as set forth above, the letters of credit and bonds related to such claims would likely be called, thereby increasing the secured, funded debt under the Prepetition Credit Facility. Therefore the Debtors have proposed the above treatment as in the best interests of their Estates.

| | |
|---|---|
| **Estimated Amount of Claims:** | **$62,000,000** |
| **Estimated Percentage Recovery:** | **100%** |

**Class 6 – Subsidiary Interests**

Subsidiary Interests are all of the Interests in the Debtors other than Interests in IBC and Interests in Brands Preferred Stock. Subsidiary Interests will be unaffected by the Plan, except to the extent required by the Restructuring Transactions.

**Class 7 - Capital Lease Claims**

Capital Lease Claims are the Claims arising under or pursuant to the Capital Leases scheduled on <u>Exhibit B</u> to the Plan. Class 7 Capital Lease Claims consist of the secured portion of all Capital Lease Claims, each of which constitutes a separate subclass and is deemed to be a separate Class. The unsecured portion of all Capital Lease Claims shall be classified and treated as Class 9 General Unsecured Claims. Holders of Class 7 Capital Lease Claims will (a) receive deferred Cash payments totaling at least the allowed amount of such Allowed Capital Lease Claim; (b) upon abandonment by the Debtors, receive the collateral with respect to such Capital Lease Claim; (c) have their Capital Lease Claims Reinstated; or (d) receive such other treatment as the debtors and such Claimholder shall have agreed upon in writing as announced at or prior to the Confirmation Hearing.

| | |
|---|---|
| **Estimated Amount of Claims:** | **$2,575,478** |
| **Estimated Percentage Recovery:** | **100%** |

**Class 8 - Prepetition Lender Claims**

Prepetition Lender Claims are comprised of all Claims of the Prepetition Agent and the Prepetition Lenders arising under or pursuant to the Prepetition Credit Facility including, without limitation, the Claim of the Prepetition Lenders for Postpetition Interest (to the extent unpaid and whether calculated at the default or non-default rate) pursuant to that certain Amended and Restated Credit Agreement, dated as of April 25, 2002, as amended, supplemented or otherwise modified prior to the Petition Date, by and among Interstate Brands Corporation and Interstate Brands West Corporation (which was subsequently merged into Interstate Bakeries Corporation), as borrowers, Interstate Bakeries Corporation, IBC Sales Corporation, Baker's Inn Quality Baked Goods, LLC and IBC Services, LLC, as guarantors, the banks and other

financial institutions from time to time thereto, JPMCB, as administrative agent, and others. Each Prepetition Lender will receive its Pro Rata share of each component of the Prepetition Lenders Plan Distribution Property. The Prepetition Lenders are, for the purpose of the Plan only, waiving claims for default interest but reserve the right to collect default interest in all other circumstances.

|  |  |
|---|---|
| **Estimated Amount of Claims:** | **$451,486,946 (not including letters of credit or default interest)** |
| **Estimated Percentage Recovery:** | **50.5% of principal and interest at non-default rates[1]** |

**Class 9 – General Unsecured Claims**

General Unsecured Claims are comprised of, among other things, trade Claims, lease and contract rejection Claims, personal injury and other litigation Claims, Deficiency Claims and Claims by governmental entities on account of anything other than taxes. Holders of General Unsecured Claims will not be entitled to any recovery under the Plan on behalf of such claims.

|  |  |
|---|---|
| **Estimated Amount of Claims:** | **$322,586,327** |
| **Estimated Percentage Recovery:** | **0%** |

**Class 10 – Subordinated Securities Claims**

**(a) Class 10a – Subordinated Debt Securities Claims**

**(b) Class 10b – Subordinated Equity Securities Claims**

Subordinated Securities Claims consist of (i) Subordinated Debt Securities Claims, which are Claims subject to subordination under section 510(b) of the Bankruptcy Code arising either (a) from the rescission of a purchase or sale of a debt Security of any Debtor; (b) for damages as a result of the purchase or sale of such debt Security of any Debtor; or (c) reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim and (ii) all Subordinated Equity Securities Claims, which are Claims subject to subordination under section 510(b) of the Bankruptcy Code arising either (a) from the rescission of a purchase or sale of an equity Security of any Debtor; (b) for damages as a result of the purchase or sale of such equity Security of any Debtor; or (c) reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim. The Subordinated Securities Claims shall be cancelled, released and extinguished, and holders of Subordinated Securities Claims will not be entitled to any recovery under the Plan on account of such claims.

|  |  |
|---|---|
| **Estimated Amount of Claims:** | **$3,000,000** |
| **Estimated Percentage Recovery:** | **0%** |

---

[1]    Prepetition Lender Claims estimated recovery is comprised of $142.3 million of the New Third Lien Term Loan and $85.8 million of New Convertible Secured Notes.

| | |
|---|---|
| **Class 11 – Interests in Brands Preferred Stock** | Interests in Brands Preferred Stock are comprised of (a) the legal, equitable contractual and other rights (whether fixed or contingent, matured or unmatured, disputed or undisputed) of any Person with respect to Brands Preferred Stock and (b) the legal, equitable, contractual and other rights, whether fixed or contingent, matured or unmatured, disputed or undisputed, of any Person to purchase, sell, subscribe to, or otherwise acquire or receive (directly or indirectly) any of the foregoing.  Interests in Brands Preferred Stock shall be cancelled, released, and extinguished, and holders of such Interests shall receive no distribution on account of such Interests. |
| | **Estimated Percentage Recovery:       0%** |
| **Class 12 – Interests in IBC** | Interests in IBC are comprised of (a) the legal, equitable contractual and other rights (whether fixed or contingent, matured or unmatured, disputed or undisputed) of any Person with respect to Old Common Stock, Old Common Stock Options, or any other equity securities or equity-linked securities of IBC and (b) the legal, equitable, contractual and other rights, whether fixed or contingent, matured or unmatured, disputed or undisputed, of any Person to purchase, sell, subscribe to, or otherwise acquire or receive (directly or indirectly) any of the foregoing.  Interests in IBC shall be cancelled, released, and extinguished, and holders of such Interests shall receive no distribution on account of such Interests. |
| | **Estimated Percentage Recovery:       0%** |

**CLAIMS AGAINST AND INTERESTS IN MRS. CUBBISON'S, ARMOUR & MAIN DEVELOPMENT AND NEW ENGLAND BAKERY:**

The estimates of the distributions to holders of Class 4 Trade Claims and Class 5 General Unsecured Claims with respect to Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery assume that holders of Class 5 General Unsecured Claims for each applicable Debtor vote to accept the applicable Plan and the Debtors do not prosecute the Mrs. Cubbison's, Armour & Main Redevelopment, or New England Bakery Substantive Consolidation Motion(s) as further described in the Plan.

| **Class Description** | **Treatment Under Plan** |
|---|---|
| **Class 1 - Other Priority Claims** | Other Priority Claims are primarily Claims held by current and former employees for unpaid wages, salaries, bonuses, severance pay, vacation pay, and other unpaid employee benefits.  Upon commencement of the Chapter 11 Cases, IBC obtained authority from the Bankruptcy Court to pay such amounts in the ordinary course of business.  IBC believes that it has paid all Other Priority Claims.  However, in the event there are any valid Claims for unpaid wages, salaries, and other employee compensation, the Debtors (or the Reorganized Debtors) will either pay such Claims in full in Cash or, if |

necessary, agree with the Claimholder to some other mutually agreeable compensation arrangement; provided that such agreement is not more favorable than the foregoing.

**Estimated Amount of Claims with respect to
Mrs. Cubbison's, Armour & Main Redevelopment
and New England Bakery:**                                            **$0**

**Estimated Percentage Recovery:**                                  **N/A**

**Class 2 – Intercompany Claims**

Each Mrs. Cubbison's Intercompany Claim, Armour & Main Redevelopment Intercompany Claim and New England Bakery Intercompany Claim will, in the sole discretion of the applicable Debtor or Reorganized Debtor holding such Claim, be (a) released, waived and discharged as of the Effective Date, (b) contributed to the capital of the obligor corporation, (c) dividended, or (d) remain unimpaired; provided that the applicable Debtor or Reorganized Debtor shall seek the consent of Equity Investors and the Prepetition Investors with respect to the treatment of each such Claim, with such consent not to be unreasonably withheld.

**Class 3 – Interests**

Class 3 Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery Interests shall be unaffected by this Plan, except to the extent required or permitted by the Restructuring Transactions or as may be required in the event the Mrs. Cubbison's Substantive Consolidation Motion, Armour & Main Redevelopment Substantive Consolidation Motion or New England Bakery Substantive Consolidation Motion is prosecuted to conclusion.

**Class 4 – Trade Claims**

Unless the holder of a Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery Trade Claim and the applicable Debtor agree to a different treatment, on the Effective Date, each holder of a Allowed Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery Trade Claim shall have its Claim paid in full in Cash (not including accrued post-petition interest).

**Estimated Amount of Claims
with respect to Mrs. Cubbison's:**                                  **$13,676**

**Estimated Percentage Recovery:**                                  **100%**

**Estimated Amount of Claims
with respect to Armour & Main Redevelopment:**                      **$0**

**Estimated Percentage Recovery:**                                  **N/A**

**Estimated Amount of Claims
with respect to New England Bakery:**                               **$3,638**

**Estimated Percentage Recovery:**                                  **100%**

**Class 5 – General
Unsecured Claims**

If Class 5 Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery General Unsecured Claims votes to accept the applicable Plan and such Plan is confirmed, the Debtors will withdraw the Mrs. Cubbison's Substantive Consolidation Motion, Armour & Main Redevelopment Substantive Consolidation Motion, or New England Bakery Substantive Consolidation Motions, as applicable, with prejudice, and, on the Effective Date or as soon thereafter as is reasonable and practicable, each holder of an Allowed Class 5 Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery General Unsecured Claim, as applicable, shall be entitled to receive such holder's Pro Rata share of the Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery General Unsecured Claims Distribution Property, as applicable, or (b) if Class 5 Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery General Unsecured Claims does not vote to accept the applicable Plan or if the applicable Plan is not confirmed, then, the Debtors shall prosecute the Mrs. Cubbison's, Armour & Main Redevelopment, or New England Bakery Substantive Consolidation Motion, as applicable, and, if such motion is granted, the holders of Claims against, and Interests in, the Debtors to which such motion(s) apply shall receive the same treatment as holders of Claims against, and Interests in, IBC under the Plan with respect to IBC. The estimated amount of Class 5 General Unsecured Claims with respect to each of Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery is $19,307,508.[2]

| | |
|---|---|
| **Estimated Amount of Claims with respect to Mrs. Cubbison's:** | **$19,307,508** |
| **Estimated Percentage Recovery:** | **1.5%** |
| **Estimated Amount of Claims with respect to Armour & Main Redevelopment:** | **$19,307,508** |
| **Estimated Percentage Recovery:** | **<1%** |
| **Estimated Amount of Claims with respect to New England Bakery:** | **$19,307,508** |
| **Estimated Percentage Recovery:** | **<1%** |

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST THE DEBTORS. EACH OF THE DEBTORS <u>STRONGLY RECOMMENDS</u> THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.**

---

2      This estimate does not include an unliquidated Control Group Liability Claim asserted by the ABA Plan which is disputed.

# TABLE OF CONTENTS

**PAGE**

SUMMARY OF PLAN ...................................................................................................................... iii
    A.   Business Overview and Events Leading to Commitment Letter ........................................ iii
    B.   Summary of Intercreditor Settlement................................................................................ ix
    C.   General Basis for the Plan.................................................................................................. x
    D.   Summary of the Plan Structure......................................................................................... xi
    E.   Summary of Treatment of Claims and Interests Under the Plan ...................................... xi

1.     INTRODUCTION ........................................................................................................................ 1

II.    BANKRUPTCY PLAN VOTING INSTRUCTIONS AND PROCEDURES ............................. 2
    A.   Definitions .......................................................................................................................... 2
    B.   Notice to Holders of Claims and Interests ........................................................................ 2
    C.   Solicitation Package............................................................................................................ 3
    D.   General Voting Procedures, Ballots, and Voting Deadline ................................................ 3
    E.   Confirmation Hearing and Deadline for Objections to Confirmation ............................... 4

III.   HISTORY OF THE DEBTORS .................................................................................................. 6
    A.   Overview of Business Operations...................................................................................... 6
    B.   Recent Financial Results.................................................................................................... 8

IV.   PREPETITION CAPITAL STRUCTURE OF THE DEBTORS ................................................ 8
    A.   Prepetition Credit Facility.................................................................................................. 8
    B.   Prepetition Notes................................................................................................................ 8
    C.   Equity ................................................................................................................................. 9

V.    CORPORATE STRUCTURE OF THE DEBTORS .................................................................... 9
    A.   Current Corporate Structure............................................................................................... 9
    B.   Board of Directors .............................................................................................................. 9
    C.   Executive Officers ............................................................................................................ 10

VI.   THE CHAPTER 11 CASES ...................................................................................................... 11
    A.   Events Leading to Commencement of the Chapter 11 Cases ........................................... 11
    B.   Continuation of Business; Stay of Litigation................................................................... 12
    C.   Summary of Certain Relief Obtained at the Outset of the Chapter 11 Cases ................. 13
         1.   First Day Orders .................................................................................................. 13
         2.   Appointment of Statutory Committees ................................................................ 14
    D.   Post-Petition Financing..................................................................................................... 14
         1.   DIP Credit Agreement ......................................................................................... 14
         2.   Other Financial Transactions ............................................................................... 18
         3.   Surety Program .................................................................................................... 18
    E.   Other Significant Events During the Chapter 11 Cases.................................................... 19
         1.   Corporate Entity Reorganization ......................................................................... 19
         2.   Mrs. Cubbison's Filing and Related First Day Orders......................................... 20
         3.   Omnibus Procedures ............................................................................................ 20
         4.   Information Technology Decisions........................................................................ 24

xix

|       | 5.  | Real Estate Matters .......................................................................... | 25 |
|       | 6.  | Labor and Employee Matters............................................................ | 27 |
|       | 7.  | Exclusivity ....................................................................................... | 31 |
| F.    | Summary of Claims Process, Bar Date, Certain Claims, and Professional Fees ............ | | 32 |
|       | 1.  | Claims Process.................................................................................. | 32 |
|       | 2.  | Schedules and Statements of Financial Affairs ................................. | 32 |
|       | 3.  | Claims Bar Date................................................................................ | 32 |
|       | 4.  | Proofs of Claim and Other Claims.................................................... | 33 |
|       | 5.  | Professional Fees ............................................................................. | 33 |
| G.    | Workers' Compensation ............................................................................... | | 34 |
| H.    | Significant Settlements and Litigation........................................................ | | 35 |
|       | 1.  | SEC Inquiry ...................................................................................... | 35 |
|       | 2.  | Smith, et al. v. Interstate Bakeries Corp., et al............................... | 35 |
|       | 3.  | June 2003 Shareholder Derivative Lawsuit ...................................... | 36 |
|       | 4.  | Labor Litigation ............................................................................... | 36 |
|       | 5.  | Environmental Matters ..................................................................... | 37 |
|       | 6.  | Preference Adversary Action ............................................................ | 41 |
|       | 7.  | Adversary Action Against the Prepetition Lenders .......................... | 41 |
|       | 8.  | ABA Plan .......................................................................................... | 41 |
|       | 9.  | Settlement of the Gianopolous Litigation ........................................ | 44 |
|       | 10. | Nestle Purina Petcare ....................................................................... | 44 |
|       | 11. | 100 Calorie Pack Packaging ............................................................. | 44 |
|       | 12. | Flowers Trademark Litigation .......................................................... | 45 |
|       | 13. | Voluntary Compliance Procedures ................................................... | 45 |
|       | 14. | Old Convertible Noteholder Litigation ............................................ | 45 |
| I.    | Accomplishments During Chapter 11; Development and Summary of the Business Plan; and IBC's Go-Forward Strategy......................................... | | 46 |
|       | 1.  | Strategic Initiatives ......................................................................... | 46 |
|       | 2.  | Summary of Intercreditor Settlement................................................ | 52 |
|       | 3.  | Reasons for Emergence at This Time ................................................ | 54 |
|       | 4.  | IBC's Future Strategy ...................................................................... | 54 |
| J.    | Treatment of PBGC Plans............................................................................ | | 54 |
| VII.  | SUMMARY OF THE REORGANIZATION PLAN ............................................ | | 55 |
| A.    | Overall Structure of the Plan....................................................................... | | 55 |
| B.    | Reorganized Capital Structure Created by Plan........................................... | | 56 |
|       | 1.  | ABL Facility ..................................................................................... | 56 |
|       | 2.  | Term Loan Facility ........................................................................... | 56 |
|       | 3.  | New Third Lien Term Loan Facility.................................................. | 56 |
|       | 4.  | New Convertible Secured Notes ....................................................... | 57 |
|       | 5.  | Warrants............................................................................................ | 57 |
|       | 6.  | Stock Appreciation Rights ................................................................ | 57 |
|       | 7.  | Reorganized IBC Equity Ownership ................................................ | 57 |
| C.    | Classification and Treatment of Claims and Interests ................................. | | 58 |
|       | 1.  | Treatment of Unclassified Claims under the Plan ............................ | 59 |
|       | 2.  | Treatment of Classified Claims Against, and Interest in, the Main Debtors under the Plan..................................................................... | | 61 |
|       | 3.  | Treatment of Classified Claims Against, and Interest in, Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery  under the Plan ................................................................................................... | | 66 |

|   | 4. | Substantive Consolidation of Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery with IBC | 68 |
|   | 5. | Special Provisions Regarding Insured Claims | 69 |
|   | 6. | Reservation of Rights Regarding Claims | 70 |
| D. | | Means for Implementation of the Plan | 70 |
|   | 1. | Continued Corporate Existence | 70 |
|   | 2. | Corporate Action | 70 |
|   | 3. | Certificate of Incorporation and Bylaws | 70 |
|   | 4. | Cancellation of Existing Securities and Agreements | 71 |
|   | 5. | Authorization and Issuance of New Common Stock | 71 |
|   | 6. | Directors and Officers | 72 |
|   | 7. | Employment, Retirement, Indemnification and Other Agreements and Incentive Compensation Programs | 72 |
|   | 8. | Implementation of the Long Term Incentive Program | 73 |
|   | 9. | Termination of the SERP | 73 |
|   | 10. | Equity Investors' Contribution | 74 |
|   | 11. | Issuance of the New Convertible Secured Notes, the New Common Stock and Warrants and Entry Into the New Third Lien Term Loan | 74 |
|   | 12. | Post-Effective Date Financing | 74 |
|   | 13. | Preservation of Causes of Action | 75 |
|   | 14. | Substantive Consolidation Motions | 75 |
|   | 15. | Plan Modification and Amendments | 76 |
|   | 16. | Creditors' Committee | 76 |
|   | 17. | Payment of Statutory Fees | 76 |
|   | 18. | Effectuating Documents; Further Transactions | 76 |
|   | 19. | Exemption From Certain Transfer Taxes and Recording Fees | 76 |
| E. | | Unexpired Leases and Executory Contracts | 77 |
|   | 1. | Assumed (Non-Union) Contracts and Leases | 77 |
|   | 2. | Rejected (Non-Union) Contracts and Leases | 77 |
|   | 3. | Assumption and Rejection of Union Contracts | 77 |
|   | 4. | Payments Related to Assumption of Executory Contracts and Unexpired Leases | 78 |
|   | 5. | Rejection Damages Bar Date | 78 |
| F. | | Restructuring Transactions and Alternative Structures | 78 |
| G. | | Provisions Governing Distributions | 79 |
|   | 1. | Time of Distributions | 79 |
|   | 2. | No Interest on Claims | 79 |
|   | 3. | Disbursing Agent | 79 |
|   | 4. | Surrender of Securities or Instruments | 79 |
|   | 5. | Claims Administration Responsibility | 80 |
|   | 6. | Delivery of Distributions | 80 |
|   | 7. | Procedures for Treating and Resolving Disputed and Contingent Claims | 80 |
| H. | | Allowance of Certain Claims | 81 |
|   | 1. | DIP Facility Claims | 81 |
|   | 2. | Professional Claims | 81 |
|   | 3. | Substantial Contribution Compensation and Expenses Bar Date | 82 |
|   | 4. | Administrative Claims Bar Date | 82 |
|   | 5. | The ACE Insurance Program | 82 |
|   | 6. | Commitment Fee | 83 |
|   | 7. | Payment of Old Convertible Note Indenture Trustee Fee Claim. | 83 |
| I. | | Creditors' Trust | 83 |

|   |   | 1. | Appointment of Trustee | 83 |
|   |   | 2. | Assignment of Trust Assets to the Creditors' Trust | 84 |
|   |   | 3. | The Creditors' Trust | 84 |
|   |   | 4. | The Trust Advisory Board | 85 |
|   |   | 5. | Distributions to Beneficiaries of the Creditors' Trust Under the Trust Agreement | 86 |
|   | J. | | Effect of the Plan on Claims and Interests | 86 |
|   |   | 1. | Revesting of Assets | 86 |
|   |   | 2. | Discharge of the Debtors | 86 |
|   |   | 3. | Compromises and Settlements | 87 |
|   |   | 4. | Release of Certain Parties | 88 |
|   |   | 5. | Releases by Holders of Claims | 88 |
|   |   | 6. | Setoffs | 89 |
|   |   | 7. | Exculpation and Limitation of Liability | 89 |
|   |   | 8. | Indemnification Obligations | 89 |
|   |   | 9. | Injunction | 90 |
|   |   | 10. | Central States Settlement | 90 |
|   |   | 11. | Other Pension Plans | 90 |
| VIII. | | | CERTAIN FACTORS TO BE CONSIDERED | 91 |
|   | A. | | General Considerations | 91 |
|   | B. | | Certain Bankruptcy Considerations | 91 |
|   | C. | | Business Factors and Competitive Condition | 92 |
|   |   | 1. | General Economic Conditions | 92 |
|   |   | 2. | Business Factors | 92 |
|   | D. | | Declining demand for the Debtors' products could have adverse effects on their financial results | 92 |
|   |   | 1. | Obesity | 93 |
|   |   | 2. | Dietary Guidelines | 93 |
|   |   | 3. | Consumer Tastes | 93 |
|   | E. | | Conditions Precedent to Consummation; Timing | 94 |
|   | F. | | The Transaction | 94 |
|   | G. | | Inherent Uncertainty of Financial Projections | 94 |
|   | H. | | Terms of existing collective bargaining agreements and labor disruptions could adversely impact the Debtors' results of operations | 95 |
|   | I. | | Implementation of various information technology systems could disrupt the Debtors' business and adversely affect their financial condition and results of operations | 95 |
|   | J. | | The Debtors' internal control over financial reporting was not effective as of May 31, 2008 and weaknesses in their internal controls and procedures could adversely affect the Debtors' financial condition | 96 |
|   | K. | | Increases in employee and employee-related costs could have adverse effects on the Debtors' financial results | 96 |
|   | L. | | Increases in prices and shortages of raw materials, fuels and utilities could cause the Debtors' costs to increase | 96 |
|   | M. | | Price increases could reduce demand for the Debtors' products | 97 |
|   | N. | | Competition could adversely impact the Debtors' results of operations | 97 |
|   | O. | | The Debtors may be obligated to make additional contributions, or incur withdrawal liability, to multi-employer pension plans | 98 |
|   | P. | | The inability to completely withdraw from the ABA Plan while operating under the provisions of chapter 11 of the Bankruptcy Code could jeopardize the | |

|       |      | Debtors' ability to emerge from bankruptcy and threaten the Debtors' viability if they emerge | 99 |
|-------|------|------|-----|
|       | Q.   | The Debtors rely on the value of their brands, and the costs of maintaining and enhancing the awareness of their brands are increasing | 100 |
|       | R.   | Economic downturns could cause consumers to shift their food purchases from the Debtors' branded products to lower priced items | 101 |
|       | S.   | Inability to anticipate changes in consumer preferences may result in decreased demand for products | 101 |
|       | T.   | The Debtors' intellectual property rights are valuable and any inability to protect them could dilute the Debtors' brand image and adversely affect their business | 101 |
|       | U.   | Further consolidation in the retail food industry may adversely impact profitability | 101 |
|       | V.   | Future product recalls or safety concerns could adversely impact the Debtors' business and financial condition and results of operations | 102 |
|       | W.   | Costs associated with environmental compliance and remediation could adversely impact the Debtors' operations | 102 |
|       | X.   | Government regulation could adversely impact the Debtors' operations | 103 |
|       | Y.   | Access to Financing and Trade Terms | 103 |
|       | Z.   | Claims Estimations | 103 |
|       | AA.  | Certain Risk Factors Relating to Securities to be Issued Under the Plan | 104 |
|       |      | 1.    Potential Dilution | 104 |
|       |      | 2.    Dividends | 104 |
|       |      | 3.    Change of Control | 104 |
|       | BB.  | Leverage | 104 |
|       | CC.  | Impact of Interest Rates | 105 |
|       | DD.  | Litigation | 105 |
|       | EE.  | Adverse Publicity | 106 |
|       | FF.  | Reduction of U.S. Federal Income Tax Attributes | 106 |
| IX.   |      | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 106 |
|       | A.   | Certain U.S. Federal Income Tax Consequences to the Debtors | 107 |
|       |      | 1.    Cancellation of Indebtedness Income | 107 |
|       |      | 2.    Utilization of NOLs | 108 |
|       |      | 3.    Alternative Minimum Tax | 108 |
|       |      | 4.    Alternative Structures | 108 |
|       | B.   | Certain U.S. Federal Income Tax Consequences to Claimholders | 109 |
|       |      | 1.    Claimholders of Capital Lease Claims | 109 |
|       |      | 2.    Claimholders of Prepetition Lender Claims | 110 |
|       |      | 3.    Claimholders of Class 5 General Unsecured Claims with respect to Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery | 111 |
|       | C.   | Information Reporting and Backup Withholding | 111 |
|       | D.   | Importance of Obtaining Professional Tax Assistance | 112 |
| X.    |      | FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST | 112 |
|       | A.   | Feasibility of the Plan | 112 |
|       | B.   | Acceptance of the Plan | 113 |
|       | C.   | Best Interests Test | 113 |
|       | D.   | Valuation of the Reorganized Debtors | 114 |
|       |      | 1.    Introduction | 114 |
|       |      | 2.    Valuation | 114 |

E.  Application of the Best Interests Test to the Liquidation Analysis and the
     Estimated Recoveries Pursuant to the Plan.................................................. 116
F.  Confirmation Without Acceptance of All Impaired Classes:  The 'Cramdown'
     Alternative ................................................................................................. 117
G.  Conditions Precedent ................................................................................... 118
     1.  Conditions to Confirmation ................................................................ 118
     2.  Conditions to Consummation ............................................................. 118
H.  Waiver of Conditions to Confirmation and Consummation of the Plan....... 120
I.  Retention of Jurisdiction .............................................................................. 120

XI.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN........... 122
A.  Continuation of the Bankruptcy Case ......................................................... 122
B.  Alternative Plans of Reorganization ........................................................... 122
C.  Liquidation Under Chapter 7 or Chapter 11 ............................................... 123
D.  Other Alternatives....................................................................................... 123

XII.  VOTING REQUIREMENTS .......................................................................... 124
A.  Parties-in-Interest Entitled to Vote ............................................................. 125
B.  Classes Impaired Under the Plan ............................................................... 126
     1.  Voting Impaired Classes of Claims. .................................................. 126
     2.  Unimpaired Classes of Claims and Interests. .................................... 126
     3.  Impaired Classes of Claims and Interests Deemed to Reject the Plan.............. 126

XIII.  CONCLUSION.......................................................................................... 126
A.  Hearing on and Objections to Confirmation ............................................... 126
     1.  Confirmation Hearing. ...................................................................... 126
     2.  Date Set for Filing Objections to Confirmation of the Plan. ............... 126
B.  Recommendation ........................................................................................ 126

## APPENDICES

Appendix A    —    Amended Joint Plan of Reorganization of Interstate Bakeries Corporation and
Its Affiliated Debtors and Debtors-in-Possession Dated October 31, 2008

Appendix B    —    Liquidation Analysis

Appendix C    —    Pro Forma Financial Projections

Appendix D    —    Historical Financial Results

## 1.    INTRODUCTION

Interstate Bakeries Corporation and eight of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors in possession (collectively, the "Debtors," "IBC" or the "Company"), submit this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") for use in the solicitation of votes on the Amended Joint Plan of Reorganization of Interstate Bakeries Corporation and its Affiliated Debtors and Debtors-in-Possession Dated October 31, 2008 (the "Plan") proposed by the Debtors and filed with the United States Bankruptcy Court for the Western District of Missouri, Kansas City Division (the "Bankruptcy Court"), on October 31, 2008.  A copy of the Plan is annexed as <u>Appendix A</u> hereto.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek chapter 11 protection, significant events that have occurred during the Chapter 11 Cases, and the anticipated organization and operations of the Reorganized Debtors.  This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with securities to be issued under the Plan, and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Claimholders in Impaired Classes must follow for their votes to be counted.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISK AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, PLEASE SEE <u>ARTICLE VII</u> HEREIN – SUMMARY OF THE PLAN AND <u>ARTICLE VIII</u> HEREIN – CERTAIN FACTORS TO BE CONSIDERED.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN FINANCIAL INFORMATION.  TO THE EXTENT ANY PORTION OF THE DISCLOSURE STATEMENT CONFLICTS WITH THE PLAN, THE PLAN SHALL GOVERN.  ALTHOUGH THE DEBTORS BELIEVE THAT SUCH SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

## II.    BANKRUPTCY PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A.    Definitions

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.  In addition, all references in this Disclosure Statement to monetary figures refer to the currency of the United States of America unless otherwise expressly provided.

### B.    Notice to Holders of Claims and Interests

This Disclosure Statement is being transmitted to certain Claimholders for the purpose of soliciting votes on the Plan and to others for informational purposes.  The purpose of this Disclosure Statement is to provide adequate information to enable the Claimholder to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote to accept or reject the Plan.

By order entered on October 30, 2008, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable Claimholders that are entitled to vote on the Plan to make an informed judgment with respect to acceptance or rejection of the Plan.  THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

ALL CLAIMHOLDERS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN.  This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Cases.

THIS DISCLOSURE STATEMENT AND THE OTHER MATERIALS INCLUDED IN THE SOLICITATION PACKAGE ARE THE ONLY DOCUMENTS AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors or the Plan other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS.  Except with respect to the projections set forth in Appendix C attached hereto (the "Projections"), and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement.  Neither the Debtors nor the Reorganized Debtors intend to update the Projections for the purposes hereof; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.  Further, the Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences.  Accordingly, the delivery of this Disclosure Statement does not imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

**C.      Solicitation Package**

Accompanying this Disclosure Statement are, among other things, copies of (1) the Plan (Appendix A hereto); (2) the notice of, among other things, the time for submitting ballot forms that are distributed to Claimholders who are included in Classes that are entitled to vote to accept or reject the Plan (the "Ballots"); the date, time and place of the hearing to consider the confirmation of the Plan and related matters; and the time for filing objections to the confirmation of the Plan (the "Confirmation Hearing Notice"); (3) as applicable, either (a) a ballot for the class in which you are entitled to vote (Classes 7 and 8 with respect to the Main Debtors, and Classes 4 and 5 with respect to Mrs. Cubbison's) to be used by you in voting to accept or reject the Plan, or (b) in lieu of a ballot, notice explaining why you are not entitled to vote; (4) the Solicitation Procedures Order; and (5) solicitation letters, if any, from the Debtors.

**D.      General Voting Procedures, Ballots, and Voting Deadline**

If you are a Claimholder entitled to vote on the Plan and a Ballot is included herewith, after carefully reviewing the Plan, this Disclosure Statement and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot.  Please complete and sign your original Ballot (copies will not be accepted) and return it in the envelope provided.

Each Ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN DECEMBER 1, 2008 AT 4:00 P.M. (PACIFIC TIME) (THE "VOTING DEADLINE") BY, AS APPLICABLE, THE DEBTORS' VOTING AGENT, KURTZMAN CARSON CONSULTANTS ("KCC"), AT INTERSTATE BAKERIES CORP BALLOT PROCESSING, C/O KURTZMAN CARSON CONSULTANTS LLC, 2335 ALASKA AVENUE, EL SEGUNDO, CA 90245.  DO NOT RETURN ANY STOCK CERTIFICATES OR DEBT INSTRUMENTS WITH YOUR BALLOT.  Additionally, if you have any questions about (1) the procedure for voting your Claim or Interest with respect to the packet of materials that you have received or (2) the amount of your Claim or Interest, you should contact KCC at (888) 647-1732.

If you wish to obtain, at your own expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d), an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact KCC at the address set forth above.  In addition, imaged copies of the Plan and Disclosure Statement (including, after the Exhibit Filing Date, all Exhibits, Plan Schedules and Appendices) and all pleadings and orders of the Bankruptcy Court are publicly available on the Bankruptcy Court's website, www.mow.uscourts.gov, for a nominal charge (a PACER account is required), or at KCC's general website address, http://www.kccllc.net/ibc, free of charge.

FOR FURTHER INFORMATION AND INSTRUCTION ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE <u>ARTICLE XII</u> HEREIN – VOTING REQUIREMENTS.

**E.      Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing to begin on December 5, 2008 at 9:00 a.m. (Central time) before the Honorable Jerry W. Venters, United States Bankruptcy Judge, Charles Evans Whittaker Courthouse, 400 East 9th Street, Kansas City, Missouri 64106, Courtroom 6A.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court and served so that they are <u>ACTUALLY RECEIVED</u> on or before December 1, 2008 at 12:00 p.m. (Central time) by:

<u>Counsel for the Debtors</u>

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Chicago, Illinois  60606
Attn: J. Eric Ivester, Esq.

- and -

Stinson Morrison Hecker LLP
1201 Walnut, Suite 2900
Kansas City, Missouri 64106-2150
Attn: Paul M. Hoffmann, Esq.

<u>U.S. Trustee</u>

Office of the United States Trustee,
Charles Evans Whittaker Courthouse
400 East 9th Street, Room 3440,
Kansas City, Missouri 64106
Attn: Sherri L. Wattenbarger, Esq.

<u>Counsel for the Prepetition Agent</u>

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017-3954
Attn: Kenneth S. Ziman, Esq.

- and -

Spencer Fane Britt & Browne LLP
1000 Walnut, Suite 1400
Kansas City, Missouri 64106-2140
Attn: Scott J. Goldstein, Esq.

Counsel for the Postpetition Agent

Bryan Cave LLP
211 North Broadway, Suite 3600,
St. Louis, Missouri 63102-2750
Attn: Gregory D. Willard, Esq.


Counsel for the Creditors' Committee

Lowenstein Sandler PC
65 Livingston Ave.
Roseland, New Jersey 07068
Attn: Kenneth Rosen, Esq.

- and -

Shughart Thomson & Kilroy PC
120 W. 12th Street
444 W. 47th Street
Kansas City, Missouri 64105
Attn: Paul D. Sinclair, Esq.


Counsel for IBC Investors I, LLC

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York  10019-7475
Attn: Richard Levin, Esq.


Counsel for Silver Point

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attn: Alan W. Kornberg, Esq.

### III.    HISTORY OF THE DEBTORS

### A.    Overview of Business Operations

Schulze Baking Company, the predecessor to IBC, was founded in 1927.  IBC was subsequently created through the merger of Schulze Baking Company and Western Bakeries Limited in 1937.  Since 1937, the Company has completed a number of strategic acquisitions of other baking businesses.  Specifically, in July 1995, IBC acquired Continental Baking Company from Ralston Purina Company, adding the "Wonder®" and "Hostess®" brands to its portfolio of products.  As a result of this acquisition, IBC was the nation's largest baker of fresh baked bread and sweet goods in terms of net sales. In January 1998, IBC acquired the assets of John J. Nissen Baking Company, a Maine-based baker and distributor of fresh bread primarily in New England, and various related entities. In August 1998, IBC acquired the assets of Drake Bakeries, Inc. and the Drake's Baking Division, which sold snack cakes throughout the northeastern U.S. under its well-known brand names, "Devil Dogs®," "Ring Dings®," "Yodels®" and "Yankee Doodles®." IBC's acquisitions throughout the years allowed IBC to increase scale, expand its product and brand portfolio and broaden its geographic presence, although IBC has not completed any significant acquisitions since 1998.

Today, the Company is one of the largest wholesale bakers and distributors of fresh baked bread and sweet goods in the United States.  The Company produces, markets and distributes a wide range of breads, rolls, croutons, snack cakes, donuts, sweet rolls and related products under national brand names such as "Wonder®", "Hostess®", "Baker's Inn®" and "Home Pride®," as well as regional brand names such as "Butternut®," "Dolly Madison," "Drake's®" and "Merita®." Based on independent publicly available market data, "Wonder®" bread is the top selling white bread brand and "Home Pride®" bread is a leading wheat bread brand in the United States.  "Hostess®" products, including "Twinkies®," "Ding Dongs®" and "HoHos®," are among the leading snack cake products sold in the United States.  The Company's brands are positioned across a wide spectrum of categories and price points.

On September 12, 2007, the Debtors realigned their organization in a new cross-functional, matrix structure and created eight business units to replace the ten profit centers around which they had been organized since 2004.  In conjunction with this realignment, the Debtors initiated changes in their reporting system effective for the beginning of fiscal 2008, which resulted in the identification of three distinct reporting segments.  The three reporting segments were determined by type of customer and distribution method.  The Debtors' management continues to maintain the wholesale operations and retail operations as reporting segments, but renamed them as route sales and outlet sales, respectively. The third reporting segment, direct sales, was established by segregating certain operations previously within wholesale operations that deliver products exclusively through warehouse channels.  The Debtors' reporting segments are strategic business units that are managed separately using different distribution and marketing strategies.

The Debtors' route sales, formerly wholesale operations, consist of an aggregation of their eight business units that manufacture, distribute, and sell fresh baked goods utilizing their direct store delivery system. The Debtors' route sales accounted for approximately 86.7% and 87.2% of their net sales in fiscal 2008 and fiscal 2007, respectively.

The Debtors' outlet sales, formerly retail operations, consist of five regions that sell their baked goods and other food items directly to consumers through company-operated outlet locations.  The Debtors' outlet sales generated approximately 10.6% and 11.1% of their net sales in fiscal 2008 and fiscal 2007, respectively.

6

The Debtors' direct sales consist of their direct warehouse shipment program, which ships bulk packaged sweet goods and dry products, such as croutons and stuffing mix, directly to customer-owned distribution centers and public warehouses for distribution.  The Debtors' direct sales generated 2.7% and 1.7% of their net sales in fiscal 2008 and fiscal 2007, respectively.

The Company believes that brand trademarks such as "Wonder®," "Home Pride®," "Butternut®," "Hostess®"and "Dolly Madison®" and product trademarks such as "Twinkies®," "HoHos®" and "Zingers®" are of material importance to the Company's strategy of brand building.  The Company takes appropriate action from time to time against third parties to prevent infringement of its trademarks and other intellectual property.  The Company also enters into confidentiality agreements from time to time with employees and third parties, as necessary, to protect formulas and processes used in producing products.

The majority of IBC's bread is sold through supermarkets and national mass merchandisers, while sweet goods are sold principally through supermarkets, national mass merchandisers and convenience stores.  One customer, Wal-Mart Stores, Inc., accounted for approximately 16.3% of IBC's net sales in fiscal 2008, while no other single customer accounted for more than 10.0% of net sales.  Sweet goods sales tend to be somewhat seasonal, with a historically weak winter period.  Sales of buns and rolls products are historically higher in the spring and summer months.

IBC conducts marketing and advertising campaigns through targeted television, radio and print advertising, as well as coupon inserts in newspapers and other printed media.  IBC distributes its products in markets representing over 80% of U.S. supermarket volume.  The Company's plants and distribution centers across the U.S. are located close to the major marketplaces enabling effective delivery and superior customer service.  IBC does not keep a significant backlog of inventory; its fresh bakery products are promptly distributed to customers after being produced.

IBC delivers its fresh baked bread and sweet goods from its network of bakeries to its distribution centers.  The sales force then delivers primarily to mass merchandisers, supermarkets and convenience stores on approximately 6,000 delivery routes.  IBC is one of only a few fresh baked bread and sweet goods producers with a national direct store delivery, or DSD, system that enables IBC to provide frequent and individualized service to its national and regional customers.  The DSD system allows IBC to effectively manage shelf space and efficiently execute in-store promotions and new product introductions.

The Business Plan (see Section VI.I. herein) calls for implementing a distribution system that evolves from the current system, which generally provides the same delivery to all customers, to one that utilizes different delivery options for customers based on customer size, growth potential and service needs.  IBC believes this system will lower its cost structure and contribute to profitable growth in revenues.  In accordance with industry practice, IBC repurchases dated and damaged products from most customers.  A portion of the Company's dated bread and other products are delivered to IBC's approximately 740 bakery outlets for retail sale.  Bakery outlet sales represented approximately 10.6% of net sales during fiscal 2008.

IBC also delivers certain sweet goods under the Dolly Madison brand through a direct warehouse shipment program to certain customers.  The program was implemented in May 2007.  Sales from the Dolly Madison direct warehouse program represented approximately 1.5% of IBC's net sales in fiscal 2008.  IBC's ability to deliver products through this method is limited by the terms of its collective bargaining agreements.

As of the date of this Disclosure Statement, the Company employs approximately 22,000 people, the majority of whom are members of and represented by either the IBT or the BCTGM.

## B.    Recent Financial Results

Set forth in Appendix D annexed hereto are certain selected consolidated financial data for the Debtors derived from their audited consolidated financial statements as of and for each of the five fiscal years in the period ended May 31, 2008, which should be read together with the audited consolidated financial statements included in the Debtors' Annual Reports on Form 10-K filed with the SEC for the fiscal years ended May 31, 2008, June 2, 2007, June 3, 2006 and May 28, 2005.  For a more comprehensive description of the Debtors' current financial condition and operating results, the information contained in Appendix D and the aforementioned Annual Reports on Form 10-K should also be read together and in connection with the Debtors' other periodic reports filed with the SEC.

## IV.    PREPETITION CAPITAL STRUCTURE OF THE DEBTORS

## A.    Prepetition Credit Facility

IBC entered into a $900 million Amended and Restated Credit Agreement dated as of April 25, 2002 (as amended, modified or supplemented, from time to time, together with all other documentation executed in connection therewith, including all letters of credit issued thereunder and any collateral or security documents related thereto, the "Prepetition Credit Agreement") by and among Interstate Brands Corporation and Interstate Brands West Corporation ("Brands West," which was subsequently merged into Interstate Bakeries Corporation), as borrowers, Interstate Bakeries Corporation as Guarantor, the banks and other financial institutions from time to time party thereto, and JPMCB, as administrative agent (the "Prepetition Agent").  Ultimately, IBC Sales Corporation, Baker's Inn Quality Baked Goods, LLC and IBC Services, LLC, were added as Guarantors to the Prepetition Credit Agreement.  The obligations owed pursuant to the Prepetition Credit Agreement are secured by substantially all of the Debtors' personal property (including, without limitation, accounts receivable, general intangibles, intellectual property, equipment and equity interests in Mrs. Cubbison's) and a majority of owned real property (the "Prepetition Liens").

The Prepetition Credit Agreement provided for three separate term loans and a revolving credit line.  As of September 25, 2008, under this credit facility, the Company had letters of credit issued and outstanding of approximately $83.9 million and funded debt outstanding of approximately $451.5 million.

## B.    Prepetition Notes

The Company issued $100 million in senior subordinated convertible notes under an Indenture dated as of August 12, 2004, by and among Interstate Bakeries Corporation as the issuing company and Interstate Brands Corporation, Baker's Inn Quality Baked Goods, LLC, IBC Sales Corporation, IBC Services, LLC, and IBC Trucking, LLC as guarantors and U.S. Bank National Association as Trustee.  Pursuant to the Indenture, Interstate Bakeries Corporation issued $100 million in aggregate principal amount of 6% Senior Subordinated Convertible Notes Due August 15, 2014 (the "Old Convertible Notes") in a private placement.  The Old Convertible Notes are unsecured notes, with interest thereon payable each February 15 and August 15 during the term thereof, with all principal and other outstanding obligations thereunder due on August 15, 2014.  The notes are subordinated to senior indebtedness, including obligations arising under the Prepetition Credit Agreement, and are convertible at the option of the holder under certain circumstances into shares of common stock at an initial conversion rate of 98.9854 shares per $1,000 principal amount of notes (an initial conversion price of $10.1025 per

8

share), subject to adjustment.  In July 2006, a principal amount of $1,000 was converted to 98 shares of the Company's common stock.

## C.    Equity

As of August 15, 2008, there were 45,202,826 shares of common stock issued, outstanding and publicly traded.  Giving effect to the Old Convertible Notes and common stock equivalents, there were 55,101,267 shares of common stock outstanding as of August 15, 2008.

Prior to the bankruptcy filing, IBC's common stock was listed on the New York Stock Exchange (the "NYSE").  The day after the bankruptcy filing, on September 23, 2004, IBC received notification from the NYSE that IBC was not in compliance with the requirements for continued listing and, accordingly, that IBC was delisted from the NYSE.  As a result, IBC's common stock now trades on the over-the-counter market under the symbol "IBCIQ.PK."

## V.    CORPORATE STRUCTURE OF THE DEBTORS

## A.    Current Corporate Structure

Interstate Bakeries Corporation is incorporated in Delaware.  It is the parent corporation of seven wholly-owned subsidiaries, each of which are Debtors in these jointly-administered Chapter 11 Cases, and eighty percent (80%) indirect owner of Mrs. Cubbison's Foods, Inc. ("Mrs. Cubbison's"), which also is a Debtor in the Chapter 11 Cases.

## B.    Board of Directors

The following persons comprise the Board of Directors.

| Name | Position |
|------|----------|
| Michael J. Anderson | Chairman of the Board |
| Robert B. Calhoun | Director |
| Craig D. Jung | Director and Chief Executive Officer |
| William P. Mistretta | Director |
| David I. Pauker | Director |
| Terry R. Peets | Director |
| Philip A. Vachon | Director |

*Michael J. Anderson,* Chairman of the Board of Interstate Bakeries Corporation.  Mr. Anderson has been President and Chief Executive Officer of The Andersons, Inc., a diversified agribusiness and retailing company, for more than five years.  Mr. Anderson is also a director of The Andersons, Inc. and First Energy Corp.  He has served as a director of IBC since 1998.

*Robert B. Calhoun*, Managing Director of Monitor Clipper Partners, a private equity investment firm.  Mr. Calhoun is a director of Avondale Mills, Inc. and The Lord Abbett Family of Funds.  He has served as a director of IBC since 1991.

*Craig D. Jung*, Chief Executive Officer of Interstate Bakeries Corporation.  Mr. Jung previously served as Chief Executive Officer of Panamerican Beverages, Inc. from 2002 to 2003, Chief Executive Officer of eOriginal, Inc. from 2000 to 2002, and Chief Operating Officer of Pepsi Bottling Group, Inc. from 1997 to 1999.  He has served as a director of IBC since February 2007.

*William P. Mistretta*, Senior Operations Executive for a division of the U.S. operations of Compass Group PLC, a company specializing in providing food, vending and related services, since March 2006. Mr. Mistretta served as Vice President of Operations of Aramark Uniform and Career Apparel, Inc. from May 2004 to April 2005; Senior Vice President of Operations of B Manishewitz Company from May 2003 to May 2004; and Co-Founder of American Baked Ingredients, LLC, from January 2001 to May 2003. He has served as a director of IBC since August 2006.

*David I. Pauker*, Managing Director of Goldin Associates, LLC. Mr. Pauker served as Chief Restructuring Officer and Executive Vice President of Refco, Inc., and before that as Chief Executive Officer, Chief Operating Officer or Chief Restructuring Officer for numerous underperforming or distressed companies, including Vlasic Foods International, Pharmacy Fund, Grand Court Lifestyles, PSINet Consulting Solutions, Monarch Capital Corporation, Tuttle Papock and First Interregional Advisors Corp. He has served as a director of IBC since January 2007.

*Terry R. Peets*, Chairman of World Kitchens, Inc., a manufacturer and marketer of consumer kitchen products. Mr. Peets has previously served as Chairman of Bruno's Supermarkets prior to its acquisition by Ahold USA. Mr. Peets currently serves as a member of the Board of Directors of Pinnacle Foods Group, Inc., Ruiz Foods Inc., and Winn-Dixie, and as vice chairman of the City of Hope National Cancer Center and the Beckman Research Institute. He has served as a director of IBC since January 2007.

*Philip A. Vachon*, Chief Executive Officer and Chairman of the Board of Liberate Technologies until July 2007. Before becoming chief executive officer of Liberate Technologies, Mr. Vachon served as head of sales and then as president of the company. Mr. Vachon previously served in a number of senior sales positions over a nine (9) year period for Oracle Corporation. He has served as a director of IBC since March 2007.

## C.    Executive Officers

The following persons comprise the executive officers of IBC.

*Craig D. Jung*, Chief Executive Officer of Interstate Bakeries Corporation since February 2007. Mr. Jung previously served as Chief Executive Officer of Panamerican Beverages, Inc. from 2002 to 2003, Chief Executive Officer of eOriginal, Inc. from 2000 to 2002, and Chief Operating Officer of Pepsi Bottling Group, Inc. from 1997 to 1999.

*Michael D. Kafoure*, President of Route Sales since September 2007. Mr. Kafoure previously served as President and Chief Operating Officer for more than five years.

*Kent B. Magill*, Executive Vice President, General Counsel and Corporate Secretary since August 2005. Previously, Mr. Magill served as Vice President, General Counsel and Corporate Secretary of IBC from June 2002 to August 2005 and Associate General Counsel of IBC from November 2000 to June 2002.

*Richard C. Seban*, Chief Customer Officer and Executive Vice President of Marketing since September 30, 2008. Mr. Seban served as Executive Vice President and Chief Marketing Officer from August 2005 to September 30, 2008. For more than four years prior to his appointment as Executive Vice President and Chief Marketing Officer of IBC, Mr. Seban served as President and Chief Operating Officer of High Liner Foods, Inc., a Nova Scotia-based processor and marketer of frozen seafood and pasta products.

*J. Randall Vance*, Senior Vice President, Chief Financial Officer and Treasurer since July 2007. Mr. Vance served as Senior Vice President – Finance and Treasurer of IBC from September 2004 to July 2007, Vice President and Treasurer of Farmland Industries, Inc. a diversified agribusiness cooperative, from July 2002 to January 2004 and Assistant Treasurer of Farmland Industries, Inc. from 2000 to July 2002.

*Laura D. Robb*, Vice President and Corporate Controller since July 2002. Previously, Ms. Robb served as Assistant Corporate Controller for more than two years.

*Melvin H. Ghearing*, Vice President – Bakery Outlet Business Unit since June of 2004. Mr. Ghearing served as Vice President – Retail Operations for more than two years prior thereto.

*David A. Loeser*, Consultant, Acting Executive Vice President – Human Resources of IBC since July 2007. Mr. Loeser was a Consultant of IBC from May 2007 to July 2007. Previously, he served as Senior Vice President Human Resources, Celanese Corporation, a company engaged in the manufacture of building block chemicals, from April 2005 to May 2006 and Senior Vice President Human Resources, Compucom Systems, Inc., a company offering business software applications and software management services, for more than three years prior thereto.

*Gary K. Wandschneider*, Consultant, Acting Executive Vice President – Operations of IBC since July 2007. Previously, Mr. Wandschneider served as Consultant of IBC from March 2007 to July 2007 and Executive Vice President Pepsi Bottling Group, Inc., the largest manufacturer and distribution of Pepsi-Cola beverages, for more than four years prior to November 2006.

*Suresh Mathews*, Consultant, Acting Executive Vice President – Information Technology and Chief Information Officer of IBC since February 2008; President of Digital Standard Inc., a unified digital social networking company, from August 2004 to February 2008; and Senior Vice President and Chief Information Officer of CompuCom Systems, Inc., a company offering business software applications and software management services, for more than one year prior thereto.

*Jimmy D. Williams*, Senior Vice President-Direct Sales of IBC since May 2007; Senior Vice President-Sales and Trade Marketing of IBC from March 2006 to May 2007; Vice President-Special Initiatives and Merchandising of IBC from April 2005 to March 2006; and Senior Vice President-Central Division South of IBC for more than 2 years prior thereto.

## VI.    THE CHAPTER 11 CASES

### A.    Events Leading to Commencement of the Chapter 11 Cases

IBC's decision to commence chapter 11 reorganization cases was based on a combination of specific challenges that hindered the Company's ability to successfully compete in the markets in which they operated. These challenges included, among other things, declining sales, high fixed-cost structure, excess industry capacity, rising employee pension and healthcare costs, and higher costs for ingredients and energy. Beginning in 2003, the Debtors attempted to address some of these trends by implementing a Systems Optimizing and Re-engineering project ("Program Soar"). The goal of Program Soar was to centralize the Debtors' management and administrative function thereby increasing efficiency and to ultimately reduce costs. Prior to the filing of the Chapter 11 Cases, the Debtors spent approximately $30 million on Program Soar, but had not yet realized any operational efficiencies or cost savings.

11

Notwithstanding the Company's efforts to address the competitive challenges they faced, the Company experienced certain specific and compounding events. For example, on June 3, 2004, the Company announced that it was necessary to modify the nature in which it was calculating its estimates of workers' compensation reserves due to increases in expenses in workers' compensation costs primarily in California and increases in healthcare costs nationwide. At the time, IBC increased its reserve for workers' compensation during fiscal 2004 and took a charge to pretax income of approximately $40 million, which represented an approximately 40% increase in total reserves for workers' compensation expenses. In conjunction with increasing such reserves, on May 27, 2004, the Company executed an amendment to the Prepetition Credit Agreement which modified the leverage and interest coverage covenants of the Prepetition Credit Agreement to exclude the effect of the additional workers' compensation reserves. These financial covenants had previously been adjusted, pursuant to an amendment effective May 7, 2004, to provide additional flexibility for the fourth quarter of fiscal year 2004. Subsequently, IBC determined that its liability for workers' compensation claims should have been increased by an additional $8 million, representing a cumulative increase to workers' compensation claims liability of $48 million.

In July 2004, Moody's Investors Service lowered its rating of the Company's senior secured credit facility under the Prepetition Credit Agreement to B2, with a negative outlook. On August 12, 2004, the Company further amended the leverage and interest coverage covenants of the Prepetition Credit Agreement to relax these covenant levels until November 2005. As a result of this amendment, the interest rates for all loans under the Prepetition Credit Agreement increased by 0.50%. On August 12, 2004, in an effort to create more liquidity, the Company issued the Old Convertible Notes, in the aggregate principal amount of $100 million, through a private placement. The net proceeds of the offering were primarily used to prepay certain required term loan principal payments due under the existing credit agreements and to reduce the amount outstanding under the revolving portion of the credit facility and for general corporate purposes.

After reviewing preliminary and estimated fiscal 2005 first quarter results, the Company determined that its financial condition had worsened due to the combination of factors discussed above and that it was likely in the very near term to be unable to comply with covenants under the Prepetition Credit Agreement. Faced with worsening financial results and limited sources of liquidity available to the Company, after extensive discussions with representatives for the Prepetition Lenders and certain of the holders of the Old Convertible Notes about various alternatives, the Company determined that, due to such circumstances and the Company's working capital needs, the Company's best opportunity to maximize value for all stakeholders was to pursue reorganization under chapter 11.

## B.    Continuation of Business; Stay of Litigation

On September 22, 2004, Interstate Bakeries Corporation and each of its wholly-owned subsidiaries filed voluntary petitions in the Bankruptcy Court for reorganization relief under chapter 11 of the Bankruptcy Code. Subsequently, on January 14, 2006, Mrs. Cubbison's filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court, as set forth below. Since the Petition Date, the Debtors have continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtors are authorized to operate their business in the ordinary course of business, with transactions out of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors. This relief provided the

12

Debtors with the "breathing room" necessary to assess and reorganize their business.  The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a plan of reorganization.

**C.      Summary of Certain Relief Obtained at the Outset of the Chapter 11 Cases**

      1.      *First Day Orders*

      On the Petition Date, the Debtors filed several motions seeking the relief provided by certain so-called "first day orders."  First day orders are intended to facilitate the transition between a debtor's prepetition and postpetition business operations by approving certain regular business conduct that may not be authorized specifically under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.

      The first day orders in the Chapter 11 Cases, which were entered on or soon after the Petition Date, authorized, among other things:

- the maintenance of the Debtors' bank accounts and operation of their cash management systems substantially as such systems existed prior to the Petition Date;

- the payment of employees' accrued prepetition wages and employee benefit claims;

- the payment of certain prepetition obligations to customers and the continuation of certain customer programs and practices;

- the payment of certain prepetition shipping and delivery charges;

- procedures for the resolution and payment of valid reclamation claims and claims arising pursuant to the Perishable Agricultural Commodities Act of 1930;

- the continuation of utility services during the pendency of the Chapter 11 Cases;

- the payment of certain prepetition tax claims;

- the joint administration of each of the Debtors' bankruptcy cases;

- the retention of the following professionals to serve on behalf of the Debtors: Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") as restructuring counsel; Stinson Morrison Hecker LLP as local restructuring counsel; A&M as restructuring managers; and KCC as claims, noticing and balloting agent;

- the continued retention of professionals regularly employed by the Debtors in the ordinary course of their business; and

13

- compliance with grievance procedures in existing union collective bargaining agreements, engage in arbitration and liquidate grievances.[3]

On February 4, 2005, the Bankruptcy Court approved the Debtors' retention of Miller Buckfire as investment banker and financial advisor to the Debtors.

### 2.    *Appointment of Statutory Committees*

On September 24, 2004, the Office of the United States Trustee for the Western District of Missouri (the "United States Trustee") appointed, pursuant to section 1102 of the Bankruptcy Code, a committee of unsecured creditors (the "Creditors' Committee"). The United States Trustee amended the creditors selected to serve on the Creditors' Committee on October 8, 2004, and then made further amendments on October 18, 2004 and on September 13, 2006. The following creditors were selected as members of the Creditors' Committee as of September 13, 2006: (1) U.S. Bank N.A., as indenture trustee for the Old Convertible Notes ("U.S. Bank"); (2) Conagra Foods, Inc.; (3) C P Management LLC; (4) 3V Capital Management, LLC; (5) the IBT; and (6) the BCTGM. These members continue to comprise the Creditors' Committee as of the date of this Disclosure Statement.

The Creditors' Committee is represented by Lowenstein Sandler PC. Co-Counsel to the Creditors' Committee is the law firm of Shugart Thomason & Kilroy PC, located in Kansas City, Missouri. The Creditors' Committee's financial advisor is FTI Consulting, Inc.

On November 29, 2004, the United States Trustee appointed an Official Committee of Equity Holders (the "Equity Committee") pursuant to section 1102 of the Bankruptcy Code to represent the interests of all equity holders in these cases. The United States Trustee amended the equity holders selected to serve on the Equity Committee on June 7, 2006, and then made a further amendment on September 22, 2006. The following equity holders were selected to serve as members of the Equity Committee as of September 22, 2006: (i) QVT Financial LP; (ii) Brandes Investment Partners; (iii) Glenview Capital Management LLC; and (iv) Brencourt Advisors LLC. Glenview Capital Management resigned on July 9, 2007. Brencourt Advisors LLC resigned on December 12, 2007. On October 1, 2008, the Equity Committee was disbanded by the United States Trustee due to the resignation of certain members.

## D.    **Post-Petition Financing**

### 1.    *DIP Credit Agreement*

On September 23, 2004, the Debtors obtained interim approval from the Bankruptcy Court for a $200 million Revolving Credit Agreement (the "DIP Facility") with JPMCB as administrative and collateral agent and J.P. Morgan Securities Inc. as lead arranger and lead book runner. Under the DIP Facility, the lenders party to the DIP Facility (the "DIP Lenders") agreed to provide financing up to $200 million, subject to borrowing base and other limitations. A final order with respect to the DIP Facility was approved by the Bankruptcy Court on October 22, 2004. Throughout the Chapter 11 Cases, the Debtors have received court approval of various amendments to the DIP Facility, including extensions of

---

3    Pre-petition union grievances that have not already been liquidated pursuant to this Order continue to be processed and, following emergence, will continue to be processed pursuant to the grievance procedures in collective bargaining agreements in effect at the time the grievances were filed. Monetary awards will be treated as Class 3 or 9 Claims, as appropriate.

the maturity date and the principal amount of the aggregate commitments thereunder as further described below.

The Debtors sought approval of the DIP Facility to ensure necessary liquidity during the Chapter 11 Cases. The funds available under the DIP Facility permitted the Debtors to obtain goods and services on the same terms as prior to filing the Chapter 11 Cases. Specifically, the DIP Facility provided the necessary security to the Debtors' vendors so that they would continue to do business with the Debtors, thereby minimizing the harm to the Debtors' businesses as they pursued their reorganization efforts. The DIP Facility requires that the Debtors maintain certain financial covenants and restricts liens, indebtedness, capital expenditures, dividend payments, and sales of assets.

(a)    First Amendment

On November 1, 2004, the Debtors entered into a first amendment to the DIP Facility. This first amendment, among other things, clarified the Debtors' ability to continue their ordinary course of business practice of using exchange-traded futures, in addition to options, to hedge against fluctuations in prices in commodities used in the Debtors' business, subject to certain limitations.

(b)    Second Amendment

On January 20, 2005, the Debtors entered into a second amendment to the DIP Facility. This second amendment extended certain deadlines for the Debtors to provide projected operating budgets on a monthly and quarterly basis to the DIP Lenders. In addition, the second amendment modified the Debtors' ability to make certain capital expenditures in the final two quarters of the fiscal year ended May 28, 2005 and set minimum monthly cumulative consolidated EBITDA requirements beginning February 5, 2005 and ending May 28, 2005.

(c)    Third Amendment

On May 26, 2005, the Debtors entered into a third amendment to the DIP Facility. This third amendment set certain financial covenant levels. The third amendment also increased the amount available under the DIP Facility for letters of credit from $75 million to $125 million, provided a cap on cash restructuring charges that the Debtors could incur in any period, and granted the Debtors waivers of their obligation to provide the DIP Lenders with consolidated annual financial statements until December 31, 2005.

(d)    Fourth Amendment

On November 30, 2005, the Debtors entered into a fourth amendment to the DIP Facility. This fourth amendment permitted the Debtors to pay certain prepetition real property tax claims and other secured claims that were accruing collectible postpetition interest, up to a maximum of $12 million. In addition, the fourth amendment further extended the deadline for the Debtors to provide the DIP Lenders with consolidated annual financials to March 31, 2006.

(e)    Fifth Amendment

On December 27, 2005, the Debtors entered into a fifth amendment to the DIP Facility. This fifth amendment provided certain limited cushions for the Debtors with respect to the outcome of the inquiry into the proper status of the American Bakers Association Retirement Plan (the "ABA Plan"), a pension plan to which the Debtors had been contributors, and the degree, if any, of the Debtors' funding insufficiency with respect to the ABA Plan. In addition, the fifth amendment further extended the period

15

during which the Debtors were not obligated to comply with its covenants under the DIP Facility requiring certain levels of cumulative consolidated EBITDA to include the fiscal period ending June 3, 2006.

(f)   Sixth Amendment

On March 29, 2006, the Debtors entered into a sixth amendment to the DIP Facility. This sixth amendment provided the Debtors with additional flexibility with respect to letters of credit by extending their expiration for up to 365 days beyond the maturity date of the DIP Facility. In addition, the amendment further extended the waivers previously granted to the Debtors of their obligation to provide the DIP Lenders a detailed budget as well as consolidated annual financial statements.

(g)   Seventh Amendment

On June 28, 2006, the Debtors entered into a seventh amendment to the DIP Facility. This seventh amendment extended the period during which the Debtors' compliance with the minimum cumulative consolidated EBITDA covenant of the DIP Facility was suspended. Compliance with the covenant would have been required for the fiscal period ending June 3, 2006 in the absence of the amendment. The amendment extended the suspension of the covenant through the fiscal period ending July 29, 2006.

(h)   Eighth Amendment

On August 23, 2006, the Bankruptcy Court approved an eighth amendment to the DIP Facility. In this eighth amendment, the Debtors and the DIP Lenders agreed to further extend the Maturity Date until June 2, 2007. Among other things, the eighth amendment also expanded the Debtors' borrowing sub-limit for issuance of letters of credit from $125.0 million to $150.0 million, extended the period for which the Debtors were not required to deliver audited financial statements, and allowed the Debtors to use certain restricted cash for general corporate purposes.

(i)   Ninth Amendment

On February 16, 2007, the Bankruptcy Court approved a ninth amendment to the DIP Facility. This ninth amendment amended and restated the DIP Facility, and further extended the Maturity Date to February 9, 2008. In addition, the ninth amendment adjusted the eligible real property and finished goods components of the borrowing base, amended the minimum cumulative consolidated EBITDA amounts, limited the amount of cash restructuring charges incurred to $10.0 million and added covenant levels for the extension of the DIP Facility.

(j)   First Amendment to Amended and Restated Credit Agreement (10th Amendment)

On October 1, 2007, the Debtors entered into the first amendment to the Amended and Restated Revolving Credit Agreement, which (1) amended the definition of the Borrowing Base (as defined therein) to include an additional reserve of $10.0 million until such time as the Bankruptcy Court entered a final order approving (a) a disclosure statement that provides for payment in full of the DIP Facility obligations, and (b) a commitment for exit financing associated with a plan of reorganization; (2) increased the maximum allowable cash restructuring charges incurred since December 17, 2006 from $10.0 million to $23.0 million; and (3) established a requirement that, in the event the Debtors did not publicly announce an agreement in principle with their two largest union groups (regarding certain concessions and alignment with the Business Plan), the Debtors would be obligated to submit a plan to

16

the Prepetition Lenders on or before December 1, 2007 that described the Debtors' strategy for maximizing the value of the Estates through a sale of the Company or its assets, all as described in the amendment.

         (k)    Second Amendment to Amended and Restated Credit Agreement (11th Amendment)

       On November 29, 2007, the Debtors entered into a second amendment to the Amended and Restated Revolving Credit Agreement which, among other things, changed the date for delivery of a revised plan which details the Debtors proposed strategy for maximizing the value of their estates as follows: if on or before January 29, 2008, (i) the Borrowers had not publicly announced an agreement in principle with both the BCTGM and the IBT, in each case regarding modifications to the existing collective bargaining agreements with BCTGM and IBT, respectively; and (ii) Silver Point (or an approved provider of alternate exit financing, if applicable) had not publicly announced its support of such agreements with BCTGM and IBT, then, if requested in a writing delivered by the administrative agent to the Debtors after January 29, 2008, the Debtors would be required to deliver such revised plan within twenty-one (21) days of receipt of such written request.

         (l)    Third Amendment to Amended and Restated Credit Agreement (12th Amendment)

       On December 19, 2007, the Debtors entered into a third amendment to the Amended and Restated Revolving Credit Agreement which (1) extended the maturity date from February 9, 2008 to June 2, 2008; (2) redefined the real property component of the borrowing base to the lesser of (a) $80.0 million or (b) 40% of the borrowing base inclusive of the real property component but excluding the Plan Reserve (as defined therein); (3) amended the permitted capital expenditures by fiscal quarter through the quarter ending May 31, 2008; (4) amended the minimum cumulative consolidated EBITDA by fiscal quarter through the quarter ending May 31, 2008; and (5) limited cash restructuring charges for the fiscal period beginning December 17, 2006 and ending May 31, 2008 to $23.0 million.

         (m)    Fourth Amendment to Amended and Restated Credit Agreement (13th Amendment)

       On December 19, 2007, the Debtors entered into a fourth amendment to the Amended and Restated Revolving Credit Agreement, which gave effect to certain provisions in the third amendment to the Amended and Restated Revolving Credit Agreement which permitted the Company and a super-majority of the lenders to remove those lenders that did not consent to the third amendment.

         (n)    Second Amended and Restated Credit Agreement (14th Amendment)

       On May 9, 2008, the Debtors entered into the Second Amended and Restated Revolving Credit Agreement which amended and restated the Amended and Restated Revolving Credit Agreement to, among other things, extend the maturity date until September 30, 2008 and increase the aggregate principal amount of the commitments from $200 million to approximately $250 million and increasing the sublimit for the issuance of letters of credit from $150 million to $180 million.

(o)     First Amendment to Second Amended and Restated Credit Agreement
(15th Amendment)

On September 12, 2008, the Debtors entered into a first amendment to the Second Amended and Restated Revolving Credit Agreement which extended the maturity date under the Second Amended and Restated Revolving Credit Agreement to February 9, 2009, increased the aggregate principal amount of commitments thereunder from approximately $250 million to approximately $313 million, with the potential for additional funding of $16.0 million based on the occurrence of certain events, and modified certain covenants set forth in the Second Amended and Restated Revolving Credit Agreement.

As of September 25, 2008, the Debtors had an aggregate amount of $136.6 million of issued and outstanding letters of credit under the DIP Facility and borrowings of $96.3 million outstanding under the DIP Facility. The Debtors retained $76.1 million of availability under the DIP Facility, up to $43.4 million of which could be used for the issuance of additional letters of credit.

2.     *Other Financial Transactions*

On January 24, 2005, the Bankruptcy Court authorized the Debtors to replace certain prepetition letters of credit issued by Harris Trust and Savings Bank ("Harris Bank") with letters of credit issued by JPMCB. Harris Bank was a lender party to the Prepetition Credit Agreement, but subsequently sold its position in such facility. In addition, Harris Bank was also the issuing bank for seventeen letters of credit issued on behalf of the Debtors in the aggregate amount of $78,284,350 for the benefit of various insurance companies and state agencies as collateral support for the Debtors' workers' compensation claims. The fronting fee on such letters of credit was 0.125% per annum.

After Harris Bank sold its position in the Prepetition Credit Agreement, Harris Bank distributed notices of non-renewal to all beneficiaries of the letters of credit on November 23, 2004. A provision of the Harris Bank prepetition letters of credit permitted beneficiaries to draw on them in the event of non-renewal unless substitute letters of credit acceptable to the beneficiaries were provided. A draw on the prepetition Harris Bank letters of credit would have resulted ultimately in a draw on the Prepetition Credit Facility and, thus, an increase in the amount of the Debtors' funded prepetition secured debt. This would have increased the interest payments the Debtors would be obligated to pay under the Prepetition Credit Agreement. To avoid a potential increase in the Debtors' funded prepetition secured debt, the Debtors and JPMCB agreed to issue replacement letters of credit under the Prepetition Credit Agreement with a fronting fee of 0.50% per annum.

3.     *Surety Program*

As part of the Debtors' nationwide operations, the Debtors engage in a number of business activities that require licenses, permits and other government authorizations. In such situations, the Debtors must provide financial assurance of payment in order to enable the Debtors to conduct business or obtain services in numerous states and from various organizations. For example, the Debtors are self-insured for workers' compensation claims in certain states where state law prohibits the state from accepting letters of credit as a form of financial assurance. Some other form of security, such as a surety bond, is required in order to provide the state assurance that the workers' compensation claims will be paid. The Debtors must also post bonds in order to make conforming bids on contracts solicited by schools, hospitals and similar organizations.

To assure the Debtors' ability to continue to bid on such contracts and to remain self-insured for workers' compensation claims in such states, the Bankruptcy Court approved the Debtors' entry into a Surety Program and Indemnity Agreement (the "Quanta Surety Program") with Quanta U.S. Holdings, Inc. ("Quanta") on June 29, 2005. Under the Quanta Surety Program, Quanta agreed to issue bonds on behalf of the Debtors up to an aggregate of $7.5 million. The bonds were supplied to various obligees at the request of the Debtors at the gross rates of $5.00 per thousand dollars in face amount of the bond for supply bonds; $7.50 per thousand dollars in face amount of the bond for license and permit bonds; and $9.00 per thousand dollars in face amount of the bond for self-insurer's workers' compensation bonds. The Debtors agreed to provide letters of credit sufficient to cover 100% of Quanta's outstanding exposure for issued bonds and granted Quanta priority of payment for any reimbursement obligation in the event that the letters of credit proved inadequate.

Subsequently, Quanta made the business decision to exit the surety bond business. After soliciting offers from several bonding companies to replace the service Quanta provided, the Debtors entered into an agreement with Federal Insurance Company ("Chubb") to provide bonds on terms substantially similar to the Quanta Surety Program. On June 30, 2006, the Bankruptcy Court approved the Debtors' entry into a Surety Program and Indemnity Agreement (the "Chubb Surety Program") with Chubb. Under the Chubb Surety Program, Chubb supplies bonds to various obligees at the request of the Debtors at the gross rates identical to those described above with respect to the Quanta Surety Program. As with the Quanta Surety Program, the Debtors provide letters of credit sufficient to cover 100% of Chubb's outstanding exposure for issued bonds. In addition, the Debtors agreed to provide Chubb a priority of payment for any reimbursement obligation in the event that the letters of credit prove inadequate.

## E.    Other Significant Events During the Chapter 11 Cases

### 1.    *Corporate Entity Reorganization*

On or about December 30, 2004, the Debtors filed a motion seeking authority to execute the documentation related to their prepetition corporate reorganization. Prior to the corporate reorganization, IBC had operated under an organizational structure that segregated the Company's operations geographically. Brands West operated the Company's operations in the western region of the United States (the "Western Division"), while Interstate Brands Corporation ("Interstate Brands") operated the Company's operations in the central and eastern regions of the United States. Additionally, Brands West held the Company's general office (headquarters) operations and owned the Company's intellectual property. The Company's transportation operations were conducted by IBC Trucking Corporation ("Trucking Corp."). Interstate Bakeries Corporation acted as a holding company with no active business operations. Certain other operations were conducted by Mrs. Cubbison's. Accounting for these separate legal entities was performed on an annual basis using financial information obtained from a single general ledger maintained by the Company.

Pursuant to action taken by the Board of Directors, the Company undertook a series of transactions (the "Prepetition Corporate Reorganization") designed to align its legal structure with its business operations—in particular, the Company's key supply chain components (manufacturing, sales/distribution, transportation and management). The Prepetition Corporate Reorganization, which became effective on May 30, 2004, involved, among other things: (i) merging Brands West into Interstate Bakeries Corporation, with Interstate Bakeries Corporation surviving; (ii) forming IBC Services, LLC; (iii) forming IBC Sales Corporation; (iv) converting Trucking Corp. into a Delaware limited liability corporation, IBC Trucking, LLC; (v) transferring the general office operations from Interstate Bakeries Corporation to IBC Services, LLC; (vi) transferring the Western Division operations and the stock of Mrs. Cubbison's from Interstate Bakeries Corporation to Interstate Brands; (vii) transferring all sales and

distribution operations (depots and thrift stores), except employees, from Interstate Brands to IBC Sales Corporation; and (viii) transferring the interests in IBC Trucking, LLC and the stock of Mrs. Cubbison's to IBC Sales Corporation.

The Bankruptcy Court entered an order on January 24, 2005 authorizing the Debtors to execute the documentation necessary to fully document the Prepetition Corporate Reorganization.

2.    *Mrs. Cubbison's Filing and Related First Day Orders*

As set forth above, eighty percent of Mrs. Cubbison's is owned by IBC Sales Corporation. On the Petition Date, Mrs. Cubbison's did not file for chapter 11 relief because it was not a guarantor of the debts of the other Debtors and at the time did not anticipate undue negative impact as a result of the other Debtors' filing.  However, Mrs. Cubbison's later concluded that it was in its best interests to seek relief under chapter 11 due to increased concerns about the impact of the other Debtors' Chapter 11 Cases, as well as potential benefits in ease of operation and administration issues.  Accordingly, on January 14, 2006, Mrs. Cubbison's filed a voluntary petition in the Bankruptcy Court for reorganization relief under chapter 11 of the Bankruptcy Code, approximately a year and a half after the other Debtors filed their respective petitions for reorganization relief.

On or about January 14, 2006, Mrs. Cubbison's filed several motions seeking the relief provided by certain so-called "first day orders."  In addition to directing that certain orders entered in the jointly administered Chapter 11 Cases of the other Debtors be made applicable to Mrs. Cubbison's, other first day orders authorized, among other things:

- the joint administration of Mrs. Cubbison's chapter 11 case with the other Debtors' bankruptcy cases;

- the payment of certain prepetition shipping and warehousing charges;

- the honoring of certain prepetition obligations to customers, the continuance of customer programs on a postpetition basis and the honoring of certain prepetition obligations to Mrs. Cubbison's regional managers and brokers; and

- the continued use of existing bank accounts, business forms and checks, Mrs. Cubbison's cash management system as well as the continuation of intercompany transactions and waiver of the investment and deposit requirements of 11 U.S.C. § 345(b).

3.    *Omnibus Procedures*

(a)    Reclamation Claims

Shortly before and after the Petition Date, a significant number of the Debtors' vendors asserted demands, pursuant to section 2-702 of the Uniform Commercial Code and section 546(c) of the Bankruptcy Code (the "Reclamation Claims").  Reclamation claims were asserted by almost 150 entities in the total face amount of over $28.5 million.  Certain vendors indicated that resolution of their Reclamation Claims would be critical to their ongoing business relationships with the Debtors, including the provision of trade credit.  Thus, if unresolved, the Reclamation Claims posed a significant threat to the Debtors' businesses and potentially represented a source of significant and costly litigation.

20

To address these concerns, the Debtors sought approval of a comprehensive program to reconcile, resolve consensually, and satisfy the Reclamation Claims asserted against their estates.  By final order dated November 12, 2004, the Bankruptcy Court established a streamlined procedure for reconciling Reclamation Claims.

As of the date of this Disclosure Statement, the Debtors have settled all of the asserted Reclamation Claims for a total of approximately $10 million.

(b)    Resolution of Tort Claims

On November 2, 2004, the Debtors filed a motion requesting (i) approval of procedures for (a) liquidating and settling tort claims (the "Tort Claims") and/or (b) modifying the automatic stay to permit certain litigation with respect to such claims to proceed; and (ii) extension of the automatic stay to claims against the Debtors' employees.  The Debtors estimate that as of the Petition Date, approximately 150 Tort Claims were involved in pending litigation and that an additional 600 Tort Claims had been asserted against the Debtors informally or in a non-litigious fashion.  The Debtors sought to facilitate the efficient and inexpensive liquidation of the numerous Tort Claims asserted against the Debtors arising from events which occurred prior to the Petition Date.  On December 3, 2004, the Bankruptcy Court approved the procedures for liquidating and settling the Tort Claims (the "Tort Claims Procedures").

The Tort Claims Procedures contain different resolution processes for various Claims based on the estimated amount of such Claims.  For instance, the procedures include a cost-effective, streamlined, telephonic settlement procedure for Tort Claims estimated to be Allowed in amounts equal to $10,000 or less.  Such Claims and certain larger Claims also are subject to a settlement process involving written questionnaires, response statements, and replies.  Additionally, Tort Claims in estimated amounts in excess of $50,000 are candidates for mediation and arbitration.  To the extent Tort Claims cannot be resolved through these procedures, claimants are entitled to modification of the automatic stay so that their Claims may be resolved in non-bankruptcy forums.

For settlement amounts of $50,000 or less, the Debtors are authorized to settle Tort Claims up to an aggregate cap of $10 million without further order of the Bankruptcy Court or notice to any parties.  For settlement amounts in excess of $50,000, the Debtors are authorized to settle Tort Claims without further court order upon ten (10) days' notice to certain notice parties, which include the Creditors' Committee, the Equity Committee, the Debtors' postpetition lenders, the Prepetition Lenders, the United States Trustee, the Debtors' insurers and any other party that requests notice in accordance with the Tort Claims Procedures.  Each settling Claimant is deemed to hold a General Unsecured Claim in the settled amount, to be paid in accordance with the Plan.

In addition, on May 31, 2005 the Bankruptcy Court approved the Debtors' request to retain Albert Risk Management Consultants to work with the Debtors and their insurance carriers to evaluate, price and settle certain prepetition tort claims.  Through the Tort Claims Procedures, as of June 30, 2008, the Debtors estimate that they have resolved tort claims with a face amount of approximately $99 million for an Allowed amount of approximately $11.3 million.

(c)    Resolution of Disputed Claims

On May 19, 2005, the Debtors filed a motion requesting approval of procedures (the "Claims Resolution Procedures") for the Debtors to resolve disputed claims which have been filed in the Chapter 11 Cases.  On July 5, 2005, the Bankruptcy Court entered an order granting the motion (the "Claims Resolution Order").  Pursuant to such Order, the Bankruptcy Court established certain

21

parameters by which the Debtors may reconcile and resolve disputed claims in the Chapter 11 Cases ("Disputed Claims").

Specifically, with respect to settlements of (i) administrative, priority or secured Disputed Claims where the face amount of such claim, as filed, is $25,000 or less, or where the discrepancy between the allowed amount of such Disputed Claim and the Debtors' books and records (the "Books and Records") is $25,000 or less or (ii) general unsecured Disputed Claims where the face amount of such claim, as filed, is $150,000 or less, or where the discrepancy between the allowed amount of such Disputed Claim and the Debtors' Books and Records is $150,000 or less, the Debtors are authorized to settle Disputed Claims without need for further Court approval or further notice to any party in interest other than the affected claimant.

For settlements of administrative, priority, secured or general unsecured Disputed Claims that do not fall within the categories listed in the preceding paragraph, the Debtors are authorized to settle Disputed Claims without further court order upon ten (10) days' notice to certain notice parties, which include the settling Claimant, the Prepetition Lenders, the Debtors' postpetition lenders, the Creditors' Committee and the Equity Committee.

This approved mechanism provides a cost effective means of resolving the many thousands of smaller claims in these Cases, thereby avoiding the undue burden on the Bankruptcy Court and unnecessary drain on the time, funds, and other resources of the Debtors and Reorganized Debtors that would be caused by requiring the Debtors to file motions to approve each settlement individually. The Claims Resolution Procedures have been used independently and to assist with resolving filed claims objections.

(d)    Resolution of *De Minimis* Controversies

On October 14, 2004, the Debtors filed a motion to authorize the Debtors to compromise or settle certain classes of *de minimis* controversies that are normal and expected in a business of the size of the Debtors.  On November 3, 2004, the Bankruptcy Court approved procedures (the "*De Minimis* Settlement Procedures") for the compromise and settlement of both prepetition and postpetition controversies where the final amount of the compromise or settlement is less than or equal to $400,000 with respect to each matter or related series of matters.  For disputes settled in the sum of $50,000 or less, the settlement may be consummated without any further Court approval or notice.  For disputes settled in a sum greater than $50,000 but less than or equal to $400,000, the Debtors are required to give notice to the Creditors' Committee, the Debtors' postpetition lenders, the Prepetition Lenders and the United States Trustee.

(e)    Payment of Certain Secured Claims

On September 9, 2005, the Debtors filed a motion to authorize the Debtors to compromise and pay certain real property tax claims and other secured claims that are accruing collectible postpetition interest ("Secured Tax and Other Claims").  On October 4, 2005, the Bankruptcy Court entered an order approving the motion.  Pursuant to such order, the Bankruptcy Court established certain parameters by which the Debtors may pay secured tax and other claims that the Debtors believe are accruing collectible postpetition interest and/or penalties, thereby avoiding the tens of thousands of dollars in additional liability for postpetition interest and/or penalties that would accrue if such claims remained unpaid.  For settlements of Secured Tax and Other Claims in an amount not exceeding $25,000, the Debtors are authorized to pay such claims without further court approval or further notice to any party in interest.  For settlements of Secured Tax and Other Claims in an amount exceeding $25,000, the Debtors are required to give notice to the Creditors' Committee, the Equity Committee, the Debtors'

postpetition lenders and the Prepetition Lenders. The Debtors have paid just over $12.3 million on behalf of $19.4 million in asserted tax and other claims, including postpetition amounts, saving the Debtors an estimated $7.1 million.

(f)    Sales of *De Minimis* Assets

On November 12, 2004, the Bankruptcy Court approved procedures (the "*De Minimis* Sale Procedures") by which the Debtors are authorized to sell miscellaneous surplus, non-core assets from time to time, free of any liens, encumbrances, transfer tax or similar tax, and pay applicable broker commissions in the ordinary course of business in connection with such sales without further Court approval (as modified, the "*De Minimis* Asset Sale Order"). Pursuant to these procedures, the Debtors are authorized to consummate sales of real property and personal property where the purchase price is $500,000 or less for each transaction or in the aggregate for a related series of transactions, up to an aggregate amount of $10 million in net sales proceeds. The *De Minimis* Asset Sale Order was modified by the Bankruptcy Court on June 10, 2008 to increase the cap on the aggregate amount of net sale proceeds allowable pursuant to the *De Minimis* Sale Procedures from $10 million to $15 million. Through the *De Minimis* Sale Procedures, as of July 30, 2008, the Debtors have sold *de minimis* assets resulting in net proceeds to the Estates in an aggregate amount of approximately $11 million.

(g)    Sales of Machinery & Equipment

On August 2, 2005, the Bankruptcy Court approved procedures by which the Debtors are authorized to sell the Debtors' machinery and equipment free and clear of all liens, claims and encumbrances and to employ and retain Russell T. Bundy ("Bundy") to provide asset disposition and consulting services to the Debtors. Pursuant to these procedures (the "M&E Sales Procedures"), the Debtors are authorized to sell certain machinery and equipment as designated by the Debtors from time to time upon notice to the United States Trustee, the Creditors' Committee, the Equity Committee, the Prepetition Lenders, the Debtors' postpetition lenders, each relevant taxing authority (if certain exemptions are sought) and any other known holder of a lien, claim or encumbrance against the specific property to be sold. These procedures provide a cost effective means for the Debtors to sell equipment on an expedited basis without incurring the delay and costs of preparing, filing, serving and having hearings on motions for approval of each such sale. Additionally, on September 27, 2006, the Bankruptcy Court approved the retention of Hilco Appraisal Services LLC to provide, among other things, appraisals of machinery and equipment, including on-site inspection at several of the Debtors' facilities and to provide an opinion of forced liquidation value, net forced liquidation value, orderly liquidation value and net orderly liquidation value to assist the Debtors in evaluating their exit-financing options. Through the M&E Sales Procedures, as of July 30, 2008, the Debtors have sold machinery and equipment resulting in net proceeds to the Estates in an aggregate amount of approximately $276,000.

(h)    Other Asset Sales

On February 6, 2008, the Court approved the Debtors' Motion for Entry of an Order Under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 2002 and 6004 (I) Authorizing and Approving the Sale of Certain Tractors, Trailers and Route Step Vans Free and Clear of Liens, Claims, Interests and Encumbrances Pursuant to an Auction, (II) And Granting Related Relief (docket no. 9987) (together, the "Truck Sale Motion"). Pursuant to the Truck Sale Motion, the Debtors sought authority to sell certain tractors, trailers and route step vans, which were no longer necessary for the Debtors' ongoing operations, pursuant to an auction which took place on February 8, 2008. As a result of the auction, the Debtors sold equipment for an aggregate total amount of $960,000 in proceeds.

23

4.      *Information Technology Decisions*

(a)      Accenture

To implement Program Soar, the Debtors entered into certain prepetition outsourcing agreements (collectively, the "Outsourcing Agreement") and consulting agreements (collectively, the "Consulting Agreement") with Accenture LLP ("Accenture") (the Outsourcing Agreement and the Consulting Agreement, together, the "Accenture Agreements"). In October 2004, the Debtors conducted a review of the Accenture Agreements and, on April 28, 2005, after extensive negotiations, Accenture and IBC entered into a restructuring agreement with respect to the Accenture Agreements (the "Accenture Restructuring Agreement"). On May 31, 2005, the Bankruptcy Court authorized the Accenture Restructuring Agreement.

Pursuant to the Accenture Restructuring Agreement, Accenture reduced the scope of certain services being provided to the Debtors under the Outsourcing Agreement, lowered its monthly fees for such services, waived and/or otherwise reduced certain substantial termination charges thereunder, and further modified the Debtors' right to terminate the Outsourcing Agreement. Under these terms, the Debtors agreed to assume the modified Outsourcing Agreement.

As part of their review of the Accenture Agreements, the Debtors rejected the Consulting Agreement because they no longer required the services provided thereunder. They retained, however, certain valuable license rights to critical intellectual property developed under the Consulting Agreement. Accenture also agreed to waive any Cure Claim arising from the assumption of the Outsourcing Agreement, and the parties agreed that Accenture would be granted an allowed General Unsecured Claim in the amount of $5,101,117.01. In addition, Accenture was granted the right to file a Supplemental Cost Claim (as defined in the Restructuring Agreement) of up to $100,000 which, if they file such a claim, is to be treated as a General Unsecured Claim.

(b)      Hewlett Packard

Prior to the Petition Date, IBC and Hewlett Packard Company ("HP") entered into an agreement (the "HP Agreement") to run various software applications to support IBC's order, production, distribution, payroll and sales processes on approximately 80 HP 3000 servers with MPE operating systems and 40 HP 9000 servers with UNIX operating systems (collectively, the "Supported Items"). Pursuant to the HP Agreement, HP provided system support services for the Supported Items including hardware preventative maintenance, hardware emergency maintenance, and operating system support.

The Debtors investigated their options and ultimately negotiated with Solid Systems CAD Services Inc. ("SSCS") for SSCS to provide system support services similar to those provided by HP beginning November 1, 2005. SSCS offered to provide the necessary services for substantially less than HP's cost under the HP Agreement and the Debtors determined that they would save money by switching to SSCS even after paying HP any rejection damages. The Debtors and HP entered into, and the Bankruptcy Court approved, a stipulation whereby IBC effectively terminated the HP Agreement, IBC paid all postpetition amounts that were outstanding, and HP was granted a General Unsecured Claim of $29,787.22.

5.       *Real Estate Matters*

(a)       Extension of Time to Assume or Reject Unexpired Leases

On February 21, 2008, the Debtors filed with the Bankruptcy Court their fourth motion requesting an extension of the deadline by which the Debtors must assume or reject any and all unexpired leases and subleases of nonresidential real property.  On March 12, 2008, the Debtors' motion was granted, thereby extending the deadline to the earlier of (i) the effective date of a plan of reorganization or (ii) December 21, 2008.  Accordingly, <u>Exhibit O</u> to the Plan sets forth which of the Debtors' remaining real property leases it intends to assume.  All other leases will be rejected pursuant to Section 7.2 of the Plan.

(b)       Assumption and Rejection of Real Property Leases

The Debtors devoted considerable effort during the Chapter 11 Cases to analyzing and making final decisions with regard to the approximately 1,200 real property leases and subleases the Debtors were party to prior to the Petition Date.  The Debtors determined that certain of such leases no longer served any benefit to the Estates.  In an effort to reduce postpetition administrative costs and in the exercise of the Debtors' sound business judgment, the Debtors rejected such leases (the "Rejected Leases").  In some cases, leases were rejected because the Debtors had terminated or planned to terminate operations at certain locations as part of the Debtors' ordinary business operations prior to the Petition Date.  Certain leases were rejected as part of the Debtors' efforts to restructure its operations, as set forth below.  Before rejecting such leases, the Debtors, with assistance from real estate specialists engaged by the Debtors, conducted valuation analyses with respect to the leases which took into consideration such factors as the annual rent, the remaining term of the lease (including any renewal options), the condition of the premises, comparable market rents and any previous efforts of the Debtors as to the disposition of the leases.  The Debtors also considered their options with respect to the Rejected Leases, such as evaluating the possibility of one or more assignments and/or subleases of the leases.  As a result of these analyses, the Debtors determined that the Rejected Leases did not have any marketable value beneficial to the Debtors' estates.

Through forty-two lease rejection motions, the Debtors have rejected over 540 leases.  The resultant savings from the rejection of such leases has favorably affected the Debtors' cash flow and assisted the Debtors in managing their future operations.  By rejecting each such lease, the Debtors avoided incurring unnecessary administrative charges for rent and other charges and repair and restoration of each of the premises that provide no tangible benefit to the Estates.

On the other hand, the Debtors have also determined that the continued use of certain leased property is critical to the Debtors' ongoing business operations, and have therefore assumed certain real property leases.  Through two motions, the Debtors have assumed ten (10) real property leases as of the date hereof.

(c)       Sale Procedures

To support their reorganization efforts and maximize value to their estates and creditors, the Debtors worked with their advisors to streamline the Debtors' operations by eliminating and reducing unnecessary operating expenses in disposing of surplus assets.  The Debtors had considerable success during the bankruptcy in marketing and selling real estate assets.

25

The *De Minimis* Sale Procedures provide a cost effective means for the Debtors to sell real estate on an expedited basis without incurring the delay and costs of preparing, filing, and attending hearings on motions for approval of each such sale.  Pursuant to the *De Minimis* Sale Procedures, the Debtors have sold over thirty-five (35) properties for an aggregate amount in excess of $7.7 million.

On December 14, 2004 the Debtors received Bankruptcy Court approval for their Motion For An Order Approving Standing Bidding Procedures To Be Utilized In Connection With Asset Sales (the "Bid Procedures Order").  The Bid Procedures Order allows the Debtors to maximize value in the real estate sale process by giving the Debtors the authority to, among other things (a) determine which potential buyers are qualified bidders; (b) adopt rules for the bidding process which, in the Debtors' reasonable judgment, would better promote the goals of the bidding process; (c) offer a termination fee of up to 2% of the value of the qualified bid to induce a non-insider potential bidder to make the first qualified bid; and (d) conduct auctions, if appropriate.

(d)    Other Professionals Retained

On December 21, 2004, the Debtors engaged a joint venture composed of Hilco Industrial, LLC ("Hilco Industrial") and Hilco Real Estate, LLC ("Hilco Real Estate," together with Hilco Industrial, "Hilco") to provide the Debtors with asset disposition and consulting services with respect to machinery and equipment and certain real estate assets.  Hilco and its current principals have extensive experience working with financially troubled companies in complex financial restructurings and providing a broad range of services for monetizing assets of all types including machinery, equipment and real estate.  Under the terms of the agreement, Hilco provides the Debtors with the valuation of real estate assets, develops and implements marketing programs for the sale of the property, coordinating and organizing bidding procedures, conducts auctions as necessary, and assists with negotiating the terms of the agreements.  The Bankruptcy Court approved the following compensation scheme for Hilco: five and one-half percent (5.5%) of real estate gross proceeds less than or equal to $2 million, three and three-quarters percent (3.75%) of real estate gross proceeds greater than $2 million, but less than or equal to $10 million, and three percent (3%) of real estate gross proceeds greater than $10 million plus reimbursement for reasonable costs and expenses including marketing expenses.  In addition, the Debtors utilized A&M as well as independent brokers, where they had been retained prior to the chapter 11 filings, to market certain properties.

On March 29, 2005, the Bankruptcy Court approved the Debtors' application to retain Assessment Technologies, Ltd. ("ATL") as property tax consultants for the Debtors for the purposes of appealing tax assessments and challenging tax claim amounts related to the 2005 taxable year, and all prior taxable years, for certain property owned, managed or leased by the Debtors.  Under the terms of ATL's retention, the Debtors paid to ATL 35% of all net tax savings received by the Debtors for each taxable year.  In March of 2006, the Bankruptcy Court entered an order authorizing an amendment to the retention agreement between ATL and the Debtors which, among other things, extended the agreement to include the 2006 taxable year and reduced ATL's compensation to 20% of net tax savings for 2006.  On July 25, 2007 and May 13, 2008, the Bankruptcy Court authorized a second amendment to ATL's retention to add the 2007 taxable year with ATL being compensated for 27.5% or 35% of net savings.  On May 13, 2008, the Debtors received authority from the Bankruptcy Court to add the 2008 taxable year to ATL's retention pursuant to a third amendment.  With the assistance of ATL, the Debtors achieved approximately $4.6 million in prepetition and postpetition tax savings.

The Debtors also sought Bankruptcy Court authority to retain DJM Asset Management LLC ("DJM") to provide certain real estate consulting services including negotiating advantageous lease modifications, lease extensions, amended and restated lease agreements and/or reductions in cure claim amounts.  The Bankruptcy Court entered an order on October 9, 2007 approving DJM's retention as well

as the Debtors' request to limit the terms of the compensation structure to the Key Constituents and the Court, *in camera*.

Finally, in connection with the Debtors' exit from the bread business in Southern California, on November 25, 2007, the Bankruptcy Court approved the Debtors' application to engage Alvarez & Marsal Real Estate Advisory Services, LLC ("A&M – REAS") to provide certain asset disposition and consulting services with respect to certain real estate assets located in the Southern California sub-market.  Under the terms of the engagement, the Debtors agreed to pay A&M – REAS two percent (2.0%) of the real estate gross proceeds less than or equal to $38,000,000 and one and one-half percent (1.5%) of the real estate gross proceeds greater than $38,000,000, subject to an increase in the percentage of real estate gross proceeds payable up to three percent (3%) upon the removal of certain real estate assets from the assigned properties, plus reimbursement for reasonable costs and expenses including marketing expenses.

(e)    Property Sales

With the assistance of Hilco and other brokers, and in accordance with the Bid Procedures Order, the Debtors have sold approximately 80 properties bringing in over $122 million in sales proceeds to the Debtors' estates since the Petition Date.  In addition, in connection with certain property sales, the Debtors successfully reduced their liability for interest and penalties relating to prepetition real and personal property taxes related to the properties sold.

6.    *Labor and Employee Matters*

(a)    Labor

As of the Petition Date, approximately 26,000 of the Debtors' employees (81% of the Debtors' labor force) were covered by one of approximately 500 collective bargaining agreements (the "CBAs").  Most of the Debtors' union employees were represented by either the IBT or the BCTGM.  The Debtors' union labor costs represent a significant portion of the Debtors' total costs.  Due to wage increases then-mandated by collective bargaining agreements and rapidly increasing health and welfare and pension costs, the costs attributable to the Debtors' union labor was growing at an annual inflation rate of approximately 3%.

On October 14, 2004, the Debtors sought and subsequently obtained from the Bankruptcy Court an order authorizing the Debtors to (a) comply with existing grievance procedures under the CBAs; (b) engage in arbitration; (c) pay the fees and costs of the respective arbitrators; (d) liquidate union grievances; (e) implement existing agreements and enter into and implement ongoing side agreements with unions in connection with CBAs; and (f) extend certain expired or expiring collective bargaining agreements for up to one (1) year.  These procedures have been very useful to the Debtors and their constituents, allowing for the discussion of and eventual implementation of approximately 480 short term extension and approximately 135 side agreements and the resolution of approximately 400 prepetition grievances, all of which helped maintain stable relationships with the Debtors' union employees.

As part of the Debtors' initial restructuring efforts, the Debtors determined that, in order to maximize value for all of its stakeholders, it was necessary to seek new, longer term arrangements with its union employees' collective bargaining units.  To that end, the Debtors moved the Court to establish a procedure for entering into long-term extension of their collective bargaining agreements.  On October 4, 2005, the Bankruptcy Court entered an order authorizing Debtors to enter into long-term extension of collective bargaining agreement (the "Long-Term Extension Order") authorizing the requested process.  These efforts led to over 210 long-term extension agreements with the IBT resulting in annualized saving

estimated at $15.6 million per year. With respect to the BCTGM, these efforts led to long-term extension agreements resulting in annualized savings estimated at $12.9 million per year.

IBC's relationship with its unions proved critical in the last phase of the Chapter 11 Cases as well. Mr. Jung and the reconstituted Board were collectively charged by the Key Constituents to formulate new ideas and fresh perspectives to make the Debtors competitive and profitable. Their analysis revealed that the only meaningful, sustainable alternative was to implement proven, modernizing changes in operations and work rules. The status quo, which had continually failed IBC and its constituents in the past, was simply no longer acceptable. A "hands off" approach to selling and delivery structures contributed heavily to unprofitability and lack of competitiveness and could no longer be tolerated if the Company were to survive. These innovations are integral to the Business Plan and were designed to give the Debtors a competitive advantage, thereby securing the Company's future. In an attempt to return the Debtors to a position of market leader, the Business Plan contemplates implementing proven changes both in the manner by which the Debtors manufacture their products and, ultimately, deliver them to their consumers.

With respect to delivery, the Business Plan envisions the abandonment by the Debtors of their historical high cost, "one-size-fits-all" traditional route delivery structure in favor of an advanced path-to-market structure that will create better jobs for sales employees and, in doing so, significantly increase selling and delivery productivity. Implementation of this "path-to-market" structure requires flexibility in the Debtors' ability to meet changing market demands. Work rules under the Company's CBAs are prohibitively restrictive with respect to the Debtors' ability to deliver their products to the marketplace. Thus, these agreements have to be modified in order to implement the Business Plan. Moreover, the Debtors need concessions from their unions to achieve meaningful savings in their health and welfare plans.

In order to achieve these needed changes, the Debtors sought agreement from each of the unions representing their employees to enter into certain "Modification Agreements" that modify the terms of the existing CBAs and related long term extension agreements. These Modification Agreements generally provided for, among other things, the following, where applicable: (i) changes in work rules regarding methods of distribution such that the Path-to-Market delivery structure contemplated by the Business Plan can be implemented; and (ii) changes in the various health and welfare plans such that the Company will achieve total savings of approximately $20 million in the first year, and an additional $2 million each year thereafter.

The Debtors reached an agreement with the BCTGM to provide for the concessions and work-rule changes required to implement the Business Plan. Although the memberships of approximately 98% of the collective bargaining units represented by the BCTGM ratified the modifications agreed to by the union, the memberships of BCTGM Local No. 334 at the Company's bake shop in Biddeford, Maine (the "Biddeford Local") and BCTGM Local No. 50 at the Company's bake shop in Wayne, New Jersey (the "Wayne Local"), did not. As a result, on March 12, 2008, the Bankruptcy Court entered its Order Under 11 U.S.C. § 1113(c) Authorizing Rejection of Collective Bargaining Agreements With Certain Local Affiliates of the Bakery, Confectionery, Tobacco and Grain Millers International Union, which authorized the Debtors to reject their collective bargaining agreements with the Biddeford Local and the Wayne Local.

While the Debtors' and the BCTGM were able to reach an agreement, the Debtors were not able to reach a deal with the IBT prior to the expiration of the Silver Point Commitment.

28

During March 2008, the Debtors were informed that the IBT had reached agreement in principle with Ripplewood on concessions and work rule changes that the union would give to the Debtors if Ripplewood became a majority investor in the Reorganized Company. The IBT's concessions with Ripplewood not only included the work rules to permit the Debtors' "path to market" delivery and selling concept, but also included other significant concessions required by the Debtors to implement the Business Plan.

(b)     Key Employee Retention Plan

In February 2005, the Bankruptcy Court approved the Debtors' proposed Key Employee Retention Program (the "KERP") which was designed to retain 494 employees (the "Key Employees") who were identified as mission-critical management employees with the knowledge, experience and skills necessary to manage the Debtors' businesses. The KERP divided classes of employees covered by the KERP into organizational tiers which determine eligibility and vesting requirements for the various components of the KERP. The KERP has two components: retention bonuses and restructuring performance bonuses. Retention bonuses reward employees for remaining with the Debtors during the cases and restructuring performance bonuses reward employees if the Debtors achieve their economic performance objectives. Restructuring performance bonuses have all been previously paid. The remaining portion of the retention bonus (approximately $2.4 million) will be paid within thirty (30) days after the Effective Date.

(c)     Senior Management

(i)     *Alvarez & Marsal*

At the outset of the bankruptcy, the Debtors appointed Antonio C. Alvarez II as Chief Executive Officer and John K. Suckow as Executive Vice President and Chief Restructuring Officer of the Company. Messrs. Alvarez and Suckow, as employees of A&M, were designated as officers pursuant to a Letter Agreement that was approved by the Bankruptcy Court on October 24, 2004. Under the terms of the Letter Agreement, expenses incurred for the services provided by A&M for the years ended June 2, 2007, June 3, 2006, and May 28, 2005, excluding out-of-pocket expenses, were approximately $7.2 million, $9.8 million, and $8.6 million, respectively. Mr. Alvarez resigned in connection with the employment of Craig D. Jung as Chief Executive Officer in February 2007. Mr. Suckow resigned as Executive Vice President and Chief Restructuring Officer effective August 8, 2007. Certain A&M employees stayed with the Debtors subsequent to the departure of Messrs. Alvarez and Suckow from the Company.

On July 18, 2005, the Debtors entered into a supplemental letter agreement with A&M (the "Incentive Fee Agreement"), which sets forth the manner in which A&M's incentive compensation is to be calculated under the Letter Agreement. The time to object to the Incentive Fee Agreement has been extended indefinitely. Therefore, absent consent of such parties, the Incentive Fee Agreement remains subject to Bankruptcy Court approval and, accordingly, its terms will not become effective until such consent or approval has been obtained. Pursuant to the Incentive Fee Agreement, A&M is entitled to incentive compensation to be based on five percent of Total Enterprise Value (as defined in the Incentive Fee Agreement) in excess of $723 million. Total Enterprise Value consists of two components: (1) the Debtors' total cash balance as of the effective date of a plan of reorganization, less the normalized level of cash required by the Debtors in the ordinary course of business, plus (2) either (a) the midpoint enterprise value set forth in the disclosure statement with respect to a plan of reorganization as confirmed by the Bankruptcy Court or (b) the aggregate consideration received by the Debtors in a sale. Under all circumstances other than a liquidation (in which case A&M will have no guaranteed incentive

29

compensation), A&M's incentive compensation will be a minimum of $3.85 million, if approved by the Bankruptcy Court.

(ii)    <em>Craig Jung</em>

On February 16, 2007, the Bankruptcy Court approved the Debtors' entry into an employment agreement with Craig D. Jung. Under the terms of the Mr. Jung's employment agreement, Mr. Jung is to serve as Chief Executive Officer until February 2010, subject to extension. Upon execution of the employment agreement, he received a lump sum payment of $1,200,000. As Chief Executive Officer, Mr. Jung receives an annual base salary of $900,000 and is eligible for annual reviews for increases.

Mr. Jung is also eligible for certain bonuses and incentives with respect to IBC's performance and emergence from chapter 11, the amounts of which are based upon formulas related to the total enterprise value of the Company upon the Effective Date. Beginning in fiscal 2009, Mr. Jung will have the opportunity to earn an annual cash incentive bonus, expressed as a percentage of Mr. Jung's base salary, based on achievement against adjusted EBITDA targets included in a Business Plan adopted by the Board. The target bonus opportunity is 100% of Mr. Jung's base salary. The employment agreement further provides for a special award for enhancing value, expressed as a graduated percentage of total value at certain benchmark amounts. Finally, the employment agreement provides that Mr. Jung will receive capital stock and options representing 2% of the Reorganized Debtors' fully diluted equity at emergence. Twenty-five percent of the capital stock and options grant will vest immediately upon emergence, with the remaining unvested capital stock and options vesting ratably over three years provided Mr. Jung is employed by the Reorganized Debtors on each vesting date. During his employment, Mr. Jung is a participant in all employee and executive benefit programs.

(iii)    <em>Kent Magill</em>

On June 5, 2007, the Bankruptcy Court approved the Debtors' entry into an employment agreement with Kent Magill. Under the terms of the employment agreement, Mr. Magill is to serve as Executive Vice President, General Counsel and Corporate Secretary for three years from the effective date of the agreement, which was retroactive to April 25, 2007, subject to extension. Under the employment agreement, Mr. Magill will receive an initial annual base salary of $375,000 to be reviewed at least annually and is eligible for certain bonuses and incentives. In addition to any bonus to which Mr. Magill is entitled pursuant to the Company's existing Fiscal Year 2007 Management Incentive Plan, beginning with the Company's fiscal year ending in 2008, Mr. Magill will be eligible to receive an annual performance-based cash bonus award pursuant to the terms and conditions of the Company's annual performance bonus plan, if any.

Mr. Magill is also eligible for certain bonuses and incentives with respect to IBC's performance and emergence from chapter 11, the amount of which are based upon formulas related to the total enterprise value of the Company upon the Effective Date.

(d)    Directors

Since the Chapter 11 Cases began, the Debtors have replaced almost all members of the Board of Directors. Immediately prior to the Petition Date, Mr. James Elsesser resigned as Chairman of the Board. Leo Benatar succeeded him as Chairman of the Board. The vacancy on the Board created by Mr. Elsesser's resignation was not immediately filled, and therefore, as of the Petition Date, the Board consisted of eight members. In addition to Mr. Benatar, Messrs. Kenneth Baum, Charles Sullivan, Frank E. Horton, Robert Calhoun, Michael Anderson, Ronald L. Thompson and Richard L. Metrick served as

30

Directors.  Mr. Sullivan retired from the Board on July 31, 2005, and no successor was immediately named.  The two vacancies were filled with the appointments of Mr. David N. Weinstein on August 15, 2006, and Mr. William P. Mistretta on August 29, 2006.

On January 5, 2007, the Bankruptcy Court approved a settlement with the Equity Committee and Brencourt Advisors LLC, whereby the Company's Board of Directors was reconstituted from nine members to seven.  As part of the reconstitution, Messrs. Horton, Baum, Thompson, Benatar and Metrick departed the Board, Mr. Terry Peets and Mr. David Pauker, Mr. David Weinstein was appointed as Lead Director on January 16, 2007 and Mr. Mike Anderson was elected as Non-Executive Chairman of the Board on January 24, 2007.  The final position on the Board was subsequently filled, in accordance with the settlement, by Mr. Craig D. Jung upon his appointment as Chief Executive Officer of the Debtors on February 16, 2007.  On March 6, 2007, Mr. Phillip A. Vachon joined the Board, filling a vacancy left by the resignation of Mr. David N. Weinstein on January 30, 2007.

(e)    Augmenting the Management Team

One of Mr. Jung's first actions upon assuming the chief executive position was the retention of world-class talent in an effort to help fulfill the CEO's vision for the Reorganized Debtors and to aid in the development and timely delivery of the Business Plan.  Each of the Key Constituents was kept informed of Mr. Jung's efforts to recruit this talent and of the entry into short-term consulting agreements with each new management member (each, a "New Management Member"), a practice that is consistent with the Company's past historic use of consultants to fill corporate responsibilities as needed and that provides the Company with the opportunity to see the consultants in action prior to entering into any long term commitments.  Each of the consultants entered into consulting agreements with the Company in early to mid calendar 2007, and they continue to perform under those consulting agreements.

The New Management Members are (i) Jane Miller, who served as Acting Executive Vice President and Chief Customer Officer until September 2008; (ii) Gary Wandschneider who is the Acting Executive Vice President of Operations; (iii) David Loeser who serves as Acting Executive Vice President of Human Resources; and (iv) Suresh Mathews who is the Acting Executive Vice President – Information Technology and Chief Information Officer of IBC.  Each of the New Management Members is a senior executive with numerous years of experience and proven successes in their fields.  The New Management Members played integral roles in formulating the Business Plan and have subsequently been leading the efforts to bring the Business Plan to life, including significant involvement in negotiations with the IBT and the BCTGM.

7.    *Exclusivity*

The Debtors received nine extensions of the period during which the Debtors have the exclusive right to file a plan of reorganization (the "Plan Filing Period") and the period during which the Debtors have the exclusive right to solicit and obtain acceptances of any such plans (the "Solicitation Period")  Most recently, the Bankruptcy court entered an order on October 3, 2007 extending the Plan Filing Period and Solicitation Period to and including November 8, 2007, and January 7, 2008, respectively.  The Debtors determined not to seek further extensions of the Plan Filing Period and Solicitation Period, and therefore such periods have expired.  Accordingly, other parties in interest are permitted to file plans of reorganization.

**F.      Summary of Claims Process, Bar Date, Certain Claims, and Professional Fees**

   1.      *Claims Process*

       In chapter 11 cases, claims against a debtor are established either as a result of being listed in the debtor's schedules of liabilities or through assertion by the creditor in a timely filed proof of claim form.  Once established, the claims are either allowed or disallowed.  If allowed, the claim will be recognized and treated pursuant to a plan of reorganization.  If disallowed, the creditor will have no right to obtain any recovery on, or to otherwise enforce, the claim against the debtor.

   2.      *Schedules and Statements of Financial Affairs*

       On November 22, 2004, eight of the Debtors filed with the Bankruptcy Court Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("Statements").  Separate Schedules and Statements were filed for the following eight Debtors: Interstate Bakeries Corporation, Armour and Main Redevelopment Corporation, Baker's Inn Quality Baked Goods, LLC, IBC Sales Corporation, IBC Services, LLC, IBC Trucking, LLC, Interstate Brands Corporation and New England Bakery Distributors, L.L.C.  However, because the Debtors use a consolidated cash management system through which the Debtors pay substantially all liabilities and expenses, certain assets and liabilities were not allocated among the Debtors and, therefore, certain assets and substantially all liabilities were presented on a consolidated basis in the Schedules and Statements for these eight Debtors.  Mrs. Cubbison's filed its Schedules and Statements with the Bankruptcy Court on January 27, 2006.  The Debtors filed numerous amendments to Schedule F – Creditors Holding General Unsecured Claims ("Schedule F") with the Bankruptcy Court to reflect new information obtained by the Debtors on January 10, 2005, March 11, 2005, May 18, 2005, June 1, 2006 and July 6, 2007 (which was corrected on August 28, 2007).  Each amendment reflected new information obtained by the Debtors to more accurately reflect the outstanding Claims.

       For financial reporting purposes, the Company generally prepares consolidated financial statements, which include financial information for all of its subsidiaries and affiliates, and which in the past have been filed with the SEC and audited annually.  Unlike the consolidated financial information used for the Debtors' financial reporting purposes, the Schedules and Statements reflect the assets and liabilities of each Debtor based on the Debtor's non-audited book and tax records.  The Company does not, other than annually on an unaudited, non-GAAP basis for tax purposes, prepare financial statements for its subsidiaries and affiliates.

   3.      *Claims Bar Date*

       On December 14, 2004, the Bankruptcy Court entered an order (the "Bar Date Order") establishing the general deadline for filing proofs of claim against the Debtors (the "Bar Date").  The deadline established by the Bankruptcy Court was March 21, 2005 for Claims, including Claims of governmental units, but excluding certain other Claims, including (i) Claims based on the rejection of executory contracts and unexpired leases, as to which the bar date is the later of (a) the Bar Date, or (b) thirty (30) days after the effective date of such rejection and (ii) Claims affected by the amendment, if any, of the Debtors' Schedules, as to which the bar date is the later of (x) the Bar Date, or (y) thirty (30) days after the claimant is served with notice that the Debtors have amended their Schedules.  The Debtors' claims and notice agent provided notice of the Bar Date by mailing to each person listed in the Schedules a notice of the Bar Date and a proof of claim form.  In addition, the Debtors published notice of the Bar Date in The New York Times, The Wall Street Journal (national edition), Kansas City Star and USA Today on December 21, 2004.

On March 3, 2006, the Bankruptcy Court entered an order (the "Mrs. Cubbison's Bar Date Order") establishing the general deadline for filing proofs of claim against Mrs. Cubbison's (the "Mrs. Cubbison's Bar Date"). The deadline established by the Bankruptcy Court was May 30, 2006 for all persons or entities wishing to assert Claims against Mrs. Cubbison's excluding (i) Claims based on the rejection of executory contracts and unexpired leases, as to which the bar date is the later of (a) the Mrs. Cubbison's Bar Date, or (b) thirty (30) days after the effective date of such rejection; (ii) Claims affected by the amendment, if any, of Mrs. Cubbison's Schedules, as to which the bar date is the later of (x) the Mrs. Cubbison's Bar Date, or (y) thirty (30) days after the claimant is served with notice that Mrs. Cubbison's has amended its Schedules; and (iii) Claims of governmental units, as to which the bar date was July 13, 2006. The Debtors' claims and notice agent provided notice of the Mrs. Cubbison's Bar Date by mailing to each person listed in Mrs. Cubbison's Schedules a notice of the Mrs. Cubbison's Bar Date and a proof of claim form. In addition, the Debtors published notice of the Bar Date in The Wall Street Journal (national edition), USA Today, and the Los Angeles Times on March 9, 2006.

4.    *Proofs of Claim and Other Claims*

Prior to the commencement of these cases, the Debtors maintained, in the ordinary course of business, books and records that reflected, among other things, the Debtors' liabilities and the amounts thereof owed to their creditors. According to information provided by the claims agent, over 9,200 proofs of claim have been filed against the Debtors asserting claims in the aggregate face amount of over $4 billion. In addition, numerous claims were asserted by various alleged creditors in unliquidated amounts. The Debtors have completed a review of a significant portion of the proofs of claims filed in the Chapter 11 Cases, including any supporting documentation, the Claims set forth therein and the Debtors' books and records, to determine the validity of the Claims asserted against the Debtors. Based on their reviews, the Debtors determined that certain Claims asserted against the Debtors were objectionable.

As of September 15, 2008, the Debtors have filed with the Bankruptcy Court forty (40) separate omnibus objections to Claims (collectively, the "Omnibus Objections") in which the Debtors objected to various types of claims including, but not limited to: (i) duplicate Claims; (ii) amended and replaced Claims; (iii) Claims for disputed liabilities; (iv) Claims that have been previously paid and satisfied; (v) overstated Claims; (vi) Claims asserted against the wrong debtor; (vii) Claims filed after the relevant bar date; (viii) Claims filed with insufficient documentation to support the liabilities asserted therein; (ix) Claims asserted against multiple Debtors with respect to the same liability; (x) Claims that were improperly transferred; and (xi) contingent Claims for damages for rejected real estate contracts and executory contracts which have not yet been rejected. As of September 15, 2008, the Debtors have resolved over 5,000 Claims and have expunged or reclassified an aggregate face amount of over $970 million in Claims through the Omnibus Objections.

In addition to the Omnibus Objections, as described herein, the Debtors have resolved certain other Claims through joint stipulations and orders and are negotiating additional consensual resolutions. The Debtors expect to continue preparing, filing and resolving objections to certain other Claims throughout the course of the Chapter 11 Cases.

5.    *Professional Fees*

On October 25, 2004, the Bankruptcy Court entered an order establishing procedures for interim compensation and reimbursement of expenses of professionals (the "Compensation Order"). The Compensation Order requires professionals retained in these cases to submit monthly fee statements to the Debtors and requires the Debtors to pay eighty percent of the requested fees and one hundred percent of the requested expenses pending interim approval by the Bankruptcy Court. The remaining twenty percent of fees requested in such fee statements are paid only upon further order of the Bankruptcy Court (the

"Holdback"). The Compensation Order requires the professionals retained in the Chapter 11 Cases to file applications for approval of their fees and expenses for the preceding four (4) month period approximately every four (4) months.

Accordingly, the Bankruptcy Court approved (i) the first interim fee applications for the period from September 22, 2004 through December 31, 2004 on or about March 16, 2005; (ii) the second interim fee applications for the period from January 1, 2005 through April 30, 2005 on or about July 29, 2005; (iii) the third interim fee applications for the period from May 1, 2005 to August 31, 2005 on or about December 19, 2005; (iv) the fourth interim fee applications for the period from September 1, 2005 through December 31, 2005 on or about April 14, 2006; (v) the fifth interim fee applications for the period from January 1, 2006 through April 30, 2006 on or about August 7, 2006; (vi) the sixth interim fee applications for the period from May 1, 2006 to August 31, 2006 on or about November 6, 2006; (vii) the seventh interim fee applications for the period from September 1, 2006 through December 31, 2006 on or about April 6, 2007; (viii) the eighth interim fee applications for the period from January 1, 2007 through April 30, 2007 on or about August 8, 2007; (ix) the ninth interim fee applications for the period from May 1, 2007 through August 31, 2007 on or about November 23, 2007; (x) the tenth interim fee applications for the period from September 1, 2007 through December 31, 2007 on or about April 8, 2008; and (xi) the eleventh interim fee applications for the period from January 1, 2008 through April 30, 2008 on or about July 22, 2008. The twelfth interim fee applications are due to be filed on October 14, 2008 for the period from May 1, 2008 through August 31, 2008. Through the eleventh interim application period, professional fees and expenses have been approved in the aggregate amount of $127,863,444.98 and $5,109,007.70, respectively.

## G.    Workers' Compensation

The Debtors maintain workers' compensation programs in all states in which they operate pursuant to the applicable requirements of local law to provide employees and former employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors. In certain states, the Debtors are qualifiedly self-insured pursuant to the laws and regulations of such states, whereas in other states, the Debtors insure their workers' compensation liabilities through high deductible, jurisdiction-specific workers' compensation insurance policies (the "Workers' Compensation Programs"). The Debtors have generally posted surety bonds and letters of credit with state authorities and insurance companies to guarantee the Debtors' workers' compensation obligations.

The Debtors' outstanding obligations relating to workers' compensation arise from incurred but not yet paid claims and incurred but not reported ("IBNR") claims. The Debtors estimate their IBNR claims through an actuarial process that is common in the insurance industry. As of September 15, 2008, a total of approximately 2,600 Workers' Compensation Claims were pending against the Debtors arising out of employees' alleged on-the-job injuries. The Debtors estimate that the aggregate amount payable on account of incurred but not yet paid claims and IBNR claims arising prior to September 15, 2008, and retrospectively rated premium rate adjustments, is approximately $164.7 million in undiscounted net reserves. The Debtors estimate that the prepetition amount of such claims is approximately $62.0 million. The Debtors expect that the cash payments related to Workers' Compensation Claims for the twelve months after the Effective Date will be approximately $48.5 million.

Upon confirmation and substantial consummation of the Plan, the Reorganized Debtors will continue the Workers' Compensation Programs in accordance with applicable state laws. Nothing in the Plan shall be deemed to discharge, release, or relieve the Debtors or Reorganized Debtors from any current or future liability with respect to any of the Workers' Compensation Programs. The Reorganized Debtors will be responsible for all valid claims for benefits and liabilities under the Workers' Compensation Programs regardless of when the applicable injuries were incurred. Any and all

34

obligations under the Workers' Compensation Programs will be paid in accordance with the terms and conditions of Workers' Compensation Programs and in accordance with all applicable laws.

## H.      Significant Settlements and Litigation

The Debtors are party to various legal proceedings asserting causes of action allegedly related to the events giving rise to the Chapter 11 Cases, as well as certain legal proceedings incidental to the normal course of the Debtors' business. Based upon the Debtors' current assessment of the underlying merits of the actions, as well as their historical experience in litigating such actions and the availability of applicable insurance reserves and coverage, management believes that the final resolution of these matters, to the extent not already subject to an approved settlement, will not have a significant effect on the Debtors' financial position, liquidity, cash flows or results of operations. Certain litigation matters are discussed below.

### 1.      *SEC Inquiry*

On July 9, 2004, the Debtors received notice of an informal inquiry from the SEC. This request followed the voluntary disclosures that the Company made to the SEC regarding the increase in the Company's reserve for workers' compensation during fiscal 2004 with a change to pre-tax income of approximately $48.0 million. The Debtors cooperated with the SEC in its inquiry by providing documents and other information. On January 18, 2005, the Company announced that the SEC had issued an order commencing a formal investigation for the time period from June 2002 through the present. The order indicated that the SEC staff had reported information tending to show possible violations of various securities laws. The specific allegations included that IBC may have, in connection with the purchase or sale of securities, (i) made untrue statements of material fact or omitted material facts, or engaged in acts which operated as a fraud or deceit upon purchasers of the Company's securities; (ii) failed to file accurate annual and quarterly reports; (iii) failed to add material information to make any filed reports not misleading; (iv) failed to make and keep accurate books and records and maintain adequate internal controls; and (v) falsified books or records.

Pursuant to the formal order, the SEC subpoenaed documents and testimony from several current or former officers and directors and individuals from third party professional firms providing services to the Company. The Company cooperated fully with the SEC's investigation. On November 2, 2006, the Company announced that, without admitting or denying the allegations by the SEC, it had submitted an offer of settlement to the staff of the Division of Enforcement of the SEC in connection with the investigation, which was subject to approval by the SEC. On December 21, 2006, the SEC approved the Company's settlement offer and entered a cease and desist order against future violations of the record-keeping, internal controls and reporting provisions of the federal securities laws and related SEC rules. No fine was imposed.

### 2.      *Smith, et al. v. Interstate Bakeries Corp., et al.*

In February and March of 2003, seven putative class actions were brought against the Company and certain of its current or former officers and directors in the United States District Court for the Western District of Missouri. The lead case is known as <u>Smith, et al. v. Interstate Bakeries Corp., et al.</u>. The putative class covered by the complaint is made up of purchasers or sellers of IBC stock between April 2, 2002 and April 8, 2003.

On March 30, 2004, the Company and its insurance carriers participated in a mediation with the plaintiffs. At the end of that session, the parties reached a preliminary agreement on the economic terms of a potential settlement of the cases in which the insurers would contribute $15.0 million

and the Company would contribute $3.0 million.  The Company also agreed with plaintiffs and the insurers to work towards the resolution of any non-economic issues related to the potential settlement, including documenting and implementing the parties' agreement.  On September 21, 2004, the parties executed a definitive settlement agreement consistent with the terms of the agreement reached at the mediation.  The settlement agreement was subject to court approval after notice to the class and a hearing.

As of the Petition Date, further proceedings in the case were automatically stayed.  The settlement agreement provided, however, that the parties would cooperate in seeking to have the Bankruptcy Court lift the automatic stay so that consideration and potential approval of the settlement could proceed.  A motion to lift stay was filed with the Bankruptcy Court on November 24, 2004, and the Bankruptcy Court entered an order granting this motion on April 8, 2005, so that the parties could seek final approval of the settlement agreement from the court where the litigation was pending.  On September 8, 2005, the court entered a final order approving the settlement agreement.

### 3.    *June 2003 Shareholder Derivative Lawsuit*

In June 2003, a purported shareholder derivative lawsuit was filed in Missouri state court against certain current and former officers and directors of IBC, seeking damages and other relief.  In the case, which is captioned <u>Miller v. Coffey, et al.</u>, plaintiffs allege that the defendants breached their fiduciary duties to IBC by using material non-public information about IBC to sell IBC stock at prices higher than they could have obtained had the market been aware of the material non-public information.  The Company's Board of Directors previously had received a shareholder derivative demand from the plaintiffs in the June 2003 derivative lawsuit, requesting legal action against certain officers and directors of IBC.  In response, the Company's Board of Directors appointed a Special Review Committee to evaluate the demand and to report to the board.  Prior to the Petition Date, the parties agreed to stay the lawsuit until October 11, 2004 and also had initiated preliminary discussions looking towards the possibility of resolving the matter.  Pursuant to an order entered on November 26, 2007 in the Circuit Court of Jackson County, Missouri, this matter was dismissed without prejudice.

### 4.    *Labor Litigation*

#### (a)    Ruzicka and McCourt

The Company is named in two wage and hour cases in New Jersey that have been brought under state law, one of which has been brought on behalf of a putative class of route sales representatives.  The case involving the putative class is captioned <u>Ruzicka, et al. v. Interstate Brands Corp., et al.</u>, No. 03-CV 2846 (FLW) (Sup. Ct., Ocean City, N.J.), and the other case is captioned <u>McCourt, et al. v. Interstate Brands Corp.</u>, No. 1-03-CV-00220 (FLW) (D.N.J.).  As a result of the Company's Chapter 11 filing, these cases were automatically stayed.  However, the automatic stay was lifted, and as a result of a mediation in late July 2008, the parties have reached agreement in principle to settle these cases through an allowed, pre-petition general unsecured claim in the amount of $2.0 million, which is subject to Bankruptcy Court and New Jersey Federal Court approval.

#### (b)    Fishlowitz

On October 28, 2005, the Bankruptcy Court entered an order approving the Debtors' settlement with Mitchel Fishlowitz, on behalf of himself individually and as representative of a class of individuals similarly situated.  In particular, Fishlowitz was the proposed representative of a putative class in a class action captioned <u>Fishlowitz, et al. v. Interstate Brands Corporation, Inc.</u>, then pending in the United States District Court for the Central District of California.  The plaintiffs asserted claims against the Company alleging a failure to pay overtime wages under federal law, as well as unpaid overtime,

36

unlawful uniform charges, failure to provide 30-minute meal breaks, failure to furnish employees with itemized statements, and unfair competition under California law.

After extensive settlement discussions and mediation, the Fishlowitz plaintiffs and the Debtors reached a settlement. Under the terms of the settlement, in exchange for dismissal of the class action lawsuit with prejudice and withdrawal of all claims filed related to the class action, the plaintiffs received an allowed prepetition General Unsecured Claim of $6 million in the Chapter 11 Cases. In addition, the Company agreed to pay the class a $2 million Administrative Claim subject to certain conditions precedent.

5.    *Environmental Matters*

(a)    CFC Claim

The Environmental Protection Agency (the "EPA") has made inquiries into the refrigerant handling practices of companies in IBC's industry. In September 2000, the Company received a request for information from the EPA relating to its handling of regulated refrigerants, which it has historically used in equipment in its bakeries for a number of purposes, including to cool the dough during the production process. The EPA has entered into negotiated settlements with two companies in IBC's industry, and has offered a partnership program to other members of the bakery industry that provided amnesty from fines if participating companies converted their equipment to eliminate the use of ozone-depleting substances. Because the Company had previously received an information request from the EPA, certain policies of the EPA and Department of Justice (the "DOJ") made it ineligible to participate in the partnership program. Nevertheless, the Company undertook its own voluntary program to convert its industrial equipment to reduce the use of ozone-depleting refrigerants.

Prior to the Petition Date, the Company had undertaken negotiations with the EPA to resolve issues that may have existed regarding its historic management of regulated refrigerants. The DOJ, on behalf of the United States of America, filed a proof of claim on March 21, 2005, based upon such issues. Although the proof of claim does not set forth a specific amount, the claimants allege more than 3,400 violations during the period from 1998 through 2002 and assert that each violation is subject to penalties up to $27,500 per day. The Company re-opened settlement negotiations with the DOJ and EPA, and as a result of those negotiations, the Company and the DOJ and EPA have reached an agreement in principle to settle the DOJ and EPA's claims through an allowed, pre-petition, general unsecured claim in the amount of approximately $1.1 million, which is subject to Bankruptcy Court approval.

(b)    South Coast Air Quality Matter

On June 11, 2003, the South Coast Air Quality Management District in California (the "SCAQMD") issued a Notice of Violation alleging that the Company had failed to operate catalytic oxidizers on bakery emissions at its Pomona, California facility in accordance with the conditions of that facility's Clean Air Act Title V Permit. Among other things, that permit requires that the operating temperatures of the catalytic oxidizers be at least 550 degrees Fahrenheit. Under the South Coast Air Quality Management District rules, violations of permit conditions are subject to penalties of up to $1,000 per day, for each day of violation. The Notice of Violation alleges the Company was in violation of the permit through temperature deviations on more than 700 days from September 1999 through June 2003. Since that time, four additional instances of alleged violations, some including more than one day, have been cited by the SCAQMD. The Company is cooperating with the SCAQMD, has taken steps to remove the possible cause of the deviations alleged in the Notice of Violation, applied for and received a new permit, and has replaced the oxidizers with a single, more effective oxidizer. The SCAQMD filed a proof of claim dated December 8, 2004 in the Company's bankruptcy cases for $200,000 in civil penalties. The

37

Company and SCAQMD has reached an agreement in principle to settle the SCAQMD claim through an allowed, pre-petition, general unsecured claim in the amount of $150,000, which is awaiting finalization of a stipulation to be filed with the Bankruptcy Court.

(c)    Casmalia Resources Superfund Site

In 1999, the Company received notice from the EPA of potential responsibility for waste that it arranged for disposal at the Casmalia Site in Santa Barbara County, California. Allegedly the Company arranged for the disposal of about 1,366,748 pounds of petroleum-contaminated soil at the Casmalia Site in 1989. Most of this waste was generated as the result of the soil excavations associated with the tanks at the Company's site in Glendale. The EPA also asserted liability under RCRA, but no action has been commenced against the Company and no claim has been filed in the Company's bankruptcy cases, despite notice of a bar date to the EPA. The State of California Department of Fish and Game filed two claims that have been allowed in an aggregate amount less than $7,000. No claims have been asserted yet against the Company, other companies or by the steering committee, which consists of several dozen companies who arranged for large amounts of wastes to be disposed of at the site. The cost of cleanup and possible third party claims is unknown at this point.

(d)    Former Dolly Madison Bakery located at 1426 S. Lincoln St., Stockton, California ("Stockton Site")

The State Water Resources Control Board and the California Regional Water Quality Control Board, Central Valley Region (the "Boards") have asserted the following: "The Debtors, including Brands leased this property and owned and operated an Underground Storage Tank ("UST") system at this site from at least November 6, 1986 through at least 1991. In 1988, a UST was removed by Debtors and found to have been leaking into the soil and groundwater. Specifically, on July 27, 1988, Brands, pursuant to a 1988 Tank Removal Plan and a San Joaquin County Permit issued in 1987 to Brands, removed one 1-000-gallon leaded gasoline UST from the Site. Confirmation soil sampling revealed the presence of Total Petroleum Hydrocarbons as gasoline (TPHg), Xylenes, and Lead. After Brands allegedly vacated the premises in 1991, the San Joaquin County Environmental Health Department ( the "County") sent a Notice of Reimbursement to Brands on or about November 16, 1996, informing them that they were a Responsible Party for the continuing contamination and pollution caused by the underground storage tank and ordered Brands to submit a workplan and initiate investigation and determine how to remediate the ongoing contamination and pollution. Brands did not appeal the Notice. Brands hired EMCON as its consultant and submitted a Work Plan on January 27, 1997 for three on site borings, completing the initial work in February, 1997. Waste constituents detected at a maximum soil concentrations were TPHg, benzene, toluene, ethylbenzene, xylenes, Methyl tert-Butyl Ether (MtBE). Maximum groundwater concentrations were detected of TPHg, benzene, toluene, ethylbenzene and xylenes. Brands continued to monitor the site for additional pollution and submit monitoring reports to the County. The last monitoring event was evidently conducted on or about May or June, 2004. On November 30, 2004, after the bankruptcy was filed, STRATUS ENVIRONMENTAL, INC., on behalf of Brands, filed a Site Conceptual Model for contamination and pollution caused by UST at the Stockton Site. Documents from regulatory agencies include evidence of the discharge of petroleum hydrocarbons and other constituents from the UST that has impacted soil and groundwater in the vicinity of the UST and that has continued to impact soil and groundwater off site. To date, the soil and groundwater that has been impacted has not been cleaned up or abated. The Boards hold Brands primarily responsible for the cleanup of the site and any and all continuing pollution, including migration because at the time of the discharge, Brands caused or permitted waste to be discharged to the waters of the state where it has created a condition of pollution or nuisance. On or about August 4, 2005, the County sent a letter to Brands, directing it as a responsible party to resume monitoring and to submit a workplan by September 30, 2005. After having no compliance by Brands, the County referred the matter to the Regional Board on

38

August 31, 2006 for enforcement action. On September 26, 2006, the Regional Board sent a certified letter to Brands in Kansas City advising them that the lead enforcement agency had changed from the County to the Regional Board and that Brands was required to submit a workplan to investigate the lateral and vertical extent of the contamination. This was the first time that the Regional Board became involved in enforcement of this matter. On October 8, 2007, the Regional Board adopted Cleanup and Abatement Order No. R5-2007, which orders Brands, among others, to investigate the extent of the waste, clean up the waste and abate the effects of the waste resulting from activities from the former UST system owned and operated by Brands. The Company did not appeal the Cleanup and Abatement Order to the State Board and it is a final order. The Company has responded to the Order advising that it is subject to the automatic stay in the Company's bankruptcy cases, and that the State of California is barred because it has filed no claim in the bankruptcy cases. To the extent that State Funds are utilized to clean up the site, including the Orphan Site Account or the State Underground Tank Fund, the State Water Resources Control Board has the right to recover the monies it expends from responsible parties, but the Company has responded that any such right is barred by the failure of the State to file any bankruptcy claim.[4] The cost of the cleanup of the ongoing pollution and possible third party claims is unknown at this time, but STRATUS ENVIRONMENTAL, INC has estimated that to cleanup the ongoing pollution may cost approximately $2.2 million. The State Board and Regional Board assert that the injunctive relief required in the Cleanup and Abatement Order is not a claim discharged in the bankruptcy and assert that Debtors failed to give proper notice of the bankruptcy to these agencies. In lieu of litigation, the Regional Board proposed a settlement of this matter, but the Company initially rejected it, without any counter-offer and indicated that it would not be able to spend time resolving the matter."

The Debtors deny the Boards' allegations and deny any liability regarding the Stockton Site. The Debtors state that they gave proper notice of the Bar Date and bankruptcy proceedings to the appropriate parties, that the relief requested by the Boards is a claim under 11 U.S.C. §§ 101(4), that the relief requested by the Boards is barred by the Bar Date Order for failure to file a claim, that the Boards cannot meet their burden of proving causation and/or recoverable costs and that, in the alternative and even if the Boards had filed a claim, the relief requested by the Boards is subject to the automatic stay under 11 U.S.C. §§ 362. Furthermore, the Debtors state that Claims 9080 and 9127 filed by Lorrie Greene are barred by Rules 3003(c)(2) and 3005(a), Fed. Rules Bank. Proc., and the Bar Date Order, that Lorrie Greene cannot meet her burden of proving causation and/or recoverable costs. Claims 9080 and 9127 remain the subject of claims objections.

(e)    Operating Industries, Inc. Superfund Site

This claim was filed by the Steering Committee and Member Companies on behalf of themselves and on behalf of the United States Environmental Protection Agency. This claim is for estimated response costs, reimbursement, indemnification and/or contribution for the actual costs of cleanup of the OII Superfund Site in Monterey Park, California. The actual costs are yet to be determined and it may be several decades before the costs are known. A record of decision for the Site was filed in 1996. The basis for the proof of claim is the Company's signature to the 2002 Eighth Consent Decree as a "Work Defendant" obligating the Company to pay its proportionate share of the total actual Site cleanup costs. The proof of claim estimates that the total cost of work to be performed through the year 2065 is $386,000,000 and that the Company's share of that estimated cost is $424,600. The Company objected to the proof of claim on the grounds that the liability and/or damages are disputed. The OII Steering

---

4        In its prior Disclosure Statement dated November 5, 2007, Debtors took a different position: "The state will have the right to recover the monies it expends from the orphan account from responsible parties. The cost of the cleanup is unknown at this point. This matter remains pending."

Committee's response states that the Company's projected share is based on a percentage of the total volume of materials generated at the Site for which it alleges that the Company is liable for 0.11% of the total volume (156,200 gallons) and that the burden is on the Company to negate this allegation. There is a dispute as to the number of gallons of waste that the Company sent to the Site, and there is a dispute as to the method by which the Steering Committee estimated the cleanup cost per gallon. The cost of the cleanup and the Company's share are unknown at this time. On September 2, 2008, the parties reached a tentative settlement in which the Company would allow a general unsecured, non-priority claim of $334,851.00 subject to approval of the bankruptcy court.

(f)     U-Store Two Company

U-Store Two Company ("U-Store") timely filed an unsecured claim for $500,000. The Company appears to own the former Merita Bakeries Depot, 388 N. Nova Road, Daytona Beach, Florida, DEP Facility 648731571. The Company's adjacent neighbor to the south is a mini-storage facility owned by U-Store. It appears that a UST was removed from the Depot property in 1983 and that another UST was removed from the Depot property in 1993. U-Store claims that petroleum hydrocarbons from the Depot property migrated into the soil and groundwater of the U-Store property, resulting in contamination of soil and groundwater and diminution of the value of the U-Store property. A consultant for the Company obtained access to the U-Store property and has done monitoring. The Company has agreed orally to remediate the U-Store property. Recent monitoring and sampling of the U-Store property by the Company's consultant have found concentrations that are below state action levels. The cost of remediation and possible claims by third parties are unknown at this time.

(g)     Hows Corner Superfund Site

This is a claim by the US on behalf of EPA for liability at the Hows Corner Superfund Site in Plymouth, Maine. EPA has incurred unrecovered costs of approximately $1,100,000 and calculates IBC's share of that to be $84,020 based on volumetric share including a premium to pay the same proportional share for recalcitrant parties. The Company objected to this claim in the 24th Omnibus Objection. The cost of the investigation, remediation and post-remediation monitoring and possible claims by third parties is unknown at this time. On September 8, 2008, the parties reached a tentative settlement in which the Company would allow a general unsecured, non-priority claim of $84,020.00 subject to agreement on the terms of the settlement documents and subject to approval of the bankruptcy court.

(h)     Peterson/Puritan, Inc. Superfund Site

On December 19, 2001, the Company received a Request for Information from the EPA regarding this Site at its Drakes Bakery location in Wayne, New Jersey. In correspondence dated March 7, 2002, the Company responded that its records did not show that anything other than food waste was sent to the Site. In correspondence dated July 17, 2002, the Company formally requested that the EPA remove the Company from all potentially responsible party lists due to the fact that all Company records and EPA records did not show that any hazardous waste was sent to the site from the Company. The Company is not aware of any response from the EPA after the July 2002 correspondence. Further research shows that the Site is divided into operable units and that a substantial amount of the remedial activities are ongoing and are being conducted by PRPs through one or more Administrative Orders on Consent. The Company does not know the cost of the cleanup or possible third party claims.

(i)    Salisbury, MD Matter

On July 16, 2007, the Company was sent a "Notice of Material Breach of Lease, Demand for Abatement and Remediation and Reservation of Rights" by counsel for the lessee of property at 601 East Main, Salisbury, MD (the "Salisbury Property"). The lessee included an environmental report with the Notice, which notes the observation of certain allegedly problematic environmental conditions at the Salisbury Property. The Debtors engaged the services of a third party consultant who found that the alleged contamination was below actionable levels. The Company advised the lessee of the consultant's findings and has heard nothing further. At this time there are not sufficient facts to state with any certainty the likelihood of an unfavorable outcome or the amount or range of potential loss or expense which may be incurred, if any, by the Debtors in connection with this matter.

6.    *Preference Adversary Action*

On September 20, 2006, the Debtors filed a Complaint in the bankruptcy cases, Adversary No. 06-04191, seeking avoidance and recovery of alleged preference payments to over 350 named parties in the aggregate amount of about $96 million. In addition, the Debtors have entered Tolling Agreements with various parties that involve aggregate potential preference liability of about $22 million. Pursuant to an order entered by the Bankruptcy Court, this adversary action has not been "served" on the defendants, and no defendants have filed any pleadings asserting any defenses, counterclaims or other matters in the adversary action yet.

On November 5, 2007, the Debtors filed a First Amended and Restated Complaint that added two defendants who had elected to terminate their Tolling Agreements. On December 21, 2007, the Bankruptcy Court entered an order extending the time period to commence service of process of the Complaint to the earlier of June 30, 2008 or ninety (90) days after the effective date of any confirmed plan of reorganization. On June 11, 2008, the Bankruptcy Court entered an order further extending the time period to commence service of process of the Complaint to the earlier of December 31, 2008 or ninety (90) days after the effective date of any confirmed plan of reorganization.

7.    *Adversary Action Against the Prepetition Lenders*

On September 20, 2006, Debtors filed a Complaint in the bankruptcy cases, Adversary No. 06-04192, seeking seven forms of relief against 114 parties who are or were members of the group constituting the Prepetition Lenders. The relief requested includes (i) avoidance and recovery of alleged preference payments in the aggregate amount of about $94 million; (ii) avoidance of certain liens alleged to be preferential transfers; (iii) avoidance of certain liens alleged to not be properly perfected under relevant law; and (iv) avoidance and recovery of certain transfers after the Company filed its bankruptcy cases. Pursuant to an order entered by the Bankruptcy Court, this adversary action has not been "served" on the defendants, and no defendants have filed any pleadings asserting any defenses, counterclaims or other matters in either adversary action yet. The Debtors also preserved certain claims and causes of action against the Prepetition Lenders pursuant to various orders extending the challenging deadline. According to Section 11.3 of the Plan, the Plan constitutes a compromise and settlement of the Prepetition Lender Actions and the Confirmation Order will provide for the dismissal, with prejudice, of any pending adversary proceedings filed in connection therewith.

8.    *ABA Plan*

Prior to the Petition Date, approximately 900 active IBC employees participated under the American Bakers Association Retirement Plan (the "ABA Plan"), although the number of active employees significantly decreased as a result of the Debtors' restructuring to approximately 350 active

41

employees in the ABA Plan as of September 30, 2006. The Company had previously accounted for the ABA Plan as a multi-employer plan, which resulted in recognition of expense in the amount of its actual contributions to the ABA Plan but did not require recognition of any service cost or interest cost or for the Company to record any minimum pension benefit obligation on its balance sheet.

Upon review, the Debtors determined that the ABA Plan is a type of pension plan that requires recognition of service cost and interest cost. Additionally, the Debtors concluded that its balance sheet should also reflect the appropriate pension benefit obligation. The Company believes that the ABA Plan had been historically administered as a multiple employer plan under the Employee Retirement Income Security Act of 1974 ("ERISA") and tax rules and should be treated as such. However, the amounts reflected in the Company's financial statements, after restatement of the fiscal 2004 financial statement, were calculated on the basis of treating the ABA Plan as an aggregate of single employer plans under ERISA and tax rules, which is how the ABA Plan contends it should be treated. The Company reflected its interest in the ABA Plan as an aggregate of single employer plans despite its position on the proper characterization of the ABA Plan due to representations it received from the ABA Plan and a 1979 determination issued by the Pension Benefit Guaranty Corporation (the "PBGC"). As of May 31, 2008, the Company's net pension benefit obligation liability with respect to its respective interest in the ABA Plan was approximately $69.1 million, reflecting its characterization as an aggregate of single employer plans.

At the request of the Debtors and the Kettering Baking Company, another participating employer in the ABA Plan, the PBGC revisited its 1979 determination that the Plan was an aggregate of single employer plans. After reviewing the status of the ABA Plan, the PBGC made a final determination on August 8, 2006 that the ABA Plan is a multiple employer plan under ERISA and tax rules. On August 9, 2006, the Company filed a lawsuit in Bankruptcy Court seeking enforcement of the August 8, 2006 PBGC determination.

In the Company's December 2005 submission requested by the PBGC in connection with its review of the 1979 determination referred to above, the Company asserted its belief based on available information that treatment of the ABA Plan as a multiple employer plan will result in an allocation of pension plan assets to its pension plan participants in an amount equal to approximately $40 million. The Company believes that treatment of the ABA Plan as a multiple employer plan will result in a significant reduction in its net pension benefit obligation with respect to its employee participants. The ultimate outcome of this uncertainty cannot presently be determined.

In addition, the Company has received requests for additional corrective contributions assessed after May 28, 2005, under the single employer plan assumption. The Company has not made such contributions pending the resolution of the uncertainties surrounding the ABA Plan. However, the Company expects that the amount of such contributions calculated on the basis of a multiple employer plan would be significantly less than the amounts assessed by the ABA Plan on the assumption that the plan was an aggregate of single employer plans.

On May 3, 2006, Sara Lee Corporation instituted proceedings against the ABA Plan and the Board of Trustees of the Plan in the United States District Court for the District of Columbia (the "Sara Lee Litigation"). The relief Sara Lee seeks includes, among other things, a mandatory injunction that would compel the ABA Plan and the Board of Trustees of the Plan to (i) require all participating employers in the ABA Plan with negative asset balances – which would include the Company -- to make payments to the Plan in order to maintain a positive asset balance and (ii) cut off the payment from the ABA Plan of benefits to employee-participants of the Company and other participating employers with negative asset balances, to the extent such employers did not maintain a positive balance. However, the Sara Lee Litigation is premised on the notion that the ABA Plan is an aggregate of single employer plans,

42

which is inconsistent with the PBGC's determination dated August 8, 2006 that the ABA Plan is a multiple employer plan.  On September 29, 2006, Sara Lee filed an amended complaint adding the PBGC as a defendant and challenging the PBGC's August 8, 2006 determination.  In order to obtain a resolution of these matters without litigation over the proper forum, the Debtors voluntarily stayed its lawsuit in Bankruptcy Court seeking enforcement of the August 8, 2006 determination upon the agreement by the ABA Plan and its Board of Trustees to join IBC as a party to the Sara Lee Litigation.

On December 4, 2006, the ABA Plan and the Board of Trustees served a summons upon the Debtors as a third party defendant to a Third Party Complaint filed in the Sara Lee Litigation against Sara Lee and the other participating employers in the ABA Plan.  The Third Party Complaint seeks declaratory judgment as to the nature of the ABA Plan and further asserts that the August 8, 2006 determination was arbitrary and capricious and should be rescinded.  At this time, the Company believes all relevant parties have been joined to the Sara Lee Litigation and the District Court for the District of Columbia will review the PBGC's administrative determination.

On November 22, 2006, the ABA Plan and the Board of Trustees filed a motion in the Bankruptcy Court seeking an order requiring the Company to file an application with the Internal Revenue Service (the "IRS") requesting a waiver of the minimum funding requirements applicable to the ABA Plan or, in the alternative, make $3.9 million of contributions to the ABA Plan no later than June 15, 2007.  On December 8, 2006, the Bankruptcy Court denied this motion.

The proceedings in the District Court in Washington D.C. are still pending.  On April 4, 2007, the PBGC filed a motion for summary judgment in the Sara Lee Litigation asking the District Court to enforce the PBGC's August 8, 2006, determination that the ABA Plan is a multiple employer plan.  Briefing on the PBGC's motion for summary judgment concluded on June 8, 2007, and oral argument was heard on July 2, 2007.  On September 11, 2007, the District Court issued a partial ruling on the PBGC's motion for summary judgment.  In its opinion, the District Court agreed with the PBGC and the Company as to the requisite standard for its review, but declined to review the PBGC's August 8, 2006, determination until after it could decide whether the administrative record filed by the PBGC was complete.  On August 27, 2008, a magistrate judge for the District Court ruled that the administrative record was complete.  Since this decision, Sara Lee filed an objection to the magistrate judge's order, to which the Company and the PBGC have responded.  The Company now awaits the District Court's ruling addressing the PBGC's August 8, 2006 determination.

As stated above, the Transaction is subject to various conditions and contingencies.  One such condition is either (a) entry of an order by the Bankruptcy Court in the Chapter 11 Cases, in form and substance satisfactory to Equity Investors, determining that, if and to the extent that a court of competent jurisdiction determines that any of the Debtors has any current or future liability to, under or in connection with the ABA Plan based on the Debtors' (or their employees') participation prior to the Effective Date in such pension plan, such liability is a general unsecured pre-petition claim against the relevant Debtor, and such order becoming a final order, in full force and effect without reversal, modification or stay, not subject to a pending motion for reconsideration, revocation, reversal, modification, stay or appeal and the period for an appeal having expired; or (b) Equity Investors shall otherwise be satisfied that any of the Debtors' or the Reorganized Company's or its direct and indirect subsidiaries' current or future liability (whether on- or off-balance sheet, contingent or otherwise) to, under or in connection with the ABA Plan based on the Debtors' (or their employees') participation prior to the Effective Date in such pension plan shall not result in any post-confirmation payment by, or any other cost to, the Reorganized Company or any of its direct or indirect subsidiaries.

43

In order to meet the above described condition, on October 23, 2008, the Debtors filed a motion seeking authority to enter into a settlement agreement with the PBGC pursuant to which the PBGC's claims related to the ABA Plan will be reclassified and allowed in reduced amounts as general unsecured prepetition claims.  In addition, on October 23, 2008, the Debtors filed a motion seeking to modify the stay of proceedings in the Bankruptcy Court with respect to determination of the priority of the ABA Plan's claims, if any.  Attached to such motion was a proposed motion seeking such determination, which the Debtors seek to have the Bankruptcy Court hear prior to the confirmation hearing on the Plan.

9.   *Settlement of the Gianopolous Litigation*

On March 3, 2006, the Bankruptcy Court authorized the Debtors to enter into a settlement agreement ending litigation against the Debtors in Illinois state court.  The putative class action related to the discovery of material that allegedly contaminated certain products produced over an alleged seventeen (17) day period in January 1998 at a bakery operated by the Debtors in Illinois.  After the discovery, the Debtors conducted a product recall under which all persons who bought products manufactured at that bakery during the relevant time in approximately 23 states were given the opportunity to return it for a full refund.

Between the filing of the action in 1998 and the Petition Date, the Debtors successfully had dismissed all claims except for those regarding an alleged implied warranty of merchantability of fitness for a particular purpose.  After extensive settlement negotiations, the parties entered into a settlement agreement ending the litigation.  Under the settlement agreement, the Debtors agreed to (1) issue coupons with a face value of $9,450,000 within the 23-state area; and (2) to not object to a request by the plaintiffs' attorneys for General Unsecured Claims for $1,200 for the benefit each of Mary K. Frost and Lisa Drucker and $1,500 for the benefit of Dennis Gianopolous, together the class representatives, and a total of $500,000 in attorneys' fees, costs and expenses.

10.   *Nestle Purina Petcare*

On October 4, 2005, the Bankruptcy Court authorized the Debtors to enter into a settlement agreement with Nestle Purina Petcare Company ("Purina").  The underlying dispute arose from a tax sharing agreement entered into by the parties along with a related sale and purchase agreement dated July 22, 1995.  Pursuant to the tax sharing agreement, the Company made a number of prepetition payments to Purina.  However, owing in part to a subsequent amendment to the tax laws, it was the Company's position that Purina was obligated to reimburse it for payments made.

To avoid the expense, delay and uncertainty of litigating the parties' respective positions, the parties engaged in settlement negotiations.  The resulting settlement required Purina to reimburse the Debtors $2.75 million to settle all tax-related disputes between the parties.  In addition, Purina withdrew any and all claims against the Debtors in the Chapter 11 Cases and each party provided a release to the other of all claims or causes of action arising from the relevant sections of the tax sharing agreement.

11.   *100 Calorie Pack Packaging*

On February 4, 2008, the Company received notice that the Sacramento County California District Attorney's Consumer and Environmental Protection Division had opened an inquiry into whether the packaging for the Company's 100 Calorie Pack snack cakes violated California law.  Specifically, the inquiry was focused on whether the packaging contained "nonfunctional slack fill" and/or constituted "misleading advertising".  If the allegations are found to be true, the maximum penalty could be up to $5,000 per package offered for sale or sold in the state of California.  Subsequently, the

inquiry was joined by the Yolo County California District Attorney's office.  To date no formal charges have been filed, and the Company continues to cooperate in the inquiry.  However, the Company believes that its packaging is not misleading and that any enforcement of slack fill regulations is pre-empted by federal statute and, therefore, only enforceable by the Federal Food and Drug Administration.

        12.        *Flowers Trademark Litigation*

        On July 23, 2008, Flowers Bakeries Brands, Inc. ("Flowers"), a competitor of the Company, filed a federal court trademark lawsuit in federal court in Atlanta against the Company (No. 1.08-CV-02376-TWT), challenging the Company's announced use of the trademark NATURE'S PRIDE for a new line of 100% natural premium breads.  On August 8, 2008, Flowers served and filed an amended complaint (the "Amended Complaint").  Flowers alleges that the Company's trademark infringes on and dilutes Flowers' NATURE'S OWN trademarks (four of which are federally registered) for competing fresh bread products.  The Amended Complaint asserts six separate claims, for trademark infringement, unfair competition, and dilution, and seeks injunctive relief and damages.  The Company believes that it has meritorious defenses and intends to contest the matter vigorously.

        13.        *Voluntary Compliance Procedures*

        The Company has identified certain apparent failures to withhold required contributions, and make certain lesser matching contributions, to certain deferred employee compensation plans.  Although no claim has been asserted with respect to such failures, the Company has implemented procedures to avoid such failures in the future and has disclosed these apparent past failures to the IRS under certain voluntary compliance procedures.  The Company is actively engaged in ongoing discussions with the IRS regarding the remediation of those failures.  The Company cannot predict whether those discussions will be successful and, if successful, what the cost of such remediation strategy would be.  The Company cannot predict whether the IRS may pursue a claim against the Company, what the amount of such a claim might be, if asserted, and whether such claim would ultimately be successful.  The Company believes that it has certain defenses to any such claim and anticipates that it would assert such defenses vigorously.

        14.        *Old Convertible Noteholder Litigation*

        On August 12, 2004, the Company issued the Old Convertible Notes in a private placement to six institutional accredited investors under an exemption from registration pursuant to Rule 506 of Regulation D promulgated by the SEC.  The Old Convertible Notes were purchased by Highbridge International LLC, Isotope Limited, AG Domestic Convertibles LP, AG Offshore Convertibles LTD, Shepherd Investments International, Ltd., and Stark Trading.  Between the dates of September 2 and September 21, 2004, the Company received written correspondence from all of the initial purchasers of the convertible notes stating that it was their position that the Company had made certain misrepresentations in connection with the sale of the notes.

        On or about August 29, 2008, $R^2$ Investments LDC, an entity that is a beneficial holder of $70,000,000 in face amount of the Old Convertible Notes, filed suit in the Circuit Court of Jackson County Missouri at Kansas City, case # 0816-CV27077, against former Directors and an Officer of the Company alleging negligent misrepresentation in connection with the issuance of the Old Convertible Notes.

45

I.    **Accomplishments During Chapter 11; Development and Summary of the Business Plan; and IBC's Go-Forward Strategy**

IBC's need to restructure its business through a chapter 11 reorganization proceeding arose due to the combination of a number of factors. In light of these factors, IBC concluded that commencement of the Chapter 11 Cases would afford the Company the best opportunity for restructuring its affairs and for developing and implementing a long-term, go-forward strategy. To this end, IBC has successfully implemented a number of key initiatives during the time that the Company has been in chapter 11. IBC believes that it has accomplished or will accomplish prior to emergence from chapter 11 nearly all of the actions which it required chapter 11 to address, including, among other things, the restructuring of its profit centers and restructuring its balance sheet.

1.    *Strategic Initiatives*

(a)    Initial Efforts To Reduce Costs

In the initial stage of the chapter 11 restructuring, the Debtors focused on quickly identifying opportunities for cost reductions that did not require fundamental operational changes. As a result, the Debtors began various initiatives to rationalize, among other things, their supply chain, labor and marketing costs. These initial cost-cutting measures resulted in operational cost savings in excess of $80 million.

(b)    Profit Center Consolidation

The Debtors' asset rationalization and optimization strategies have been complemented throughout the Chapter 11 Cases by a number of business initiatives. Since the Petition Date, the Debtors have restructured their operations. With the assistance of A&M, the Debtors engaged in exhaustive analyses of each of their ten PCs, seeking to identify, among other things, (i) unprofitable products and routes; (ii) areas of inefficient distribution; (iii) opportunities to rationalize brands and stock-keeping units ("SKUs"); and (iv) excess capacity in each PC. These actions were part of the Debtors' efforts to address continued revenue declines and its high-cost structure, and strengthen its focus on branded sales and deliveries.

The Debtors began the process of analyzing each of their PCs by performing a detailed review of the efficiency and profitability of existing brands, SKUs, delivery routes and individual stops within each PC. Next, the Debtors analyzed the capacity requirements needed to service the brands, SKUs and routes based on the logistical requirements of producing and delivering product identified in the initial analysis. Finally, the Debtors mapped out delivery routes based upon these requirements. During this process, each PC was visited multiple times. PC management teams were actively engaged in the review, particularly with respect to the practicalities of remapping routes.

On July 5, 2005, the Bankruptcy Court entered an order (the "First Consolidation Order") approving the Debtors' motion seeking authority to, among other things, consolidate operations in the Florida/Georgia, Mid-Atlantic and Northeast PCs. Pursuant to the authority granted in the First Consolidation Order, the Debtors consolidated operations in the Florida/Georgia PC by closing their bakery in Miami, Florida, and by reducing routes, depots and thrift stores in Florida and Georgia, where the Debtors maintain regional facilities. In the Mid-Atlantic Profit Center, the Debtors closed their bakery in Charlotte, North Carolina, and reduced routes, depots and thrift stores in North Carolina, South Carolina and Virginia. Finally, the Debtors consolidated operations in the Northeast by closing their bakery in New Bedford, Massachusetts and reducing routes, depots and thrift stores throughout the Northeast.

46

On August 9, 2005, the Bankruptcy Court entered an order (the "Second Consolidation Order") approving the Debtors' second motion seeking authority to, among other things, consolidate operations in certain PCs.  Pursuant to the Second Consolidation Order, the Debtors were given the authority to consolidate operations in the Northern California and Southern California PCs.  As a result, in the Northern California PC, the Debtors closed the Wonder/Hostess bakery and the Parisian San Francisco bakery, both located in San Francisco, California, and reduced various routes, depots and thrift stores.  In the Southern California PC, the Debtors standardized material handling and related distribution equipment and also reduced routes, depots and thrift stores in various locations where the Debtors maintain regional facilities.

On November 16, 2005, the Bankruptcy Court entered an order (the "Third Consolidation Order") approving the Debtors' motion seeking authority to, among other things, consolidate operations in the Northwest PC.  Pursuant to the authority granted in the Third Consolidation Order, the Debtors consolidated operations in the Northwest PC by closing the bakery located in Lakewood, Washington, as well as certain depots and thrift stores, and by remapping certain delivery routes.

In the Debtors' fourth consolidation motion (the "Fourth Consolidation Motion"), filed on November 22, 2005, the Debtors sought Bankruptcy Court authority to consolidate operations in three additional PCs – the North Central, South Central and Southeast PCs.  In analyzing operations in these PCs, the Debtors determined that no bakeries were required to be closed in order to achieve target levels of profitability and efficiency.  The Debtors did, however, determine that certain depots and thrift stores should be closed, distribution should be standardized and certain delivery routes should be remapped.  On December 16, 2005, the Bankruptcy Court granted the authority sought in the Fourth Consolidation Motion.

The Debtors were granted authority to consolidate operations in the tenth and final PC – the Upper Midwest PC – pursuant to an order entered by the Bankruptcy Court on May 17, 2006 (the "Fifth Consolidation Order").  Similar to the Debtors' efforts to consolidate operations in its other PCs, the Debtors consolidated operations in the Upper Midwest PC by closing certain depots and thrift stores, and by reducing and remapping certain delivery routes.

As a result of the Debtors' efforts to consolidate operations in its ten PCs, nine bakeries were closed along with approximately 200 distribution centers.  In addition, the Debtors rationalized their delivery route network, reducing the number of routes by approximately thirty percent, from approximately 9,100 delivery routes to approximately 6,400.  Furthermore, the PC analyses contributed to a reduction in the Debtors' workforce by approximately 7,000 positions.  These efforts resulted in hundreds of millions of dollars of savings.  Ultimately, however, even these savings were not enough to ensure that the Company could emerge from chapter 11 as a viable enterprise.

(c)    Marketing Initiatives

The Debtors have initiated a marketing program designed to offset revenue declines by developing protocols to better anticipate and meet changing demand through a consistent flow of new products.  In August 2005, the Company hired Richard Seban as Executive Vice President and Chief Marketing Officer.  Prior to joining the Company, Mr. Seban had approximately 30 years of experience in sales, marketing and new product development in consumer packaged goods at various companies including Sara Lee Bakery, an IBC competitor.

As part of the Debtors' aggressive new marketing efforts, the Company re-launched the iconic Wonder® bread brand on a national basis under the "Wonder® Classic" name, along with the launch in January, 2006, of three new Wonder® bread products: "Wonder® made with Whole Grain

47

White," "Wonder® Kids," and "Wonder® White Bread Fans® 100% Whole Grain."  In addition, the Company launched new products within its buns and rolls product segment, including Wonder® buns, made with whole grains, and Wonder® wheat hamburger and hot dog buns.

The Company continues to work on other programs and additional new product launches. On the bread side of the business, the Company launched two new Wonder® everyday wheat bread products: "Wonder® made with Whole Grain Wheat" and "Wonder® made with Whole Grain Honey Wheat."  On the sweet goods side of the business, the Company launched an updated packaging redesign for the entire Hostess® line, a major promotional and public relations campaign in connection with the 75th anniversary of the introduction of Twinkies®, and new products such as the highly successful Hostess® 100 Calorie Packs.  In addition, IBC executed various holiday, movie and sports promotion tie-ins and related opportunistic marketing initiatives.

(d)    2007 Intensification of Restructuring Efforts

The Debtors intensified their restructuring efforts beginning in calendar 2007 because the initiatives undertaken since the Petition Date were not sufficient to allow the Debtors to emerge from chapter 11 as a viable enterprise.  Calendar 2007 brought major developments that enabled the Debtors to reach the point where they are today, ready to emerge from bankruptcy after over four years in chapter 11.

(i)    *The Business Plan*

In February 2007, with the input of the Creditors' Committee, the Equity Committee, the Debtors' postpetition lenders and the Prepetition Lenders, the Debtors hired Mr. Craig D. Jung as Chief Executive Officer to establish a vision of the future of IBC.  Specifically, Mr. Jung was initially charged with creating a viable five (5) year business plan that would form the basis for emergence from chapter 11. One of Mr. Jung's first actions upon assuming the chief executive position was the retention of world-class talent in an effort to help fulfill the Chief Executive Officer's vision for the Reorganized Debtors and to aid in the development of the Business Plan.  Mr. Jung and his management team worked together to formulate new items and lead the Company's efforts to: (1) fix the Company's cost structure to grow margins; (2) accelerate innovation to realize attractive revenue growth; (3) drive productivity to improve margins; and (4) create a performance culture.  Their analysis revealed that the only meaningful, sustainable alternative was to implement proven, modernizing changes in operations and work rules.  The status quo, which had continually failed IBC and its constituents in the past, was simply no longer acceptable, and a "hands off" approach to selling and delivery structures that contributed heavily to unprofitability and lack of competitiveness could no longer be tolerated if the Company were to survive.

With respect to delivery, the Business Plan envisions the abandonment by the Debtors of their historical high cost, "one-size-fits-all" traditional route delivery structure in favor of the advanced Path-to-Market structure that will create better jobs for sales employees and, in doing so, significantly increase selling and delivery productivity.  To implement these four priorities, IBC determined to undertake certain initiatives.  First, IBC set out to implement a distribution system with different delivery options for its customers based on customer size, growth potential and service needs to lower its cost structure and profitably grow revenues.  Also, IBC took steps to implement a lean manufacturing program to drive productivity.  IBC additionally focused on improving brand management and innovation, including increased investment in marketing IBC's brands.  Lastly, IBC committed to redefining its organization to remove unnecessary layers of management and implement a matrix structure to improve communication, leadership and accountability.

On June 28, 2007, the Company submitted the Business Plan to the Key Constituents for their review and input.

48

The Business Plan was created in two parts.   The first part – the Base Plan – is a determination of the projected operations in each of the Debtors' business units on a go-forward basis with minimal changes.   The second part is a projection of what can be achieved through specific initiatives to improve the Debtors' performance, the projected results of which are layered onto the Base Plan to create the Transformation Plan.   The Base Plan was created through a bottom-up process, consisting of developing five (5) year forecasts of sales and expenses for each business unit with realistic assumptions and expectations.   Sales were forecasted locally by product category, and the Base Plan was reviewed by the senior leadership team.   The Transformation Plan was created through a top-down process, focusing on company-wide initiatives to improve operations and move goods to market efficiently.   The initiatives outlined in the Transformation Plan seek to improve asset optimization, material and labor productivity, asset productivity, route optimization, and to develop an enhanced operational leadership structure.   In August 2007, as part of implementation of the Business Plan, the Debtors restructured their thrift store operations and closed a number of retail outlets.

(ii)     <em>Exit of Southern California Bread Business</em>

On August 28, 2007, the Debtors announced their intention to exit the bread market in Southern California because of lack of profitability.   On September 13, 2007, the Debtors filed the Motion for an Order Pursuant to 11 U.S.C. §§ 105(A), 363(B), and 365(A) for Authority to (I) Exit Bread Business in Southern California Market and Related Restructuring; (II) Implement Process for Rejecting Additional Executory Contracts and Unexpired Leases Associated with Such Exit and Restructuring and (III) Implement Process for Abandoning Certain Property Associated with Such Exit and Restructuring (Docket No. 9477).   The Order relating thereto granted the necessary authority for Debtors to close four bakeries, eliminate approximately 325 routes, and close 17 distribution centers and 19 outlet stores by October 29, 2007.   The closings and consolidations resulted in the reduction of the Debtors work force by approximately 1,300 employees.   After review of the actions necessary to effectuate the exit from the bread market in southern California, the Debtors believe that such actions will not trigger withdrawal liability under ERISA related to their multiemployer pension plans.

(iii)     <em>Organize for Success Initiative</em>

On September 12, 2007, the Debtors implemented their sale structure initiative.   The Debtors replaced the ten (10) previously existing PCs with eight (8) business units.   At the same time, the Company collapsed its sales management structure by eliminating two layers of sales management and approximately 200 sales management positions.

(e)     Events Leading to the Commitment Letter

One of the Debtors' highest priorities to implement the Business Plan and emerge from chapter 11 was the goal to obtain new investment.   The Debtors, in the exercise of their business judgment, concluded that the best way to obtain the highest and/or otherwise best offer for a junior debt or equity investment was to obtain a "stalking horse" bid as soon as possible.   Such a bid would provide clarity to the constituents and the marketplace both as to investment structure and value (a "floor").   That proposal could then be subjected to a broad, open and Court-supervised bidding process that would likely result in higher or otherwise better offers without the risks inherent in a free-for-all process without a floor as a starting point.

It was impractical to even begin discussions with potential investors prior to finalization of the Business Plan.   However, mindful of the looming deadlines, immediately upon delivery of the Business Plan in late June 2007, the Debtors and their financial advisors began discussions with a number

49

of potential plan investors in search of a stalking horse bid for a junior debt or equity investment that would fund the Debtors' emergence from bankruptcy.

Because time was of the essence, discussions first took place with the Debtors' existing significant stakeholders as they were already knowledgeable about the Company, its management, operations and the Business Plan. Indeed, many of those entities not only had the apparent financial wherewithal to make an investment of the type sought by the Debtors, but also were enthused about the prospect of such an investment. The above discussions yielded initial indications of interest from three potential investor groups having existing claims or interests, all within a relatively short time frame (e.g., by the end of July 2007 – less than one month after delivery of the Business Plan).

With these indications of interest in hand, the Debtors and their financial advisors contacted additional third-party investors to explore whether a superior offer could be achieved. Miller Buckfire contacted over 125 parties including approximately 70 prospective financial investors to solicit an equity commitment, including over 20 parties recommended by the Committees, and approximately 55 strategic parties. Over fifty of those parties negotiated and executed confidentiality agreements with the Debtors and, with the assistance of Miller Buckfire, the Debtors provided each of these parties an offering memorandum setting forth key financial and operational information regarding the Debtors and access to an online data room that contained the Business Plan as well as extensive additional information including, but not limited to, the Company's business, products, operations and financial performance.

Numerous parties conducted substantial due diligence, including presentations and extensive follow-up diligence sessions with senior management of the Debtors. As part of this process, the Debtors provided additional materials to Miller Buckfire to enable them to solicit superior offers from additional third-party investors. Moreover, members of the Debtors' senior management attended several all-day meetings with each group that provided a proposal. Senior management conducted numerous scheduled and unscheduled conference calls to address follow-up issues that resulted from the all-day meetings. The Debtors' senior management invested enormous amounts of time and energy seeking a stalking-horse bidder, while simultaneously running the Debtors' business and implementing various initiatives to improve the strength of their operations.

On November 7, 2007, the Court approved the Silver Point Commitment. The Silver Point Commitment was comprised of a $120 million senior secured revolving credit facility, a $60 million senior secured term loan facility and a $220 million letter of credit facility. The Silver Point Commitment contained various conditions to the commitments contemplated thereunder, including the ratification of amendments to the collective bargaining agreements governing the relationship between the Debtors and their unionized workforce necessary to implement the Business Plan and the condition that an order by the Bankruptcy Court confirming the First Amended Plan be entered no later than March 14, 2008.

The Debtors reached an agreement with the BCTGM, which is in effect for all of its local bargaining units. In addition, the Debtors reached agreements with all but two of the other unions representing its employees, which agreements are in effect. However, as of March 7, 2008, the Debtors had not reached a deal with the IBT. On March 7, 2008, the Debtors filed the Motion to Continue Hearings on First Amended Joint Plan of Reorganization of Interstate Bakeries Corporation and its Affiliated Debtors and Debtors-in-Possession and Certain Plan-Related Matters and, pursuant to that motion, the Bankruptcy Court entered an order continuing the hearing to confirm the First Amended Plan until April 23, 2008. As a consequence of the continuance, an order confirming the First Amended Plan was not entered by March 14, 2008, and the Silver Point Commitment expired in accordance with its terms.

50

Following the expiration of the Silver Point Commitment, the Debtors and their advisors embarked on a dual-path to maximize value for all constituents.  One path involved discussions between the Debtors and multiple potential investors, including certain existing creditors as well as Ripplewood, about modifications to the First Amended Plan or an investment and related financing to serve as the basis for a new stand-alone plan of reorganization.  The other path involved restarting the sale process originally undertaken in 2007, including the solicitation of indications of interest to purchase all or portions of the Debtors' businesses or assets on a going-concern basis.  As part of these efforts, Miller Buckfire, contacted approximately 55 strategic buyers and provided interested parties with a significant amount of detailed information, while also conducting numerous site visits, meetings and conference calls to facilitate their diligence.  As a result, the Debtors received multiple indications of interest from potential buyers.

During March 2008, the Debtors were informed that the IBT had reached agreement in principle with Ripplewood on concessions and work rule changes that the union would give to the Debtors if Ripplewood became a majority investor in the Reorganized Company.  The IBT's concessions with Ripplewood not only included the work rules to permit the Debtors' "path to market" delivery and selling concept, but also included other significant concessions required by the Debtors to implement the Business Plan.

Leading up to and while the Debtors were working on the dual-path emergence strategy, the business and industry experienced record high increases in the cost of key commodities, including wheat and fuel.  While a significant portion of the cost inflation was passed along through price increases, the Debtors' operational performance declined and they required an increase in the DIP Facility to fund continuing operating losses and the resulting cash burn.  As a result, on May 9, 2008, the Debtors increased the amount available for borrowing under the DIP Facility from $200 million to $249.7 million and extended the maturity date to September 30, 2008.

Mindful of the need to either emerge from bankruptcy pursuant to a confirmed stand-alone plan or sell their assets by the September 30, 2008 maturity date as required by the DIP Facility, the Debtors contacted Ripplewood and the other parties working to put together a feasible stand-alone plan and asked that they provide, by May 19, 2008, a Firm Plan Proposal.  The Debtors informed these parties and their major constituencies that if a Firm Plan Proposal was not received by May 19, 2008, the Debtors would have no choice but to begin the sale process in earnest in order to complete it by September 30, 2008 and thereby maximize value for all constituencies.

The Debtors did not receive a Firm Plan Proposal by May 19, 2008 and, as a result, shifted much of their focus and resources to maximizing value through the sales effort.  However, certain parties, including Ripplewood, continued to express interest in funding a stand-alone plan, and Silver Point continued to express interest in financing a stand-alone plan, and the Debtors continued to assist such parties as they conducted additional due diligence.

In early June 2008, Miller Buckfire sent a detailed letter along with bid packages to each of the parties interested in purchasing some or all of the Debtors' assets, requesting that they submit final proposals by June 25, 2008.  The bid packages contained a proposed asset purchase agreement, bidding procedures and order approving such bidding procedures.  While the Debtors received multiple asset purchase proposals for various parts of their businesses and assets by the June 25, 2008 deadline, only one asset purchase proposal contemplated continuing a substantial portion of the businesses as a going concern (such proposal, the "Going Concern Proposal").  Therefore, the Debtors and their advisors focused on negotiating and developing the Going Concern Proposal, since it would have provided the greatest recovery for the Debtors' estates if a stand-alone plan of reorganization was not achievable.

51

After receiving the Going Concern Proposal and other asset purchase proposals, the Debtors again reached out to the parties potentially interested in pursuing a stand-alone plan of reorganization, including Ripplewood and certain Prepetition Lenders, requesting them to submit a Firm Plan Proposal by July 10, 2008. The Debtors indicated that if a Firm Plan Proposal was not submitted by then, the Debtors would file motions to sell their saleable assets and wind-down their operations at their earliest opportunity. No such proposals were forthcoming.

Following extensive negotiations between the Debtors and the proposed purchaser under the Going Concern Proposal, in late July 2008, the proposed purchaser determined that it was no longer interested in pursuing the Going Concern Proposal. With no other Firm Plan Proposals forthcoming, and a deepening strain on the Debtors' employees and liquidity after nearly four years in bankruptcy, the Debtors began preparation for a liquidation and orderly wind-down of their operations. The Debtors continued, however, to facilitate due diligence with Ripplewood and certain Prepetition Lenders as well as financing discussions with Silver Point in the hopes of achieving a stand-alone plan of reorganization.

On July 17, 2008, Ripplewood presented the Debtors with an initial proposal for an equity investment by one of its affiliates, coupled with proposed debt financing, to fund the Debtors' emergence from bankruptcy. Following receipt of such proposal, the Debtors and their advisors engaged in extensive negotiations and held numerous meetings with Ripplewood, the Prepetition Investors and other parties in efforts to further develop such proposal. These efforts led to the filing of a motion to enter into a commitment letter by and between the Debtors and Equity Investors which would provide the basis for the Plan. On October 3, 2008, the Bankruptcy Court approved the Commitment Letter. In connection with the Transaction, (i) Equity Investors agrees to, on the Effective Date, (a) invest $44.2 million in cash in the Reorganized Company in exchange for 4,420,000 shares of the New Common Stock, and (b) purchase $85.8 million of (the New Convertible Secured Notes; (ii) GECC and GECM agree to structure, arrange and syndicate the ABL Facility; (iii) Silver Point and Monarch agree to structure, arrange and syndicate the Term Loan Facility; and (iv) the Prepetition Lenders will convert their Prepetition Lender Claims into $142.3 million of the New Third Lien Term Loan (subject to adjustment pursuant to the terms of the Commitment Letter), $85.8 million of New Convertible Secured Notes and Series E Warrants with a strike price of $0.01 and representing 1.5% of the fully-diluted equity interests of Reorganized IBC (calculated as of the Effective Date). Pursuant to the Investment Agreement, Equity Investors will also receive Series A Warrants with a strike price of $12.50 and representing 13.5% of the New Common Stock on a fully-diluted basis (calculated as of the Effective Date and taking into account dilution from the conversion of all the New Convertible Secured Notes to be issued on the Effective Date, but not accounting for any other dilution). In addition, Equity Investors will be issued Series D Warrants with a strike price of $12.50 and representing 1.5% of the fully-diluted equity interests of Reorganized IBC (calculated as of the Effective Date). On the Effective Date, the lenders under the Term Loan Facility (or their Permitted Affiliates) will be issued 4,420,000 shares of the New Common Stock, Series B Warrants with a strike price of $12.50 and representing 1.917% of the New Common Stock on a fully-diluted basis (calculated as of the Effective Date), and Series C Warrants with a strike price of $10.00 and representing 2.837% of the New Common Stock on a fully diluted basis (calculated as of the Effective Date).

2.      *Summary of Intercreditor Settlement*

The Debtors worked closely with the Creditors' Committee, the Old Convertible Note Indenture Trustee and the Prepetition Lenders to resolve certain disputes with respect to their respective rights in, and claims against, the Debtors' assets. Litigation of these disputes would have been extremely time-consuming and costly. Most importantly, litigation of these issues (as opposed to settlement), threatened to jeopardize the Debtors' ability to reorganize under the structure set forth in the Commitment

Letter.  As a result, on October 3, 2008, the Debtors, the Prepetition Lenders, the Creditors' Committee and the Old Convertible Note Indenture Trustee reached a fair and reasonable compromise.

The compromise reached with the Creditors' Committee, which is subject to definitive documentation, provides for, among other things, the establishment of the Creditors' Trust upon the Debtors' emergence from Chapter 11 for the benefit of General Unsecured Creditors.  The Creditors' Trust will be funded through a cash payment of $5.0 million.  Costs of administering the Creditors' Trust will be paid from the Trust Assets.  The Creditors' Trust will also receive rights to pursue certain litigation claims at the expense of the Creditors' Trust, including the D&O Claims and the Trust Avoidance Claims.  Finally, the Creditors' Trust will receive the Trust Stock Appreciation Rights, which will be cash-settled stock appreciation rights, with a strike price equal to $15.00, equaling 3% of the fully-diluted equity interests of the Reorganized Company as of the Effective Date (with such 3% dilution to be borne equally by Equity Investors and the Prepetition Lenders in a manner agreed upon by Equity Investors and the Prepetition Lenders).  There can be no assurance that the Trust Claims or the potential cash payment described above will result in any distributable value for general unsecured creditors.

As consideration for the creation of the Creditors' Trust, the Debtors, the Prepetition Lenders and the Creditors' Committee agree to the full and complete release and satisfaction of any and all claims of the Debtors (and those claiming derivatively through the Debtors) against the Prepetition Lenders, in their capacities as such, including, but not limited to: (i) claims against the Prepetition Lenders asserted or that could have been asserted by the Debtors in the Prepetition Lender Actions, (ii) challenges with respect to the extent, amount, validity and priority of the Prepetition Lenders' liens and security interests, and (iii) allegations or claims that the adequate protection payments made to the Prepetition Lenders during the Chapter 11 Cases should be "recharacterized" as principal payments and applied to reduce the Prepetition Lenders' secured claims.  As part of the Intercreditor Settlement, the Prepetition Lender Actions will be dismissed with prejudice.

In addition, the Debtors, the Prepetition Lenders, the Creditors' Committee and the Old Convertible Note Indenture Trustee agree that the transfer of the Trust Assets to the Creditors' Trust and the satisfaction of the Old Convertible Note Indenture Trustee Fee Claim shall also be in full and complete release and satisfaction of any and all claims that could be prosecuted by any party in interest in the Chapter 11 Cases including the Creditors' Committee, its members, the Prepetition Lenders and the Old Convertible Note Indenture Trustee with respect to the non-substantive consolidation of the Debtors' estates.

Finally, the Debtors, the Prepetition Lenders, the Creditors' Committee and the Old Convertible Note Indenture Trustee agree that any provision contained in the Old Convertible Note Indenture purporting to subordinate the right of payment of holders of Old Convertible Notes to the rights of Prepetition Lenders shall be null and void and all Prepetition Lenders shall waive any right to enforce such a provision solely for purposes of the settlement described therein.

All documents implementing the terms of the Intercreditor Settlement, including the Trust Stock Appreciation Rights, shall be in form and substance reasonably satisfactory to Equity Investors, the Creditors' Committee and the Prepetition Investors.

As a result of the compromise, the Creditors' Committee withdrew its previously-filed objection to the Debtors' efforts to obtain Bankruptcy Court approval of the proposed commitments under the Commitment Letter and agreed to support the Plan as amended to reflect the compromise.

3.    *Reasons for Emergence at This Time*

Although IBC has accomplished many important goals through the tools afforded by chapter 11, IBC believes that the prospects for further operational improvement will be best achieved outside of chapter 11, and that chapter 11, in fact, is neither necessary nor conducive to moving forward with the operational turnaround of the business.

IBC's key remaining operational challenges, in IBC's judgment, do not require chapter 11 and, in fact, are better addressed outside of chapter 11.  In this respect, there are continued costs to remaining in chapter 11 that warrant emergence at this time, including the concern of employees over job security; the continued administrative costs of the chapter 11 process; and the continued diversion of management time to the chapter 11 process.  Upon emergence from chapter 11, management will be free to focus their energies on system-wide implementation of strategic initiatives.

4.    *IBC's Future Strategy*

As part of the process to emerge from chapter 11, IBC undertook a thorough and detailed initiative to develop the Business Plan.  The Business Plan was developed in an effort to: (i) fix the Company's cost structure to grow margins; (ii) accelerate innovation to realize attractive revenue growth; (iii) drive productivity to improve margins; and (iv) create a performance culture.  To implement these four priorities, IBC has undertaken or determined to undertake a number of specific initiatives.  Included in those initiatives are the implementation of the "path-to-market" changes that can now be put in place under the revised CBAs with the BCTGM (in Memphis, Jacksonville and Orlando), the Retail and Wholesale Department Store Union (in Birmingham, Alabama, Grand Rapids, Michigan and North Carolina) and the United Auto Workers (in Charlotte) and with the IBT at the Company's remaining locations.  These initiatives will evolve IBC's "one size fits all" system to afford customers different delivery options based on customer size, growth potential and service needs.  This will in turn lower the Company's cost structure and is projected to profitably grow revenues.  IBC has also taken steps to implement a lean manufacturing program to drive productivity.  IBC's marketing department is focused on improving brand management and innovation, including increased investment in marketing IBC's brands.  Lastly, IBC has committed to redefining its organization to remove unnecessary layers of management and implement a matrix structure to improve communication, leadership and accountability.

## J.    **Treatment of PBGC Plans**

IBC participates in or sponsors two defined benefit pension plans (the "Pension Plans") which are covered by Title IV of ERISA, 29 U.S.C. §§ 1301-1461 (2000 and Supp. V. 2005).  (One of the Pension Plans, the ABA Plan, is also sponsored by other employers unrelated to the Company.  For more information about the ABA Plan, see Section VI.H.8 herein).  With regard to IBC's other defined benefit plan, IBC has not made any determination regarding whether it will continue to participate in or sponsor either or both of the Pension Plans subsequent to the Effective Date and is actively exploring its alternatives in this regard.  In addition, the PBGC has the statutory authority to initiate termination proceedings regarding either or both of the Pension Plans without regard to IBC's determination.

If either or both of the Pension Plans terminate (or IBC withdraws from the Pension Plan that is sponsored by other unrelated employers) prior to the confirmation of the Plan, IBC could incur liability to the PBGC under Title IV of ERISA with respect to such terminations or withdrawal.  In addition, the PBGC has indicated that it would assert that certain claims related to such terminations or withdrawal, including some or all of the liabilities to PBGC, may be entitled to priority under various Bankruptcy Code provisions.  As with any claim, IBC will challenge any assertion of priority that is not consistent with applicable law.

54

In the event that the Pension Plans are not terminated (and IBC does not withdraw from the Pension Plan that is sponsored by other unrelated employers) prior to the Effective Date, the Reorganized Debtors' liability to PBGC, if any, would remain contingent unless and until the Pension Plans are terminated (or, in the case of the Pension Plan that is sponsored by other unrelated employers, the Reorganized Debtor withdraws from such plan) and would not be affected by any provision of the Plan or by any of the following: (i) confirmation of the Plan; (ii) cancellation of the Old Common Stock of the Debtors; or (iii) dissolution of the Reorganized Debtors.

## VII.    SUMMARY OF THE REORGANIZATION PLAN

THIS ARTICLE PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.

ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS, AND OTHER PARTIES IN INTEREST.

### A.    Overall Structure of the Plan

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders. Upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity security holder in, the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The terms of the Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of the Business Plan, make the distributions contemplated under the Plan, and pay their continuing obligations in the ordinary course of their businesses. Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria. The Plan, though proposed jointly, constitutes a separate plan proposed by each Debtor. Therefore, except as expressly provided in Section 3.3 of the Plan, the classifications set forth in Section 3.2 of the Plan shall be deemed to apply separately with respect to each plan proposed by each Debtor.

If the Plan is confirmed by the Bankruptcy Court and consummated, (i) the Claims in certain Classes will be reinstated or modified and receive distributions equal to the full amount of such Claims; (ii) the Claims of certain other Classes will be modified and receive distributions constituting a partial recovery on such Claims; and (iii) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests. The Plan contemplates that holders of Prepetition Lender Claims will receive a distribution consisting of their Pro Rata shares of (i) the New Third Lien Term Loan and (ii) $85.8 million in aggregate principal amount of the New Convertible Secured Notes. Holders of General Unsecured Claims against the Main Debtors will not receive a distribution pursuant to the Plan. The Old Common Stock will be cancelled. The Debtors' Interestholders will not receive a distribution under the Plan. The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan, and the other property to be distributed under the Plan, are described below.

## B.    Reorganized Capital Structure Created by Plan

The Plan sets forth the capital structure for the Reorganized Debtors upon their emergence from chapter 11, which is summarized as follows:

### 1.    *ABL Facility*

The Reorganized Debtors will enter into a $125 million asset-based revolving credit facility as described in the Commitment Letter (the "ABL Facility"). In the event of any conflict between any summary in the Plan or in the Disclosure Statement of the ABL Facility contemplated by the ABL Facility Commitment Papers and the terms and conditions set forth in the ABL Facility Commitment Papers, the terms and conditions contained in the ABL Facility Commitment Papers and, once executed, the terms and conditions contained in the definitive documentation, will control.

### 2.    *Term Loan Facility*

The Reorganized Debtors will enter into a $344 million (subject to adjustment pursuant to the terms of the Commitment Letter) secured term loan financing facility as described in the Term Loan Facility Commitment Papers. In the event of any conflict between any summary in the Plan or in the Disclosure Statement of the Term Loan Facility contemplated by the Term Loan Facility Commitment Papers and the terms and conditions set forth in the Term Loan Facility Commitment Papers, the terms and conditions contained in the Term Loan Facility Commitment Papers and, once executed, the terms and conditions contained in the definitive documentation, will control.

### 3.    *New Third Lien Term Loan Facility*

The Reorganized Debtors will enter into a $142.3 million (subject to adjustment pursuant to the terms of the Commitment Letter) third priority secured term loan financing facility as described in the Commitment Letter (the "New Third Lien Term Loan Facility"). Each holder of Prepetition Lender Claims will receive its Pro Rata share of the New Third Lien Term Loan in exchange for its Prepetition Lender Claims as further described in the Plan. In the event of any conflict between any summary in the

56

Plan or in the Disclosure Statement of the New Third Lien Term Loan Facility contemplated by the Commitment Letter and the terms and conditions set forth in the Commitment Letter, the terms and conditions contained in the Commitment Letter and, once executed, the terms and conditions contained in the definitive documentation, will control.

### 4.   *New Convertible Secured Notes*

The Reorganized Debtors will issue 5% fourth priority secured convertible notes in the original principal amount of $171.6 million.  $85.8 million in aggregate principal amount of the New Convertible Secured Notes will be distributed to holders of Prepetition Lender Claims as provided in Article IV of the Plan.  $85.8 million in aggregate principal amount of the New Convertible Secured Notes will be issued to Equity Investors pursuant to the Investment Agreement.  A summary description of the New Convertible Secured Notes is set forth at <u>Exhibit G</u> attached to the Plan.  In the event of any conflict between any summary in the Plan or in the Disclosure Statement of the New Convertible Secured Notes contemplated by the Commitment Letter and the terms and conditions set forth in the Commitment Letter, the terms and conditions contained in the Commitment Letter and, once executed, the terms and conditions contained in the definitive documentation, will control.

### 5.   *Warrants*

On the Effective Date, Reorganized IBC will issue warrants (the "Warrants") to Equity Investors, the Term Loan Facility Lenders (or their Permitted Affiliates) and the Prepetition Lenders. Pursuant to the Investment Agreement, Equity Investors will also receive Series A Warrants with a strike price of $12.50 and representing 13.5% of the New Common Stock on a fully-diluted basis (calculated as of the Effective Date).  In addition, Equity Investors will be issued Series D Warrants with a strike price of $12.50 and representing 1.5% of the fully-diluted equity interests of Reorganized IBC (calculated as of the Effective Date).  On the Effective Date, the lenders under the Term Loan Facility (or their Permitted Affiliates) will be issued 4,420,000 shares of the New Common Stock, Series B Warrants with a strike price of $12.50 and representing 1.917% of the New Common Stock on a fully-diluted basis (calculated as of the Effective Date), and Series C Warrants with a strike price of $10.00 and representing 2.837% of the New Common Stock on a fully diluted basis (calculated as of the Effective Date).  Finally, the Prepetition Lenders will be issued Series E Warrants with a strike price of $0.01 and representing 1.5% of the fully-diluted equity interests of Reorganized IBC (calculated as of the Effective Date).

### 6.   *Stock Appreciation Rights*

In connection with the Transaction, the Reorganized Company intends to enter, but has not yet entered, into collective bargaining agreements with certain of its unions which will establish employee equity sharing plans that will provide for the issuance of stock appreciation rights to certain employees of the Reorganized Company.

### 7.   *Reorganized IBC Equity Ownership*

Reorganized IBC will, on the Effective Date, issue 8,840,000 shares of the New Common Stock with (i) 4,420,000 shares of New Common Stock to be issued to Equity Investors for $44.2 million in cash and (ii) 4,420,000 shares of New Common Stock to be issued to the Term Loan Facility Lenders (or their Permitted Affiliates) pro rata in accordance with the relative amounts of their loans funded under the Term Loan Facility.  The New Common Stock issued under the Plan shall be subject to legal or economic dilution from conversions of New Convertible Secured Notes, future issuances of New Convertible Secured Notes as "pay-in-kind" interest on the existing New Convertible Secured Notes, exercises of Warrants and stock options, restricted stock and stock appreciation rights issued to directors,

officers and employees of Reorganized IBC under the Long Term Incentive Plan and the employee equity sharing plans to be established in accordance with the collective bargaining agreements to be entered into in connection with the Transaction.  Holders of New Common Stock will grant proxies to Equity Investors to vote such holder's New Common Stock as Equity Investors, in its sole discretion, shall determine.

On the Effective Date, Reorganized IBC shall be eligible to deregister under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the SEC thereunder.

## C.    Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims, which, pursuant to section 1123(a)(1), do not need to be classified).  The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In that event, the Debtors, in consultation with the Creditors' Committee, intend, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member.  Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Impaired Claim that ultimately is allowed by the Bankruptcy Court may vary from any estimated allowed amount of such Claim and, accordingly, the total Claims ultimately allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the value of the property that ultimately will be received by a particular holder of an Allowed Claim under the Plan may be adversely (or favorably) affected by the aggregate amount of Claims ultimately allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below.  The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' assets.  In view of the deemed rejection by Classes 9, 10a, 10b, 11 and 12 with respect to the Main Debtors, however, as set forth below, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.  Specifically, section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all impaired classes of claims and interests.  See Section X.F of this Disclosure Statement.  Although the Debtors believe that the

Plan can be confirmed under section 1129(b), there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

      1.      *Treatment of Unclassified Claims under the Plan*

      (a)    Administrative Claims

Administrative Claims consist primarily of the costs and expenses of administration of the Chapter 11 Cases incurred by the Debtors.  Such costs may include, but are not limited to the cost of operating the business since the Petition Date, the outstanding unpaid fees and expenses of the professionals retained by the Debtors and the Creditors' Committee as approved by the Bankruptcy Court, and the payments necessary to cure prepetition defaults on unexpired leases and executory contracts that are being assumed under the Plan (the "Cure").  All payments to professionals in connection with the Chapter 11 Cases for compensation and reimbursement of expenses, and all payments to reimburse expenses of members of the Creditors' Committee and the Equity Committee, will be made in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Rules and are subject to approval of the Court as being reasonable.  The Debtors believe that they will have sufficient Cash to pay any professional fees which remain unpaid as of the Effective Date.  The Debtors further believe that the aggregate amount of Administrative Claims will not exceed the Reorganized Debtors' ability to pay such Claims when they are allowed and/or otherwise become due.  The procedures governing allowance and payment of Administrative Claims are described in Section VII.G of this Disclosure Statement (the "Provisions Governing Distributions").

Subject to the provisions of Articles VIII and IX of the Plan, on the first Periodic Distribution Date occurring after the later of (i) the date an Administrative Claim becomes an Allowed Administrative Claim or (ii) the date an Administrative Claim becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the holder of such Administrative Claim, an Allowed Administrative Claimholder in any Debtor's Chapter 11 Case shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Administrative Claim, (x) Cash equal to the unpaid portion of such Allowed Administrative Claim or (y) such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder shall have agreed upon in writing; <u>provided</u>, <u>however</u>, that Allowed Administrative Claims with respect to fixed and undisputed obligations incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases will be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.  In no event, however, will a postpetition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business.  Reclamation Claims allowed pursuant to the procedures set forth in the Reclamation Order will be paid in Cash on the Distribution Date or as soon thereafter as is practical.

The Debtors have estimated that the amount of Allowed Administrative Claims expected to have been accrued up to the Effective Date will be approximately $10,158,706, consisting primarily of Reclamation Claims and excluding Professional Fee Claims and Administrative Claims that will be paid in the ordinary course subsequent to the Effective Date.  As to Cure costs attributable to the Debtors' assumption of executory contracts and non-residential real property leases that are to be assumed pursuant to the Plan, the Debtors believe that the aggregate amount of all Cure costs will not be material.  The Debtors believe that there will be sufficient funds available to satisfy the ultimate determination of Cure claims.

The Plan provides that all requests for payment of an Administrative Claim (other than as set forth in Sections 9.2, 9.3 and 9.6 of the Plan, and other than with respect to Cure Claims) must be made by application filed with the Bankruptcy Court and served on counsel for the Reorganized Debtors no later than thirty (30) days after the Effective Date. In the event that the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court will determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, no application seeking payment of an Administrative Claim need be filed with respect to an undisputed postpetition obligation (i) which was paid or is payable by a Debtor in the ordinary course of business or (ii) the payment of which was previously approved by the Bankruptcy Court. In no event, however, will a postpetition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), claims for pension liabilities relating to the Debtors' alleged withdrawal liability, secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business.

(b)    Priority Tax Claims

Priority Tax Claims are Claims of governmental units for taxes that are entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code. The taxes entitled to priority are (i) taxes on or measured by income or gross receipts that meet the requirements set forth in section 507(a)(8)(A) of the Bankruptcy Code; (ii) property taxes meeting the requirements of section 507(a)(8)(B) of the Bankruptcy Code; (iii) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in section 507(a)(8)(C) of the Bankruptcy Code; (iv) employment taxes on wages, salaries, or commissions that are entitled to priority pursuant to section 507(a)(3) of the Bankruptcy Code, to the extent that such taxes also meet the requirements of section 507(a)(8)(D); (v) excise taxes of the kind specified in section 507(a)(8)(E) of the Bankruptcy Code; (vi) customs duties arising out of the importation of merchandise that meet the requirements of section 507(a)(8)(F) of the Bankruptcy Code; and (vii) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in section 507(a)(8)(G) of the Bankruptcy Code.

Under the Plan, each holder of an Allowed Priority Tax Claim will be entitled to receive, at the sole option of the Debtors (or the Reorganized Debtors), in full satisfaction, settlement, release, and discharge of and in exchange for such Priority Tax Claim, (a) equal Cash payments made on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding six years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date; (b) such other treatment agreed to by the Allowed Priority Tax Claimholder and the Debtors (or the Reorganized Debtors), provided such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors) than the treatment set forth in subsection (a) above; or (c) payment in full in Cash.

The Massachusetts Department of Revenue (the "MDR") has objected to the Debtors' proposed interest rate applicable to Allowed Priority Tax Claims, and has asserted the appropriate interest rate should be 8%. The Debtors dispute that 8% is the appropriate interest rate. Unless the objection is otherwise resolved, the Debtors will, at the Confirmation Hearing, seek a determination from the Bankruptcy Court as to the appropriate interest rate to be paid to the MDR Allowed Priority Tax Claim. Because the Debtors (i) agree to the amount of the MDR Allowed Priority Tax Claim and (ii) the applicable interest rate will be determined prior to the Confirmation Hearing, Section 8.2 of the Plan shall not be applicable to the MDR Allowed Priority Tax Claim.

The Debtors have estimated that the aggregate amount of Priority Tax Claims payable under the Plan will be approximately $1,363,120 million.

2.     *Treatment of Classified Claims Against, and Interest in, the Main Debtors under the Plan*

(a)     Class 1, Secured Tax Claims

The Plan defines a Secured Tax Claim as a Secured Claim arising prior to the Petition Date against any of the Debtors for taxes owed to a governmental unit.

The Plan provides that, except as otherwise provided in and subject to Section 8.7 therein, on the first Periodic Distribution Date occurring after the later of (i) the date a Secured Tax Claim becomes an Allowed Secured Tax Claim; or (ii) the date a Secured Tax Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such Secured Tax Claim, the holder of an Allowed Class 1 Secured Tax Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Secured Tax Claim, (x) Cash equal to the amount of such Allowed Secured Tax Claim or (y) such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder will have agreed in writing, provided that such treatment is not more favorable than the treatment in clause (x) above.  The Plan further provides that the Debtors' failure to object to a Secured Tax Claim in the Chapter 11 Cases is without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the holder of the Secured Tax Claim.

Secured Tax Claims are Unimpaired.  The Debtors estimate that the aggregate amount of Secured Tax Claims payable under the Plan will be approximately $276,119.

(b)     Class 2, Secured Claims

The Plan defines a Secured Claim as a Claim, other than a Prepetition Lender Claim, that is secured by a Lien which is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, on property in which an Estate has an interest, or a Claim that is subject to setoff under section 553 of the Bankruptcy Code; to the extent of the value of the holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable; as determined by a Final Order pursuant to section 506(a) of the Bankruptcy Code, or in the case of setoff, pursuant to section 553 of the Bankruptcy Code, or in either case as otherwise agreed upon in writing by the Debtors or the Reorganized Debtors and the holder of such Claim.  Class 2 Secured Claims consist of each separate subclass for Secured Claims, each of which is deemed to be a separate Class for all purposes under the Bankruptcy Code.

The Plan provides that, except as otherwise provided in and subject to Section 8.7 therein, on the first Periodic Distribution Date occurring after the later of (i) the date a Secured Claim becomes an Allowed Secured Claim; or (ii) the date a Secured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such Secured Claim, the Debtors (or Reorganized Debtors) will, in full satisfaction, settlement, release, and discharge of and in exchange for such Class 2 Secured Claim, (x) pay Cash equal to the amount of such Allowed Secured Claim, (y) return the collateral to the secured creditor with respect to such Secured Claim, or (z) reinstate such Secured Claim in accordance with the provisions of subsection 1124(2) of the Bankruptcy Code.  The Plan additionally provides that the Debtors' failure to object to a Secured Claim in the Chapter 11 Cases will be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim

61

in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Reorganized Debtors) when and if such Claim is sought to be enforced by the holder of the Secured Claim.

Secured Claims are Unimpaired.  The Debtors have estimated that the aggregate amount of Secured Claims payable under the Plan will be approximately $158,367.

(c)     Class 3, Other Priority Claims

The Plan defines an Other Priority Claim as a Claim against the Debtors entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

The Plan provides that, except as provided in and subject to Section 8.7 therein, on the first Periodic Distribution Date occurring after the later of (i) the date an Other Priority Claim becomes an Allowed Other Priority Claim or (ii) the date an Other Priority Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such Other Priority Claim, each Allowed Class 3 Other Priority Claimholder will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, (x) Cash in an amount equal to the amount of such Allowed Other Priority Claim or (y) such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder will have agreed upon in writing, provided that such treatment is not more favorable than the treatment in clause (x) above.  The Debtors' failure to object to an Other Priority Claim in the Chapter 11 Cases will be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the holder of the Other Priority Claim.

Other Priority Claims are Unimpaired.  The Debtors estimate that the aggregate amount of Other Priority Claims payable under the Plan will be approximately $493,327.

(d)     Class 4, Intercompany Claims

The Plan defines an Intercompany Claim as a Claim by any Debtor or an Affiliate of a Debtor against a Main Debtor.

The Plan provides that all Intercompany Claims will, in the sole discretion of the applicable Debtor or Reorganized Debtor holding such Claim, be (a) released, waived and discharged as of the Effective Date, (b) contributed to the capital of the obligor corporation, (c) dividended, or (d) remain unimpaired; provided that the applicable Debtor or Reorganized Debtor shall seek the consent of Equity Investors and the Prepetition Investors with respect to the treatment of each Intercompany Claim, with such consent not to be unreasonably withheld.

Intercompany Claims are Unimpaired.

(e)     Class 5, Workers' Compensation Claims

The Plan defines a Workers' Compensation Claim as a Claim held by an employee of the Debtors for workers' compensation coverage under the workers' compensation program applicable in the particular state in which the employee is employed by the Debtors.

The Plan provides that the Reorganized Debtors will pay all Workers' Compensation Claims that are determined to be valid under applicable state law and the corresponding programs maintained by the Debtors, in accordance with the terms and conditions of such state law and such programs. Nothing in the Plan will be deemed to discharge, release, or relieve the Debtors or the Reorganized Debtors from any current or future liability with respect to any valid Workers' Compensation Claim, regardless of when the underlying injuries occurred. Furthermore, the Plan provides that all payments of Workers' Compensation Claims made by the Debtors during the pendency of the Chapter 11 Cases will be ratified by the Plan. The Debtors' failure to object to a Workers' Compensation Claim in the Chapter 11 Cases are without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Reorganized Debtors) when and if such Claim is sought to be enforced by the holder of the Workers' Compensation Claim.

Workers' Compensation Claims are Unimpaired. The Debtors have estimated that the aggregate amount of Workers' Compensation Claims payable under the Plan will be approximately $62,000,000. As described more fully in Section VI.G herein, the Debtors' liabilities under the Workers' Compensation Programs are generally secured by letters of credit and bonds posted with the Company's insurers and with the state authorities that govern those self insurance programs in which the Company participates. If the Workers' Compensation Claims were Impaired under the Plan, rather than treated as set forth above, the letters of credit and bonds related to such claims would likely be called, thereby increasing the secured, funded debt under the Prepetition Credit Facility. Therefore the Debtors have proposed the above treatment as in the best interests of these estates.

(f)    Class 6, Subsidiary Interests

The Plan defines Subsidiary Interests as, collectively, all equity interests in any of Armour and Main Redevelopment Corporation, Baker's Inn Quality Baked Goods, LLC, IBC Sales Corporation, IBC Services, LLC, IBC Trucking, LLC, Interstate Brands Corporation, New England Bakery Distributors, L.L.C., and Mrs. Cubbison's Foods, Inc., other than Interests in Brands Preferred Stock.

Subsidiary Interests are Unimpaired. Subsidiary Interests will be unaffected by the Plan, except to the extent required by the Restructuring Transactions.

(g)    Class 7, Capital Lease Claims

The Plan defines Capital Lease Claims as Claims arising under or pursuant to Capital Leases. The secured portion of each Capital Lease Claim is a separate subclass and each subclass is deemed to be a separate Class for all purposes under the Bankruptcy Code.

The Plan provides that, except as otherwise provided and subject to Section 8.7 therein, on the first Periodic Distribution Date occurring after the later of (i) the date a Capital Lease Claim becomes an Allowed Capital Lease Claim or (ii) the date a Capital Lease Claim becomes payable pursuant to any agreement between the Debtors and the holder of such Capital Lease Claim, the holder of such Capital Lease Claim, in full satisfaction, settlement, release and discharge of and in exchange for such Capital Lease Claim shall, in the sole discretion of the Debtors, (w) receive deferred Cash payments totaling at least the allowed amount of such Allowed Capital Lease Claim; (x) upon abandonment by the Debtors, receive the collateral with respect to such Capital Lease Claim; (y) have such Allowed Capital Lease Claim reinstated in accordance with the provisions of subsection 1124(2) of the Bankruptcy Code; or (z) receive such other treatment as the Debtors and such Claimholder shall have agreed upon in writing as announced at or prior to the Confirmation Hearing.

63

Capital Lease Claims are Impaired.  The Debtors estimate that Capital Lease Claims will be in the approximate aggregate amount of $2,575,478.

(h)     Class 8, Prepetition Lender Claims

The Plan defines Prepetition Lender Claims as all Claims of the Prepetition Agent and the Prepetition Lenders arising under or pursuant to the Prepetition Credit Facility including, without limitation, the Claim of the Prepetition Lenders for Postpetiton Interest (to the extent unpaid and whether calculated at the default or non-default rate) pursuant to the Prepetition Credit Agreement.

The Plan provides that, not withstanding any provision of the Plan to the contrary, upon entry of the Confirmation Order, all Prepetition Lender Claims (excluding liability of the Debtors to the Prepetition Lenders for undrawn, outstanding letters of credit) shall be allowed in full in the aggregate amount of $451,486,946 (or such greater amount as may be applicable in the event that a letter of credit outstanding under the Prepetition Credit Agreement is drawn after the date of the Plan) and shall constitute Allowed Claims for all purposes in these Chapter 11 Cases, not subject to defense, offset, counterclaim, recoupment, reduction, subordination or recharacterization by the Debtors or any party in interest.

The Plan provides that, on the Effective Date, each holder of an Allowed Prepetition Lender Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Claim, its Pro Rata share of each component of the Prepetition Lenders Plan Distribution Property, with the amount of each Claimholder's Pro Rata share to be determined by a fraction, the numerator of which is equal to the amount of such Claimholder's Allowed Prepetition Lender Claim, and the denominator of which is equal to the aggregate amount of all Allowed Prepetition Lender Claims. Adequate Protection Claims shall be deemed satisfied in full by payments made pursuant to and in accordance with the DIP Facility Order.

On the Effective Date, each issued and outstanding letter of credit under the Prepetition Credit Agreement (each a "Prepetition LC") shall be replaced and cancelled, secured by "back up" letters of credit issued by an institution acceptable to the issuer of the Prepetition LC, or cash collateralized at 105% of the face amount of each Prepetition LC on terms in form and substance (a) satisfactory to the bank issuer of such Prepetition LC and (b) reasonably satisfactory to Equity Investors and the Prepetition Investors.

Prepetition Lender Claims are Impaired.

(i)     Class 9, General Unsecured Claims

The Plan defines a General Unsecured Claim as a Claim that (a) is not an Administrative Claim or a Priority Tax Claim and (b) does not fall within Class 1 Secured Tax Claims, Class 2 Secured Claims, Class 3 Other Priority Claims, Class 4 Intercompany Claims, Class 5 Workers' Compensation Claims, Class 6 Subsidiary Interests, Class 7 Capital Lease Claims, Class 8 Prepetition Lender Claims, Class 10a Subordinated Debt Securities Claims or Class 10b Subordinated Equity Securities Claims.

The Plan provides that holders of General Unsecured Claims against the Main Debtors will neither receive nor retain any property on account of such claims.

As part of the Intercreditor Settlement, holders of Allowed Class 9 General Unsecured Claims shall be entitled to participate in the Intercreditor Settlement, subject to the terms set forth in the Intercreditor Settlement Order and the Trust Agreement.  The procedures for distributions to the Trust

64

Beneficiaries shall be in accordance with the terms set forth in the Trust Agreement. The procedures for resolving Disputed Claims of the Trust Beneficiaries are set forth in the Plan and in the Trust Agreement.

(j)      Class 10, Subordinated Securities Claims

The Plan defines Subordinated Securities Claims as all Subordinated Debt Securities Claims and all Subordinated Equity Securities Claims, collectively.

(i)      *Class 10a, Subordinated Debt Securities Claims*

The Plan defines Subordinated Debt Securities Claims as all Claims subject to subordination under section 510(b) of the Bankruptcy Code that arise from the rescission of a purchase or sale of a debt Security of any Debtor (including, but not limited to, Old Common Stock and Old Common Stock Options), or for damages arising from the purchase or sale of such equity Security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims. Subordinated Debt Securities Claims are Impaired.

Subordinated Debt Securities Claims are Impaired. Subordinated Debt Securities Claims will be cancelled, released, and extinguished. The Plan provides that holders of Subordinated Debt Securities Claims will neither receive nor retain any property on account of such claims.

(ii)      *Class 10b, Subordinated Equity Securities Claims*

The Plan defines Subordinated Equity Securities Claims as all Claims subject to subordination under section 510(b) of the Bankruptcy Code that arise from the rescission of a purchase or sale of an equity Security of any Debtor (including, but not limited to, Old Convertible Notes), or for damages arising from the purchase or sale of such debt Security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims.

Subordinated Equity Securities Claims are Impaired. Subordinated Equity Securities Claims will be cancelled, released, and extinguished. The Plan provides that holders of Subordinated Equity Securities Claims will neither receive nor retain any property on account of such claims.

(k)      Class 11, Interests in Brands Preferred Stock

The Plan defines Interests in Brands Preferred Stock as all equity interests relating to the 6,026 shares of $4.80 dividend cumulative preferred stock of Brands authorized under Article IV of the restated certificate of incorporation of Brands, as amended.

Interests in Brands Preferred Stock are Impaired. The Plan provides that Interests in Brands Preferred Stock will be cancelled, released, and extinguished, and holders of such Interests will neither receive nor retain any property on account of such Interests.

(l)      Class 12, Interests in IBC

The Plan defines Interests in IBC as, collectively, all equity interests in IBC including, without limitation, Old Common Stock and Old Common Stock Options.

Interests in IBC are Impaired. The Plan provides that Interests in IBC will be cancelled, released, and extinguished, and holders of such Interests will neither receive nor retain any property on account of such Interests.

65

3.      *Treatment of Classified Claims Against, and Interest in, Mrs. Cubbison's,
Armour & Main Redevelopment and New England Bakery  under the Plan*

(a)      Class 1, Other Priority Claims

The Plan defines an Other Priority Claim as a Claim against the Debtors entitled to
priority pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an
Administrative Claim.

Except as otherwise provided in and subject to Section 8.7 of the Plan, on the first
Periodic Distribution Date occurring after the later of (a) the date an Other Priority Claim becomes an
Allowed Other Priority Claim or (b) the date an Other Priority Claim becomes payable pursuant to any
agreement between Mrs. Cubbison's (or Reorganized Mrs. Cubbison's), Armour & Main Redevelopment
(or Reorganized Armour & Main Redevelopment) or New England Bakery (or Reorganized New England
Bakery), as applicable, and the holder of such Other Priority Claim, each Class 1 Other Priority
Claimholder shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for,
such Other Priority Claim, (x) Cash in an amount equal to the amount of such Allowed Other Priority
Claim or (y) such other treatment as to which Mrs. Cubbison's (or Reorganized Mrs. Cubbison's),
Armour & Main Redevelopment (or Reorganized Armour & Main Redevelopment) or New England
Bakery (or Reorganized New England Bakery), as applicable, and such Claimholder shall have agreed
upon in writing, provided that such treatment is not more favorable than the treatment in clause (x) above.
The Debtors' failure to object to an Other Priority Claim in the Chapter 11 Cases shall be without
prejudice to Reorganized Mrs. Cubbison's, Reorganized Armour & Main Redevelopment's, or
Reorganized New England Bakery's, as applicable, right to contest or otherwise defend against such
Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the applicable
Debtor or Reorganized Debtor) when and if such Claim is sought to be enforced by the holder of the
Other Priority Claim.

Other Priority Claims with respect to Mrs. Cubbison's, Armour & Main Redevelopment
and New England Bakery are Unimpaired.  The Debtors estimate that the aggregate amount of Other
Priority Claims payable under the Plan with respect to Mrs. Cubbison's, Armour & Main Redevelopment
and New England Bakery will be approximately $0.

(b)      Class 2, Intercompany Claims

The Plan provides that each Mrs. Cubbison's Intercompany Claim, Armour & Main
Redevelopment Intercompany Claim and New England Bakery Intercompany Claim will, in the sole
discretion of the applicable Debtor or Reorganized Debtor holding such Claim, be (a) released, waived
and discharged as of the Effective Date, (b) contributed to the capital of the obligor corporation, (c)
dividended, or (d) remain unimpaired; provided that the applicable Debtor or Reorganized Debtor shall
seek the consent of Equity Investors and the Prepetition Investors with respect to the treatment of each
such Claim, with such consent not to be unreasonably withheld.

Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery
Intercompany Claims are Unimpaired.  The Debtors estimate that the aggregate amount of Mrs.
Cubbison's, Armour & Main Redevelopment and New England Bakery Intercompany Claims payable
under the Plan will be approximately $0.

(c)      Class 3, Interests

Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery Interests are Unimpaired.  The Plan provides that such Interests shall be unaffected by the Plan, except to the extent required or permitted by the Restructuring Transactions or as may be required in the event the Mrs. Cubbison's Substantive Consolidation Motion, Armour & Main Redevelopment Substantive Consolidation Motion or New England Bakery Substantive Consolidation Motion is prosecuted to conclusion.

(d)      Class 4, Trade Claims

The Plan provides that, unless the holder of a Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery Trade Claim and the applicable Debtor agree to a different treatment, on the Effective Date, each holder of a Allowed Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery Trade Claim shall have its Claim paid in full in Cash (not including accrued post-petition interest).

Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery Trade Claims are Impaired.  The Debtors estimate that the aggregate amount of Mrs. Cubbison's Trade Claims payable under the Plan will be approximately $13,676.  The Debtors estimate that the aggregate amount of Armour & Main Redevelopment and New England Bakery Trade Claims payable under the Plan will be approximately $0.

(e)      Class 5, General Unsecured Claims

The Plan provides that, if Class 5 Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery General Unsecured Claims votes to accept the applicable Plan and such Plan is confirmed, the Debtors will withdraw the Mrs. Cubbison's Substantive Consolidation Motion, Armour & Main Redevelopment Substantive Consolidation Motion, or New England Bakery Substantive Consolidation Motions, as applicable, with prejudice, and, on the Effective Date or as soon thereafter as is reasonable and practicable, each holder of an Allowed Class 5 Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery General Unsecured Claim, as applicable, shall be entitled to receive such holder's Pro Rata share of the Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery General Unsecured Claims Distribution Property, as applicable, or (b) if Class 5 Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery General Unsecured Claims does not vote to accept the applicable Plan or if the applicable Plan is not confirmed, then, the Debtors shall prosecute the Mrs. Cubbison's, Armour & Main Redevelopment, or New England Bakery Substantive Consolidation Motion, as applicable, and, if such motion is granted, the holders of Claims against, and Interests in, the Debtors to which such motion(s) apply shall receive the same treatment as holders of Claims against, and Interests in, IBC under the Plan with respect to IBC.

Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery General Unsecured Claims are Impaired.  The estimated amount of Class 5 General Unsecured Claims with respect to each of Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery is $19,307,508.[5]

---

5      This estimate does not include an unliquidated Control Group Liability Claim asserted by the ABA Plan which is disputed.

4.      *Substantive Consolidation of Mrs. Cubbison's, Armour & Main
        Redevelopment and New England Bakery with IBC*

The Plan represents individual plans of reorganization for each of the Debtors, including Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery.  A "Control Group Liability Claim" is a Claim asserted by, or on behalf of, a qualified defined benefit pension plan against and all members of IBC's controlled group of companies and related entities as defined under section 4001(b)(1) of the Employee Retirement Income Security Act of 1974 (on a joint and several basis).  In the Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery cases, the holders of Control Group Liability Claims assert that all of the Debtors are jointly and severally liable on such claims.  As a result, in an effort to resolve the Control Group Liability Claims, the Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery Plans embody a compromise and settlement whereby the holders of Class 5 General Unsecured Claims, including the holders of Control Group Liability Claims, would be entitled to share in the Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery General Unsecured Claims Distribution Property available under the respective Plans.  To the extent the Class 5 General Unsecured Creditors do not vote to accept all of these three Plans, then the Debtors with respect to the non-accepted Plans will seek to prosecute the applicable Substantive Consolidation Motion(s) and thereby seek to substantively consolidate such Debtor(s) with IBC.

Generally, substantive consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of the multiple debtors for certain purposes under a plan.  The effect of consolidation is the pooling of the assets of, and claims against, the consolidated debtors; satisfying liabilities from a common fund; and combining the creditors of the debtors for purposes of voting on reorganization plans.  In re Augie/Restivo Baking Co., 860 F.2d 515, 518 (2d Cir. 1988).  There is no statutory authority specifically authorizing substantive consolidation.  The authority of a Bankruptcy Court to order substantive consolidation is derived from its general equitable powers under section 105(a) of the Bankruptcy Code, which provides that the court may issue orders necessary to carry out the provisions of the Bankruptcy Code.  In re DRW Property Co. 82, 54 B.R. 489, 494 (Bankr. N.D.Tex. 1985).  Nor are there statutorily prescribed standards for substantive consolidation.  Instead, judicially developed standards control whether substantive consolidation should be granted in any given case.  The United States Court of Appeals for the Eighth Circuit, the circuit in which the Debtors' Chapter 11 Cases are pending, recognizes that a court may authorize substantive consolidation.  See, e.g., In re Giller, 962 F.2d 796 (8th Cir. 1992).

The propriety of substantive consolidation must be evaluated on a case-by-case basis. See In re Giller, 962 F.2d 796 (8th Cir. 1992); In re Affiliated Foods, Inc., 249 B.R. 770 (W.D. Mo. 2000). The extensive list of elements and factors frequently cited and relied upon by courts in determining the propriety of substantive consolidation may be viewed as variants on the following: 1) the necessity of consolidation due to the interrelationship among the debtors; 2) whether the benefits of consolidation outweigh the harm to creditors; and 3) prejudice resulting from not consolidating the interrelated debtors. In re Giller, 962 F.2d 796.  Some courts have viewed these elements and factors as examples of information that may be useful to courts charged with deciding whether there is substantial identity between the entities to be consolidated and whether consolidation is necessary to avoid some harm or to realize some benefit.

Substantive consolidation is an equitable remedy that a bankruptcy court may be asked to apply in chapter 11 cases involving affiliated debtors.  Substantive consolidation involves the pooling of the assets and liabilities of the affected debtors.  All of the debtors in the substantively consolidated group are treated as if they were a single corporate and economic entity.  Consequently, a creditor of one of the substantively consolidated debtors is treated as a creditor of the substantively consolidated group of debtors, and issues of individual corporate ownership of property and individual corporate liability on

obligations are ignored.  Substantive consolidation of two or more debtors' estates generally results in the deemed consolidation of the assets and liabilities of the debtors, the elimination of multiple and duplicative creditor claims, joint and several liability claims and guarantees and the payment of allowed claims from a common fund.  The Debtors believe that substantive consolidation of Mrs. Cubbison's with IBC is warranted in light of the criteria established by the courts in ruling on the propriety of substantive consolidation in other cases.

The facts and circumstances surrounding the historical business operations of the Debtors and Mrs. Cubbison's support substantive consolidation.  Without the manufacturing operations, management, accounting and other overhead support of the other Debtors, Mrs. Cubbison's likely could not operate as a stand alone entity and would have little, if any value on a liquidation basis.  Furthermore, Mrs. Cubbison's is reliant on the subsidiaries owned by IBC for the manufacturing and packaging of its products.  IBC indirectly owns eighty percent (80%) of the commons stock of Mrs. Cubbison's, and they share a common director.  All of the employees that do work on behalf of Mrs. Cubbison's are employed by Brands, a wholly owned subsidiary of IBC, and are leased to Mrs. Cubbison's.  Mrs. Cubbison's enjoys the use of IBC's unified cash management system.  Indeed, IBC supplies many overhead functions, including the filing of tax returns (in all but two states, such returns are filed on a consolidated basis with IBC and its other subsidiaries), and its office space is leased on its behalf by another subsidiary of IBC.

The facts and circumstances surrounding the historical business operations of the Debtors and Armour & Main Redevelopment and New England Bakery support substantive consolidation of each of these entities with IBC as well.  Armour & Main Redevelopment was established with respect to a redevelopment agreement with the city of Kansas City Missouri.  The property was redeveloped and was subsequently transferred to IBC.  Armour & Main Redevelopment has no assets, no employees and no current function, and its purpose of existence, which has been fulfilled, was for the benefit of IBC and its subsidiaries.  Armour & Main Redevelopment has common officers and directors with the Debtors and all of the costs associated with its continued corporate existence are funded by the Debtors through their unified cash management system.  Armour & Main Redevelopment therefore has no ability to survive without the management, accounting and other overhead support of the other Debtors, and would have little, if any value on a liquidation basis.  Likewise, New England Bakery has no assets, no employees and no current operations.  New England Bakery at one point served as an entity that engaged certain distributors to distribute products on behalf of the Debtors.  All such distribution arrangements have ceased. New England Bakery has common officers and directors with the Debtors and all of the costs associated with its continued corporate existence are funded by the Debtors through their unified cash management system.  New England Bakery therefore has no ability to survive without the management, accounting and other overhead support of the other Debtors, and would have little, if any value on a liquidation basis.

5.    *Special Provisions Regarding Insured Claims*

Under the Plan, an Insured Claim is any Claim or portion of a Claim (other than a Workers' Compensation Claim) that is insured under the Debtors' insurance policies, but only to the extent of such coverage.  Distributions under the Plan to each holder of an Insured Claim will be in accordance with the treatment provided under the Plan for General Unsecured Claims; provided, however, that the maximum amount of any Claim under the Plan on account of an Allowed Insured Claim upon which a distribution will be made will be limited to an amount equal to the applicable self-insured retention under the relevant insurance policy; provided further, however, that, to the extent a holder has an Allowed Insured Claim, the amount of which exceeds the total coverage available from the relevant insurance policies of the Debtors, such holder will have an Allowed General Unsecured Claim in the amount by which such Allowed Insured Claim exceeds the coverage available from the relevant Debtors' insurance policies.  Furthermore, nothing in Section 4.3 of the Plan will constitute a waiver or release of

69

any Retained Actions or Avoidance Claims the Debtors may hold against any Person, including the Debtors' insurance carriers; and nothing in Section 4.3 of the Plan is intended to, will, or will be deemed to preclude any holder of an Allowed Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any distribution such holder may receive under the Plan; provided, however, that the Debtors do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the Estates to which they are entitled.

The Plan does not expand the scope of, or alter in any other way, the rights and obligations of the Debtors' insurers under their policies, and the Debtors' insurers will retain any and all defenses to coverage that such insurers may have, including the right to contest and/or litigate with any party, including the Debtors, the existence, primacy and/or scope of available coverage under any alleged applicable policy. The Plan will not operate as a waiver of any other Claims the Debtors' insurers have asserted or may assert in any proof of claim or the Debtors' rights and defenses to such proofs of claim.

6.    *Reservation of Rights Regarding Claims*

Except as otherwise explicitly provided in the Plan, nothing will affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

**D.    Means for Implementation of the Plan**

1.    *Continued Corporate Existence*

Subject to the Restructuring Transactions described in Section 6.13 of the Plan and Exhibit I annexed thereto, each of the Debtors will continue to exist as a Reorganized Debtor after the Effective Date as a separate corporate entity, with all the powers of a corporation or limited liability company, as applicable, under applicable law in the jurisdiction in which it is organized and pursuant to the Organizational Documents in effect prior to the Effective Date, except to the extent such Organizational Documents are amended by the Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

2.    *Corporate Action*

The Plan provides that each of the matters provided for under the Plan involving the corporate structure of the Debtors or corporate action to be taken by or required of the Debtors will, as of the Effective Date, be deemed to have occurred and be effective as provided therein, and will be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of any of the Debtors or the Reorganized Debtors.

3.    *Certificate of Incorporation and Bylaws*

The Organizational Documents shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code. The Organizational Documents for Reorganized IBC shall, among other things, authorize 60,000,000 shares of New Common Stock, $0.01 par value per share. The Certificate of Incorporation for Reorganized IBC, in form and substance satisfactory to Equity Investors, is attached to the Plan as Exhibit L and the bylaws for Reorganized IBC, in form and substance satisfactory to Equity Investors, is attached to the Plan as Exhibit M. A summary description of the New

Common Stock is set forth as <u>Exhibit F</u> to the Plan.  The charter and bylaws of each Reorganized Subsidiary Debtor, shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, until two (2) years after the Effective Date.

4.    *Cancellation of Existing Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan, (a) the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of or interests in the Debtors that are Reinstated under the Plan, will be cancelled, and (b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indenture, certificates of designation, bylaws, or certificate or articles of incorporation or similar document governing the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of or interests in the Debtors that are Reinstated under the Plan, as the case may be, will be released and discharged.  Notwithstanding anything to the contrary in the Plan, as of the Effective Date, the Reorganized Debtors shall assume all existing indemnification obligations arising under (i) the Prepetition Credit Agreement (including the Loan Documents, as defined therein) in favor of JPMCB, J.P. Morgan Securities Inc. and any of the Plan Supporters (each in their respective capacity under the Prepetition Credit Agreement), (ii) the DIP Credit Agreement, (iii) the exit facility commitment letter by and among Silver Point, IBC and Brands dated October 18, 2007, as amended and restated as of November 6, 2007, (iv) the Term Loan Facility Commitment Papers and (v) Annexes I and I-A to the Commitment Letter, and all such indemnification obligations shall not be cancelled, terminated or otherwise modified and shall remain in full force and effect.  Subject to payment in full of the Old Convertible Note Indenture Trustee Fee Claim on the Effective Date, all of the obligations of the Debtors and the Reorganized Debtors under the Old Convertible Note Indenture and the Old Convertible Notes, including indemnification obligations, shall be cancelled, released and discharged without limitation, and the Old Convertible Notes Indenture Trustee shall be discharged from any further obligations thereunder, <u>provided</u>, <u>however</u>, that said cancellation, release and discharge shall not affect, limit or impair the rights of the Old Convertible Notes Indenture Trustee as against any holder of Old Convertible Notes.  Upon and subject to such cancellation, release and discharge, all distributions to holders of Old Convertible Notes Claims by the Trustee of the Creditors' Trust, if any, shall be made directly by the Trustee thereof and the Old Convertible Notes Indenture Trustee shall have no duties relating thereto.

5.    *Authorization and Issuance of New Common Stock*

(a)    The Certificate of Incorporation for Reorganized IBC shall authorize 60,000,000 shares of New Common Stock.  On the Effective Date, Reorganized IBC shall (i) issue up to 4,420,000 shares of New Common Stock to the Term Loan Facility Lenders (or their Permitted Affiliates) and (ii) issue 4,420,000 shares of New Common Stock to Equity Investors.  A summary description of the New Common Stock is set forth as <u>Exhibit F</u> to the Plan.

(b)    The New Common Stock issued under the Plan shall be subject to economic and legal dilution based upon (i) the issuance of New Common Stock pursuant to the Long Term Incentive Plan as set forth in Section 6.8 of the Plan, (ii) the conversions of New Convertible Secured Notes, (iii) the exercise of Warrants, (iv) the employee equity sharing plans to be entered into in connection with the Transaction, (v) the Trust Stock Appreciation Rights, and (vi) any other shares of New Common Stock issued after the consummation of the Plan.

(c)     The issuance of the New Common Stock, including the shares of the New Common Stock, options, or other equity awards, if any, reserved by Reorganized IBC for the Long Term Incentive Plan and the other employee equity sharing plans to be entered into in connection with the Transaction, and the shares of New Common Stock reserved by Reorganized IBC for the conversion of the New Convertible Secured Notes and the exercise of the Warrants, is authorized without the need for any further corporate action or action by any other party.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, and if applicable, fully paid and non-assessable.

6.     *Directors and Officers*

(a)     The existing officers or managing members of the Debtors shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the board of directors or equityholders, as the case may be, to replace them.

(b)     On the Effective Date, the term of the current members of the board of directors of the corporate Debtors shall expire.  The initial board of directors of the corporate Reorganized Debtors will consist of eight (8) directors. Craig Jung (or in the event of his death, incapacity, or resignation, the chief executive officer of IBC) shall serve as a director.  Equity Investors shall designate five (5) directors.  The Prepetition Investors shall designate two (2) directors reasonably satisfactory to Equity Investors.

The Persons designating board members shall file with the Bankruptcy Court and give to the Debtors written notice of the identities of such members on a date that is not less than ten (10) days prior to the Voting Deadline.

(c)     Other provisions governing the service, term and continuance in office of the members of the board shall be as set forth in the Organizational Documents of the Reorganized Debtors.

7.     *Employment, Retirement, Indemnification and Other Agreements and Incentive Compensation Programs*

(a)     The proposed terms of employment of certain key employees of the Reorganized Debtors, to be effective on the Effective Date, are summarized at <u>Exhibit N</u> attached to the Plan (the "Executive Employment Agreements").  The Executive Employment Agreements are to be in form and substance satisfactory to Equity Investors and the assumption of, or entry into, the Executive Employment Agreements as provided for in the Plan shall be subject to the consent of Equity Investors prior to the Confirmation Date.  For the avoidance of doubt, with the exception of the requirement that the Debtors assume the Executive Employment Agreement with Craig Jung, entry into or assumption of any Executive Employment Agreement or other employment agreement shall not be a condition precedent to the confirmation or consummation of the Plan.

(b)     With the exception of those individuals (i) whose employment terms are summarized on <u>Exhibit N</u> to the Plan, and (ii) the terms of whose employment agreements are subject to a rejection motion as of the Confirmation Hearing, to the extent that any of the Debtors has in place as of the Effective Date employment, severance (change in control), retirement, indemnification and other agreements with their respective active directors, officers, managing members and employees who will continue in such capacities or a similar capacity after the Effective Date, or retirement income plans, welfare benefit plans and other plans for such Persons, such agreements, programs and plans will

remain in place after the Effective Date, and the Reorganized Debtors will continue to honor such agreements, programs and plans except to the extent provided in the Plan without prejudice to the Reorganized Debtors' authority to modify or eliminate any such agreements, programs or plans as permitted under applicable non-bankruptcy law.  Benefits provided under such agreements or plans may include benefits under qualified and non-qualified retirement plans; health and dental coverage; short and long-term disability benefits; death and supplemental accidental death benefits; vacation; leased car; financial consulting, tax preparation and estate planning as well as an annual physical examination, each paid or provided commensurate with an employee's position in accordance with the applicable Reorganized Debtor's policies then in effect.  Such agreements and plans also may include equity, bonus and other incentive plans in which officers, managing members and other employees of the Reorganized Debtors may be eligible to participate; provided, however, such equity, bonus and other incentive plans shall not provide for the issuance of New Common Stock and to the extent that such equity, bonus and other incentive plan provides for the issuance of Existing Securities, such provision shall be deemed null and void and the officers, managing members and other employees shall waive any right to enforce such provisions; provided, further, however, that pursuant to the Long Term Incentive Plan, there shall be reserved for certain members of management, directors, and other employees of the Reorganized Debtors a certain number of shares of New Common Stock and other securities all as more fully described in Section 6.8 of the Plan.

(c)    Notwithstanding anything contained in the Plan to the contrary, the terms of the KERP will not be modified, altered, or amended.  Retention Bonuses (as defined in the KERP) will be paid in the amounts and at such times as contemplated by the KERP.

8.    *Implementation of the Long Term Incentive Program*

A summary of the Long Term Incentive Plan is attached to the Plan as Exhibit E.  On the Effective Date, the Reorganized Debtors shall implement the Long Term Incentive Plan in order to promote the growth and general prosperity of the Reorganized Debtors by offering incentives to key employees who are primarily responsible for the growth of the Reorganized Debtors, and to attract and retain qualified employees and thereby benefit the shareholders of the Reorganized Debtors based on growth of the Reorganized Debtors.  Pursuant to the Long Term Incentive Plan, the Reorganized Debtors shall deliver certain stock options and restrictive stock grants to certain members of management and other employees on and after the Effective Date, in such amounts and pursuant to such terms as set forth in the Long Term Incentive Plan.

The Long Term Incentive Plan will be administered by Reorganized IBC's board of directors.  In applying and interpreting the provisions of the Long Term Incentive Plan, the decisions of Reorganized IBC's board of directors shall be final.

The Long Term Incentive Plan is to be in form and substance satisfactory to Equity Investors and the establishment of the Long Term Incentive Plan shall be subject to the consent of Equity Investors.

9.    *Termination of the SERP*

Immediately prior to the Effective Date, the SERP shall be deemed terminated, and the Reorganized Debtors' obligations thereunder shall cease, and on the Effective Date the trustee of the rabbi trust holding certain assets of the SERP shall remit such assets to the Reorganized Debtors to be used for general corporate purposes.

10.     *Equity Investors' Contribution*

Pursuant and subject to the terms and conditions of the Investment Agreement, Equity Investors shall make the Investment in the amount specified in the Investment Agreement, to be utilized by the Debtors or Reorganized Debtors to make Cash distributions as required under the Plan and to consummate the transactions contemplated by the Plan, the Investment Agreement and the Commitment Letter.

11.     *Issuance of the New Convertible Secured Notes, the New Common Stock and Warrants and Entry Into the New Third Lien Term Loan*

On the Effective Date, Reorganized IBC shall issue the New Convertible Secured Notes, the New Common Stock and the Warrants for distribution, and shall enter into the New Third Lien Term Loan, in accordance with the terms of the Transaction. In the Confirmation Order, the Bankruptcy Court shall approve the New Third Lien Term Loan and the New Convertible Secured Notes in substantially the form disclosed to the Bankruptcy Court and authorize the Reorganized Debtors to enter into the New Third Lien Term Loan and issue the New Convertible Secured Notes pursuant to the New Third Lien Term Loan Credit Facility and the New Convertible Secured Note Indenture, respectively, and execute the same together with such other documents as the agent under the New Third Lien Term Loan and the trustee under the New Convertible Secured Note Indenture may reasonably require.

The issuance to the Prepetition Lenders of the New Convertible Secured Notes (including the New Common Stock into which such New Convertible Secured Notes are convertible) and the distribution thereof shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code. The definitive documents with respect to the New Convertible Secured Notes distributed pursuant to the Plan will have mandatory conversion rights, anti-dilution rights and transfer restrictions reflecting the terms set forth on Exhibit G to the Plan and shall be mutually acceptable to the Debtors, Equity Investors and the Prepetition Investors.

12.     *Post-Effective Date Financing*

On the Effective Date, the Reorganized Debtors (other than Mrs. Cubbison's) shall (i) enter into the New Credit Facilities and the New Third Lien Term Loan Credit Facility, together with all guarantees evidencing obligations of the Reorganized Debtors thereunder and security documents, (ii) execute mortgages, certificates and other claims documentation and deliveries as the Prepetition Investors reasonably request, (iii) deliver insurance and customary opinions, and (iv) enter into other documentation as described in the Term Loan Facility Commitment Papers and Exhibit H to the Commitment Letter, all of which items in clauses (i) – (iv) shall be in form and substance reasonably satisfactory to the Prepetition Investors, and such documents and all other documents, instruments and agreements to be entered into, delivered or contemplated thereunder shall become effective in accordance with their terms on the Effective Date. In the Confirmation Order, the Bankruptcy Court shall approve the New Credit Facilities and the New Third Lien Term Loan Credit Facility in substantially the form disclosed to the Bankruptcy Court and authorize the Reorganized Debtors to execute the same together with such other documents as the lenders under the New Credit Facilities and the New Third Lien Term Loan Credit Facility may reasonably require in order to effectuate the treatment afforded to such parties under the New Credit Facilities and the New Third Lien Term Loan Credit Facility, respectively.

Upon the Effective Date (i) the Debtors and the Reorganized Debtors are authorized to execute and deliver the New Credit Facility Documents, the New Third Lien Term Loan Credit Facility, the New Convertible Secured Note Indenture, all mortgages, intercreditor agreements, security documents and all other related agreements, documents or instruments to be executed or delivered in connection

74

therewith (collectively, the "Exit Facility Documents") and perform their obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages or indemnities, (ii) the Exit Facility Documents shall constitute the legal, valid and binding obligations of the Reorganized Debtors parties thereto, enforceable in accordance with their respective terms, (iii) the Liens granted to secure the obligations under each applicable Exit Facility Document shall be, and shall remain (until released in accordance with the terms of the applicable Exit Facility Document), legal, valid, perfected, non-voidable, non-avoidable and binding liens on, and security interests in, all property and assets of the Reorganized Debtors (to the extent required by the Exit Facility Documents) having the priority granted to them under the Plan, and (iv) no obligation, payment, transfer or grant of security under the Exit Facility Documents shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff or counterclaim on account of any act, event or occurrence arising on or prior to the Effective Date.  The Debtors and the Reorganized Debtors, as applicable, and the other persons granting any liens and security interests to secure the obligations under the Exit Facility Documents are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary or desirable to establish and further evidence perfection of such liens and security interests under the provisions of any applicable federal, state, provincial or other law (whether domestic or foreign) (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals and consents shall not be required for such perfection), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

### 13.  *Preservation of Causes of Action*

In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in the Plan, the Reorganized Debtors shall retain and may, in their sole discretion, enforce or prosecute all Retained Actions, a nonexclusive list of which is attached to the Plan as Exhibit A-1.  The Debtors or the Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, compromise, or enforce such rights (or decline to do any of the foregoing).  The Reorganized Debtors or any successors may prosecute (or decline to prosecute) such Retained Actions in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.  Except as otherwise provided herein, the failure of the Debtors to specifically list any Claim, right of action, suit or proceeding in the Schedules or in Exhibit A-1 does not, and will not be deemed to, constitute a waiver or release by the Debtors of such claim, right of action, suit or proceeding, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits or proceedings in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit or proceeding upon or after the confirmation or consummation of the Plan.

### 14.  *Substantive Consolidation Motions*

If Class 5 General Unsecured Claims voting on the respective Plans of Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery do not each vote as a class to accept the applicable Plan, and if the applicable Plan as it pertains to Mrs. Cubbison's, Armour & Main Redevelopment or New England Development is not timely confirmed, the Debtors shall seek to substantively consolidate Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery, as appropriate, and IBC pursuant to the Mrs. Cubbison's Substantive Consolidation Motion, Armour & Main Redevelopment Substantive Consolidation Motion or New England Bakery Substantive Consolidation Motion, as applicable.  The Debtors may combine two or more Substantive Consolidation Motions in one pleading.  Objections to the Substantive Consolidation Motion(s) may be decided at the Confirmation Hearing or at a later date.

15.      *Plan Modification and Amendments*

Pursuant to Section 14.2 of the Plan, the Debtors may alter, amend, or modify the Plan or any Exhibits thereto under section 1127(a) of the Bankruptcy Code, in a form that is reasonably satisfactory to Equity Investors and the Prepetition Investors, at any time prior to the Confirmation Hearing.   After the Confirmation Date and prior to substantial consummation of the Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan.

16.      *Creditors' Committee*

Effective on the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to applications for Professional Claims.   The professionals retained by the Creditors' Committee and the members thereof shall not be entitled to compensation and reimbursement of expenses for services rendered after the Effective Date, except for services rendered in connection with (a) the implementation of the transactions contemplated to occur on the Effective Date hereunder and (b) applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date pursuant to Section 9.2 of the Plan.

17.      *Payment of Statutory Fees*

All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation hearing, shall be paid on the Effective Date.  The Reorganized Debtors will continue to pay fees pursuant to section 1930 of title 28 of the United States Code as required by that section.

18.      *Effectuating Documents; Further Transactions*

The chairman of the board of directors, the Chief Executive Officer, or any other executive officer or managing member of the Debtors will be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Secretary or Assistant Secretary of the Debtors will be authorized to certify or attest to any of the foregoing actions.

19.      *Exemption From Certain Transfer Taxes and Recording Fees*

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to the Plan (including, without limitation, pursuant to any grant of collateral under the New Credit Facilities), or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any document recording tax, stamp tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

E.        **Unexpired Leases and Executory Contracts**

　　　　1.        *Assumed (Non-Union) Contracts and Leases*

　　　　　　Except with respect to the Union Contracts (whose treatment under the Plan is described in Section 7.3 therein), only those executory contracts and unexpired leases to which the Debtors (or any of them) are a party that are specifically listed on the schedule of assumed contracts and leases annexed to the Plan as Exhibit O, or that were entered into postpetition, shall be deemed automatically assumed and Reinstated as of the Effective Date; provided, however, that neither the inclusion by the Debtors of a contract or lease on Exhibit O nor anything contained in the Plan shall constitute an admission by the Debtors that such lease or contract is an unexpired lease or executory contract or that any Debtor, or any of their Affiliates, has any liability thereunder.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions, pursuant to section 365(b)(1) of the Bankruptcy Code and, to the extent applicable, section 365(b)(3) of the Bankruptcy Code, as of the Effective Date.

　　　　　　Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of the Plan.

　　　　2.        *Rejected (Non-Union) Contracts and Leases*

　　　　　　Except with respect to the Union Contracts (whose treatment under the Plan is described in Section 7.3 therein) and except with respect to executory contracts and unexpired leases that have previously been assumed or are the subject of a motion to assume filed, or a notice of assumption served pursuant to an order of the Bankruptcy Court, on or before the Confirmation Date, all executory contracts and unexpired leases not assumed as set forth in Section 7.1 of the Plan will be deemed automatically rejected as of the Effective Date or such earlier date as the Debtors may have unequivocally terminated their performance under such lease or contract.  Expired leases and contracts that are no longer executory will neither be assumed or rejected as a part of these procedures.

　　　　3.        *Assumption and Rejection of Union Contracts*

　　　　　　Each Union Contract to which the Debtors are a party shall be deemed automatically assumed and Reinstated as of the Effective Date, unless such Union Contract (a) shall have been previously rejected by the Debtors, (b) is the subject of a motion to reject pursuant to section 1113 of the Bankruptcy Code filed on or before the Confirmation Date, or (c) expired prior to the Effective Date and/or is no longer executory on the Effective Date by its own terms.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions, pursuant to section 365(b)(1) of the Bankruptcy Code and, to the extent applicable, section 365(b)(3) of the Bankruptcy Code, as of the Effective Date.  Any rejection of a Union Contract will proceed by motion made pursuant to section 1113 of the Bankruptcy Code.

4.        *Payments Related to Assumption of Executory Contracts and Unexpired
Leases*

The provisions (if any) of each executory contract or unexpired lease to be assumed and
Reinstated under the Plan which are or may be in default shall be satisfied solely by Cure.  Objections to
assumption or rejection including, without limitation, to Cure related to non-monetary defaults, must be
raised in an objection to be filed no later than the date by which objections are required to be filed with
respect to confirmation of the Plan.  Any such Objections will be litigated at the Confirmation Hearing or
at such other time as the Bankruptcy Court may schedule.

5.        *Rejection Damages Bar Date*

If rejection of an executory contract or unexpired lease rejected pursuant to the Plan
results in a Claim, then such Claim shall be forever barred and shall not be enforceable against either the
Debtors or the Reorganized Debtors or such entities' properties unless a proof of claim is filed with the
clerk of the Bankruptcy Court and served upon counsel to the Debtors within thirty (30) days after service
of the earlier of (a) notice of the Confirmation Order or (b) other notice that the executory contract or
unexpired lease has been rejected.  Any Claim that may be Allowed as a result of the rejection of an
executory contract or unexpired lease shall be treated as a General Unsecured Claim.

## F.        Restructuring Transactions and Alternative Structures

Subject to the prior agreement of Equity Investors and the Prepetition Investors on the
form of the Restructuring Transactions, the Debtors or the Reorganized Debtors, as the case may be, shall
take such actions as may be necessary or appropriate to effect the relevant Restructuring Transactions.
The term "Restructuring Transactions" means a dissolution or winding up of the corporate existence of a
Debtor or the consolidation, merger, contribution of assets, or other transaction in which a Reorganized
Debtor merges with or transfers substantially all of its assets and liabilities to a Reorganized Debtor or
their Affiliates, on or after the Effective Date, as set forth on Exhibit I of the Plan.  The Restructuring
Transactions contemplated by the Plan include, but are not limited to, all of the transactions described in
the Plan.  Such actions may also include: (a) the execution and delivery of appropriate agreements or
other documents of merger, consolidation or reorganization containing terms that are consistent with the
terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of
appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability,
duty or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate
Organizational Documents with the appropriate governmental authorities under applicable law; and (d) all
other actions that such Debtor or Reorganized Debtor determines are necessary or appropriate, including
the making of filings or recordings in connection with the relevant Restructuring Transaction.  In the
event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring
Transaction, each party to such merger shall cease to exist as a separate corporate entity and thereafter the
surviving Reorganized Debtor shall assume and perform the obligations under the Plan of each
Reorganized Debtor party to such merger.  In the event a Reorganized Debtor is liquidated, the
Reorganized Debtors (or the Reorganized Debtor which owned the stock of such liquidating Debtor prior
to such liquidation) shall assume and perform the obligations of such liquidating Reorganized Debtor
under the Plan.

Several alternative structures for the post-emergence capital structure of the Debtors are
being explored.  Under certain of the alternative structures, Equity Investors would organize one or more
new entities which would acquire the Debtors, or the assets of the Debtors, in a taxable transaction.  Other
alternative structures involve the Debtors entering into certain transactions prior to the Effective Date in
order to modify the overall corporate structure of the Debtors and/or otherwise structure their businesses

for corporate or operational reasons. The reorganization of the Debtors will be consummated pursuant to an alternative structure described in this paragraph only if, after further analysis, the Debtors believe that it will improve the corporate or operational structure or otherwise provide efficiencies to the Estates or the Reorganized Debtors, and only if the Debtors have received the prior written consent of Equity Investors and the Prepetition Investors. Any such reorganization will not have any material adverse effect on any of the distributions under the Plan.

## G.    Provisions Governing Distributions

### 1.    *Time of Distributions*

Except as otherwise provided for in the Plan or ordered by the Bankruptcy Court, distributions under the Plan will be made to holders of Allowed Claims on a Periodic Distribution Date.

### 2.    *No Interest on Claims*

Unless otherwise specifically provided for in the Plan, the Confirmation Order, the DIP Credit Agreement or the Prepetition Credit Agreement, Postpetition Interest will not accrue or be paid on Claims, and no Claimholder will be entitled to interest accruing on or after the Petition Date on Claims, rights, or Interests, and no Claimholder will be entitled to interest accruing on or after the Petition Date on any Claim, right or Interest. Interest will also not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made thereon when and if such Disputed Claim becomes an Allowed Claim.

### 3.    *Disbursing Agent*

The Plan calls for the Reorganized Debtors or a party designated by the Reorganized Debtors, in its sole discretion, to serve as a Disbursing Agent. The Disbursing Agent will make all distributions required under the Plan.

### 4.    *Surrender of Securities or Instruments*

On or before the Distribution Date, or as soon as practicable thereafter, each holder of an instrument evidencing a Claim (as to each, a "Certificate"), will surrender such Certificate to the Disbursing Agent, or, with respect to indebtedness that is governed by other agreement, the respective Servicer, and such Certificate will be cancelled. No distribution of property under the Plan will be made to or on behalf of any such holder unless and until such Certificate is received by the Disbursing Agent or the respective Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Disbursing Agent or the respective Servicer. Any holder who fails to surrender or cause to be surrendered such Certificate, or fails to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Disbursing Agent or the respective Servicer prior to the first anniversary of the Effective Date, will be deemed to have forfeited all rights and Claims in respect of such Certificate and will not participate in any distribution under the Plan, and all property in respect of such forfeited distribution, including any dividends or interest attributable thereto, will revert to the Reorganized Debtors notwithstanding any federal or state escheat laws to the contrary. Notwithstanding the foregoing, no Prepetition Lender is required to surrender a Certificate to the Prepetition Agent and no Prepetition Lender shall forfeit its distribution rights for failure to surrender such Certificate.

5.      *Claims Administration Responsibility*

The Reorganized Debtors will have sole and absolute discretion in administering, disputing, objecting to, compromising or otherwise resolving all Claims against the Debtors (the "Claims Administration"); provided, however, that before the Reorganized Debtors agree to allow a General Unsecured Claim in an amount greater than $1,000,000, the Reorganized Debtors shall give reasonable notice to the Creditors' Trust of their intended agreement and the Creditors' Trust can elect to assume responsibility for administering, disputing, objecting, compromising or otherwise resolving such General Unsecured Claim and assume and pay from the Trust Assets any fees, costs, expenses or other liabilities incurred in connection with administering, disputing, objecting, compromising or otherwise resolving such General Unsecured Claim.  If the Creditors' Trust does not elect to assume such responsibility within three Business Days after the Reorganized Debtors' delivery of notice to the Creditors' Trust, the General Unsecured Claim shall be disposed of in the manner proposed by the Reorganized Debtors.  The Reorganized Debtors shall bear the responsibility for any fees, costs, expenses or other liabilities incurred by the Reorganized Debtors in connection with the Claims Administration; provided, however, prior to the Reorganized Debtors taking any responsibility with respect to Claims Administration, the Creditors' Trust and the Reorganized Debtors shall have entered into an agreement whereby the Creditor' Trust shall compensate the Reorganized Debtors for their reasonable costs and expenses (excluding attorneys' fees) associated with the Reorganized Debtors' use of resources used to assist the Creditors' Trust in the Claims Administration.

6.      *Delivery of Distributions*

Distributions under this Plan to holders of Allowed Prepetition Lender Claims will be made to, or at the direction of, the Prepetition Agent and will be distributed by the Prepetition Agent in accordance with the Prepetition Credit Agreement.  Distributions under this Plan to holders of DIP Facility Claims shall be made to, or at the direction of, the DIP Agent and shall be distributed by the DIP Agent in accordance with the DIP Credit Agreement.  Distributions under this Plan to all other Allowed Claimholders will be made by the Disbursing Agent.  If any Claimholder's distribution is returned as undeliverable, no further distributions to such Claimholder will be made unless and until the Disbursing Agent or the appropriate Servicer is notified of such Claimholder's then current address, at which time all missed distributions will be made to such Claimholder without interest.  Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed.  All claims for undeliverable distributions will be made on or before the second anniversary of the Effective Date.  After such date, all unclaimed property will revert to the Reorganized Debtors.  Upon such reversion, the claim of any Claimholder, or their successors, with respect to such property will be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

7.      *Procedures for Treating and Resolving Disputed and Contingent Claims*

(a)      *No Distributions Pending Allowance*

Under the Plan, no payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim.  All objections to Claims must be filed on or before the Claims Objection Deadline.

(b)    *Distributions After Allowance*

Payments and distributions to each respective Claimholder on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, will be made in accordance with provisions of the Plan that govern distributions to such Claimholders. Subject to Section 8.2 of the Plan, on the first Periodic Distribution Date following the date when a Disputed Claim becomes an Allowed Claim, the Disbursing Agent will distribute to the Claimholder any Cash that would have been distributed on the dates distributions were previously made to Claimholders had such Allowed Claim been an Allowed Claim on such dates, together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Allowed Claimholders included in the applicable class.

## H.    Allowance of Certain Claims

1.    *DIP Facility Claims*

On the Effective Date, all claims arising under the DIP Facility shall be allowed in an amount to be agreed upon by the Debtors and such Claimholders, and all obligations of the Debtors under the DIP Facility shall be paid in full in Cash or otherwise satisfied in a manner acceptable to such Claimholders in accordance with the terms of the DIP Facility and the DIP Credit Agreement including, without limitation, replacement and cancellation, securing by "back up" letters of credit issued by an institution acceptable to the bank that issued the letters of credit outstanding under the DIP Facility, or cash collateralization at 105% of the face amount of all letters of credit issued and outstanding under the DIP Credit Facility on terms in form and substance (a) satisfactory to the bank issuer of such letter of credit and (b) reasonably satisfactory to Equity Investors and the Prepetition Investors. Upon compliance with the preceding sentence, all liens and security interests granted to secure such obligations shall be deemed cancelled and shall be of no further force and effect.

2.    *Professional Claims*

Under the Plan, all final requests for payment of Professional Claims must be filed no later than sixty (60) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims will be determined by the Bankruptcy Court.

Subject to the Holdback Amount, on the Effective Date, the Debtors or the Reorganized Debtors will pay all amounts owing to Professionals for all outstanding amounts relating to prior periods through the Effective Date. To receive payment on the Effective Date for unbilled fees and expenses incurred through such date, two (2) days prior to the Effective Date, the Professionals must estimate fees and expenses due for periods that have not been billed as of the Effective Date and must deliver such estimate to counsel for the Debtors, the Prepetition Investors, Equity Investors and the Prepetition Agent. Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated period must submit a detailed invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order.

The Disbursing Agent will maintain the Holdback Escrow Account in trust for the Professionals. On the Effective Date, the Debtors or the Reorganized Debtors will fund the Holdback Escrow Account by paying to the Disbursing Agent Cash equal to the aggregate Holdback Amount for all Professionals. The remaining amount of Professional Claims owing to the Professionals will be paid to such Professionals by the Disbursing Agent from the Holdback Escrow Account when such claims are

finally allowed by the Bankruptcy Court.  When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, will be paid to the Reorganized Debtors.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate.

Notwithstanding the foregoing, the fees and expenses of the Prepetition Investors as provided in the Term Loan Facility Commitment Papers, and as approved by the Commitment Letter Approval Order, shall be payable by the Debtors (or the Reorganized Debtors) to the Prepetition Investors promptly upon invoicing to the Debtors (or the Reorganized Debtors) without any notice to the Bankruptcy Court or any other party.

Notwithstanding the foregoing, the fees and expenses of Equity Investors as provided in the Commitment Letter, and as approved by the Commitment Letter Approval Order, shall be payable by the Debtors (or the Reorganized Debtors) to Equity Investors promptly upon invoicing to the Debtors (or the Reorganized Debtors) without any notice to the Bankruptcy Court or any other party.

3.    *Substantial Contribution Compensation and Expenses Bar Date*

Requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), 503(b)(4), and 503(b)(5) of the Bankruptcy Code must be filed with the clerk of the Bankruptcy Court, on or before a date which is forty-five (45) days after the Effective Date (the "503 Deadline"), and serve such application on counsel for the Debtors and as otherwise required by the Bankruptcy Court and the Bankruptcy Code on or before the 503 Deadline, or be forever barred from seeking such compensation or expense reimbursement.

4.    *Administrative Claims Bar Date*

All other requests for payment of an Administrative Claim (other than as set forth in Sections 9.2, 9.3 and 9.6 of the Plan, and other than with respect to Cure Claims) must be filed with the Bankruptcy Court and served on counsel for the Debtors no later than thirty (30) days after the Effective Date.  Unless the Debtors or the Reorganized Debtors object to an Administrative Claim by the Claims Objection Deadline, such Administrative Claim shall be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim (i) which is paid or payable by any Debtor in the ordinary course of business or (ii) the payment of which has been approved by the Bankruptcy Court.

5.    *The ACE Insurance Program*

Notwithstanding anything to the contrary in this Disclosure Statement, the Plan or the Confirmation Order: (a) on the Effective Date, the Debtors and the Reorganized Debtors shall assume the ACE Insurance Program in its entirety and shall pay the cure costs related to such assumption; (b) the ACE Insurance Program (including, but not limited to, all letters of credit and other collateral and security provided to the ACE Companies (or any of them) pursuant the ACE Insurance Program) shall survive and shall not be amended, modified, waived or impaired in any respect by the Plan, the Confirmation Order or otherwise without the prior written agreement of the ACE Companies; (c) the claims of the ACE Companies arising under the ACE Insurance Program shall be Allowed Administrative Claims, which are payable in the ordinary course of business, and shall not be discharged or released by the Plan or the

82

Confirmation Order; (d) the ACE Companies shall not be required to file or serve a request for payment of any Administrative Claim and shall not be subject to any bar date governing Administrative Claims; (e) nothing in the Plan or the Confirmation Order shall be construed as, or is, a determination as to coverage under the ACE Insurance Program; and (f) nothing in the Plan or Disclosure Statement in any way: (i) precludes or limits the rights of the insurers to contest and/or litigate with any party, including, without limitation, the Debtors, the existence, primacy and/or scope of available coverage under any alleged applicable policy; (ii) permits any holder of a Workers' Compensation Claim or an Insured Claim to recover the same amounts from the ACE Companies and the Debtors; (iii) alters the ACE Companies' rights and obligations under the ACE Insurance Program or modifies the coverage provided thereunder; or (iv) alters the Debtors' rights and obligations under the ACE Insurance Program, including, without limitation, any duty of the Debtors' to defend, at their own expense, against claims asserted under the Policies; provided, however, that, after the Effective Date, the ACE Companies shall use their commercially reasonable efforts, consistent with the ACE Insurance Program, to reduce the aggregate letters of credit and other collateral and security provided to the ACE Companies (or any of them) pursuant to the ACE Insurance Program by the Reorganized Debtors.

6.   *Commitment Fee*

Notwithstanding anything to the contrary in the Plan, on the Effective Date, the Debtors or the Reorganized Debtors shall pay (i) the balance of the Commitment Fee to Equity Investors in accordance with the Commitment Letter Approval Order and (ii) the Term Loan Facility Commitment Fee to the Term Loan Facility Commitment Parties in accordance with the Commitment Letter Approval Order.

7.   *Payment of Old Convertible Note Indenture Trustee Fee Claim.*

Notwithstanding anything to the contrary in the Plan, on the Effective Date, the Old Convertible Note Indenture Trustee Fee Claim shall be paid in Cash without any further notice to the Bankruptcy Court or otherwise; provided, however, that no later than five (5) days prior to the Confirmation Hearing, the Old Convertible Note Indenture Trustee shall have provided to the Debtors, Equity Investors and the Prepetition Investors copies of invoices evidencing the fees and expenses incurred by the Old Convertible Note Indenture Trustee during the Chapter 11 Cases through the Effective Date; provided, further, that the Bankruptcy Court shall retain jurisdiction over any disputes regarding the reasonableness of the Allowed Old Convertible Note Indenture Trustee Fee Claim.  Upon payment of the Old Convertible Note Indenture Trustee Fee Claim, the Old Convertible Note Indenture Trustee shall forever release, waive and discharge its "charging" lien with respect to any distribution that is made to any holder of Old Convertible Notes.

**I.   Creditors' Trust**

The Plan provides for the creation of the Creditors' Trust to be administered by a trustee with the advice and direction of the Trust Advisory Board.

1.   *Appointment of Trustee.*

(a)   The Trustee for the Creditors' Trust shall be designated by the Creditors' Committee.  Specifically, the Creditors' Committee shall file a notice on a date which is at least ten days prior to the date the Bankruptcy Court establishes for the commencement of the Confirmation Hearing designating the Person who it has selected as the Trustee and seeking approval of such designation.  The Person designated as the Trustee shall file an affidavit contemporaneously with the Creditors' Committee's motion demonstrating that such Person is disinterested.  The Person so designated by the

Creditors' Committee shall become the Trustee as of the Effective Date upon the Bankruptcy Court entering an order granting the motion after consideration of the same and any objections thereto at the Confirmation Hearing.

(b)    The Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan and the Trust Agreement.

2.    *Assignment of Trust Assets to the Creditors' Trust*.  On the Effective Date, the Trust Assets shall be transferred to the Creditors' Trust, for and on behalf of the Trust Beneficiaries.  Beneficial interests in the Creditors' Trust shall be non-transferable, except by death or operation of law, and will not be evidenced by certificates.  Only cash proceeds of Trust Assets may be distributed to Trust Beneficiaries and "in-kind" distributions are not permitted.

3.    *The Creditors' Trust*.

(a)    Without any further action of the directors, officers or shareholders of the Debtors or the Reorganized Debtors, on the Effective Date, the Trust Agreement, substantially in the form of Exhibit K to the Plan, shall become effective.  The Trustee shall accept the Creditors' Trust and sign the Trust Agreement on that date and the Creditors' Trust will then be deemed created and effective.

(b)    The duration of the Creditors' Trust will be limited to an initial term of five years, subject to further extension solely for the purpose of permitting the Creditors' Trust to liquidate the Trust Assets and distribute the proceeds thereof to the Trust Beneficiaries.

(c)    The Trustee shall have full authority to take any steps necessary to administer the Trust Agreement, including, without limitation, the duty and obligation to liquidate the Trust Assets (having first obtained such approvals from the Trust Advisory Board as may be necessary, if any), as applicable, and, if authorized by majority vote of those members of the Trust Advisory Board authorized to vote, to prosecute and settle Trust Claims, in such a manner so as reasonably to maximize the value of the Trust Assets.

(d)    All fees, costs and expenses associated with the administration of the Creditors' Trust and distribution to Trust Beneficiaries shall be the responsibility of and be paid by the Creditors' Trust from the Trust Assets.  The Reorganized Debtors will provide information and assistance to the Creditors' Trust to the extent reasonably required to assist the Creditors' Trust in the investigation and prosecution of Trust Claims; provided, however, the Reorganized Debtors shall not have an obligation to provide information and assistance to the Creditors' Trust until the Reorganized Debtors and the Creditors' Trust have entered into an agreement, the terms of which were negotiated in good faith, for the Creditors' Trust to compensate the Reorganized Debtors for their reasonable costs and expenses (including reasonably attorneys' fees) associated with the Reorganized Debtors' resources used in connection with such requested assistance.

(e)    The Trustee may retain such law firms, accounting firms, experts, advisors, consultants, investigators, appraisers, auctioneers or other professionals as it may deem necessary (collectively, the "Trustee Professionals"), in its sole discretion, to aid in the performance of its responsibilities pursuant to the terms of the Plan including, without limitation, the liquidation of Trust Assets, as applicable.  The Trustee Professionals shall continue to prepare monthly statements in the same manner and in the same detail as required pursuant to the Professional Fee Order, and the Trustee Professionals shall serve such statements on each member of the Trust Advisory Board.  In the event two or more members of the Trust Advisory Board object to the reasonableness of such fees and expenses, the

84

matter shall be submitted to the Bankruptcy Court for approval of the reasonableness of such fees and expenses.

       (f)     For U.S. federal income tax purposes, it is intended that the Creditors' Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by the Trust Beneficiaries.

       (g)     The Trustee shall be responsible for filing all U.S. federal, state and local tax returns for the Creditors' Trust.

       (h)     To the extent that there is an inconsistency or conflict between the description of the Creditors' Trust provided in the Plan and the Trust Agreement, the Trust Agreement shall control.

      4.     *The Trust Advisory Board*.

       (a)     The Trust Advisory Board shall be comprised of three (3) members as designated by the Creditors' Committee. The Creditors' Committee shall give written notice of the identities of such members and file and serve such notice with the Bankruptcy Court, on a date that is not less than ten (10) days prior to the Confirmation Hearing; provided, however, that if and to the extent the Creditors' Committee fails to file and serve such notice, the Debtors shall designate the members of the Trust Advisory Board by announcing their identities at the Confirmation Hearing. The Trust Advisory Board shall adopt such bylaws as it may deem appropriate. The Trustee shall consult regularly with the Trust Advisory Board when carrying out the purpose and intent of the Creditors' Trust. Members of the Trust Advisory Board shall be entitled to compensation from the Creditors' Trust in accordance with the Trust Agreement and to reimbursement from the Creditors' Trust of the reasonable and necessary expenses incurred by them in carrying out the purpose of the Trust Advisory Board. Any compensation paid to members of the Trust Advisory Board or reimbursement of their reasonable and necessary expenses shall be payable solely by the Creditors' Trust from the Trust Assets.

       (b)     In the case of an inability or unwillingness of any member of the Trust Advisory Board to serve, such member shall be replaced by designation of the remaining members of the Trust Advisory Board. If any position on the Trust Advisory Board remains vacant for more than thirty (30) days, such vacancy shall be filled within fifteen (15) days thereafter by the designation of the Trustee without the requirement of a vote by the other members of the Trust Advisory Board.

       (c)     Upon the certification by the Trustee that all assets transferred into Trust have been distributed, abandoned or otherwise disposed of, the members of the Trust Advisory Board shall resign their positions, whereupon they shall be discharged from further duties and responsibilities.

       (d)     The Trust Advisory Board may, by majority vote, approve all settlements of Trust Claims which the Trustee may propose; provided, however, that the Trustee may seek Bankruptcy Court approval of a settlement of a Trust Claim if the Trust Advisory Board fails to act on a proposed settlement of such Trust Claim within thirty (30) days of receiving notice of such proposed settlement by the Trustee.

       (e)     The Trust Advisory Board may, by majority vote, authorize the Trustee to invest the corpus of the Trust in prudent investments other than those described in section 345 of the Bankruptcy Code.

(f)    The Trust Advisory Board may remove the Trustee in the event of gross negligence or willful misconduct.  In the event the requisite approval is not obtained, the Trustee may be removed by the Bankruptcy Court for cause shown.  In the event of the resignation or removal of the Trustee, the Trust Advisory Board shall, by majority vote, designate a person to serve as successor Trustee.

(g)    The Trust Advisory Board shall require a fidelity bond from the Trustee in such reasonable amount as may be agreed to by majority vote of the Trust Advisory Board.

(h)    The Trust Advisory Board shall govern its proceedings through the adoption of bylaws, which the Trust Advisory Board may adopt by majority vote.  No provision of such bylaws shall supersede any provision of the Plan.

5.    *Distributions to Beneficiaries of the Creditors' Trust Under the Trust Agreement.*

Notwithstanding Section 4.1(i) of the Plan, and as part of the Intercreditor Settlement, holders of Allowed General Unsecured Claims shall be entitled to participate in the Intercreditor Settlement, to the extent provided in and subject to the terms set forth in the Intercreditor Settlement Order and the Trust Agreement.  The procedures for distributions to the Trust Beneficiaries shall be in accordance with the terms set forth in the Trust Agreement.  The procedures for resolving Disputed Claims of the Trust Beneficiaries are set forth in the Plan and in the Trust Agreement.

**J.    Effect of the Plan on Claims and Interests**

1.    *Revesting of Assets*

Except as otherwise explicitly provided in the Plan, on the Effective Date all property comprising the Estates (including Retained Actions) shall revest in each of the Debtors and, ultimately, in the Reorganized Debtors, free and clear of all Claims, Liens and Interests of creditors and equity security holders (other than as expressly provided herein).  As of the Effective Date, each of the Reorganized Debtors may operate its business and use, acquire, and dispose of property and settle and compromise Claims without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

2.    *Discharge of the Debtors*

Effective as of the Confirmation Date (but subject to the occurrence of the Effective Date) and except as otherwise specifically provided in the Plan or in the Confirmation Order, Confirmation of the Plan will satisfy, discharge, and release of all Claims and Causes of Action, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors, the Reorganized Debtors, and the Estates or any of their assets or properties, regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims, rights, and Interests, including, but not limited to, demands and liabilities that arose before the Confirmation Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not (i) a proof of claim or interest based upon such debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim or Interest based upon such debt, right, or Interest is allowed under section 502 of the Bankruptcy

86

Code, or (iii) the holder of such a Claim, right, or Interest accepted the Plan.  The Confirmation Order will be a judicial determination of the discharge of all liabilities of and Interests in the Debtors, subject to the Effective Date occurring.

As of the Effective Date, except as provided in the Plan or in the Confirmation Order (including with respect to the indemnification obligations referenced in the last sentence of Section 6.4 of the Plan) or under the terms of the documents evidencing and orders approving the New Credit Facilities, the Investment Agreement, the Commitment Letter, the New Third Lien Term Loan Credit Facility, the New Convertible Secured Note Indenture and the Trust Stock Appreciation Rights, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all Interests in IBC, and in the Brands Preferred Stock, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

3.  *Compromises and Settlements*

Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various Claims (a) against them and (b) that they have against other Persons.  The Debtors expressly reserve the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against them and claims that they may have against other Persons up to and including the Effective Date.  After the Effective Date, such right shall pass to the Reorganized Debtors as contemplated in Section 11.1 of the Plan, without any need for Bankruptcy Court approval.

Pursuant to the Intercreditor Settlement and Bankruptcy Rule 9019, the Debtors, the Prepetition Lenders and the Creditors' Committee agree to (a) the creation of the Creditors' Trust pursuant to Article X of the Plan, the transfer of the Trust Assets thereto, the allowance and payment of the Old Convertible Note Indenture Trustee Fee Claim and other good and valuable consideration and (b) the full and complete release and satisfaction of any and all claims of the Debtors (and those claiming derivatively through the Debtors) against the Prepetition Lenders, in their capacities as such, including, but not limited to: (i) claims against the Prepetition Lenders asserted or that could have been asserted by the Debtors in the Prepetition Lender Actions, (ii) challenges with respect to the extent, amount, validity and priority of the Prepetition Lenders' liens and security interests, and (iii) allegations or claims that the adequate protection payments made to the Prepetition Lenders during the Chapter 11 Cases should be "recharacterized" as principal payments and applied to reduce the Prepetition Lenders' secured claims. For the avoidance of doubt, the foregoing shall not release the obligations of the Term Loan Facility Commitment Parties for the Term Loan Facility pursuant to the Term Loan Facility Commitment Papers or the obligations of the parties to the Intercreditor Settlement.

In addition, pursuant to the Intercreditor Settlement and Bankruptcy Rule 9019, the Debtors, the Prepetition Lenders, the Creditors' Committee and the Old Convertible Note Indenture Trustee agree that the transfer of the Trust Assets to the Creditors' Trust and the satisfaction of the Old Convertible Note Indenture Trustee Fee Claim shall also be in full and complete release and satisfaction of any and all claims that could be prosecuted by any party in interest in the Chapter 11 Cases including the Debtors, the Creditors' Committee, its members, the Prepetition Lenders and the Old Convertible Note Indenture Trustee with respect to the non-substantive consolidation of the Debtors' bankruptcy estates pursuant to the Plan.

Finally, pursuant to the Intercreditor Settlement and Bankruptcy Rule 9019, the Debtors, the Prepetition Lenders, the Creditors' Committee and the Old Convertible Note Indenture Trustee agree that any provision contained in the Old Convertible Note Indenture purporting to subordinate the right of payment of holders of Old Convertible Notes to the rights of Prepetition Lenders shall be null and void and all Prepetition Lenders shall waive any right to enforce such a provision solely for purposes of the settlement described therein.

All documents implementing the terms of the Intercreditor Settlement, including the Trust Stock Appreciation Rights, shall be in form and substance reasonably satisfactory to Equity Investors, the Creditors' Committee and the Prepetition Investors.

4.     *Release of Certain Parties*

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code shall be deemed to forever release, waive, and discharge the Released Parties of all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, including the Prepetition Lender Actions, and liabilities which the Debtors or the Estates are entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the Plan or the Reorganized Debtors with respect to each of the Released Parties; provided, however, that nothing contained in the Plan is intended to operate as a release of any potential claims by the Debtors and their Estates against parties who have executed Tolling Agreements with the Debtors during the Chapter 11 Cases, but only with respect to Claims covered by such Tolling Agreements and only to the extent that such Tolling Agreements continue to be in full force and effect and the tolling periods contemplated thereby have not expired as of the Effective Date. Notwithstanding anything to the contrary contained in the Plan, nothing in the Plan shall be deemed to release any of the Debtors, Equity Investors, the Term Loan Facility Commitment Parties or any of their Affiliates from their obligations under the Plan, the New Credit Facilities, the Investment Agreement, the Commitment Letter, the New Third Lien Term Loan Credit Facility, the Trust Stock Appreciation Rights or the New Convertible Secured Note Indenture and the transactions contemplated thereby.

5.     *Releases by Holders of Claims*

As of the Effective Date, for good and valuable consideration, the adequacy of which is confirmed in the Plan, each holder of a Claim that affirmatively votes in favor of the Plan will forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities, including the Prepetition Lender Actions, whatsoever against the Released Parties, arising under or in connection with or related to the Debtors, the Estates, the conduct of the Debtors' business, the Chapter 11 Cases, the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder) or the Reorganized Debtors, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the Plan or the Reorganized Debtors; provided, however, that nothing contained therein is intended to operate as a release of any potential claims by third parties against any parties that have signed Tolling Agreements with a third party, but only with respect to

88

Claims covered by such Tolling Agreements and only to the extent that such Tolling Agreements continue to be in full force and effect and the tolling periods contemplated thereby have not expired. Notwithstanding anything to the contrary herein, the Plan shall not discharge, enjoin or restrain the assertion, institution or enforcement of any claims against any non-debtor parties (a) that may be held by the Securities and Exchange Commission or (b) with respect to the Pension Plans, including any claim for breach of fiduciary duty or any claim asserted by the PBGC.

> 6.    *Setoffs*

Except with respect to Claims specifically Allowed under the Plan, including the Prepetition Lender Claims, the Debtors may, but will not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such Claimholder; but neither the failure to do so nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Claimholder.

> 7.    *Exculpation and Limitation of Liability*

Except as otherwise specifically provided in the Plan, the Released Parties, any of such parties' respective present officers, directors, managing members, employees, advisors, attorneys, representatives, financial advisors, investment bankers, or agents and any of such parties' successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, right, Cause of Action and liability to one another or to any Claimholder or Interestholder, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, investment bankers, attorneys or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of (i) the filing and prosecution of the Chapter 11 Cases, (ii) the negotiation and execution of the exit facility commitment letter by and among Silver Point, IBC and Brands dated October 18, 2007 as amended and restated as of November 6, 2007, the Commitment Letter, the Term Loan Facility Commitment Papers, the ABL Facility Commitment Papers, the New Credit Facility Documents, the Investment Agreement, the New Convertible Secured Note Indenture, the New Convertible Secured Notes and the New Third Lien Term Loan Credit Facility, (iii) the negotiation and filing of the Plan, (iv) the pursuit of confirmation of the Plan, (iv) the negotiation and pursuit of approval of this Disclosure Statement, (v) the consummation of the Plan, and (vi) the administration of the Plan or the property to be distributed under the Plan, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  Notwithstanding anything to the contrary contained herein or in the Plan, Section 11.7 of the Plan shall not release any party from any claim, obligation, right, Cause of Action or liability arising from any act or omission committed in bad faith, gross negligence or willful misconduct.

> 8.    *Indemnification Obligations*

Except as specifically provided in Sections 6.4 and 6.7 of the Plan, in satisfaction and compromise of the Indemnitee's Indemnification Rights: (a) all Indemnification Rights except those held by (i) Persons included in either the definition of "Insured Persons" or the "Insureds" in either of the policies providing the Debtors' D&O Insurance; and (ii) Professionals, but only to the extent that they have expressly been granted Indemnification Rights in the documents filed with the Bankruptcy Court and only to the extent that such Indemnification Rights are determined to be valid and enforceable, shall be released and discharged on and as of the Effective Date; provided that the Indemnification Rights excepted from the release and discharge will remain in full force and effect on and after the Effective Date and will not be modified, reduced, discharged, or otherwise affected in any way by the Chapter 11

Cases; (b) the Debtors or Reorganized Debtors, as the case may be, covenant to use commercially reasonable efforts to purchase and maintain D&O Insurance providing coverage for those Persons described in subsection (a)(i) of Section 11.8 of the Plan whose Indemnification Rights are not being released and discharged on and as of the Effective Date, for a period of six years after the Effective Date insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for, or on behalf of the Debtors or the Reorganized Debtors in at least the scope and amount as currently maintained by the Debtors (the "Insurance Coverage"); and (c) the Debtors or the Reorganized Debtors, as the case may be, hereby indemnify such Persons referred to in subclause (b) above to the extent of, and agree to pay for, any deductible or retention amount that may be payable in connection with any claim covered by either under the foregoing Insurance Coverage or any prior similar policy.

9.      *Injunction*

The satisfaction, release, and discharge pursuant to Article XI of the Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim or Cause of Action satisfied, released, or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

10.     *Central States Settlement*

Notwithstanding anything to the contrary contained in the Plan and assuming that no complete withdrawal as contemplated pursuant to 29 U.S.C. §§ 1383 and 1385 occurs prior to or in connection with the Plan (all as previously agreed to in the Settlement Agreement dated November 14, 2006 (as approved by the Bankruptcy Court on November 13, 2006)), any claim against or liability of (including, without limitation, any liability or claim for withdrawal liability under 29 U.S.C. §§ 1383 and 1385) any of the Debtors or any third-party to the Central States Fund, a multi-employer plan as that term is defined by 29 U.S.C. § 1301(a)(3) (the "Central States Plan"), specifically including Claim Nos. 9205, 9206, 9207, 9208, 9209, 9214, 9215, 9216 and 9217, is left unimpaired under the Plan, shall not be discharged and shall continue unaltered as if the Chapter 11 Cases had not been commenced, nor shall any third-party be released from any liability or claim that the Central States Plan may have against that third-party as a result of any one of the Debtor's participation in the Central States Plan.  The Debtors shall seek inclusion of the foregoing in the Confirmation Order.  In light of the foregoing provisions, the Central States Plan shall have no right to receive any distribution on account of the Complete Withdrawal Claim (as such term is defined in the Settlement Agreement referred to in Section 11.10 of the Plan) and shall not be permitted to vote on or object to the Plan on account of such contingent claim.  Nothing contained in the Plan is intended to alter the terms of the Settlement Agreement referred to this paragraph.

11.     *Other Pension Plans*

Notwithstanding anything to the contrary contained in the Plan, to the extent the withdrawal liability under 29 U.S.C. §§ 1383 and 1385 as asserted or assertable by the New York State Teamsters Conference Pension and Retirement Fund, Western Pennsylvania Teamsters and Employers Pension Fund and New England Teamsters and Trucking Industry Pension Fund has not yet been incurred and remains a potential withdrawal liability of the Debtors as of the Effective Date, then such withdrawal liability claim shall continue unaltered as if the Chapter 11 Cases had not been commenced, nor shall any third-party be released from any potential withdrawal liability claim that the New York State Teamsters Conference Pension and Retirement Fund, Western Pennsylvania Teamsters and Employers Pension Fund and New England Teamsters and Trucking Industry Pension Fund may have against a third-party as a result of the Debtors' participation in the New York State Teamsters Conference Pension and Retirement

Fund, Western Pennsylvania Teamsters and Employers Pension Fund and New England Teamsters and Trucking Industry Pension Fund.  None of the foregoing shall have a right to receive any distribution on account of a withdrawal liability claim that has not yet been incurred and remains a potential withdrawal liability claim and shall not be permitted to vote on or object to the Plan on account of such withdrawal liability claim.

## VIII.    CERTAIN FACTORS TO BE CONSIDERED

The holder of a Claim against a Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference in the Plan) before deciding whether to vote to accept or to reject the Plan.

### A.    General Considerations

The formulation of a reorganization plan is the principal purpose of a chapter 11 case. The Plan sets forth the means for satisfying the holders of Claims against and Interests in the Debtors. Certain Claims may receive partial distributions pursuant to the Plan, and in some instances, no distributions at all.  The recapitalization of the Debtors realizes the going concern value of the Debtors for their Claimholders.  Moreover, reorganization of the Debtors' business and operations under the Plan also avoids the potentially adverse impact of a liquidation on the Debtors' employees and many of their customers, trade vendors, suppliers of goods and services, and lessors.

### B.    Certain Bankruptcy Considerations

Even if all voting Impaired Classes vote in favor of the Plan, and even if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan.  Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting holders of Claims and Interests will not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  See Article X of this Disclosure Statement.  Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  See Appendix B attached hereto for a liquidation analysis of the Debtors.  If a liquidation or protracted reorganization were to occur, there is a significant risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders.  The Debtors' future results are dependent upon the successful confirmation and implementation of a plan of reorganization.  Failure to obtain this approval in a timely manner could adversely affect the Debtors' operating results, as the Debtors' ability to obtain financing to fund their operations and their relations with customers and suppliers may be harmed by protracted bankruptcy proceedings.  Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for their liabilities that will be subject to a plan of reorganization.  Once a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders, customers, and suppliers to do business with a company that recently emerged from bankruptcy proceedings.

C.     **Business Factors and Competitive Condition**

      1.     *General Economic Conditions*

      The Business Plan makes certain assumptions regarding the general economic conditions of the United States economy and the baking industry.  An estimate of future economic conditions is subject to many factors outside the Debtors' control, including costs for relevant commodities necessary to create the Debtors' products, interest rates, inflation, unemployment rates, consumer spending, war and other such factors.  Any one of these or other economic factors could have a significant impact on the operating performance of the Reorganized Debtors.  There is no guarantee that economic conditions will improve in the near term.

      2.     *Business Factors*

      The Debtors' operating performance is tied to the Debtors' ability to, among other things (i) accurately anticipate ingredient and other raw material costs, fuel and utility costs and availability and successfully hedge against fluctuations in those costs and the ability to procure necessary ingredients; (ii) properly manage labor and employee benefits costs; (iii) retain the value in the Debtors' brands and trademarks; (iv) successfully implement business strategies and otherwise execute planned changes in various aspects of the business; (v) attract, motivate and retain key executives and employees; and (vi) attract and retain customers.

      Any one of the above-referenced factors, many of which may be affected by circumstances outside the Debtors' control, could have an impact on the Reorganized Debtors' operating performance.  In addition, should the Reorganized Debtors experience a significant disruption of terms with vendors, or should margins fail to improve, or the availability of capital is affected, compliance with financial covenants and cash resources could be affected.

      In addition, there are risks that the goals of the Business Plan will not be achieved.  In such event, the Debtors may be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated in the Plan, or become subject to further insolvency proceedings.

D.     **Declining demand for the Debtors' products could have adverse effects on their financial results**

      The Debtors have experienced a significant decline in the demand for their bread products.  According to data from Information Resources Incorporated (the "IRI"), an independent market research concern that reports sales trends in most supermarkets (excluding mass merchandisers, club stores and discount stores), the Debtors' total unit volume of branded sweet goods declined by 8.0% during fiscal 2008 from the comparable fiscal 2007 period, and revenues from the Debtors' branded sweet good products declined 0.8% from fiscal 2007 to fiscal 2008.  The Debtors' total unit volume of branded bread products declined by 11.3% during fiscal 2008 from the comparable fiscal 2007 period.  During fiscal 2008, revenues related to the Debtors' bread products declined 6.5% from the comparable fiscal 2007 period.  A significant portion of the decline was the result of the Debtors' exit from the bread market in Southern California.  Removing the effect of this withdrawal, the Debtors' decline in total branded bread units was 7.2% in fiscal 2008 compared to fiscal 2007 and the decline in branded bread revenue was 1.1%.  Data from IRI also indicates that the declining unit trend in branded bread and sweet goods products was evident in the industry during fiscal 2008.  The Debtors believe that they will continue to experience reduced demand for their products based on various factors, including the factors listed below.

1.        *Obesity*

The Debtors believe that the recent national awareness regarding obesity trends in children and adults and related issues has had an impact on the eating habits of many consumers and, as a result, consumers have changed and will continue to change their consumption of bread products and sweet goods.  While the long-term impact of consumers concerned about eating habits, including consumption of carbohydrates, calories, and fat is still unclear, changes in consumption habits could impact demand for the Debtors' products going forward.

On August 7, 2007, the Federal Trade Commission (the "FTC") issued an Order To File Special Report (the "2007 FTC Order") to 44 food manufacturers, including the Debtors, as a result of a Congressional order to gather information from certain food manufacturers related to advertising to children.  The 2007 FTC Order requires the Debtors to provide detailed information on its snack cake marketing activities during calendar 2006.  The Debtors filed a response with the FTC on November 1, 2007.

2.        *Dietary Guidelines*

Dietary guidelines also could result in reduced demand for the Debtors' bread and sweet good products.  The Department of Health and Human Services and Department of Agriculture's *Dietary Guidelines for Americans* (the "2005 Dietary Guidelines") provides dietary advice aimed at promoting health and reducing the risk for major chronic diseases, and serves as the basis for federal food and nutritional education programs.  The guidelines recommend, among other things, limiting the intake of saturated and trans fats, cholesterol, added sugar, and salt.

The Debtors are currently subject to Food and Drug Administration labeling regulations that became effective January 1, 2006, requiring them to list information relating to trans fat content.  Although virtually all of the Debtors' bread products and such key iconic Hostess® sweet goods as multipacks of Twinkies® and Ho Hos® have the "0 grams" trans fat label, certain of the Debtors' products that are fried or Kosher do contain trans fat (which is declared on the products' labels).  As a result of various pressures, including market pressures, the Debtors intend to introduce only new products that can properly be labeled with the "0 grams" trans fat declaration to assist those consumers concerned about their trans fat consumption.  There can be no assurance that these and other actions that the Debtors may take will offset the effect, if any, of the 2005 Dietary Guidelines' recommendation to reduce the intake of saturated and trans fats and added sugar.

The 2005 Dietary Guidelines additionally recognize that whole grains are an important source of fiber and nutrients and the Debtors have a number of whole grain products among their product offerings.  However, the substantial majority of the Debtors' bread revenues are from the sale of white bread and other refined-grain bread products.  Even if consumers increase their consumption of whole grain products as a result of the new guidelines, the Debtors cannot guarantee there will be an increase in consumption of the Debtors' whole grain product offerings.

3.        *Consumer Tastes*

In addition, the Debtors' success depends in part on their ability to anticipate the tastes and dietary habits of consumers and to offer products that appeal to consumers' preferences.  The inability of the Debtors to anticipate and react to fluctuating consumer preferences can result in reduced demand for the Debtors' products.  While the Debtors recently introduced several new and improved products designed to achieve and retain market share, there is no guarantee that these new products will meet consumer preferences.

93

E.        **Conditions Precedent to Consummation; Timing**

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

F.        **The Transaction**

On September 12, 2008, the Debtors entered into the Commitment Letter with Equity Investors setting forth the principal terms of the Plan. In connection with the Plan, the Debtors would, among other things, issue new third lien notes, new senior secured convertible debt, shares of new common stock in the reorganized company and warrants to purchase new common stock. Under the terms of the Commitment Letter, Equity Investors have agreed to purchase 4,420,000 shares of new common stock for $44,200,000 and provide new convertible debt in the principal amount of $85,800,000. Under the terms of the ABL Facility Commitment Papers, GECC and GECM agree to structure, arrange and syndicate a $125,000,000 asset-based senior secured revolving credit facility. Under the terms of the Term Loan Facility Commitment Papers, the Term Loan Facility Commitment Parties agreed to structure, arrange and syndicate a $344,000,000 term loan credit facility.

There can be no assurance that the Plan will be confirmed or, if confirmed, consummated. In the event the Plan is not confirmed by the Bankruptcy Court, the Company will continue its efforts to maximize the value of the bankruptcy estates, which may include, but not be limited to, the sale of the Company or some or all of its assets, infusion of capital and debt restructuring or any combination of these options. There can be no assurance as to whether the Company will be able to successfully implement any such strategy on terms and conditions acceptable to the Company or to its various constituents in the bankruptcy or as to the ultimate recovery of value available to such constituents.

The Transaction is subject to various conditions and contingencies including, without limitation, that no material adverse change will have occurred. In addition, the Transaction is contingent upon ratification of amendments to collective bargaining agreements governing the relationship between the Debtors and their unionized workforce necessary to implement the Business Plan, as referenced in the Commitment Letter. To date, all such ratifications have not occurred.

G.        **Inherent Uncertainty of Financial Projections**

The Projections set forth in Appendix C annexed hereto cover the operations of the Reorganized Debtors on a consolidated basis through fiscal 2014. These Projections are based on numerous assumptions including the timing, confirmation, and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Debtors' operations.

Critical assumptions underlying the Business Plan that will have a significant impact on the Reorganized Debtors' ability to achieve projections, and that correspondingly have a material impact on value, include the ability of the Company to (i) successfully execute the improvement initiatives which

form the basis of the projections set forth in the Business Plan; (ii) improve gross margins; (iii) reduce operating costs; and (iv) improve management of working capital.

       The foregoing variations and assumptions may be material and may adversely affect the ability of the Reorganized Debtors to make payments with respect to post-Effective Date indebtedness and to achieve the Projections.  Because the actual results achieved throughout the periods covered by the Projections can be expected to vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance that the actual results will occur.

       During the Chapter 11 Cases, the Debtors have not been able to satisfactorily project their operating and financial performance, particularly with respect to sales.  Actual results achieved did not meet forecasts prepared by the Company and shared with the Creditors' Committee and Equity Committee.  The Debtors' gross margin was significantly below the projections contained in the original chapter 11 operating plan.  The Debtors are still in the process of developing and implementing a reliable mechanism for forecasting sales and gross margin.

       Except with respect to the Projections and except as otherwise specifically and expressly stated in the Plan, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. Neither the Debtors nor the Reorganized Debtors intend to update the Projections for the purposes hereof; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.

## H.    Terms of existing collective bargaining agreements and labor disruptions could adversely impact the Debtors' results of operations

       Most of the Debtors' employees are members of either the IBT or BCTGM.  Because a substantial portion of the Debtors' workers are unionized, the Debtors' costs are generally higher and their ability to implement productivity improvements and effect savings with respect to health care, pension and other retirement costs is more restricted than in many nonunion operations as a result of various restrictions specified in the Debtors' collective bargaining agreements.  Terms of collective bargaining agreements that prevent the Debtors from competing effectively could adversely affect the Debtors' financial condition, results of operations and cash flows. In addition, the Debtors' chapter 11 filing and restructuring activities, including changes to their benefit programs and labor negotiations in connection with the Debtors' efforts to lower their cost structure and their operational restructuring process, have strained relations with certain employee groups and labor unions.  The Debtors are committed to working with those groups to attempt to resolve conflicts that may arise. However, there can be no assurance that these efforts will be successful.  Conflicts that result in work stoppages or disruptions could adversely affect the Debtors' financial condition and results of operation.

## I.    Implementation of various information technology systems could disrupt the Debtors' business and adversely affect their financial condition and results of operations

       The Debtors have implemented a new human resources management and payroll system across their companies.  Additionally, the Debtors intend to upgrade and modernize other core information technology systems, including a significant capital investment in new technology to support a redesigned "order to cash" process (the process of handling orders from the time they are made in the store through manufacturing, shipping, invoicing and payment) that the Debtors believe is critical for the implementation of the Business Plan, as well as the revised "path to market" distribution system.  This includes purchase of new handheld computers for all route sales representatives and the information systems to support such computers, as well as significant redesign and upgrading of the Company's network

95

infrastructure, including the core network, and supporting infrastructure in the production facilities, distribution centers and outlet stores.  In the event the Debtors encounter delays, cost overruns or difficulties in implementation of these new systems, the Debtors may experience disruptions and delays in their business or higher than anticipated capital costs, which could adversely affect their financial condition, results of operations and cash flows.

J.    **The Debtors' internal control over financial reporting was not effective as of May 31, 2008 and weaknesses in their internal controls and procedures could adversely affect the Debtors' financial condition**

As discussed in Item 9A in the 10-K filed by IBC with the Securities Exchange Committee on September 15, 2008, management assessed the Debtors' internal control over financial reporting as of May 31, 2008, the end of their most recent fiscal year, and concluded that material weaknesses existed and the Debtors' internal control over financial reporting was not effective.

The Debtors are continuing their substantial efforts to improve their internal control over financial reporting and disclosure controls and procedures related to substantially all areas of the Debtors' financial statements and disclosures.  The remediation efforts are continuing and are expected to continue throughout fiscal 2009.  There remains a risk that the Debtors will fail to prevent or detect a material misstatement of their annual or interim financial statements.  In addition, if the Debtors are unsuccessful in their remediation efforts, their financial condition, their ability to report their financial condition and results of operations accurately and in a timely manner and their ability to earn and retain the trust of their shareholders, employees, and customers, could be adversely affected.

K.    **Increases in employee and employee-related costs could have adverse effects on the Debtors' financial results**

Historically, the Debtors have seen their health care and workers' compensation costs increase, in some instances substantially.  The Debtors' ability to pass along any cost increase in health care to their employees is limited by their collective bargaining agreements, which cover approximately 82% of the Debtors' employees.  Any substantial increase in health care or workers' compensation costs may adversely affect the Debtors' financial condition, results of operations and cash flows.  In addition, a shortage of qualified employees or a substantial increase in the cost of qualified employees could adversely affect the Debtors' financial condition, results of operations and cash flows.

L.    **Increases in prices and shortages of raw materials, fuels and utilities could cause the Debtors' costs to increase**

The principal raw materials used to bake the Debtors' fresh bread and sweet goods, including flour, sugar, corn sweetener, vital wheat gluten, eggs and edible oils, and the paper, films and plastics used to package the Debtors' products, are subject to substantial price fluctuations. The prices for raw materials are influenced by a number of factors, including the weather, crop production, transportation and processing costs, government regulation and policies, worldwide market supply and demand and alternative demand for raw materials, such as the demand for corn for use in the production of ethanol.

The current high demand for acres to be planted with corn has put pressure on the acreage available to be planted in wheat, the key product in flour used by the Debtors.  Flour is the largest single ingredient cost for raw materials purchased by the Debtors.  Flour prices have recently spiked to all-time highs.  In addition, prices in such commodities as corn sweetener, vital wheat gluten and eggs have also recently surged.  Given current supply and demand, such high prices may continue for some time,

96

particularly if crop yield is negatively impacted by adverse weather.  Many commodities have recently been at record levels, and commodity markets are experiencing unprecedented volatility.  Any substantial increase in the prices of raw materials may adversely affect the Debtors' financial condition, results of operations and cash flows.  The Debtors enter into raw materials purchase contracts to be performed in the future, generally with a term of one (1) year or less, to purchase raw materials at fixed prices to protect the Debtors against price increases.  However, in the event that raw materials prices drop rapidly, these contracts could cause the Debtors to pay higher prices for raw materials than are available in the spot markets.

The Debtors rely on utilities to operate their business.  For example, the Debtors' bakeries and other facilities use natural gas, propane and electricity to operate.  In addition, the Debtors' distribution operations use gasoline and diesel fuel to deliver their products.  For these reasons, substantial future increases in prices for, or shortages of, these fuels or electricity could adversely affect the Debtors' financial condition, results of operations and cash flows.

**M.    Price increases could reduce demand for the Debtors' products**

In fiscal 2007 and fiscal 2008, the Debtors implemented significant price increases for many of their products.  Rising commodity costs could necessitate additional price increases.  Any increase in the Debtors' prices could have a negative effect on consumer demand for the Debtors' products and their sales and profits.

**N.    Competition could adversely impact the Debtors' results of operations**

The baking industry is highly competitive. Competition is based on product quality, price, customer service, brand recognition and loyalty, effective promotional activities, access to retail outlets and sufficient shelf space and the ability to identify and satisfy consumer preferences.  The Debtors compete with large national bakeries, smaller regional operators, small retail bakeries, supermarket chains with their own bakeries, grocery stores with their own in-store bakery departments or private label products and diversified food companies.  Some of these competitors are more diversified and many have greater financial resources than the Debtors do.  Customer service, including responsiveness to delivery needs and maintenance of fully stocked shelves, is an important competitive factor and is central to the competition for retail shelf space.  From time to time, the Debtors experience price pressure in certain of their markets as a result of the Debtors' competitors' promotional pricing practices.  Excess industry capacity could also result in price pressure in certain markets.  As a result, the Debtors may need to reduce the prices for some of their products to respond to competitive and customer pressures and to maintain market share.  Such pressures also may restrict the Debtors' ability to increase prices in response to raw material and other cost increases.  Any reduction in prices as a result of competitive pressures, or any failure to increase prices when raw material costs increase, would harm profit margins and, if the Debtors' sales volumes fail to grow sufficiently to offset any reduction in margins, the Debtors' results of operations will suffer.

In order to protect the Debtors' existing market share or capture increased market share in this highly competitive retail environment, the Debtors continue to promote their products, advertise and introduce and establish new products.  Due to inherent risks in the marketplace associated with advertising and new product introductions, including uncertainties about trade and consumer acceptance, the Debtors' actions may not prove successful in maintaining or enhancing the Debtors' market share and could result in lower sales and profits.  In addition, the Debtors may incur increased credit and other business risks as a result of competing for customers in a highly competitive retail environment.

97

**O.    The Debtors may be obligated to make additional contributions, or incur withdrawal liability, to multi-employer pension plans**

 The Debtors have collective bargaining agreements with their unions that stipulate the amount of contributions that the Debtors must make to union-sponsored, multi-employer pension plans in which the Debtors' employees participate.  Multi-employer pension plans generally are managed by trustees, who are appointed by management of the employers participating in the plans (including the Debtors, in some cases) and the affiliated unions and who have fiduciary obligations to act prudently and in the best interests of the plan's participants.

 Under their collective bargaining agreements, the Debtors are obligated to make contributions to a number of multi-employer plans which cover the majority of the Debtors' employees.  Benefits under these plans generally are based on a specified amount for each year of service.  The Debtors contributed $109.3 million, $115.7 million and $125.8 million to all of their multi-employer plans in fiscal 2008, 2007 and 2006, respectively.  Based on the most recent information available to them, the Debtors believe that certain of the multi-employer pension plans to which they contribute are substantially underfunded.

 While the Debtors expect the contribution rates to these plans to continue to increase as they have in recent years, the amount of increase will depend upon the outcome of collective bargaining, actions taken by trustees, the actual return on assets held in these plans, the impact of new government regulations and the rate of employer withdrawals from the plans, as discussed below.

 Under current law, an employer that withdraws or partially withdraws from a multi-employer pension plan may incur withdrawal liability to the plan, which represents the portion of the plan's underfunding that is allocable to the withdrawing employer pursuant to complex actuarial and allocation rules under ERISA.  Current information regarding the funding status and potential withdrawal liability allocable to the Company is not routinely made available by multi-employer pension plans.  However, based on publicly available information and limited information available from the plans, both of which are often dated and not subject to independent verification, the Debtors believe that their total contingent liability in the event of the Debtors' complete withdrawal from all multi-employer plans to which the Debtors contribute would be in a range from $850 million to $1 billion.  This range does not reflect recent investment returns or losses on plan assets or actuarial experience of the plans, both of which could materially impact the amount of withdrawal liability on a given date.  This range also does not reflect a potential increase in the Debtors' liability as the result of the partial or complete withdrawal of other employers participating in the plans.  If employers that withdraw or partially withdraw from a multi-employer pension plan are not able or fail to pay their withdrawal liability to the plan, by reason of bankruptcy or otherwise, the remaining participating employers in the plan must meet the plan's funding obligations and are responsible for an increased portion of the plan's underfunding.  The decline in the value of assets held by certain of the multi-employer pension plans to which the Debtors contribute, coupled with the high level of benefits generally provided by the plans and the inability or failure of withdrawing employers to pay their withdrawal liability, has dramatically increased the underfunding of these plans in recent years.  As a result, and in light of pension reform legislation at the federal level, the Debtors expect that their contributions to these plans will continue to increase and the plans' benefit levels, underfunding and related issues will continue to create challenges for the Debtors and other employers in the bakery and trucking industries.

 When the Debtors close bakeries, distribution centers and retail outlets, they may incur withdrawal liabilities with respect to underfunded multi-employer pension plans.  Since fiscal 2004, the Debtors have closed 14 bakeries and, in connection with their restructuring activities, the Debtors may close additional bakeries, routes, bakery outlets and distribution centers in the future.  Any assessments

for any withdrawal liability that the Debtors might incur by future closures will be recorded when the affected plans determine that it is probable that a liability exists and that the amount of the withdrawal liability can be reasonably estimated.

Additionally, ERISA and the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code") and related regulations establish minimum funding requirements for multi-employer pension plans. The Pension Protection Act of 2006 (the "PPA") imposes stricter minimum funding requirements on multi-employer pension plans for plan years commencing on or after January 1, 2008. Under the PPA, plans that fail to meet certain funding standards are categorized as being in critical or endangered status. The trustees for critical or endangered plans must adopt a rehabilitation or funding improvement plan designed to improve the plan's funding within a prescribed period of time. Rehabilitation and funding improvement plans may include increased employer contributions, reductions in benefits or a combination of the two. Unless otherwise agreed upon, any requirement to increase employer contributions will not take effect until the current collective bargaining agreements expire. However, an immediate five percent surcharge (increasing to ten percent for the following and subsequent years) is imposed on contributions to critical plans and remains in effect until the bargaining parties agree on modifications imposed by the rehabilitation plan adopted by the trustees. In addition, the failure of a plan to meet funding improvement targets provided in its rehabilitation or funding improvement plan could result in the imposition of an excise tax on contributing employers. To date, the Debtors have received notice that five plans to which they contribute have been designated in critical status and an additional four plans to which they contribute have been designated in endangered status. If excise taxes were imposed on the Debtors, or they are required to make additional contributions, it could adversely affect the Debtors' financial condition, results of operations and cash flows.

For the forgoing reasons, the Debtors are unable to determine the amount of actual future contributions, excise taxes or withdrawal liabilities, if any, for which they may be responsible or whether an adverse affect on the Debtors' financial condition, results of operations and cash flows could result from the Debtors' participation in these plans.

**P.      The inability to completely withdraw from the ABA Plan while operating under the provisions of chapter 11 of the Bankruptcy Code could jeopardize the Debtors' ability to emerge from bankruptcy and threaten the Debtors' viability if they emerge**

Based upon the most recent available actuarial estimates using statutory termination discount rates, the Debtors' portion of the underfunding of the ABA Plan could be approximately $15 to $20 million, assuming the plan was characterized as a multiple employer plan. Conversely, if the plan was characterized as an aggregate of single employer plans, it is likely that the single employer plan attributable to the Debtors would have to be terminated, in which event, the Debtors' portion of the underfunding could be approximately $65 to $80 million. Since January 2006, the Debtors have been notified of $35.5 million of required contributions, which they have not paid.

Any liability resulting from the Debtors' withdrawal from the ABA Plan (if it is determined to be a multiple employer plan) or the termination of the single employer plan attributable to the Debtors (if it is determined to be an aggregate of single employer plans) while operating under the provisions of chapter 11 of the Bankruptcy Code would be a claim in the Chapter 11 Cases and would be treated in accordance with the terms of any plan of reorganization or as may otherwise be provided by the Bankruptcy Code, as opposed to being a post emergence liability. Conversely, if the ABA Plan was determined to be a multiple employer plan and the Debtors were to withdraw from the ABA Plan post emergence or if the ABA Plan were determined to be an aggregate of single employer plans and the single employer plan that was attributable to the Debtors was terminated post emergence, it is possible that any

liability resulting from their withdrawal from the ABA Plan or the termination of the single employer plan attributable to them would be a post emergence liability.

In light of this exposure, the Debtors (1) withdrew their active nonunion employees from the plan effective April 18, 2008; and (2) are working with the applicable unions to effect similar action with respect to their active union employees while they are operating under the provisions of chapter 11 of the Bankruptcy Code.  Accordingly, the Debtors expect that they will successfully withdraw from the ABA Plan prior to emergence from Chapter 11.

As stated above, consummation of the Transaction is subject to various conditions and contingencies.  One such condition is that (a) there be entry of an order by the Bankruptcy Court in the Chapter 11 Cases, in form and substance satisfactory to Equity Investors, determining that, if and to the extent that a court of competent jurisdiction determines that any of the Debtors has any current or future liability to, under or in connection with the ABA Plan based on the Debtors' (or their employees') participation prior to the Effective Date in such pension plan, such liability is a general unsecured pre-petition claim against the relevant Debtor, and such order becoming a final order, in full force and effect without reversal, modification or stay, not subject to a pending motion for reconsideration, revocation, reversal, modification, stay or appeal and the period for an appeal having expired, or (b) Equity Investors shall otherwise be satisfied that any of the Debtors' or the Reorganized Company's or its direct and indirect subsidiaries' current or future liability (whether on- or off-balance sheet, contingent or otherwise) to, under or in connection with the ABA Plan based on the Debtors' (or their employees') participation prior to the Effective Date in such pension plan shall not result in any post-confirmation payment by, or any other cost to, the Reorganized Company or any of its direct or indirect subsidiaries.

In order to meet the above described condition, on October 23, 2008, the Debtors filed a motion seeking authority to enter into a settlement agreement with the PBGC pursuant to which the PBGC's claims related to the ABA Plan will be reclassified and allowed in reduced amounts as general unsecured prepetition claims.  In addition, on October 23, 2008, the Debtors filed a motion seeking to modify the stay of proceedings in the Bankruptcy Court with respect to determination of the priority of the ABA Plan's claims, if any.  Attached to such motion was a proposed motion seeking such determination, which the Debtors seek to have the Bankruptcy Court hear prior to the confirmation hearing on the Plan.

**Q.**   **The Debtors rely on the value of their brands, and the costs of maintaining and enhancing the awareness of their brands are increasing**

The Debtors believe that maintaining their brands via marketing and other brand-building efforts is an important aspect of the Debtors' efforts to attract and expand their consumer base. However, the costs associated with maintaining and enhancing consumer awareness of the Debtors' brands are increasing.  The Debtors may not be able to successfully maintain or enhance consumer awareness of their brands and, even if the Debtors are successful in their branding efforts, such efforts may not be cost-effective.  In addition, the Debtors' chapter 11 filing may have an adverse impact on the reputation of their brands with consumers.  If the Debtors are unable to maintain or enhance consumer awareness of their brands in a cost effective manner, it would adversely affect their financial condition, results of operations and cash flows.

**R.    Economic downturns could cause consumers to shift their food purchases from the Debtors' branded products to lower priced items**

The willingness of consumers to purchase premium branded food products depends in part on national and local economic conditions. In periods of economic downturns or uncertainty, consumers tend to purchase more private label or other lower priced products. In fact, as a result of the recent economic downturn, the Debtors' sales volume of higher margin branded products has suffered, adversely affecting their financial condition, results of operations and cash flows.

**S.    Inability to anticipate changes in consumer preferences may result in decreased demand for products**

The Debtors' success depends in part on their ability to anticipate the tastes and dietary habits of consumers and to offer products that appeal to their preferences. Consumer preferences change, and the Debtors' failure to anticipate, identify or react to these changes could result in reduced demand for their products, which could in turn adversely affect their financial condition, results of operations and cash flows. The Debtors have introduced several new products over the last few years and improved products in order to achieve and retain market share and have incurred significant development and marketing costs in connection therewith. If the Debtors' products fail to meet consumer preferences, then the Debtors' strategy to maintain and grow sales and profits with new products will be less successful.

**T.    The Debtors' intellectual property rights are valuable and any inability to protect them could dilute the Debtors' brand image and adversely affect their business**

The Debtors regard their trademarks, including "Wonder®," "Hostess®," "Home Pride®," "Butternut®," "Dolly Madison®," "Drake's®," and "Merita®," as well as the Debtors' trade secrets and similar intellectual property, as important to their success. The efforts the Debtors have taken to protect their proprietary rights may not be sufficient or effective. In the event that any of the their proprietary information is misappropriated, the Debtors' business could be seriously harmed. For example, if the Debtors are unable to protect their trademarks from unauthorized use, the Debtors' brand image may be harmed. Other parties may take actions that could impair the value of the Debtors' proprietary rights or the reputation of the Debtors' products. Any impairment of the Debtors' brand image could cause their enterprise value to decline. Also, the Debtors may not be able to timely detect unauthorized use of their intellectual property and take appropriate steps to enforce their rights. In the event the Debtors are unable to enforce their intellectual property rights, it could adversely affect their financial condition, results of operations and cash flows. In addition, protecting the Debtors' intellectual property and other proprietary rights can be expensive. Any increase in the unauthorized use of the Debtors' intellectual property could make it more expensive to do business and could adversely affect their financial condition, results of operations and cash flows. A number of the Debtors' brands are also manufactured and produced pursuant to licensing agreements. The Debtors' ability to renew these licensing agreements as they come due may be made more difficult by the chapter 11 process, which could also adversely affect their financial condition, results of operations and cash flows.

**U.    Further consolidation in the retail food industry may adversely impact profitability**

As supermarket chains continue to consolidate and as mass merchants gain scale, the Debtors' larger customers may seek more favorable terms for their purchases of the Debtors' products, including increased spending on promotional programs. Sales to the Debtors' larger customers on terms less favorable than their current terms could adversely affect the Debtors' financial condition, results of operations and cash flows.

101

**V.    Future product recalls or safety concerns could adversely impact the Debtors' business and financial condition and results of operations**

The Debtors may be required to recall certain of their products should they become contaminated or be damaged. The Debtors may also become involved in lawsuits and legal proceedings if it is alleged that the consumption of any of the Debtors' products causes injury, illness or death. A product recall or an adverse result in any such litigation could adversely affect the Debtors' financial condition, results of operations and cash flows.

The Debtors could be adversely affected if consumers in their principal markets lose confidence in the safety and quality of the Debtors' products. Adverse publicity about the safety and quality of certain food products, such as the publicity about foods containing genetically modified ingredients, whether or not valid, may discourage consumers from buying the Debtors' products or cause production and delivery disruptions.

A number of the Debtors' brand names are owned, and products are produced and sold under these brand names, by third parties outside the United States. Product recalls or adverse publicity about the safety and quality of these products could discourage consumers from buying the Debtors' products, which could adversely affect the Debtors' financial condition, results of operations and cash flows.

**W.    Costs associated with environmental compliance and remediation could adversely impact the Debtors' operations**

The Debtors are subject to numerous environmental laws and regulations that impose environmental controls on them or otherwise relate to environmental protection and health and safety matters, including, among other things, the discharge of pollutants into the air and water, the handling, use, treatment, storage and cleanup of solid and hazardous wastes, and the investigation and remediation of soil and groundwater affected by regulated substances. The Debtors have underground storage tanks at various locations throughout the United States that are subject to federal and state regulations establishing minimum standards for these tanks and, where necessary, remediation of associated contamination. The Debtors are presently in the process of or have completed remediating any known contaminated sites. In addition, the Debtors have reached an agreement in principle with the EPA and the DOJ to settle a claim relating to the Debtors' handling of regulated refrigerants. The Debtors have also received notices from the EPA, state agencies, and/or private parties seeking contribution, that the Debtors have been identified as a potentially responsible party (a "PRP"), under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), arising out of the alleged disposal of hazardous substances at certain disposal sites on properties owned or controlled by others. Because liability under CERCLA may be imposed retroactively without regard to fault, the Debtors may be required to share in the cleanup cost of six "Superfund" sites. The Debtors' ultimate liability may depend on many factors, including (i) the volume and types of materials contributed to the site; (ii) the number of other PRPs and their financial viability; and (iii) the remediation methods and technology to be used.

It is difficult to quantify the potential financial impact of actions involving environmental matters, particularly fines, remediation costs at waste disposal sites and future capital expenditures for environmental control equipment at these or other presently unknown locations. The Debtors believe the ultimate liability arising from such environmental matters, taking into account established accruals for estimated liabilities, should not be material to the Debtors' overall financial position, but could be material to their results of operations or cash flows for a particular quarter or fiscal year.

**X.      Government regulation could adversely impact the Debtors' operations**

The Debtors' operations and properties are subject to regulation by federal, state and local government entities and agencies.  As a baker of fresh baked bread and sweet goods, the Debtors' operations are subject to stringent quality, labeling and traceability standards, including under the Federal Food and Drugs Act of 1906 and Bioterrorism Act of 2002, and rules and regulations governing trade practices, including advertising.  The Debtors' operations are also subject to federal, state and local workplace laws and regulations, including the federal Fair Labor Standards Act of 1938 and the federal Occupational Safety and Health Act of 1970.  Future compliance with or violation of such regulations, and future regulation by various federal, state and local government entities and agencies, which could become more stringent, may adversely affect the Debtors' financial condition, results of operations and cash flows.  The Debtors could also be subject to litigation or other regulatory actions arising out of government regulations, which could adversely affect their financial condition, results of operations and cash flows.

**Y.      Access to Financing and Trade Terms**

The Debtors' operations are dependent on the availability and cost of working capital financing and trade terms provided by vendors and may be adversely affected by any shortage or increased cost of such financing and trade vendor support.  The Debtors' postpetition operations have been financed from operating cash flow and borrowings pursuant to the DIP Facility.  The Debtors believe that substantially all of their needs for funds necessary to consummate the Plan and for post-Effective Date working capital financing will be met by projected operating cash flow, the New Credit Facilities, and trade terms supplied by vendors.  Moreover, if the Debtors or the Reorganized Debtors require working capital and trade financing greater than that provided by projected operating cash flow, the New Credit Facilities, and trade financing, they may be required either to (a) obtain other sources of financing or (b) curtail their operations.  The Debtors believe that the recapitalization to be accomplished through the Plan will facilitate the ability to obtain additional or replacement working capital financing.

No assurance can be given, however, that any additional replacement financing will be available on terms that are favorable or acceptable to the Debtors or the Reorganized Debtors.  IBC believes that it is important to the Business Plan that IBC's performance meets projected results in order to ensure continued support from vendors.  There are risks to IBC in the event such support erodes after emergence from chapter 11 that could be alleviated by remaining in chapter 11.  Chapter 11 affords a debtor such as IBC the opportunity to close bakeries, distribution centers and bakery outlets and liquidate assets relatively expeditiously, tools that will not be available to IBC upon emergence.  However, the Debtors believe that the benefits of emergence from chapter 11 at this time outweigh the potential costs of remaining in chapter 11, and that emergence at this time is in the long-term operational best interests of IBC.

**Z.      Claims Estimations**

Except as provided in the Trust Agreement, the Debtors reserve the right to object to the amount or classification of any Claim or Interest except any such Claim or Interest that is deemed Allowed under the Plan or except as otherwise provided in the Plan.  There can be no assurance that the estimated Claim amounts set forth herein are correct.  The actual Allowed amount of Claims likely will differ in some respect from the estimates.  The estimated amounts are subject to certain risks, uncertainties, and assumptions.  Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

**AA.     Certain Risk Factors Relating to Securities to be Issued Under the Plan**

Each holder of New Common Stock, including those holders receiving shares upon the conversion of any New Convertible Secured Notes or the exercise of any Warrant, shall be required to execute a Stockholders' Agreement with the Reorganized Company and Equity Investors, the form of which is set forth at Exhibit J to the Plan.  By entering into the Stockholders' Agreement, each holder of New Common Stock (other than Equity Investors) shall, among other things, grant to Equity Investors authority to act as a proxy for such holder of New Common Stock in respect of any vote or approval of holders of New Common Stock (other than matters requiring a holders' approval pursuant to section 8(b) of the Investment Agreement).  In addition, certain risk factors relating to the securities to be issued under the Plan are described below.

1.     *Potential Dilution*

The ownership percentage represented by New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from conversions of New Convertible Secured Notes, exercises of Warrants and stock options, restricted stock and stock appreciation rights issued to directors, officers and employees of the Reorganized IBC under the Long Term Incentive Plan.  In the future, similar to all companies, additional equity financings or other share issuances by Reorganized IBC could adversely affect the market price of the New Common Stock.  Sales by existing holders of a large number of shares of the New Common Stock in the public market, or the perception that additional sales could occur, could cause the market price of the New Common Stock to decline.

2.     *Dividends*

The Debtors do not anticipate that cash dividends or other distributions will be paid with respect to the New Common Stock in the foreseeable future.  In addition, restrictive covenants in certain debt instruments to which Reorganized IBC will be a party, including the New Credit Facilities, may limit the ability of Reorganized IBC to pay dividends.

3.     *Change of Control*

The Organization Documents for the Reorganized Debtors may contain, and the general corporate law under the jurisdictions of organization for the Reorganized Debtors may contain, provisions that may have the effect of delaying, deterring, or preventing a change in control of Reorganized IBC.

**BB.     Leverage**

The Debtors believe that they will emerge from chapter 11 with a reasonable level of debt that can be effectively serviced in accordance with the Business Plan.  Circumstances, however, may arise which might cause the Debtors to conclude that they are overleveraged, which could have significant negative consequences, including:

- it may become more difficult for the Reorganized Debtors to satisfy their obligations with respect to all of their obligations;

- the Reorganized Debtors may be vulnerable to a downturn in the markets in which they operate or a downturn in the economy in general;

- the Reorganized Debtors may be required to dedicate a substantial portion of their cash flow from operations to fund working capital, capital expenditures, and other general corporate requirements;

- the Reorganized Debtors may be limited in their flexibility to plan for, or react to, changes in their businesses and the industry in which they operate or entry of new competitors into their markets;

- the Reorganized Debtors may be placed at a competitive disadvantage compared to their competitors that have less debt, including with respect to implementing effective pricing and promotional programs; and

- the Reorganized Debtors may be limited in borrowing additional funds.

The covenants in the New Credit Facilities may also restrict the Reorganized Debtors' flexibility. Such covenants may place restrictions on the ability of the Reorganized Debtors to incur indebtedness; pay dividends and make other restricted payments or investments; sell assets; make capital expenditures; engage in certain mergers and acquisitions; and refinance existing indebtedness. Additionally, there may be factors beyond the control of the Reorganized Debtors that could impact their ability to meet debt service requirements. The ability of the Reorganized Debtors to meet debt service requirements will depend on their future performance, which, in turn, will depend on the Reorganized Debtors' ability to sustain sales conditions in the markets in which the Reorganized Debtors operate, the economy generally, and other factors that are beyond their control. The Debtors can provide no assurance that the businesses of the Reorganized Debtors will generate sufficient cash flow from operations or that future borrowings will be available in amounts sufficient to enable the Reorganized Debtors to pay their indebtedness or to fund their other liquidity needs. Moreover, the Reorganized Debtors may need to refinance all or a portion of their indebtedness on or before maturity. The Debtors cannot make assurances that the Reorganized Debtors will be able to refinance any of their indebtedness on commercially reasonable terms or at all. If the Reorganized Debtors are unable to make scheduled debt payments or comply with the other provisions of their debt instruments, their various lenders will be permitted under certain circumstances to accelerate the maturity of the indebtedness owing to them and exercise other remedies provided for in those instruments and under applicable law.

## CC.    Impact of Interest Rates

Changes in interest rates and foreign exchange rates may affect the fair market value of the Debtors' assets. Specifically, decreases in interest rates will positively impact the value of the Debtors' assets and the strengthening of the dollar will negatively impact the value of their net foreign assets, although the value of such foreign assets is very small in relation to the value of the Debtors' operations as a whole.

## DD.    Litigation

The Reorganized Debtors will be subject to various claims and legal actions arising in the ordinary course of their businesses. The Debtors are not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the Reorganized Debtors.

## EE.    Adverse Publicity

Adverse publicity or news coverage relating to the Reorganized Debtors, including, but not limited to, publicity or news coverage in connection with the Chapter 11 Cases, may negatively impact the Debtors' efforts to establish and promote name recognition and a positive image after the Effective Date.

## FF.    Reduction of U.S. Federal Income Tax Attributes

As described more fully in Section IX.A.1 herein, the Debtors expect to realize a substantial amount of cancellation of debt ("COD") income, for U.S. federal income tax purposes, as a result of the discharge of obligations pursuant to the Plan and, consequently, the Debtors will be required to reduce certain of their respective U.S. federal income tax attributes. Specifically, the Debtors expect that their net operating losses ("NOLs") and NOL carryovers, and certain other U.S. federal income tax attributes, including basis in assets, will be substantially reduced. The Debtors anticipate that the substantial reduction of NOLs and NOL carryovers, and of other U.S. federal income tax attributes, will result in effective income tax rates applicable to the Debtors' net income, for financial accounting purposes, that are substantially in excess of the highest statutory marginal income tax rates.

## IX.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, CLAIMHOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY CLAIMHOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) CLAIMHOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A summary description of certain U.S. federal income tax consequences of the Plan is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. Only the principal consequences of the Plan for Claimholders who are entitled to vote to accept or reject the Plan are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the IRS or any other taxing authorities have been or will be sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other taxing authorities. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Claimholder. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code, the Treasury regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date hereof and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address state, local or non-U.S. tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, U.S. expatriates, Claimholders who are, or who hold their Claims through, pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction). Furthermore, the following discussion does not address alternative minimum tax considerations for Claimholders or U.S. federal taxes other than income taxes.  Except as expressly provided below, the following discussion assumes that Claimholders hold their Claims as capital assets for U.S. federal income tax purposes.

For purposes of the following discussion, a "U.S. Holder" is a holder of an Impaired Claim that is (i) a citizen or individual resident of the U.S.; (ii) a corporation (or other entity classified as a corporation for U.S. federal tax purposes) created and organized under the laws of the U.S. or any political subdivision thereof; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust that (a) is subject to the primary supervision of a U.S. court and has one or more U.S. persons, within the meaning of Internal Revenue Code section 7701(a)(30), who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.  For purposes of the following discussion, a "Non-U.S. Holder" is a holder of an Impaired Claim that is an individual, corporation, estate or trust and is not a U.S. Holder.

**Each Claimholder is strongly urged to consult its own tax advisor regarding the U.S. federal, state, local and non-U.S. tax consequences of the transactions described herein or contemplated by the Plan.**

## A.    Certain U.S. Federal Income Tax Consequences to the Debtors

As described in Section VII.F herein, several alternative structures for the post-emergence capital structure of the Debtors are being explored.  Under certain of the alternative structures, Equity Investors would organize one or more new entities which would acquire the Debtors, or the assets of the Debtors, in a taxable transaction (any such structure, an "Alternative Taxable Structure").  Other alternative structures involve the Debtors entering into certain transactions prior to the Effective Date in order to modify the overall corporate structure of the Debtors and/or otherwise structure their businesses for corporate or operational reasons (any such structure, an "Alternative Simplification Structure").  As noted in Section VII.F herein, the reorganization of the Debtors will be consummated pursuant to an Alternative Taxable Structure or an Alternative Simplification Structure only if, after further analysis, the Debtors believe that it will improve the corporate or operational structure or otherwise provide efficiencies to the Estates or the Reorganized Debtors, and only if the Debtors have received the prior written consent of Equity Investors and the Prepetition Investors.  Accordingly, the following discussion will begin with a description of certain U.S. federal income tax consequences of the Plan to the Debtors under the anticipated structure for the reorganization of the Debtors, and then will briefly describe certain U.S. federal income tax considerations that may be applicable with respect to an Alternative Taxable Structure or an Alternative Simplification Structure.

### 1.    *Cancellation of Indebtedness Income*

Under general U.S. federal income tax principles, each Debtor will realize COD income to the extent that its obligation to a Claimholder is discharged pursuant to the Plan for an amount that is less than the adjusted issue price of such Claimholder's Claim (in most cases, the adjusted issue price of a

Claim equals the amount that a Debtor received upon incurring the obligation, with certain adjustments). For this purpose, the amount paid to a Claimholder in discharge of its Claim generally will equal the sum of the amount of Cash paid to such Claimholder, the "issue price" of any debt issued to such Claimholder, and the fair market value on the Effective Date of any other property paid to such Claimholder.

The Debtors expect to realize a substantial amount of COD income as a result of the discharge of obligations pursuant to the Plan.  However, because each Debtor will be a debtor in a bankruptcy case at the time it realizes COD income, the Debtors will not be required to include such COD income in their gross income for U.S. federal income tax purposes, but rather will be required to reduce certain of their respective U.S. federal income tax attributes by the amounts of COD income so excluded. Under the general rules of Internal Revenue Code section 108, the excluded COD income is expected to result in the substantial reduction of the Debtors' NOLs and NOL carryovers, and of certain other U.S. federal income tax attributes of the Debtors, including basis in assets.  The Debtors anticipate that the substantial reduction of NOLs and NOL carryovers, and of other U.S. federal income tax attributes, will result in effective income tax rates applicable to the Debtors' net income, for financial accounting purposes, that are substantially in excess of the highest statutory marginal income tax rates.

2.      *Utilization of NOLs*

Under Internal Revenue Code section 382, whenever there is a more than fifty percent (50%) owner shift of a corporation during a three (3) year testing period (an "ownership change"), the ability of the corporation to utilize its NOL carryovers and certain subsequently recognized built-in losses to offset post-ownership change taxable income may be subject to an annual limitation.  The issuance of New Common Stock pursuant to the Plan will constitute an ownership change for purposes of Internal Revenue Code section 382.  This ownership change may result in a significant limitation on the ability of the Reorganized Debtors to utilize their NOL carryovers.

3.      *Alternative Minimum Tax*

A corporation may incur alternative minimum tax liability even in the case that NOL carryovers and other U.S. federal income tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax.  It is possible that the Debtors may be liable for the alternative minimum tax.

4.      *Alternative Structures*

If the reorganization of the Debtors were to be consummated pursuant to an Alternative Taxable Structure, the Debtors would recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between the fair market value of their assets and their adjusted tax basis in such assets.  Any gain recognized would be sheltered by the Debtors' NOLs to the extent of such NOLs. The entities that would acquire the Debtors' assets (or would be treated as acquiring such assets for U.S. federal income tax purposes) would obtain an aggregate tax basis in such assets that is equal to their fair market value, and such entities would not succeed to any tax attributes of the Debtors.

For U.S. federal income tax purposes, an Alternative Simplification Structure would entail tax-free or taxable transfers of assets by one or more Debtors to one or more other Debtors.  A taxable transfer of assets between Debtors may result in the recognition of gain or loss by the Debtors for U.S. federal income tax purposes.  Any gain recognized would be sheltered by the Debtors' NOLs to the extent of such NOLs.

**B.     Certain U.S. Federal Income Tax Consequences to Claimholders**

The U.S. federal income tax consequences of the transactions contemplated by the Plan to Claimholders that are U.S. Holders and Non-U.S. Holders generally will be as described below.  These consequences (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things: (i) the manner in which a Claimholder acquired a Claim; (ii) the length of time the Claim has been held; (iii) the Claimholder's method of tax accounting; (iv) whether the Claimholder has taken a bad debt deduction with respect to the Claim (or any portion of the Claim) in the current or prior taxable years; (v) whether the Claim was acquired at a discount; (vi) whether the Claimholder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (vii) whether the Claim is an installment obligation for U.S. federal income tax purposes; (viii) whether the Claim constitutes a "security" for U.S. federal income tax purposes; and (ix) whether the Claim constitutes a "United States real property interest" for U.S. federal income tax purposes.  Therefore, each Claimholder is strongly urged to consult its own tax advisor regarding information that may be relevant to its particular situation and circumstances and the tax consequences to it of the transactions contemplated by the Plan.

The U.S. federal income tax consequences to Claimholders that are U.S. Holders and Non-U.S. Holders may depend upon the manner in which the reorganization of the Debtors is consummated.  As noted in Section VII.F herein, the reorganization of the Debtors may be consummated pursuant to an Alternative Taxable Structure or an Alternative Simplification Structure if, after further analysis, the Debtors believe that it will improve the corporate or operational structure or otherwise provide efficiencies to the Estates or the Reorganized Debtors, and if the Debtors have received the prior written consent of Equity Investors and the Prepetition Investors.  Accordingly, the following discussion will describe certain U.S. federal income tax consequences to U.S. Holders and Non-U.S. Holders under the anticipated structure for the reorganization of the Debtors and, where applicable, will briefly describe certain U.S. federal income tax consequences with respect to an Alternative Taxable Structure or an Alternative Simplification Structure.

1.     *Claimholders of Capital Lease Claims*

(a)     U.S. Holders

The receipt of Cash and any other property by a U.S. Holder of a Capital Lease Claim pursuant to the Plan should be treated as a taxable transaction for U.S. federal income tax purposes.  As a result, such a U.S. Holder generally should recognize ordinary income or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the sum of the Cash plus the fair market value on the date of receipt of any other property received pursuant to the Plan and (ii) such U.S. Holder's adjusted tax basis in its Capital Lease Claim.

A U.S. Holder's tax basis in any property received pursuant to the Plan generally should be equal to the fair market values of each such consideration on the date of receipt, and the holding period with respect to each such consideration will begin on the day following the relevant date of receipt.

(b)     Non-U.S. Holders

A Non-U.S. Holder of a Capital Lease Claim generally will be subject to U.S. federal withholding tax at a thirty percent (30%) rate with respect to income, if any, realized on the receipt of Cash and any other property pursuant to the Plan unless such Non-U.S. Holder is eligible for an exemption from, or reduced rate of, U.S. federal withholding tax pursuant to an applicable tax treaty (and such Non-U.S. Holder timely provides the appropriate certification regarding its eligibility for treaty

benefits).  However, if such income is effectively connected with the conduct of a trade or business within the U.S. by the Non-U.S. Holder (and, if required by an applicable tax treaty, is attributable to a permanent establishment or fixed base within the U.S.), then such income generally will not be subject to U.S. federal withholding tax (provided the Non-U.S. Holder timely provides the appropriate certification).  In such case, such income generally will be subject to U.S. federal income tax in the same manner as if such income were recognized by a U.S. person and, in the case of a Non-U.S. Holder that is a corporation, may also be subject to the branch profits tax (currently imposed at a rate of thirty percent (30%), or a lower applicable treaty rate).

2. *Claimholders of Prepetition Lender Claims*

(a) U.S. Holders

The Debtors believe and intend to take the position, and the following discussion assumes, that the Prepetition Lender Claims do not constitute "securities" for U.S. federal income tax purposes, and, although the matter is not free from doubt, that the New Convertible Secured Notes constitute equity, rather than debt, for U.S. federal income tax purposes.  The receipt by a U.S. Holder of New Convertible Secured Notes, participations in the New Third Lien Term Loan and Series E Warrants pursuant to the Plan should be treated as a taxable transaction for U.S. federal income tax purposes.  As a result, except as described in the next sentence, such a U.S. Holder generally should recognize capital gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the sum of the fair market value, on the Effective Date, of the New Convertible Secured Notes and Series E Warrants received pursuant to the Plan and the "issue prices" (defined below) of the participations in the New Third Lien Term Loan received pursuant to the Plan and (ii) such U.S. Holder's adjusted tax basis in its Prepetition Lender Claim.  A U.S. Holder should, however, recognize ordinary income to the extent it receives such consideration in respect of accrued interest or accrued market discount that has not already been included in the U.S. Holder's gross income for U.S. federal income tax purposes.  Any capital gain or loss recognized will be long-term capital gain or loss if the U.S. Holder's holding period with respect to its Prepetition Lender Claim is more than one (1) year on the Effective Date.  The deductibility of capital loss is subject to limitations.

A U.S. Holder's tax basis in its New Convertible Secured Notes and Series E Warrants received pursuant to the Plan generally should be equal to the fair market value of such New Convertible Secured Notes and Series E Warrants on the Effective Date, and a U.S. Holder's tax basis in its participations in the New Third Lien Term Loan received pursuant to the Plan generally should be equal to the "issue prices" (defined below) of such participations.  The holding period with respect to each such consideration will begin on the day following the Effective Date.

For purposes of this discussion regarding certain U.S. federal income tax consequences to U.S. Holders of Prepetition Lender Claims, the "issue prices" of the participations in the New Third Lien Term Loan will equal their stated principal amounts if none of the Prepetition Lender Claims or the participations in the New Third Lien Term Loan are considered "publicly traded" for U.S. federal income tax purposes.  If a substantial amount of the Prepetition Lender Claims or the participations in the New Third Lien Term Loan were considered "publicly traded" for U.S. federal income tax purposes, then the issue prices of the participations in the New Third Lien Term Loan would instead be their fair market values on the Effective Date.

Each U.S. Holder of a Prepetition Lender Claim should be aware that, regardless of its method of tax accounting, it may be required to recognize interest income with respect to participations in the New Third Lien Term Loan in advance of cash payments attributable to such income pursuant to the rules governing original issue discount.  Each U.S. Holder of a Prepetition Lender Claim is strongly urged

110

to consult its own tax advisor regarding the U.S. federal, state, local and non-U.S. tax consequences of holding participations in the New Third Lien Term Loan.

If the reorganization of the Debtors were to be consummated pursuant to an Alternative Taxable Structure, the Debtors, or the assets of the Debtors, would be acquired by one or more entities organized by Equity Investors. In such a case, the taxation of a U.S. Holder would be substantially similar to that described above.

(b)    Non-U.S. Holders

A Non-U.S. Holder of a Prepetition Lender Claim generally will not be subject to U.S. federal withholding tax with respect to gain, if any, realized on the receipt of New Convertible Secured Notes, participations in the New Third Lien Term Loan and Series E Warrants pursuant to the Plan. A Non-U.S. Holder generally also will not be subject to U.S. federal income tax with respect to such gain unless (i) the gain is effectively connected with the conduct of a trade or business within the U.S. by the Non-U.S. Holder and, if required by an applicable tax treaty, is attributable to a permanent establishment or fixed base within the U.S. or (ii) in the case of a Non-U.S. Holder that is a nonresident alien individual, such Non-U.S. Holder is present in the U.S. for 183 or more days in the taxable year of the Effective Date and certain other conditions are satisfied. In the case described in clause (i) above, gain recognized generally will be subject to U.S. federal income tax in the same manner as if such gain were recognized by a U.S. person and, in the case of a Non-U.S. Holder that is a corporation, may also be subject to the branch profits tax (currently imposed at a rate of thirty percent (30%), or a lower applicable treaty rate).

3.    *Claimholders of Class 5 General Unsecured Claims with respect to Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery*

U.S. Holders of Class 5 General Unsecured Claims with respect to Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery that are "multiemployer pension plans," as that term is defined pursuant to Section 3(37) of ERISA, are subject to Section 404(g) of the Internal Revenue Code which provides, among other things, that withdrawal liability payments are to be considered as employer contributions for purposes of tax deductions. Each such U.S. Holder of a Class 5 General Unsecured Claim with respect to Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery is strongly urged to consult its own tax advisor regarding the U.S. federal income tax consequences of the receipt of amounts distributed pursuant to the Plan.

C.    **Information Reporting and Backup Withholding**

Certain payments, including the distributions or payments in respect of Claims pursuant to the Plan, generally are subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding (currently at a rate of twenty-eight percent (28%)) under certain circumstances. Under the Internal Revenue Code's backup withholding rules, a Claimholder may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the Claimholder (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) timely provides a correct U.S. taxpayer identification number and makes certain certifications under penalties of perjury.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Claimholder's U.S. federal income tax liability, and such Claimholder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS.

111

D.      **Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF
CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A
SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE
ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX
ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY
VARY DEPENDING ON A CLAIMHOLDER'S PARTICULAR CIRCUMSTANCES.
ACCORDINGLY, EACH CLAIMHOLDER IS STRONGLY URGED TO CONSULT ITS OWN
TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX
CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN OR CONTEMPLATED
BY THE PLAN.

X.      **FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST**

A.      **Feasibility of the Plan**

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not
likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.
This requirement is imposed by section 1129(a)(11) of the Bankruptcy Code and is referred to as the
"feasibility" requirement.  The Debtors believe that they will be able to timely perform all obligations
described in the Plan, and, therefore, that the Plan is feasible.

To demonstrate the feasibility of the Plan, the Debtors have prepared financial
Projections for fiscal 2009 through 2014, as set forth in Appendix C attached to this Disclosure Statement.
The Projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service
their debt obligations and to fund their operations.  Accordingly, the Debtors believe that the Plan satisfies
the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  As noted in the Projections,
however, the Debtors caution that no representations can be made as to the accuracy of the Projections or
as to the Reorganized Debtors' ability to achieve the projected results.  Many of the assumptions upon
which the Projections are based are subject to uncertainties outside the control of the Debtors.  Some
assumptions inevitably will not materialize, and events and circumstances occurring after the date on
which the Projections were prepared may be different from those assumed or may be unanticipated, and
may adversely affect the Debtors' financial results.  Therefore, the actual results can be expected to vary
from the projected results and the variations may be material and adverse.  See Article VIII of this
Disclosure Statement, "Certain Factors to Be Considered," for a discussion of certain risk factors that may
affect financial feasibility of the Plan.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD
COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN
ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, OR THE RULES
AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING
PROJECTIONS.  FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY THE
DEBTORS' INDEPENDENT ACCOUNTANTS.  ALTHOUGH PRESENTED WITH NUMERICAL
SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME
OF WHICH IN THE PAST HAVE NOT BEEN ACHIEVED AND WHICH MAY NOT BE REALIZED
IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND
COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND
THE CONTROL OF THE DEBTORS.  CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE
REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER

PERSON, THAT THE PROJECTIONS WILL BE REALIZED.  ACTUAL RESULTS MAY VARY
MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

**B.    Acceptance of the Plan**

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired
Claims and Interests vote to accept the Plan, except under certain circumstances.  Section 1126(c) of the
Bankruptcy Code defines acceptance of a plan by a class of Impaired Claims as acceptance by holders of
at least two-thirds in dollar amount and more than one-half in number of Claims in that Class, but for that
purpose counts only those who actually vote to accept or to reject the Plan.  Thus, a Class of Claims will
have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast
their Ballots in favor of acceptance.  Under section 1126(d) of the Bankruptcy Code, a Class of Interests
has accepted the Plan if holders of such Interests holding at least two-thirds in amount actually voting
have voted to accept the Plan.  Holders of Claims or Interests who fail to vote are not counted as either
accepting or rejecting the Plan.

**C.    Best Interests Test**

Even if a plan is accepted by each class of holders of claims and interests, the Bankruptcy
Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of
claims and interests that are impaired by the plan and that have not accepted the plan.  The "best interests"
test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either
that (i) all members of an impaired class of claims or interests have accepted the plan or (ii) the plan will
provide a member who has not accepted the plan with a recovery of property of a value, as of the
effective date of the plan, that is not less than the amount that such holder would recover if the debtor
were liquidated under chapter 7 of the Bankruptcy Code.

In order to determine whether the Plan satisfies the best interests test, the Debtors
prepared a Liquidation Analysis (attached hereto as Appendix B) based upon a hypothetical liquidation
under Chapter 7 of the Bankruptcy Code.  To calculate the probable distribution to members of each
Impaired Class of claims and Interests if the Debtors were liquidated under a Chapter 7 case, the Debtors
first had to determine the costs of, and proceeds from, any hypothetical liquidation.  To conduct such an
uncertain process, the Debtors had to rely upon a series of estimates and assumptions that, although
considered reasonable by the Debtors, are subject to contingencies beyond the control of the Debtors,
their management and their advisors.

The Liquidation Analysis assumes that liquidation proceeds would be distributed in
accordance with Bankruptcy Code sections 726 and 1129(b).  If a Chapter 7 liquidation were pursued for
the Debtors, the amount of liquidation value available to creditors would be reduced first, by the costs of
the liquidation including fees and expenses of the trustee appointed to manage the liquidation, fees and
expenses of other professionals retained by the trustee to assist with the liquidation and asset disposition
expenses, second, by the DIP Facility Claims, third, by the claims of secured creditors to the extent of the
value of their collateral except as described herein, and, fourth, by the priority and administrative costs
and expenses of the Chapter 7 estates, including unpaid operating expenses incurred during the Chapter
11 Cases and any accrued and unpaid professional fees.

The liquidation itself would trigger certain priority payments that otherwise would not be
due in the ordinary course of business.  These priority payments would be made in full before any
distribution of proceeds to pay general unsecured claims, including potential employee claims, executory
contract and unexpired lease rejection claims and potential pension fund withdrawal liability.  Such
events would likely create a much larger number of unsecured creditors and would subject the Chapter 7

113

estates to considerable additional claims, thereby diluting any potential recoveries to holders of general unsecured claims.

This analysis is a hypothetical exercise that has been prepared in order to satisfy a requirement of the Bankruptcy Code. This analysis is not intended and should not be used for any other purpose. The Liquidation Analysis does not purport to be a valuation of the Debtors' assets as a going concern, and there may be a significant difference between the Liquidation Analysis and the values that may be realized in an actual liquidation. This analysis assumes "Liquidation Values" based on appraisals, where available, and the Debtors' business judgment, where appraisals are not available. The recoveries shown do not contemplate a sale or sales of business units on a going concern basis. While the Debtors make no assurances, it is possible that proceeds received from such going concern sale(s) would be more than in the hypothetical liquidation, the costs associated with the sales(s) would be less, fewer claims would be asserted against the bankruptcy estates and/or certain ordinary course claims would be assumed by the buyer(s) of such business(es) and that, as a result, greater distributions would be made to stakeholders.

## D.    Valuation of the Reorganized Debtors

### 1.    *Introduction*

In conjunction with formulating the Plan, the Debtors have determined that it is appropriate to estimate the Reorganized Debtors' going concern Enterprise Value post confirmation. The Debtors with the assistance of Miller Buckfire, whose retention was approved by the court, prepared such a valuation.

### 2.    *Valuation*

The Enterprise Value of the Reorganized Debtors is estimated to be between approximately $475 million and $629 million, with a mid-point estimate of approximately $551 million, as of an assumed Effective Date of January 11, 2009. The range of pro forma equity value on a fully-diluted basis, assuming the conversion of all New Convertible Secured Notes into equity, available to the constituents of the Reorganized Debtors was estimated to be between $312 million and $466 million, with a mid-point of approximately $389 million, which takes into account the Enterprise Value less estimated net non-convertible debt outstanding on the Effective Date of $162 million, including, among other things, capital leases of $2.6 million (net of an estimated $240 million of cash collateral for outstanding letters of credit and $87 million of cash to the balance sheet). The values are based upon information available to, and analyses undertaken by, Miller Buckfire as of October 23, 2008. This estimated Enterprise Value includes, but is not limited to, among other factors discussed below, the Debtors' income statements and balance sheets, current financial market conditions and the inherent uncertainty today as to the achievement of the Debtors' financial projections as more fully set forth on Appendix C to this Disclosure Statement. Assuming 26.0 million common shares on an as-converted basis which consists of 8.8 million initial common shares and 17.2 million shares reserved for the conversion of the New Convertible Secured Notes and the Series E Warrants (which have a strike price of $0.01) of the Reorganized Debtors on the Effective Date, the Per Share Value is between $12.02 and $17.92 with a value of $14.94 used as a mid-point estimate, prior to dilution from any shares issued for stock appreciation rights, options or Warrants (other than the Series E Warrants).

The preparation of the estimated Enterprise Value included, but was not limited to: (a) the review of certain consolidated and regional historical financial information of the Debtors for recent years and interim periods; (b) the review of the Company's Business Plan dated October 2008; (c) interviews with certain members of senior management of the Debtors and their advisors to discuss the

Debtors' operations and future prospects; (d) review of relevant publicly available information concerning the Company, the fresh baking industry in which it competes, its markets and the market values of public companies deemed generally comparable to the operating businesses of the Debtors; (e) consideration of certain economic and industry information relevant to the Debtors' operating businesses; (f) review of certain analyses prepared by firms retained by the Debtors; (g) site visits of the Debtors' facilities; and (h) other analyses as deemed appropriate.  Although a review and analysis of the Debtors' businesses, operating assets and liabilities, and business plans was conducted, the valuation relies on the accuracy and completeness of all: (a) financial and other information furnished by the Debtors and by other firms retained by the Debtors and (b) publicly available information.  No independent evaluations or appraisals of the Debtors' assets were sought or were obtained in connection therewith.  As of October 2008, the amount of and ability to use NOL carryovers and certain other U.S. federal income tax attributes the Debtors will retain post-emergence, while subject to annual limitations per Section IX.A herein, is uncertain and not expected to have a material impact on the Business Plan.  Accordingly, the effect of NOL carryovers has been excluded from the Reorganized Debtors' estimated going concern Enterprise Value.  Two valuation methodologies were utilized for the valuation analysis, each receiving an equal weighting in the concluded Enterprise Value estimate: (1) the discounted cash flow methodology and (2) comparable public company methodology.  The discounted cash flow methodology derives an estimated Enterprise Value by adding the present value of projected unlevered free cash flows to the present value of the terminal value at the end of the projection period, each discounted by an appropriate range of risk-adjusted discount rates.  The Comparable Public Company Methodology derives an estimated Enterprise Value by applying trading multiples of public companies with similar lines of business and operating characteristics to the applicable financial metrics of the Debtors.  In selecting such comparable companies, Miller Buckfire considered factors including, but not limited to, the nature of the comparable companies' businesses, operations, assets and capital structures, as well as such companies' current and projected operating and financial performance relative to the Debtors and to the turnaround required for the Debtors to perform as projected.

THE ESTIMATES OF VALUE REPRESENT HYPOTHETICAL ENTERPRISE VALUES OF THE REORGANIZED DEBTORS AS THE CONTINUING OPERATOR OF ITS BUSINESS AND ASSETS, AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES OR ESTIMATES OF THE ACTUAL MARKET VALUE WHICH MAY BE REALIZED IF THE ASSETS ARE SOLD, AND MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.  THE FOREGOING VALUATION ALSO REFLECTS A NUMBER OF ASSUMPTIONS INCLUDING, BUT NOT LIMITED TO, A SUCCESSFUL REORGANIZATION OF THE DEBTORS' BUSINESSES AND FINANCES IN A TIMELY MANNER, ACHIEVING THE FORECASTS REFLECTED IN THE FINANCIAL PROJECTIONS, NECESSARY CONCESSIONS BY THE COLLECTIVE BARGAINING UNITS, MARKET CONDITIONS AND THE PLAN BECOMING EFFECTIVE IN ACCORDANCE WITH ITS TERMS ON A BASIS CONSISTENT WITH THE ESTIMATES AND OTHER ASSUMPTIONS DISCUSSED HEREIN.  THE ENTERPRISE VALUE IS HIGHLY DEPENDENT UPON ACHIEVING THE FINANCIAL RESULTS SET FORTH IN THE PROJECTIONS AS WELL AS THE REALIZATION OF CERTAIN OTHER ASSUMPTIONS, NONE OF WHICH ARE GUARANTEED, AND ARE SUBJECT TO UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS.  BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, MILLER BUCKFIRE, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY, BUT THE DEBTORS BELIEVE THE ESTIMATES HAVE BEEN PREPARED IN GOOD FAITH BASED ON REASONABLE ASSUMPTIONS. DEPENDING ON THE RESULTS OF THE DEBTORS' OPERATIONS OR CHANGES IN THE FINANCIAL MARKETS, WHICH ARE CURRENTLY UNDER SEVERE DISTRESS, THE VALUATION ANALYSIS, AS OF THE

EFFECTIVE DATE, MAY DIFFER FROM THAT DESCRIBED HEREIN, AND SUCH
DIFFERENCES COULD BE MATERIAL.  IN ADDITION, THE VALUATION OF NEWLY ISSUED
SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF
WHICH ARE DIFFICULT TO PREDICT.  ACTUAL MARKET PRICES OF SUCH SECURITIES AT
ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES;
CONDITIONS IN THE FINANCIAL MARKETS; THE ANTICIPATED INITIAL SECURITIES
HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE
THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG TERM BASIS; AND OTHER
FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES.  ACTUAL MARKET
PRICES OF SUCH SECURITIES ALSO MAY BE AFFECTED BY THE CHAPTER 11 CASES OR
BY OTHER FACTORS NOT POSSIBLE TO PREDICT.  ACCORDINGLY, THE ENTERPRISE
VALUE DOES NOT NECESSARILY REFLECT, AND SHOULD NOT BE CONSTRUED AS
REFLECTING, VALUES THAT WILL BE ATTAINED IN THE PUBLIC OR PRIVATE MARKETS.
THE ENTERPRISE VALUE ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN
ESTIMATE OF THE POST REORGANIZATION MARKET TRADING VALUE.  SUCH TRADING
VALUE MAY BE MATERIALLY DIFFERENT FROM THE ENTERPRISE VALUE RANGES
ASSOCIATED WITH THE VALUATION ANALYSIS.  THERE CAN BE NO ASSURANCE THAT A
TRADING MARKET WILL DEVELOP FOR THE NEW SECURITIES.

FURTHERMORE, IN THE EVENT THAT THE ACTUAL DISTRIBUTIONS IN
THESE CHAPTER 11 CASES DIFFER FROM THOSE THE DEBTORS ASSUMED IN THEIR
RECOVERY ANALYSIS, IMPAIRED CLASSES CLAIMHOLDERS' ACTUAL RECOVERIES
COULD BE SIGNIFICANTLY HIGHER OR LOWER THAN ESTIMATED BY THE DEBTORS.

**E.**      **Application of the Best Interests Test to the Liquidation Analysis and the Estimated
Recoveries Pursuant to the Plan**

A liquidation analysis prepared with respect to the Debtors is attached as <u>Appendix B</u> to
this Disclosure Statement.  The Debtors believe that any liquidation analysis is speculative.  For example,
the liquidation analysis necessarily contains an estimate of the amount of Claims which will ultimately
become Allowed Claims, including Claims for withdrawal liability associated with the Debtors' multi-
employer pension plans.  See discussion of such Claims in <u>Article VIII</u> of this Disclosure Statement,
"Certain Factors to be Considered."  In preparing the liquidation analysis, the Debtors have projected the
amount of Allowed Claims based upon a review of their scheduled and filed proofs of claim.  No order or
finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at
the projected amounts of Allowed Claims set forth in the liquidation analysis.  In preparing the liquidation
analysis, the Debtors have projected a range for the amount of Allowed Claims with the low end of the
range the lowest reasonable amount of Claims and the high end of the range the highest reasonable
amount of the Claims, thus allowing assessment of the most likely range of chapter 7 liquidation
dividends to the holders of the Allowed Claims.  The estimate of the amount of Allowed Claims set forth
in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any
determination of the value of any distribution to be made on account of Allowed Claims and Interests
under the Plan.  In addition, as noted above, the valuation analysis of the Reorganized Debtors also
contains numerous estimates and assumptions.  For example, the value of the New Common Stock cannot
be determined with precision due to the absence of a public market for the New Common Stock.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the
Debtors believe that, taking into account the liquidation analysis and the estimated recoveries pursuant to
the Plan, the Plan meets the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.  The
Debtors believe that the members of each Impaired Class will receive at least as much under the Plan than
they would in a liquidation in a hypothetical chapter 7 case.  Creditors will receive a better recovery

116

through the distributions contemplated by the Plan because the continued operation of the Debtors as going concerns rather than a forced liquidation will allow the realization of more value for the Debtors' assets. These factors lead to the conclusion that recoveries pursuant the Plan would be at least as much, and in many cases significantly greater, than the recoveries available in a chapter 7 liquidation.

The Debtors believe the methodology used to prepare the liquidation analysis attached hereto as <u>Appendix B</u> is appropriate and that the assumptions and conclusions set forth therein are fair and reasonable under the circumstances and represent a reasonable exercise of the Debtors' business judgment with respect to such matters.

## F.    Confirmation Without Acceptance of All Impaired Classes:  The 'Cramdown' Alternative

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of Claims has accepted it. The Court may confirm the Plan at the request of the Debtors notwithstanding the Plan's rejection (or deemed rejection) by impaired Classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

The votes of holders of Class 9 General Unsecured Claims, Class 10 Subordinated Securities Claims (including Classes 10a and 10b), Class 11 Interests in Brands Preferred Stock and Class 12 Interests in IBC are not being solicited because such holders are not entitled to receive or retain under the Plan any interest in property on account of their Claims and Interests. Such Classes therefore are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, the

117

Debtors are seeking confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to such Classes, and may seek confirmation pursuant thereto as to other Classes if such Classes vote to reject the Plan.  Notwithstanding the deemed rejection by such Classes, the Debtors the Plan may be confirmed.

## G.    Conditions Precedent

### 1.    Conditions to Confirmation

The following are conditions precedent to confirmation of the Plan that must be satisfied unless waived in accordance with Section 12.3 of the Plan:

(a)    The Bankruptcy Court shall have approved this Disclosure Statement in form and substance reasonably satisfactory to the Debtors, the Prepetition Investors and Equity Investors.

(b)    The Confirmation Order, the Plan, and all exhibits and annexes to each of the Plan and the Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, the Prepetition Investors and Equity Investors.

### 2.    Conditions to Consummation

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied unless waived in accordance with Section 12.3 of the Plan:

(a)    The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order) authorizing the rejection of unexpired leases and executory contracts by the Debtors as contemplated by Section 7.2 of the Plan.

(b)    The Debtors shall have entered into the New Credit Facilities, the New Convertible Secured Note Indenture and the New Third Lien Term Loan Credit Facility and all conditions precedent to the consummation thereof shall have been waived (subject to any applicable consent requirements) or satisfied in accordance with the terms thereof.

(c)    All conditions precedent in the Investment Agreement shall have been waived (subject to any applicable consent requirements) or satisfied in accordance with the terms thereof.

(d)    The Confirmation Order, with the Plan and all exhibits and annexes to each, in form and substance reasonably acceptable to the Debtors, the Prepetition Investors and Equity Investors, shall have been entered by the Bankruptcy Court on or before January 15, 2009, and shall be a Final Order, and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending; provided, however, that if the Confirmation Order has not become a Final Order because a notice of appeal has been timely filed and the parties are not stayed or enjoined from consummating the Investment or the Transaction, this condition contained in Section 12.2(c) of the Plan shall be deemed satisfied unless the effect of the appeal could reasonably be expected to be adverse to the business, operations, property, condition (financial or otherwise) or prospects of the Reorganized Debtors and their direct and indirect subsidiaries, taken as a whole, or adverse to Equity Investors or the Prepetition Investors, in each case as determined by Equity Investors or the Prepetition Investors, respectively.

(e)    The Bankruptcy Court shall have entered the Intercreditor Settlement Order.

(f)    All actions, documents and agreements necessary to implement the Plan shall be in form and substance reasonably satisfactory to the Debtors, Equity Investors and the Prepetition Investors and shall have been effected or executed as applicable.

(g)    The Confirmation Date shall have occurred and the Confirmation Order shall, among other things, provide that:

(i)    the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(ii)    all executory contracts or unexpired leases assumed by the Debtors during the Chapter 11 Cases or under the Plan shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Reorganized Debtors, notwithstanding any provision in such contract or lease (including those described in sections 365(b)(2) and 365(f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables or requires termination of such contract or lease;

(iii)    the transfers of property by the Debtors (A) to the Reorganized Debtors (1) are or shall be legal, valid, and effective transfers of property, (2) vest or shall vest the Reorganized Debtors with good title to such property free and clear of all liens, charges, Claims, encumbrances, or Interests, except as expressly provided in the Plan or Confirmation Order, (3) do not and shall not constitute avoidable transfers under the Bankruptcy Code or under applicable non-bankruptcy law, and (4) do not and shall not subject the Reorganized Debtors to any liability by reason of such transfer under the Bankruptcy Code or under applicable non-bankruptcy law, including, without limitation, any laws affecting successor or transferee liability, and (B) to Claimholders under the Plan are for good consideration and value and are in the ordinary course of the Debtors' businesses;

(iv)    except as expressly provided in the Plan or the Confirmation Order, the Debtors are discharged effective upon the Effective Date from any "debt" (as that term is defined in section 101(12) of the Bankruptcy Code), and the Debtors' liability in respect thereof is extinguished completely, whether reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or unfixed, matured or unmatured, disputed or undisputed, legal or equitable, known or unknown, or that arose from any agreement of the Debtors entered into or obligation of the Debtors incurred before the Effective Date, or from any conduct of the Debtors prior to the Effective Date, or that otherwise arose before the Effective Date, including, without limitation, all interest, if any, on any such debts, whether such interest accrued before or after the Petition Date;

(v)    the applicable provisions of the Reconstitution Order are incorporated into the Plan and or the Confirmation Order, as required by the Reconstitution Order;

119

(vi)      the Plan does not provide for the liquidation of all or substantially all of the property of the Debtors and its confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization;

(vii)     all Interests (except Subsidiary Interests, but including the Brands Preferred Stock) are terminated effective upon the Effective Date;

(viii)    the issuance to the Prepetition Lenders of the New Convertible Secured Notes (including the New Common Stock into which such New Convertible Secured Notes are convertible) and the distribution thereof shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code; and

(ix)      the Prepetition Lender Actions, and any adversary proceedings filed in connection therewith, are dismissed with prejudice.

(h)      The Trust Assets shall have been transferred to the Creditors' Trust and the Allowed Amount of the Old Convertible Note Indenture Trustee Fee Claim shall have been paid in Cash to the Old Convertible Note Indenture Trustee in accordance with Section 9.7(a) of this Plan.

(i)      All documents implementing the terms of the Intercreditor Settlement, including the Trust Stock Appreciation Rights, shall be in form and substance reasonably satisfactory to Equity Investors and the Prepetition Investors.

(j)      All documents implementing the terms of the Intercreditor Settlement, including the Trust Stock Appreciation Rights, shall be in form and substance reasonably satisfactory to the Creditors' Committee.

## H.      Waiver of Conditions to Confirmation and Consummation of the Plan

The conditions set forth in Sections 12.1 and 12.2 (other than the conditions set forth in Section 12.2(e), 12.2(h) and 12.2(j)) of the Plan may be waived by the Debtors subject to such waiver being reasonably satisfactory to Equity Investors and the Prepetition Investors, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.  The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors in their sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors in their sole discretion).  The failure of the Debtors in their sole discretion to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.  The conditions set forth in Section 12.2(e), 12.2(h) and 12.2(j) may be waived by the Debtors subject to such waiver being acceptable to the Creditors' Committee.

## I.      Retention of Jurisdiction

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan (except in the case of the New Credit Facility Documents, the New Convertible Secured Notes, the New Third Lien Term Loan, the Warrants, the New Common Stock and the Stockholders' Agreement, which shall be subject to the jurisdiction indicated in the definitive documentation thereof), including, among others, the following matters:

120

(a)     to hear and determine pending motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid;

(b)     to adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or the Plan, or the Trust Agreement, proceedings to adjudicate the allowance of Disputed Claims, and all controversies and issues arising from or relating to any of the foregoing;

(c)     to adjudicate any and all disputes arising from the distribution of the New Convertible Secured Notes, the New Common Stock and the Warrants;

(d)     to ensure that distributions to Allowed Claimholders are accomplished as provided in the Plan and in the Trust Agreement;

(e)     to hear and determine any and all objections to the allowance of Claims and the estimation of Claims, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to allow or disallow any Claim, in whole or in part;

(f)     to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(g)     to issue orders in aid of execution, implementation, or consummation of the Plan;

(h)     to enter such orders as may be necessary for the Trustee to satisfy its obligations pursuant to the Trust Agreement;

(i)     to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(j)     to hear and determine all applications for compensation and reimbursement of Professional Claims under the Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

(k)     to determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

(l)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order or the Trust Agreement, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

(m)     to hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of its Estates, wherever located;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

121

(o)    to hear any other matter not inconsistent with the Bankruptcy Code;

(p)    to hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(q)    to hear and determine all disputes involving the releases and exculpations granted in the Plan and the injunctions established therein;

(r)    to enter a final decree closing the Chapter 11 Cases; and

(s)    to enforce all orders previously entered by the Bankruptcy Court.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims, Interests, Retained Actions, the Trust Agreement, the Trust Assets and the Trust Claims and any motions to compromise or settle such disputes.

## XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders.  If the Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the pending Chapter 11 Cases; (b) an alternative plan or plans of reorganization; or (c) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

### A.    Continuation of the Bankruptcy Case

If the Debtors remain in chapter 11, they could continue to operate their businesses and manage their properties as debtors-in-possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code.  It is not clear whether the Debtors could survive as a going concern if these chapter 11 cases are protracted beyond the timeline contemplated by the Commitment Letter.  In particular, the Debtors could have difficulty sustaining the high costs and the erosion of market confidence which may be caused if the Debtors remain chapter 11 debtors-in-possession and gaining access to sufficient liquidity to allow them to continue their operations as a going concern.  And as further discussed in Section VI.I herein, the Debtors believe that they have accomplished the goals that chapter 11 has allowed them to achieve, and that IBC's key remaining challenges are operational and therefore do not require that the Company remain in chapter 11.

### B.    Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest in the Chapter 11 Cases could propose a different plan or plans.  Such plans might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of their assets, or a combination of both.

122

## C.    Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtors' Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code.  In a chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtors.

However, the Debtors believe that creditors would lose substantially higher going concern value if the Debtors were forced to liquidate.  In addition, the Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Estates.  The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors may also be liquidated pursuant to a chapter 11 plan.  In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation might result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed.  However, any distribution to the Claimholders and Interestholders under a chapter 11 liquidation plan probably would be delayed substantially.

The Debtors' liquidation analysis, prepared with their restructuring advisors, is premised upon a hypothetical liquidation in a chapter 7 case and is attached as <u>Appendix B</u> to this Disclosure Statement.  In the analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of their assets, and the extent to which such assets are subject to liens and security interests.  The likely form of any liquidation in a chapter 7 proceeding would be the sale of individual assets.  Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable in each instance under the Plan.  In the opinion of the Debtors, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford holders of Claims and holders of Interests as great a realization potential as does the Plan.

## D.    Other Alternatives

Consistent with the charge given by the Debtors' reconstituted board of directors to new management in early 2007, the Debtors have considered other alternatives to proceeding with the Business Plan, the Transaction and the Plan.  These alternatives include: (a) separation of the bread and snack/cake business segments, selling one or the other of these businesses and reorganization of the remaining business segment; (b) proceeding with elements of the Business Plan but not including several of the transformational aspects of the Business Plan including, without limitation, the path to market initiative and further union concessions; (c) sale of certain less profitable business segments and reorganization based upon the remaining business segments but not including path to market and further union concessions; and (d) a sale or sales of the Debtors' assets and/or business segments in one or more transactions either as going concerns sales or otherwise.  In addition, the Debtors considered a possible reorganization of their direct store delivery structure without implementation of the path to market initiative by eliminating route delivery drivers employed by the Debtors and instead operating with independent operators to distribute the Debtors' products. The Debtors' analysis of the foregoing included

123

substantial experience gained through the Debtors having undertaken efforts to find alternatives to the Transaction in their earlier attempts to sell certain business segments. The Debtors have identified numerous obstacles to implementation of those of the alternatives set forth above that contemplate the Debtors' reorganization including several operational impediments and a lack of available financing. Moreover, the Debtors believe that these alternatives would result in less recoveries for stakeholders than are anticipated pursuant to the Plan. Additionally, it is likely that pursuit of any one of these alternatives would result in significant (a) additional claims asserted against the Estates and (b) job loss among the Debtors' union and non-union employees and (c) elimination of go-forward pension contributions with respect to such union employees and resulting withdrawal liability claims which could significantly undermine the financial strength of certain of the Debtors' multiple employer pension plans and jeopardize the continued existence of those plans. Accordingly, the Debtors believe the Business Plan, the Transaction and the Plan maximize the value of the Debtors and represent the best alternative for the Debtors, their Estates and their constituencies.

## XII.    VOTING REQUIREMENTS

On October 30, 2008, the Bankruptcy Court approved an order (the "Solicitation Procedures Order"), among other things, approving this Disclosure Statement, setting voting procedures, and scheduling the hearing on confirmation of the Plan. A copy of the Confirmation Hearing Notice is enclosed with this Disclosure Statement. The Confirmation Hearing Notice sets forth in detail, among other things, the voting deadlines and objection deadlines with respect to the Plan. The Confirmation Hearing Notice and the instructions attached to the Ballot should be read in connection with this section of this Disclosure Statement.

If you have any questions about (i) the procedure for voting your Claim with respect to the packet of materials that you have received; (ii) the amount of your Claim holdings, or (iii) if you wish to obtain, at your own expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d), an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact:

Interstate Bakeries Corp Ballot Processing
C/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245
Telephone (888) 647-1732

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures by the Debtors concerning the Plan have been adequate and have included information concerning all payments made or promised by the Debtors in connection with the Plan and the Chapter 11 Cases. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law, and under Federal Rule of Bankruptcy Procedure 3020(b)(2), it may do so without receiving evidence if no objection is timely filed.

In particular, and as described in more detail above, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that (a) the Plan has been accepted by the requisite votes of all Classes of impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the non-acceptance by one or more such Classes; (b) the Plan is "feasible," which means that there is a reasonable probability that the Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization or liquidation; and (c) the Plan is in the "best interests" of all Claimholders and

124

Interestholders, which means that such holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

THE BANKRUPTCY COURT MUST FIND THAT ALL CONDITIONS MENTIONED ABOVE ARE MET BEFORE IT CAN CONFIRM THE PLAN.  THUS, EVEN IF ALL THE CLASSES OF IMPAIRED CLAIMS WERE TO ACCEPT THE PLAN BY THE REQUISITE VOTES, THE BANKRUPTCY COURT MUST STILL MAKE AN INDEPENDENT FINDING THAT THE PLAN SATISFIES THESE REQUIREMENTS OF THE BANKRUPTCY CODE, THAT THE PLAN IS FEASIBLE, AND THAT THE PLAN IS IN THE BEST INTERESTS OF THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS.

UNLESS THE BALLOT BEING FURNISHED IS TIMELY SUBMITTED TO THE VOTING AGENT SO THAT IT IS RECEIVED ON OR PRIOR TO DECEMBER 1, 2008 AT 4:00 P.M. (PACIFIC TIME) TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED BY SUCH BALLOT, THE DEBTORS MAY, IN THEIR SOLE DISCRETION, REJECT SUCH BALLOT AS INVALID AND, THEREFORE, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN.  IN NO CASE SHOULD A BALLOT OR ANY OF THE CERTIFICATES BE DELIVERED TO THE DEBTORS OR ANY OF THEIR ADVISORS.

## A.    Parties-in-Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (1) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (2) the claim or interest is impaired by the Plan.  If the holder of an impaired claim or impaired interest will not receive any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan.  If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan and the plan proponent need not solicit such holder's vote.

The holder of a Claim that is Impaired under the Plan is entitled to vote to accept or reject the Plan if (1) the Plan provides a distribution in respect of such Claim and (2) (a) the Claim has been scheduled by the respective Debtor (and such Claim is not scheduled as disputed, contingent, or unliquidated); (b) such Claimholder has timely filed a proof of claim as to which no objection has been filed; or (c) such Claimholder has timely filed a motion pursuant to Federal Rule of Bankruptcy Procedure 3018(a) seeking temporary allowance of such Claim for voting purposes only and the Debtor has not opposed the Motion or objected to the Claim, in which case the holder's vote will be counted only upon order of the Court.

A vote may be disregarded if the Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

125

**B.**    **Classes Impaired Under the Plan**

      1.    *Voting Impaired Classes of Claims.*

The following Classes are Impaired under, and are entitled to vote to accept or reject, the Plan: Claims in Classes 7 and 8 with respect to the Main Debtors and Classes 4 and 5 with respect to Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery.

      2.    *Unimpaired Classes of Claims and Interests.*

With respect to the Main Debtors, Class 1 Secured Tax Claims, Class 2 Secured Claims, Class 3 Other Priority Claims, Class 4 Intercompany Claims, Class 5 Workers' Compensation Claims, and Class 6 Subsidiary Interests are Unimpaired by this Plan.  With respect to Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery, Class 1 Other Priority Claims, Class 2 Intercompany Claims and Class 3 Interests are Unimpaired by this Plan.  Under section 1126(f) of the Bankruptcy Code and/or the Solicitation Procedures Order, such Claimholders are conclusively presumed to have accepted this Plan.  Their votes to accept or reject the Plan will not be solicited.

      3.    *Impaired Classes of Claims and Interests Deemed to Reject the Plan.*

With respect to the Main Debtors, holders of Claims and Interests in Classes 9, Class 10 (including Classes 10a and 10b), 11 and 12 are not entitled to receive any distribution under the Plan on account of their Claims and Interests.  Pursuant to section 1126(g) of the Bankruptcy Code, Classes 9, 10 (including Classes 10a and 10b), 11 and 12 are conclusively presumed to have rejected the Plan, and the votes of Claimholders and Interestholders in such Classes therefore will not be solicited.

## XIII.    CONCLUSION

**A.**    **Hearing on and Objections to Confirmation**

      1.    *Confirmation Hearing.*

The hearing on confirmation of the Plan has been scheduled for December 5, 2008 at 9:00 a.m. (Central time).  Such hearing may be adjourned from time to time by announcing such adjournment in open court, all without further notice to parties in interest, and the Plan may be modified by the Debtors pursuant to section 1127 of the Bankruptcy Code prior to, during, or as a result of that hearing, without further notice to parties in interest.

      2.    *Date Set for Filing Objections to Confirmation of the Plan.*

The time by which all objections to confirmation of the Plan must be filed with the Court and received by the parties listed in the Confirmation Hearing Notice has been set for December 1, 2008 at 12:00 p.m. (Central time).  A copy of the Confirmation Hearing Notice is enclosed with this Disclosure Statement.

**B.**    **Recommendation**

The Plan provides for an equitable distribution to prepetition secured creditors of the Debtors, preserves the value of the business as a going concern, and preserves the jobs of employees.  The Debtors believe that any alternative to confirmation of the Plan, such as liquidation or attempts by another party in interest to file a plan, could result in significant delays, litigation, and costs, as well as the loss of

126

jobs by the employees.  Moreover, the Debtors believe that their creditors will receive greater and earlier recoveries under the Plan than those that would be achieved in liquidation or under an alternative plan. FOR THESE REASONS, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.

Dated:    October 31, 2008

Respectfully submitted,

Interstate Bakeries Corporation, et al

By:    /s/ Craig D. Jung
        Craig D. Jung
        Chief Executive Officer of Interstate
        Bakeries Corporation

J. Eric Ivester (ARDC No. 06215581)    Paul M. Hoffmann (Missouri Bar No. 31922)
Samuel S. Ory (Missouri Bar No. 43293)    STINSON MORRISON HECKER LLP
SKADDEN ARPS SLATE MEAGHER    1201 Walnut, Suite 2900
& FLOM LLP    Kansas City, MO 64106-2150
333 West Wacker Drive, Suite 2100    Telephone: (816) 691-2746
Chicago, Illinois  60606-1285    Facsimile: (816) 412-1191
Telephone: (312) 407-0700    e-mail: phoffmann@stinson.com
Facsimile: (312) 407-0411
e-mail: ibcinfo@skadden.com

-and-

J. Gregory Milmoe (JM 0919)
SKADDEN ARPS SLATE MEAGHER
& FLOM LLP
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

Attorneys for the Debtors and Debtors-in-Possession

**APPENDIX A**


**AMENDED JOINT PLAN OF REORGANIZATION OF INTERSTATE BAKERIES
CORPORATION AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION
DATED OCTOBER 31, 2008**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## KANSAS CITY DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| INTERSTATE BAKERIES | ) | Case No. 04-45814 (JWV) |
| CORPORATION, <u>et al.</u>, | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

## AMENDED JOINT PLAN OF REORGANIZATION OF INTERSTATE BAKERIES CORPORATION AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION DATED OCTOBER 31, 2008

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
J. Eric Ivester
Samuel S. Ory
333 West Wacker Drive
Chicago, Illinois 60606

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
J. Gregory Milmoe (JM 0919)
Four Times Square
New York, New York 10036-6522

- and -

STINSON MORRISON HECKER LLP
Paul M. Hoffmann (Missouri Bar No. 31922)
1201 Walnut, Suite 2900
Kansas City, MO 64106-2150

Counsel for Debtors and Debtors-in-Possession

Dated:  October 31, 2008

# TABLE OF CONTENTS

**PAGE**

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, AND
COMPUTATION OF TIME..................................................................2
   A.     Scope of Definitions ...................................................................2
   B.     Definitions...................................................................................3
           1.1     "503 Deadline"...............................................................3
           1.2     "ABL Facility".................................................................3
           1.3     "ABL Facility Commitment Papers"...............................3
           1.4     "ACE Companies"..........................................................3
           1.5     "ACE Insurance Program"..............................................3
           1.6     "Adequate Protection Claims".......................................3
           1.7     "Administrative Claim"...................................................3
           1.8     "Affiliates"......................................................................4
           1.9     "Allowed Claim" ............................................................4
           1.10    "Allowed Class __ Claim"..............................................4
           1.11    "Armour & Main Redevelopment"................................4
           1.12    "Armour & Main Redevelopment Control Group
                  Liability Claim" .............................................................4
           1.13    "Armour & Main Redevelopment General Unsecured
                  Claims Distribution Property" .......................................4
           1.14    "Armour & Main Redevelopment Intercompany Claim"...........4
           1.15    "Armour & Main Redevelopment Interests" ...............4
           1.16    "Armour & Main Redevelopment Substantive
                  Consolidation Motion"...................................................5
           1.17    "Armour & Main Redevelopment Trade Claim".........5
           1.18    "Avoidance Claims" .......................................................5
           1.19    "Bankruptcy Code".........................................................5
           1.20    "Bankruptcy Court".........................................................5
           1.21    "Bankruptcy Rules".........................................................5
           1.22    "Brands".........................................................................5
           1.23    "Brands Preferred Stock".................................................5
           1.24    "Business Day" ...............................................................6
           1.25    "Capital Leases".............................................................6
           1.26    "Capital Lease Claim" ....................................................6
           1.27    "Cash".............................................................................6
           1.28    "Causes of Action" ........................................................6
           1.29    "Central States Plan".......................................................6
           1.30    "Certificate"....................................................................6
           1.31    "Chapter 11 Case(s)".......................................................6
           1.32    "Claim" ..........................................................................6
           1.33    "Claimholder".................................................................6
           1.34    "Claims Administration" ................................................6

**PAGE**

1.35 "Claims Objection Deadline" ....................................................7
1.36 "Class" ....................................................................................7
1.37 "Commitment Fee" ..................................................................7
1.38 "Commitment Letter" ..............................................................7
1.39 "Commitment Letter Approval Order" ....................................7
1.40 "Confirmation Date" ...............................................................7
1.41 "Confirmation Hearing" ..........................................................7
1.42 "Confirmation Order" ..............................................................7
1.43 "Creditors' Committee" ...........................................................7
1.44 "Creditors' Trust" ...................................................................7
1.45 "Cure" .....................................................................................8
1.46 "D&O Claims" .........................................................................8
1.47 "D&O Insurance" .....................................................................8
1.48 "DIP Agent" .............................................................................8
1.49 "DIP Credit Agreement" ..........................................................8
1.50 "DIP Facility" ..........................................................................8
1.51 "DIP Facility Claim" ................................................................8
1.52 "DIP Facility Order" ................................................................8
1.53 "DIP Lenders" ..........................................................................9
1.54 "Debt Commitment Fee" ..........................................................9
1.55 "Debtors" .................................................................................9
1.56 "Deficiency Claim" ..................................................................9
1.57 "Disallowed Claim" .................................................................9
1.58 "Disbursing Agent" ..................................................................9
1.59 "Disclosure Statement" ............................................................9
1.60 "Disputed Claim" .....................................................................9
1.61 "Distribution Date" ................................................................10
1.62 "Effective Date" .....................................................................10
1.63 "Equity Commitment Fee" .....................................................10
1.64 "Equity Investors" ..................................................................10
1.65 "Estates" .................................................................................10
1.66 "Executive Employment Agreements" ...................................10
1.67 "Exhibit" ................................................................................10
1.68 "Exhibit Filing Date" .............................................................10
1.69 "Existing Securities" ..............................................................10
1.70 "Exit Facility Documents" .....................................................10
1.71 "Face Amount" .......................................................................10
1.72 "Final Order" ..........................................................................11
1.73 "General Unsecured Claim" ...................................................11
1.74 "Holdback Amount" ...............................................................11
1.75 "Holdback Escrow Account" .................................................11
1.76 "IBC" .....................................................................................11
1.77 "Impaired" .............................................................................11
1.78 "Indemnification Rights" .......................................................11

**PAGE**

1.79  "Indemnitee" ................................................................11
1.80  "Insurance Coverage" ..................................................12
1.81  "Insured Claim" ............................................................12
1.82  "Intercompany Claim" ..................................................12
1.83  "Intercreditor Settlement" ............................................12
1.84  "Intercreditor Settlement Motion" ...............................12
1.85  "Intercreditor Settlement Order" ..................................12
1.86  "Interest" ......................................................................12
1.87  "Interestholder" ............................................................12
1.88  "Investment" ................................................................12
1.89  "Investment Agreement" ..............................................12
1.90  "Investment Agreement Order" ....................................13
1.91  "JPMCB" ......................................................................13
1.92  "KERP" ........................................................................13
1.93  "Lien" ...........................................................................13
1.94  "Long Term Incentive Plan" .........................................13
1.95  "Main Debtors" ............................................................13
1.96  "Monarch" ....................................................................13
1.97  "Mrs. Cubbison's" .......................................................13
1.98  "Mrs. Cubbison's Control Group Liability Claim" .................13
1.99  "Mrs. Cubbison's General Unsecured Claims
         Distribution Property" ................................................13
1.100 "Mrs. Cubbison's Intercompany Claim" .....................14
1.101 "Mrs. Cubbison's Interests" .........................................14
1.102 "Mrs. Cubbison's Substantive Consolidation Motion" ...........14
1.103 "Mrs. Cubbison's Trade Claim" ..................................14
1.104 "New Common Stock" .................................................14
1.105 "New Convertible Secured Note Indenture" ...............14
1.106 "New Convertible Secured Notes" ..............................14
1.107 "New Credit Facilities" ................................................14
1.108 "New Credit Facility Documents" ...............................14
1.109 "New England Bakery" ................................................14
1.110 "New England Bakery Control Group Liability Claim" ...........15
1.111 "New England Bakery General Unsecured Claims
         Distribution Property" ................................................15
1.112 "New England Bakery Intercompany Claim" ..............15
1.113 "New England Bakery Interests" .................................15
1.114 "New England Bakery Substantive Consolidation
         Motion" ......................................................................15
1.115 "New England Bakery Trade Claim" ...........................15
1.116 "New Third Lien Term Loan" .......................................15
1.117 "New Third Lien Term Loan Credit Facility" ..............15
1.118 "Old Common Stock" ..................................................15
1.119 "Old Common Stock Options" ....................................16

**PAGE**

1.120 "Old Convertible Note Indenture" ...........................................16
1.121 "Old Convertible Note Indenture Trustee" ...............................16
1.122 "Old Convertible Note Indenture Trustee Fee Claim" .............16
1.123 "Old Convertible Notes" ...........................................................16
1.124 "Old Convertible Notes Claim" ...............................................16
1.125 "Ordinary Course Professional Order" ....................................16
1.126 "Organizational Documents" ...................................................16
1.127 "Other Priority Claim" .............................................................16
1.128 "Pension Plans" .........................................................................16
1.129 "Periodic Distribution Date" ...................................................17
1.130 "Permitted Affiliate" ................................................................17
1.131 "Person" .....................................................................................17
1.132 "Petition Date" ..........................................................................17
1.133 "Plan" .........................................................................................17
1.134 "Plan Supporter" .......................................................................17
1.135 "Postpetition Interest" ..............................................................17
1.136 "Prepetition Agent" ..................................................................17
1.137 "Prepetition Credit Agreement" ..............................................17
1.138 "Prepetition Credit Facility" ....................................................18
1.139 "Prepetition Investors" .............................................................18
1.140 "Prepetition LC" .......................................................................18
1.141 "Prepetition Lender Actions" ...................................................18
1.142 "Prepetition Lender Claims" ....................................................18
1.143 "Prepetition Lenders" ...............................................................18
1.144 "Prepetition Lenders Plan Distribution Property" ..................18
1.145 "Priority Claim" ........................................................................18
1.146 "Priority Tax Claim" .................................................................18
1.147 "Pro Rata" ..................................................................................18
1.148 "Professional" ...........................................................................19
1.149 "Professional Claim" ................................................................19
1.150 "Professional Fee Order" .........................................................19
1.151 "Reclamation Claim" ................................................................19
1.152 "Reclamation Order" ................................................................19
1.153 "Reconstitution Order" .............................................................19
1.154 "Reinstated" or "Reinstatement" .............................................19
1.155 "Released Parties" .....................................................................20
1.156 "Reorganized . . ." ....................................................................20
1.157 "Reorganized Debtors" .............................................................20
1.158 "Restructuring Transaction(s)" ................................................20
1.159 "Restructuring Transactions Notice" .......................................20
1.160 "Retained Actions" ...................................................................20
1.161 "SERP" ......................................................................................20
1.162 "Scheduled" ...............................................................................21
1.163 "Schedules" ...............................................................................21

**PAGE**

1.164 "Secured Claim" ...................................................21
1.165 "Secured Tax Claim" .........................................21
1.166 "Security" ...........................................................21
1.167 "Series A Warrants" ...........................................21
1.168 "Series B Warrants" ...........................................21
1.169 "Series C Warrants" ...........................................21
1.170 "Series D Warrants" ...........................................22
1.171 "Series E Warrants" ...........................................22
1.172 "Servicer" ...........................................................22
1.173 "Silver Point" .....................................................22
1.174 "Stockholders' Agreement" ...............................22
1.175 "Solicitation Procedures Order" ........................22
1.176 "Subordinated Debt Securities Claim" ..............22
1.177 "Subordinated Equity Securities Claim" ...........22
1.178 "Subordinated Securities Claim" .......................23
1.179 "Subsidiary Debtors" .........................................23
1.180 "Subsidiary Interests" ........................................23
1.181 "Term Loan Facility" .........................................23
1.182 "Term Loan Facility Commitment Fee" .............23
1.183 "Term Loan Facility Commitment Papers" ........23
1.184 "Term Loan Facility Commitment Parties" ........23
1.185 "Term Loan Facility Lenders" ...........................23
1.186 "Tolling Agreement" ..........................................24
1.187 "Transaction" .....................................................24
1.188 "Trust Advisory Board" .....................................24
1.189 "Trust Agreement" .............................................24
1.190 "Trust Assets" ....................................................24
1.191 "Trust Avoidance Claims" .................................24
1.192 "Trust Beneficiary" ............................................24
1.193 "Trust Claims" ...................................................24
1.194 "Trust Stock Appreciation Rights" ....................24
1.195 "Trustee" .............................................................25
1.196 "Trustee Professionals" ......................................25
1.197 "Unimpaired" ......................................................25
1.198 "Union Contracts" ..............................................25
1.199 "Voting Deadline" ..............................................25
1.200 "Warrants" ..........................................................25
1.201 "Workers' Compensation Claim" .......................25
C.    Rules of Interpretation ...........................................25
D.    Computation of Time ..............................................26
E.    Exhibits ...................................................................26
ARTICLE II ADMINISTRATIVE EXPENSES AND PRIORITY TAX
CLAIMS .............................................................................26
2.1    Administrative Claims .............................................26

**PAGE**

2.2     Priority Tax Claims......................................................................27
ARTICLE III CLASSIFICATION OF CLAIMS AND INTERESTS .........................27
3.1     Introduction................................................................................27
3.2     Classification of Claims Against and Interests In the
         Main Debtors .............................................................................28
3.3     Classification of Claims Against and Interests In Mrs.
         Cubbison's, Armour & Main Redevelopment and New
         England Bakery..........................................................................29
ARTICLE IV PROVISIONS FOR TREATMENT OF CLAIMS AND
         INTERESTS .................................................................................30
4.1     Treatment of Claims Against and Interests In the Main
         Debtors.......................................................................................30
4.2     Treatment of Claims Against and Interests In Mrs.
         Cubbison's, Armour & Main Redevelopment and New
         England Bakery..........................................................................33
4.3     Special Provisions Regarding Insured Claims .........................35
4.4     Reservation of Rights.................................................................36
ARTICLE V ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
         REJECTION BY ONE OR MORE IMPAIRED CLASSES OF
         CLAIMS OR INTERESTS.............................................................36
5.1     Impaired Classes of Claims Entitled to Vote ...........................36
5.2     Classes Deemed to Accept Plan................................................36
5.3     Acceptance by Impaired Classes ..............................................36
5.4     Classes Deemed to Reject Plan.................................................37
5.5     Confirmation Pursuant to Section 1129(b) of the
         Bankruptcy Code .......................................................................37
5.6     Confirmability and Severability of a Plan ................................37
ARTICLE VI MEANS FOR IMPLEMENTATION OF THE PLAN.........................37
6.1     Continued Corporate Existence ................................................37
6.2     Corporate Action.......................................................................37
6.3     Certificate of Incorporation and Bylaws..................................38
6.4     Cancellation of Existing Securities and Agreements................38
6.5     Authorization and Issuance of New Common Stock.................39
6.6     Directors and Officers...............................................................40
6.7     Employment, Retirement, Indemnification and Other
         Agreements and Incentive Compensation Programs ................40
6.8     Implementation of the Long Term Incentive Program .............41
6.9     Termination of the SERP ..........................................................42
6.10    Equity Investors' Contribution .................................................42
6.11    Issuance of the New Convertible Secured Notes, the
         New Common Stock and Warrants and Entry Into the
         New Third Lien Term Loan........................................................42
6.12    Post-Effective Date Financing ..................................................42
6.13    Restructuring Transactions and Alternative Structures ...........44

**PAGE**

6.14    Preservation of Causes of Action................................................45
6.15    Exclusivity Period.......................................................................45
6.16    Effectuating Documents; Further Transactions ........................45
6.17    Exemption From Certain Transfer Taxes and Recording
        Fees ............................................................................................45
6.18    Substantive Consolidation Motions ...........................................46
ARTICLE VII UNEXPIRED LEASES AND EXECUTORY CONTRACTS ...........46
7.1     Assumed (Non-Union) Contracts and Leases............................46
7.2     Rejected (Non-Union) Contracts and Leases.............................47
7.3     Assumption and Rejection of Union Contracts .........................47
7.4     Payments Related to Assumption of Executory
        Contracts and Unexpired Leases.................................................47
7.5     Rejection Damages Bar Date ......................................................47
ARTICLE VIII PROVISIONS GOVERNING DISTRIBUTIONS ...........................48
8.1     Time of Distributions..................................................................48
8.2     No Interest on Claims .................................................................48
8.3     Disbursing Agent ........................................................................48
8.4     Surrender of Securities or Instruments ......................................48
8.5     Claims Administration Responsibility........................................48
8.6     Delivery of Distributions ...........................................................49
8.7     Procedures for Treating and Resolving Disputed and
        Contingent Claims ......................................................................50
ARTICLE IX ALLOWANCE AND PAYMENT OF CERTAIN
ADMINISTRATIVE CLAIMS ...........................................................................50
9.1     DIP Facility Claims.....................................................................50
9.2     Professional Claims ....................................................................51
9.3     Substantial Contribution Compensation and Expenses
        Bar Date ......................................................................................52
9.4     Other Administrative Claims ......................................................52
9.5     The ACE Insurance Program ......................................................52
9.6     Commitment Fee..........................................................................53
9.7     Payment of Old Convertible Note Indenture Trustee
        Fee Claim ....................................................................................53
ARTICLE X CREDITORS' TRUST.......................................................................54
10.1    Appointment of Trustee ..............................................................54
10.2    Assignment of Trust Assets to the Creditors' Trust...................54
10.3    The Creditors' Trust....................................................................54
10.4    The Trust Advisory Board ..........................................................55
10.5    Distributions to Beneficiaries of the Creditors' Trust
        Under the Trust Agreement ........................................................57
ARTICLE XI EFFECT OF THE PLAN ON CLAIMS AND INTERESTS ...............57
11.1    Revesting of Assets.....................................................................57
11.2    Discharge of the Debtors ............................................................57
11.3    Compromises and Settlements....................................................58

**PAGE**

| | | |
|---|---|---|
| 11.4 | Release of Certain Parties | 59 |
| 11.5 | Releases by Holders of Claims | 60 |
| 11.6 | Setoffs | 61 |
| 11.7 | Exculpation and Limitation of Liability | 61 |
| 11.8 | Indemnification Obligations | 61 |
| 11.9 | Injunction | 62 |
| 11.10 | Central States Settlement | 62 |
| 11.11 | Other Pension Plans | 63 |

ARTICLE XII CONDITIONS PRECEDENT ..............................63

| | | |
|---|---|---|
| 12.1 | Conditions to Confirmation | 63 |
| 12.2 | Conditions to Consummation | 63 |
| 12.3 | Waiver of Conditions to Confirmation or Consummation | 66 |

ARTICLE XIII RETENTION OF JURISDICTION ..............................66
ARTICLE XIV MISCELLANEOUS PROVISIONS..............................69

| | | |
|---|---|---|
| 14.1 | Binding Effect | 69 |
| 14.2 | Modification and Amendments | 69 |
| 14.3 | Withholding and Reporting Requirements | 69 |
| 14.4 | Allocation of Plan Distributions Between Principal and Interest | 69 |
| 14.5 | Creditors' Committee | 69 |
| 14.6 | Payment of Statutory Fees | 70 |
| 14.7 | Revocation, Withdrawal, or Non-Consummation | 70 |
| 14.8 | Notices | 70 |
| 14.9 | Term of Injunctions or Stays | 73 |
| 14.10 | Governing Law | 73 |
| 14.11 | Waiver and Estoppel | 73 |
| 14.12 | Rights of Equity Investors | 73 |
| 14.13 | Rights of the Prepetition Investors | 73 |
| 14.14 | Allowance of Old Convertible Notes Claim | 74 |

## **EXHIBITS**

Exhibit A-1     Nonexclusive List of Retained Actions and Avoidance Claims

Exhibit A-2     Trust Avoidance Claims

Exhibit B       Schedule of Capital Leases

Exhibit C       Intercreditor Settlement Order

Exhibit D       Investment Agreement

Exhibit E       Summary Description of the Terms of the Long Term Incentive Plan

Exhibit F       Summary Description of the Terms of the New Common Stock

Exhibit G       Summary Description of the Terms of the New Convertible Secured Notes

Exhibit H       Summary Description of the Terms of the New Third Lien Term Loan

Exhibit I       Summary Description of the Restructuring Transactions

Exhibit J       Form of Stockholders' Agreement

Exhibit K       Form of Creditors' Trust Agreement

Exhibit L       Form of Certificate of Incorporation

Exhibit M       Form of Bylaws

Exhibit N       Summary Description of Terms of Employment of Certain Key Executives

Exhibit O       Schedule of Assumed Unexpired Leases and Non-Union Executory Contracts

# INTRODUCTION

Interstate Bakeries Corporation ("IBC") and eight of its direct and indirect subsidiaries and affiliates, debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned jointly-administered chapter 11 reorganization cases, hereby propose the following reorganization plans for the resolution of outstanding creditor claims and equity interests against each of the Debtors. This Plan, though proposed jointly, constitutes a separate plan proposed by each Debtor. Therefore, except as expressly provided in Section 3.3 herein, the classifications set forth in Section 3.2 herein shall be deemed to apply separately with respect to each plan proposed by each Debtor.

Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties, results of operations, projections for future operations, risk factors, and a summary and analysis of this Plan and certain related matters, including distributions to be made under this Plan. Each Debtor is a proponent of the plan contained herein within the meaning of section 1129 of the Bankruptcy Code. Capitalized terms used but not defined in this Introduction have the meanings ascribed to them in Article I of this Plan. The Debtors who are proponents of this Plan, their chapter 11 case numbers, and their jurisdictions of incorporation or formation are as follows:

| Debtors (state of formation or incorporation) | Bankruptcy Case No. |
|---|---|
| Interstate Bakeries Corporation (Delaware) | Case No. 04-45814 (JWV) |
| Interstate Brands Corporation (Delaware) | Case No. 04-45816 (JWV) |
| IBC Sales Corporation (Delaware) | Case No. 04-45817 (JWV) |
| IBC Trucking, LLC (Delaware) | Case No. 04-45818 (JWV) |
| New England Bakery Distributors L.L.C. (Connecticut) | Case No. 04-45819 (JWV) |
| Baker's Inn Quality Baked Goods, LLC (Delaware) | Case No. 04-45820 (JWV) |
| IBC Services, LLC (Missouri) | Case No. 04-45821 (JWV) |
| Armour and Main Redevelopment Corporation (Missouri) | Case No. 04-45822 (JWV) |
| Mrs. Cubbison's Foods, Inc. (California) | Case No. 06-40111 (JWV) |

This Plan contemplates the reorganization of each of the Debtors upon consummation of this Plan and the resolution of the outstanding Claims against and Interests in the Debtors pursuant to sections 1123, 1129 and 1141 of the Bankruptcy

Code.  This Plan further contemplates that holders of Prepetition Lender Claims will receive a distribution consisting of the New Third Lien Term Loan, $85,800,000 in aggregate principal amount of the New Convertible Secured Notes and Series E Warrants representing 1.5% of the fully-diluted equity interests of Reorganized IBC (calculated as of the Effective Date).  Holders of General Unsecured Claims against the Main Debtors will not receive a distribution pursuant to this Plan.  However, pursuant to the settlement and compromise contemplated by the Intercreditor Settlement described herein, among other things, the Trust Assets shall be transferred to the Creditors' Trust on the Effective Date and, in exchange, the Creditors' Committee has agreed to release any and all claims against the Prepetition Lenders.  As a result, the Creditors' Committee has agreed to support this Plan.  Furthermore, the Existing Securities of the Debtors will be cancelled and holders of the Existing Securities will not receive distributions under this Plan.

These reorganization cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the United States Bankruptcy Court for the Western District of Missouri.

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject this Plan may not be solicited from a Claimholder or Interestholder until the Disclosure Statement has been approved by the Bankruptcy Court and distributed to Claimholders and Interestholders.  ALL CLAIMHOLDERS WHO ARE ELIGIBLE TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Article XIII of this Plan, the Debtors expressly reserve their right to alter, amend or modify this Plan, one or more times, before this Plan's substantial consummation.

# ARTICLE I

## DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

### A.     Scope of Definitions

For purposes of this Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article I of this Plan.  Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the

Bankruptcy Rules, as applicable. Whenever it appears appropriate from the context, each term stated in the singular or the plural includes the singular and the plural, and each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter.

## B. <u>Definitions</u>

1.1 **"503 Deadline"** shall have the meaning ascribed to it in Section 9.3 hereof.

1.2 **"ABL Facility"** means the asset-based revolving credit facility by and among IBC, Interstate Brands Corporation and General Electric Capital Corporation in the committed amount of $125,000,000.

1.3 **"ABL Facility Commitment Papers"** means that certain commitment letter by and among General Electric Capital Corporation, GE Capital Markets, Inc., Brands, IBC and Equity Investors, dated September 11, 2008 (together with the exhibits and annexes attached thereto and as amended, restated, modified or otherwise supplemented from time to time in accordance with the terms thereof) together with that certain fee letter by and among General Electric Capital Corporation, GE Capital Markets, Inc., Brands, IBC and Equity Investors, dated September 11, 2008 (as amended, restated, modified or otherwise supplemented from time to time in accordance with the terms thereof), in each case, for the ABL Facility.

1.4 **"ACE Companies"** means, collectively, ACE American Insurance Company, Indemnity Insurance Company of North America, and ESIS, Inc. and their respective affiliates.

1.5 **"ACE Insurance Program"** means all insurance policies and all agreements, documents or instruments relating thereto including, without limitation, claims servicing agreements, that have been issued or entered into by the ACE Companies (or any of them) to or with one or more of the Debtors and their respective predecessors and/or affiliates.

1.6 **"Adequate Protection Claims"** means rights of the Prepetition Lenders to receive adequate protection pursuant to the DIP Facility Order.

1.7 **"Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, DIP Facility Claims, the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the business of the Debtors, including wages, salaries or commissions for services rendered after the commencement of the Chapter 11 Cases, Professional Claims, and all fees and charges assessed against the Estates under chapter 123 of title 28 of the

United States Code, and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code.

**1.8** **"Affiliates"** shall have the meaning ascribed to such term by section 101(2) of the Bankruptcy Code.

**1.9** **"Allowed Claim"** means a Claim or any portion thereof, (a) that has been allowed by a Final Order of the Bankruptcy Court (or such other court as a Reorganized Debtor and the holder of such Claim agree may adjudicate such Claim and objections thereto), or (b) which (i) is not the subject of a proof of claim timely filed with the Bankruptcy Court but (ii) is Scheduled as liquidated and noncontingent, other than a Claim that is Scheduled at zero, in an unknown amount, or as disputed, but only to the extent such Claim is Scheduled as liquidated and noncontingent or (c) for which a proof of claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed within the periods of limitation fixed by this Plan, the Bankruptcy Code or by any order of the Bankruptcy Court or (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or (d) that is expressly allowed in a liquidated amount in this Plan.

**1.10** **"Allowed Class __ Claim"** means an Allowed Claim in the specified Class.

**1.11** **"Armour & Main Redevelopment"** means Armour and Main Redevelopment Corporation, one of the Debtors and a debtor-in-possession, Case No. 04-45822 (JWV).

**1.12** **"Armour & Main Redevelopment Control Group Liability Claim"** means a Claim asserted by, or on behalf of, a qualified defined benefit pension plan against all members of IBC's controlled group of companies and related entities as defined under section 4001(b)(1) of the Employee Retirement Income Security Act of 1974 (on a joint and several basis), to the extent such Claim is asserted against Armour & Main Redevelopment.

**1.13** **"Armour & Main Redevelopment General Unsecured Claims Distribution Property"** means $10,000 in Cash.

**1.14** **"Armour & Main Redevelopment Intercompany Claim"** means a Claim by another Debtor against Armour & Main Redevelopment.

**1.15** **"Armour & Main Redevelopment Interests"** means the shares of common stock of Armour & Main Redevelopment, and all options, rights and other instruments evidencing an ownership interest in Armour & Main Redevelopment.

A-4

**1.16** **"Armour & Main Redevelopment Substantive Consolidation Motion"** means that certain motion to be filed with the Bankruptcy Court no later than twenty (20) days prior to the Confirmation Hearing pursuant to which the Debtors will seek to substantively consolidate Armour & Main Redevelopment and IBC, for purposes of voting and distribution, and pursuant to which the Claims against, and Interests in, Armour & Main Redevelopment will receive the same treatment as if they were Claims against, or Interests in, IBC under the Plan with respect to IBC.

**1.17** **"Armour & Main Redevelopment Trade Claim"** means each Claim against Armour & Main Redevelopment that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Armour & Main Redevelopment Intercompany Claim or Armour & Main Redevelopment Control Group Liability Claim.

**1.18** **"Avoidance Claims"** means Causes of Action against Persons other than the Debtors arising under any of sections 544, 545, 547, 548, 550, 551 and 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation is commenced to prosecute such Causes of Action, but excluding the Prepetition Lender Actions and any other Causes of Action otherwise assertable against the Prepetition Lenders.

**1.19** **"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as in effect on the date hereof but, with respect to amendments to the Bankruptcy Code subsequent to commencement of the Chapter 11 Cases, only to the extent that such amendments were made expressly applicable to bankruptcy cases which were filed as of the enactment of such amendments.

**1.20** **"Bankruptcy Court"** means the United States Bankruptcy Court for the Western District of Missouri.

**1.21** **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

**1.22** **"Brands"** means Interstate Brands Corporation, one of the Debtors and a debtor-in-possession, Case No. 04-45816 (JWV).

**1.23** **"Brands Preferred Stock"** means the 6,026 shares of $4.80 dividend cumulative preferred stock of Brands authorized under Article IV of the restated certificate of incorporation of Brands, as amended.

A-5

**1.24** **"Business Day"** means any day, excluding Saturdays, Sundays and legal holidays, on which commercial banks are open for business in New York City.

**1.25** **"Capital Leases"** means those certain non-operating lease agreements scheduled on Exhibit B attached hereto, together with all related leases, lease amendments, lease supplements, memoranda of leases, mortgages, loan agreements, guarantees, guarantee and collateral agreements, and all other related loan, lease and security documents executed and delivered in connection therewith, as the same have been amended, amended and restated, modified or supplemented from time to time.

**1.26** **"Capital Lease Claim"** means a Claim arising under or pursuant to a Capital Lease.

**1.27** **"Cash"** means legal tender of the United States.

**1.28** **"Causes of Action"** means any and all actions, claims, proceedings, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, in law, equity or otherwise, including actions brought prior to the Petition Date, actions under chapter 5 of the Bankruptcy Code, and actions against any Person for failure to pay for products or services provided or rendered by the Debtors, all claims, suits or proceedings relating to enforcement of the Debtors' intellectual property rights, including patents, copyrights and trademarks, and all claims or causes of action seeking recovery of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtors' or the Reorganized Debtors' business.

**1.29** **"Central States Plan"** has the meaning ascribed to it in Section 11.10 hereof.

**1.30** **"Certificate"** has the meaning ascribed to it in Section 8.4 hereof.

**1.31** **"Chapter 11 Case(s)"** means the chapter 11 case(s) of the Debtors pending in the Bankruptcy Court.

**1.32** **"Claim"** means a claim against the Debtors (or all or any of them), whether or not asserted, as defined in section 101(5) of the Bankruptcy Code.

**1.33** **"Claimholder"** means a holder of a Claim.

**1.34** **"Claims Administration"** shall have the meaning ascribed to it in Section 8.5 hereof.

A-6

**1.35** **"Claims Objection Deadline"** means that day which is one hundred eighty (180) days after the Effective Date, as the same may be from time to time extended by the Bankruptcy Court without further notice to parties-in-interest.

**1.36** **"Class"** means a category of Claimholders or Interestholders described in Article IV of this Plan.

**1.37** **"Commitment Fee"** means the Equity Commitment Fee and the Debt Commitment Fee.

**1.38** **"Commitment Letter"** means that certain commitment letter by and between IBC and Equity Investors, dated September 12, 2008 (including the exhibits and annexes attached thereto and as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof), together with that certain fee letter by and between IBC and Equity Investors, dated September 12, 2008 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof).

**1.39** **"Commitment Letter Approval Order"** means the Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), 364(c)(1), 503(b) and 507(a) Authorizing the Debtors to (I) Enter into Equity Commitment Letter and Related Agreements Including (A) Equity Commitment Fee Letter, (B) Revolving Facility Commitment Letter and Related Fee Letter, and (C) Term Loan Exit Facility Commitment Letter and Related Fee Letter, and (II) Pay Certain Fees and Expenses Associated Therewith (Docket No. 11333) pursuant to which the Bankruptcy Court approved the Commitment Letter, the Term Loan Facility Commitment Papers and the ABL Facility Commitment Papers.

**1.40** **"Confirmation Date"** means the date of entry of the Confirmation Order.

**1.41** **"Confirmation Hearing"** means the hearing before the Bankruptcy Court on confirmation of this Plan and related matters under section 1128 of the Bankruptcy Code.

**1.42** **"Confirmation Order"** means the order entered by the Bankruptcy Court confirming this Plan.

**1.43** **"Creditors' Committee"** means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

**1.44** **"Creditors' Trust"** means the trust which is created pursuant to this Plan to be administered by the Trustee with the advice and/or under the direction of the Trust Advisory Board, all as more specifically set forth in Article X of this Plan.

**1.45   "Cure"** means the payment or other honor of all obligations required to be paid or honored in connection with assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution, within a reasonable period of time following the Effective Date, of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such other amount as may be agreed upon by the parties, under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**1.46   "D&O Claims"** means those claims against certain former officers and directors that are to be transferred to the Creditors' Trust on the Effective Date pursuant to the Intercreditor Settlement.

**1.47   "D&O Insurance"** means insurance maintained by the Debtors which covers, among others, the directors, officers and managing members of the Debtors or any of them.

**1.48   "DIP Agent"** means the administrative agent for the DIP Lenders under the DIP Credit Agreement.

**1.49   "DIP Credit Agreement"** means the Second Amended and Restated Revolving Credit Agreement, dated as of May 9, 2008, among IBC, as parent borrower, the subsidiary borrowers party thereto, the DIP Agent and the DIP Lenders, which was executed by the Debtors (except Mrs. Cubbison's) in connection with the DIP Facility, as amended by the First Amendment to the Second Amended and Restated Revolving Credit Agreement, dated as of September 12, 2008.

**1.50   "DIP Facility"** means the debtor-in-possession secured financing facility provided to the Debtors by the DIP Lenders pursuant to the DIP Credit Agreement and agreements related thereto as authorized by the Bankruptcy Court pursuant to the DIP Facility Order.

**1.51   "DIP Facility Claim"** means all Administrative Claims of the DIP Agent and the DIP Lenders arising under or pursuant to or related to the DIP Facility.

**1.52   "DIP Facility Order"** means, collectively, the final order that was entered by the Bankruptcy Court on October 22, 2004, authorizing and approving the DIP Facility and the agreements related thereto, and any further orders entered by the Bankruptcy Court approving subsequent extensions and modifications of the DIP Facility.

**1.53** **"DIP Lenders"** means the lenders from time to time party to the DIP Credit Agreement.

**1.54** **"Debt Commitment Fee"** means the commitment fee for Equity Investors's commitments to purchase New Convertible Secured Notes under the Commitment Letter, in the amount of $4,290,000, payable in accordance with the terms of the Commitment Letter.

**1.55** **"Debtors"** has the meaning ascribed to it in the Introduction hereof.

**1.56** **"Deficiency Claim"** means, in the case of a Claimholder who asserts a Secured Claim or Prepetition Lender Claim against the Debtors, a Claim equal to the amount by which such Claim exceeds the secured portion thereof as determined pursuant to section 506 of the Bankruptcy Code.

**1.57** **"Disallowed Claim"** means a Claim or any portion thereof, that (a) has been disallowed by a Final Order, (b) is Scheduled at zero or as contingent, disputed or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or (c) is not Scheduled and as to which a proof of claim bar date has been set but no proof of claim has been timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court.

**1.58** **"Disbursing Agent"** means the Reorganized Debtors or any Person designated by either the Debtors or Reorganized IBC, with the consent of Equity Investors (with such consent not to be unreasonably withheld), to serve as a disbursing agent under Article VIII of this Plan.

**1.59** **"Disclosure Statement"** means the written disclosure statement that relates to this Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017 on October 30, 2008, as such disclosure statement may be amended, modified or supplemented from time to time.

**1.60** **"Disputed Claim"** means a Claim or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim and includes, without limitation, Claims that (a) (i) have not been Scheduled by the Debtors (or any of them) or have been Scheduled at zero or as unknown, contingent, unliquidated or disputed, and (ii) are not the subject of an objection filed in the Bankruptcy Court or as to which the time for filing an objection has not yet expired, (b) that are the subject of a proof of claim or interest that differs in nature, amount or priority from the Schedules, or (c) are the subject of an objection filed with the Bankruptcy Court, which objection has not been withdrawn or overruled by a Final Order of the Bankruptcy Court.

**1.61** **"Distribution Date"** means a date selected by IBC or Reorganized IBC, not more than twenty (20) Business Days after the Effective Date.

**1.62** **"Effective Date"** means the Business Day on which all conditions to the consummation of this Plan set forth in Section 12.2 hereof have been either satisfied or waived as provided in Section 12.3 hereof and is the day upon which this Plan is substantially consummated, which Effective Date shall also be the closing date under the Investment Agreement.

**1.63** **"Equity Commitment Fee"** means the commitment fee for Equity Investors's commitment to purchase New Common Stock under the Commitment Letter, in the amount of $2,210,000, payable in accordance with the terms of the Commitment Letter.

**1.64** **"Equity Investors"** means IBC Investors I, LLC.

**1.65** **"Estates"** means the bankruptcy estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

**1.66** **"Executive Employment Agreements"** has the meaning ascribed to it in Section 6.7 hereof.

**1.67** **"Exhibit"** means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement.

**1.68** **"Exhibit Filing Date"** means the date on which Exhibits to this Plan or the Disclosure Statement shall be filed with the Bankruptcy Court, which date shall be at least ten (10) days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court.

**1.69** **"Existing Securities"** means, collectively, the Brands Preferred Stock, Old Convertible Notes, Old Common Stock and Old Common Stock Options, and all options, warrants, rights and other instruments evidencing an ownership interest in any Debtor (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable or otherwise, to acquire any of the foregoing (except for Subsidiary Interests other than the Brands Preferred Stock).

**1.70** **"Exit Facility Documents"** has the meaning ascribed to it in Section 6.12 hereof.

**1.71** **"Face Amount"** means, (a) when used in reference to a Disputed Claim or Disallowed Claim, the full stated liquidated amount claimed by the Claimholder in any proof of claim timely filed with the Bankruptcy Court or otherwise Allowed by any Final Order of the Bankruptcy Court and (b) when used in reference to an Allowed Claim, the allowed amount of such Claim.

**1.72** **"Final Order"** means an order or judgment, the operation or effect of which has not been stayed, reversed or amended and as to which order or judgment (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing (other than under Rule 60(b) of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024) has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

**1.73** **"General Unsecured Claim"** means a Claim that (a) is not an Administrative Claim or a Priority Tax Claim and (b) (i) with respect to the Main Debtors, does not fall within Class 1 Secured Tax Claims, Class 2 Secured Claims, Class 3 Other Priority Claims, Class 4 Intercompany Claims, Class 5 Workers' Compensation Claims, Class 7 Capital Lease Claims, Class 8 Prepetition Lender Claims, Class 10a Subordinated Debt Securities Claims or Class 10b Subordinated Equity Securities Claims or (ii) with respect to Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery, does not fall within Class 1 Other Priority Claims, Class 2 Intercompany Claims or Class 4 Trade Claims.

**1.74** **"Holdback Amount"** means the amount equal to 20% of fees billed to the Debtors in a given month that was retained by the Debtors as a holdback on payment of Professional Claims pursuant to the Professional Fee Order.

**1.75** **"Holdback Escrow Account"** means the escrow account established by the Disbursing Agent into which Cash equal to the Holdback Amount shall be deposited on the Effective Date for the payment of Allowed Professional Claims to the extent not previously paid or disallowed.

**1.76** **"IBC"** has the meaning ascribed to it in the Introduction hereof.

**1.77** **"Impaired"** refers to any Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.78** **"Indemnification Rights"** means any obligations of the Debtors (or any of them) to indemnify, reimburse, advance or contribute to the losses, liabilities or expenses of an Indemnitee pursuant to a Debtor's certificate of incorporation, bylaws, or policy of providing indemnification to an Indemnitee, or pursuant to any applicable law or specific agreement in respect of any claims, demands, suits, causes of action or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for or on behalf of the Debtors (or any of them).

**1.79** **"Indemnitee"** means all present and former directors, officers, employees, agents or representatives of the Debtors who are entitled to assert Indemnification Rights.

**1.80** **"Insurance Coverage"** shall have the meaning ascribed to it in Section 11.8 hereof.

**1.81** **"Insured Claim"** means any Claim or portion of a Claim (other than a Workers' Compensation Claim) that is insured under the Debtors' insurance policies, but only to the extent of such coverage.

**1.82** **"Intercompany Claim"** means a Claim by any Debtor against a Main Debtor.

**1.83** **"Intercreditor Settlement"** means that settlement and compromise of controversies by and among the Debtors, certain Prepetition Lenders and the Creditors' Committee whereby the Trust Assets shall be transferred to the Creditors' Trust on the Effective Date in full and complete satisfaction of any and all claims against the Prepetition Lenders and any and all challenges, contests or claims for or against the substantive consolidation of the Debtors, all as such settlement and compromise of controversies is more specifically described in the Intercreditor Settlement Motion and the Intercreditor Settlement Order.

**1.84** **"Intercreditor Settlement Motion"** means that certain Motion to Compromise Controversies Pursuant to Bankruptcy Rule 9019 whereby the Debtors seek approval of a compromise with respect to the Intercreditor Settlement.

**1.85** **"Intercreditor Settlement Order"** means an order of the Bankruptcy Court approving the Intercreditor Settlement Motion, in substantially the form attached hereto as Exhibit C.

**1.86** **"Interest"** means (a) the legal, equitable contractual and other rights (whether fixed or contingent, matured or unmatured, disputed or undisputed) of any Person with respect to Old Common Stock, Old Common Stock Options, Brands Preferred Stock or any other equity securities of the Debtors (or any of them) and (b) the legal, equitable, contractual and other rights, whether fixed or contingent, matured or unmatured, disputed or undisputed, of any Person to purchase, sell, subscribe to, or otherwise acquire or receive (directly or indirectly) any of the foregoing.

**1.87** **"Interestholder"** means a holder of an Interest.

**1.88** **"Investment"** means the purchase by Equity Investors of the New Common Stock and New Convertible Secured Notes pursuant to the Investment Agreement.

**1.89** **"Investment Agreement"** means the Investment Agreement between IBC and Equity Investors dated as of September 26, 2008 (including the exhibits attached thereto and as amended, restated, supplemented or otherwise modified from

time to time in accordance with the terms thereof) and approved by the Investment Agreement Order.  The Investment Agreement is set forth at Exhibit D.

1.90 **"Investment Agreement Order"** means the Final Order entered by the Bankruptcy Court on October 22, 2008, authorizing and approving the Investment Agreement.

1.91 **"JPMCB"** means JPMorgan Chase Bank, N.A., a national banking association.

1.92 **"KERP"** means that certain Key Employee Retention Plan adopted by IBC's board of directors and approved by order of the Bankruptcy Court on February 17, 2005, as amended.

1.93 **"Lien"** means a lien, security interest or charge against or interest in property of the Debtors to secure payment of a debt or performance of an obligation owed by the Debtors.  For purposes of this Plan, the term shall not include (a) a lien resulting from the provisions of Chapter 5 of the Bankruptcy Code or (b) a lien that has been or may be avoided pursuant to Chapter 5 of the Bankruptcy Code.

1.94 **"Long Term Incentive Plan"** means that certain long term incentive plan as is more specifically described at Exhibit E attached hereto, by which the Reorganized Debtors shall deliver certain stock options and restricted stock grants to certain members of management and other employees on and after the Effective Date.

1.95 **"Main Debtors"** means all of the Debtors excluding Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery.

1.96 **"Monarch"** means Monarch Master Funding Ltd and its respective Affiliates and managed funds.

1.97 **"Mrs. Cubbison's"** means Mrs. Cubbison's Foods, Inc., one of the Debtors and a debtor-in-possession, Case No. 06-40111 (JWV).

1.98 **"Mrs. Cubbison's Control Group Liability Claim"** means a Claim asserted by, or on behalf of, a qualified defined benefit pension plan against all members of IBC's controlled group of companies and related entities as defined under section 4001(b)(1) of the Employee Retirement Income Security Act of 1974 (on a joint and several basis), to the extent such claim is asserted against Mrs. Cubbison's.

1.99 **"Mrs. Cubbison's General Unsecured Claims Distribution Property"** means $300,000 in Cash.

**1.100  "Mrs. Cubbison's Intercompany Claim"** means a Claim by any Debtor against Mrs. Cubbison's.

**1.101  "Mrs. Cubbison's Interests"** means the shares of common stock of Mrs. Cubbison's, and all options, rights and other instruments evidencing an ownership interest in Mrs. Cubbison's.

**1.102  "Mrs. Cubbison's Substantive Consolidation Motion"** means that certain motion to be filed with the Bankruptcy Court no later than twenty (20) days prior to the Confirmation Hearing pursuant to which the Debtors will seek to substantively consolidate Mrs. Cubbison's and IBC, for purposes of voting and distribution, and pursuant to which the Claims against, and Interests in, Mrs. Cubbison's will receive the same treatment as if they were Claims against, or Interests in, IBC under the Plan with respect to IBC.

**1.103  "Mrs. Cubbison's Trade Claim"** means each Claim against Mrs. Cubbison's that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Mrs. Cubbison's Intercompany Claim or Mrs. Cubbison's Control Group Liability Claim.

**1.104  "New Common Stock"** means shares of common stock of Reorganized IBC to be authorized and issued on or after the Effective Date. A summary description of the New Common Stock is set forth at Exhibit F.

**1.105  "New Convertible Secured Note Indenture"** means the New Convertible Secured Notes indenture among IBC, the guarantors party thereto and the trustee party thereto.

**1.106  "New Convertible Secured Notes"** mean the 5% fourth priority secured convertible notes, in the original principal amount of $171.6 million, to be issued by Reorganized IBC on the Effective Date, together with any "pay-in-kind" interest on such New Convertible Secured Notes to be issued after the Effective Date. A summary description of the New Convertible Secured Notes is set forth at Exhibit G attached hereto.

**1.107  "New Credit Facilities"** means (a) the ABL Facility, and (b) the Term Loan Facility.

**1.108  "New Credit Facility Documents"** means all documents comprising the definitive documentation of the New Credit Facilities, including without limitation, all collateral and security documents and intercreditor agreements contemplated thereby.

**1.109  "New England Bakery"** means New England Bakery Distributors L.L.C., one of the Debtors and a debtor-in-possession, Case No. 04-45819 (JWV).

**1.110 "New England Bakery Control Group Liability Claim"** means a Claim asserted by, or on behalf of, a qualified defined benefit pension plan against all members of IBC's controlled group of companies and related entities as defined under section 4001(b)(1) of the Employee Retirement Income Security Act of 1974 (on a joint and several basis), to the extent such Claim is asserted against New England Bakery.

**1.111 "New England Bakery General Unsecured Claims Distribution Property"** means $10,000 in Cash.

**1.112 "New England Bakery Intercompany Claim"** means a Claim by any Debtor against New England Bakery.

**1.113 "New England Bakery Interests"** means the shares of common stock of New England Bakery, and all options, rights and other instruments evidencing an ownership interest in New England Bakery.

**1.114 "New England Bakery Substantive Consolidation Motion"** means that certain motion to be filed with the Bankruptcy Court no later than twenty (20) days prior to the Confirmation Hearing pursuant to which the Debtors will seek to substantively consolidate New England Bakery and IBC, for purposes of voting and distribution, and pursuant to which the Claims against, and Interests in, New England Bakery will receive the same treatment as if they were Claims against, or Interests in, IBC under the Plan with respect to IBC.

**1.115 "New England Bakery Trade Claim"** means each Claim against New England Bakery that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, New England Bakery Intercompany Claim or New England Bakery Control Group Liability Claim.

**1.116 "New Third Lien Term Loan"** means the six-year term loan facility in the aggregate principal amount equal to $142.3 million; provided, however, the principal amount of the New Third Lien Term Loan may be decreased (with a corresponding increase in the amount of the Term Loan Facility on a dollar-for-dollar basis) in accordance with numbered paragraph 19 of the Commitment Letter and Exhibit J to the Commitment Letter subject to the consent of the Term Loan Facility Commitment Parties. A summary description of the New Third Lien Term Loan is set forth at Exhibit H attached hereto.

**1.117 "New Third Lien Term Loan Credit Facility"** means the credit facility governing the New Third Lien Term Loan by and among Reorganized IBC, Reorganized Brands, the guarantors party thereto and the Prepetition Lenders.

**1.118 "Old Common Stock"** means shares of IBC's common stock that were authorized, issued and outstanding prior to the Effective Date.

**1.119 "Old Common Stock Options"** means all options, warrants and rights (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable or otherwise, to acquire shares of Old Common Stock or other equity interests in IBC.

**1.120 "Old Convertible Note Indenture"** means the Old Convertible Notes indenture dated as of August 12, 2004, among IBC, the guarantors party thereto and the Old Convertible Note Indenture Trustee.

**1.121 "Old Convertible Note Indenture Trustee"** means U.S. Bank National Association, as trustee under the Old Convertible Note Indenture.

**1.122 "Old Convertible Note Indenture Trustee Fee Claim"** means the reasonable fees and expenses of the Old Convertible Note Indenture Trustee incurred by the Old Convertible Note Indenture Trustee during the Chapter 11 Cases through the Effective Date in an amount not to exceed $890,000.

**1.123 "Old Convertible Notes"** means the 6% senior subordinated convertible notes due August 15, 2014, dated as of August 12, 2004, in the aggregate principal amount of $100 million, issued by IBC pursuant to the Old Convertible Note Indenture.

**1.124 "Old Convertible Notes Claim"** shall mean the allowed Class 9 General Unsecured Claim of the Old Convertible Note Indenture Trustee on behalf of the holders of Old Convertible Notes in the Allowed amount of $100,649,000.

**1.125 "Ordinary Course Professional Order"** means the Bankruptcy Court's Order Under 11 U.S.C. § 327 of the Bankruptcy Code Authorizing the Debtors to Employ Professionals Utilized in the Ordinary Course of Business (Docket No. 408).

**1.126 "Organizational Documents"** means the bylaws, articles of incorporation, corporate charters, certificates of formation, limited liability agreements or other documents or agreements that govern or affect the corporate formation and governance of the Debtors (or any of them) and the Reorganized Debtors (or any of the them) including, without limitation, the Stockholders' Agreement.

**1.127 "Other Priority Claim"** means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim.

**1.128 "Pension Plans"** means the American Bakers Association Retirement Plan and the IBC Defined Benefit Plan, two defined-benefit pension plans sponsored

by the Debtors and covered by Title IV of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1301-1461 (2000 and Supp. V. 2005).

**1.129  "Periodic Distribution Date"** means (a) the Distribution Date, as to the first distribution made by the Reorganized Debtors, and (b) thereafter, (i) the first Business Day occurring ninety (90) days after the Distribution Date and (ii) subsequently, the first Business Day occurring ninety (90) days after the immediately preceding Periodic Distribution Date.

**1.130  "Permitted Affiliate"** means (a) any affiliate of a Term Loan Facility Lender whose identity has been disclosed in writing to Equity Investors in writing prior to September 12, 2008 and (b) any other affiliate of a Term Loan Facility Lender reasonably acceptable to Equity Investors.

**1.131  "Person"** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other entity.

**1.132  "Petition Date"** means the date on which each Debtor filed its voluntary petition commencing its Chapter 11 Case, that is (a) with respect to all of the Debtors other than Mrs. Cubbison's, September 22, 2004 and (b) with respect to Mrs. Cubbison's, January 14, 2006.

**1.133  "Plan"** means this joint plan of reorganization, which is jointly proposed by the Debtors for the resolution of outstanding Claims and Interests in the Chapter 11 Cases, as such plan may be further amended from time to time in accordance with the Bankruptcy Code, Bankruptcy Rules and Section 14.2, and the exhibits hereto.

**1.134  "Plan Supporter"** means each Prepetition Lender that is a signatory to Annex I or Annex I-A (in each case, as amended from time to time) to the Commitment Letter as of the Effective Date.

**1.135  "Postpetition Interest"** means, collectively, such interest, reasonable fees, costs, or charges provided for under the agreements between a Debtor and a Claimholder whose Claim is secured by property of the Estates to the extent such items have accrued and are payable pursuant to the provisions of the Bankruptcy Code including, without limitation, section 506(b) of the Bankruptcy Code.

**1.136  "Prepetition Agent"** means the administrative agent for the Prepetition Lenders under the Prepetition Credit Agreement.

**1.137  "Prepetition Credit Agreement"** means the collective reference to that certain Amended and Restated Credit Agreement, dated as of April 25, 2002, as

amended, supplemented or otherwise modified from time to time, by and among Brands and Interstate Brands West Corporation (which was subsequently merged into Interstate Bakeries Corporation), as borrowers, the banks and other financial institutions from time to time thereto, and JPMCB, as administrative agent, all letters of credit issued thereunder, and any collateral or security documents related to the foregoing.

1.138  **"Prepetition Credit Facility"** means the financing accommodations evidenced by the Prepetition Credit Agreement and related documents.

1.139  **"Prepetition Investors"** means Silver Point, Monarch Alternative Capital L.P. and McDonnell Investment Management LLC and their respective Affiliates and managed funds.

1.140  **"Prepetition LC"** has the meaning ascribed to it in Section 4.7 hereof.

1.141  **"Prepetition Lender Actions"** means the collective reference to that certain First Amended and Restated Complaint to Avoid and Recover Certain Transfers and for Judgment (Adv. Pro. 06-04192) filed with the Bankruptcy Court and any claims or Causes of Action preserved pursuant to that certain Agreed Order Extending the Challenge Deadline, ordered by the Bankruptcy Court on April 24, 2007 (Docket No. 8848).

1.142  **"Prepetition Lender Claims"** mean all Claims of the Prepetition Agent and the Prepetition Lenders arising under or pursuant to the Prepetition Credit Facility including, without limitation, the Claim of the Prepetition Lenders for Postpetition Interest whether calculated at the default or non-default rate.

1.143  **"Prepetition Lenders"** means those Persons holding a Prepetition Lender Claim.

1.144  **"Prepetition Lenders Plan Distribution Property"** means (a) the New Third Lien Term Loan, (b) $85,800,00 in aggregate principal amount of the New Convertible Secured Notes and (c) the Series E Warrants.

1.145  **"Priority Claim"** means a Claim entitled to priority pursuant to section 507 of the Bankruptcy Code.

1.146  **"Priority Tax Claim"** means a Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

1.147  **"Pro Rata"** means, from time to time, unless this Plan specifically provides otherwise, with respect to Claims, the proportion that the Face Amount of a Claim in a particular Class bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class.

**1.148** **"Professional"** means those Persons employed in the Chapter 11 Cases pursuant to sections 327 and 1103 of the Bankruptcy Code, or otherwise; provided, however, that "Professional" does not include those Persons retained pursuant to the Ordinary Course Professional Order.

**1.149** **"Professional Claim"** means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services rendered or expenses incurred after the Petition Date and prior to and including the Effective Date.

**1.150** **"Professional Fee Order"** means the order entered by the Bankruptcy Court on October 25, 2004, authorizing the interim payment of Professional Claims subject to the Holdback Amount.

**1.151** **"Reclamation Claim"** means a Claim administered, determined and allowed by agreement between the Debtors and a party asserting a reclamation claim, all as contemplated pursuant to the Reclamation Order.

**1.152** **"Reclamation Order"** means that certain Order Under 11 U.S.C. §§ 362, 503 and 546 (A) Providing Administrative Expense Treatment for Certain Holders of Valid Reclamation Claims and (B) Establishing Procedures for Resolution and Payment of Reclamation Claims entered by the Bankruptcy Court on November 12, 2004, whereby IBC established procedures for determining the validity and extent of reclamation claims.

**1.153** **"Reconstitution Order"** means that certain Order Pursuant to Bankruptcy Rule 9019, sections 105, 1107 and 1108 of the Bankruptcy Code, and section 303 of the Delaware General Corporation Law Approving A Proposed Settlement Reconstituting the Board of Directors of Interstate Bakeries Corporation and Granting Certain Related Relief entered by the Bankruptcy Court on January 5, 2007, whereby IBC reconstituted its board of directors.

**1.154** **"Reinstated"** or **"Reinstatement"** means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Claimholder so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the Claimholder to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Claimholder for any damages incurred as a result of any reasonable reliance by such Claimholder on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Claimholder; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited

A-19

to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, "going dark" provisions, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated in order to accomplish Reinstatement.

**1.155  "Released Parties"** means, collectively, (a) the Debtors, the officers, directors and managing members of the Debtors who were either serving in such capacities as of the Confirmation Date, or who had served in such capacities during the Chapter 11 Cases, (b) the Reorganized Debtors, (c) the officers, directors and managing members of the Reorganized Debtors serving in such capacity after the Effective Date, (d) the DIP Lenders, (e) the Prepetition Lenders, (f) the Plan Supporters, (g) the Prepetition Investors, (h) Silver Point, (i) the Term Loan Facility Lenders, (j) JPMCB and J.P. Morgan Securities Inc., (k) Equity Investors, (l) the Creditors' Committee, and each of its members in their capacity as such, and (m) with respect to each of the Persons named in (a) – (l) above, such Person's Affiliates, principals, employees, agents, officers, directors, financial advisors, attorneys and other professionals, and any of their successors and assigns, when acting in any of such capacities.

**1.156  "Reorganized . . ."** means the applicable Debtor from and after the Effective Date.

**1.157  "Reorganized Debtors"** means, collectively, all Debtors from and after the Effective Date.

**1.158  "Restructuring Transaction(s)"** means a dissolution or winding up of the corporate existence of a Debtor or the consolidation, merger, contribution of assets, or other transaction in which a Reorganized Debtor merges with or transfers substantially all of its assets and liabilities to a Reorganized Debtor or their Affiliates, on or after the Effective Date, as set forth in the Restructuring Transactions Notice.

**1.159  "Restructuring Transactions Notice"** means the notice filed with the Bankruptcy Court on or before the Exhibit Filing Date as Exhibit I to this Plan listing the restructuring Debtors and briefly describing the relevant Restructuring Transactions.

**1.160  "Retained Actions"** means any and all Causes of Actions other than the Trust Claims, the Prepetition Lender Actions and any other Cause of Action otherwise assertable against the Prepetition Lenders.  A nonexclusive list of the Retained Actions is attached hereto as Exhibit A-1.

**1.161  "SERP"** means that certain Supplemental Executive Retirement Plan maintained by the Debtors prior to the Petition Date, which provides retirement benefits to certain officers and other select employees, pursuant to which IBC agreed

A-20

to pay certain key executives and managers who retire after age 60 an annual retirement benefit equal to 1.8% of the participant's average annual base salary received during the 60 months immediately preceding retirement, for each year of service to IBC, up to 20 years.

**1.162 "Scheduled"** means, with respect to any Claim or Interest, the status, priority and amount, if any, of such Claim or Interest as set forth in the Schedules.

**1.163 "Schedules"** means the schedules of assets and liabilities and the statements of financial affairs filed in the Chapter 11 Cases by the Debtors, as such schedules or statements have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

**1.164 "Secured Claim"** means a Claim, other than a Prepetition Lender Claim, that is secured by a Lien which is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, on property in which an Estate has an interest, or a Claim that is subject to setoff under section 553 of the Bankruptcy Code; to the extent of the value of the holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable; as determined by a Final Order pursuant to section 506(a) of the Bankruptcy Code, or in the case of setoff, pursuant to section 553 of the Bankruptcy Code, or in either case as otherwise agreed upon in writing by the Debtors or the Reorganized Debtors and the holder of such Claim.

**1.165 "Secured Tax Claim"** means a Secured Claim arising prior to the Petition Date against any of the Debtors for taxes owed to a governmental unit.

**1.166 "Security"** shall have the meaning ascribed to it in section 101(49) of the Bankruptcy Code.

**1.167 "Series A Warrants"** means the warrants (in the form attached to the Investment Agreement) issued to Equity Investors that will entitle holders to receive, upon the exercise of all Series A Warrants, 13.5% of the fully diluted equity interests of Reorganized IBC (calculated as of the Effective Date).

**1.168 "Series B Warrants"** means the warrants (in the form attached to the Investment Agreement) issued to the Term Loan Facility Lenders (or their Permitted Affiliates) that will entitle holders to receive, upon the exercise of all Series B Warrants, 1.917% of the fully diluted equity interests of Reorganized IBC (calculated as of the Effective Date).

**1.169 "Series C Warrants"** means the warrants (in the form attached to the Investment Agreement) issued to the Term Loan Facility Lenders (or their Permitted Affiliates) that will entitle holders to receive, upon exercise of all Series C Warrants,

2.837% of the fully diluted equity interests of Reorganized IBC (calculated as of the Effective Date).

**1.170 "Series D Warrants"** means the warrants (in the form attached to the Investment Agreement) issued to Equity Investors that will entitle holders to receive, upon the exercise of all Series D Warrants, 1.5% of the fully-diluted equity interests of Reorganized IBC (calculated as of the Effective Date).

**1.171 "Series E Warrants"** means the warrants (in the form attached to the Investment Agreement) issued to the Prepetition Lenders that will entitle holders to receive, upon the exercise of all Series E Warrants, 1.5% of the fully-diluted equity interests of Reorganized IBC (calculated as of the Effective Date).

**1.172 "Servicer"** means the Old Convertible Note Indenture Trustee with respect to the Old Convertible Note Indenture or any other agent or servicer under any other agreement that governs the rights of a Claimholder .

**1.173 "Silver Point"** means Silver Point Finance, LLC and its respective Affiliates and managed funds.

**1.174 "Stockholders' Agreement"** means the agreement that each holder of New Common Stock, including those holders receiving shares upon the conversion of any New Convertible Secured Notes or the exercise of any Warrant, shall be required to execute.  A form of the Stockholders' Agreement is set forth at Exhibit J.

**1.175 "Solicitation Procedures Order"** means the order of the Bankruptcy Court approved on October 30, 2008 pursuant to which the Bankruptcy Court, inter alia, approved the Disclosure Statement and set various procedures for soliciting and tabulating votes on this Plan.

**1.176 "Subordinated Debt Securities Claim"** means a Claim subject to subordination under section 510(b) of the Bankruptcy Code that arises from the rescission of a purchase or sale of a debt Security of any Debtor (including, but not limited to, Old Convertible Notes), or for damages arising from the purchase or sale of such debt Security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

**1.177 "Subordinated Equity Securities Claim"** means a Claim subject to subordination under section 510(b) of the Bankruptcy Code that arises from the rescission of a purchase or sale of an equity Security of any Debtor (including, but not limited to, Old Common Stock and Old Common Stock Options), or for damages arising from the purchase or sale of such equity Security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

**1.178 "Subordinated Securities Claim"** means, collectively, all Subordinated Debt Securities Claims and all Subordinated Equity Securities Claims.

**1.179 "Subsidiary Debtors"** means, collectively, Armour and Main Redevelopment Corporation; Baker's Inn Quality Baked Goods, LLC; Brands; IBC Sales Corporation; IBC Services, LLC; IBC Trucking, LLC; New England Bakery Distributors, L.L.C.; and Mrs. Cubbison's.

**1.180 "Subsidiary Interests"** means, collectively, all of the issued and outstanding shares of stock, membership interests, other equity interests or other instruments evidencing an ownership interest in any Subsidiary Debtor as of the Effective Date, and all options, warrants and rights (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable or otherwise, to acquire shares of stock, membership interests or other equity interests in the Subsidiary Debtors, as of the Effective Date, which stock, interests, options, warrants and rights are owned directly or indirectly by IBC.

**1.181 "Term Loan Facility"** means the five-year term loan facility by and among IBC, Brands and the Term Loan Facility Lenders in the principal amount of $344,000,000; provided, however, the principal amount of the Term Loan Facility may be increased (with a corresponding reduction in the amount of the New Third Lien Term Loan on a dollar-for-dollar basis) in accordance with numbered paragraph 19 of the Commitment Letter and Exhibit J to the Commitment Letter subject to the consent of the Term Loan Facility Commitment Parties.

**1.182 "Term Loan Facility Commitment Fee"** means the commitment fee payable by the Debtors or Reorganized Debtors to the Term Loan Facility Commitment Parties under the terms of the Term Loan Facility Commitment Papers, in the amount of $16,800,000, and the paid-in-kind incremental facility fee (as described in the Term Loan Facility Commitment Papers).

**1.183 "Term Loan Facility Commitment Papers"** means that certain commitment letter by and among Silver Point Finance, LLC, Monarch, Brands and IBC, dated September 12, 2008 (together with the exhibits and annexes attached thereto and as amended, restated, modified or otherwise supplemented from time to time in accordance with the terms thereof) together with that certain fee letter by and among Silver Point, Monarch, Brands and IBC, dated September 12, 2008 (as amended, restated, modified or otherwise supplemented from time to time in accordance with the terms thereof), in each case, for the Term Loan Facility.

**1.184 "Term Loan Facility Commitment Parties"** shall mean Silver Point and Monarch.

**1.185 "Term Loan Facility Lenders"** means Silver Point, Monarch Alternative Capital L.P., McDonnell Investment Management LLC, and each other

Prepetition Lender or other Person that participates in the Term Loan Facility, and their respective affiliates and managed funds.

1.186 **"Tolling Agreement"** means an agreement executed by and among either the Debtors or third party claimants tolling the applicable statute of limitations with respect to a Claim or Cause or Action.

1.187 **"Transaction"** means the consummation of the Plan and all related transactions contemplated by the Plan, the Commitment Letter and the Investment Agreement (including the exhibits and annexes attached hereto and thereto, and as amended, restated, supplemented or otherwise modified from time to time in accordance with the Commitment Letter and the Investment Agreement).

1.188 **"Trust Advisory Board"** means the board that is to be created pursuant to Section 10.4 of this Plan for the purpose of advising the Trustee with respect to decisions affecting the Creditors' Trust to the extent set forth in the Trust Agreement.

1.189 **"Trust Agreement"** means that certain Trust Agreement which is to govern the Creditors' Trust, substantially in the form attached as Exhibit K to this Plan, pursuant to which, among other things, the Trust Assets shall be liquidated, as applicable, and the proceeds distributed to the Trust Beneficiaries on a pro rata basis without regard to whether multiple obligors exist with respect to a Trust Beneficiary's Claim.

1.190 **"Trust Assets"** means $5,000,000 in Cash, the Trust Claims, the Trust Stock Appreciation Rights, and any and all proceeds of the foregoing and interest or income accruing with respect thereto.

1.191 **"Trust Avoidance Claims"** means the Avoidance Claims that are specifically listed on Exhibit A-2 hereto, or as are otherwise agreed to by Equity Investors and the Creditors' Committee, which claims are to be transferred to the Creditors' Trust on the Effective Date (as opposed to all other Avoidance Claims, which will be retained by the Reorganized Debtors).

1.192 **"Trust Beneficiary"** means a holder of an Allowed General Unsecured Claim; provided, however, that any Prepetition Lender who holds an Allowed General Unsecured Claim on account of Claims arising under the Prepetition Credit Agreement shall not be a Trust Beneficiary for purposes hereof.

1.193 **"Trust Claims"** shall mean the D&O Claims and the Trust Avoidance Claims.

1.194 **"Trust Stock Appreciation Rights"** means cash-settled stock appreciation rights, with a strike price equal to $15.00, equaling 3% of the fully-

diluted equity interests of the Reorganized Company as of the Effective Date, the other terms of which shall be the same as the stock appreciation rights to be distributed to the Reorganized Debtors' unionized workforce. The Debtors shall deliver a description of such terms to the Creditors' Committee on or before the Exhibit Filing Date, if available, but in any case, no later than three (3) days prior to the first day set for the Confirmation Hearing provided that the Debtors and the Creditors' Committee have first agreed that such description shall be kept confidential.

 1.195 **"Trustee"** means the trustee of the Creditors' Trust as contemplated by the Trust Agreement and designated pursuant to Section 10.1 of this Plan and section 1123(b)(3) of the Bankruptcy Code.

 1.196 **"Trustee Professionals"** has the meaning ascribed to it in subsection 10.3(d) hereof.

 1.197 **"Unimpaired"** refers to any Claim which is not Impaired.

 1.198 **"Union Contracts"** means those certain collectively bargained labor contracts among Brands and the various unions duly organized and representing certain of Brands' employees that are in full force and effect on the Effective Date, and any related modification agreement, extension agreement and side agreement duly executed by Brands.

 1.199 **"Voting Deadline"** means December 1, 2008, at 4:00 p.m. (Pacific time).

 1.200 **"Warrants"** means the Series A Warrants, the Series B Warrants, the Series C Warrants, the Series D Warrants and the Series E Warrants.

 1.201 **"Workers' Compensation Claim"** means a Claim held by an employee or former employee of the Debtors (or any of them) for workers' compensation coverage under the workers' compensation program applicable in the particular state in which the employee is employed by the Debtors.

## C.   Rules of Interpretation

 For purposes of this Plan (a) any reference in this Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be in such form or on such terms and conditions, (b) any reference in this Plan to an existing document or Exhibit filed or to be filed means such document or Exhibit as it may have been or may be amended, modified or supplemented, (c) unless otherwise specified, all references in this Plan to Sections, Articles, Schedules and Exhibits are references to Sections, Articles, Schedules and Exhibits of or to this Plan, (d) the

words "herein" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan, (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan, (f) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply, (g) to the extent the Disclosure Statement is inconsistent with the terms of this Plan, this Plan shall control, (h) to the extent this Plan is inconsistent with the Confirmation Order, the Confirmation Order shall control, and (i) to the extent this Plan is inconsistent with the transaction documents for the Transaction, the transaction documents shall control.

### D.    Computation of Time

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

### E.    Exhibits

All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or before the Exhibit Filing Date.  After the Exhibit Filing Date, copies of Exhibits can be obtained upon written request to Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60606 (Attn: J. Eric Ivester, Esq.), counsel to the Debtors.  In addition, imaged copies of the Exhibits will be available on the Bankruptcy Court's website, www.mow.uscourts.gov, for a nominal charge (a PACER account is required), or at the Voting Agent's general website address, http://www.kccllc.net/ibc, free of charge.  To the extent any Exhibit is inconsistent with the terms of the body of this Plan, unless otherwise ordered by the Bankruptcy Court, the terms of the relevant Exhibit shall control.

## ARTICLE II

## ADMINISTRATIVE EXPENSES
## AND PRIORITY TAX CLAIMS

**2.1    Administrative Claims**.  Subject to the provisions of Article IX of this Plan, on the first Periodic Distribution Date occurring after the later of (a) the date an Administrative Claim becomes an Allowed Administrative Claim or (b) the date an Administrative Claim becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the holder of such Administrative Claim, an Allowed Administrative Claimholder in any Debtor's Chapter 11 Case shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Administrative Claim, (x) Cash equal to the unpaid portion of such Allowed Administrative Claim or (y) such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder shall have agreed upon in writing;

provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto; provided further, however, that in no event shall a postpetition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; provided further, however, that Reclamation Claims allowed pursuant to the procedures set forth in the Reclamation Order shall be paid in Cash on the Distribution Date or as soon thereafter as is practical.

      **2.2**    **Priority Tax Claims**.  With respect to each Allowed Priority Tax Claim in any Debtor's Chapter 11 Case, at the sole option of the Debtors (or the Reorganized Debtors), the Allowed Priority Tax Claimholder shall be entitled to receive on account of such Priority Tax Claim, in full satisfaction, settlement, release, and discharge of and in exchange for such Priority Tax Claim, (a) equal Cash payments made on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding six years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (b) such other treatment agreed to by the Allowed Priority Tax Claimholder and the Debtors (or the Reorganized Debtors), provided such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors) than the treatment set forth in subsection (a) above, or (c) payment in full in Cash.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

      **3.1**    **Introduction**.

      Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class for purposes of voting on this Plan and of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims

and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified, and their treatment is set forth in Article II herein.

This Plan, though proposed jointly, constitutes a separate plan proposed by each Debtor.  Therefore, except as expressly provided in Section 3.3 herein, the classifications set forth in Section 3.2 herein shall be deemed to apply separately with respect to each plan proposed by each Debtor.

**3.2      Classification of Claims Against and Interests In the Main Debtors**.

(a)      Unimpaired Classes of Claims Against and Interests In the Main Debtors (deemed to have accepted this Plan and, therefore, not entitled to vote).

(i)      Class 1 – Secured Tax Claims.  Class 1 consists of all Secured Tax Claims.

(ii)      Class 2 – Secured Claims.  Class 2 consists of each separate subclass for each Secured Claim.  Each subclass is deemed to be a separate Class for all purposes under the Bankruptcy Code.

(iii)      Class 3 – Other Priority Claims.  Class 3 consists of Other Priority Claims.

(iv)      Class 4 – Intercompany Claims.  Class 4 consists of all Intercompany Claims.

(v)      Class 5 – Workers' Compensation Claims.  Class 5 consists of all Workers' Compensation Claims.

(vi)      Class 6 – Subsidiary Interests.  Class 6 consists of Subsidiary Interests, except for Interests in Brands Preferred Stock.

(b)      Impaired Classes of Claims Against and Interests In the Main Debtors (entitled to vote on this Plan).

(i)      Class 7 – Capital Lease Claims.  Class 7 consists of separate subclasses for the secured portion of each Capital Lease Claim.  Each subclass is deemed to be a separate Class for all purposes under the Bankruptcy Code.  The unsecured portion of each Capital Lease Claim shall be classified and treated as Class 9 General Unsecured Claims.

(ii)      Class 8 – Prepetition Lender Claims.  Class 8 consists of the Prepetition Lender Claims.

A-28

(c)      Impaired Classes of Claims Against and Interests In the Main Debtors (deemed to have rejected this Plan and therefore not entitled to vote on this Plan).

(i)      Class 9 – General Unsecured Claims.  Class 9 consists of the General Unsecured Claims, including Deficiency Claims.

(ii)      Class 10 – Subordinated Securities Claims. Class 10 consists of two separate subclasses for the Subordinated Securities Claims. Each subclass is deemed to be a separate Class for all purposes under the Bankruptcy Code.  Both subclasses are deemed to have rejected this Plan and, therefore, neither subclass is entitled to vote.

(1)      Class 10a – Subordinated Debt Securities Claims.  Class 10a consists of all Subordinated Debt Securities Claims that may exist against a particular Debtor.

(2)      Class 10b – Subordinated Equity Securities Claims.  Class 10b consists of all Subordinated Equity Securities Claims that may exist against a particular Debtor.

(iii)      Class 11 – Interests in Brands Preferred Stock.  Class 11 consists of Interests in Brands Preferred Stock.

(iv)      Class 12 – Interests in IBC.  Class 12 consists of Interests in IBC.

**3.3      Classification of Claims Against and Interests In Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery.**

(a)      Unimpaired Classes of Claims Against and Interests (deemed to have accepted these Plans and, therefore, not entitled to vote).

(i)      Class 1 – Other Priority Claims.  As to the separate Plans of each of Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery, Class 1 consists of Other Priority Claim.

(ii)      Class 2 – Intercompany Claims.  As to the separate Plans of each of Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery, Class 2 consists of all Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery Intercompany Claims, respectively.

(iii)      Class 3 – Interests.  As to the separate Plans of each of Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery,

Class 3 consists of all Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery Interests, respectively.

(b)    Impaired Classes of Claims (Classes 4 and 5 are entitled to vote on this Plan).

(i)    Class 4 –Trade Claims.  As to the separate Plans of each of Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery, Class 4 consists of all Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery Trade Claims, respectively.

(ii)    Class 5 –General Unsecured Claims.  As to the separate Plans of each of Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery, Class 5 consists of all Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery General Unsecured Claims, respectively.

## ARTICLE IV

## <u>PROVISIONS FOR TREATMENT OF</u><br><u>CLAIMS AND INTERESTS</u>

**4.1    Treatment of Claims Against and Interests In the Main Debtors**.

(a)    Class 1 (Secured Tax Claims).  Except as otherwise provided in and subject to Section 8.7 herein, on the first Periodic Distribution Date occurring after the later of (a) the date a Secured Tax Claim becomes an Allowed Secured Tax Claim or (b) the date a Secured Tax Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such Secured Tax Claim, the holder of such Class 1 Secured Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Secured Tax Claim, (x) Cash equal to the amount of such Allowed Secured Tax Claim or (y) such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder shall have agreed in writing, provided <u>that</u> such treatment is not more favorable than the treatment in clause (x) above.  The Debtors' failure to object to a Secured Tax Claim in the Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the holder of the Secured Tax Claim.

(b)    Class 2 (Secured Claims).  Except as otherwise provided in and subject to Section 8.7 herein, on the first Periodic Distribution Date occurring after the later of (a) the date a Secured Claim becomes an Allowed Secured Claim or (b)

the date a Secured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such Secured Claim, the Debtors (or Reorganized Debtors) shall, in full satisfaction, settlement, release, and discharge of and in exchange for such Class 2 Secured Claim, (x) pay Cash equal to the amount of such Allowed Secured Claim, (y) return the collateral to the secured creditor with respect to such Secured Claim, or (z) reinstate such Secured Claim in accordance with the provisions of subsection 1124(2) of the Bankruptcy Code.  The Debtors' failure to object to a Secured Claim in the Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Reorganized Debtors) when and if such Claim is sought to be enforced by the holder of the Secured Claim.

(c)     Class 3 (Other Priority Claims).  Except as otherwise provided in and subject to Section 8.7 herein, on the first Periodic Distribution Date occurring after the later of (a) the date an Other Priority Claim becomes an Allowed Other Priority Claim or (b) the date an Other Priority Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such Other Priority Claim, each Class 3 Other Priority Claimholder shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Priority Claim, (x) Cash in an amount equal to the amount of such Allowed Other Priority Claim or (y) such other treatment as to which the Debtors (or the Reorganized Debtors) and such Claimholder shall have agreed upon in writing, provided that such treatment is not more favorable than the treatment in clause (x) above.  The Debtors' failure to object to an Other Priority Claim in the Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Debtors or the Reorganized Debtors) when and if such Claim is sought to be enforced by the holder of the Other Priority Claim.

(d)     Class 4 (Intercompany Claims).  Each Intercompany Claim will, in the sole discretion of the applicable Debtor or Reorganized Debtor holding such Claim, be (a) released, waived and discharged as of the Effective Date, (b) contributed to the capital of the obligor corporation, (c) dividended, or (d) remain unimpaired; provided that the applicable Debtor or Reorganized Debtor shall seek the consent of Equity Investors and the Prepetition Investors with respect to the treatment of each Intercompany Claim, with such consent not to be unreasonably withheld.

(e)     Class 5 (Workers' Compensation Claims).  The Reorganized Debtors shall pay all Workers' Compensation Claims that are determined to be valid under applicable state law and the corresponding programs maintained by the Debtors in accordance with the terms and conditions of such state law and such programs. Nothing in this Plan shall be deemed to discharge, release, or relieve the Debtors or

A-31

the Reorganized Debtors from any current or future liability with respect to any valid Workers' Compensation Claim, regardless of when the underlying injuries occurred. All payments of Workers' Compensation Claims made by the Debtors during the pendency of the Chapter 11 Cases are hereby ratified. The Debtors' failure to object to a Workers' Compensation Claim in the Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the Reorganized Debtors) when and if such Claim is sought to be enforced by the holder of the Workers' Compensation Claim.

(f)    Class 6 (Subsidiary Interests).    Class 6 Subsidiary Interests shall be unaffected by this Plan, except to the extent required by the Restructuring Transactions.

(g)    Class 7 (Capital Lease Claims).    Except as otherwise provided herein and subject to Section 8.7, on the first Periodic Distribution Date occurring after the later of (a) the date a Capital Lease Claim becomes an Allowed Capital Lease Claim or (b) the date a Capital Lease Claim becomes payable pursuant to any agreement between the Debtors and the holder of such Capital Lease Claim, the holder of such Class 7 Capital Lease Claim, in full satisfaction, settlement, release and discharge of and in exchange for such Class 7 Capital Lease Claim shall, in the sole discretion of the Debtors, (w) receive deferred Cash payments totaling at least the allowed amount of such Allowed Class 7 Capital Lease Claim, (x) upon abandonment by the Debtors, receive the collateral with respect to such Capital Lease Claim, (y) have such Class 7 Capital Lease Claim reinstated in accordance with the provisions of subsection 1124(2) of the Bankruptcy Code, or (z) receive such other treatment as the Debtors and such Claimholder shall have agreed upon in writing as announced at or prior to the Confirmation Hearing.

(h)    Class 8 (Prepetition Lender Claims).    Notwithstanding any provision to the contrary herein, upon entry of the Confirmation Order, all Prepetition Lender Claims (excluding liability of the Debtors to the Prepetition Lenders for undrawn, outstanding letters of credit) shall be allowed in full in the aggregate amount of $451,486,946 (or such greater amount as may be applicable in the event that a letter of credit outstanding under the Prepetition Credit Agreement is drawn after the date of this Plan) and shall constitute Allowed Claims for all purposes in these Chapter 11 Cases, not subject to defense, offset, counterclaim, recoupment, reduction, subordination or recharacterization by the Debtors or any party in interest.

On the Effective Date, each holder of an Allowed Prepetition Lender Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Claim, its Pro Rata share of each component of the Prepetition Lenders Plan Distribution Property, with the amount of each Claimholder's Pro Rata share to be determined by a fraction, the numerator of which is equal to the amount of such

Claimholder's Allowed Prepetition Lender Claim, and the denominator of which is equal to the aggregate amount of all Allowed Prepetition Lender Claims. Adequate Protection Claims shall be deemed satisfied in full by payments made pursuant to and in accordance with the DIP Facility Order.

On the Effective Date, each issued and outstanding letter of credit under the Prepetition Credit Agreement (each a "Prepetition LC") shall be replaced and cancelled, secured by "back up" letters of credit issued by an institution acceptable to the issuer of the Prepetition LC, or cash collateralized at 105% of the face amount of each Prepetition LC on terms in form and substance (a) satisfactory to the bank issuer of such Prepetition LC and (b) reasonably satisfactory to Equity Investors and the Prepetition Investors.

(i)     Class 9 (General Unsecured Claims). Holders of General Unsecured Claims against the Main Debtors shall neither receive nor retain any property on account of their Claims.

(j)     Class 10a (Subordinated Debt Securities Claims). Subordinated Debt Securities Claims shall be cancelled, released, and extinguished. Holders of Subordinated Debt Securities Claims shall neither receive nor retain any property on account of their Claims.

(k)     Class 10b (Subordinated Equity Securities Claims). Subordinated Equity Securities Claims shall be cancelled, released, and extinguished. Holders of Subordinated Equity Securities Claims shall neither receive nor retain any property on account of their Claims.

(l)     Class 11 (Interests in Brands Preferred Stock). Interests in Brands Preferred Stock shall be cancelled, released, and extinguished, and holders of such Interests shall neither receive nor retain any property on account of such Interests.

(m)     Class 12 (Interests in IBC). Interests in IBC shall be cancelled, released, and extinguished, and holders of such Interests shall neither receive nor retain any property on account of such Interests.

**4.2     Treatment of Claims Against and Interests In Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery**.

(a)     Class 1 (Other Priority Claims). Except as otherwise provided in and subject to Section 8.7 herein, on the first Periodic Distribution Date occurring after the later of (a) the date an Other Priority Claim becomes an Allowed Other Priority Claim or (b) the date an Other Priority Claim becomes payable pursuant to any agreement between Mrs. Cubbison's (or Reorganized Mrs. Cubbison's), Armour & Main Redevelopment (or Reorganized Armour & Main Redevelopment) or New

England Bakery (or Reorganized New England Bakery), as applicable, and the holder of such Other Priority Claim, each Class 1 Other Priority Claimholder shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Priority Claim, (x) Cash in an amount equal to the amount of such Allowed Other Priority Claim or (y) such other treatment as to which Mrs. Cubbison's (or Reorganized Mrs. Cubbison's), Armour & Main Redevelopment (or Reorganized Armour & Main Redevelopment) or New England Bakery (or Reorganized New England Bakery), as applicable, and such Claimholder shall have agreed upon in writing, provided that such treatment is not more favorable than the treatment in clause (x) above.  The Debtors' failure to object to an Other Priority Claim in the Chapter 11 Cases shall be without prejudice to Reorganized Mrs. Cubbison's, Reorganized Armour & Main Redevelopment's, or Reorganized New England Bakery's, as applicable, right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum (at the option of the applicable Debtor or Reorganized Debtor) when and if such Claim is sought to be enforced by the holder of the Other Priority Claim.

(b)     Class 2 (Intercompany Claims).     Each Mrs. Cubbison's Intercompany Claim, Armour & Main Redevelopment Intercompany Claim and New England Bakery Intercompany Claim will, in the sole discretion of the applicable Debtor or Reorganized Debtor holding such Claim, be (a) released, waived and discharged as of the Effective Date, (b) contributed to the capital of the obligor corporation, (c) dividended, or (d) remain unimpaired; provided that the applicable Debtor or Reorganized Debtor shall seek the consent of Equity Investors and the Prepetition Investors with respect to the treatment of each such Claim, with such consent not to be unreasonably withheld.

(c)     Class 3 (Interests).  Class 3 Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery Interests shall be unaffected by this Plan, except to the extent required or permitted by the Restructuring Transactions or as may be required in the event the Mrs. Cubbison's Substantive Consolidation Motion, Armour & Main Redevelopment Substantive Consolidation Motion or New England Bakery Substantive Consolidation Motion is prosecuted to conclusion.

(d)     Class 4 (Trade Claims).     Unless the holder of a Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery Trade Claim and the applicable Debtor agree to a different treatment, on the Effective Date, each holder of a Allowed Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery Trade Claim shall have its Claim paid in full in Cash (not including accrued post-petition interest).

(e)     Class 5 (General Unsecured Claims).     If Class 5 Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery General Unsecured Claims votes to accept the applicable Plan and such Plan is confirmed, the

Debtors will withdraw the Mrs. Cubbison's Substantive Consolidation Motion, Armour & Main Redevelopment Substantive Consolidation Motion, or New England Bakery Substantive Consolidation Motions, as applicable, with prejudice, and, on the Effective Date or as soon thereafter as is reasonable and practicable, each holder of an Allowed Class 5 Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery General Unsecured Claim, as applicable, shall be entitled to receive such holder's Pro Rata share of the Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery General Unsecured Claims Distribution Property, as applicable, or (b) if Class 5 Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery General Unsecured Claims does not vote to accept the applicable Plan or if the applicable Plan is not confirmed, then, the Debtors shall prosecute the Mrs. Cubbison's, Armour & Main Redevelopment, or New England Bakery Substantive Consolidation Motion, as applicable, and, if such motion is granted, the holders of Claims against, and Interests in, the Debtors to which such motion(s) apply shall receive the same treatment as holders of Claims against, and Interests in, IBC under the Plan with respect to IBC.

### 4.3    Special Provisions Regarding Insured Claims.

(a)    Distributions under this Plan to each holder of an Insured Claim shall be in accordance with the treatment provided under this Plan for General Unsecured Claims; provided, however, that the maximum amount of any Claim under this Plan on account of an Allowed Insured Claim upon which a distribution shall be made shall be limited to an amount equal to the applicable self-insured retention under the relevant insurance policy; provided further, however, that, to the extent a holder has an Allowed Insured Claim the amount of which exceeds the total coverage available from the relevant insurance policies of the Debtors, such holder shall have an Allowed General Unsecured Claim in the amount by which such Allowed Insured Claim exceeds the coverage available from the relevant Debtors' insurance policies. Nothing in this section shall constitute a waiver or release of any Retained Actions or Avoidance Claims the Debtors may hold against any Person, including the Debtors' insurance carriers; and nothing in this section is intended to, shall, or shall be deemed to preclude any holder of an Allowed Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any distribution such holder may receive under this Plan; provided, however, that the Debtors do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the Estates to which they are entitled.

(b)    This Plan shall not expand the scope of, or alter in any other way, the rights and obligations of the Debtors' insurers under their policies, and the Debtors' insurers shall retain any and all defenses to coverage that such insurers may have, including the right to contest and/or litigate with any party, including the Debtors, the existence, primacy and/or scope of available coverage under any alleged applicable policy. This Plan shall not operate as a waiver of any other Claims the

Debtors' insurers have asserted or may assert in any proof of claim or the Debtors' rights and defenses to such proofs of claim.

**4.4    Reservation of Rights**.  Except as otherwise explicitly provided in this Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment of Claims.  Except to the extent a Reorganized Debtor expressly assumes an obligation or liability of a Debtor or another Reorganized Debtor, this Plan shall not operate to impose liability on any Reorganized Debtor for the Claims against any other Debtor or the debts and obligations of any other Debtor or Reorganized Debtor, and from and after the Effective Date, each Reorganized Debtor, subject to the Restructuring Transactions, will be separately liable for its own obligations.

## ARTICLE V

## ACCEPTANCE OR REJECTION OF THE PLAN;
## EFFECT OF REJECTION BY ONE OR MORE
## IMPAIRED CLASSES OF CLAIMS OR INTERESTS

**5.1    Impaired Classes of Claims Entitled to Vote**.  Holders of Claims and Interests in each Impaired Class of Claims or Interests are entitled to vote as a Class to accept or reject this Plan, other than Classes that are deemed to reject this Plan as provided in Section 5.4 herein.  Accordingly, the votes of holders of Claims in Classes 7 and 8 with respect to the Main Debtors and Classes 4 and 5 with respect to Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery shall be solicited with respect to this Plan.

**5.2    Classes Deemed to Accept Plan**.  With respect to the Main Debtors, Class 1 Secured Tax Claims, Class 2 Secured Claims, Class 3 Other Priority Claims, Class 4 Intercompany Claims, Class 5 Workers' Compensation Claims, and Class 6 Subsidiary Interests are Unimpaired by this Plan.  With respect to Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery, Class 1 Other Priority Claims, Class 2 Intercompany Claims and Class 3 Interests are Unimpaired by this Plan.  Under section 1126(f) of the Bankruptcy Code and/or the Solicitation Procedures Order, such Claimholders are conclusively presumed to have accepted this Plan, and the votes of such Claimholders will not be solicited.

**5.3    Acceptance by Impaired Classes**.  With respect to the Main Debtors, Class 7 Capital Lease Claims and Class 8 Prepetition Lender Claims are Impaired under this Plan.  With respect to Mrs. Cubbison's, Armour & Main Redevelopment and New England Bakery Class 4 Trade Claims and Class 5 General Unsecured Claims are Impaired under this Plan.  Pursuant to section 1126(c) of the Bankruptcy

Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class has accepted this Plan if this Plan is accepted by the holders of at least two-third (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan.

**5.4    Classes Deemed to Reject Plan**.  With respect to the Main Debtors, because holders of Claims in Class 9 General Unsecured Claims, Class 10a Subordinated Debt Securities Claims and Class 10b Subordinated Equity Securities Claims, and the holders of Interests in Class 11 Interests in Brands Preferred Stock and Class 12 Interests in IBC are not receiving or retaining any property under this Plan on account of such Claims or Interests, they are conclusively presumed to have rejected this Plan, and the votes of such holders will not be solicited.

**5.5    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**. To the extent that any Impaired Class entitled to vote rejects this Plan or is deemed to have rejected it, the Debtors will request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

**5.6    Confirmability and Severability of a Plan**.  Subject to Section 14.2, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan as it applies to the Debtors or any particular Debtor.  A determination by the Bankruptcy Court that this Plan, as it applies to the Debtors or any particular Debtor, is not confirmable pursuant to section 1129 of the Bankruptcy Code shall not limit or affect: (a) the confirmability of this Plan as it applies to the other Debtor(s); or (b) the Debtors' ability to modify this Plan, as it applies to the Debtors or to any particular Debtor, to satisfy the requirements of section 1129 of the Bankruptcy Code.

## ARTICLE VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

**6.1    Continued Corporate Existence**.   Subject to the Restructuring Transactions contemplated by this Plan, each of the Debtors shall continue to exist as a Reorganized Debtor after the Effective Date as a separate corporate entity, with all the powers of a corporation or limited liability company, as applicable, under applicable law in the jurisdiction in which each applicable Debtor is organized and pursuant to the Organizational Documents in effect prior to the Effective Date, except to the extent such Organizational Documents are amended by this Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

**6.2    Corporate Action**.  Each of the matters provided for under this Plan involving the corporate structure of the Debtors or corporate action to be taken by or required of the Debtors, shall, as of the Effective Date, be deemed to have occurred

A-37

and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of any of the Debtors or the Reorganized Debtors.

      **6.3    Certificate of Incorporation and Bylaws**.  The Organizational Documents shall be amended as necessary to satisfy the provisions of this Plan and the Bankruptcy Code.  The Organizational Documents for Reorganized IBC shall, among other things, authorize 60,000,000 shares of New Common Stock, $0.01 par value per share.  The Certificate of Incorporation for Reorganized IBC, in form and substance satisfactory to Equity Investors, is attached hereto as <u>Exhibit L</u> and the bylaws for Reorganized IBC, in form and substance satisfactory to Equity Investors, is attached hereto as <u>Exhibit M</u>.  A summary description of the New Common Stock is set forth as <u>Exhibit F</u>.  The charter and bylaws of each Reorganized Subsidiary Debtor, shall be amended as necessary to satisfy the provisions of this Plan and the Bankruptcy Code and shall include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, until two (2) years after the Effective Date.

      **6.4    Cancellation of Existing Securities and Agreements**.  On the Effective Date, except as otherwise specifically provided for herein, (a) the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of or Interests in the Debtors that are Reinstated under this Plan, shall be cancelled, and (b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indenture, certificates of designation, bylaws, or certificate or articles of incorporation or similar document governing the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of or interests in the Debtors that are Reinstated under this Plan, as the case may be, shall be released and discharged.  Notwithstanding anything to the contrary herein, as of the Effective Date, the Reorganized Debtors shall assume all existing indemnification obligations arising under (i) the Prepetition Credit Agreement (including the Loan Documents, as defined therein) in favor of JPMCB, J.P. Morgan Securities Inc. and any of the Plan Supporters (each in their respective capacity under the Prepetition Credit Agreement), (ii) the DIP Credit Agreement, (iii) the exit facility commitment letter by and among Silver Point, IBC and Brands dated October 18, 2007, as amended and restated as of November 6, 2007, (iv) the Term Loan Facility Commitment Papers and (v) Annexes I and I-A to the Commitment Letter, and all such indemnification obligations shall not be cancelled, terminated or otherwise modified and shall remain in full force and effect.  Subject to

payment in full of the Old Convertible Note Indenture Trustee Fee Claim on the Effective Date, all of the obligations of the Debtors and the Reorganized Debtors under the Old Convertible Note Indenture and the Old Convertible Notes, including indemnification obligations, shall be cancelled, released and discharged without limitation, and the Old Convertible Notes Indenture Trustee shall be discharged from any further obligations thereunder, provided, however, that said cancellation, release and discharge shall not affect, limit or impair the rights of the Old Convertible Notes Indenture Trustee as against any holder of Old Convertible Notes.  Upon and subject to such cancellation, release and discharge, all distributions to holders of Old Convertible Notes Claims by the Trustee of the Creditors' Trust, if any, shall be made directly by the Trustee thereof and the Old Convertible Notes Indenture Trustee shall have no duties relating thereto.

> **6.5     Authorization and Issuance of New Common Stock**.

(a)     The Certificate of Incorporation for Reorganized IBC shall authorize 60,000,000 shares of New Common Stock.   On the Effective Date, Reorganized IBC shall (i) issue up to 4,420,000 shares of New Common Stock to the Term Loan Facility Lenders (or their Permitted Affiliates) and (ii) issue 4,420,000 shares of New Common Stock to Equity Investors.  A summary description of the New Common Stock is set forth as Exhibit F.

(b)     The New Common Stock issued under this Plan shall be subject to economic and legal dilution based upon (i) the issuance of New Common Stock pursuant to the Long Term Incentive Plan as set forth in Section 6.8 of this Plan, (ii) the conversions of New Convertible Secured Notes, (iii) the exercise of Warrants, (iv) the employee equity sharing plans to be entered into in connection with the Transaction, (v) the Trust Stock Appreciation Rights, and (vi) any other shares of New Common Stock issued after the consummation of this Plan.

(c)     The issuance of the New Common Stock, including the shares of the New Common Stock, options, or other equity awards, if any, reserved by Reorganized IBC for the Long Term Incentive Plan and the other employee equity sharing plans to be entered into in connection with the Transaction, and the shares of New Common Stock reserved by Reorganized IBC for the conversion of the New Convertible Secured Notes and the exercise of the Warrants, is authorized without the need for any further corporate action or action by any other party.

All of the shares of New Common Stock issued pursuant to this Plan shall be duly authorized, validly issued, and if applicable, fully paid and non-assessable.

**6.6** **Directors and Officers**.

(a)     The existing officers or managing members of the Debtors shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the board of directors or equityholders, as the case may be, to replace them.

(b)     On the Effective Date, the term of the current members of the board of directors of the corporate Debtors shall expire.  The initial board of directors of the corporate Reorganized Debtors will consist of eight (8) directors. Craig Jung (or in the event of his death, incapacity, or resignation, the chief executive officer of IBC) shall serve as a director.  Equity Investors shall designate five (5) directors.  The Prepetition Investors shall designate two (2) directors reasonably satisfactory to Equity Investors.

The Persons designating board members shall file with the Bankruptcy Court and give to the Debtors written notice of the identities of such members on a date that is not less than ten (10) days prior to the Voting Deadline.

(c)     Other provisions governing the service, term and continuance in office of the members of the board shall be as set forth in the Organizational Documents of the Reorganized Debtors.

**6.7** **Employment, Retirement, Indemnification and Other Agreements and Incentive Compensation Programs**.

(a)     The proposed terms of employment of certain key employees of the Reorganized Debtors, to be effective on the Effective Date, are summarized at Exhibit N attached hereto (the "Executive Employment Agreements").  The Executive Employment Agreements are to be in form and substance satisfactory to Equity Investors and the assumption of, or entry into, the Executive Employment Agreements as provided for herein shall be subject to the consent of Equity Investors prior to the Confirmation Date.  For the avoidance of doubt, with the exception of the requirement that the Debtors assume the Executive Employment Agreement with Craig Jung, entry into or assumption of any Executive Employment Agreement or other employment agreement shall not be a condition precedent to the confirmation or consummation of this Plan.

(b)     With the exception of those individuals (i) whose employment terms are summarized on Exhibit N, and (ii) the terms of whose employment agreements are subject to a rejection motion as of the Confirmation Hearing, to the extent that any of the Debtors has in place as of the Effective Date employment, severance (change in control), retirement, indemnification and other agreements with their respective active directors, officers, managing members and employees who will continue in such capacities or a similar capacity after the Effective Date, or retirement

A-40

income plans, welfare benefit plans and other plans for such Persons, such agreements, programs and plans will remain in place after the Effective Date, and the Reorganized Debtors will continue to honor such agreements, programs and plans except to the extent provided herein without prejudice to the Reorganized Debtors' authority to modify or eliminate any such agreements, programs or plans as permitted under applicable non-bankruptcy law.  Benefits provided under such agreements or plans may include benefits under qualified and non-qualified retirement plans; health and dental coverage; short and long-term disability benefits; death and supplemental accidental death benefits; vacation; leased car; financial consulting, tax preparation and estate planning as well as an annual physical examination, each paid or provided commensurate with an employee's position in accordance with the applicable Reorganized Debtor's policies then in effect.  Such agreements and plans also may include equity, bonus and other incentive plans in which officers, managing members and other employees of the Reorganized Debtors may be eligible to participate; provided, however, such equity, bonus and other incentive plans shall not provide for the issuance of New Common Stock and to the extent that such equity, bonus and other incentive plan provides for the issuance of Existing Securities, such provision shall be deemed null and void and the officers, managing members and other employees shall waive any right to enforce such provisions; provided, further, however, that pursuant to the Long Term Incentive Plan, there shall be reserved for certain members of management, directors, and other employees of the Reorganized Debtors a certain number of shares of New Common Stock and other securities all as more fully described in Section 6.8 below.

(c)     Notwithstanding anything contained herein to the contrary, the terms of the KERP shall not be modified, altered, or amended.  Retention Bonuses (as defined in the KERP) shall be paid in the amounts and at such times as contemplated by the KERP.

**6.8     Implementation of the Long Term Incentive Program**.  A summary of the Long Term Incentive Plan is attached hereto as Exhibit E.  On the Effective Date, the Reorganized Debtors shall implement the Long Term Incentive Plan in order to promote the growth and general prosperity of the Reorganized Debtors by offering incentives to key employees who are primarily responsible for the growth of the Reorganized Debtors, and to attract and retain qualified employees and thereby benefit the shareholders of the Reorganized Debtors based on growth of the Reorganized Debtors.  Pursuant to the Long Term Incentive Plan, the Reorganized Debtors shall deliver certain stock options and restrictive stock grants to certain members of management and other employees on and after the Effective Date, in such amounts and pursuant to such terms as set forth in the Long Term Incentive Plan.

The Long Term Incentive Plan will be administered by Reorganized IBC's board of directors.  In applying and interpreting the provisions of the Long Term Incentive Plan, the decisions of Reorganized IBC's board of directors shall be final.

The Long Term Incentive Plan is to be in form and substance satisfactory to Equity Investors and the establishment of the Long Term Incentive Plan shall be subject to the consent of Equity Investors.

**6.9     Termination of the SERP**.  Immediately prior to the Effective Date, the SERP shall be deemed terminated, and the Reorganized Debtors' obligations thereunder shall cease, and on the Effective Date the trustee of the rabbi trust holding certain assets of the SERP shall remit such assets to the Reorganized Debtors to be used for general corporate purposes.

**6.10    Equity Investors' Contribution**.  Pursuant and subject to the terms and conditions of the Investment Agreement, Equity Investors shall make the Investment in the amount specified in the Investment Agreement, to be utilized by the Debtors or Reorganized Debtors to make Cash distributions as required under this Plan and  to consummate the transactions contemplated by this Plan, the Investment Agreement and the Commitment Letter.

**6.11    Issuance of the New Convertible Secured Notes, the New Common Stock and Warrants and Entry Into the New Third Lien Term Loan**.  On the Effective Date, Reorganized IBC shall issue the New Convertible Secured Notes, the New Common Stock and the Warrants for distribution, and shall enter into the New Third Lien Term Loan, in accordance with the terms of the Transaction.  In the Confirmation Order, the Bankruptcy Court shall approve the New Third Lien Term Loan and the New Convertible Secured Notes in substantially the form disclosed to the Bankruptcy Court and authorize the Reorganized Debtors to enter into the New Third Lien Term Loan and issue the New Convertible Secured Notes pursuant to the New Third Lien Term Loan Credit Facility and the New Convertible Secured Note Indenture, respectively, and execute the same together with such other documents as the agent under the New Third Lien Term Loan and the trustee under the New Convertible Secured Note Indenture may reasonably require.

The issuance to the Prepetition Lenders of the New Convertible Secured Notes (including the New Common Stock into which such New Convertible Secured Notes are convertible) and the distribution thereof shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.  The definitive documents with respect to the New Convertible Secured Notes distributed pursuant to this Plan will have mandatory conversion rights, anti-dilution rights and transfer restrictions reflecting the terms set forth on Exhibit G hereto and shall be mutually acceptable to the Debtors, Equity Investors and the Prepetition Investors.

**6.12    Post-Effective Date Financing**.   On the Effective Date, the Reorganized Debtors (other than Mrs. Cubbison's) shall (a) enter into the New Credit Facilities and the New Third Lien Term Loan Credit Facility together with all guarantees evidencing obligations of the Reorganized Debtors thereunder and

security documents, (b) execute mortgages, certificates and other claims documentation and deliveries as the Prepetition Investors reasonably request, (c) deliver insurance and customary opinions, and (d) enter into other documentation as described in the Term Loan Facility Commitment Papers and Exhibit H to the Commitment Letter, all of which items in clauses (a) – (d) shall be in form and substance reasonably satisfactory to the Prepetition Investors, and such documents and all other documents, instruments and agreements to be entered into, delivered or contemplated thereunder shall become effective in accordance with their terms on the Effective Date.  In the Confirmation Order, the Bankruptcy Court shall approve the New Credit Facilities and the New Third Lien Term Loan Credit Facility in substantially the form disclosed to the Bankruptcy Court and authorize the Reorganized Debtors to execute the same together with such other documents as the lenders under the New Credit Facilities and the New Third Lien Term Loan Credit Facility may reasonably require in order to effectuate the treatment afforded to such parties under the New Credit Facilities and the New Third Lien Term Loan Credit Facility, respectively.

Upon the Effective Date (i) the Debtors and the Reorganized Debtors are authorized to execute and deliver the New Credit Facility Documents, the New Third Lien Term Loan Credit Facility, the New Convertible Secured Note Indenture, all mortgages, intercreditor agreements, security documents and all other related agreements, documents or instruments to be executed or delivered in connection therewith (collectively, the "Exit Facility Documents") and perform their obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages or indemnities, (ii) the Exit Facility Documents shall constitute the legal, valid and binding obligations of the Reorganized Debtors parties thereto, enforceable in accordance with their respective terms, (iii) the Liens granted to secure the obligations under each applicable Exit Facility Document shall be, and shall remain (until released in accordance with the terms of the applicable Exit Facility Document), legal, valid, perfected, non-voidable, non-avoidable and binding liens on, and security interests in, all property and assets of the Reorganized Debtors (to the extent required by the Exit Facility Documents) having the priority granted to them under the Plan, and (iv) no obligation, payment, transfer or grant of security under the Exit Facility Documents shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff or counterclaim on account of any act, event or occurrence arising on or prior to the Effective Date.  The Debtors and the Reorganized Debtors, as applicable, and the other persons granting any liens and security interests to secure the obligations under the Exit Facility Documents are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary or desirable to establish and further evidence perfection of such liens and security interests under the provisions of any applicable federal, state, provincial or other law (whether domestic or foreign) (it being understood that perfection shall occur automatically by virtue of the entry of the

Confirmation Order and any such filings, recordings, approvals and consents shall not be required for such perfection), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

**6.13    Restructuring Transactions and Alternative Structures**. Subject to the prior agreement of Equity Investors and the Prepetition Investors on the form of the Restructuring Transactions, the Debtors or the Reorganized Debtors, as the case may be, shall take such actions as may be necessary or appropriate to effect the relevant Restructuring Transactions. Such actions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of this Plan; (c) the filing of appropriate Organizational Documents with the appropriate governmental authorities under applicable law; and (d) all other actions that such Debtor or Reorganized Debtor determines are necessary or appropriate, including the making of filings or recordings in connection with the relevant Restructuring Transaction. In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger shall cease to exist as a separate corporate entity and thereafter the surviving Reorganized Debtor shall assume and perform the obligations under this Plan of each Reorganized Debtor party to such merger. In the event a Reorganized Debtor is liquidated, the Reorganized Debtors (or the Reorganized Debtor which owned the stock of such liquidating Debtor prior to such liquidation) shall assume and perform the obligations of such liquidating Reorganized Debtor under this Plan.

Several alternative structures for the post-emergence capital structure of the Debtors are being explored. Under certain of the alternative structures, Equity Investors would organize one or more new entities which would acquire the Debtors, or the assets of the Debtors, in a taxable transaction. Other alternative structures involve the Debtors entering into certain transactions prior to the Effective Date in order to modify the overall corporate structure of the Debtors and/or otherwise structure their businesses for corporate or operational reasons. The reorganization of the Debtors will be consummated pursuant to an alternative structure described in this paragraph only if, after further analysis, the Debtors believe that it will improve the corporate or operational structure or otherwise provide efficiencies to the Estates or the Reorganized Debtors, and only if the Debtors have received the prior written consent of Equity Investors and the Prepetition Investors. Any such reorganization will not have any material adverse effect on any of the distributions under this Plan.

**6.14    Preservation of Causes of Action**.   In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in this Plan, the Reorganized Debtors shall retain and may, in their sole discretion, enforce or prosecute all Retained Actions, a nonexclusive list of which is attached hereto as Exhibit A-1.   The Debtors or the Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, compromise, or enforce such rights (or decline to do any of the foregoing).   The Reorganized Debtors or any successors may prosecute (or decline to prosecute) such Retained Actions in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.   Except as otherwise provided herein, the failure of the Debtors to specifically list any Claim, right of action, suit or proceeding in the Schedules or in Exhibit A-1 does not, and will not be deemed to, constitute a waiver or release by the Debtors of such claim, right of action, suit or proceeding, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits or proceedings in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit or proceeding upon or after the confirmation or consummation of this Plan.

**6.15    Exclusivity Period**.   Subject to Section 14.2, the Debtors shall retain the exclusive right to amend or modify this Plan, and to solicit acceptances of any amendments to or modifications of this Plan, through and until the Effective Date.

**6.16    Effectuating Documents; Further Transactions**.   The chairman of the board of directors, the Chief Executive Officer, or any other executive officer or managing member of the Debtors shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.   The Secretary or Assistant Secretary of the Debtors shall be authorized to certify or attest to any of the foregoing actions.

**6.17    Exemption From Certain Transfer Taxes and Recording Fees**. Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to this Plan (including, without limitation, pursuant to any grant of collateral under the New Credit Facilities), or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, will not be subject to any document recording tax, stamp tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to

A-45

accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

 **6.18 Substantive Consolidation Motions**.  If Class 5 General Unsecured Claims voting on the respective Plans of Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery do not each vote as a class to accept the applicable Plan, and if the applicable Plan as it pertains to Mrs. Cubbison's, Armour & Main Redevelopment or New England Development is not timely confirmed, the Debtors shall seek to substantively consolidate Mrs. Cubbison's, Armour & Main Redevelopment or New England Bakery, as appropriate, and IBC pursuant to the Mrs. Cubbison's Substantive Consolidation Motion, the Armour & Main Redevelopment Substantive Consolidation Motion or New England Bakery Substantive Consolidation Motion, as applicable.   The Debtors may combine two or more Substantive Consolidation Motions in one pleading.  Objections to the Substantive Consolidation Motion(s) may be decided at the Confirmation Hearing or at a later date.

# ARTICLE VII

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

 **7.1 Assumed (Non-Union) Contracts and Leases**.  Except with respect to the Union Contracts (whose treatment under this Plan is described in Section 7.3 herein), only those executory contracts and unexpired leases to which the Debtors (or any of them) are a party that are specifically listed on the schedule of assumed contracts and leases annexed hereto as <u>Exhibit O</u>, or that were entered into postpetition, shall be deemed automatically assumed and Reinstated as of the Effective Date; <u>provided</u>, <u>however</u>, that neither the inclusion by the Debtors of a contract or lease on <u>Exhibit O</u> nor anything contained in this Plan shall constitute an admission by the Debtors that such lease or contract is an unexpired lease or executory contract or that any Debtor, or any of their Affiliates, has any liability thereunder.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions, pursuant to section 365(b)(1) of the Bankruptcy Code and, to the extent applicable, section 365(b)(3) of the Bankruptcy Code, as of the Effective Date.

 Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights <u>in rem</u> related to such premises, unless any of the foregoing agreements has been

rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of this Plan.

**7.2**     **Rejected (Non-Union) Contracts and Leases**.  Except with respect to the Union Contracts (whose treatment under this Plan is described in Section 7.3 herein) and except with respect to executory contracts and unexpired leases that have previously been assumed or are the subject of a motion to assume, or a notice of assumption served pursuant to an order of the Bankruptcy Court, on or before the Confirmation Date, all executory contracts and unexpired leases not assumed as set forth in Section 7.1 of this Plan shall be deemed automatically rejected as of the Effective Date or such earlier date as the Debtors may have unequivocally terminated their performance under such lease or contract.   The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to section 365 of the Bankruptcy Code. The Debtors reserve the right to file a motion on or before the Confirmation Date to reject any executory contract or unexpired lease.

**7.3**     **Assumption and Rejection of Union Contracts**.   Each Union Contract to which the Debtors are a party shall be deemed automatically assumed and Reinstated as of the Effective Date, unless such Union Contract (a) shall have been previously rejected by the Debtors, (b) is the subject of a motion to reject pursuant to section 1113 of the Bankruptcy Code filed on or before the Confirmation Date, or (c) expired prior to the Effective Date and/or is no longer executory on the Effective Date by its own terms.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions, pursuant to section 365(b)(1) of the Bankruptcy Code and, to the extent applicable, section 365(b)(3) of the Bankruptcy Code, as of the Effective Date.  Any rejection of a Union Contract will proceed by motion made pursuant to section 1113 of the Bankruptcy Code.

**7.4**     **Payments Related to Assumption of Executory Contracts and Unexpired Leases**.  The provisions (if any) of each executory contract or unexpired lease to be assumed and Reinstated under this Plan which are or may be in default shall be satisfied solely by Cure.  Objections to assumption or rejection including, without limitation, to Cure related to non-monetary defaults, must be raised in an objection to be filed no later than the date by which objections are required to be filed with respect to confirmation of the Plan.  Any such Objections will be litigated at the Confirmation Hearing or at such other time as the Bankruptcy Court may schedule.

**7.5**     **Rejection Damages Bar Date**.  If rejection of an executory contract or unexpired lease rejected pursuant to this Plan results in a Claim, then such Claim shall be forever barred and shall not be enforceable against either the Debtors or the Reorganized Debtors or such entities' properties unless a proof of claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Debtors within thirty (30) days after service of the earlier of (a) notice of the Confirmation Order or (b) other notice that the executory contract or unexpired lease has been rejected.  Any

Claim that may be Allowed as a result of the rejection of an executory contract or unexpired lease shall be treated as a General Unsecured Claim.

## ARTICLE VIII

## PROVISIONS GOVERNING DISTRIBUTIONS

**8.1     Time of Distributions**.  Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under this Plan shall be made on a Periodic Distribution Date.

**8.2     No Interest on Claims**.  Unless otherwise specifically provided for in this Plan, the Confirmation Order, the DIP Credit Agreement or the Prepetition Credit Agreement, Postpetition Interest shall not accrue or be paid on Claims, and no Claimholder shall be entitled to interest accruing on or after the Petition Date on any Claim, right, or Interest.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

**8.3     Disbursing Agent**.  The Disbursing Agent shall make all distributions required under this Plan.

**8.4     Surrender of Securities or Instruments**.   On or before the Distribution Date, or as soon as practicable thereafter, each holder of an instrument evidencing a Claim (as to each, a "Certificate"), shall surrender such Certificate to the Disbursing Agent or, with respect to indebtedness that is governed by other agreement, the respective Servicer, and such Certificate shall be cancelled.   No distribution of property hereunder shall be made to or on behalf of any such holder unless and until such Certificate is received by the Disbursing Agent or the respective Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Disbursing Agent or the respective Servicer.  Any holder who fails to surrender or cause to be surrendered such Certificate, or fails to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Disbursing Agent or the respective Servicer prior to the first anniversary of the Effective Date, shall be deemed to have forfeited all rights and Claims in respect of such Certificate and shall not participate in any distribution hereunder, and all property in respect of such forfeited distribution, including any dividends or interest attributable thereto, shall revert to the Reorganized Debtors notwithstanding any federal or state escheat laws to the contrary.

**8.5     Claims Administration Responsibility**.  The Reorganized Debtors will have sole and absolute discretion in administering, disputing, objecting to, compromising or otherwise resolving all Claims against the Debtors (the "Claims

Administration"); provided, however, that before the Reorganized Debtors agree to allow a General Unsecured Claim in an amount greater than $1,000,000, the Reorganized Debtors shall give reasonable notice to the Creditors' Trust of their intended agreement and the Creditors' Trust can elect to assume responsibility for administering, disputing, objecting, compromising or otherwise resolving such General Unsecured Claim and assume and pay from the Trust Assets any fees, costs, expenses or other liabilities incurred in connection with administering, disputing, objecting, compromising or otherwise resolving such General Unsecured Claim.  If the Creditors' Trust does not elect to assume such responsibility within three Business Days after the Reorganized Debtors' delivery of notice to the Creditors' Trust, the General Unsecured Claim shall be disposed of in the manner proposed by the Reorganized Debtors.  The Reorganized Debtors shall bear the responsibility for any fees, costs, expenses or other liabilities incurred by the Reorganized Debtors in connection with the Claims Administration; provided, however, prior to the Reorganized Debtors taking any responsibility with respect to Claims Administration, the Creditors' Trust and the Reorganized Debtors shall have entered into an agreement whereby the Creditor' Trust shall compensate the Reorganized Debtors for their reasonable costs and expenses (excluding attorneys' fees) associated with the Reorganized Debtors' use of resources used to assist the Creditors' Trust in the Claims Administration.

**8.6    Delivery of Distributions**.  Distributions under this Plan to holders of Allowed Prepetition Lender Claims shall be made to or at the direction of the Prepetition Agent and shall be distributed by the Prepetition Agent in accordance with the Prepetition Credit Agreement.  Distributions under this Plan to holders of DIP Facility Claims shall be made to or at the direction of the DIP Agent and shall be distributed by the DIP Agent in accordance with the DIP Credit Agreement. Distributions under this Plan to all other Allowed Claimholders shall be made by the Disbursing Agent.  If any Claimholder's distribution is returned as undeliverable, no further distributions to such Claimholder shall be made unless and until the Disbursing Agent or the appropriate Servicer is notified of such Claimholder's then current address, at which time all missed distributions shall be made to such Claimholder without interest.  Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed.  All claims for undeliverable distributions shall be made on or before the second anniversary of the Effective Date.  After such date, all unclaimed property shall revert to the Reorganized Debtors.  Upon such reversion, the claim of any Claimholder, or their successors, with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

**8.7    Procedures for Treating and Resolving Disputed and Contingent Claims**.

(a)    *No Distributions Pending Allowance.*   No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim.   All objections to Claims must be filed on or before the Claims Objection Deadline.

(b)    *Distributions After Allowance.*   Payments and distributions to each respective Claimholder on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, will be made in accordance with provisions of this Plan that govern distributions to such Claimholders.   Subject to Section 8.2 hereof, on the first Periodic Distribution Date following the date when a Disputed Claim becomes an Allowed Claim, the Disbursing Agent will distribute to the Claimholder any Cash that would have been distributed on the dates distributions were previously made to Claimholders had such Allowed Claim been an Allowed Claim on such dates, together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Allowed Claimholders included in the applicable class.

# ARTICLE IX

## ALLOWANCE AND PAYMENT OF
## CERTAIN ADMINISTRATIVE CLAIMS

**9.1    DIP Facility Claims**.   On the Effective Date, all claims arising under the DIP Facility shall be allowed in an amount to be agreed upon by the Debtors and such Claimholders, and all obligations of the Debtors under the DIP Facility shall be paid in full in Cash or otherwise satisfied in a manner acceptable to such Claimholders in accordance with the terms of the DIP Facility and the DIP Credit Agreement including, without limitation, replacement and cancellation, securing by "back up" letters of credit issued by an institution acceptable to the bank that issued the letters of credit outstanding under the DIP Facility, or cash collateralization at 105% of the face amount of all letters of credit issued and outstanding under the DIP Credit Facility on terms in form and substance (a) satisfactory to the bank issuer of such letter of credit and (b) reasonably satisfactory to Equity Investors and the Prepetition Investors.   Upon compliance with the preceding sentence, all liens and security interests granted to secure such obligations shall be deemed cancelled and shall be of no further force and effect.

### 9.2    **Professional Claims**.

(a)    *Final Fee Applications.*    All final requests for payment of Professional Claims must be filed no later than forty-five (45) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

(b)    *Payment of Interim Amounts.*    Subject to the Holdback Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts relating to prior periods through the Effective Date.  In order to receive payment on the Effective Date for unbilled fees and expenses incurred through such date, two (2) days prior to the Effective Date, the Professionals shall estimate fees and expenses due for periods that have not been billed as of the Effective Date and shall deliver such estimate to counsel for the Debtors, the Prepetition Investors, Equity Investors and the Prepetition Agent.  Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order.

(c)    On the Effective Date, the Debtors or the Reorganized Debtors shall pay to the Disbursing Agent, in order to fund the Holdback Escrow Account, Cash equal to the aggregate Holdback Amount for all Professionals.  The Disbursing Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds shall not be considered property of the Reorganized Debtors.  The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Disbursing Agent from the Holdback Escrow Account when such claims are finally allowed by the Bankruptcy Court.  When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors.

(d)    Upon the Effective Date, any requirement that professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate.

(e)    Notwithstanding the foregoing, the fees and expenses of the Prepetition Investors as provided in the Term Loan Facility Commitment Papers, and as approved by the Commitment Letter Approval Order, shall be payable by the Debtors (or the Reorganized Debtors) to the Prepetition Investors promptly upon invoicing to the Debtors (or the Reorganized Debtors) without any notice to the Bankruptcy Court or any other party.

(f)      Notwithstanding the foregoing, the fees and expenses of Equity Investors as provided in the Commitment Letter, and as approved by the Commitment Letter Approval Order, shall be payable by the Debtors (or the Reorganized Debtors) to Equity Investors promptly upon invoicing to the Debtors (or the Reorganized Debtors) without any notice to the Bankruptcy Court or any other party.

**9.3      Substantial Contribution Compensation and Expenses Bar Date**. Any Person who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), 503(b)(4), and 503(b)(5) of the Bankruptcy Code must file an application with the clerk of the Bankruptcy Court, on or before a date which is forty-five (45) days after the Effective Date (the "503 Deadline"), and serve such application on counsel for the Debtors and as otherwise required by the Bankruptcy Court and the Bankruptcy Code on or before the 503 Deadline, or be forever barred from seeking such compensation or expense reimbursement.

**9.4      Other Administrative Claims**.  All other requests for payment of an Administrative Claim (other than as set forth in Sections 9.2, 9.3 and 9.6 of this Plan, and other than with respect to Cure Claims) must be filed with the Bankruptcy Court and served on counsel for the Debtors no later than thirty (30) days after the Effective Date.  Unless the Debtors or the Reorganized Debtors object to an Administrative Claim by the Claims Objection Deadline, such Administrative Claim shall be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim (i) which is paid or payable by any Debtor in the ordinary course of business or (ii) the payment of which has been approved by the Bankruptcy Court.

**9.5      The ACE Insurance Program**. Notwithstanding anything to the contrary in this Plan, the Disclosure Statement or the Confirmation Order: (a) on the Effective Date, the Debtors and the Reorganized Debtors shall assume the ACE Insurance Program in its entirety and shall pay the cure costs related to such assumption; (b) the ACE Insurance Program (including, but not limited to, all letters of credit and other collateral and security provided to the ACE Companies (or any of them) pursuant the ACE Insurance Program) shall survive and shall not be amended, modified, waived or impaired in any respect by this Plan, the Confirmation Order or otherwise without the prior written agreement of the ACE Companies; (c) the claims of the ACE Companies arising under the ACE Insurance Program shall be Allowed Administrative Claims, which are payable in the ordinary course of business, and shall not be discharged or released by this Plan or the Confirmation Order; (d) the ACE Companies shall not be required to file or serve a request for payment of any Administrative Claim and shall not be subject to any bar date governing

Administrative Claims; (e) nothing in this Plan or the Confirmation Order shall be construed as, or is, a determination as to coverage under the ACE Insurance Program; and (f) nothing in this Plan or the Disclosure Statement in any way: (i) precludes or limits the rights of the insurers to contest and/or litigate with any party, including, without limitation, the Debtors, the existence, primacy and/or scope of available coverage under any alleged applicable policy; (ii) permits any holder of a Workers' Compensation Claim or an Insured Claim to recover the same amounts from the ACE Companies and the Debtors; (iii) alters the ACE Companies' rights and obligations under the ACE Insurance Program or modifies the coverage provided thereunder; or (iv) alters the Debtors' rights and obligations under the ACE Insurance Program, including, without limitation, any duty of the Debtors' to defend, at their own expense, against claims asserted under the Policies; provided, however, that, after the Effective Date, the ACE Companies shall use their commercially reasonable efforts, consistent with the ACE Insurance Program, to reduce the aggregate letters of credit and other collateral and security provided to the ACE Companies (or any of them) pursuant to the ACE Insurance Program by the Reorganized Debtors.

     **9.6**    **Commitment Fee**. Notwithstanding anything to the contrary herein, on the Effective Date, the Debtors or the Reorganized Debtors shall pay (i) the balance of the Commitment Fee to Equity Investors in accordance with the Commitment Letter Approval Order and (ii) the Term Loan Facility Commitment Fee to the Term Loan Facility Commitment Parties in accordance with the Commitment Letter Approval Order.

     **9.7**    **Payment of Old Convertible Note Indenture Trustee Fee Claim**. Notwithstanding anything to the contrary herein, on the Effective Date, the Old Convertible Note Indenture Trustee Fee Claim shall be paid in Cash without any further notice to the Bankruptcy Court or otherwise; provided, however, that no later than five (5) days prior to the Confirmation Hearing, the Old Convertible Note Indenture Trustee shall have provided to the Debtors, Equity Investors and the Prepetition Investors copies of invoices evidencing the fees and expenses incurred by the Old Convertible Note Indenture Trustee during the Chapter 11 Cases through the Effective Date; provided, further, that the Bankruptcy Court shall retain jurisdiction over any disputes regarding the reasonableness of the Allowed Old Convertible Note Indenture Trustee Fee Claim. Upon payment of the Old Convertible Note Indenture Trustee Fee Claim, the Old Convertible Note Indenture Trustee shall forever release, waive and discharge its "charging" lien with respect to any distribution that is made to any holder of Old Convertible Notes.

## ARTICLE X

## CREDITORS' TRUST

**10.1    Appointment of Trustee**.

(a)     The Trustee for the Creditors' Trust shall be designated by the Creditors' Committee.  Specifically, the Creditors' Committee shall file a notice on a date which is at least ten days prior to the date the Bankruptcy Court establishes for the commencement of the Confirmation Hearing designating the Person who it has selected as the Trustee and seeking approval of such designation.  The Person designated as the Trustee shall file an affidavit contemporaneously with the Creditors' Committee's motion demonstrating that such Person is disinterested.  The Person so designated by the Creditors' Committee shall become the Trustee as of the Effective Date upon the Bankruptcy Court entering an order granting the motion after consideration of the same and any objections thereto at the Confirmation Hearing.

(b)     The Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in this Plan and the Trust Agreement.

**10.2    Assignment of Trust Assets to the Creditors' Trust**.   On the Effective Date, the Trust Assets shall be transferred to the Creditors' Trust, for and on behalf of the Trust Beneficiaries.  Beneficial interests in the Creditors' Trust shall be non-transferable, except by death or operation of law, and will not be evidenced by certificates.   Only cash proceeds of Trust Assets may be distributed to Trust Beneficiaries and "in-kind" distributions are not permitted.

**10.3    The Creditors' Trust**.

(a)     Without any further action of the directors, officers or shareholders of the Debtors or the Reorganized Debtors, on the Effective Date, the Trust Agreement, substantially in the form of Exhibit K to this Plan, shall become effective.  The Trustee shall accept the Creditors' Trust and sign the Trust Agreement on that date and the Creditors' Trust will then be deemed created and effective.

(b)     The duration of the Creditors' Trust will be limited to an initial term of five years, subject to further extension solely for the purpose of permitting the Creditors' Trust to liquidate the Trust Assets and distribute the proceeds thereof to the Trust Beneficiaries.

(c)     The Trustee shall have full authority to take any steps necessary to administer the Trust Agreement, including, without limitation, the duty and obligation to liquidate the Trust Assets (having first obtained such approvals from the Trust Advisory Board as may be necessary, if any), as applicable, and, if authorized by majority vote of those members of the Trust Advisory Board authorized

to vote, to prosecute and settle Trust Claims, in such a manner so as reasonably to maximize the value of the Trust Assets.

(d)     All fees, costs and expenses associated with the administration of the Creditors' Trust and distribution to Trust Beneficiaries shall be the responsibility of and be paid by the Creditors' Trust from the Trust Assets.  The Reorganized Debtors will provide information and assistance to the Creditors' Trust to the extent reasonably required to assist the Creditors' Trust in the investigation and prosecution of Trust Claims; provided, however, the Reorganized Debtors shall not have an obligation to provide information and assistance to the Creditors' Trust until the Reorganized Debtors and the Creditors' Trust have entered into an agreement, the terms of which were negotiated in good faith, for the Creditors' Trust to compensate the Reorganized Debtors for their reasonable costs and expenses (including reasonably attorneys' fees) associated with the Reorganized Debtors' resources used in connection with such requested assistance.

(e)     The Trustee may retain such law firms, accounting firms, experts, advisors, consultants, investigators, appraisers, auctioneers or other professionals as it may deem necessary (collectively, the "Trustee Professionals"), in its sole discretion, to aid in the performance of its responsibilities pursuant to the terms of this Plan including, without limitation, the liquidation of Trust Assets, as applicable.  The Trustee Professionals shall continue to prepare monthly statements in the same manner and in the same detail as required pursuant to the Professional Fee Order, and the Trustee Professionals shall serve such statements on each member of the Trust Advisory Board.  In the event two or more members of the Trust Advisory Board object to the reasonableness of such fees and expenses, the matter shall be submitted to the Bankruptcy Court for approval of the reasonableness of such fees and expenses.

(f)     For U.S. federal income tax purposes, it is intended that the Creditors' Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by the Trust Beneficiaries.

(g)     The Trustee shall be responsible for filing all U.S. federal, state and local tax returns for the Creditors' Trust.

(h)     To the extent that there is an inconsistency or conflict between the description of the Creditors' Trust provided herein and the Trust Agreement, the Trust Agreement shall control.

**10.4    The Trust Advisory Board.**

(a)     The Trust Advisory Board shall be comprised of three (3) members as designated by the Creditors' Committee.  The Creditors' Committee shall give written notice of the identities of such members and file and serve such notice

with the Bankruptcy Court, on a date that is not less than ten (10) days prior to the Confirmation Hearing; provided, however, that if and to the extent the Creditors' Committee fails to file and serve such notice, the Debtors shall designate the members of the Trust Advisory Board by announcing their identities at the Confirmation Hearing. The Trust Advisory Board shall adopt such bylaws as it may deem appropriate. The Trustee shall consult regularly with the Trust Advisory Board when carrying out the purpose and intent of the Creditors' Trust. Members of the Trust Advisory Board shall be entitled to compensation from the Creditors' Trust in accordance with the Trust Agreement and to reimbursement from the Creditors' Trust of the reasonable and necessary expenses incurred by them in carrying out the purpose of the Trust Advisory Board. Any compensation paid to members of the Trust Advisory Board or reimbursement of their reasonable and necessary expenses shall be payable solely by the Creditors' Trust from the Trust Assets.

(b) In the case of an inability or unwillingness of any member of the Trust Advisory Board to serve, such member shall be replaced by designation of the remaining members of the Trust Advisory Board. If any position on the Trust Advisory Board remains vacant for more than thirty (30) days, such vacancy shall be filled within fifteen (15) days thereafter by the designation of the Trustee without the requirement of a vote by the other members of the Trust Advisory Board.

(c) Upon the certification by the Trustee that all assets transferred into Trust have been distributed, abandoned or otherwise disposed of, the members of the Trust Advisory Board shall resign their positions, whereupon they shall be discharged from further duties and responsibilities.

(d) The Trust Advisory Board may, by majority vote, approve all settlements of Trust Claims which the Trustee may propose; provided, however, that the Trustee may seek Bankruptcy Court approval of a settlement of a Trust Claim if the Trust Advisory Board fails to act on a proposed settlement of such Trust Claim within thirty (30) days of receiving notice of such proposed settlement by the Trustee.

(e) The Trust Advisory Board may, by majority vote, authorize the Trustee to invest the corpus of the Trust in prudent investments other than those described in section 345 of the Bankruptcy Code.

(f) The Trust Advisory Board may remove the Trustee in the event of gross negligence or willful misconduct. In the event the requisite approval is not obtained, the Trustee may be removed by the Bankruptcy Court for cause shown. In the event of the resignation or removal of the Trustee, the Trust Advisory Board shall, by majority vote, designate a person to serve as successor Trustee.

(g) The Trust Advisory Board shall require a fidelity bond from the Trustee in such reasonable amount as may be agreed to by majority vote of the Trust Advisory Board.

(h)    The Trust Advisory Board shall govern its proceedings through the adoption of bylaws, which the Trust Advisory Board may adopt by majority vote. No provision of such bylaws shall supersede any provision of this Plan.

**10.5    Distributions to Beneficiaries of the Creditors' Trust Under the Trust Agreement**.    Notwithstanding Section 4.1(i) herein, and as part of the Intercreditor Settlement, holders of Allowed General Unsecured Claims shall be entitled to participate in the Intercreditor Settlement, to the extent provided in and subject to the terms set forth in the Intercreditor Settlement Order and the Trust Agreement.    The procedures for distributions to the Trust Beneficiaries shall be in accordance with the terms set forth in the Trust Agreement.    The procedures for resolving Disputed Claims of the Trust Beneficiaries are set forth herein and in the Trust Agreement.

## ARTICLE XI

## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

**11.1    Revesting of Assets**.    Except as otherwise explicitly provided in this Plan, on the Effective Date all property comprising the Estates (including Retained Actions) shall revest in each of the Debtors and, ultimately, in the Reorganized Debtors, free and clear of all Claims, Liens and Interests of creditors and equity security holders (other than as expressly provided herein).    As of the Effective Date, each of the Reorganized Debtors may operate its business and use, acquire, and dispose of property and settle and compromise Claims without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan and the Confirmation Order.

**11.2    Discharge of the Debtors**.    Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in this Plan or in the Confirmation Order, Confirmation of this Plan shall satisfy, discharge, and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), the Debtors, the Reorganized Debtors and the Estates of Claims and Causes of Action, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, rights, and Interests, including, but not limited to, demands and liabilities that arose before the Confirmation Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or

502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim or interest based upon such debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or Interest accepted this Plan.  The Confirmation Order shall be a judicial determination of the discharge of all liabilities of and Interests in the Debtors, subject to the Effective Date occurring.

As of the Effective Date, except as provided in this Plan or in the Confirmation Order (including with respect to the indemnification obligations referenced in the last sentence of Section 6.4 herein) or under the terms of the documents evidencing and orders approving the New Credit Facilities, the Investment Agreement, the Commitment Letter, the New Third Lien Term Loan Credit Facility, the New Convertible Secured Note Indenture and the Trust Stock Appreciation Rights, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as provided in this Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all Interests in IBC, and in the Brands Preferred Stock, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

**11.3    Compromises and Settlements**.    Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various Claims (a) against them and (b) that they have against other Persons.  The Debtors expressly reserve the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against them and claims that they may have against other Persons up to and including the Effective Date.  After the Effective Date, such right shall pass to the Reorganized Debtors as contemplated in Section 11.1 of this Plan, without any need for Bankruptcy Court approval.

Pursuant to the Intercreditor Settlement and Bankruptcy Rule 9019, the Debtors, the Prepetition Lenders and the Creditors' Committee agree to (a) the creation of the Creditors' Trust pursuant to Article X of this Plan, the transfer of the Trust Assets thereto, the allowance and payment of the Old Convertible Note Indenture Trustee Fee Claim and other good and valuable consideration and (b) the full and complete release and satisfaction of any and all claims of the Debtors (and those claiming derivatively through the Debtors) against the Prepetition Lenders, in their capacities as such, including, but not limited to: (i) claims against the Prepetition Lenders asserted or that could have been asserted by the Debtors in the Prepetition

Lender Actions, (ii) challenges with respect to the extent, amount, validity and priority of the Prepetition Lenders' liens and security interests, and (iii) allegations or claims that the adequate protection payments made to the Prepetition Lenders during the Chapter 11 Cases should be "recharacterized" as principal payments and applied to reduce the Prepetition Lenders' secured claims.  For the avoidance of doubt, the foregoing shall not release the obligations of the Term Loan Facility Commitment Parties for the Term Loan Facility pursuant to the Term Loan Facility Commitment Papers or the obligations of the parties to the Intercreditor Settlement.

In addition, pursuant to the Intercreditor Settlement and Bankruptcy Rule 9019, the Debtors, the Prepetition Lenders, the Creditors' Committee and the Old Convertible Note Indenture Trustee agree that the transfer of the Trust Assets to the Creditors' Trust and the satisfaction of the Old Convertible Note Indenture Trustee Fee Claim shall also be in full and complete release and satisfaction of any and all claims that could be prosecuted by any party in interest in the Chapter 11 Cases including the Debtors, the Creditors' Committee, its members, the Prepetition Lenders and the Old Convertible Note Indenture Trustee with respect to the non-substantive consolidation of the Debtors' bankruptcy estates pursuant to this Plan.

Finally, pursuant to the Intercreditor Settlement and Bankruptcy Rule 9019, the Debtors, the Prepetition Lenders, the Creditors' Committee and the Old Convertible Note Indenture Trustee agree that any provision contained in the Old Convertible Note Indenture purporting to subordinate the right of payment of holders of Old Convertible Notes to the rights of Prepetition Lenders shall be null and void and all Prepetition Lenders shall waive any right to enforce such a provision solely for purposes of the settlement described therein.

All documents implementing the terms of the Intercreditor Settlement, including the Trust Stock Appreciation Rights, shall be in form and substance reasonably satisfactory to Equity Investors, the Creditors' Committee and the Prepetition Investors.

**11.4    Release of Certain Parties**.  As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code shall be deemed to forever release, waive, and discharge the Released Parties of all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, including the Prepetition Lender Actions, and liabilities which the Debtors or the Estates are entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the

Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, this Plan or the Reorganized Debtors with respect to each of the Released Parties; provided, however, that nothing contained herein is intended to operate as a release of any potential claims by the Debtors and their Estates against parties who have executed Tolling Agreements with the Debtors during the Chapter 11 Cases, but only with respect to Claims covered by such Tolling Agreements and only to the extent that such Tolling Agreements continue to be in full force and effect and the tolling periods contemplated thereby have not expired as of the Effective Date.   Notwithstanding anything to the contrary contained herein, nothing in this Plan shall be deemed to release any of the Debtors, Equity Investors, the Term Loan Facility Commitment Parties or any of their Affiliates from their obligations under this Plan, the New Credit Facilities, the Investment Agreement, the Commitment Letter, the New Third Lien Term Loan Credit Facility, the Trust Stock Appreciation Rights or the New Convertible Secured Note Indenture and the transactions contemplated thereby.

**11.5    Releases by Holders of Claims.  As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each holder of a Claim that affirmatively votes in favor of this Plan hereby forever releases, waives, and discharges all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities, including the Prepetition Lender Actions, whatsoever against the Released Parties, arising under or in connection with or related to the Debtors, the Estates, the conduct of the Debtors' business, the Chapter 11 Cases, this Plan (other than the rights under this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered hereunder) or the Reorganized Debtors, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, this Plan or the Reorganized Debtors; provided, however, that nothing contained herein is intended to operate as a release of any potential claims by third parties against any parties that have signed Tolling Agreements with a third party, but only with respect to Claims covered by such Tolling Agreements and only to the extent that such Tolling Agreements continue to be in full force and effect and the tolling periods contemplated thereby have not expired as of the Effective Date. Notwithstanding anything to the contrary herein, this Plan shall not discharge, enjoin or restrain the assertion, institution or enforcement of any claims against any non-debtor parties (a) that may be held by the Securities and Exchange Commission or (b) with respect to the Pension Plans, including any claim for breach of fiduciary duty or any claim asserted by the Pension Benefit Guaranty Corporation.**

**11.6    Setoffs**.  Except with respect to Claims specifically Allowed under the Plan, including the Prepetition Lender Claims, the Debtors may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such Claimholder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Claimholder.

**11.7    Exculpation and Limitation of Liability**.  Except as otherwise specifically provided in this Plan, the Released Parties, any of such parties' respective present officers, directors, managing members, employees, advisors, attorneys, representatives, financial advisors, investment bankers, or agents and any of such parties' successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, right, Cause of Action and liability to one another or to any Claimholder or Interestholder, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, investment bankers, attorneys or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of (i) the filing and prosecution of the Chapter 11 Cases, (ii) the negotiation and execution of the exit facility commitment letter by and among Silver Point, IBC and Brands dated October 18, 2007 as amended and restated as of November 6, 2007, the Commitment Letter, the Term Loan Facility Commitment Papers, the ABL Facility Commitment Papers, the New Credit Facility Documents, the Investment Agreement, the New Convertible Secured Note Indenture, the New Convertible Secured Notes and the New Third Lien Term Loan Credit Facility, (iii) the negotiation and filing of this Plan, (iv) the pursuit of confirmation of this Plan, (iv) the negotiation and pursuit of approval of the Disclosure Statement, (v) the consummation of this Plan, and (vi) the administration of this Plan or the property to be distributed under this Plan, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.  Notwithstanding anything to the contrary contained herein, this Section 11.7 shall not release any party from any claim, obligation, right, Cause of Action or liability arising from any act or omission committed in bad faith, gross negligence or willful misconduct.

**11.8    Indemnification Obligations**.  Except as specifically provided in Sections 6.4 and 6.7 of this Plan, in satisfaction and compromise of the Indemnitees' Indemnification Rights: (a) all Indemnification Rights except those held by (i) Persons included in either the definition of "Insured Persons" or the "Insureds" in any of the policies providing the D&O Insurance, and (ii) Professionals, but only to the extent that they have expressly been granted Indemnification Rights in the documents filed with the Bankruptcy Court and only to the extent that such Indemnification Rights are determined to be valid and enforceable, shall be released and discharged on and as of the Effective Date; provided that the Indemnification Rights excepted

A-61

from the release and discharge shall remain in full force and effect on and after the Effective Date and shall not be modified, reduced, discharged, or otherwise affected in any way by the Chapter 11 Cases; (b) the Debtors or Reorganized Debtors, as the case may be, covenant to use commercially reasonable efforts to purchase and maintain D&O Insurance providing coverage for those Persons described in subsection (a)(i) of this Section 11.8 whose Indemnification Rights are not being released and discharged on and as of the Effective Date, for a period of six years after the Effective Date insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for, or on behalf of the Debtors or the Reorganized Debtors in at least the scope and amount as currently maintained by the Debtors (the "Insurance Coverage"); and (c) the Debtors or the Reorganized Debtors, as the case may be, hereby indemnify such Persons referred to in subclause (b) above to the extent of, and agree to pay for, any deductible or retention amount that may be payable in connection with any claim covered by either under the foregoing Insurance Coverage or any prior similar policy.

**11.9   Injunction.  The satisfaction, release, and discharge pursuant to this Article XI of this Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim or Cause of Action satisfied, released, or discharged under this Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.**

**11.10   Central States Settlement**.  Notwithstanding anything to the contrary contained in this Plan and assuming that no complete withdrawal as contemplated pursuant to 29 U.S.C. §§ 1383 and 1385 occurs prior to or in connection with this Plan (all as previously agreed to in the Settlement Agreement dated November 14, 2006 (as approved by the Bankruptcy Court on November 13, 2006)), any claim against or liability of (including, without limitation, any liability or claim for withdrawal liability under 29 U.S.C. §§ 1383 and 1385) any of the Debtors or any third-party to the Central States Fund, a multi-employer plan as that term is defined by 29 U.S.C. § 1301(a)(3) (the "Central States Plan"), specifically including Claim Nos. 9205, 9206, 9207, 9208, 9209, 9214, 9215, 9216 and 9217, is left unimpaired under this Plan, shall not be discharged and shall continue unaltered as if the Chapter 11 Cases had not been commenced, nor shall any third-party be released from any liability or claim that the Central States Plan may have against that third-party as a result of any one of the Debtor's participation in the Central States Plan.  The Debtors shall seek inclusion of the foregoing in the Confirmation Order.  In light of the foregoing provisions, the Central States Plan shall have no right to receive any distribution on account of the Complete Withdrawal Claim (as such term is defined in the Settlement Agreement referred to in this Section 11.10) and shall not be permitted to vote on or object to this Plan on account of such contingent claim.  Nothing

contained herein is intended to alter the terms of the Settlement Agreement referred to this Section 11.10.

**11.11  Other Pension Plans**.   Notwithstanding anything to the contrary contained in this Plan, to the extent the withdrawal liability under 29 U.S.C. §§ 1383 and 1385 as asserted or assertable by the New York State Teamsters Conference Pension and Retirement Fund, Western Pennsylvania Teamsters and Employers Pension Fund and New England Teamsters and Trucking Industry Pension Fund has not yet been incurred and remains a potential withdrawal liability of the Debtors as of the Effective Date, then such withdrawal liability claim shall continue unaltered as if the Chapter 11 Cases had not been commenced, nor shall any third-party be released from any potential withdrawal liability claim that the New York State Teamsters Conference Pension and Retirement Fund, Western Pennsylvania Teamsters and Employers Pension Fund and New England Teamsters and Trucking Industry Pension Fund may have against a third-party as a result of the Debtors' participation in the New York State Teamsters Conference Pension and Retirement Fund, Western Pennsylvania Teamsters and Employers Pension Fund and New England Teamsters and Trucking Industry Pension Fund.  None of the foregoing shall have a right to receive any distribution on account of a withdrawal liability claim that has not yet been incurred and remains a potential withdrawal liability claim and shall not be permitted to vote on or object to this Plan on account of such withdrawal liability claim.

## ARTICLE XII

## CONDITIONS PRECEDENT

**12.1   Conditions to Confirmation**.  The following are conditions precedent to confirmation of this Plan that must be satisfied unless waived in accordance with Section 12.3 of this Plan:

(a)     The Bankruptcy Court shall have approved a disclosure statement with respect to this Plan in form and substance reasonably satisfactory to the Debtors, the Prepetition Investors and Equity Investors.

(b)     The Confirmation Order, this Plan, and all exhibits and annexes to each of this Plan and the Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, the Prepetition Investors and Equity Investors.

**12.2   Conditions to Consummation**.   The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied unless waived in accordance with Section 12.3 of this Plan:

(a)    The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order) authorizing the rejection of unexpired leases and executory contracts by the Debtors as contemplated by Section 7.2 hereof.

(b)    The Debtors shall have entered into the New Credit Facilities, the New Convertible Secured Note Indenture and the New Third Lien Term Loan Credit Facility and all conditions precedent to the consummation thereof shall have been waived (subject to any applicable consent requirements) or satisfied in accordance with the terms thereof.

(c)    All conditions precedent in the Investment Agreement shall have been waived (subject to any applicable consent requirements) or satisfied in accordance with the terms thereof.

(d)    The Confirmation Order, with the Plan and all exhibits and annexes to each, in form and substance reasonably acceptable to the Debtors, the Prepetition Investors and Equity Investors, shall have been entered by the Bankruptcy Court on or before January 15, 2009, and shall be a Final Order, and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending; provided, however, that if the Confirmation Order has not become a Final Order because a notice of appeal has been timely filed and the parties are not stayed or enjoined from consummating the Investment or the Transaction, this Section 12.2(c) shall be deemed satisfied unless the effect of the appeal could reasonably be expected to be adverse to the business, operations, property, condition (financial or otherwise) or prospects of the Reorganized Debtors and their direct and indirect subsidiaries, taken as a whole, or adverse to Equity Investors or the Prepetition Investors, in each case as determined by Equity Investors or the Prepetition Investors, respectively.

(e)    The Bankruptcy Court shall have entered the Intercreditor Settlement Order.

(f)    All actions, documents and agreements necessary to implement this Plan shall be in form and substance reasonably satisfactory to the Debtors, Equity Investors and the Prepetition Investors and shall have been effected or executed as applicable.

(g)    The Confirmation Date shall have occurred and the Confirmation Order shall, among other things, provide that:

(i)    the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent;

(ii)    all executory contracts or unexpired leases assumed by the Debtors during the Chapter 11 Cases or under this Plan shall be assigned

A-64

and transferred to, and remain in full force and effect for the benefit of, the Reorganized Debtors, notwithstanding any provision in such contract or lease (including those described in sections 365(b)(2) and 365(f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables or requires termination of such contract or lease;

(iii)     the transfers of property by the Debtors (A) to the Reorganized Debtors (1) are or shall be legal, valid, and effective transfers of property, (2) vest or shall vest the Reorganized Debtors with good title to such property free and clear of all liens, charges, Claims, encumbrances, or Interests, except as expressly provided in this Plan or Confirmation Order, (3) do not and shall not constitute avoidable transfers under the Bankruptcy Code or under applicable non-bankruptcy law, and (4) do not and shall not subject the Reorganized Debtors to any liability by reason of such transfer under the Bankruptcy Code or under applicable non-bankruptcy law, including, without limitation, any laws affecting successor or transferee liability, and (B) to Claimholders under this Plan are for good consideration and value;

(iv)     except as expressly provided in this Plan or the Confirmation Order, the Debtors are discharged effective upon the Effective Date from any "debt" (as that term is defined in section 101(12) of the Bankruptcy Code), and the Debtors' liability in respect thereof is extinguished completely, whether reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or unfixed, matured or unmatured, disputed or undisputed, legal or equitable, known or unknown, or that arose from any agreement of the Debtors entered into or obligation of the Debtors incurred before the Effective Date, or from any conduct of the Debtors prior to the Effective Date, or that otherwise arose before the Effective Date, including, without limitation, all interest, if any, on any such debts, whether such interest accrued before or after the Petition Date;

(v)     the applicable provisions of the Reconstitution Order are incorporated into this Plan and or the Confirmation Order, as required by the Reconstitution Order;

(vi)     this Plan does not provide for the liquidation of all or substantially all of the property of the Debtors and its confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization;

(vii)     all Interests (except Subsidiary Interests, but including the Brands Preferred Stock) are terminated effective upon the Effective Date;

(viii)     the issuance to the Prepetition Lenders of the New Convertible Secured Notes (including the New Common Stock into which

A-65

such New Convertible Secured Notes are convertible) and the distribution thereof shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code; and

(ix)    the Prepetition Lender Actions, and any adversary proceedings filed in connection therewith, are dismissed with prejudice.

(h)    The Trust Assets shall have been transferred to the Creditors' Trust and the Allowed Amount of the Old Convertible Note Indenture Trustee Fee Claim shall have been paid in Cash to the Old Convertible Note Indenture Trustee in accordance with Section 9.7(a) of this Plan.

(i)    All documents implementing the terms of the Intercreditor Settlement, including the Trust Stock Appreciation Rights, shall be in form and substance reasonably satisfactory to Equity Investors and the Prepetition Investors.

(j)    All documents implementing the terms of the Intercreditor Settlement, including the Trust Stock Appreciation Rights, shall be in form and substance reasonably satisfactory to the Creditors' Committee.

**12.3    Waiver of Conditions to Confirmation or Consummation**.    The conditions set forth in Sections 12.1 and 12.2 (other than the condition set forth in Section 12.2(e), 12.2(h) and 12.2(j)) of this Plan may be waived by the Debtors subject to such waiver being reasonably satisfactory to Equity Investors and the Prepetition Investors, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.    The failure to satisfy or waive any conditions to the Confirmation Date or the Effective Date may be asserted by the Debtors in their sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors in their sole discretion).    The failure of the Debtors in their sole discretion to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.    The conditions set forth in Section 12.2(e), 12.2(h) and 12.2(j) may be waived by the Debtors subject to such waiver being acceptable to the Creditors' Committee.

## ARTICLE XIII

## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and this Plan (except in the case of the New Credit Facility Documents, the New Convertible Secured Notes, the New Third Lien Term Loan, the Warrants, the New Common Stock and the Stockholders' Agreement, which shall be

subject to the jurisdiction indicated in the definitive documentation thereof), including, among others, the following matters:

(a)    to hear and determine pending motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid;

(b)    to adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or this Plan, or the Trust Agreement, proceedings to adjudicate the allowance of Disputed Claims, and all controversies and issues arising from or relating to any of the foregoing;

(c)    to adjudicate any and all disputes arising from the distribution of the New Convertible Secured Notes, the New Common Stock and the Warrants;

(d)    to ensure that distributions to Allowed Claimholders are accomplished as provided herein and in the Trust Agreement;

(e)    to hear and determine any and all objections to the allowance of Claims and the estimation of Claims, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to allow or disallow any Claim, in whole or in part;

(f)    to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(g)    to issue orders in aid of execution, implementation, or consummation of this Plan;

(h)    to enter such orders as may be necessary for the Trustee to satisfy its obligations pursuant to the Trust Agreement;

(i)    to consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(j)    to hear and determine all applications for compensation and reimbursement of Professional Claims under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

(k)     to determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

(l)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order or the Trust Agreement, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

(m)     to hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of its Estates, wherever located;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     to hear any other matter not inconsistent with the Bankruptcy Code;

(p)     to hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(q)     to hear and determine all disputes involving the releases and exculpations granted herein and the injunctions established herein;

(r)     to enter a final decree closing the Chapter 11 Cases; and

(s)     to enforce all orders previously entered by the Bankruptcy Court.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims, Interests, Retained Actions, the Trust Agreement, the Trust Assets and the Trust Claims and any motions to compromise or settle such disputes.

## ARTICLE XIV

## MISCELLANEOUS PROVISIONS

**14.1    Binding Effect**.  As of the Effective Date, this Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former Claimholders, all present and former Interestholders, other parties-in-interest and their respective heirs, successors, and assigns.

**14.2    Modification and Amendments**.  The Debtors may alter, amend, or modify this Plan or any Exhibits hereto under section 1127(a) of the Bankruptcy Code, in a form that is reasonably satisfactory to Equity Investors and the Prepetition Investors, at any time prior to the Confirmation Hearing.   After the Confirmation Date and prior to substantial consummation of this Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Plan.

**14.3    Withholding and Reporting Requirements**.  In connection with this Plan and all instruments issued in connection therewith and distributions thereunder, the Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**14.4    Allocation of Plan Distributions Between Principal and Interest**. To the extent that any Allowed Claim entitled to a distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, for United States federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

**14.5    Creditors' Committee**.   Effective on the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to applications for Professional Claims.   The professionals retained by the Creditors' Committee shall not be entitled to compensation and reimbursement of expenses for services rendered after the Effective Date, except for services rendered in connection with (a) the implementation of the transactions contemplated to occur on the Effective Date hereunder and (b) applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date pursuant to Section 9.2 hereof.

A-69

**14.6    Payment of Statutory Fees**.    All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation hearing, shall be paid on the Effective Date.    The Reorganized Debtors will continue to pay fees pursuant to section 1930 of title 28 of the United States Code as required by that section.

**14.7    Revocation, Withdrawal, or Non-Consummation**.

(a)    *Right to Revoke or Withdraw.*    Each Debtor reserves the right to revoke or withdraw this Plan at any time prior to the Effective Date.

(b)    *Effect of Withdrawal, Revocation, or Non-Consummation.*    If the Debtors revoke or withdraw this Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan, any settlement, or compromise embodied in this Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), the assumption or rejection of executory contracts or unexpired leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be null and void.    In such event, nothing contained herein, and no acts taken in preparation for consummation of this Plan, shall be deemed to constitute a waiver or release of any Claims by or against or Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

**14.8    Notices**.    Any notice required or permitted to be provided to the Debtors, the Creditors' Committee, the Prepetition Agent, the DIP Agent, the Prepetition Investors or Equity Investors under this Plan shall be in writing and served by (a) certified mail, return receipt requested, (b) hand delivery, or (c) overnight delivery service, to be addressed as follows:

If to the Debtors:

INTERSTATE BAKERIES CORPORATION
12 E Armour Blvd
Kansas City, Missouri 64111
Attn:   General Counsel

with copies to:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606-1285
Attn:   J. Eric Ivester

– and –

STINSON MORRISON HECKER LLP
1201 Walnut, Suite 2900
Kansas City, Missouri 64106-2150
Attn:   Paul M. Hoffmann (Missouri Bar No. 31922)

If to the Creditors' Committee:

LOWENSTEIN SANDLER PC
65 Livingston Avenue
Roseland, New Jersey 07068
Attn:   Kenneth Rosen

– and –

SHUGART THOMASON & KILROY PC
120 West 12th Street
Kansas City, Missouri 64105
Attn:   Paul Sinclair

If to the Prepetition Agent:

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue, 27th Floor
New York, New York 10017
Attn:   Kenneth Ziman

– and –

SPENCER FANE BRITT & BROWNE LLP
1000 Walnut, Suite 1400
Kansas City, Missouri 64106
Attn:   Scott Goldstein

If to the DIP Agent:

BRYAN CAVE, LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 64106
Attn:   Gregory D. Willard

If to Silver Point:

    SILVER POINT FINANCE, LLC
    2 Greenwich Plaza, 1st FL
    Greenwich, Connecticut 06830
    Attn:   Fred Fogel

    with a copy to:

    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
    1285 Avenue of the Americas
    New York, New York 10019-6064
    Attn:   Alan W. Kornberg

If to Monarch Alternative Capital L.P.:

    MONARCH ALTERNATIVE CAPITAL L.P.
    535 Madison Avenue
    17th Floor
    New York, New York  10022
    Attn:   Robert G. Burns

If to McDonnell Investment Management LLC:

    MCDONNELL INVESTMENT MANAGEMENT LLC
    Alternative Credit Strategies Group
    1515 West 22nd Street, 11th Floor
    Oak Brook, Illinois  60523
    Attn:   Zoltan Donovan

    with a copy to:

    WINSTON & STRAWN LLP
    Winston & Strawn LLP
    35 W. Wacker Drive
    Chicago, Illinois 60601-9703
    Attn:   Jai S. Khanna

If to Equity Investors:

    IBC INVESTORS I, LLC
    c/o Ripplewood Holdings L.L.C.
    One Rockefeller Plaza, 32nd Floor
    New York, New York 10020
    Attn:   Christopher Minnetian, Esq.

with a copy to:

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York  10019-7475
Attn:   Richard Levin, Esq.

**14.9   Term of Injunctions or Stays**.  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**14.10   Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein or in the relevant governing agreement, document or instrument, the laws of the State of New York shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan.

**14.11   Waiver and Estoppel**.  Each Claimholder or Interestholder shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, or any other Person, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

**14.12   Rights of Equity Investors**.  Notwithstanding anything herein to the contrary or an affirmative vote to accept this Plan, nothing contained in this Plan shall alter, amend, or modify the rights of Equity Investors under the Commitment Letter or the Investment Agreement unless such alteration, amendment, or modification has been agreed to in writing by Equity Investors in accordance with the terms of the Commitment Letter or the Investment Agreement, as applicable.

**14.13   Rights of the Prepetition Investors**.   Notwithstanding anything herein to the contrary or an affirmative vote to accept this Plan, nothing contained in this Plan shall alter, amend, or modify the rights of the Prepetition Investors under the New Credit Facility Documents, the Commitment Letter or the Term Loan Facility Commitment Papers unless such alteration, amendment, or modification has been agreed to in writing by the Prepetition Investors.

**14.14  Allowance of Old Convertible Notes Claim**.  The Old Convertible Notes Claim shall be Allowed in the amount of $100,649,000.  The Allowed Old Convertible Notes Claim shall not be reduced on account of payment of the Old Convertible Note Indenture Trustee Fee Claim.

Dated: **Kansas City, Missouri**
      **October 31, 2008**

                  INTERSTATE BAKERIES CORPORATION AND ITS
                  AFFILIATES AND SUBSIDIARIES THAT ARE ALSO
                  DEBTORS AND DEBTORS-IN-POSSESSION IN THE
                  CHAPTER 11 CASES

                  By:  /s/ Craig D. Jung
                        Craig D. Jung
                        Chief Executive Officer of Interstate Bakeries
                        Corporation

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
333 West Wacker Drive
Chicago, Illinois  60606-1285
Attn:   J. Eric Ivester
       Samuel S. Ory

     – and –

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
Attn:   J. Gregory Milmoe (JM 0919)

     – and –

STINSON MORRISON HECKER LLP
1201 Walnut, Suite 2900
Kansas City, MO 64106-2150
Attn:   Paul M. Hoffmann (Missouri Bar No. 31922)

ATTORNEYS FOR INTERSTATE BAKERIES
CORPORATION AND ITS SUBSIDIARIES AND
AFFILIATES THAT ARE ALSO DEBTORS AND
DEBTORS-IN-POSSESSION IN THE CHAPTER 11
CASES

PLAN EXHIBIT A-1

NONEXCLUSIVE LIST OF
RETAINED ACTIONS AND AVOIDANCE CLAIMS

All Plan Exhibits are subject to all of the provisions of the Amended Joint Plan of
Reorganization of Interstate Bakeries Corporation and its Affiliated Debtors And Debtors-in-
Possession Dated October 31, 2008 (as subsequently modified or amended, the "Plan"),
including, without limitation, Article 14.2, under which the Debtors have reserved the right to
alter, amend, or modify the Plan or any Exhibits thereto under section 1127(a) of the Bankruptcy
Code, in a form that is reasonably satisfactory to Equity Investors and the Prepetition Investors,
at any time prior to the Confirmation Hearing.

Retained Actions

General Note[1]

In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in this Plan, the Reorganized Debtors shall retain and may, in their sole discretion, enforce or prosecute all Retained Actions, a nonexclusive list of which is attached hereto as Exhibit A-1. The Debtors or the Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, compromise, or enforce such rights (or decline to do any of the foregoing). The Reorganized Debtors or any successors may prosecute (or decline to prosecute) such Retained Actions in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action. Except as otherwise provided herein, the failure of the Debtors to specifically list any Claim, right of action, suit or proceeding in the Schedules or in Exhibit A-1 does not, and will not be deemed to, constitute a waiver or release by the Debtors of such claim, right of action, suit or proceeding, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits or proceedings in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit or proceeding upon or after the confirmation or consummation of this Plan.

For the avoidance of any confusion, the Debtors and Reorganized Debtors expressly retain, among all other rights of action:

1.    Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against the American Bakers Association Retirement Plan (the "ABA Plan"), the Board of Trustees of the ABA Plan, Sara Lee Corporation, and/or any other parties affiliated with the ABA Plan, the Board of Trustees of the ABA Plan, or Sara Lee Corporation  as generally described in Section VI. H. 8 of the Disclosure Statement.

2.    Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against any third parties, including but not limited to one or more funds affiliated with the Retail, Wholesale and Department Store Union ("RWDSU") for overpayment of benefits or contributions or otherwise.

3.    Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against any third parties for tortious interference, RICO violations or otherwise for impeding or interfering with the Debtors' (i) relationships with its employees and/or their union representatives or (ii) efforts to propose and confirm a plan of reorganization or maximize value for the Debtors' estates through sales of the Debtors' assets or otherwise.

---

1    Capitalized terms used in this Exhibit and not otherwise defined have the meanings ascribed to such terms in the Plan.

4.      Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against Flowers Bakeries Brands, Inc., a competitor of the Company, including, but not limited to, those claims, Causes of Action and rights of action related to the trademark lawsuit in federal court in Atlanta (No. 1.08-CV-02376-TWT).

5.      Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against Kirin Flexible Packaging, a competitor of the Company, including, but not limited to, those claims, Causes of Action and rights of action related to the breach of contract lawsuit in the Superior Court of the State of California for the County of Los Angeles (No. BC389983)

6.      Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against (i) the following parties identified in that certain First Amended and Restated Complaint to Avoid Preferential Transfers and for Judgment, Adversary Action No. 06-04191 (the "Preference Adversary Proceeding"), pending in the Cases, and (ii) parties that have executed Tolling Agreements with the Debtors regarding the issues raised in the Preference Adversary Proceeding:

| Defendant | Total Transfers |
| --- | --- |
| | |
| AARHUS UNITED USA, INC. PHILADELPHIA PA | $   335,461.40 |
| AG PROCESSING INC KANSAS CITY MO | 288,042.90 |
| AGVEST, INC. BUFFALO NY | 69,360.00 |
| ALLIED CUSTOM GYPSUM | 180,702.00 |
| ALTA DENA CERTIFIED DAIRY LOS ANGELES CA | 266,563.59 |
| AMERADA HESS CORPORATION | 633,076.93 |
| AMF BAKERY SYSTEMS | 67,646.76 |
| BALTIMORE SPICE | 77,735.19 |
| BARRY CALLEBAUT | 1,378,524.56 |
| BC WILLIAMS BAKERY SERVICE | 2,290,621.28 |
| BERBERIAN NUT COMPANY STOCKTON CA | 277,633.58 |
| BETTER MADE POTATO CHIPS DETROIT MI | 69,177.59 |
| BOC GASES | 381,346.52 |
| BP ENERGY (GAS) | 217,844.63 |
| BP PRODUCTS | 558,983.51 |
| BRYCE CORPORATION | 499,801.88 |
| BUNGE | 2,810,396.53 |
| BURD & FLETCHER KANSAS CITY MO | 351,026.32 |
| BYRTON DAIRY PRODUCTS, INC. LAKE FOREST IL | 81,235.60 |
| BYRTON DAIRY PRODUCTS, INC. MILWAUKEE WI | 81,304.00 |
| CAIN FOOD INDUSTRIES | 69,378.18 |
| CAMPBELL MITHUN ESTY INC MINNEAPOLIS MN | 7,923,011.26 |
| CAPITOL DISTRIBUTION CO. SANTA FE SPRINGS CA | 158,377.65 |
| CENTERPOINT | 248,773.06 |
| CEREFORM USA COLUMBUS OH | 156,874.24 |

| | |
|---|---|
| CHALLENGE DAIRY PRODUCTS SAN FRANCISCO CA | 156,348.96 |
| CHERRCO INC | 878,819.40 |
| CHEVRON | 129,723.75 |
| CHICAGO DISPLAY MILWAUKEE WI | 85,111.29 |
| CHIQUITA BRANDS INC | 134,914.80 |
| CINTAS | 636,655.90 |
| COCA COLA | 845,191.06 |
| CONSOLIDATED BISCUIT CO MC COMB OH | 116,496.19 |
| DANISCO USA, INC | 977,204.87 |
| DEER CREEK HONEY FARMS, LTD LONDON OH | 80,465.40 |
| DLT SVC & FREIGHT | 4,459,312.19 |
| ENERGY USA | 97,165.79 |
| ENERGY USA-TPC | 89,149.83 |
| EVERSON SPICE CO. LONG BEACH CA | 96,051.85 |
| FATHER SAMS BAKERY | 374,387.38 |
| FAYGO BEVERAGERS, INC. DETROIT MI | 64,537.60 |
| FIRST UNION COMMERCIAL CHARLOTTE NC | 1,288,422.14 |
| FLEET CAPITAL LEASING | 971,745.81 |
| FORAN SPICE CO. OAK CREEK WI | 127,464.00 |
| FOSTER FARMS DAIRY | 110,339.11 |
| FREIGHTLINEER | 57,286.30 |
| FRITO LAY, INC | 1,561,684.98 |
| GASMARK WYOMISSING PA | 54,557.46 |
| GE CAPITAL BUSINESS ASSETS | 690,409.67 |
| GE FLEET SERVICES | 129,694.37 |
| GLOPAK ST-LEONARD QC | 2,332,791.93 |
| GREAT GRAIN, LLC / BUBBAS BAKESALT LAKE CITY UT | 469,427.00 |
| GRAIN MILLERS INC | 193,853.29 |
| GREAT LAKES TRADING CO. TRAVERSE CITY MI | 93,621.93 |
| GREEN VALLEY PECAN CO. SAHUARITA AZ | 80,096.30 |
| GUITTARD CHOCOLATE COMPANY SAN FRANCISCO CA | 887,424.58 |
| HART INDUSTRIES, INC. OWINGS MILLS MD | 333,726.20 |
| HEWLETT PACKARD | 801,764.07 |
| HONEY HOLDING I FARM HOUSTON TX | 228,245.20 |
| IDAHO PACIFIC CORPORATION RIRIE ID | 160,315.98 |
| IGI RESOURCES (GAS) | 129,941.61 |
| INFINITE ENERGY, INC. ORLANDO FL | 235,210.59 |
| INNOVATIVE CEREAL SYSTEMS | 3,596,912.60 |
| INTERMEC TECHNOLOGIES CORPORATION | 746,569.97 |
| INTERNATIONAL FIBER CORPORATION | 529,050.40 |
| INTERNATIONAL FLAVORS & FRAGRANCES PHILADELPHIA PA | 60,761.50 |
| INTERNATIONAL MOLASSES CORP. ROCHELLE PARK NJ | 283,720.13 |
| INTERNATIONAL PAPER COMPANY | 366,264.32 |
| INTL PAPER | 71,378.00 |

| | |
|---|---|
| IRVING OIL CORP. BANGOR ME | 247,258.12 |
| J & K INGREDIENTS PATERSON NJ | 73,777.10 |
| J. B. HUNT TRANSPORT, INC CHARLOTTE NC | 285,809.45 |
| JENCO, INC. GREENSBORO NC | 195,050.78 |
| JEWEL APPLE, LTD. YAKIMA WA | 65,488.50 |
| JSO ASSOCIATES GREAT NECK NY | 86,651.00 |
| KERRY INGREDIENTS ATLANTA GA | 123,198.40 |
| KEY MIX CORPORATION BALTIMORE MD | 175,661.98 |
| KRAFT FOODS | 303,976.62 |
| LESAFFRE YEAST CORPORATION MILWAUKEE WI | 66,943.50 |
| LEVEL VALLEY CREAMERY | 172,815.99 |
| LION RAISIN CO | 824,263.04 |
| LODERS CROKLAAN USA CHARLOTTE NC | 223,199.45 |
| MALNOVE, INC | 3,333,621.95 |
| MASTER PACKAGING, INC | 610,667.23 |
| MCCORMICK & COMPANY | 84,007.00 |
| MENNEL MILLING COMPANY KANSAS CITY MO | 269,256.79 |
| MISSION FOODS | 78,634.00 |
| MGP INGREDIENTS | 432,769.32 |
| MICHAEL FOODS, INC | 4,775,614.75 |
| MRB FOOD SOURCES LINCOLN CA | 63,382.00 |
| NIACET CORPORATION | 691,980.48 |
| NORTH AMERICAN SALT ATLANTA GA | 160,110.93 |
| NORTH PACIFIC FOOD PRODUCTS SAINT LOUIS MO | 188,895.31 |
| OLD DUTCH FOOD INC SAINT PAUL MN | 122,454.71 |
| OLD LONDON FOODS INC | 64,335.49 |
| PEPSI | 586,372.32 |
| PETERSON FARMS INC | 117,112.60 |
| PINNACLE FOODS CORPORATION | 605,033.30 |
| PRESTIGE PAK, INC | 1,058,121.48 |
| PRINTPACK, INC | 2,948,765.71 |
| PURATOS CORPORATION | 126,968.73 |
| PERDUE FARMS INC | 753,998.95 |
| REYNOLDS FOOD PACKAGING | 762,648.55 |
| ROCK TENN COMPANY | 2,136,551.50 |
| ROQUETTE AMERICA, INC. CHICAGO IL | 125,633.80 |
| ROYAL PETROLEUM CO PHILADELPHIA PA | 118,935.55 |
| SENSIENT FLAVORS | 217,388.98 |
| SHAMROCK SALES & SERVICE NIPOMO CA | 202,240.55 |
| SMURFIT-STONE | 131,486.23 |
| SOLAE COMPANY LLC | 162,419.09 |
| ST. JOHNS PACKAGING LTD | 1,102,586.99 |
| SUN-MAID | 331,068.18 |
| T.J. HARKINS CHICAGO IL | 601,464.50 |
| TABLE TALK PIES INC WORCESTER MA | 370,406.92 |
| TALAMO FOODS GILROY CA | 62,416.44 |
| THE BRYCE COMPANY LLC | 221,924.95 |
| THE LONG COMPANY CHICAGO IL | 97,644.82 |

| | |
|---|---|
| TJ HARKINS CO. WOOD DALE IL | 74,410.00 |
| UGI ENERGY SERVICES | 445,686.43 |
| UNITED PARCEL SERVICE | 246,173.81 |
| UNITED SALT CORPORATION DALLAS TX | 78,937.04 |
| US FLEET LLC ROCKY MOUNT NC | 220,796.56 |
| US SALT LLC ATLANTA GA | 81,080.44 |
| UTZ QUALITY FOOD HANOVER PA | 81,407.30 |
| WACHOVIA TRUSTEE (463-676 PENS VALLEY FORGE PA | 398,436.72 |
| WASATCH ENERGY CORP SALTLAKE CITY UT | 90,110.19 |
| WEYERHAEUSER PACKAGING, INC | 883,189.81 |
| WPS ENERGY SERVICE INC GREEN BAY WI | 85,634.49 |
| AMERICAN SUGAR REFINING, INC. | 4,548,062.04 |
| OKEELANTA CORPORATION | 588,824.74 |
| CLEAR PACK COMPANY FRANKLIN PARK IL | 289,879.79 |
| THE FIBRED GROUP LAVALE MD | 599,201.65 |

The Debtors reserve their right to modify this list to amend, add or remove parties or otherwise update this list, but disclaim any obligation to do so.

PLAN EXHIBIT A-2

<u>TRUST AVOIDANCE CLAIMS</u>

All Plan Exhibits are subject to all of the provisions of the Amended Joint Plan of Reorganization of Interstate Bakeries Corporation and its Affiliated Debtors And Debtors-in-Possession Dated October 31, 2008 (as subsequently modified or amended, the "Plan"), including, without limitation, Article 14.2, under which the Debtors have reserved the right to alter, amend, or modify the Plan or any Exhibits thereto under section 1127(a) of the Bankruptcy Code, in a form that is reasonably satisfactory to Equity Investors and the Prepetition Investors, at any time prior to the Confirmation Hearing.

Trust Avoidance Claims

General Note[1]

In accordance with section 1123(b)(3) of the Bankruptcy Code and section 10.2 of the Plan, the Reorganized Debtors shall transfer and shall be deemed to have transferred to the Creditors' Trust, for and on behalf of the beneficiaries of the Trust, the below-described Trust Claims.  The Trust, in its sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Trust Claims (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action unless such approval is required under the Plan.  The Trustee or the Creditors' Trust or any successors may prosecute (or decline to prosecute) such Trust Claims in accordance with the best interests of the Creditors' Trust beneficiaries or any successors holding such rights of action.

1.      Any and all claims, Causes of action, rights of action, suits, and proceedings in favor of the Debtors or their Estates as set forth in the Intercreditor Settlement Order.

2.      Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against the following parties identified in that certain First Amended and Restated Complaint to Avoid Preferential Transfers and for Judgment, Adversary Action No. 06-04191, pending in the Cases:

| Defendant | Total Transfers |
|---|---|
| | |
| CONCORD FOODS, INC. BROCKTON MA | $     223,724.17 |
| CORPORATE EXPRESS | 79,741.23 |
| DAWN FOOD PRODUCTS JACKSON MI | 306,875.44 |
| FIELD CONTAINER CO. L.P. CHICAGO IL | 333,455.35 |
| FUEL MANAGERS, INC | 616,305.65 |
| LEASE PLAN USA ATLANTA GA | 207,784.65 |
| LYNCH OIL COMPANY, INC. KISSIMMEE FL | 52,943.13 |
| OZBURN - HESSEY LOGISTICS LLC CINCINNATI OH | 81,355.96 |
| SEMPRA ENERGY | 855,251.98 |
| STOCKTON OIL COMPANY BILLINGS MT | 100,209.19 |
| SUMMIT ENERGY SER. INC. LOUISVILLE KY | 60,000.00 |
| TEXICAN HORIZON ENERGY MKTING TOMBALL TX | 95,153.63 |
| ACF INDUSTRIES, LLC SAINT LOUIS MO | 375,474.24 |
| ALPHA BAKING CO CHICAGO IL | 93,547.57 |
| ATMOS ENERGY | 273,340.71 |
| BOGHOSIAN RAISIN | 68,160.00 |
| DH ASSOCIATES PALMYRA NY | 60,268.19 |
| FLOWERS FOODS SPECIALTY | 152,852.54 |
| GLOBAL CROSSING | 203,242.23 |

---

[1]      Capitalized terms used in this Exhibit and not otherwise defined have the meanings ascribed to such terms in the Plan.

| | |
|---|---|
| IKON | 84,736.86 |
| MARATHON ASHLAND PETROLEUM | 56,204.66 |
| METRO PACKAGING & IMAGING WAYNE NJ | 73,565.14 |
| QWEST | 146,808.50 |
| TRANS MONTAIGNE DENVER CO | 103,540.47 |
| A B C DISTRIBUTORS LITHIA FL | 60,000.00 |
| ADECCO EMPLOYMENT SERV. | 84,647.48 |
| AIRDRAULIC ENGINEERING RANDOLPH MA | 54,870.00 |
| AIRGAS | 104,575.27 |
| ALABAMA POWER CO | 66,112.23 |
| ALL AMERICAN FOODS, INC. MANKATO MN | 163,162.50 |
| AMEREN CILCO | 391,238.77 |
| AMERENUE | 572,031.94 |
| AMERICAN ELECTRIC CO | 83,081.24 |
| AMERICAN ELECTRIC POWER | 273,230.75 |
| AMERICAN EXPRESS FT LAUDERDALE FL | 82,024.41 |
| AQUALON COMPANY ATLANTA GA | 57,927.50 |
| AUTO-HYDRAULICS, INC. LAUREL MD | 52,436.98 |
| AVALON PETROLEUM | 124,736.17 |
| BACKSTROM & HEINRICHS SAN DIEGO CA | 58,022.09 |
| BELLSOUTH | 135,579.07 |
| BFI | 134,855.47 |
| BLACK HAWK COUNTY TREASURER WATERLOO IA | 85,964.00 |
| BOGHOSIAN RAISIN CO. FOWLER CA | 93,418.87 |
| BOMBARDIER CAPITAL RAIL INC. JACKSONVILLE FL | 83,100.00 |
| BRIGGS & BRIGGS, INC. DALLAS TX | 90,076.04 |
| BROESCH MECHANICAL SERVICES INC | 73,819.34 |
| BURLESONS PURE HONEY WAXAHACHIE TX | 80,137.31 |
| CALIFORNIA PRETZEL CO SAN FRANCISCO CA | 97,184.50 |
| CASANOVA PENDRILL COSTA MESA CA | 232,468.00 |
| CERTIFIED FOODS SAN LEANDRO CA | 98,089.82 |
| CHAZEN ENGINEERING & LAND SURVEY POUGHKEEPSIE NY | 73,898.04 |
| CINERGY | 245,585.04 |
| CITY ALEX ALEXANDRIA LA | 65,707.71 |
| CITY OF ALEXANDRIA LA | 133,098.03 |
| CITY OF BIDDEFORD BIDDEFORD ME | 172,854.39 |
| CITY OF EMPORIA EMPORIA KS | 67,623.73 |
| CITY OF GLENDALE LOS ANGELES CA | 210,801.89 |
| CITY OF LA, PUBLIC WORKS/SANITLOS ANGELES CA | 58,901.09 |
| CITY OF LOS ANGELES MUNICIPAL LOS ANGELES CA | 179,938.55 |
| CLARK COUNTY  LAS VEGAS NV | 77,068.99 |
| CLOVERHILL BAKERY BEDFORD PK IL | 192,170.48 |
| CLOVERHILL PASTRY-VEND | 373,345.80 |
| CM PRODUCTS CHICAGO IL | 65,134.20 |
| COMMAND LABOR | 325,720.88 |
| COMMAND LABOR LLC LAS VEGAS NV | 102,615.56 |
| COMMERCIAL ENERGY ACC: MDU8CUT BANK MT | 95,647.98 |

| | |
|---|---|
| COMMONWEALTH EDISON CHICAGO IL | 182,440.11 |
| CON EDISON NEW YORK NY | 344,361.05 |
| CONSUMERS ENERGY | 89,144.00 |
| CONSUMERS FLAVORING EXTRACT BROOKLYN NY | 110,608.41 |
| CONTINENTAL FOOD SALES, INC. BAINBRIDGE ISLAND WA | 126,217.70 |
| CORNERSTONE ENERGY, INC. OMAHA NE | 217,368.60 |
| COUER DALENE FRENCH BAKING | 224,871.92 |
| COUER DALENE FRENCH BAKING CO | 387,547.81 |
| CREATIVE FOODS LLC BLYTHEVILLE AR | 75,803.84 |
| CREME CURLS BAKERY INC HUDSONVILLE MI | 122,542.16 |
| CROMPTON CORPORATION PALATINE IL | 75,255.34 |
| CUSTOM INDUSTRIES SAINT LOUIS MO | 118,003.08 |
| DAVIS TRUCK SERVICE INC ELKHART IL | 535,839.60 |
| DEEM, LLC INDIANAPOLIS IN | 83,008.69 |
| DEGUSSA FLAVORS & FRUIT SYSTEM PHILADELPHIA PA | 256,583.05 |
| DMV SACRAMENTO CA | 128,615.10 |
| DOBAKE BAKERIES, INC | 969,409.20 |
| DON JULIO FOODS FREEPORT CENTER CLEARFIELD UT | 451,804.76 |
| DONS WELDING SERVICE SAINT LOUIS MO | 223,315.81 |
| DTE ENERGY | 84,702.22 |
| DUKE POWER | 236,393.64 |
| DYNAMIC DISPLAY BASKING RIDGE NJ | 121,449.50 |
| EXXON | 212,098.02 |
| E-ZPASS STATEN ISLAND NY | 166,265.29 |
| FABRICON PRODUCTS, INC. DETROIT MI | 65,619.25 |
| FLORIDA POWER & LIGHT CO | 174,055.51 |
| FLYING J | 253,683.08 |
| FOOD FOR LIFE CORONA CA | 93,118.38 |
| FORSYTHE SOLUTIONS GROUP INC. CHICAGO IL | 135,361.50 |
| FREUND BAKING CITY OF COMMERCE CA | 979,065.32 |
| FRONTIER TRUST COMPANY | 75,594.63 |
| GATE FUEL SERVICES INC. JACKSONVILLE FL | 121,971.73 |
| GEORGIA POWER COMPANY | 311,774.56 |
| GEORGIA-PACIFIC CHICAGO IL | 79,385.39 |
| GLAZE COMMERCIAL REAL ESTATE KANSAS CITY MO | 123,300.52 |
| GLOBAL MANAGEMENT SERVICES | 555,787.04 |
| GOLDEN GATE TRUCK CENTER OAKLAND CA | 349,752.24 |
| GRIFFITH LABORATORIES | 129,809.12 |
| H & N PACKAGING, INC. COLMAR PA | 75,436.74 |
| H&S BAKERY INC | 85,140.98 |
| HAMPEL OIL DISTRIBUTORS WICHITA KS | 159,617.31 |
| HARMAN ATCHISON RESEARCH GROUP | |
| OVERLAND PARK KS | 183,150.00 |
| HESS MICROGEN WOODBRIDGE NJ | 173,876.00 |
| HORIZON SNACK FOODS CHICAGO IL | 197,191.08 |
| HOUSTON ENERGY SERV LLC | 388,084.83 |
| HUDSON RIVER GROUP VALHALLA NY | 60,844.00 |
| HUNT & SONS INC SACRAMENTO CA | 114,580.53 |
| I2 TECHNOLOGIES DALLAS TX | 94,990.00 |

| | |
|---|---|
| IFF PHILADELPHIA PA | 62,670.65 |
| INDIANAPOLIS POWER & LIGHT CO INDIANAPOLIS IN | 186,156.07 |
| INNOVATIVE ENTERPRISES, INC. WASHINGTON MO | 57,690.02 |
| ITL BELL GARDENS CA | 117,328.43 |
| JAMCO PARTS UNLIMITED SOMERVILLE NJ | 68,504.38 |
| JEA JACKSONVILLE FL | 127,716.04 |
| JEFFERSON SMURFIT CORP | 101,303.34 |
| JR WOOD CO. CHICAGO IL | 55,630.24 |
| KANSAS POWER & LIGHT CO KANSAS CITY MO | 119,117.74 |
| KIEL BROS COLUMBUS IN | 68,828.84 |
| KIEL BROS OIL CO, INC COLUMBUS IN | 77,317.63 |
| KIRIN FLEXIBLE PACKAGING CERRITOS CA | 205,607.52 |
| KUB KNOXVILLE TN | 95,788.21 |
| L&P FINANCIAL SERVICE C/O US BSAINT LOUIS MO | 93,033.94 |
| L.A. DWP | 230,866.57 |
| LANGLINAIS BAKING COMPANY LAFAYETTE LA | 237,684.52 |
| LONE STAR INDUSTRIES INC FRISCO TX | 130,444.36 |
| MAINE WILD BLUEBERRY CO. CHERRYFIELD ME | 303,577.85 |
| MANPOWER | 170,227.34 |
| MANSFIELD OIL CORP. | 184,633.57 |
| MCI | 852,916.72 |
| MEDWAY PLASTICS | 63,503.40 |
| MEMPHIS LIGHT GAS & WATER MEMPHIS TN | 301,716.94 |
| MERIT OIL CO BLOOMINGTON CA | 192,647.48 |
| MID AMERICAN ENERGY | 191,805.68 |
| MOORHEAD & COMPANY INC | 96,390.00 |
| MORABITO BAKING COMPANY NORRISTOWN PA | 63,421.40 |
| MOTION INDUSTRIES | 61,632.13 |
| M-TAG BALTIMORE MD | 138,120.00 |
| N Y INTERNATIONAL BREAD ORLANDO FL | 122,904.03 |
| NAPA | 95,199.85 |
| NATIONAL ENVIRONMENTAL GROUP, CEDARHURST NY | 72,069.05 |
| NATIONAL FUEL RESOURCES WILLIAMSVILLE NY | 86,127.28 |
| NATIONAL OIL & SUPPLY CO INC TULSA OK | 92,553.51 |
| NEVADA POWER COMPANY | 308,941.62 |
| NEW YORK INTERNATIONAL ORLANDO FL | 136,473.99 |
| NEXCOR TECHNOLOGIES | 59,129.42 |
| NEXTEL COMMUNICATIONS | 191,050.54 |
| NOBLE ENERGY | 223,166.19 |
| NOBLE ENERGY MARKETING HOUSTON TX | 65,119.45 |
| NORTHLICH INC. CINCINNATI OH | 171,151.81 |
| NPCO | 110,786.70 |
| OHIO GAS COMPANY | 57,072.43 |
| OMNIBRANDS, INC CHICAGO IL | 255,285.11 |
| ORACLE CORPORATION CHICAGO IL | 129,037.12 |
| ORLANDO UTILITIES COMMISSION | 222,276.06 |
| OTTER TAIL ENERGY SERV MINNEAPOLIS MN | 84,219.32 |
| OXFORD FROZEN FOODS LIMITED OXFORD NS | 126,875.10 |
| PACIFIC GAS & ELECTRIC | 752,838.13 |

| | |
|---|---|
| PACKAGING SYSTEMS AUTOMATION PLYMOUTH MN | 220,034.55 |
| PARIS PACKAGING, INC. NEW ORLEANS LA | 138,440.55 |
| PARMALAT | 78,584.86 |
| PAR-WAY TRYSON COMPANY | 78,842.68 |
| PASSAIC VALLEY SEWERAGE NEWARK NJ | 97,427.55 |
| PECO ENERGY | 397,807.39 |
| PEERLESS MACHINERY CORP CLEVELAND OH | 58,202.84 |
| PENSKE TRUCK LEASING | 64,933.05 |
| PETRO COMMERCIAL SERVICES BROOKLYN NY | 95,505.26 |
| PETROLEUM EQUIPMENT CONSTRUCTION TAPOPKA FL | 61,453.00 |
| PHARMACARE GROUP SALES | 69,191.24 |
| PHH FINANCIAL SERVICE, INC BALTIMORE MD | 226,344.60 |
| PREMIUM FOOD SALES BRADFORD ON | 412,240.00 |
| PREMIUM INGREDIENTS LTD. | 87,999.50 |
| PRIME INDUSTRIAL RECRUITERS | 144,863.38 |
| PROGRESS ENERGY | 165,712.86 |
| PROPAC MARKETING ADDISON TX | 187,399.50 |
| PROSTAFF 5006 MINNEAPOLIS MN | 127,689.48 |
| PSE&G CO NEW BRUNSWICK NJ | 323,833.87 |
| Q6 LLC CHESTERFIELD MO | 387,622.57 |
| RANDSTAD EMPLOYMENT SOLUTIONS | 324,705.41 |
| RESOURCES OF KANSAS CITY KANSAS CITY MO | 236,539.00 |
| RND MECHANICAL CONTRACTOR | 69,996.02 |
| RY MT PUBLIC UTILITIES ROCKY MOUNT NC | 530,133.97 |
| SALEM LEASING CORPORATION CHARLOTTE NC | 342,100.27 |
| SAN DIEGO GAS & ELECTRIC SANTA ANA CA | 140,108.20 |
| SAVI, LLC SAINT LOUIS MO | 55,706.80 |
| SBC OR SOUTHWESTERN BELL | 416,735.98 |
| SCE&G COLUMBIA SC | 119,379.92 |
| SECURITAS SECURITY SERV | 175,598.06 |
| SELECT ENERGY | 305,237.95 |
| SENTRY ROOFING, INC. COVINGTON IN | 603,728.75 |
| SETHNESS PRODUCTS CO. CHICAGO IL | 72,323.91 |
| SIG DOBOY INC MINNEAPOLIS MN | 79,319.86 |
| SKC COMMUNICATION PRODUCTS, INC LENEXA KS | 58,736.23 |
| SACRAMENTO METROPOLITAN UTILITIES DISTRICT | 145,936.28 |
| SNYDER OF BERLIN PITTSBURGH PA | 60,443.65 |
| SOUTHERN CALIF EDISON | 536,811.59 |
| SOUTHERN CALIFORNIA GAS | 121,390.91 |
| SOUTHERN PERFECTION | 971,730.05 |
| SOUTHWEST GAS | 109,508.97 |
| SPECIALTY PRODUCTS MINNETONKA MN | 65,480.00 |
| SPECTRA MARKETING SYSTEMS INC. CHICAGO IL | 68,137.50 |
| SPETCO, INC. LECOMPTE LA | 127,846.81 |
| ST ARMANDS BAKING CO BRADENTON FL | 403,492.99 |
| STOOPS FREIGHTLINER | 63,469.80 |
| STREICHER MOBILE FUELING ATLANTA GA | 67,965.53 |
| SUPEROIR PACKAGING EQUIPMENT CTOTOWA NJ | 105,538.34 |
| SURF CITY FOOD & BEVERAGE CO. UPLAND CA | 61,634.30 |

| | |
|---|---|
| T & W OIL COMPANY COLUMBUS GA | 218,631.36 |
| TEKSYSTEMS ATLANTA GA | 77,695.00 |
| THE EASTRIDGE GROUP LOS ANGELES CA | 66,616.46 |
| TITAN ATLANTIC GROUP, INC KANSAS CITY MO | 83,057.24 |
| TOLEDO EDISON | 219,115.54 |
| TRUMAN ARNOLD COMPANIES TEXARKANA TX | 351,635.05 |
| U.S. FOODSERVICE CHARLOTTE NC | 129,863.59 |
| UBFNA | 81,150.17 |
| ULTRA MERCHANDISING SUNSET BEACH CA | 64,164.00 |
| UNITED BAKERY EQUIPMENT CO | 184,990.86 |
| UTAH POWER #18956666-001 6 *35PORTLAND OR | 80,612.11 |
| VANGUARD PACKAGING KANSAS CITY MO | 715,378.83 |
| VERIFICATION INC | 244,801.51 |
| VERIZON | 241,219.16 |
| VICTORY BOX | 78,811.73 |
| WASTE MANAGEMENT | 297,860.40 |
| WATER REVENUE BUREAU | 89,620.91 |
| WESTAR ENERGY | 226,752.93 |
| WESTERN BAGEL BAKING CO VAN NUYS CA | 352,089.71 |
| WILLOUGHBY DESIGN GROUP L.L.C. KANSAS CITY MO | 145,076.38 |
| WISE FOODS INC HARTFORD CT | 125,546.40 |
| XCEL ENERGY | 70,655.87 |
| XEROX | 80,792.30 |

The Debtors reserve their right to remove from this list, prior to the Effective Date, Trust Avoidance Claims in an amount not to exceed $6.0 million in the aggregate upon instruction from Equity Investors.

PLAN EXHIBIT B

## SCHEDULE OF CAPITAL LEASES

PLAN EXHIBIT B

## SCHEDULE OF CAPITAL LEASES

| REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|
| 0350 | 09/01/99 | 4612 GREENWAY DR. NE KNOXVILLE, TN 37918 | B & H RENTALS ATTN: J.R. BYERLEY | PO BOX 692 MORRISTOWN, TN 37815 |
| 0859 | 07/01/02 | 18453 N. 7TH AVE. PHOENIX, AZ 85023 | IBC PARADISE PROPERTIES, L.L.C. | C/O KEHL HOMES 6183 S PRAIRIE VIEW DR, STE 102 TAYLORSVILLE, UT 84118 CONTACT: BRENDA BELL |
| 0875 | 12/01/00 | 6912 HARNEY ROAD TAMPA, FL 33617 | TOMARCO PARTNERS, LLP | P. O. BOX 1384 SEBRING, FL 33871-1384 CONTACT PATRICIA W. HANDLEY |
| 0893 | 03/07/02 | 1913 W JEFFERSON SPRINGFIELD, IL 62702 | JAMES A. AND JOSEPHINE M. SKEETERS | 140 WINDSOR ROAD SPRINGFIELD, IL 62702 |
| 0906 | 12/01/00 | 4301 N. PINE HILLS RD ORLANDO, FL 32808 | PRN INVESTMENTS, INC. | 3120 FLORENE DR. ORLANDO, FL 32806 |
| 0923 | 04/01/03 | 1332 CLEARLAKE RD COCOA BEACH, FL 32931 | 1322 CLEARLAKE LLC | ANTHONY SALAMONE 21772 CLUB VILLA TERRACE BOCA RATON, FL 33433 |
| 0982 | 02/01/01 | 1340 W. BROADWAY MISSOULA, MT 59802 | CURT & LANNI JACOBSON | PO BOX 8276 MISSOULA, MT 59807 |
| 1079 | 05/01/02 | 1981 SW MAIN BLVD. LAKE CITY, FL 32025 | NORWOOD & JENLEE WEST FAMILY TRUST | 1022 LYNN DR. WAYCROSS, GA 31503 |
| 1161 | 12/01/01 | 53RD & BELLE AVE DAVENPORT, IA 52807 | WAYNE MONTGOMERY, JR., MICHAEL L. MONTGOMERY | 2222 EAST 53RD ST. DAVENPORT, IA 52807 |
| 1180 | 10/01/99 | 1241 S LECANTO HWY LECANTO, FL 34461 | FLOUR POWER TRUST | C/O FLORIDA GULF BANK 2247 1ST ST. FORT MYERS, FL 33901 |
| 1190 | 06/01/99 | MILITARY & TRICKEY BENTON, AR 72015 | ALATEN PROPERTIES | ROBBIE MARTIN P.O. BOX 2177 MUSCLE SHOALS, AL 35662 |
| 1211 | 11/01/98 | 163 NASSAU PLACE YULEE, FL 32097 | CAROL WEST, PRESIDENT | FAL, INC. 2323 BAKERS CREEK ROAD WHITTIER, NC 28789 CONTACT: RANDY HARDEN |

PLAN EXHIBIT B

### SCHEDULE OF CAPITAL LEASES

| REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|------|--------------------------|------------------|-------------------------|------------------|
| 1251 | 07/01/02 | 233 NEW ORLEANS BLVD HOUMA, LA 70364 | HARRISON-WALKER PROPERTIES, LLC | 18024 GRAND CYPRESS CREEK BATON ROUGE, LA 70810 |
| 1254 | 2/1/1998 | 2243 S. MAIN DARLINGTON, SC 29532 | JO-JO ENTERPRISES, INC. ATTN: JOE LAVENDER | P.O. BOX 1527 HARTSVILLE, SC 29551 |
| 0878 | 04/01/01 | 26 TWIN OAKS DR. CHESWOLD, DE 19936 | WONDERHOST, LLC | 110 S. POPLAR ST., STE. 400 P.O. BOX 2697 WILMINGTON, DE 19805-0697 |
| 0185 | 10/01/00 | 1891 NORTHERN AVE. KINGMAN, AZ 86402 | M. DIANE ROGERS | 125 PINE CANYON ROAD SALINAS, CA 93908 |

PLAN EXHIBIT C

INTERCREDITOR SETTLEMENT ORDER

IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MISSOURI
KANSAS CITY DIVISION

– – – – – – – – – – – – – – – – – – – – – – – – –

|  |  |
|---|---|
| In re: | Chapter 11 |
| INTERSTATE BAKERIES CORPORATION, et al., | Case No. 04-45814 (JWV) |
|  | Jointly Administered |
| Debtors. |  |

– – – – – – – – – – – – – – – – – – – – – – – – –

## ORDER PURSUANT TO 11 U.S.C. §§ 363(b) AND FED. R. BANK. P. 9019 APPROVING COMPROMISE OF CONTROVERSIES AND DISPUTES AMONG VARIOUS PARTIES INCLUDING THE DEBTORS, THE PRE-PETITION LENDERS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
(Related to Docket No. [●])

This matter having come before the Court on the motion (the "Motion")[1] of Interstate

Bakeries Corporation and eight[2] of its subsidiaries and affiliates, debtors and debtors-in-

possession in the above-captioned cases (collectively, "Interstate Bakeries," the "Company," or

the "Debtors"), for an order, pursuant to 11 U.S.C. §§ 363(b) and Rule 9019 of the Federal Rules

of Bankruptcy Procedure (a) approving the Compromise of Controversies by and among the

Compromising Parties and (b) authorizing the Debtors to take such actions as are reasonably

necessary to fulfill the terms of the Compromise of Controversies.  The Court, having

determined that (i) it has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C.

---

1    Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the Motion and the Plan.

2    The following subsidiaries' and affiliates' chapter 11 cases are jointly administered with Interstate Bakeries' chapter 11 case:  Armour and Main Redevelopment Corporation; Baker's Inn Quality Baked Goods, LLC; IBC Sales Corporation; IBC Services, LLC; IBC Trucking, LLC; Interstate Brands Corporation; New England Bakery Distributors, L.L.C.; and Mrs. Cubbison's Foods, Inc.

1

§§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iii) the relief

requested in the Motion is in the best interests of the Debtors, their estates and their creditors and

the Debtors' decision to enter into the Compromise of Controversies is reasonable and

appropriate under the circumstances; (iv) proper and adequate notice of the Motion and the

hearing thereon having been given and that no other or further notice is necessary; and (v) upon

the record herein and after due deliberation thereon; and the Creditors' Committee having

supported confirmation of the Plan; and good cause having been shown that the Court should

grant the relief as set forth herein;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.     The Motion is GRANTED and the Compromise of Controversies as set forth

herein is hereby approved.

2.     <u>Establishment of the Creditors' Trust</u>.  On the Effective Date, the Creditors'

Trust will be established for the benefit of holders of Allowed General Unsecured Claims,

including the holders of Old Convertible Note Claims.  The Trust Agreement that shall govern

the terms of the Creditors' Trust shall be in a form reasonably acceptable to the Creditors'

Committee, Equity Investors, Pre-Petition Investors, and Reorganized Debtors and shall provide,

among other things, that (w) beneficial interests in the Creditors' Trust shall be non-transferable,

except by death or operation of law, and will not be evidenced by certificates, (x) the purposes of

the Creditors' Trust will be limited to the rights and powers set forth in the Trust Agreement and

the duration of the Creditors' Trust will be limited to an initial term of five years, subject to

further extension as the circumstances may warrant solely for the purposes of the administration

of claim objections, the realization of the TSARs (defined below) and the pursuit of Trust

Claims, (y) the Creditors' Trust will be responsible for making distributions to Trust

2

Beneficiaries of the Creditors' Trust and shall bear the responsibility for any fees, costs,

expenses or other liabilities related thereto, and (z) distributions to Trust Beneficiaries from the

Creditors' Trust shall be on a *pro rata* basis without regard to multiple obligors; provided,

however, that any Pre-Petition Lender that holds an allowed General Unsecured Claim on

account of claims arising under the Pre-Petition Credit Agreement shall not be a Trust

Beneficiary and shall not share in any distributions made by the Trustee pursuant to the

Creditors' Trust.

        3.    Documents Implementing Intercreditor Settlement.  All documents

implementing the terms of the Intercreditor Settlement, including the TSARs, shall be in form

and substance reasonably satisfactory to Equity Investors, the Creditors' Committee and the

Prepetition Investors.

        4.    Administration of Claims:  The Reorganized Debtors will have sole and

absolute discretion in administering, disputing, objecting to, compromising or otherwise

resolving all Claims against the Debtors (the "Claims Administration"); provided, however, that

before the Reorganized Debtors agree to allow a General Unsecured Claim in an amount greater

than $1,000,000, the Reorganized Debtors shall give at least three (3) Business Days notice (the

"Settlement Notice") to the Creditors' Trust of their intended agreement and the basis for the

proposed resolution.  If the Creditors' Trust does not elect to assume responsibility for the

Claims Administration of such claim within three (3) Business Days after the Reorganized

Debtors deliver the Settlement Notice, the General Unsecured Claim shall be disposed of in the

manner proposed by the Reorganized Debtors.  In the event the Creditors' Trust elects to assume

responsibility for the Claims Administration of a particular General Unsecured Claim within

three (3) Business Days of receiving the Settlement Notice, (a) the Creditors' Trust shall assume

3

and pay from the Trust Assets any fees, costs, expenses or other liabilities incurred by the

Creditors' Trust in connection with its Claims Administration of such General Unsecured Claim

and (b) the Reorganized Debtors shall provide reasonable cooperation and assistance to the

Trustee and its representatives with respect to the Claims Administration process relating to such

claim.

      5.   <u>Cooperation Agreement</u>.  The Reorganized Debtors shall have no

responsibility to cooperate hereunder unless the Trustee shall have negotiated in good faith the

terms of and executed by the Effective Date, an agreement (the "<u>Cooperation Agreement</u>") for

the Creditors' Trust to compensate the Reorganized Debtors for  (i) their reasonable costs and

expenses (excluding attorneys' fees) associated with the Reorganized Debtors' resources used to

assist the Creditors' Trust with respect to Claims Administration of any General Unsecured

Claims that the Creditors' Trust elects to assume responsibility for, and (ii) the Reorganized

Debtors' reasonable costs and expenses (including attorney's fees) associated with the

Reorganized Debtors' resources used to assist the Creditors' Trust in the prosecution of the Trust

Claims (defined below).  In the event that the Reorganized Debtors and the Trustee cannot agree

upon the terms of the Cooperation Agreement, the Court shall resolve such dispute.

      6.   <u>Allowance of Old Convertible Note Claim</u>.  The Allowed General Unsecured

Claim for the Old Convertible Notes Claim shall be $100,649,000 (*i.e.*, principal and interest on

the Old Convertible Notes as of the Petition Date).

      7.   <u>Transfer to the Creditors' Trust</u>.  On the Effective Date, the Creditors' Trust

shall be established and the Trust Assets described below shall be transferred to the Creditors'

Trust for, and on behalf of, the Trust Beneficiaries:

      (a)   a cash payment in the amount of $5,000,000;

(b)   documents evidencing cash-settled stock appreciation rights ("TSARs") (i) with respect to three percent (3%) of the fully diluted equity interests of the Reorganized Company as of the Effective Date, (ii) which shall have a strike price equal to $15 per share, and (iii) which shall otherwise have the same terms as the stock appreciation rights to be received by the representatives of certain of the Debtors' unionized work force; and

(c)   (i) those avoidance claims or causes of action described on Exhibit A-2 to the Plan (collectively, the "Trust Avoidance Claims") and (ii) claims or causes of action arising out of, or related directly or indirectly to, a person's relationship to the Debtors as a director of certain of the Debtors (and/or their predecessors) and/or their employment as an officer of the Debtors to the extent such claims or causes of action have not been previously released or as to which applicable statutes of limitations have not yet expired (collectively, "D&O Claims" and, together with the Trust Avoidance Claims, the "Trust Claims"); provided, however, D&O Claims shall not include claims as to which any present or former director, officer or managing member of any Debtor would have a right of indemnification against the Reorganized Debtors unless (x) such D&O Claims are 100% covered by directors and officers' liability insurance ("D&O Insurance") or (y) the applicable indemnitees are otherwise prohibited from prosecuting such indemnification rights against the Reorganized Debtors; provided, further, that in connection with the transfer of D&O Claims as contemplated hereby, the Creditors' Trust must agree, in a notice to be delivered to the Reorganized Company on the Effective Date, that the Creditors' Trust will seek satisfaction of any judgment received by it with respect to D&O Claims solely from available D&O Insurance and shall not seek satisfaction of any such judgment from the assets of any defendant.

8.   Structure of the TSARs:  The TSARs will contain such terms and/or otherwise be structured in such a manner so as to assure that neither the Company nor the Creditors' Trust will be required to comply with SEC reporting requirements subsequent to the Effective Date.

9.   Payment of Old Convertible Notes Indenture Trustee Fee Claim: On the Effective Date, the Debtors or the Reorganized Debtors shall pay the Old Convertible Note Indenture Trustee Fee Claim in cash; provided, however, that no later than five (5) days prior to the Confirmation Hearing, the Old Convertible Note Indenture Trustee shall have provided to the Debtors, Equity Investors and the Prepetition Investors copies of invoices evidencing the fees and expenses incurred by the Old Convertible Note Indenture Trustee during the Chapter 11 Cases through the Effective Date; provided, further, that the Bankruptcy Court shall retain

5

jurisdiction over any disputes regarding the reasonableness of the Allowed Old Convertible Note Indenture Trustee Fee Claim. Upon payment of the Old Convertible Note Indenture Trustee Fee Claim, the Old Convertible Note Indenture Trustee shall forever release, waive and discharge its "charging" lien with respect to any distribution that may be made to any holder of Old Convertible Notes pursuant to the Creditors' Trust.

          10.   <u>Release of Claims</u>: On the Effective Date, pursuant to this Agreement and the Plan, and upon the transfer of the Trust Assets to the Creditors' Trust, the Lien Avoidance Action shall be dismissed with prejudice and any and all claims of the Debtors (and those claiming derivatively through the Debtors) against the Pre-Petition Lenders including, but not limited to, (a) claims against the Pre-Petition Lenders asserted or that could have been asserted by the Debtors in the Lien Avoidance Action, (b) the Preserved Claims, (c) challenges with respect to the extent, amount, validity and priority of the Pre-Petition Lenders' liens and security interests and (d) claims that the adequate protection payments made to the Pre-Petition Lenders during the Bankruptcy Cases should be recharacterized as principal payments and applied to reduce the Prepetition Lenders' secured claims, shall be fully and forever released. The transfer of Trust Assets to be made to the Creditors' Trust and the payment of the Old Convertible Note Indenture Trustee Fee Claim shall also be in full and complete release and satisfaction of any and all claims that could be prosecuted by any party in interest in the Bankruptcy Cases including the Debtors, the Creditors' Committee, its members and the Prepetition Lenders with respect to substantive consolidation of the Debtors' estates. All distributions to the Old Convertible Notes Indenture Trustee or to the holders of Old Convertible Notes Claims pursuant to this Agreement, including distributions from the Creditors' Trust, shall be free and clear of any contractual rights of subordination set forth in the Old Convertible Notes Indenture.

11.    <u>Other Matters</u>.

(a)    Prior to the Effective Date, the Debtors will use their reasonable best efforts to provide to the Creditors' Committee the information necessary (including payment history, correspondence, files, bank statements, proof of payment, invoices and delivery documents relating to any new value defense, and related documents) for the Creditors' Trust to prosecute the Trust Avoidance Claims.

(b)    Prior to the Effective Date, the Creditors' Committee may give notice to the Pre-Petition Investors of those holders of General Unsecured Claims who may be interested in participating in the New Term Loan ("<u>Creditor Participants</u>"), provided, however, the Creditors Committee shall be under no obligation to actively solicit or recommend any Creditor Participants.  The Debtors, the Pre-Petition Investors and the Creditors' Committee shall agree to a process whereby qualified parties will be notified of the opportunity to participate in the New Term Loan.  The Pre-Petition Investors shall offer the Creditor Participants the right to participate in the New Term Loan in an amount collectively not to exceed ten (<u>10%</u>) percent of the aggregate principal amount thereof provided that such participation by a Creditor Participant shall not require the Reorganized Debtors to register any securities with the United States Securities and Exchange Commission and subject in all respects to Equity Investors' right to approve lenders participating in the New Term Loan.

12.    <u>Conditions Precedent to Compromise of Controversies</u>.  The Compromise of Controversies as set forth in this Order shall be effective upon confirmation of the Plan and occurrence of the Effective Date.

13.    <u>No Admission.</u>  The  Compromise of Controversies set forth in this Order is the result of a compromise and accord and nothing contained herein shall be construed as an admission of liability or wrongdoing on the part of any party or their respective affiliates, shareholders, directors, trustees, officers, agents, representatives, employees, members, successors or assigns.

14.    <u>Reporting Requirements:</u>  The Trustee shall provide, either by mail or through access to a website, annual status reports to the Trust Beneficiaries.  Each annual status report shall contain a comprehensive summary of all activity by the reporting party during the previous year, a summary of the professional fees sought and obtained in the prior year and a summary of cash receipts and disbursements of the Trustee, a summary of cash receipts and

disbursements of the Creditors' Trust, a summary of the distributions made to the Trust

Beneficiaries and such other information as the Trustee deems appropriate for inclusion or as

reasonably requested by the parties to whom such reports are to be submitted.

    15. The Debtors are hereby authorized to take such actions as are reasonably

necessary to fulfill the terms of the Compromise of Controversies as set forth in this Order.

    16. This Court shall retain jurisdiction over all matters arising from or related to

the implementation of this Order.

Dated: Kansas City, Missouri
   December ___, 2008

_____
UNITED STATES BANKRUPTCY JUDGE

PLAN EXHIBIT D

<u>INVESTMENT AGREEMENT</u>

[TO BE FILED NOT LATER THAN THE EXHIBIT FILING DATE]

PLAN EXHIBIT E

SUMMARY DESCRIPTION OF LONG TERM INCENTIVE PLAN

[TO BE FILED NOT LATER THAN THE EXHIBIT FILING DATE]

PLAN EXHIBIT F

INTERSTATE BAKERIES CORPORATION
NEW COMMON STOCK

Summary of Principal Terms and Conditions
_____

Unless otherwise provided herein, capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Commitment Letter.

| | |
|---|---|
| Issuer: | The Reorganized Company. |
| New Common Stock: | On the Effective Date, the Reorganized Company will issue New Common Stock to (1) Investors and (2) the Term Loan Facility Lenders (or their Permitted Affiliates). |
| | On the Effective Date, the Reorganized Company will also issue restricted stock to Craig Jung in accordance with the terms of his employment agreement. |
| Amount: | There will be 8,840,000 shares of New Common Stock issued and outstanding as of the Effective Date (before giving effect to any dilution from the conversion of New Convertible Debt or the exercise of Warrants or stock options, restricted stock or stock appreciation rights issued to directors, officers or other employees of the Reorganized Company and the Creditors' Trust for the benefit of holders of General Unsecured Claims), with (1) 4,420,000 shares of New Common Stock to be purchased by Investors for cash at an aggregate purchase price of $44,200,000 and (2) 4,420,000 shares of New Common Stock to be distributed to the Term Loan Facility Lenders (or their Permitted Affiliates), pro rata in accordance with the relative amounts of their loans funded under the Term Loan |

Facility.

| | |
|---|---|
| Stockholders' Agreement: | As a condition to receiving shares of New Common Stock, holders of New Common Stock will be required to enter into a Stockholders' Agreement reflecting the terms set forth on Exhibit E to the Commitment Letter. |
| State of Incorporation: | State of Delaware. |

PLAN EXHIBIT G

INTERSTATE BAKERIES CORPORATION
NEW CONVERTIBLE DEBT

Summary of Principal Terms and Conditions
_____

Unless otherwise provided herein, capitalized terms used but not defined herein shall
have the meanings assigned to such terms in the Commitment Letter to which this
Exhibit C is attached.

| | |
|---|---|
| Issuer: | The Reorganized Company. |
| New Convertible Debt: | Pursuant to the Plan, on the Effective Date the Reorganized Company will issue New Convertible Debt to Investors and the Senior Secured Creditors. |
| Principal Amount: | $171,600,000 in aggregate principal amount, to be allocated as follows: |

- $85,800,000 to Investors, to be purchased by Investors for cash at an aggregate purchase price of $85,800,000 ("Tranche A"); and

- $85,800,000 to the Senior Secured Creditors, in partial satisfaction and discharge of the Prepetition Debt and allocated pro rata among the Senior Secured Creditors in accordance with the relative amounts of their Prepetition Debt ("Tranche B").

| | |
|---|---|
| Term: | 10 years, bullet. |
| Interest: | Interest on the New Convertible Debt will be at the rate of 5.0% per annum, payable semi-annually by the Reorganized Company. Interest payments will be made at each interest payment date by the Reorganized Company, at its election, either (1) in cash |

(to the extent permitted under other debt facilities, if any) or (2) in the form of "PIK" notes representing additional New Convertible Debt in the amount of interest payable at such interest payment date.

Conversion Price:

Holders of New Convertible Debt may at any time and at each holder's option convert all or a portion of such New Convertible Debt into shares of New Common Stock at the conversion price of (i) one share of New Common Stock for each $10.00 principal amount of Tranche A New Convertible Debt and (ii) one share of New Common Stock for each $10.84715 principal amount of Tranche B New Convertible Debt (in each case, the "Conversion Price").

Additional Interest Payments

Holders of New Convertible Debt will receive additional interest payments equal to all dividends and distributions payable to holders of the Company's common stock in addition to stated interest payments, except for dividends and distributions that adjust the Conversion Price as set forth under Anti-Dilution provisions below.

Additional Liquidation Payments

In the event of any liquidation, dissolution or winding up of the Company and in addition to any recovery of principal, premium and accrued and unpaid interest with respect to the New Convertible Debt, Holders will receive payments equal to any distributions to holders of the Company's common stock out of assets legally available for distribution to stockholders on a pro rata as if converted basis, but only to the extent that such distributions exceed the amount of any recovery with respect to the New Convertible Debt.

Mandatory Conversion:

Upon an initial public offering of the Reorganized Company, the Reorganized Company may, at its option, convert all New Convertible Debt then outstanding into shares of New Common Stock at the

Conversion Price.

In the event Investors exercises its Drag-Along Rights under the Stockholders' Agreement, all New Convertible Debt then outstanding held by all holders will automatically convert into shares of New Common Stock at the Conversion Price.

Anti-Dilution:

Subject to the right of the holders of New Convertible Debt to exercise preemptive rights as provided in the Stockholders' Agreement on an as-converted basis, customary proportional anti-dilution adjustments in the event of a combination, subdivision or reclassification of shares of New Common Stock or any dividend payment with respect to New Common Stock in the form of additional shares of New Common Stock.

Change of Control Put:

The Reorganized Company shall be required to make an offer to purchase all outstanding New Convertible Debt at par within 30 days after the occurrence of a Change in Control (to be defined).

Security:

Guaranteed by the direct and indirect, existing and future, wholly owned domestic subsidiaries of the Reorganized Company and Interstate Brands Corporation (subject to exceptions for immaterial subsidiaries to be agreed) and secured by a perfected fourth priority security interest in the Term Priority Collateral and the Borrowing Base Assets (each as defined in Exhibit G to the Commitment Letter as in effect on the date hereof).

Optional Prepayment:

The Reorganized Company may prepay all or any portion of New Convertible Debt at any time at a price of (1) prior to the first anniversary of the Effective Date, 102.5% of the principal amount to be prepaid and (2) on

and after the first anniversary of the Effective Date, 101% of the principal amount to be prepaid.  Any such optional prepayment of New Convertible Debt shall be made on a pro rata basis among all holders of New Convertible Debt.  Upon notice of a proposed optional prepayment, holders of New Convertible Debt may convert the portion of New Convertible Debt proposed to be prepaid prior to the date set forth for such optional prepayment.

Voting Rights:                    None.

Stockholders' Agreement:          Each holder of New Convertible Debt will be required to enter into the Stockholders' Agreement as a condition to receiving shares of New Common Stock issuable upon conversion of such holder's New Convertible Debt (unless such holder is already a party thereto).

Registration Rights:              None.

Indenture:                        To contain customary provisions consistent with the terms of the Commitment Letter.

Transfer Restrictions:            So long as the Stockholders' Agreement has not been terminated in accordance with the terms thereof, all transfers of New Convertible Debt are subject to the prior consent of Investors in its sole discretion; provided, however, that the New Convertible Debt shall be freely transferable among the Senior Secured Creditors and their affiliates (with the transferability to affiliates subject to the prior consent of Investors, which consent shall not be unreasonably withheld), subject to (a) the Reorganized Company being provided advance written notice of the consummation and terms of such transfer and (b) absolute written assurances of confidentiality among the parties to such transfer and the Reorganized Company

(subject to disclosure required by law).

Governing Law:                          State of New York.

PLAN EXHIBIT H

INTERSTATE BAKERIES CORPORATION
NEW THIRD LIEN TERM LOANS

Summary of Principal Terms and Conditions

_____

Unless otherwise provided herein, capitalized terms used but not defined herein shall
have the meanings assigned to such terms in the Commitment Letter.

### Article I.    Parties

| | |
|---|---|
| *Borrowers:* | Reorganized IBC and Reorganized Brands (the "***Borrowers***"). |
| *Guarantors:* | Each of the Borrowers' direct and indirect, existing and future, wholly owned domestic subsidiaries, subject to exceptions for immaterial subsidiaries to be agreed (each a "***Guarantor***" and collectively the "***Guarantors,***" and, together with the Borrowers, the "***Loan Parties***"). |
| *Administrative Agent:* | TBD (the "***Administrative Agent***"). |
| *Collateral Agent:* | A collateral trustee reasonably satisfactory to the Administrative Agent and the Borrowers. |
| *Initial Lenders:* | The Senior Secured Creditors (together with their permitted assignees, the "***Lenders***"). |

### Article II.    Third Lien Term Loan Facility

A six-year term loan facility (the "***Third Lien Term Loan Facility***") in an aggregate principal amount equal to $142.3 million (which amount may be decreased in accordance with Exhibit J to the Commitment Letter as in effect on the date  hereof and/or on a dollar for dollar basis to the extent that the amount of the Senior Lien Term Loan Facility (as defined below) is increased to effect the satisfaction of condition 15(b) of the Commitment Letter as in effect on the date hereof) (the loans thereunder, the "***Third Lien Term Loans***").  The principal amount of the Third Lien Term Loans shall be repayable on the sixth

anniversary of the Effective Date (the "**Maturity Date**") on which date the unpaid balance of the Third Lien Term Loan Facility and any accrued interest shall be due and payable in full.

*Availability*      The Third Lien Term Loans shall be made in a single drawing on the Effective Date.

*Purpose*      The Third Lien Term Loans shall be issued to the Senior Secured Creditors pursuant to the Plan on the Effective Date to satisfy, in part, the Prepetition Debt.

## Article III.    Certain Payment Provisions

*Fees, Early Termination Fees and Interest Rates*      As set forth on Annex A and in the Fee Letter.

*Optional Prepayments and Commitment Reductions*      Subject to the terms of the Intercreditor Agreement (as defined below), the Borrowers may, upon prior written notice, prepay the Third Lien Term Loans, in whole at any time or in part from time to time.  Any optional prepayments shall be subject to the Early Termination Fees described in Annex A, including, during the first year after the Effective Date, the make-whole amount referred to therein for any optional prepayments.

*Mandatory Prepayment*      Subject to the terms of the Intercreditor Agreement and after the obligations under the Term Loan Facility (including any permitted refinancing or replacement thereof, the "**Senior Lien Term Loan Facility**") have been paid in full (except in the case of clause (iii) below), an amount equal to (i) 100% of the net cash proceeds received by the Borrowers or any of their subsidiaries from the issuance of indebtedness after the Effective Date, other than customary exceptions for indebtedness permitted to be incurred under the definitive documentation with respect to the Third Lien Term Loan Facility (the "**Credit Documentation**"), (ii) 100% of the net cash proceeds received from the sale or other disposition of all or any part of the assets of the Borrowers or any other Loan Party after the Effective Date (other than (w) sales of real estate owned in Southern California as of the Effective Date, (x) sales of inventory in the ordinary course of business, (y) sales of other assets in the

ordinary course of business subject to a cap to be agreed
and (z) other exceptions to be agreed), up to $100.0
million (less the aggregate amount of such net cash
proceeds  that were reinvested while the Senior Term
Loan Facility was outstanding) of which shall be
deposited in a segregated cash collateral account, subject
to a control agreement in favor of the Collateral Agent
(subject to the proviso at the end of this sentence) and
shall be subject to full withdrawal and reinvestment rights
(so long as no payment Default or bankruptcy Event of
Default then exists) for amounts reinvested within 365
days after receipt in long term (as determined in
accordance with GAAP) assets useful in a permitted
business of the Borrowers or the other Loan Parties,
provided that to the extent such amounts are committed
pursuant to a written agreement to be so reinvested within
such 365 day period, such reinvestment period for such
amounts shall be extended for 180 days, (iii) 100% of the
net cash proceeds in excess of $20,000,000 in the
aggregate from the sale or other disposition of sales of
real estate owned in Southern California as of the
Effective Date and (iv) 100% of all casualty and
condemnation proceeds received by the Borrowers or any
other Loan Party after the Effective Date, subject to
exceptions to be agreed and full reinvestment rights (so
long as no payment Default or bankruptcy Event of
Default then exists) for amounts reinvested within 365
days after receipt in long term (as determined in
accordance with GAAP) assets useful in a permitted
business of the Borrowers or the other Loan Parties,
provided that (A) to the extent such amounts are
committed pursuant to a written agreement to be so
reinvested within such 365 day period, such reinvestment
period for such amounts shall be extended for 180 days
and (B) casualty and condemnation proceeds that exceed
$10 million in the aggregate shall be deposited in a
segregated cash collateral account to be established within
a reasonable period after the Effective Date to be agreed,
subject to a control agreement in favor of the Collateral
Agent (subject to the proviso at the end of this sentence),
and shall be subject to full withdrawal and reinvestment
rights (so long as no payment Default or bankruptcy Event
of Default then exists); provided that  if the Borrowers are
unable to obtain a control agreement for a cash collateral

account as described in clause (ii) or (iv) above after using commercially reasonable efforts (which commercially reasonable efforts shall include initiating discussions and negotiating with  the banks where the blocked accounts under the ABL Facility are to be established to obtain control agreements on substantially similar terms  in favor of the Collateral Agent) to do so, it shall not be a Default or Event of Default so long as such funds are held in a segregated securities account in which the Collateral Agent has a third priority security interest  that is perfected by filing of a UCC-1 financing statement. Application of such mandatory prepayments shall be as set forth in the Credit Documentation.  Mandatory prepayments pursuant to clauses (ii), (iii) and (iv) above shall be applied without prepayment penalty.  Mandatory prepayments pursuant to clause (i) above shall be subject to the Early Termination Fees described in Annex A.

## Article IV.    Collateral

The obligations of each Loan Party in respect of the Third Lien Term Loan Facility shall be secured by (a) a perfected third priority (subject to first priority liens securing the Senior Lien Term Loan Facility and second priority liens securing the ABL Facility) security interest in the Term Priority Collateral (as defined in Exhibit G to the Commitment Letter as in effect on the date hereof) and (b) a perfected third priority (subject to first priority liens securing the ABL Facility and second priority liens securing the Senior Lien Term Loan Facility) security interest  in the Borrowing Base Assets (as defined in Exhibit G to the Commitment Letter as in effect on the date hereof).

*Intercreditor Agreement:*    The lien priority, relative rights and other creditors' rights issues in respect of the Collateral will be set forth in one or more intercreditor agreements on terms and conditions reasonably satisfactory to the Administrative Agent.

**Article V.      Certain Conditions**

The availability of the Third Lien Term Loan Facility is subject to the satisfaction or waiver of the conditions set forth in the Commitment Letter and the following conditions (the date of such satisfaction or waiver of all such conditions and the initial funding of the Third Lien Term Loans on the effective date of the Plan, the "***Effective Date***"):

(a)     The effective date of the Plan shall have occurred (and all conditions precedent thereto as set forth in the Plan shall have been satisfied or waived, provided that if such waiver could reasonably be expected to be adverse in any material respect to the interests of the Lenders, the Administrative Agent shall have provided its prior written consent to such waiver).

(b)     As of the Effective Date, the representations and warranties contained in the Credit Documentation shall be true and correct in all material respects.

(c)     As of the Effective Date, no event shall have occurred and be continuing or would result from the extension of Third Lien Term Loans that would constitute a Default or an Event of Default.

(d)     Each of the Borrowers shall have provided the documentation and other information to the Lenders that the Lenders are required to obtain under the Patriot Act.

(e)     Negotiation, execution and delivery of definitive Credit Documentation, including, without limitation, guarantees, security documents, mortgages, evidence of insurance, customary opinions, certificates and other closing documentation and deliveries as the Administrative Agent shall reasonably request with respect to the Third Lien Term Loan Facility, in each case, reflecting and consistent with the terms and conditions set forth herein, as applicable, and otherwise in form and substance reasonably satisfactory to the Administrative Agent.

## Article VI.    Certain Documentation Matters

The Credit Documentation shall contain the following representations, warranties, affirmative and negative covenants, and events of default relating to the Loan Parties and their subsidiaries (subject to exceptions, materiality thresholds, baskets, grace periods and carve-outs to be agreed upon):

*Representations and Warranties*

Valid existence, organization, requisite power and authority, good standing, qualification to do business, compliance with law and regulations (including terrorism laws and FCPA), power to execute, due authorization, execution and enforceability of the Credit Documentation (no conflict with organizational documents, material agreements or material applicable law), capital stock and ownership of the subsidiaries, necessary consents obtained, binding obligation, accuracy of financial statements, projections, payment of taxes, accuracy in all material respects of disclosure taken as a whole, solvency of the Loan Parties on a consolidated basis on the Effective Date, absence of material litigation, compliance with margin regulations, no defaults (other than in respect of indebtedness), schedule of collective bargaining agreements in effect on the Effective Date, perfected security interest in collateral upon Effective Date, inapplicability of Investment Company Act, insurance, labor matters, ERISA and employee benefit plans, permits and licenses, environmental matters, ownership of real and personal property, intellectual property, and Regulation H.

*Affirmative Covenants*

Delivery of quarterly financial statements and compliance certificates within 45 days after the end of each fiscal quarter; annual audited financial statements for fiscal year ending May 2009 to be provided on or before the date that is 365 days after the end of fiscal year ending May 2009, and thereafter, annual audited financial statements to be delivered within 270 days of fiscal year end; delivery of monthly financial data generated by the Borrowers' internal accounting systems for use by senior and financial management of the Borrowers within 30 days after the end of each fiscal month; delivery of compliance certificates; delivery of an annual budget within 90 days

after the beginning of each fiscal year; delivery of all reports provided under the ABL Facility and the Senior Lien Term Loan Facility; delivery of copies of amendments, modifications and waivers to, notices of default under, and certain other information and reports delivered under, the ABL Facility and other indebtedness secured by senior and subordinated liens on the Collateral;  written notices with respect to known defaults, ERISA events, material environmental matters and material litigation; written notices of termination, material amendment or entry into collective bargaining agreements;  written notice of any change in any Loan Party's corporate name, identity, corporate structure or federal taxpayer identification number; written notice of knowledge of (a) any lien against any material portion of the Collateral (other than permitted liens) and (b) any loss, damage or destruction of any material portion of the Collateral; delivery of all periodic reports, proxy statements and registration statements publicly filed with the Securities and Exchange Commission (notice of EDGAR filing shall be sufficient for delivery of applicable reports); preservation of corporate existence, compliance with material applicable laws and regulations (including environmental laws and regulations); payment of taxes and other obligations (other than indebtedness); maintenance of properties, permits and customary insurance; access to books and records and inspection rights for the Administrative Agent (and Lenders during an Event of Default); further assurances (including delivery of information requested by a Lender to comply with the Patriot Act and provision of additional collateral and guaranties consistent with the paragraph above entitled "Collateral").

The Borrowers shall use commercially reasonable efforts to obtain, within 365 days following the Effective Date, interest rate protection agreements on terms reasonably satisfactory to the Borrowers in effect for the three years following the Effective Date covering a notional amount that results in at least 50% of the aggregate principal amount of the Borrowers' consolidated long-term indebtedness (other than the ABL Facility) being effectively subject to a fixed rate or maximum interest

rate.

*Negative Covenants*

Limitations on indebtedness (including guaranties and speculative hedging transactions), liens, negative pledge clauses, investments (including loans), asset dispositions, restricted junior payments in respect of capital stock (including dividends, redemptions and repurchases), prepayments, redemptions or repurchases of subordinated or junior indebtedness (in right of payment or lien priority)(for the avoidance of doubt, subject to the provisions of the Intercreditor Agreement with regard to Term Priority Collateral and the proceeds thereof, there shall be no limitation on prepayments of indebtedness under the ABL Facility), fundamental changes (including mergers, consolidations, disposition of assets or acquisitions), changes in nature of business, sales and lease backs, transactions with shareholders and affiliates, third party restrictions on subsidiary distributions, amendments or waivers with respect to subordinated indebtedness, the ABL Facility, the Senior Lien Term Loan Facility and other indebtedness secured by senior and subordinated liens on the Collateral and organizational documents (in each case in a manner that is adverse in any material respect to the Lenders), changes in fiscal year, compliance with margin regulations and issuance of disqualified capital stock.

The negative covenants will permit, among other things, (i) payment of management fees (which will accrue from the Effective Date and may be payable quarterly in advance) in an amount of up to $1,000,000 per quarter, provided no payment  Default or other Event of Default has occurred and is continuing (but which may accrue and be payable when such Default or Event of Default is cured), and payments of out-of-pocket expenses incurred by Ripplewood Holdings L.L.C. or its affiliates in connection with the provision of such management services, (ii) payment of financial advisory fees and reasonable out-of-pocket expenses relating to acquisitions in amounts to be agreed, provided no Default or Event of Default has occurred and is continuing, (iii) repurchases of equity securities from employees up to an amount to be agreed, (iv) payment of amounts to be agreed to IBC Investors I, LLC necessary to pay taxes or tax

distributions, operating expenses and other specified obligations to be agreed, provided no payment Default or other Event of Default has occurred and is continuing, and (v) making of restricted payments, investments and prepayments of subordinated debt in each case with the proceeds of equity issuances by, or capital contributions to, Reorganized IBC, which proceeds have not been previously so applied or applied to an equity cure and provided that no payment Default or other Event of Default has occurred and is continuing.

| | |
|---|---|
| *Financial Covenants* | To but excluding the last day of the first full fiscal quarter ending after the third anniversary of the Effective Date, incurrence covenants tested to the extent of incurrence of additional indebtedness (with carve outs to allow for (i) loans borrowed and letters of credit issued pursuant to the ABL Facility, and any refinancing or replacement thereof, in an aggregate amount not to exceed the inventory and receivables borrowing base (before application of advance rates or blocks) in effect from time to time, (ii) any refinancings, renewals or replacements of the Outstanding L/Cs and (iii) other additional exceptions to be agreed). Commencing with the end of the first full fiscal quarter after the third anniversary of the Effective Date, maximum secured debt (excluding the New Convertible Debt (as defined in the Equity Commitment Letter)) to EBITDA ratio (to be tested quarterly on a consolidated basis) and, commencing with the end of the first full fiscal year after the third anniversary of the Effective Date, maximum capital expenditures, financial covenants shall apply, in each case, tested at a cushion of 20% to IBC's five-year business plan (as determined by IBC Investors I, LLC and subject to review and agreement by the Administrative Agent) from the end of the first full fiscal quarter after the third anniversary of the Effective Date through the fourth anniversary of the Effective Date and, thereafter tested at cushion of 15% to IBC's five-year business plan (with benchmark amounts for the sixth year to be mutually agreed). |

For purposes of determining compliance with the financial covenants, if equity contributions are made to Reorganized IBC during a fiscal quarter or on or prior to the date that is 20 days after the date financial statements

are required to be delivered for such fiscal period, the proceeds of which are promptly applied to prepay loans under the Third Lien Term Loan Facility, then such prepayment of indebtedness shall be deemed to have occurred prior to the end of such fiscal period.  In addition, equity contributions made to Reorganized IBC during a fiscal quarter or on or prior to the day that is 20 days after the day on which financial statements are required to be delivered for such fiscal quarter will, at the request of the Borrowers, be included in the calculation of consolidated EBITDA for the purposes of determining compliance with financial covenants at the end of such fiscal quarter and applicable subsequent periods (any such equity contribution so included in the calculation of consolidated EBITDA, a "Specified Equity Contribution"), provided that (a) the amount of any Specified Equity Contribution shall not be greater than the amount required to cause the Borrowers to be in compliance with the financial covenants, (b) Specified Equity Contributions shall be disregarded for purposes of determining availability under baskets dependent on equity issuances or contributions, (c) a Specified Equity Contribution may be made with respect to only one fiscal quarter in each four fiscal quarter period and (d) any prepayment of indebtedness made with a Specified Equity Contribution shall be disregarded for purposes of compliance with the financial covenants at any time such Specified Equity Contribution is included in the calculation of consolidated EBITDA.

|                    |                                                                |
| ------------------ | -------------------------------------------------------------- |
| *Events of Default* | Nonpayment of principal when due; nonpayment of interest, fees or other amounts after a grace period of 30 days; material inaccuracy of a representation or warranty when made; violation of financial covenants, negative covenants and the following affirmative covenants: use of proceeds, delivery of notices of known defaults and maintenance of existence of the Loan Parties; violation of other affirmative covenants after grace period of 30 days after notice thereof from the Administrative Agent (provided that if the Borrowers shall fail to provide notice of a known default, the 30 day grace period with respect to the underlying default shall commence upon the earlier to occur of a responsible officer of any Borrower obtaining knowledge of such underlying default and |

notice thereof from the Administrative Agent); cross default to material indebtedness; bankruptcy events; certain ERISA events (with exceptions to be agreed); material unsatisfied and unstayed judgments (in excess of insurance); actual or asserted invalidity of any guarantee or any material provision of any intercreditor agreement, or security document with respect to a material portion of the Collateral (in each case, other than by reason of the action or inaction of the Administrative Agent or the Lenders); and a change of control (the definition of which is to be agreed upon).

*Requisite Lenders*

Amendments and waivers with respect to the Credit Documentation shall require the approval of Lenders holding more than 50% of the aggregate principal amount of the Third Lien Term Loans (the "***Required Lenders***"), except that (a) the consent of each Lender directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the final maturity of any Third Lien Term Loan, (ii) reductions in the stated rate of interest or any fee or extensions of any due date thereof and (iii) increases in the amount or extensions of the expiry date of any Lender's commitment; (b) the consent of 100% of the Lenders shall be required with respect to (i) reductions of any of the voting percentages, changes to pro rata sharing provisions or changes to application of repayments or prepayments (it being understood that waivers of mandatory prepayments shall be permitted with the consent of the Required Lenders) and (ii) releases of all or substantially all of the Guarantors or all or substantially all of the Collateral; and (c) the consent of the Administrative Agent and the Collateral Agent, as applicable, for changes to the agency provisions.

The Credit Documentation will include customary provisions for replacing non-consenting Lenders in connection with amendments and waivers requiring the consent of all Lenders or of all Lenders directly affected thereby so long as Lenders holding more than 50% of the aggregate principal amount of the Third Lien Term Loans shall have consented thereto.

| | |
|---|---|
| *Assignments and Participations* | Lenders will be permitted to make assignments in a minimum amount of $1 million (unless such assignment is of a Lender's entire interest in the Third Lien Term Loan Facility) to other financial institutions acceptable to the Administrative Agent and, so long as no payment Default or other Event of Default has occurred and is continuing, the Borrowers, which acceptances shall not be unreasonably withheld or delayed; provided however, that the approval of the Administrative Agent and the Borrowers shall not be required in connection with assignments to other Lenders (or to affiliates or approved funds of Lenders).  Each Lender shall be permitted to grant participations in its rights and obligations under the Third Lien Term Loan Facility, or any part thereof, to any person or entity without the consent of the Administrative Agent or the Loan Parties.  Participants shall have the same benefits as the Lenders with respect to yield protection and increased cost provisions (except a participant shall not be entitled to any greater amount than the relevant Lender would have received if no participation had been sold).  Voting rights of participants shall be limited to certain matters with respect to which the affirmative vote of all Lenders would be required as described under "Requisite Lenders" above.  Pledges of Third Lien Term Loans in accordance with applicable law shall be permitted without restriction.  Promissory notes shall be issued under the Third Lien Term Loan Facility only upon request. |
| *Expenses and Indemnification* | The Borrowers shall pay (i) all reasonable out-of-pocket expenses of the Administrative Agent associated with the syndication of the Third Lien Term Loan Facility and the preparation, negotiation, execution, delivery and administration of the Credit Documentation and any amendment or waiver with respect thereto (including, without limitation, the reasonable fees, disbursements and other charges of a single counsel for the Administrative Agent, plus, if necessary, one local counsel in each applicable jurisdiction), (ii) reasonable out-of-pocket expenses of having the Third Lien Term Loans rated by one or more rating agencies in an aggregate amount of up to $25,000, and (iii) all out-of-pocket expenses of the Administrative Agent and the Lenders (including, without limitation, the fees, disbursements and other charges of a |

single counsel for the Administrative Agent and the Lenders, plus, if necessary, one local counsel in each applicable jurisdiction, except in the case of an actual or reasonably likely conflict of interest) in connection with the enforcement of the Credit Documentation.

The Administrative Agent and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will be indemnified and held harmless against, any loss, liability or related reasonable out-of-pocket cost or expense (including, without limitation, reasonable fees and disbursements of counsel), in each case arising out of or in connection with or relating to the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the bad faith, gross negligence or willful misconduct of the indemnified party or any of its affiliates or its or any of its affiliates' officers, directors, employees, advisors or agents).

If any indemnified party shall receive an indemnification payment in respect of any loss, liability, cost or expense pursuant to the preceding paragraph and such loss, liability, cost or expense is found by a final non-appealable judgment by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such indemnified party or any of its affiliates or any of its or its affiliates' respective officers, directors, employees, advisors or agents, then such indemnified party shall refund the amount received by it in respect of such indemnification in excess of that amount to which it is entitled under the terms of the preceding paragraph

*Yield Protection, Taxes and Other Deductions*

The Credit Documentation shall contain customary provisions protecting the Lenders against changes in reserve, tax, capital adequacy and other requirements of law and from changes in withholding taxes or imposition of or changes in other taxes (subject in each case to a 180 day limit on claims and a right of the Borrowers to replace any Lender making such a claim).  All payments are to be free and clear of any present or future taxes, withholdings or other deductions whatsoever unless withholding taxes arise under current law to a non-US

Lender.

*Governing Law and Forum*      State of New York.

<u>**Annex A**</u>

**Interest and Certain Fees**

| | |
|---|---|
| *Interest Rate*............................ | The Third Lien Term Loans shall bear interest at a rate per annum equal to the rate set forth in the table below for the applicable loan year: |

*Loan Year*................................    1-3      8.0%
*Interest Rate*

                                     4       11.0% if paid in kind
                                                or
                                     10.0% if paid in cash

                                     5       13.0% if paid in kind
                                                or
                                     12.0% if paid in cash

                                     6       13.3724%

| | |
|---|---|
| *Interest Payments*.................... | Interest on the Third Lien Term Loans (i) for years 1 through 3, shall be capitalized as principal quarterly in arrears, (ii) for years 4 and 5, shall either be paid in cash or capitalized as principal, in each case quarterly in arrears, as elected by the Borrowers prior to the commencement of the applicable quarterly period and (iii) for year 6, shall be paid in cash at the end of the annual accrual period for such year. |
| *Default Rate*............................ | At any time when a payment Event of Default or a bankruptcy Event of Default has occurred and is continuing,, all amounts outstanding under the Third Lien Term Loan Facility shall bear interest at 2.0% above the rate for paid in kind interest otherwise then applicable thereto, payable in cash. |
| *Rate and Fee Basis*.................. | All *per annum* rates shall be calculated on the basis of a year of 365/366 days, and the actual number of days elapsed. |

*Early Termination Fees* .......... All optional prepayments and the mandatory prepayment described in clause (i) of Section III herein of the Third Lien Term Loans shall, in addition to the principal being prepaid, include the payment of (a) the make-whole amount (to be defined) for any prepayments made prior to the first anniversary of the Effective Date and (b) the product of all Third Lien Term Loans repaid multiplied by (i) 3.0% for all such prepayments made on or after the first anniversary of the Effective Date and prior to the second anniversary of the Effective Date; and (ii) 1.0% for all such prepayments made on or after the second anniversary of the Effective Date and prior to the third anniversary of the Effective Date.

PLAN EXHIBIT I

SUMMARY DESCRIPTION OF RESTRUCTURING TRANSACTIONS

[TO BE FILED NOT LATER THAN THE EXHIBIT FILING DATE]

PLAN EXHIBIT J

INTERSTATE BAKERIES CORPORATION
FORM OF STOCKHOLDERS' AGREEMENT

STOCKHOLDERS' AGREEMENT


Dated as of [  ]


with respect to

Interstate Bakeries Corporation

# TABLE OF CONTENTS

PAGE

Section 1.    Certain Definitions.................................................................................2

Section 2.    Methodology for Calculations ...................................................................6

Section 3.    Restrictions on Transfers of Stock; Right of First Offer .............................6

Section 4.    Tag-Along Rights ......................................................................................8

Section 5.    Drag-Along Rights...................................................................................10

Section 6.    New Securities .........................................................................................11

Section 7.    Corporate Governance; Management .........................................................11

Section 8.    Voting; Major Transactions ......................................................................12

Section 9.    Registration Rights ..................................................................................12

Section 10.    Indemnification........................................................................................26

Section 11.    Legend ...................................................................................................27

Section 12.    Representations and Warranties................................................................28

Section 13.    Management Rights .................................................................................30

Section 14.    Reports to Stockholders ..........................................................................30

Section 15.    Expenses and Fees ..................................................................................32

Section 16.    Miscellaneous .........................................................................................32

Section 17.    Effectiveness of Agreement; Termination.................................................35


Annex A     Form of Assumption Agreement
Annex B     Form of Management Services Agreement

i

STOCKHOLDERS' AGREEMENT

THIS AGREEMENT (this "Agreement") is made as of [  ] by and among Interstate Bakeries Corporation, a corporation organized under the laws of the State of Delaware (the "Company"), IBC Investors I, LLC, a limited liability company organized under the laws of the State of Delaware ("Investors I"), IBC Investors II, LLC, a limited liability company organized under the laws of the State of Delaware (together with Investors I, "Investors")[1], [NAMES OF OTHER ORIGINAL STOCKHOLDERS][2] (together with Investors, the "Original Stockholders"), and the other Stockholders of the Company party hereto from time to time.

**W I T N E S S E T H:**

WHEREAS, the Company and its direct and indirect subsidiaries (collectively, the "Debtors") commenced voluntary cases under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Western District of Missouri to effectuate a reorganization of the Debtors (the "Reorganization") pursuant to a joint plan of reorganization (the "Plan");

WHEREAS, in connection with the Reorganization, the Company and Investors entered into an Investment Agreement dated as of September [  ], 2008 (as such agreement may be amended, supplemented or otherwise modified from time to time, the "Investment Agreement"), pursuant to which the Company, at the Closing and subject to the terms and conditions set forth in the Investment Agreement, will issue to each of Investors, among other things, the number of shares of common stock, par value $0.01 per share, of the Company (the "Common Stock") set forth in Schedule I next to its name;

WHEREAS, in connection with the Reorganization, the Company, upon the effectiveness of and subject to the terms and conditions set forth in the Plan, will issue to [Names of other Original Stockholders], among other things, the number of shares of Common Stock set forth in Schedule I next to the name of such Stockholder;

WHEREAS, the parties hereto deem it to be in their best interests to enter into an agreement establishing and setting forth their agreement with respect to certain rights and obligations associated with ownership of Stock; and

WHEREAS, this Agreement shall become effective immediately following the Closing.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and obligations hereinafter set forth, the parties hereto hereby agree as follows:

---

[1] Definition of "Investors" may be further modified to take into account co-investment arrangements, if any.

[2] To also include management members that receive stock.

Section 1.      Certain Definitions.

As used herein, the following terms shall have the following meanings:

"1940 Act":  The United States Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder.

"Affiliate":  With respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with such first Person.  The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; provided, however, that no Stockholder shall be deemed to be an Affiliate of any other Stockholder solely as a result of being a party to this Agreement or the transactions contemplated hereby; provided further, however, that none of the Company or any of its subsidiaries shall be deemed to be an Affiliate of any Stockholder and no Stockholder or any of its Affiliates shall be deemed to be an Affiliate of the Company or any of its subsidiaries.

"Affiliate Transferee":  As defined in Section 3(a).

"Agreement":  As defined in the preamble.

"Assignee":  As defined in Section 3(a).

"Assumption Agreement":  A writing substantially in the form attached hereto as Annex A whereby a Person becomes a party to this Agreement.

"Board":  As defined in Section 7(a).

"Business Day":  A day which is not a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close.

"Closing":  As defined in the Investment Agreement.

"Closing Date":  As defined in the Investment Agreement.

"Common Stock":  As defined in the recitals.

"Company":  As defined in the preamble.

"Debtors":  As defined in the recitals.

"Demand Notice":  As defined in Section 9.1(a).

"Director" and "Directors":  As defined in Section 7(a).

"Drag-Along Notice":  As defined in Section 5(a).

"Drag-Along Sale":  As defined in Section 5(a).

2

"<u>Drag-Along Stockholders</u>":  As defined in Section 5(a).

"<u>Exchange Act</u>":  The United States Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"<u>First Offer Acceptance</u>":  As defined in Section 3(c)(i).

"<u>First Offer Marketing Period</u>":  As defined in Section 3(c)(ii).

"<u>First Offer Notice</u>":  As defined in Section 3(c)(i).

"<u>First Offer Offeree</u>":  As defined in Section 3(c)(i).

"<u>First Offer Transferor</u>":  As defined in Section 3(c)(i).

"<u>HSR Act</u>":  As defined in Section 3(c)(i).

"<u>Indemnified Party</u>":  As defined in Section 10(a).

"<u>Initial Public Offering</u>":  The initial bona fide underwritten public offering and sale of Common Stock pursuant to an effective registration statement under the Securities Act that results in (i) aggregate proceeds to the Stockholders and the Company of at least $50 million and (ii) the listing of the Common Stock on a United States national securities exchange or the quotation of such Common Stock on a United States inter-dealer quotation system.

"<u>Investment Agreement</u>":  As defined in the recitals.

"<u>Investors</u>":  As defined in the preamble.

"<u>Management Services Agreement</u>":  The Management Services Agreement to be entered into as of the Closing Date by and among the Company and Investors (or its designees) in the form attached hereto as Annex B.

"<u>New Convertible Debt</u>":  As defined in the Investment Agreement.

"<u>New Stock</u>":  Any Stock that is issued or otherwise created by the Company subsequent to the Closing Date; <u>provided</u>, <u>however</u>, that the term "New Stock" does not include Stock (i) issued pursuant to the acquisition of, or investment in, another Person by the Company or any of its subsidiaries, whether by merger, consolidation, purchase or exchange of stock or assets or reorganization or otherwise; (ii) issued in connection with any stock dividend, stock split or any other pro-rata subdivision or combination of any Stock of the Company; (iii) issued to the financing sources of any refinancing of the Financing (as defined in the Investment Agreement); (iv) issued upon the conversion of any New Convertible Debt or the exercise of any Warrant; (v) issued pursuant to any registered public offering; (vi) issued as pay-in-kind interest on the New Convertible Debt or (vii) issued to officers, directors or employees of the Company or any of its subsidiaries under any incentive plan or upon exercise of options granted under any incentive stock option plan.

"New Stockholder":  Any Person (other than Investors or its Affiliates and other than senior management and other employees and directors of the Company who receive Common Stock at the Closing) (i) who is issued Common Stock at the Closing or (ii) who becomes, or would become, a holder of Common Stock upon the conversion of any New Convertible Debt or the exercise of any Warrant.

"New Stockholders Representative": As defined in Section 9.1(a).

"Offer Date":  As defined in Section 3(c)(i).

"Offer Price":  As defined in Section 3(c)(i).

"Offered Stock":  As defined in Section 3(c)(i).

"Original Stockholders":  As defined in the preamble.

"Other Stockholders":  The Stockholders other than Investors.

"Person":  Any individual, partnership, corporation, limited liability company, limited company, unincorporated organization or association, trust (including the trustees thereof, in their capacity as such), joint venture, joint-stock company or other entity or organization, including a government or governmental agency.

"Plan":  As defined in the recitals.

"Prepetition Investors":  Silver Point Finance, LLC, Monarch Alternative Capital L.P. and McDonnell Investment Management LLC, and their respective Affiliates.

"Registrable Securities":  At any time, (a) any shares of Stock (other than Stock Equivalents) held by a Stockholder, (b) any shares of Stock issuable upon conversion, exchange or exercise of any Stock Equivalent of the Company held by a Stockholder (whether or not so converted, exchanged or exercised, provided that the conversion, exchange or exercise occurs not later than the effectiveness of the registration) and (c) any securities of the Company issued in exchange for or in respect of any of the foregoing, whether pursuant to a merger or consolidation, as a result of any stock split or reclassification of, or share dividend on, any of the foregoing or otherwise.  For purposes of this Agreement, any Registrable Securities shall cease to be Registrable Securities when (i) a registration statement covering such Registrable Securities has been declared effective and such Registrable Securities have been disposed of pursuant to such effective registration statement, (ii) such Registrable Securities shall have been disposed of pursuant to Rule 144, (iii) such Registrable Securities are sold by a Person in a transaction in which the rights under the provisions of this Agreement relating to registration are not assigned or (iv) such Registrable Securities shall cease to be outstanding.

"Registration Expenses":  As defined in Section 9.4(c).

"Registration Indemnified Party":  As defined in Section 9.6(c).

"Registration Indemnifying Party":  As defined in Section 9.6(c).

4

"Requesting Demand Stockholder":  As defined in Section 9.1(a).

"Reorganization":  As defined in the recitals.

"Required Interest":  As defined in Section 16(f).

"Rule 144":  Rule 144 promulgated under the Securities Act.

"SEC":  The United States Securities and Exchange Commission.

"Securities Act":  The United States Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Senior Secured Creditors":  Holders of Prepetition Debt (as defined in the Investment Agreement).

"Stock":  (i) any Common Stock, (ii) any other capital stock of the Company that (x) has voting rights generally and not only in limited circumstances, (y) shares in the proceeds of a liquidation or dissolution of the Company on a basis that is tied to the proceeds payable with respect to Common Stock or (z) shares in distributions of the Company on a basis that is tied to distributions payable with respect to Common Stock and (iii) any Stock Equivalents of the Company, in each case, whether owned on the date hereof or acquired hereafter.

"Stock Equivalents":  Securities, including options, that are, or may become, convertible into or exchangeable or exercisable for Stock, including any options, warrants or rights to acquire Stock.

"Stockholder" or "Stockholders":  The Original Stockholders and any other subsequent holder of Stock who agrees to be bound by the terms of this Agreement.

"Tag-Along Notice":  As defined in Section 4(a)(i).

"Tag-Along Sale":  As defined in Section 4(a)(i).

"Tag-Along Seller":  As defined in Section 4(a)(i).

"Tagging Stockholder":  As defined in Section 4(a)(ii).

"Term Loan Facility":  As defined in the Investment Agreement.

"Transfer":  To sell, transfer, assign, distribute, pledge, encumber or otherwise dispose of any Stock, either voluntarily or involuntarily.  Any sale, transfer, assignment, distribution, pledge, encumbrance or other disposition of any ownership interests in any entity that is a direct or indirect beneficial or record owner of any Stock, or any other transaction that has the economic effect of Transferring Stock, shall be deemed to be a Transfer of Stock by the Stockholder directly owning such Stock.  Notwithstanding the foregoing, it is understood and agreed that a Transfer shall not include (a) any Transfer of any ownership interests in Ripplewood Partners II, L.P. (or in any of its partners) or in

5

any entity that owns, beneficially or of record, Stock among a diverse group of other assets, (b) any distribution of Stock to any direct or indirect holders of ownership interests in Investors or any such entity that owns Stock among a diverse group of other assets, so long as the transferee is a Stockholder (or agrees to become a Stockholder in connection therewith), or (c) any indirect Transfer which the Company determines should not under the circumstances be treated as a Transfer.

"United States" or "U.S.":  The United States of America, its territories and possessions, any State of the United States of America and the District of Columbia, as the context requires.

"Unwinding Event":  As defined in Section 3(a).

"VCOC Stockholder":  A Stockholder or any Affiliate thereof that is intended to qualify as a "venture capital operating company" within the meaning of 29 C.F.R. § 2510.3-101(d).

"Warrants":  As defined in the Investment Agreement.

Section 2.      Methodology for Calculations.  For all purposes of this Agreement, the proposed Transfer or the Transfer of a Stock Equivalent shall be treated as the proposed Transfer or the Transfer of the shares of Stock into which such Stock Equivalent can be converted, exchanged or exercised.  All holdings of Stock by Persons who are Affiliates of each other shall be aggregated for purposes of meeting any threshold tests under this Agreement; provided, however, that equitable adjustment to the calculation of such holdings shall be made in the event that more than one class of Stock of the Company is issued.

Section 3.      Restrictions on Transfers of Stock; Right of First Offer.

(a)  Subject to the last sentence of Section 9.5(b), without the consent of Investors acting in its sole discretion, no Stockholder may Transfer its Stock in whole or in part to any Person (an "Assignee"); provided, however, that a Stockholder may at any time and from time to time (A) Transfer all or a portion of its Stock to one or more Affiliates of such Stockholder (an "Affiliate Transferee") with the consent of Investors (not to be unreasonably withheld), (B) Transfer all or a portion of its Stock to one or more Senior Secured Creditors without the consent of Investors, and (C) Transfer its Common Stock in accordance with Section 4 as a Tagging Stockholder, Section 5 as a Drag-Along Stockholder, Section 9.1 pursuant to an exercise of demand registration rights or Section 9.2 pursuant to an exercise of piggyback registration rights, without the consent of Investors.  In the event a transaction or event is contemplated in which any such Affiliate Transferee will cease to qualify as an Affiliate Transferee (an "Unwinding Event"), then (i) such Affiliate Transferee will promptly notify the Company of the pending occurrence of such Unwinding Event and (ii) prior to such Unwinding Event, such Affiliate Transferee will take all actions necessary to effect a transfer of all of the Stock held by such Affiliate Transferee either back to the Person who originally transferred such Stock to it or to another Affiliate of such original transferor.  In the event of any purported Transfer by a Stockholder of any Stock in violation of the provisions of this Agreement, such

6

purported Transfer will be void and of no effect, and the Company or the applicable Stockholder, as the case may be, will not give effect to such Transfer.

(b)  No Transfer shall be made pursuant to Section 3(a) unless:

(i)  such Transfer would not violate the Securities Act or other securities laws applicable to the Company or the Stock to be Transferred;

(ii)  such Transfer would not cause the Company to become subject to the 1940 Act;

(iii)  such Transfer would not require the Company to register a class of equity securities under Section 12 of the Exchange Act or any similar provision of any applicable foreign securities laws;

(iv)  in the case of a Transfer to an Affiliate Transferee or an Original Stockholder, (A) the Company has received prior written notice of the terms of such Transfer and (B) the transferor and transferee to such Transfer have provided the Company with absolute written assurance that the terms of such Transfer would remain strictly confidential among such transferor, transferee and the Company (subject only to disclosure required by applicable law); and

(v)  any transferee of Stock (including Affiliate Transferees, but excluding transferees who acquire shares of Stock pursuant to Section 5 or in a registered offering pursuant to Section 9 or, following the Initial Public Offering, in a bona fide widely distributed sale either to the public or pursuant to Rule 144), at the time of and as a condition to such Transfer, becomes a party to this Agreement by executing and delivering to the Company an Assumption Agreement.

Upon executing and delivering an Assumption Agreement, the transferee will be treated as a Stockholder for all purposes hereof and shall succeed to the rights of the transferring Stockholder hereunder, except as otherwise provided in this Agreement or the Assumption Agreement.

In its reasonable discretion, the Company may condition any Transfer to be made pursuant to this Section 3 upon receipt of an opinion of counsel to the effect that such Transfer complies with clauses (i), (ii) and (iii) of this Section 3(b), which opinion and counsel shall be reasonably satisfactory to the Company.

(c)  <u>Right of First Offer</u>.  (i)  Subject to the provisions of Section 9.5(b), if at any time any or all of the Stock held by any Other Stockholder (each such Other Stockholder, a "<u>First Offer Transferor</u>") is proposed to be Transferred to any Person in a Transfer permitted pursuant to Section 3(a) (other than to an Affiliate of such First Offer Transferor or to an Original Stockholder, or in accordance with Section 4 as a Tagging Stockholder or Section 5 as a Drag-Along Stockholder), the First Offer Transferor shall give Investors (the "<u>First Offer Offeree</u>") written notice (the "<u>First Offer Notice</u>") of its bona fide intention to Transfer such Stock indicating the number of shares of Stock to be offered for Transfer (the "<u>Offered Stock</u>"), the price in cash at which the First Offer Transferor proposes to Transfer the Offered Stock (the "<u>Offer Price</u>") and all other

7

material terms and conditions on which the First Offer Transferor proposes to Transfer the Offered Stock (including the identity of the proposed transferee if a proposed transferee has been identified).  Delivery of a First Offer Notice shall constitute an offer by the First Offer Transferor, irrevocable through and including the Offer Date (as defined below) to Transfer to the First Offer Offeree, subject to the terms of this Section 3(c), all (but not less than all) of the Offered Stock at the Offer Price.  During the 15 days following the receipt of such First Offer Notice (such 15th day, for the purposes of this Section 3(c), the "Offer Date"), the First Offer Offeree shall have the right to exercise the right to purchase, at the Offer Price, the Offered Stock by delivery of a reply notice (a "First Offer Acceptance") to the First Offer Transferor setting forth (x) its irrevocable election to purchase from the First Offer Transferor all of the Offered Stock, (y) closing arrangements and (z) a closing date not less than 20 nor more than 45 days following the Offer Date (unless a longer period of time is necessary to comply with the requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), or to obtain any other consent required to effect such purchase and sale, in which case such longer period).  The First Offer Acceptance shall constitute a binding commitment of the First Offer Offeree to purchase, and a binding commitment of the First Offer Transferor to Transfer, all of the Offered Stock at the Offer Price.  The First Offer Transferor shall transfer to the First Offer Offeree the Offered Stock, free and clear of all liens, and shall deliver to the First Offer Offeree such other documents and instruments of transfer as the First Offer Offeree reasonably may request.

(ii)  In the event there has not been a timely election by the First Offer Offeree to purchase the Offered Stock in accordance with Section 3(c)(i), then for a period of 60 days immediately following the Offer Date (unless a longer period of time is necessary to comply with the requirements of the HSR Act or to obtain any other consent required to effect such purchase and sale, in which case such longer period) (the "First Offer Marketing Period"), the First Offer Transferor may Transfer, subject to the terms and provisions of this Agreement (including the consent of Investors under Section 3(a)), the Offered Stock at a price not less than the Offer Price and on the same terms and conditions as provided in the First Offer Notice to the First Offer Offeree.  If such Transfer is not made within the First Offer Marketing Period or is proposed to be made at a price that is less than the Offer Price or not on the same terms and conditions as provided in the First Offer Notice to the First Offer Offeree, (x) no Transfer of Stock shall be made unless and until a further application of the procedure set forth in Section 3(c)(i) shall have been made with respect to any such prospective Transfer of Stock and (y) the First Offer Transferor may not offer to Transfer its Stock to any Person (including the First Offer Offeree pursuant to this Section 3(c)) until the date that is six months after the last day of the First Offer Marketing Period.

Section 4.    Tag-Along Rights.

(a)  Transfer of Stock.  (i)    Subject to the provisions of Section 9.5(b), if at any time Stock held by Investors (the "Tag-Along Seller") is proposed to be Transferred to any Person (other than to an Affiliate or pursuant to a Drag-Along Sale, an exercise of demand registration rights under Section 9.1 or an exercise of piggyback registration rights under Section 9.2) in an amount (based on the proposed Transfer price) that, together with any related Transfers of Stock by such Tag-Along Seller and any of its Affiliates, either

8

(A) exceeds $10 million, or (B)(1) exceeds $1 million and (2) when added together with all prior Transfers (other than to an Affiliate or pursuant to a Drag-Along Sale, an exercise of demand registration rights under Section 9.1 or an exercise of piggyback registration rights under Section 9.2) by Investors that were excluded from clause (A) because the amount of such Transfer was less than $10 million, exceeds $12.5 million, and if such Transfer shall otherwise be permitted in accordance with Section 3 (each a "<u>Tag-Along Sale</u>"), then at least 20 days prior to the date proposed for such Tag-Along Sale, the Tag-Along Seller shall (x) provide to all other Stockholders a notice (the "<u>Tag-Along Notice</u>") stating the material terms and conditions of such proposed Tag-Along Sale (including the amount of Stock to be Transferred, the consideration to be paid for such Stock and the name of the proposed purchaser) and copies of all agreements (which may be provided in draft form to the extent not yet finalized) to be executed by Tagging Stockholders in connection with such proposed Tag-Along Sale, to the extent available, and (y) offer to all other Stockholders the opportunity to participate in such Tag-Along Sale in accordance with this Section 4 on the same terms and conditions as the Tag-Along Seller (with appropriate adjustments as may be determined by the Company in the case of an indirect Transfer of Stock); <u>provided</u>, <u>however</u>, that any indemnities shall be made by the Stockholders severally and not jointly.

(ii)  Within 10 Business Days of its receipt of the Tag-Along Notice, each Stockholder that has elected (each such electing Stockholder, a "<u>Tagging Stockholder</u>") to participate in the Tag-Along Sale shall notify the Tag-Along Seller and the Company of its election.  Each Tagging Stockholder shall have the right (without the consent of Investors) to Transfer to the proposed purchaser its pro rata share (based on its relative Stock ownership as compared to all other Stockholders) of the Stock being sold in the Tag-Along Sale.  Notwithstanding the foregoing, with respect to any Tag-Along Sale of (i) Common Stock, only sales of Common Stock shall be effected, (ii) Warrants, only sales of Warrants shall be effected, with the Warrants having a lower exercise price than the Warrants being sold by Investors or their Affiliates in the Tag-Along Sale being sold at a price based on the price paid for the Warrants being sold by Investors or their Affiliates plus the difference in exercise prices (provided, however, that a Tagging Stockholder may not sell Warrants having a lower exercise price than the Warrants being sold by Investors or their Affiliates in the Tag-Along Sale unless such Tagging Stockholder no longer holds any Warrants having the same exercise price as the Warrants being sold by Investors or their Affiliates), and (iii) New Convertible Debt, only sales of New Convertible Debt shall be effected.

(b)  Any notification by a Tagging Stockholder pursuant to Section 4(a) shall be a final and binding commitment of such Tagging Stockholder to participate in such Tag-Along Sale; <u>provided</u>, <u>however</u>, that in the event there is a material change in the terms and conditions (including the consideration) of such Tag-Along Sale, the Tag-Along Seller shall give written notice of such change to each Stockholder, and (x) each Stockholder that is then a Tagging Stockholder shall thereafter have the right to revoke its election to participate in such Tag-Along Sale by providing written notice to the Tag-Along Seller within two Business Days of receiving the notice of such change and (y) each Stockholder that is not then a Tagging Stockholder shall have the right to elect to participate in such Tag-Along Sale by providing written notice to the Tag-Along Seller within two Business Days of receiving the notice of such change.

9

(c)  Notwithstanding anything contained in this Section 4, there shall be no liability on the part of the Tag-Along Seller to the Tagging Stockholders if the transfer of the Stock of the Tag-Along Seller pursuant to this Section 4 is not consummated for any reason.  Whether to effect a transfer of Stock, or to terminate any such transaction prior to its consummation, is in the sole discretion of such Tag-Along Seller.

Section 5.   <u>Drag-Along Rights</u>.

(a)  If at any time Investors and/or any of its Affiliates proposes to Transfer at least 50% of the Common Stock then held by Investors and its Affiliates to any Person (other than Affiliates of Investors) (a "<u>Drag-Along Sale</u>"), then Investors may cause each Other Stockholder (a "<u>Drag-Along Stockholder</u>") to Transfer, as part of the Drag-Along Sale, the same percentage of the Common Stock held by such Drag-Along Stockholder (including the Common Stock to be issued upon mandatory conversion of the New Convertible Debt and automatic exercise of the Warrants in connection with such Drag-Along Sale) as the percentage of the Common Stock being Transferred in the Drag-Along Sale by Investors and/or any of its Affiliates of the total Common Stock then held by Investors and its Affiliates, and shall provide notice at least 15 days prior to the date proposed for such Drag-Along Sale (the "<u>Drag-Along Notice</u>") to the Drag-Along Stockholders stating the material terms and conditions of such Drag-Along Sale (including the kind and amount of consideration to be paid for such Common Stock and the name of the proposed purchaser) and providing copies of all agreements (which may be provided in draft form to the extent not yet finalized) to be executed by the Drag-Along Stockholders in connection with such Drag-Along Sale, to the extent available.  In the event that Investors decline to exercise their rights under this Section 5 in connection with a Transfer that qualifies as a Drag-Along Sale, the Other Stockholders may thereafter exercise their rights under Section 4 to the extent that such Transfer qualifies as a Tag-Along Sale.

(b)  In the event Investors provides a Drag-Along Notice in accordance with this Section 5, each Drag-Along Stockholder shall (i) be obligated to Transfer to the proposed purchaser its Common Stock (including the Common Stock to be issued upon mandatory conversion of the New Convertible Debt and automatic exercise of the Warrants in connection with such Drag-Along Sale) for the same consideration per share of Common Stock and otherwise on the same terms and conditions as Investors and/or its Affiliates, as applicable (with appropriate adjustments as may be determined by Investors in the case of an indirect Transfer of Common Stock), as such terms and conditions are set forth in such Drag-Along Notice and (ii) execute and deliver such instruments of conveyance and transfer and take such other actions as Investors or the proposed purchaser may reasonably require in order to carry out the terms of this Section 5.  If the Drag-Along Sale occurs after an Initial Public Offering and pursuant to the acquisition agreement for the Drag-Along Sale stockholders are given an option as to the form or amount of consideration to be received pursuant to the Drag-Along Sale, each Drag-Along Stockholder shall be given the same option.

(c)  The instruments of conveyance and transfer for a Drag-Along Sale shall not include any representations and warranties of any Drag-Along Stockholder except such representations and warranties as are ordinarily given by a seller of securities, including with respect to such seller's authority to sell, enforceability of agreements against such

10

seller, such seller's good title in such securities and good title in such securities to be acquired by the purchaser at the closing of such sale; provided, however, that all representations and warranties, covenants, indemnities and agreements shall be made by Investors and/or its Affiliates, on the one hand, and each Drag-Along Stockholder, on the other hand, thereunder severally and not jointly and that any liability of Investors and/or its Affiliates, as the case may be, and each Drag-Along Stockholder thereunder shall be borne by each of them on a pro rata basis based on the relative number of shares of Common Stock being sold by it.

Section 6.    New Securities.

When and to the extent the Company determines that it will issue shares of New Stock, the Company shall offer to each Stockholder its pro rata share of the New Stock to be issued (based on its pro rata Stock ownership as compared to all Stock issued and outstanding prior to the issuance of such New Stock), which offer shall be made by written notice from the Company to the Stockholders. Within 10 Business Days of its receipt of such notice, each Stockholder shall notify the Company of the number of shares of New Stock the Stockholder requests to purchase, subject to a maximum of such Stockholder's pro rata share of such New Stock as described in the immediately preceding sentence (it being understood and agreed that the Company may make provision for Stockholders (on a pro rata basis) to request to purchase more than their respective pro rata shares of such New Stock, to the extent other Stockholders decline to purchase such New Stock). Any request by a Stockholder pursuant to the immediately preceding sentence shall be a final and binding commitment by such Stockholder to purchase the shares of New Stock so requested.

Section 7.    Corporate Governance; Management.

(a)  The Board of Directors of the Company (the "Board") shall be composed of the number of directors (each a "Director" and collectively the "Directors") determined by Investors in its discretion from time to time, which shall be at least three Directors. Immediately following the Closing, the Board shall be composed of eight Directors. Investors shall be entitled to appoint the Directors (including the Chairman of the Board); provided, however, that (x) immediately following the Closing one of the Directors shall be the chief executive officer of the Company and (y) so long as the Prepetition Investors collectively hold more than 10 percent of the Common Stock then outstanding, the Prepetition Investors holding a majority in interest of the Common Stock then held by all Prepetition Investors shall have the right to collectively appoint a total of two Directors, which Director appointees shall be reasonably satisfactory to Investors. The Company and each of the Stockholders hereby agree to take all action necessary to effect the appointment to the Board of each Director appointee as described in this Section 7(a).

(b)  Any Director (i) may resign upon delivery of written notice from such Director to the Company, (ii) may be removed by written request of the Stockholder(s) that appointed such Director pursuant to Section 7(a), or (iii) may be removed at the written request of Investors; provided, however, that any removal requested by Investors of a Director appointed pursuant to clause (y) of Section 7(a) may only be effected if such

11

Director ceases to be reasonably satisfactory to Investors.  A vacancy in the Board shall be filled promptly by an appointee of the Stockholders entitled to appoint such Director pursuant to Section 7(a).

(c)  Except as otherwise required by law or regulation, the Company and each of the Stockholders shall use commercially reasonable best efforts to cause the charter, by-laws or other comparable organizational documents of the Company (and, to the extent necessary, the charter, by-laws or other comparable organizational documents of any subsidiary of the Company) to contain limitations on the liability of Directors to the fullest extent permissible under the laws of the State of Delaware.

(d)  The Company shall use commercially reasonable best efforts to procure and maintain during the term of this Agreement directors' and officers' liability insurance for each of the Directors (at the Company's reasonable expense) which is comparable to that provided by other companies similar to the Company.

Section 8.    Voting; Major Transactions.  (a)  Notwithstanding anything to the contrary contained in this Agreement, each Stockholder of the Company shall vote its respective shares of Stock, on all matters presented to the Stockholders for their approval (other than matters requiring a Stockholder's approval pursuant to Section 8(b)), in such manner as such Stockholder is directed by Investors I.  Upon becoming a Stockholder, each Stockholder other than Investors I hereby makes, constitutes and appoints Investors I, with full power of substitution and resubstitution, its true and lawful attorney, for it and in its name, place and stead and for its use and benefit, to act as its proxy in respect of any vote or approval of Stockholders (other than matters requiring a Stockholder's approval pursuant to Section 8(b)).  The proxy granted pursuant to this Section 8(a) is a special proxy coupled with an interest and is irrevocable.

(b)  Without the affirmative vote or consent of Investors I and the affirmative vote or consent of a majority in interest of the Other Stockholders, the Company shall not, and shall not permit its subsidiaries to (i) enter into any transaction between the Company or any of its subsidiaries, on the one hand, and Investors or any of its Affiliates, on the other hand, other than (A) the Management Services Agreement (including the payment of fees, costs and expenses thereunder, but not any amendment or supplement thereof) and any transaction contemplated by the Investment Agreement or the Plan and (B) any transaction in which all Stockholders are entitled to participate (including transactions pursuant to Section 6), or (ii) make any amendment to the certificate of incorporation or by-laws of the Company that would materially adversely affect the rights of the Other Stockholders.

Section 9.    Registration Rights.

9.1    Demand Registration.

(a)  At any time and from time to time, Investors (on behalf of themselves and their respective Affiliates) and, after 180 days (or earlier if permitted by Investors and

the underwriter(s) in the Initial Public Offering) following the consummation of the Initial Public Offering, a representative (the "New Stockholders Representative")[3] appointed by the New Stockholders and their respective permitted transferees holding a majority in interest of the Registrable Securities held by all New Stockholders and their respective permitted transferees at such time (each, a "Requesting Demand Stockholder") may, in a written notice (a "Demand Notice") to the Company, request that the Company file a registration statement on any Form that is available to the Company for the registration of securities (other than a registration statement on Form S-4 or Form S-8 or any successor or similar forms and, in the case of requests by the New Stockholders Representative, other than a shelf registration statement) under the Securities Act covering the registration of all or a portion of such Requesting Demand Stockholder's Registrable Securities, as specified in the Demand Notice.  In order to be valid, any Demand Notice after the Initial Public Offering must provide the information described in Section 9.3(a) or be followed by such information, when requested as contemplated by Section 9.3(a).  Following receipt of a valid Demand Notice, the Company shall use commercially reasonable efforts, in accordance with Section 9.4, to effect the registration of the Registrable Securities covered by such Demand Notice, subject to any "cutbacks" imposed in accordance with Section 9.3(d).

(b)  The maximum number of registrations that the Company is required to effect in response to Demand Notices given by the New Stockholders Representative is two; provided, however, that the New Stockholders Representative shall not give a Demand Notice to the Company (and the Company shall not accept Demand Notices from the New Stockholders Representative) within the 12-month period following the effectiveness of a registration statement filed by the Company pursuant to a Demand Notice delivered by the New Stockholders Representative.  A registration requested by a Demand Notice shall not be deemed to have been effected on behalf of a Requesting Demand Stockholder unless (i) the related registration statement has been declared effective by the SEC, (ii) such registration statement has remained effective for the period set forth in Section 9.4(b) plus such longer period as, in the opinion of counsel for the underwriter or underwriters, a prospectus is required by law to be delivered in connection with the sale of Registrable Securities by an underwriter or dealer, (iii) the offering of Registrable Securities pursuant to such registration is not subject to any stop order, injunction or other similar order or requirement of the SEC during such period and (iv) in the event of an underwritten offering, the conditions to closing specified in the underwriting agreement entered into in connection with such registration are satisfied pursuant to the terms of such underwriting agreement.  However, notwithstanding the requirement of clause (i), if the Requesting Demand Stockholder withdraws its request prior to the related registration statement being declared effective by the SEC, then such registration will be deemed to have been effected for purposes of this Section 9.1(b) unless (A) the Requesting Demand Stockholder pays the Registration Expenses incurred by the Company through the date of such withdrawal or (B) the withdrawal is due to the disclosure of material adverse information relating specifically to the Company that the Requesting

---

[3] Silver Point to be the initial New Stockholders Representative.  Mechanics for appointment, removal, resignation, exculpation and reliance to be set forth in separate agreement.

13

Demand Stockholder did not know prior to submitting its Demand Notice (and in each case of (A) and (B), the Requesting Demand Stockholder shall not be deemed to have used a "demand right"). Furthermore, if in a registered offering requested by a Requesting Demand Stockholder such Requesting Demand Stockholder is subject to a cutback imposed in accordance with Section 9.3(d) of more than 50% of the Registrable Securities as to which it has requested registration, such Requesting Demand Stockholder shall not be deemed to have used a "demand right" in connection with such offering.

(c)   As soon as reasonably practicable, but in no event later than 30 days, after receiving a valid Demand Notice, the Company shall file with the SEC a registration statement covering all of the Registrable Securities covered by such Demand Notice as well as any other Registrable Securities as to which registration is properly requested in accordance with Section 9.2 (which other Registrable Securities may be included by means of a pre-effective amendment), but subject in both cases to any cutbacks imposed in accordance with Section 9.3(d). However, if this filing deadline would otherwise occur within 120 days following the effective date of any other registration statement with respect to which the Stockholders have been entitled to join pursuant to Section 9.2 (180 days in the case of the registration statement for the Initial Public Offering), then the Company may defer the filing date until after such 120th day (or 180th day in the case of the registration statement for the Initial Public Offering).

(d)   In the case of a shelf registration statement, the Company shall not be required to keep such registration statement effective for longer than (i) one year following the effectiveness of the registration statement or, if earlier, (ii) the date on which (x) all of the Registrable Securities covered by the registration statement have been sold pursuant thereto and (y) the date on which all Registrable Securities held by the Requesting Demand Stockholder are eligible for sale without volume restrictions pursuant to Rule 144.

(e)   In the event that, following the receipt of a Demand Notice, (i) the Company is in possession of material non-public information the disclosure of which the Board determines, in its reasonable judgment and in good faith, would be materially adverse to the Company and would not otherwise be required under any applicable law to be publicly disclosed and (ii) the Company gives the Requesting Demand Stockholder written notice of such determination, the Company shall, notwithstanding the provisions of Section 9.1 hereof, be entitled to postpone for up to an aggregate of 120 days in any 12-month period the filing of any registration statement otherwise required to be prepared and filed by it pursuant to Section 9.1 hereof. In the event the Company postpones the filing of any registration statement pursuant to the preceding sentence, the Requesting Demand stockholder may withdraw its Demand Notice prior to the filing of the registration statement and shall not be deemed to have used a "demand right".

9.2     Piggyback Registration.

(a)   If at any time following the consummation of the Initial Public Offering the Company intends to file a registration statement under the Securities Act (other than a registration statement on Form S-4 or S-8 or any successor or similar forms) covering a primary or secondary offering of any Stock, whether in response to a valid Demand Notice or otherwise, the Company shall promptly give each Stockholder written notice specifying

14

the date on which the Company anticipates filing such registration statement and advising each such party of its right to have its Registrable Securities included in such registration in accordance with this Section 9. Each Stockholder will then have the opportunity, by written notice received by the Company no later than 10 Business Days after such Stockholder's receipt of the Company's notice of such proposed filing, to request that all or a portion of such Stockholder's Registrable Securities be included in such registration statement.

(b)  Following receipt of any such timely request, the Company shall include in such registration statement (including by means of a pre-effective amendment if the registration statement has already been filed) all of the Registrable Securities that such Stockholder requests for inclusion in such registration statement, subject to any cutbacks imposed in accordance with Section 9.3(d), and the Company shall use commercially reasonable efforts in accordance with Section 9.4 to effect the registration of all such Registrable Securities. However, if at any time after giving written notice of its intention to file such a registration statement and prior to the effective date of such registration statement, the Company decides for any reason not to proceed with the proposed registration (including because the Requesting Demand Stockholder withdraws its request pursuant to Section 9.1), then the Company shall give written notice of such decision to the parties holding Registrable Securities, at which point the Company will be relieved of its obligation to register any Registrable Securities in connection with such registration (but not from its obligation to pay the related Registration Expenses); provided, however, that this right on the part of the Company shall not affect the Company's obligation to proceed with a registration validly requested under Section 9.1 and to include in such registration the Registrable Securities requested for inclusion by any Stockholder pursuant to this Section 9.2.

(c)  In connection with any underwritten offering, the Company shall not be required under Section 9.2 to include Registrable Securities in such underwritten offering unless the holders intending to sell Registrable Securities accept the terms of the underwriting of such offering that have been reasonably agreed upon between the Company, the Requesting Demand Stockholder (if any) and the underwriters selected in accordance with this Agreement, but no Stockholder will be required to make representations or warranties to the underwriters or other purchasers or to provide indemnities other than as specified in this Agreement, and all such representations and warranties shall be on a several and not joint basis.

9.3    Rights and Obligations of Holders in Connection with a Registration.

(a)  The Stockholders participating in a registration in accordance with this Section 9 shall furnish to the Company such information regarding themselves, the Registrable Securities held by them and the intended method of disposition and plan of distribution of such securities as the Company may reasonably request and as may reasonably be required in connection with the registration to be effected by the Company.

(b)  The Stockholders participating in a registered offering in accordance with this Section 9 will, if it is an underwritten offering, enter into an underwriting

15

agreement, to be negotiated by the Company and its counsel, in customary form, which agreement will contain such representations and warranties by and obligations of the Company as are customarily contained in underwriting agreements generally, including, without limitation, customary indemnification and contribution provisions.  Customary representations and warranties by, and the other agreements on the part of, the Company to and for the benefit of such underwriters shall also be made to and for the benefit of the Stockholders participating in such offering in a manner customary for such transaction.  No Stockholder of Registrable Securities shall be required to make any representations or warranties to or agreements with the Company or the underwriters other than those representations, warranties and agreements (including limited indemnification with respect to written information supplied by such Stockholder with respect to itself) regarding such Stockholder as are customarily given by non-controlling stockholders seeking to sell shares in an underwritten secondary offering; provided, however, that if any Stockholder of Registrable Securities disapproves of the terms of the underwriting, such Stockholder's sole remedy shall be to elect to withdraw all of its Registrable Securities by written notice to the Company, the managing underwriter and, if applicable, the Requesting Demand Stockholder.  The Registrable Securities so withdrawn shall also be withdrawn from registration and the corresponding Demand Notice of such Requesting Demand Stockholder, if any, shall also be deemed to have been withdrawn.

    (c)  The Company will have the right to select the underwriters in connection with any registered offering in accordance with this Section 9.

    (d)  If the managing underwriter or underwriters determine in their reasonable business judgment that the total amount of Registrable Securities and other securities of the Company proposed to be included in an offering proposed to which Section 9.1 or Section 9.2 applies is such as to materially adversely affect the success of such offering, then the Company shall only be obligated to include in such registered offering the amount of securities which the Company is so advised can be sold in such offering, as follows:

   (i)  if such registration includes a registration of shares of securities to be offered for sale by the Company (other than in connection with a registration in response to a Demand Notice), the Company shall include in such registration, to the extent of available capacity, first, all such securities that the Company proposes to be included in such registration, and second, the Registrable Securities requested to be included in such registration by the Stockholders, pro rata among them in the proportion that the number of Registrable Securities sought to be registered by each of them bears to the total number of Registrable Securities sought to be registered by all of them; and

   (ii)  if such registration is a registration of Registrable Securities in response to a Demand Notice, then the Company shall include in such registration, to the extent of available capacity, first, the Registrable Securities requested to be included in such registration by the Stockholders pro rata among them in the proportion that the number of Registrable Securities sought to be registered by each of them bears to the total number of Registrable Securities sought to be registered by all of them, and second, such securities that the Company proposes to be included in such registration.

16

(e) Each Stockholder of Registrable Securities agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 9.4(a)(viii), such Stockholder shall forthwith discontinue disposition of Registrable Securities pursuant to the registration statement covering such Registrable Securities until such Stockholder's receipt of the copies of the supplemented or amended prospectus contemplated by Section 9.4(a)(viii) and, if so directed by the Company, such Stockholder shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Stockholder's possession, of the prospectus covering such Registrable Securities current at the time of receipt of such notice; provided, however, that any period of time during which a Stockholder must discontinue disposition of Registrable Securities shall not be included in the determination of a period of distribution for purposes of Section 9.4(b).

     9.4     <u>Obligations of the Company in Connection with a Registration</u>.

(a) Whenever required under Section 9.1 or Section 9.2 to use commercially reasonable efforts to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably practicable (but subject to Section 9.1(d), Section 9.1(e) and any other applicable provisions in this Section 9):

(i) prepare and file with the SEC a registration statement with respect to such Registrable Securities and use commercially reasonable efforts to cause such registration statement to become and remain effective for the period of the distribution contemplated thereby determined as provided in Section 9.4(b);

(ii) before filing a registration statement, prospectus or issuer free writing prospectus or any amendments or supplements thereto, furnish to counsel of the holders of such Registrable Securities copies of all such documents proposed to be filed, which documents will be subject to the reasonable review and comment of such counsel, and such other documents reasonably requested by such counsel, including any comment letter from the SEC, and provide such counsel reasonable opportunity to participate in the preparation of such registration statement, each prospectus included therein and each issuer free writing prospectus related thereto (including any amendments and supplements thereto) and such other opportunities to conduct a reasonable investigation within the meaning of the Securities Act, including reasonable access to the Company's books and records, officers, accountants and other advisors;

(iii) prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection therewith (A) reasonably requested by any Stockholder of such Registrable Securities (to the extent such request relates to information relating to such Stockholder) and (B) as may be necessary to keep such registration statement effective for the period of distribution contemplated thereby determined as provided in Section 9.4(b) and comply in all material respects with the provisions of the Securities Act with respect to the disposition of all Registrable Securities covered by such registration statement, and furnish to the Stockholders of such Registrable Securities copies of any such amendments and supplements prior to their being used or filed with the SEC;

17

(iv)  furnish to the selling Stockholders of Registrable Securities such numbers of copies of the registration statement, the prospectus included therein (including each preliminary prospectus), any other prospectus filed under Rule 424 under the Securities Act relating to such Registrable Securities and any issuer free writing prospectus (and any amendments or supplements thereto in conformity with the requirements of the Securities Act, and, in each case including all exhibits thereto and all documents incorporated by reference therein) and such other documents and information as they may reasonably request and make available for inspection by the parties referred to in Section 9.4(a)(xv) such financial and other information and books and records of the Company, and cause the officers, Directors, employees, counsel and independent certified public accountants of the Company to respond to such inquiries, as shall be reasonably necessary, in the judgment of the respective counsel referred to in Section 9.4(a)(xv), to conduct a reasonable investigation within the meaning of Section 11 of the Securities Act;

(v)  use commercially reasonable efforts to register or qualify the Registrable Securities covered by such registration statement under such securities or blue sky laws of such jurisdictions as any selling Stockholder or underwriter of Registrable Securities reasonably requests and do any and all other acts and things which may be reasonably necessary or advisable to enable such Stockholder to consummate the disposition in such jurisdictions of the Registrable Securities owned by such Stockholder; provided, however, that the Company will not be required in connection therewith or as a condition thereto to (A) register or qualify to do business in or file a general consent to service of process in any jurisdiction wherein it would not, but for the requirements of this Section 9.4(a)(v), be obligated to do so, or (B) take any action that would subject it to more than de minimis taxation in a jurisdiction where it is not already subject to tax but for the requirements of this paragraph;

(vi)  promptly notify in writing each selling Stockholder of Registrable Securities, their counsel, the sales or placement agent, if any, therefor and the managing underwriter or underwriters, if any, thereof (A) when such registration statement, the prospectus included therein, any prospectus amendment or supplement or post-effective amendment or any issuer free writing prospectus has been filed, and, with respect to such registration statement or any post-effective amendment, when the same has become effective, (B) of any comments by the SEC or by any blue sky or securities commissioner or regulator of any state with respect thereto or any request by the SEC for amendments or supplements to such registration statement, prospectus or issuer free writing prospectus or for additional information, (C) of the issuance by the SEC of any stop order suspending the effectiveness of such registration statement or the initiation or threatening of any proceedings for that purpose, (D) if at any time the representations and warranties of the Company contained in any underwriting agreement or other customary agreement cease to be true and correct in all material respects or (E) of the receipt by the Company of any notification with respect to the suspension of the qualification of such Registrable Securities for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose;

(vii)  use commercially reasonable efforts to prevent the entry of and obtain the withdrawal of any order suspending the effectiveness of such registration statement or any post-effective amendment thereto at the earliest practicable date;

18

(viii)  promptly notify in writing each selling Stockholder of Registrable Securities, at any time when a prospectus relating to such Registrable Securities is required to be delivered under the Securities Act (including in circumstances where such requirement may be satisfied pursuant to Rule 172 under the Securities Act) and when any issuer free writing prospectus includes information that may conflict with the information contained in such registration statement (including any document incorporated by reference therein that has not been superseded or modified), of the happening of any event as a result of which the prospectus included or incorporated by reference in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make, in light of the circumstances under which they were made, the statements therein not misleading, and at the request of any such Stockholder promptly prepare and furnish to such Stockholder a reasonable number of copies of a supplement to or an amendment of such prospectus or an issuer free writing prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make, in light of the circumstances under which they were made, the statements therein not misleading;

(ix)  furnish, at the request of any selling Stockholder of Registrable Securities, if the method of distribution is by means of an underwriting, on the date that the Registrable Securities are delivered to the underwriters for sale pursuant to such registration, or if such Registrable Securities are not being sold through underwriters, on the date that the registration statement with respect to such Registrable Securities becomes effective, (A) a signed opinion, dated such date, of the independent legal counsel representing the Company for the purpose of such registration, addressed to the underwriters, if any, and to the Stockholders making such request, as to such matters as such underwriters or the Stockholders including Registrable Securities in such registration, as the case may be, may reasonably request and as would be customary in such a transaction; and (B) letters, dated such date and the date the offering is priced, from the independent certified public accountants of the Company, addressed to the underwriters, if any, and to the Stockholders making such request and, if such accountants refuse to deliver such letters to such Stockholders, then to the Company (x) stating that they are independent certified public accountants within the meaning of the Securities Act and that, in the opinion of such accountants, the financial statements and other financial data of the Company included or incorporated by reference in the registration statement, the prospectus or any issuer free writing prospectus, or any amendment or supplement thereto, comply as to form in all material respects with the applicable accounting requirements of the Securities Act and (y) covering such other financial matters (including information as to the period ending not more than five Business Days prior to the date of such letters) with respect to the registration in respect of which such letter is being given as such underwriters or the Stockholders holding a majority of the Registrable Securities included in such registration, as the case may be, may reasonably request and as would be customary in such a transaction;

(x)  provide a transfer agent and registrar for all such Registrable Securities not later than the effective date of such registration;

19

(xi)  enter into customary agreements (including if the method of distribution is by means of an underwriting, an underwriting agreement in customary form, including customary indemnification provisions substantially consistent with Section 9.6 and, to the extent required by the underwriters, customary lock-up provisions substantially consistent with Section 9.7) and take such other actions as are reasonably required in order to expedite or facilitate the disposition of the Registrable Securities to be so included in the registration statement;

(xii)  use commercially reasonable efforts to obtain the governmental and self regulatory organization authorizations which may be required to effect such registration or the offering or sale in connection therewith or to enable the selling Stockholders to offer, or to consummate the disposition of, their Registrable Securities;

(xiii)  use commercially reasonable efforts to cause all Registrable Securities covered by the registration statement to be approved for listing on a U.S. national securities exchange or approved for trading on a national interdealer quotation system, and cooperate with the selling Stockholders of Registrable Securities and the managing underwriter or underwriters, if any, to facilitate the timely preparation and delivery of certificates representing such Registrable Securities to be sold, which certificates shall conform to the requirements of such national securities exchange or interdealer quotation system and shall not bear any restrictive legends, and, in the case of an underwritten offering, enable such Registrable Securities to be in such denominations and registered in such names as the managing underwriter or underwriters may request at least two Business Days prior to any sale of such Registrable Securities;

(xiv)  otherwise comply in all material respects with all applicable rules and regulations of the SEC, and make available to its security holders, as soon as reasonably practicable, but not later than 18 months after the effective date of the registration statement, an earnings statement covering the period of at least 12 months beginning with the first full month after the effective date of such registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 promulgated thereunder;

(xv)  make available for inspection by any selling Stockholder of Registrable Securities, any underwriter participating in any disposition pursuant to such registration statement and any attorney, accountant or other agent retained by any such Stockholder or underwriter, all financial and other records, pertinent corporate documents and properties of the Company, and cause the Company's officers, Directors, employees and independent accountants to supply all information reasonably requested by any such Stockholder, underwriter, attorney, accountant or agent in connection with such registration statement;

(xvi)  permit any selling Stockholder of Registrable Securities that, in its sole and exclusive judgment, might be deemed to be an underwriter or a controlling Person of the Company to participate in the preparation of such registration or comparable statement and to require the insertion therein of material, furnished to the Company in writing, which in the reasonable judgment of the Stockholder and its counsel should be included;

20

(xvii)  if requested by the managing underwriter or agent or any selling Stockholder of Registrable Securities covered by the registration statement, promptly incorporate in a prospectus supplement or post-effective amendment such information as the managing underwriter or agent or such Stockholder reasonably requests to be included therein, including, with respect to the number of Registrable Securities being sold by such Stockholder to such underwriter or agent, the purchase price being paid therefor by such underwriter or agent and with respect to any other terms of the underwritten offering of the Registrable Securities to be sold in such offering, and make all required filings of such prospectus supplement or post-effective amendment as soon as reasonably practicable after being notified of the matters incorporated in such prospectus supplement or post-effective amendment;

(xviii)  cause the Company's executive officers to use, in accordance with customary practice, their commercially reasonable best efforts to support the marketing of the Registrable Securities, which may include participating in a so-called "road show" if requested and deemed advisable by the managing underwriter or underwriters; and

(xix)  use commercially reasonable efforts to take all other steps customary or necessary to effect the registration and sale of the Registrable Securities as contemplated hereby.

(b)  For purposes of Section 9.4(a), and with respect to registration required pursuant to Section 9.1, (i) the period of distribution of Registrable Securities in a firm commitment underwritten public offering will be deemed to extend until each underwriter has completed the distribution of all securities purchased by it (or such shorter period as may be required in the underwriting agreement) and (ii) the period of distribution of Registrable Securities in any other registration will be deemed to extend until the earlier of the sale of all Registrable Securities covered thereby and 60 days after the effective date thereof.

(c)  All fees, costs and expenses incurred in connection with each registration or attempted registration pursuant to Section 9.1 or 9.2, including all registration, filing and qualification fees, word processing, duplicating, printers' and accounting costs and fees (including the expenses of any special audits or "cold comfort" letters required by or incident to the Company's performance of its obligations under Section 9.4), fees of the National Association of Securities Dealers, Inc., listing fees, fees and expenses of complying with state securities or blue sky laws, fees and disbursements of counsel for the Company, fees and disbursements of underwriters customarily paid by the issuers or sellers of securities and fees and expenses of the counsel to the Stockholders participating therein), but excluding any underwriting discounts or commissions ("Registration Expenses"), shall be paid by the Company.  However, the Company will not be required to pay the fees and expenses of more than one counsel for Investors and one other counsel for all other Stockholders of Registrable Securities participating therein.

9.5    Rule 144.

(a)  With a view to making available the benefits of certain rules and regulations of the SEC that may permit the sale of the Registrable Securities to the public

21

without registration, the Company agrees that, after such time as the Company shall have consummated its Initial Public Offering, it will:

(i)  make and keep current public information available, as those terms are understood and defined in Rule 144;

(ii)  use commercially reasonable efforts to file with the SEC in a timely manner all reports and other documents required to be filed by the Company under the Securities Act and the Exchange Act; and

(iii)  furnish to each Stockholder forthwith upon written request (i) a written statement by the Company as to its compliance with the reporting requirements of Rule 144, the Securities Act and the Exchange Act, (ii) a copy of the most recent annual or quarterly report of the Company, and (iii) such other reports and documents so filed by the Company as such Stockholder may reasonably request in availing itself of Rule 144.

(b)  After such time as the Company shall have consummated its Initial Public Offering, any Transfer pursuant to and in accordance with the provisions of Rule 144 shall not be subject to the provisions or procedures set forth in Section 3(c) or Section 4 above (but, for the avoidance of doubt, shall be subject to the remaining provisions of Section 3 above).  Notwithstanding the foregoing, to the extent that Investors effects a Transfer of a portion of its Stock pursuant to and in accordance with the provisions of Rule 144, each of the Other Stockholders shall be able to Transfer a pro rata portion of its Stock pursuant to and in accordance with the provisions of Rule 144 without the consent of Investors under Section 3(a).

   9.6 <u>Indemnification</u>.  In the event the Company files any registration statement under the Securities Act or the Exchange Act, this Section 9.6 shall apply.

(a)  The Company shall indemnify and hold harmless Investors, each Stockholder requesting or joining in the registration under such registration statement and each such Stockholder's directors, officers and each Person, if any, who controls such Stockholder, as the case may be, within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, from and against any and all losses, claims, damages and liabilities (including any legal or other expenses reasonably incurred in connection with defending or investigating any such action or claim) to which they may become subject under the Securities Act or otherwise, including any amount paid in settlement of any litigation commenced or threatened, insofar as such losses, claims, damages or liabilities (or actions or proceedings in respect thereof, whether or not such indemnified person is a party thereto) arise out of or are based on any untrue or alleged untrue statement of a material fact contained in such registration statement, preliminary prospectus, final prospectus, issuer free writing prospectus or amendments or supplements thereto or arise out of or are based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make, in light of the circumstances under which they were made, the statements therein not misleading; <u>provided</u>, <u>however</u>, that the Company shall not be liable to any Stockholder or such Stockholder's directors or officers or controlling Persons, in any such case, for any such

22

loss, claim, damage or liability (or action or proceeding in respect thereof, whether or not such indemnified person is a party thereto) to the extent that it arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in connection with such registration statement, preliminary prospectus, final prospectus, issuer free writing prospectus or amendments or supplements thereto, in conformity with written information relating to such Stockholder furnished to the Company by such Stockholder expressly for inclusion therein in connection with such registration; provided further, however, that as to any preliminary prospectus or any final prospectus, this indemnity agreement shall not inure to the benefit of any Stockholder or any such Stockholder's directors or officers or controlling Persons, on account of any loss, claim, damage or liability arising from the sale of Registrable Securities to any Person by such Stockholder, if such Stockholder or its representatives failed to send or give a copy of the final prospectus, prospectus supplement or issuer free writing prospectus, as the case may be (excluding documents incorporated by reference therein), as the same may be amended or supplemented, to that Person within the time required by the Securities Act, and the untrue statement or alleged untrue statement of a material fact or omission or alleged omission to state a material fact in such preliminary prospectus or final prospectus was corrected in the final prospectus, such prospectus supplement or such issuer free writing prospectus, as the case may be (excluding documents incorporated by reference therein), unless such failure resulted from the non-compliance by the Company with Section 9.4(a)(viii).  Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of any such Stockholder or any such Stockholder's directors or officers or controlling Persons and shall survive the transfer of such securities by such Stockholder.

(b)  Each Stockholder requesting or joining in a registration, severally and not jointly, shall indemnify and hold harmless the Company, each of its Directors and officers and each Person, if any, who controls the Company within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act to the same extent as the foregoing indemnity from the Company to the Stockholders but only with reference to written information relating to such Stockholder furnished to the Company by such Stockholder expressly for inclusion in connection with such registration; provided, however, that the liability of each Stockholder hereunder shall not exceed the net proceeds received by such Stockholder from the sale of Registrable Securities covered by such registration.

(c)  In case any proceeding (including any governmental investigation) shall be instituted involving any Person in respect of which indemnity may be sought pursuant to either Section 9.6(a) or (b), such Person (the "Registration Indemnified Party") shall promptly notify the Person against whom such indemnity may be sought (the "Registration Indemnifying Party") in writing and the Registration Indemnifying Party, upon request of the Registration Indemnified Party, shall retain counsel reasonably satisfactory to the Registration Indemnified Party to represent the Registration Indemnified Party and any others the Registration Indemnifying Party may designate in such proceeding and shall pay the reasonable fees and disbursements of such counsel related to such proceeding, and the Registration Indemnifying Party shall, at its election and at the expense of the Registration Indemnifying Party, assume the defense thereof.  In any such proceeding, any Registration Indemnified Party shall have the right to retain its own counsel, but the fees and expenses

23

of such counsel shall be at the expense of such Registration Indemnified Party unless
(i) the Registration Indemnifying Party and the Registration Indemnified Party shall have
mutually agreed to the retention of such counsel or (ii) the named parties to any such
proceeding (including any impleaded parties) include both the Registration Indemnifying
Party and the Registration Indemnified Party and representation of both parties by the same
counsel would be, in the reasonable opinion of counsel to the Registration Indemnified
Party, inappropriate due to actual or potential differing interests between them, in which
event the fees and expenses of such counsel shall be borne by the Registration Indemnifying
Party.  It is understood that the Registration Indemnifying Party shall not, in respect of the
legal expenses of any Registration Indemnified Party in connection with any proceeding or
related proceedings in the same jurisdiction, be liable for the fees and expenses of more
than one separate firm (in addition to any local counsel) for all such indemnified parties
and that all such fees and expenses shall be reimbursed as they are incurred.  Such firm
shall be designated in writing by the affected Stockholder(s), in the case of parties
indemnified pursuant to Section 9.6(a), and by the Company, in the case of parties
indemnified pursuant to Section 9.6(b).  The Registration Indemnifying Party shall not be
liable for any settlement of any proceeding effected without its written consent (which shall
not be unreasonably withheld or delayed), but if settled with such consent or if there shall
be a final judgment for the plaintiff, the Registration Indemnifying Party agrees to
indemnify the Registration Indemnified Party from and against any loss or liability by
reason of such settlement or judgment.  No Registration Indemnifying Party shall, without
the prior written consent of the Registration Indemnified Party, effect any settlement of
any pending or threatened proceeding in respect of which any Registration Indemnified
Party is or could have been a party and indemnity could have been sought hereunder by such
Registration Indemnified Party, unless such settlement includes an unconditional release of
such Registration Indemnified Party from all liability on claims that are the subject matter of
such proceeding.

       (d)  If the indemnification provided for in this Section 9.6 is held by a court
of competent jurisdiction to be unavailable to any Person entitled to indemnification
hereunder with respect to any losses, claims, damages, liabilities and expenses referred to
herein, then the Registration Indemnifying Party, in lieu of indemnifying such Registration
Indemnified Party hereunder, shall contribute to the amount paid or payable by such
Registration Indemnified Party as a result of such loss, claim, damage, liability or expense
(i) in such proportion as is appropriate to reflect the relative benefits received by the
Registration Indemnifying Party and the Registration Indemnified Party from the
distribution of the Registrable Securities or (ii) if the allocation provided by clause
(i) above is not permitted by applicable law, in such proportion as is appropriate to reflect
not only the relative benefits referred to in clause (i) above but also the relative fault of the
Registration Indemnifying Party and of the Registration Indemnified Party in connection
with the statements or omissions which resulted in such loss, claim, damage, liability or
expense, as well as any other relevant equitable considerations.  The relative benefits
received by the Company, on the one hand, and the selling Stockholder of Registrable
Securities or underwriter, as the case may be, on the other hand, in connection with the
distribution of the Registrable Securities shall be deemed to be in the same proportion as
the total net proceeds received by the Company from the offering bear to the total net
proceeds received by such Stockholder from the offering or the underwriting discounts and
commissions received by the underwriter in such offering, as the case may be.  The

24

relative fault of the Registration Indemnifying Party and of the Registration Indemnified Party shall be determined by reference to, among other things, whether the untrue statement or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by the Registration Indemnifying Party, the Registration Indemnified Party or the underwriter and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission; provided, however, that the foregoing contribution agreement shall not inure to the benefit of any Registration Indemnified Party if indemnification would be unavailable to such Registration Indemnified Party by reason of the provisions of Sections 9.6(a) or (b), and in no event shall the obligation of any Registration Indemnifying Party to contribute under this clause (d) exceed the amount that such Registration Indemnifying Party would have been obligated to pay by way of indemnification if the indemnification provided for under Sections 9.6(a) or (b) had been available under the circumstances.

9.7    Lock-up.

(a)    Each Stockholder that holds Registrable Securities that could be included in a registration statement pursuant to Section 9.2 shall, in connection with any registration by the Company of any Stock (including Registrable Securities), at the request of the Company, promptly cease to effect any sale, disposition or distribution of any Stock (other than any included in the registration) without the prior written consent of the Company for a period beginning from the time the Company gives notice to each Stockholder of its intention to file a registration statement and ending upon the earlier of the expiration of the "lock-up" period imposed on the Company under the underwriting agreement (if any) relating to an underwritten offering covered by such registration statement, the date such registration statement is withdrawn or abandoned, or 60 days after the effective date of such registration statement in the case of a registration that is not an underwritten offering, except to the extent the Company and the underwriter or underwriters each conclude that Stockholders holding less than a minimum ownership percentage of outstanding Stock need not be subject to the "lock-up" period.

(b)    The Company agrees (i) not to effect any public offer, sale or distribution of Stock for a period beginning from the time the Company gives notice to each Stockholder pursuant to this Section 9 of its intention to file a registration statement to which Section 9.1 or 9.2 applies and 90 days after the effective date of such registration statement (180 days after such effective date in the case of the Initial Public Offering), and (ii) to use commercially reasonable efforts to cause each Stockholder to agree not to effect any sale, disposition or distribution of any Stock during such period (other than any included in the registration) without the prior written consent of the Company for a period beginning from the time the Company gives notice to each Stockholder of its intention to file a registration statement and ending upon the earlier of the expiration of the "lock-up" period imposed on the Company under the underwriting agreement (if any) relating to an underwritten offering covered by such registration statement, the date such registration statement is withdrawn or abandoned, or 60 days after the effective date of such registration statement in the case of an registration that is not an underwritten offering.

25

Section 10.      Indemnification.

(a)  To the fullest extent permitted by law, none of the Stockholders, their respective Affiliates, nor any of their respective partners, members, shareholders, directors, officers, employees, agents, consultants, legal or other advisors, nor the Directors (each, an "Indemnified Party"), shall be liable to the Company or to any Stockholder for (i) any act or omission by such Indemnified Party in connection with the conduct of the affairs of the Company or otherwise in connection with this Agreement or the matters contemplated herein, unless such act or omission resulted from gross negligence or willful misconduct by such Indemnified Party or (ii) any act or omission of any broker or other agent or representative of the Company.

(b)  No Stockholder shall have any personal liability whatsoever in its capacity as a Stockholder, whether to the Company, to any of the other Stockholders or to the creditors of the Company, including, without limitation, for the debts, liabilities, contracts or other obligations of the Company or for any losses of the Company.

(c)  To the fullest extent permitted by law, the Company shall indemnify and save harmless each Indemnified Party from and against any and all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim) of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnified Party and arise out of or in connection with the affairs of the Company, including acting as a Director or the equivalent of the Company, or the performance by such Indemnified Party of any of the Board's responsibilities hereunder or otherwise in connection with the matters contemplated herein; provided, however, that each Indemnified Party shall be entitled to indemnification hereunder only to the extent that such Indemnified Party's conduct did not constitute gross negligence or willful misconduct.

The satisfaction of any indemnification and any saving harmless pursuant to this Section 10 shall be from and limited to the Company's assets, and no Stockholder shall have any personal liability on account thereof.

(d)  Expenses reasonably incurred by an Indemnified Party in defense or settlement of any claim that may be subject to a right of indemnification hereunder shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnified Party to repay such amount to the extent that it shall be determined ultimately that such Indemnified Party is not entitled to be indemnified hereunder.

(e)  The right of any Indemnified Party to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which such Indemnified Party may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Indemnified Party's successors, assigns and legal representatives.

26

(f)  Any Indemnified Party shall be deemed to be a creditor of the Company with respect to any amounts payable to such Indemnified Party pursuant to this Section 10.

Section 11.    <u>Legend</u>.  Each Stockholder and the Company shall take all action necessary to cause each certificate representing outstanding shares of Stock owned by a Stockholder to bear legends containing substantially the following words:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>SECURITIES ACT</u>"), OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES.  THE SECURITIES MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS.

> THE SALE, TRANSFER, ASSIGNMENT, DISTRIBUTION, PLEDGE, ENCUMBRANCE OR OTHER DISPOSITION (EACH A "<u>TRANSFER</u>") AND VOTING OF ANY OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE RESTRICTED BY THE TERMS OF A STOCKHOLDERS' AGREEMENT DATED AS OF [      ] (THE "<u>STOCKHOLDERS' AGREEMENT</u>") AMONG THE COMPANY AND THE STOCKHOLDERS NAMED THEREIN, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.  THE COMPANY WILL NOT REGISTER THE TRANSFER OF SUCH SECURITIES ON THE BOOKS OF THE COMPANY UNLESS AND UNTIL THE TRANSFER HAS BEEN MADE IN COMPLIANCE WITH THE TERMS OF THE STOCKHOLDERS' AGREEMENT.

The requirement that the above securities legend be placed upon certificates evidencing shares of Stock shall terminate upon the earliest of the following events: (i) when such shares of Stock are Transferred pursuant to an effective registration statement under the Securities Act or (ii) when such shares of Stock are Transferred in any other transaction if the seller delivers to the Company an opinion of its counsel, which counsel and opinion shall be reasonably satisfactory to the Company, or a "no-action" letter from the staff of the SEC, in either case to the effect that such legend is no longer necessary in order to protect the Company against a violation by it of the Securities Act upon any sale or other disposition of such shares of Stock without registration thereunder.  The requirement that the above stockholder's agreement legend be placed upon certificates evidencing

27

shares of Stock shall terminate upon a Transfer of Stock to a Transferee that is not required to become party to this Agreement.  Upon the consummation of any event requiring the removal of a legend hereunder, the Company, upon the surrender of certificates containing such legend, shall, at its own expense, deliver to the Stockholder of any such shares of Stock as to which the requirement for such legend shall have terminated, one or more new certificates evidencing such shares of Stock not bearing such legend.

Section 12.    Representations and Warranties.  Each of the Stockholders, severally and not jointly, hereby represents and warrants to the other Stockholders and to the Company as follows:

(a)  Authorization.  The Stockholder has the power and authority to enter into this Agreement and all other documents and instruments executed or to be executed by the Stockholder pursuant to this Agreement.  The execution and delivery of this Agreement and all other documents and instruments executed or to be executed by the Stockholder pursuant to this Agreement, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all necessary action on the part of the Stockholder.  This Agreement and all other documents and instruments executed or to be executed by the Stockholder pursuant to this Agreement have been, or will have been, at the time of their respective execution and delivery, duly executed and delivered by a Person duly authorized to execute and deliver this Agreement and such other documents and instruments on behalf of the Stockholder.

(b)  Compliance with Other Instruments and Laws.  The execution and delivery of this Agreement and all other documents and instruments executed or to be executed by the Stockholder pursuant to this Agreement, and the consummation of the transactions contemplated hereby and thereby, will not conflict with or result in any violation of or default under any provision of (i) the organizational documents of the Stockholder or (ii) any mortgage, indenture, trust, lease, partnership or other agreement or other instrument, permit, concession, grant, franchise, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to the Stockholder or any of its properties or assets except in the case of clause (ii) for any such conflicts, violations or defaults which would not have a material adverse effect on the validity or enforceability of this Agreement.

(c)  Authorizations and Consents.  No consent, approval or authorization is required to be obtained or made by the Stockholder in connection with its execution, delivery or performance of this Agreement or the validity and enforceability of this Agreement, other than under circumstances where the failure to obtain such consent, approval or authorization would not have a material adverse effect on the validity or enforceability of this Agreement.

(d)  Litigation.  No action, suit, proceeding or governmental investigation is pending against the Stockholder at law or in equity or before any governmental authority that seeks to question, delay or prevent the consummation of the transactions contemplated hereby.

28

(e) <u>Information and Experience</u>.  The Stockholder has made detailed inquiry concerning the Company and has received any and all written information which it has requested and all questions and inquiries have been answered to its satisfaction.  The Stockholder has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Stock, is able to bear the risks of an investment in the Stock and understands the risks of, and other considerations relating to, a purchase of the Stock.  Other than as set forth in the Agreement, the Stockholder is not relying upon any other information, representation or warranty by Ripplewood, the Company or any agent of either of them in determining to invest in the Company.  The Stockholder has consulted with its own advisers as to the financial, tax, legal and related matters concerning an investment in the Stock and, on that basis, believes that an investment in the Stock is suitable and appropriate for the Stockholder.  The Stockholder has no need for immediate liquidity in the Stockholder's investment in the Stock.

(f) <u>Interests Acquired for Investment Purposes</u>.  The Stock to be acquired hereunder is being acquired by the Stockholder for its own account for investment purposes only and not with a view to resale or distribution.  The Stockholder understands that the Stock has not been registered under the Securities Act, the securities laws of any U.S. state or the securities laws of any other jurisdiction, nor is such registration contemplated.  The Stockholder understands and agrees further that shares of the Stock must be held indefinitely unless they are subsequently registered under the Securities Act and such laws or an exemption from registration under the Securities Act and such laws covering the sale of the Stock is available and that even if such an exemption is available, the assignability and transferability of the Stock will be governed by this Agreement, which imposes substantial restrictions on transfer.  The Stockholder understands that legends as set forth in Section 11 will be placed on all documents evidencing the Stock.

(g) <u>Accredited Investor</u>.  The Stockholder is an "accredited investor" as defined in Rule 501(a) promulgated under Regulation D of the Securities Act.

(h) <u>Financial Capability</u>.  The Stockholder and its Affiliates, after making any requisite capital calls, will have the financial capacity to complete the transactions contemplated by this Agreement.

(i) <u>Brokers</u>.  The Stockholder has not retained any finder, broker, agent, financial advisor, "purchaser representative" (as defined in Rule 501(h) promulgated under Regulation D of the Securities Act) or other intermediary in connection with the transactions contemplated by this Agreement.  No agent, broker or other Person acting on behalf of the Stockholder is, or will be, entitled to any commission or broker's or finder's fees from the Stockholder, or from any Affiliate of the Stockholder, in connection with any of the transactions contemplated herein.

(j) The Stockholder hereby agrees to indemnify and hold harmless the Company from any liability for any compensation or other fees or expenses of any such intermediary, agent, broker or other Person described in Section 12(i) retained by such Stockholder and the fees and expenses of defending against such liability or alleged liability.

29

Section 13.    <u>Management Rights</u>.

(a)  With respect to each VCOC Stockholder, the Company hereby agrees that for so long as such VCOC Stockholder continues to hold any Stock, the Company shall, with respect to such VCOC Stockholder:

(b)  provide the VCOC Stockholder or a designated representative thereof with (A) upon reasonable notice, at reasonable times, from time to time, the right to inspect and copy the books and records of the Company and its subsidiaries, (B) upon reasonable notice, at reasonable times, from time to time, the right to visit and inspect the properties of the Company and its subsidiaries, (C) copies of all audited financial statements of the Company and its subsidiaries and (D) copies of all materials provided to the Board;

(c)  make appropriate officers and/or Directors of the Company available periodically for consultation with the VCOC Stockholder or a designated representative thereof with respect to matters relating to the business and affairs of the Company and its subsidiaries, including significant changes in management personnel and compensation of employees, introduction of new products or new lines of business, important acquisitions or dispositions of plants and equipment, significant research and development programs, the purchasing or selling of important trademarks, licenses or concessions or the proposed commencement or compromise of significant litigation;

(d)  inform the VCOC Stockholder or a designated representative thereof in advance with respect to any significant corporate actions, including extraordinary dividends, mergers, acquisitions or dispositions of assets, issuances of significant amounts of debt or equity and material amendments to the certificate of incorporation or bylaws of the Company and upon reasonable notice, at reasonable times, from time to time, provide the VCOC Stockholder or a designated representative thereof with the right to consult with the Company with respect to such actions; and

(e)  provide the VCOC Stockholder or a designated representative thereof with such other rights of consultation as may be reasonably necessary to qualify its investment in the Company as a "venture capital investment" for purposes of the United States Department of Labor Regulation published at 29 C.F.R. Section 2510.3-101(d)(3)(i).

The Company agrees to consider, in good faith, the recommendations of each VCOC Stockholder or its designated representative in connection with the matters on which it is consulted as described above, it being understood that the ultimate discretion with respect to such matters shall be retained by the Company.

Section 14.    <u>Reports to Stockholders</u>.

(a)  <u>Books, Records and Accounts</u>.  Appropriate books, records and accounts shall be kept by the Company at the principal place of business of the Company or such other place as the Board shall determine in its discretion.  Except as otherwise expressly provided herein, such books and records shall be maintained on a basis that allows the proper preparation of the financial statements and tax returns of the Company.

30

Upon furnishing reasonable advance notice to the Company, each Stockholder or its duly authorized representative shall have access to all books, records and accounts of the Company and its subsidiaries and the right to make copies thereof for any purpose reasonably related to the Stockholder's interest as a Stockholder of the Company at any reasonable time during normal business hours of the Company, in each case, under such conditions and restrictions as the Board may reasonably prescribe.

(b)  Reports to Stockholders.  (i) As soon as practicable after the audited consolidated financial statements of the Company and its subsidiaries are available for each fiscal year of the Company, the Company shall send to each Stockholder:

(A)  copies of such information as may be required for applicable income tax reporting purposes arising by reason of the Stockholder's investment in the Company;

(B)  the following annual audited consolidated financial statements of the Company and its subsidiaries prepared on the basis of generally accepted accounting principles in the United States:

(1)  a balance sheet as of the end of such period,

(2)  a statement of income or loss for such period, and

(3)  a statement of cash flows for such period; and

(C)  in the case of the financial statements for the Company with respect to any fiscal year, an opinion of the independent auditors of the Company based upon their audit of the financial statements referred to in clause (B) above.

(ii)  As soon as practicable after the unaudited consolidated financial statements of the Company and its subsidiaries are available for each fiscal quarter of the Company, the Company shall send to each Stockholder the following unaudited quarterly consolidated financial statements of the Company and its subsidiaries prepared on the basis of generally accepted accounting principles in the United States:

(A)  a balance sheet as of the end of such period,

(B)  a statement of income or loss for such period, and

(C)  a statement of cash flows for such period.

(iii)  As soon as practicable after the end of each calendar month, the Company shall send to each Stockholder any management reports, key performance indicators and financial reports for banks lending funds to the Company or any of its subsidiaries prepared by the Company or any such subsidiary for such period; provided that neither the Company nor any subsidiary thereof shall be deemed to be required to prepare any of the foregoing solely as a result of this Section 14(b)(iii).

31

(iv)  The financial statements referenced in this Section 14(b) shall be expressed in U.S. dollars.

(v)  In addition, so long as the Term Loan Facility remains in effect, the Company shall also provide to each Stockholder all reports that the Company provides to the lenders under the Term Loan Facility pursuant to the definitive documentation for the Term Loan Facility at the same time that the Company provides such reports to the lenders under the Term Loan Facility.

(c)  This Section 14 shall terminate upon an Initial Public Offering and, with respect to any Stockholder, when such Stockholder and its Affiliates cease to own at least 2% of the issued and outstanding Stock.

Section 15.    Expenses and Fees.

(a)  Other Expenses.  The Company shall pay any and all fees and expenses incurred by Investors and the Company in connection with the transactions contemplated hereby and the Investment Agreement (including expenses incurred in connection with the Reorganization).

(b)  Management Services Agreement.  The Stockholders acknowledge that the Company shall annually pay to Investors or its designees (i) the management fee and (ii) the out-of-pocket costs and expenses incurred by Investors or its Affiliates in connection with the services provide by Investors or its Affiliates under the Management Services Agreement, in each case as required pursuant to the Management Services Agreement.

Section 16.    Miscellaneous.

(a)  Consent to Jurisdiction.  Each party hereto irrevocably submits to the exclusive jurisdiction of (i) the Court of Chancery of the State of Delaware and (ii) the United States District Court for the District of Delaware for purposes of any suit, action or other proceeding arising out of this Agreement.  Each party agrees to commence any such suit, action or proceeding either in the Court of Chancery of the State of Delaware or the United States District Court for the District of Delaware.  Each party hereto hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any suit, action or proceeding with respect to this Agreement, any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to serve process in accordance with this Section 16(a), that its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and to the fullest extent permitted by applicable law, that the suit, action or proceeding in any such court is brought in an inconvenient forum, or that this Agreement, or the subject matter hereof, may not be enforced in or by such courts and further irrevocably waives, to the fullest extent permitted by applicable law, the benefit of any defense that would hinder, fetter or delay the levy, execution or collection of any amount to which the party is entitled pursuant to the final judgment of any court having

32

jurisdiction.  Each party irrevocably consents to the service of process out of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered airmail, postage prepaid, to such party at its address set forth in this Agreement, such service of process to be effective upon acknowledgement of receipt of such registered mail.  Nothing herein shall affect the right of any party to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against the other party in any other jurisdiction in which the other party may be subject to suit.

(b)  Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to conflict of laws principles of such State.

(c)  Successor and Assigns.  This Agreement and the rights and duties of the parties hereto shall be binding upon and shall inure to the benefit of the parties hereto and their respective executors, administrators, heirs, successors and permitted assigns; provided, however, that no Person (other than an Affiliate Transferee) claiming by, through or under a Stockholder (whether such Stockholder's executor, administrator, heir, successor or permitted Assignee), as distinct from such Stockholder itself, shall have any rights as, or in respect of, a Stockholder (including the right to approve or vote on any matter or to notice thereof).  In the event of any merger, consolidation or other business combination of the Company with any of its Affiliates, each of the parties hereto or their permitted Assignees (or, if different, the surviving entity of the merger, consolidation or other business combination) shall execute a stockholders' agreement with terms that are substantially equivalent to this Agreement (including the registration rights provided for in Section 9 hereof).  Notwithstanding anything in this Agreement to the contrary, neither this Agreement, nor any right, remedy, obligation or liability arising hereunder shall be assignable by any party other than in connection with a Transfer of Stock permitted by the terms of this Agreement.

(d)  Further Assurances.  Each Stockholder shall take all necessary or desirable actions within its control (including, without limitation, attending all meetings in person or by proxy for purposes of obtaining a quorum and executing all written consents in lieu of meetings, as applicable), and the Company shall take all necessary and desirable actions within its control (including, without limitation, calling special Board and Stockholder meetings), to effectuate the provisions of this Agreement, including, but not limited to, the election of the Directors pursuant to Section 7(a).

(e)  Confidentiality.  Each Stockholder will maintain the confidentiality of any and all materials of any kind, including but not limited to management presentations, the subject matter of meetings and any other information relating to the business, financial structure, financial position or financial results, clients or affairs of the Company, or any entity owned directly or indirectly by the Company, that shall not be generally known to the public received by such Stockholder, except (A) as otherwise required by governmental regulatory agencies, self-regulating bodies, stock exchanges or equivalent bodies, law or legal process or (B) for disclosures to directors, officers, employees, partners, members, shareholders, representatives and advisors of such Stockholder and its

33

Affiliates who need to know the information and who are informed of the confidential nature of the information and agree to keep such information confidential.  Each Stockholder further agrees to destroy or return to the Company any such confidential information in the event it ceases to be a Stockholder.

(f)  Amendments.  Except as required by law, this Agreement may not be amended or supplemented without the written consent of Investors, the Company and a majority in interest of the Other Stockholders; provided that no such amendment shall materially adversely affect the interests of a Stockholder without the written consent of such Stockholder so affected.  The Board shall provide a copy of all amendments approved pursuant to this Section 16(f) to the Stockholders.

(g)  Notices.  All notices, requests, claims, demands and other communications under this Agreement shall be in writing and shall be deemed given upon receipt by the parties (i) in the case of any Stockholder, at the address or fax number of such Stockholder as set forth in the Company's books and records (or at such other address as shall be specified by such Stockholder by like notice) or (ii) in the case of the Company, at the following address (or at such other address as shall be specified by the Company by like notice):

> Interstate Bakeries Corporation
> 12 East Armour Boulevard
> Kansas City, Missouri 64111
> Attn: General Counsel
> Fax:  (816) 502-4138

with a copy to:

> Ripplewood Holdings L.L.C.
> One Rockefeller Plaza, 32nd Floor
> New York, New York 10020
> Attn:  Christopher Minnetian, General Counsel
> Fax:  (212) 218-2769

and to:

> Cravath, Swaine & Moore LLP
> Worldwide Plaza
> 825 Eighth Avenue
> New York, New York  10019
> Attn:  Peter S. Wilson, Esq.
> Fax:  (212) 474-3700

Each such notice shall be effective if given by fax, upon dispatch (with confirmation of receipt), or if otherwise, upon delivery to the address of such Stockholder.

(h)  Counterparts.  This Agreement may be executed in one or more original or facsimile or electronically transmitted counterparts, all of which shall be considered one

and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

(i) <u>Entire Agreement; No Third-Party Beneficiaries</u>.  This Agreement, taken together with the other documents and agreements referred to herein or entered into concurrently herewith, (a) constitute the entire agreement, and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter contained herein and (b) except for Sections 9.6 and 10, are not intended to confer upon any Person other than the parties hereto any rights or remedies.

(j) <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule or law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

(k) <u>Section Titles</u>.  Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text hereof.

(l) <u>Waiver of Jury Trial</u>.  The Stockholders hereby irrevocably and unconditionally waive trial by jury in any legal action or proceeding relating to this Agreement in any jurisdiction in which a jury trial in such an action or proceeding would be permitted.

Section 17.    <u>Effectiveness of Agreement; Termination</u>.  Notwithstanding anything in this Agreement to the contrary, this Agreement shall be effective immediately following the Closing and shall terminate and be of no further effect at any time when Investors and its Affiliates collectively hold less than 10 percent of all Common Stock then outstanding; <u>provided</u>, <u>however</u>, that Section 10 of this Agreement shall survive indefinitely following the termination of this Agreement with respect to events that occurred prior to the termination of this Agreement.

[Signature page to follow.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

INTERSTATE BAKERIES CORPORATION,

by

_____
        Name:
        Title:


IBC INVESTORS I, LLC,

by RIPPLEWOOD PARTNERS II, L.P.,
        as its Sole Member,

        by RIPPLEWOOD PARTNERS II, GP, L.P.,
                as its General Partner,

                by RP II GP, LLC,
                        as its General Partner,

        by

_____
        Name:
        Title:


IBC INVESTORS II, LLC,

by RIPPLEWOOD PARTNERS II, L.P.,
        as its Sole Member,

        by RIPPLEWOOD PARTNERS II, GP, L.P.,
                as its General Partner,

                by RP II GP, LLC,
                        as its General Partner,

        by

_____
        Name:
        Title:

36

[OTHER ORIGINAL STOCKHOLDERS],

by

                                                   _____

Name:
Title:

37

SCHEDULE I

[TO BE COMPLETED]

ANNEX A
FORM OF ASSUMPTION AGREEMENT

[Date]

Interstate Bakeries Corporation
12 East Armour Boulevard
Kansas City, Missouri 64111
Attention: General Counsel

Ladies & Gentleman:

We refer to the Stockholders' Agreement dated as of [●] (the "Stockholders' Agreement") by and among Interstate Bakeries Corporation, a corporation organized under the laws of the State of Delaware (the "Company"), IBC Investors I, LLC, a limited liability company organized under the State of Delaware, IBC Investors II, LLC, a limited liability company organized under the laws of the State of Delaware, [NAME OF OTHER ORIGINAL STOCKHOLDERS] and the other Stockholders (as such term is defined in the Stockholders' Agreement) of the Company party thereto from time to time, relating to the Stock (as such term is defined in the Stockholders' Agreement) of the Company.

Pursuant to Section 3(b) of the Stockholders' Agreement, effective as of the date hereof, the undersigned hereby (i) agrees to be bound by, and admitted as a party to, the Stockholders' Agreement in its capacity as a Stockholder (as such term is defined in the Stockholders' Agreement) as if it were an original party thereto in accordance with and subject to the terms thereof and (ii) makes the representations and warranties of Stockholders set forth in the Stockholders' Agreement.[*]

Sincerely,

[Name]
[Title]

Accepted and Agreed:

Interstate Bakeries Corporation

---

[*] In the case of an indirect Transfer, this Assumption Agreement may be modified in a manner satisfactory to Investors.

1

Annex B

## <u>MANAGEMENT SERVICES AGREEMENT</u>

[intentionally omitted]

PLAN EXHIBIT K

## FORM OF CREDITORS' TRUST AGREEMENT

[TO BE FILED NOT LATER THAN THE EXHIBIT FILING DATE]

PLAN EXHIBIT L

FORM OF CERTIFICATE OF INCORPORATION

RESTATED
CERTIFICATE OF INCORPORATION
OF
INTERSTATE BAKERIES CORPORATION

INTERSTATE BAKERIES CORPORATION (the "Corporation"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (the "DGCL"), DOES HEREBY CERTIFY:

1.  The name of the Corporation is Interstate Bakeries Corporation and the name under which the Corporation was originally incorporated is IBC Holdings Corp. The date the original Certificate of Incorporation was filed was September 9, 1987.

2. This Restated Certificate of Incorporation, which amends and restates in its entirety the Certificate of Incorporation of the Corporation as heretofore amended and restated, is authorized by and is being filed in connection with the Joint Plan of Reorganization of Interstate Bakeries Corporation and its Affiliated Debtors and Debtors-in-Possession dated [•], 2008 (as such plan may be amended from time to time, the "Plan of Reorganization"), and was duly adopted pursuant to Sections 242, 245 and 303 of the DGCL. The Plan of Reorganization was confirmed by order entered on [•], by the United States Bankruptcy Court for the Western District of Missouri.

On the date the Plan of Reorganization becomes effective, all stock of and other equity interests in, and all options, warrants, conversion rights, rights of first refusal and other rights (contractual or otherwise) to acquire or receive any stock of or other equity interest in, the Corporation that are in existence prior to the effectiveness of the Plan of Reorganization (including those under the Corporation's Rights Agreement with UMB Bank, N.A., as rights agent, dated as of May 8, 2000) are extinguished and cancelled in accordance with the Plan of Reorganization.

3. The text of the Certificate of Incorporation of the Corporation, as heretofore amended and restated, is hereby amended and restated in its entirety to read as follows:

## ARTICLE FIRST

The name of the corporation (hereinafter called the "Corporation") is Interstate Bakeries Corporation.

## ARTICLE SECOND

The address of the Corporation's registered office in the State of Delaware is 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.  The name of its registered agent at such address is The Corporation Trust Company.

ARTICLE THIRD

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "DGCL").

ARTICLE FOURTH

The total number of shares of all classes of stock that the Corporation shall have authority to issue is 61,000,000 shares, consisting of 60,000,000 shares of Common Stock, par value $0.01 per share (the "Common Stock"), and 1,000,000 shares of Preferred Stock, par value $0.01 per share (the "Preferred Stock").

I.  Preferred Stock.

1.  The Preferred Stock may be issued in one or more series and shall have such voting powers, full or limited, or no voting powers, and such designations, powers, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, as shall be stated and expressed in this Certificate of Incorporation or in any amendment hereto, or in a resolution or resolutions providing for the issuance of such stock adopted by the Board of Directors.

II.  Common Stock.

Except as otherwise provided herein or as otherwise required by applicable law, all shares of Common Stock will be identical in all respects and will entitle the holders thereof to the same rights and privileges.

A.  Voting Rights.  Except as expressly provided herein or as required under the DGCL, each holder of record of shares of Common Stock shall have one vote in respect of each share of Common Stock so held by him or her on all matters to be voted upon by the Corporation's stockholders.

B.  Dividends.  Subject to applicable law and the rights, if any, of the holders of any outstanding series of Preferred Stock, when and as dividends are declared or paid on shares of Common Stock, whether in cash, property or securities of the Corporation, the holders of record of shares of Common Stock will be entitled to a ratable portion of such dividends, based upon the number of shares of Common Stock then held of record by each such holder.

C.  Liquidation.  Subject to applicable law and the rights, if any, of the holders of any outstanding series of Preferred Stock, the holders of record of shares of Common Stock will be entitled to share ratably, in proportion to the number of shares of Common Stock held of record by each holder, in all distributions to the holders of the Common Stock in the event of any liquidation, dissolution or winding up of the Corporation.

ARTICLE FIFTH:

In furtherance and not in limitation of the powers conferred upon it by law, the Board of Directors of the Corporation is expressly authorized and empowered to make, alter, amend or repeal the By-laws of the Corporation.

ARTICLE SIXTH:

Unless and except to the extent that the By-laws of the Corporation so require, the election of directors of the Corporation need not be by written ballot.

ARTICLE SEVENTH:

Each person who is or was or had agreed to become a director or officer of the Corporation, and each such person who is or was serving or who had agreed to serve at the request of the Corporation as a director, officer, partner, member, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise (including the heirs, executors, administrators or estate of such person), shall be indemnified by the Corporation to the fullest extent permitted by Section 145 of the DGCL as presently in effect or as it may hereafter be amended, which indemnification shall not be deemed exclusive of any other rights to which such person may be entitled under the By-laws of the Corporation or any agreement, vote of stockholders or disinterested directors or otherwise.  Any repeal or modification of this ARTICLE SEVENTH shall not adversely affect any right to indemnification of any persons existing at the time of such repeal or modification with respect to any matter occurring prior to such repeal or modification.

ARTICLE EIGHTH:

To the fullest extent permitted by the DGCL as presently in effect or as it may hereafter be amended, no director of the Corporation shall be liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) pursuant to Section 174 of the DGCL or (iv) for any transaction from which the director derived an improper personal benefit. Any repeal or modification of this ARTICLE EIGHTH shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification with respect to acts or omissions occurring prior to such repeal or modification.

ARTICLE NINTH:

To the extent required by Section 1123(a)(6) of the Bankruptcy Code, the Corporation shall not issue any non-voting equity securities.

IN WITNESS WHEREOF, I, [NAME], [TITLE] of the Corporation, have executed this Restated Certificate of Incorporation this [•] day of [•], [•].

_____

Name:
Title:

PLAN EXHIBIT M

<u>FORM OF BYLAWS</u>

[TO BE FILED NOT LATER THAN THE EXHIBIT FILING DATE]

PLAN EXHIBIT N

SUMMARY DESCRIPTION OF TERMS OF EMPLOYMENT
OF CERTAIN KEY EXECUTIVES

[TO BE FILED NOT LATER THAN THE EXHIBIT FILING DATE]

PLAN EXHIBIT O

SCHEDULE OF ASSUMED UNEXPIRED LEASES
AND NON-UNION EXECUTORY CONTRACTS

Attached hereto are the unexpired leases and non-union executory contracts to be assumed pursuant to Section 7.1 of the Amended Joint Plan of Reorganization (the "Plan") of Interstate Bakeries Corporation and its Affiliated Debtors and Debtors-in-Possession ("Exhibit O") Dated October 31, 2008.  In accordance with Section 14.2 of the Plan, the Debtors may alter, amend or modify the Exhibits in a form that is reasonably satisfactory to Equity Investors and Prepetition Investors at any time prior to the Confirmation Hearing.  Each unexpired lease or executory contract listed below shall include any amendments related thereto.

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 1. | 0248 | 02/01/00 | 443 W PARKS HWY WASILLA, AK | AVANTI CORPORATION | P.O. BOX 873088 WASILLA, AK 99687; 172 S. LAMONT CIR., SUITE A WASILLA, AK 99687 |
| 2. | 0336 | 06/01/72 | 4000 BESSEMER HWY BIRMINGHAM, AL | KATHRYN HALE WILBORN | 4836 CLARIMONT AVE. BIRMINGHAM, AL 35222 LYNDON C. WILBORN |
| 3. | 0678 | 03/01/94 | 814 HWY 431 BOAZ, AL | LAVENDER PROPERTIES, LLC | P.O. BOX 651 BOAZ, AL 35957 CONTACT: JEFFREY LAVENDER |
| 4. | 0396 | 06/01/93 | 424 CRAFT HIGHWAY CHICKSAW, AL | LOIS LADAS | 1050 SOUTH BROAD ST. MOBILE, AL 36603 |
| 5. | 0389 | 05/01/87 | 6310 UNIVERSITY BLV (#3 COTTONDALE SQ.) COTTONDALE, AL | BILLY JOE WELLS AND JERI. WELLS | 2930 NORMANDY PLACE TUSCALOOSA, AL 35406 |
| 6. | 0552 | 01/01/90 | 2201 2ND AVE NW CULLMAN, AL | JACK C. MONTGOMERY AND JENNIE L. MONTGOMERY | P.O. BOX 309 VINEMONT, AL 35179 |
| 7. | 0128 | 09/01/75 | 1010 SIXTH AVE, SE DECATUR, AL | KATHY ANN IVEY | PO BOX 1195 HAZARD, KY 41701; 217 GORMAN RIDGE RD. HAZARD, KY 41701 |
| 8. | 0312 | 05/01/92 | 6998 N MEMORIAL PKY HUNTSVILLE, AL | JACK C. MONTGOMERY AND JENNIE L. MONTGOMERY | 510 COUNTY RD. 1117, CULLMAN, AL 35057 |
| 9. | 0320 | 10/01/86 | 2501 B JORDAN LANE HUNTSVILLE, AL | JORDAN LANE SHOPPING CENTER, LLC | 401 W ATLANTIC AVE. STE R-12 DELRAY BEACH, FL 33444 |
| 10. | 0361 | 03/01/94 | 310 HWY 78 JASPER, AL | MALLORY MAY & AMSOUTH BANK N.A. AS CO-TRUSTEES | P.O. BOX 2417 JASPER, AL 35501 |
| 11. | 0433 | 07/01/04 | 2273 CONGRESSMAN WL DICKENSON DR. MONTGOMERY, AL | J. SIMMONS PROPERTIES, LLC | ATTN: JOHN SIMMONS JR. 2521 UPPER WETUMPKA RD MONTGOMERY, AL 36107 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 12. | 0512 | 06/01/89 | 510 COLISEUM MONTGOMERY, AL | SUGAR BEAR, INC. | P.O. BOX 3096 MONTGOMERY, AL 36109 CONTACT: PATRICIA FORSHEY; 515 COLISEUM BLVD. MONTGOMERY, AL 36109 |
| 13. | 0267 | 01/01/95 | 3829 AVALON AVE MUSCLE SHOALS, AL | AIRPORT PROPERTIES | P.O. BOX 2177 MUSCLE SHOALS, AL 35661 |
| 14. | 0049 | 08/01/91 | 112 & 114 W HAMBRIC OXFORD, AL | BILL J. & FAYE M. SMITH | P.O. BOX 1587 DECATUR, AL 35602 |
| 15. | 0688 | 12/01/86 | 1930 CRAWFORD ROAD PHOENIX CITY, AL | RAIFORD INVESTMENTS | P.O. BOX 2500 PHOENIX CITY, AL 36868 CONTACT: R. MICHAEL RAIFORD |
| 16. | 0003 | 03/01/84 | 799 W GRAND HWY 77 RAINBOW CITY, AL | BOYCE J. WHITE, JR. | 1039 FORREST AVENUE GADSDEN, AL 35901 |
| 17. | 0807 | 06/01/04 | 40865 HIGHWAY 280 UNIT #4 SYLACAUGA, AL | BOWDEN OIL | 40865 HIGHWAY 280 SYLACAUGA, AL 35150 PAM PAYTON |
| 18. | 0360 | 06/01/97 | 1115 W HILLSBORO EL DORADO, AR | OIL BOWL, INC. | 314 EAST OAK STREET EL DORADO, AR 71730 |
| 19. | 0627 | 06/01/73 | 313 W BROADWAY FORREST CITY, AR | ELPORTER GAMBLE | 733 HICKEY STREET FORREST CITY, AR 72335 |
| 20. | 0406 | 10/01/77 | 1612 S. PHOENIX AVE. FT. SMITH, AR | PIERCY A. & L. LORENE WELLS | 3218 SOUTHRIDGE ESTATES FORT SMITH, AR 72916 CONTACT: SHANNON WELLS |
| 21. | 0559 | 08/01/82 | 3734 MIDLAND FT. SMITH, AR | CLEVE L. COTNER | COTNER PROPERTIES, INC. P.O. BOX 152 FORT SMITH, AR 72902 |
| 22. | 0268 | 02/01/98 | 300 62/65 BYPASS HARRISON, AR | RICHARD COGER | C/O SURPLUS CITY P.O. BOX 250 HUNTSVILLE, AR 72740 |
| 23. | 0969 | 05/01/00 | ALBERT PK & GARDNER HOT SPRINGS, AR | ALATEN PROPERTIES | ROBBIE MARTIN P.O. BOX 2177 MUSCLE SHOALS, AL 35662 |

Exhibit O-1

**SCHEDULE OF ASSUMED UNEXPIRED LEASES**

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 24. | 0628 | 01/01/80 | 305 DUPREE JACKSONVILLE, AR | C.T. & ALMA JEAN BOYD | 8 BOWIE POINT SHERWOOD, AR 72120 |
| 25. | 0175 | 08/07/67 | 2807 E. MATTHEWSJONESBORO, AR | STALLINGS-MOORE LLP | C/O NEIL STALLINGS PROPERTIES, INC. 405 SOUTHWEST DRIVE STE A #165 JONESBORO, AR 72401 CONTACTS: KATHY MOORE, KEN STALLINGS, NATE STALLINGS |
| 26. | 0005 | 09/01/00 | HWY 5 NORTH MOUNTAIN HOME,   AR | RANDY & CONNIE BLACK | 2557 JACQUES DR. BRH-36 BOONE TERRE, MO 63628 |
| 27. | 0868 | 04/01/96 | 3809 MCARTHUR RD N. LITTLE ROCK, AR | MAXAMILLION LLC | RANDALL D. & MARY M. IVES 606 W. COMMERCE DR. SUITE #2 BRYANT, AR 72022 |
| 28. | 1218 | 01/25/82 | 2605 E MAIN ST RUSSELLVILLE, AR | PIERCY A. & L. LORENE WELLS | 3218 SOUTHRIDGE ESTATES FORT SMITH, AR 72916 CONTACT: SHANNON WELLS |
| 29. | 1000 | 06/01/99 | 3704 E RACE ST SEARCY, AR | ALATEN PROPERTIES | ROBBIE MARTIN P.O. BOX 2177 MUSCLE SHOALS, AL 35662 |
| 30. | 0679 | 09/01/82 | 1188 HWY 49 W W. HELENA, AR | JON P. SANDERS | 1218 HIGHWAY 49 WEST HELENA, AR 72390 |
| 31. | 0039 | 03/01/74 | 6313 GEYSER SPR RD WAKEFIELD, AR | WONDER INVESTMENTS | S. PORTER BROWNLEE P.O. BOX 3553 LITTLE ROCK, AR 72203-3553 |
| 32. | 0722 | 06/01/00 | 684 E. 4TH ST BENSON, AZ | PAT HARROLD | P.O. BOX 55 POMERENE, AZ 85627 |
| 33. | 1290 | 11/13/00 | 217 E. 1ST ST. CASA GRANDE, AZ | SUN VALLEY LAND COMPANY, INC. | 1577 N. PINAL AVE. CASA GRANDE, AZ 85222; (PHYSICAL ADDRESS) P.O. BOX 10160 CASA GRANDE, AZ 85230-0160 |
| 34. | 0844 | 12/09/99 | 3295 N NEVADA ST CHANDLER, AZ | AIRCRAFT BOLT CORPORATION C/O DOUG HIGGINS | P.O. BOX 1946 MONUMENT, CO 80132 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 35. | 0498 | 06/01/02 | 391 B WEST RD 250 CHINO VALLEY, AZ | JOHN CAMPBELL | P.O. BOX 7 CHINO VALLEY, AZ 86323 |
| 36. | 1288 | 01/01/00 | 49253 PARKER POSTON HWY, #9 EHRENBURG, AZ | ROLANDO CAVAZOS | ROLANDO CAVAZOS PO BOX 441 EHRENBERG, AZ 85334 |
| 37. | 1283 | 07/11/80 | 2001 N. 3RD STFLAGSTAFF, AZ | D.W. ROSS & C.J. PUGLIANO | 3400 COUNTRY CLUB DR. FLAGSTAFF, AZ 86004 MAY-OCT; 19241 NO. 93RD AVE PEORIA, AZ 85382 OCT-MAY |
| 38. | 1285 | N/A | 812 HIGHLAND AVE. GLOBE, AZ | JAMES MCMILLAN | 3941 E. CHANDLER BLVD. STE 106-182 PHOENIX, AZ 85048 |
| 39. | 0582 | 01/01/03 | 1595 DOVER AVE #F LAKE HAVASU, AZ | G. HOLTEN QUINN | C/O SUZANNAH BALLARD P.O. BOX 1529 LAKE HAVASU CITY, AZ 86405 |
| 40. | 0240 | 10/01/88 | 816 E. UNIVERSITY DR MESA, AZ | CLEARVIEW REALTY, INC. | 1223 S. CLEARVIEW AVE. STE. 106, MESA, AZ 85208 CONTACT LAURIE GALLA |
| 41. | 0922 | 05/01/96 | 4100 E BROADWAY, STE. 150 PHOENIX, AZ | PACIFIC BROADWAY LLC | P. O. BOX 25991 LOS ANGELES, CA  90025 CONTACT: BECKY SMITH |
| 42. | 0743 | 08/01/97 | ROUTE 10 SHOWLOW, AZ | OLD LINDEN ROAD RENTAL, LLC | 901 N 18 AVE. SHOWLOW, AZ 85901 CONTACT: GERALD OR EILEEN PERKINS |
| 43. | 0257 | 05/01/91 | 121 E 24TH ST YUMA, AZ | CAL AND JOANNE FAMILY PARTNERSHIP | P.O. BOX 5346 YUMA, AZ 85366-5846 |
| 44. | 0975 | 11/25/92 | 2749 LONETREE WAY ANTIOCH, CA | PAUL H. MAK C/O THE TERRACE SHOPPING CENTER | 101 ELLINWOOD DRIVE, PLEASANT HILL, CA  94523 |
| 45. | 1075 | 01/01/87 | 1111 EL CAMINO REAL ARROYO GRANDE, CA | MANKINS WONDER RENTALS | 1005 EL CAMINO REAL ARROYO GRANDE, CA 93420-2588 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 46. | 0271 | 10/01/92 | UNIT10 & 11 NELSON AUBURN, CA | WAYNE DAVIS | 11765 LAKESHORE NORTH AUBURN, CA 95602 |
| 47. | 1239 | 04/01/81 | 451-B ARROW HWY AZUSA, CA | YUH DAH CORPORATION | ATTN: GEORGIA CORIGSBY 2401 HITCHCOCK DR. ALHAMBRA, CA 91803 |
| 48. | 0578 | 08/01/93 | 1901 N CHESTER AVE BAKERSFIELD, CA | 4-M INVESTMENTS | 275 PANORAMA DR. BAKERSFIELD, CA 93305 DON MCMURTREY |
| 49. | 0273 | 01/01/81 | 1493 E 6TH STBEAUMONT, CA | RICHARD G. DAVIS | 1690 MASTERS DR. #14 BANNING, CA 92220 |
| 50. | 0993 | 4/1/1992 | 8438 EASTERN AVENUE BELL GARDENS, CA | BETTE LEVINE, JACK ZITTRER, & GERALD SCHUMER | 8017 DUNBARTON AVE. LOS ANGELES, CA 90045 |
| 51. | 0867 | 01/15/74 | 9847 DESOTO AVE CHATSWORTH, CA | CROSSROADS TRUST | 6671 SUNSET BLVD. #1575 LOS ANGELES, CA 90028 CONTACT: LINDA DUTTENHAUER |
| 52. | 1162 | 06/15/79 | 385 F PARK AVE. CHICO, CA | JEROME & MARY JOYCE JOHNSON, D/B/A TRIPLE J INVESTMENT | 15451 PALOS VERDE DRIVE MONTE SERENO, CA 95030 |
| 53. | 0924 | 01/01/87 | 2817 MAIN STREET CHULA VISTA, CA | BEAUCHAMP FAMILY TRUST | J.D. BEAUCHAMP 327 W. 11TH ST. NATIONAL CITY, CA 92050 |
| 54. | 0979 | 07/01/03 | 7222 E. GAGE AVE COMMERCE, CA | BHS, INC. | 7222 E. GAGE AVE. COMMERCE, CA 90040 CONTACT: BENJAMIN SHEN |
| 55. | 1032 | 07/06/98 | 1950 MARKET ST #1 CONCORD, CA | MARKET STREET/PEAN PROPERTIES | 101 ELLINWOOD DR. PLEASANT HILL, CA 94523 |
| 56. | 1164 | 10/01/76 | 493 S. 4TH ST EL CENTRO, CA | JOSEPH & YVONNE MALOOF | P.O. BOX 1164 EL CENTRO, CA 92243 |
| 57. | 1219 | 03/04/91 | 40667- 69 FREMONT FREMONT, CA | FREMONT SHOPPING CENTER | C/O COATES & SOWARDS, INC 1725 S BASCOM AVE, STE 104 CAMPBELL, CA 95008 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 58. | 0187 | 03/01/00 | 4783 E. GETTYSBURG FRESNO, CA | GLORIA BERLANGA | 562 WALNUT AVE. GREENFIELD, CA  93927 |
| 59. | 0272 | 04/21/69 | 12539 S. PRAIRIE AVE. HAWTHORNE, CA | ROD DANIELS DBA BARBECUE KING | 867 W SUNSET BLVD. LOS ANGELES, CA  90012 |
| 60. | 0355 | 05/01/02 | 11960-B HESPERIA RD HESPERIA, CA | WRD DEVELOPMENT | DALE GERINGER 1190 GLENDALE GALLERIA GLENDALE, CA 91210 |
| 61. | 1264 | 11/01/83 | 11988 HESPERIA ROAD HESPERIA, CA | RICHARD L. & PATRICIA E. & ARTHUR & MAE GERINGER | 1516 STONE LANE GLENDALE, CA 91202 |
| 62. | 1280 | 03/01/74 | 2343 W. LOMITA BLVD LOMITA, CA | DOUGLAS L AND BARBARA A LIGHTFOOT | 24314 LOMITA DRIVE LOMITA, CA  90717 |
| 63. | 0161 | 02/01/59 | 3636 SANTA FE LONG BEACH, CA | GLICK BROTHERS LUMBER COMPANY | C/O THE RODIN COMPANY 15442 VENTURA BLVD. STE. 200 SHERMAN OAKS, CA 91403 |
| 64. | 1104 | 01/01/72 | 2010 SOUTH STREETLONG BEACH, CA | GINSBURG LIVING TRUST | NORMAN GINSBURG P.O. BOX 3910 LAGUNA HILLS, CA 92654 |
| 65. | 0467 | 11/01/96 | 6111 S GRAMERCY PL LOS ANGELES, CA | ADVANCE PAPER BOX CO. | 6100 S. GRAMERCY PLACE LOS ANGELES, CA 90047 CONTACT: CARLO MENDOZA |
| 66. | 1094 | 06/01/97 | 2150 WARDROBE AVE MERCED, CA | MAC FAMILY LIMITED PARTNERSHIP, MARK CAUWELS | PO BOX 3705 MERCED, CA 95344 |
| 67. | 0896 | 01/15/79 | 2517 YOSEMITE BLVD MODESTO, CA | GRANT & MCDOWELL | C/O BREKKE REAL ESTATE, INC. 1127 LONE PALM AVE. MODESTO, CA 95351 |
| 68. | 1126 | 02/01/01 | 2101 STANDIFORD AVE MODESTO, CA | HANNAH FAMILY TRUST | C/O AIM PROPERTY MANAGEMENT 1212 "K" ST. MODESTO, CA 95354 |

Exhibit O-1

**SCHEDULE OF ASSUMED UNEXPIRED LEASES**

| KEY | REID | LEASE COMMENCE- MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 69. | 1052 | 09/15/63 | 3020 WEST 5TH ST. OXNARD, CA | DAVID PETIT; HELEN BIDDLE; CYNTHIA JANE MAYS | PETIT: 4853 N. CLUBHOUSE DR. SOMIS, CA 93066 BIDDLE: 222 N. ST. OXNARD, CA 93030 |
| 70. | 1277 | 11/01/91 | 2260 E PALMDALE PALMDALE, CA | PALMDALE TOWNE SQUARE ASSOCIATES | C/O THE REMM GROUP 505 S. VILLA ROAD, #201 ANAHEIM HILLS, CA 92807 CONTACT: JAN MELANO |
| 71. | 0845 | 01/01/98 | 555 CALIFORNIA ST PITTSBURG, CA | DONALD J. & DONNA L. BRUZZONNE | 1200 SNYDER LANE WALNUT CREEK, CA 94598 |
| 72. | 0966 | 10/01/97 | 11220 PYRITES WAY RANCHO CORDOVA, CA | MCT PROPERTIES, LLC | C/O BOULDIN & ENGLISH, INC. 10411 OLD PLACERVILLE ROAD STE. 215 SACRAMENTO, CA 95827 |
| 73. | 0971 | 12/23/86 | 1575 HARTNELL AVE REDDING, CA | NORTHERN CALIFORNIA PROPERTIES | C/O RON MYGRANT P.O. BOX 493595 REDDING, CA 96049 |
| 74. | 0690 | 11/17/78 | 1323 N. INYO ST RIDGECREST, CA | BOWLAY INC. | 14560 CLARK ST. #101 SHERMAN OAKS, CA 91411 |
| 75. | 1250 | 04/01/64 | 2215 THIRD ST RIVERSIDE, CA | WALLING-CRABTREE | 10020 INDIANA AVE. STE 211 RIVERSIDE, CA 92951 |
| 76. | 0104 | 06/15/92 | 1220 BLUMENFIELD DR SACRAMENTO, CA | ELLIS FAMILY ENTERPRISES, LP | 1111 JOELLIS WAY SACRAMENTO, CA 95815 CONTACT SIDNEY OR SHARON ELLIS |
| 77. | 0852 | 08/15/82 | 6801 STOCKTON BLVD.SACRAMENTO, CA | GLENN W. SORENSEN, SR. & JR. | SR.: 550 RODANTE WAY SACRAMENTO, CA 95864 |
| 78. | 1256 | 08/01/85 | 4635 AUBURN BLVD SACRAMENTO, CA | BENCHMARK PROPERTIES. LLC | ATTN: CLAYTON THOMAS P.O. BOX 2736 GRANITE BAY, CA 95746; PHYSICAL ADDRESS: 23818 DARKHORSE DR. AUBURN, CA 95602 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|------|------|------|------|------|------|
| 79. | 0957 | 09/01/78 | 1040 ABBOTT ST SALINSAS, CA | MORANDA HEIRS | 1102 ABBOTT ST. SALINAS, CA 93901 CONTACT: STAN BRAGA |
| 80. | 0213 | 01/01/80 | 433 S WATERMAN SAN BERNARDINO, CA | VANIR DEVELOPMENT CO., INC. | P.O. BOX 310 VANIR TOWER CITY HALL PLAZA SAN BERNARDINO, CA 92402-0310 |
| 81. | 0841 | 01/01/99 | 7706 TRADE ST., TREPTE IND PK A&B SAN DIEGO, CA | TREPTE INDUSTRIAL PARK, LTD. | 9665 GRANITE RIDGE, STE. 200 SAN DIEGO, CA 92123 |
| 82. | 0914 | 06/01/02 | 7807 CONVOY COURT SAN DIEGO, CA | THE REALITY ASSOCIATES FUND | 1420 BRISTOL STREET NORTH #100, NEWPORT BEACH, CA 92660 |
| 83. | 1152 | 01/01/72 | 1346 SAN FERNANDO SAN FERNANDO, CA | ANNA M. KOCVARA | 3531 E. MAULE AVE. LAS VEGAS, NV 89120-2918 |
| 84. | 0856 | 03/16/83 | 1920 INGALLS ST SAN FRANCISCO, CA | INGALLS PROPERTY C/O EDWARD KEEGAN | 1401 GRIFFITH STREET SAN FRANCISCO, CA 94124 |
| 85. | 0583 | 07/01/80 | 1946  23RD STREET SAN PABLO, CA | LUCIEN SUNG | 1800 MESA BUENA AVE. SAN PABLO, CA 94806 |
| 86. | 0118 | 10/01/95 | 1140 E. WATERLOO RD STOCKTON, CA | HBM INVESTMENTS | 13351-D RIVERSIDE DR., #343 SHERMAN OAKS, CA 91423 CONTACT: DAVID KOHAN |
| 87. | 0998 | 10/13/95 | 2619 LYCOMING ST STOCKTON, CA | STEVE GIANNECCHINI | 3651 N.  JACK TONE ROAD STOCKTON, CA 95215 |
| 88. | 0613 | 01/01/02 | 101 RIDGE ROAD SUTTER CREEK, CA | RALPH WALSH | 15432 RIDGE RD. SUTTER CREEK, CA 95685 |
| 89. | 1141 | 05/01/00 | 2121 E TULARE AVE TULARE, CA | STONE PROPERTIES | C/O LINDA LOORZ P.O. BOX 25187 FRESNO, CA 93729-5187 |
| 90. | 0981 | 02/01/96 | 1460 STATE RD UKIAH, CA | ADELENE M.. GULUZZO | P.O. BOX 21353 SAN JOSE, CA 95151-1353 |
| 91. | 1060 | 05/01/93 | 127 PEABODY RD.VACAVILLE, CA | SWAMI INTERNATIONAL | P.O. BOX 2905 CUPERTINO, CA 95015 KUSUM MANGALICK |

Exhibit O-1

### SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 92. | 0129 | 10/01/91 | 16789 D STREET VICTORVILLE, CA | ROBERT N. HOWARTH | 2240 VILLAGE WALK DR. #2212 HENDERSON, NV 89052 |
| 93. | 0880 | 10/01/89 | 2 HANGAR WAY WATSONVILLE, CA | JEFFERY A. GRANT | 164 S. ENCINAL AVENUE OJAI, CA 93023 |
| 94. | 0676 | 10/01/70 | SIDETRACK #137435 WILDASIN, CA | STAUBACH GLOBAL SERVICES | P.O. BOX 847574 DALLAS, TX 75284-7574 |
| 95. | 0249 | 06/16/93 | 39560 KENTUCKY AVE. WOODLAND, CA | SLEGH TRUST | 1849-A EAST GIBSON ROAD WOODLAND, CA  95776 |
| 96. | 0585 | 04/01/04 | 2040 E. 8TH STREET GREELEY, CO | BLISS INVESTMENTS, LLC | P.O. BOX 816 GREELEY, CO 80632; 2438 EAST 8TH STREET GREELEY, CO 80632 |
| 97. | 0699 | 09/01/02 | 1008 OLIVE LAMAR, CO | MARK OBERWORTMANN | 906 POMPANO PORT ISABEL, TX 78578 |
| 98. | 0131 | 04/16/73 | 1603 PRAIRIE PUEBLO, CO | OLSON PROPERTIES. LLC | 10615 CHARDONNAY DR. OKLAHOMA CITY, OK |
| 99. | 0260 | 12/01/01 | 412 MCCULLOCH BLVD PUEBLO WEST, CO | MASSOOD & PENNY SAEEDI | P.O. BOX 3235 COKEDALE, CO 81082 PHYSICAL ADDRESS: 10901 COUNTY ROAD 57.7 COKEDALE, CO 81082 |
| 100. | 0680 | 12/01/00 | 724 HEREFORD STERLING, CO | ALLEN PANCOST TRUCKING, INC. | 722 HEREFORD RD. STERLING, CO 80751 CONTACT: GERRY SCHAEFER |
| 101. | 0539 | 11/01/02 | 3705 FREEDOM ROAD TRINIDAD, CO | LARRY ROBINSON | 34840 COUNTY RD. 20.2 TRINIDAD, CO 81082 |
| 102. | 0962 | 10/15/94 | 150 SAND BANK RD CHESHIRE, CT | MARSHALL ENTERPRISES LLC | 1187 HIGHLAND AVE. P.O. BOX 416 CHESHIRE, CT 06410 MARSHALL FISCO |
| 103. | 0858 | 11/01/89 | 23 THOMPSON RD E. WINDSOR, CT | THOMPSON RD. ASSOCIATES LLC | C/O SBK ASSOCIATES, LLC P.O. BOX 537 MANCHESTER, CT  06045 |

**Exhibit O-1**

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 104. | 0992 | 01/01/92 | 1084 ROUTE 32 MONTVILLE, CT | BOWDISH ENTERPRISES, LLC | ATTN: CT MAIL TELLER P.O. BOX 2525 HARTFORD, CT 06146 |
| 105. | 0215 | 12/15/84 | 200 W MAIN ST NORWICH, CT | RICHARD STOUT, PROPERTY MANAGER | WEST MAIN STREET, INC. C/O RICHARD STOUT 100 NECK ROAD OLD LYME, CT 06371 |
| 106. | 1181 | 09/01/91 | 1315 NEWPORT GAP PK WILMINGTON, DE | FUSCO ENTERPRISES, L.P. | 200 AIRPORT RD. P.O. BOX 665 NEW CASTLE, DE 19720 |
| 107. | 0043 | 04/01/96 | 1202 STATE RD 64 AVON PARK, FL | A LOAF AFFAIR, LTD. | ATTN: MJ BURGES, JR. P.O. BOX 1503 FORT MYERS, FL 33902 |
| 108. | 0402 | 04/24/90 | 5981 S E BASELINE BELLEVIEW, FL | DON & MARTHA KAY | 1215 SE 12TH COURT OCALA, FL 34471 |
| 109. | 0615 | 10/01/95 | 6005 E 17TH ST E&F BRADENTON, FL | BARR FAMILY PARTNERSHIP, D/B/A RAILSIDE INDUSTRIAL PARK | 6005 17TH ST. E. BRADETON, FL 34203 |
| 110. | 1133 | 05/01/97 | 600 5TH ST EAGLE LAKE, FL | ON A ROLL | ATTN: PATRICIA W. HANDLEY P.O. BOX 1384 BEBRING, FL 33871-1384; PHYSICAL ADDRESS 2636 MELLOW LANE SEBRING, FL 33870-4966 |
| 111. | 0695 | 01/01/04 | STATE RD 211& US 19 FANNING SPRINGS, FL | RICK'S STORAGE UNITS | 15151 NW HWY 129 TRENTON, FL  32693 |
| 112. | 1168 | 01/01/88 | 2160 N E 31ST AVE. GAINESVILLE, FL | MINI MAXI WAREHOUSE | 2150 NE 31ST AVE. GAINSVILLE, FL 32609 |
| 113. | 1061 | 10/01/94 | 7708 STATE RD 52, SUITE 1 HUDSON, FL | FRALO HOLDINGS, #2 LLC | 7708 STATE ROAD 52 SUITE 102 HUDSON, FL 34667 |
| 114. | 0302 | 04/01/97 | 1225 W EDGEWOOD AVE JACKSONVILLE, FL | JOHN D. JARMON AND ELIZABETH S. JARMON | 320 EAST CALL ST. STARKE, FL 32091-3302 |
| 115. | 0511 | 10/01/93 | 1959 LANE AVENUE JACKSONVILLE, FL | CARL STOUDEMIRE | 4712 APACHE AVENUE JACKSONVILLE, FL 32210 |

11

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 116. | 1068 | 10/01/93 | 9020 BEACH BLVD JACKSONVILLE, FL | DON & MARTHA KAY | 1215 SE 12TH COURT OCALA, FL 34471 |
| 117. | 1210 | 12/01/93 | 6707 103RD ST. JACKSONVILLE, FL | JANICE K. OWEN | 626 NE 45TH COURT OCALA, FL 34470 |
| 118. | 1101 | 05/01/89 | 1190 E DONEGANKISSIMMEE, FL | KENNETH E. BUIKEMA & CYNTHIA NUGENT | PO BOX 422557 KISSIMMEE, FL 34742-2557 |
| 119. | 1166 | 03/01/97 | 2226-1 S. COMBEE LAKELAND, FL | JOE P. RUTHVEN TRUSTEE | P.O. BOX 2420 LAKELAND, FL 33806-2420 |
| 120. | 0778 | 09/15/97 | 409 N 13TH ST LEESBURG, FL | MAURICE P. YOSKIN | 13474 SOUTH COUNTY RD 25 EASTLAKE WEIR, FL 32133-0078 |
| 121. | 1118 | 02/01/97 | 503 N 13TH ST LEESBURG, FL | WILLIAM L. POLK, WILLIAM L. POLK ENTERPRISES, LLC | P.O. BOX 491637 LEESBURG, FL 34749-1637 |
| 122. | 0641 | 05/01/94 | CO CLUB RD & US 90 MADISON, FL | H. JACK & BETTY JEAN MCLEOD | 920 W. BASE ST. MADISON, FL 32340 |
| 123. | 0093 | 07/01/97 | 2555 AURORA RD MELBOURNE, FL | T.A. & ROBERTA ALTMAN | P.O. BOX 360911 MELBOURNE, FL 32936; 10 PALMER RD, SUITE H INDIAN HARBOUR BEACH, FL 32927 |
| 124. | 1024 | 05/01/00 | 3601 GRAND BLVD. NEW PORT RICHEY, FL | LET THEM EAT CAKE TRUST | C/O PATTY HANDLEY P.O. BOX 1384 SEBRING, FL 33871 |
| 125. | 0865 | 8/1/1975 | 790 E OAKLAND PK OAKLAND PARK, FL | ADKINS & ADKINS | |
| 126. | 0401 | 01/01/77 | 3027 N.E. JACKSONVILLE RD OCALA, FL | JANICE K. OWEN | 626 NE 45TH COURT. OCALA, FL 34470 |
| 127. | 0458 | 02/01/82 | 2288 N.W. 10TH ST OCALA, FL | DON & MARTHA KAY | 1215 SE 12TH COURT OCALA, FL 34471 |
| 128. | 0400 | 06/01/01 | 414 N.E. PARK ST. OKEECHOBEE, FL | WAFH CORPORATION OF OKEECHOBEE | 1403 W. AVE. A BELLE GLADE, FL 33430 |
| 129. | 0943 | 12/01/97 | 8600 E COLONIAL DR ORLANDO, FL | LEASE SPACE, INC. | 6536 PINECASTLE BLVD., STE A ORLANDO, FL 32809 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 130. | 1160 | 09/01/78 | 1815 FAIRFIELD DRIVE PENSACOLA, FL | MCDONALD SHOPPING CTR | 3030 N. PACE BLVD. PENSACOLA, FL 32505 |
| 131. | 1086 | 08/01/98 | 701 S.W. BILTMOREPORT ST. LUCIE, FL | J. GRIFFIN DEVELOPMENT CO., INC. | 1321 SE RIVERSIDE DR. STUART, FL 34996 |
| 132. | 0574 | 05/01/04 | 580 SOLUTIONS WAY, UNITS E & F ROCKLEDGE, FL | LEWIS F. & ELIZABETH A. ARMISTEAD & SCOTT ARMISTEAD | 671 FERN DR. MERRITT ISLAND, FL 12952 |
| 133. | 1095 | 03/01/93 | 1073 TALLEVAST RD SARASOTA, FL | UPPERCRUST INVESTMENT. LTD. | ACCT#3000003172 FLORIDA GULF BANK 2247 FIRST ST. FT. MYERS, FL 33901 |
| 134. | 1149 | 01/01/92 | 5224 MARINER BLVD SPRING HILL, FL | ROSINA INC. | C/O DANIEL CONTI 626 REXCORP PLAZA, 6TH FL. UNIONDALE, NY 11556 |
| 135. | 0338 | 05/01/95 | 84 S DIXIE HWY ST. AUGUSTINE, FL | DON & MARTHA KAY | 1215 SE 12TH COURT OCALA, FL 34471 |
| 136. | 0353 | 10/01/89 | 2311 28TH ST. N. ST. PETERSBURG, FL | SHARES REM, INC. | 6820 3RD AVE. N., ST. PETERSBURG, FL 33710 CONTACT: BHITTI PATEL, DREAMS MANAGEMENT |
| 137. | 1019 | 05/01/92 | 4567 CAPITAL CIRCLE TALLAHASSEE, FL | KING RENTAL PROPERTIES | C/O PROCTOR & LONG PROPERTY MANAGEMENT LLC 825 THOMASVILLE RD TALLAHASSEE, FL 32303 |
| 138. | 1136 | 09/01/95 | 4228 N ARMENIA AVE TAMPA, FL | J. BURNS CREIGHTON, JR. | P.O. BOX 1902 TAMPA, FL 33601 |
| 139. | 0576 | 01/01/01 | 4909 ALLEN RD ZEPHYRHILLS, FL | MRS. GAIL HILL | HILLVEST, INC. PO BOX 1198 ZEPHYRHILLS, FL 33540 CONTACT: GLEN GREENFELDER, ATTORNEY |
| 140. | 0002 | 12/01/96 | 3698 COMMUNITY ROAD BRUNSWICK, GA | JIM GRIFFIN | 1321 SE RIVERSIDE DRIVE STUART, FL 34996 |
| 141. | 0378 | 01/01/90 | 4900 BUENA VISTA RD COLUMBUS, GA | 1-EY, INC | 1860 MIDTOWN DRIVE, COLUMBUS, GA 31906 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 142. | 1295 | 09/01/00 | 445 ANDREWS RD. COLUMBUS, GA | FLOURNY CALHOUN REALTY | PO BOX 6607 COLUMBUS, GA 31917-6607; 2520 WYNTON ROAD COLUMBUS, GA 31906 |
| 143. | 0623 | 04/01/87 | 2171 N. ELM STREET COMMERCE, GA | MR. J. BERRY GARRETT | COMMERCE PLAZA, INC. PO DRAWER 36 FOUNTAIN INN, SC 29644 |
| 144. | 1193 | 02/01/92 | 1162 WEST AVE. CONYERS, GA | FLORIA MANN ANDERSEN | P.O. BOX 232 CONYERS, GA 30012 CONTACT: JIM ANDERSEN |
| 145. | 0358 | 05/01/97 | 240 S. HWY 301 JESUP, GA | JIM GRIFFIN | J. GRIFFIN DEVELOPMENT CO. 1321 SE RIVERSIDE DR. STUART, FL 34996 |
| 146. | 0276 | 09/01/84 | 1621 VETERANS MEMORIAL HWY SE MABLETON, GA | WYATT, TRAVIS, THOMPSON, REECE & DUKE | ATTN: TRUMAN TRAVIS 215 DENNY CIRCLE DALLAS, GA 30157 |
| 147. | 0321 | 04/01/90 | 3920 PIO NONO AVE. MACON, GA | HENRY P. PERSONS, III, PRESIDENT | COUSINS PROPERTIES, INC. MURPHEY, TAYLOR & ELLIS, INC. PO BOX 4468 MACON, GA 31213; 3095 VINEVILLE AVE. MACON, GA 31204 |
| 148. | 0532 | 05/18/83 | 1892 CANTON HWY MARIETTA, GA | CORNELIA CORPORATION | P. O. BOX 1134 TRION, GA 30753 |
| 149. | 0133 | 12/01/91 | 4174 OLD AUSTELL RD POWDER SPRINGS, GA | WESLEY HUFFMAN PROPERTY MANAGEMENT C/O CHARLES WESLEY HUFFMAN | 695 SMITH FERGUSON RD DALLAS, GA 30157 |
| 150. | 1232 | 09/01/75 | 6587 HWY 85 RIVERDALE, GA | BOB LONDON, LONDON REALTY CO. | 2931 PIEDMONT ROAD, SUITE E ATLANTA, GA 30355 CONTACT: ERIC RINZLER |
| 151. | 0581 | 11/01/95 | 502 N OAK ST. VALDOSTA, GA | JAMES N. WEST | 1022 LYNN DRIVE WAYCROSS, GA 31501 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 152. | 0744 | 08/01/03 | 1707 OLD REYNOLDS ST. WAYCROSS, GA | HILDA M. POPE | P.O. BOX 723 WAYCROSS, GA 31502 |
| 153. | 0472 | 11/03/75 | HIGHWAY 6 ATLANTIC, IA | ROBERT ABILD | PO BOX 392 ATLANTIC, IA 50022; 1711 E 7TH ATLANTIC, IA 50022 (PHYSICAL ADDRESS) |
| 154. | 0932 | 09/01/02 | 2830 MT PLEASANT ST BURLINGTON, IA | R. L. SCHWENKER | STANDARD OF BEAVERDALE, INC. 11194 TWIN PONDS DRIVE WEST BURLINGTON, IA 52655 CONTACT: CHRIS RYNER |
| 155. | 1021 | 8/10/1982 | 2001 16TH AVE S.W. CEDAR RAPIDS, IA | DAN L. SCHWITTERS, SCHWITTERS ENTERPRISES, INC. | PO BOX 924 CEDAR RAPIDS, IA 52406-0924 |
| 156. | 0655 | 12/28/94 | 320 N. 4TH ST CLINTON, IA | PATRICK AND SANDRA K. NOWLIN | 1125 11TH AVENUE NORTH CLINTON, IA 52732 |
| 157. | 0007 | 06/01/98 | 1535 AVENUE G COUNCIL BLUFF, IA | RANDY BLACK | 2557 JACQUES DRIVE, BRH 35 BONNE TERRE, MO 63628 |
| 158. | 0435 | 04/01/91 | 1606 ROCKINGHAM RD DAVENPORT, IA | W. MICHAEL BURKE | 216 HILLCREST AVE DAVENPORT, IA 52803 |
| 159. | 0624 | 09/01/89 | 107 E BROADWAY DECORAH, IA | DAVID T. LENSING AND PAMELA J. LARSON | PO BOX 334 WAUKON, IA 52172 |
| 160. | 1100 | 01/01/97 | 2620 E. UNIVERSITY E. DES MOINES, IA | GOBEL TRACTOR CO., INC., C/O ROBERT KNAPP | 950 OFFICE PARK ROAD, STE 216 WEST DES MOINES, IA 50265 |
| 161. | 0724 | 11/01/99 | 1913 KOUNTRY LANE FT. DODGE, IA | PAUL ELECTRIC RENTAL STORAGE | 1105 2ND AVE., N. FORT DODGE, IA 50501-4012 CONTACT RICHARD R. BROWN OR PAULA J. LINDER |
| 162. | 0409 | 10/13/00 | 937 BLAIRS FERRY RD MARION, IA | TIM BEVER | PARK AVENUE REALTY CO. PO BOX 242 MARION, IA 52302 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|-----|------|--------------------------|------------------|-------------------------|------------------|
| 163. | 0638 | 03/01/73 | 1001 E 2ND ST MUSCATINE, IA | WARREN W. POOLE | WELLS FARGO BANK, NA C/O JON SICKELKA P.O. BOX 1967 CEDAR RAPIDS, IA  52406 |
| 164. | 0436 | 08/01/77 | 606 W MAIN ST OTTUMWA, IA | RICHARD H. CARROLL | CARROLL REALTY CO. P.O. BOX 1140 OTTUMWA, IA 52501 |
| 165. | 0333 | 06/01/98 | 2836 HWY 75 N SIOUX CITY, IA | HIGH TECH ELECTRIC LLC | 1717  23RD STREET SIOUX CITY, IA  51104 |
| 166. | 0564 | 06/01/74 | 1820 CENTER ST.SIOUX CITY, IA | EVONNE COLE | 5101 41ST STREET SIOUX CITY, IA 51108-9702 |
| 167. | 0630 | 01/01/99 | HWY 71 NORTH & 18 SPENCER, IA | RALPH W WYATT GST EXEMPT TRUST | C/O COTTON GRAVE FARM MGMT 517 NORTH GRAND PO BOX 462 SPENCER, IA 51301 CONTACT: GARY GRAVE |
| 168. | 0913 | 09/01/96 | 2550 100TH ST URBANDALE, IA | PAPA'S PROPERTIES INC. | 1444 NW 124TH COURT DES MOINES, IA 50325 CONTACT: ZANE SMITH |
| 169. | 0156 | 06/15/81 | FRANKLIN & 6TH ST WATERLOO, IA | HOWARD ALLEN INVESTMENTS, INC. | P. O. BOX 622 CEDAR FALLS, IA  50613 |
| 170. | 0135 | 06/01/01 | 3020 E. 17TH ST. AMMON, ID | PARTS, L.C. | C/O KEHL HOMES 6183 S PRAIRIE VIEW DR, STE 102 TAYLORSVILLE, UT 84118 CONTACT: BRENDA BELL |
| 171. | 0493 | 12/01/92 | 110 E SPRUCE ST BELLEVUE, ID | BYRON DOWNARD | P.O. BOX 387 HAILEY, ID 83333 |
| 172. | 0045 | 03/01/87 | 9224 W. CHINDEN BLVD BOISE, ID | RICHARD M. PHILLIPS, RMP PROPERTIES | 210 MURRAY ST. BOISE, ID 83174 CONTACT: JAKE OR STACI SMITH |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 173. | 0846 | 08/24/04 | 743 W. MCGREGOR COURT, STE. 110 BOISE, ID | BOISE CAPITAL PARTNERS, LLC C/O THORNTON OLIVER KELLER COMMERCIAL REAL ESTATE | 250 SOUTH 5TH ST. SECOND FLOOR BOISE, ID 83702 |
| 174. | 0261 | 11/01/98 | 3506 CLEVELAND BLVD CALDWELL, ID | BILL GILBERT | P. O. BOX 1064 CALDWELL, ID 83606 |
| 175. | 1124 | 11/01/96 | 4534 YELLOWSTONE CHUBBUCK, ID | NOR-JAM, JAMES E. THILMONT | P.O. BOX 5598 CHUBBUCK, ID 83202 |
| 176. | 0072 | 12/01/92 | 1670 N WIOODRUFF IDAHO FALLS, ID | MARVIN OLSON | 1690 NORTH WOODRUFF IDAHO FALLS, ID 83401 |
| 177. | 0976 | 07/01/00 | 1500 N. LOCUST GROVE (LOCUST GROVE & FAIRVIEW) MERIDIAN, ID | P & P INVESTMENTS | P.O. BOX 2146 EAGLE, ID  83616 |
| 178. | 0681 | 05/20/02 | 690 S MAIN ST. MOUNTAIN HOME, ID | CLAUDE J. BERMENSOLO FAMILY PARTNERSHIP, LLP | 310 EAST JACKSON MOUNTAIN HOME, ID 83647 CONTACT CLAUDE M. BERMENSOLO OR LIZ LOTT |
| 179. | 0038 | 09/01/83 | 2603 SUNDANCENAMPA, ID | 2515 SUNDANCE LLC | WINSLOW INVESTMENTS, LTD C/O BILL GUTRIDGE THORNTON OLIVER KELLER 250 S. FIFTH ST. SECOND FLOOR BOISE, ID 83702 ATTN CANDICE RANSON, ASSISTANT PROPERTY MANAGER |
| 180. | 0879 | 06/01/03 | 211 FREIGHTWAYS TWIN FALLS, ID | PARTS, L.C. | C/O KEHL HOMES 6183 S PRAIRIE VIEW DR STE 102 TAYLORSVILLE, UT 84118 CONTACT: BRENDA BELL |
| 181. | 1106 | 11/17/87 | 318 HOMER ADAMS PKWY ALTON, IL | MAGNA COMPANY | P.O. BOX 1522 HIGH RIDGE, MO 63049; 3711 S. LAKESHORE DR. HOUSE SPRINGS, MO 63051 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 182. | 0522 | 01/01/83 | 1605 N BELT EAST BELLEVILLE, IL | W. BUTTS & M. KOENIG | C/O WILLIAM BUTTS 333 LINCOLNSHIRE BLVD BELLEVILLE, IL 62221 |
| 183. | 0674 | 12/01/62 | E REED & NORTH MAIN BENTON, IL | LYNCH FAMILY TRUST | 11038 N. DUQUOIN ROAD BENTON, IL 62812 |
| 184. | 0473 | 08/01/88 | 314 N. STILLWELL BLOOMINGTON, IL | BENCHMARK CONSTRUCTION COMPANY | P.O. BOX 1026 BLOOMINGTON, IL 61702 |
| 185. | 0089 | 02/01/96 | 116 N BOLINGBROOK BOLINGBROOK, IL | BRIAR SQUARE, LLC | 2801 CENTRE CIRCLE DRIVE DOWNERS GROVE, IL  60515 |
| 186. | 0201 | 02/01/94 | 1911 ROUTE 50 BOURBONNAIS, IL | PETER DYER | 6714 N KILPATRICK AVE LINCOLNWOOD, IL  60712 |
| 187. | 1119 | 03/01/02 | 107 S. BROADWAY CENTRAL CITY, IL | CENTRAL CITY PLAZA | 604 EAST GREEN ST. CENTRAL CITY, IL 62801 |
| 188. | 1137 | 09/01/00 | 504 N WALNUT CHAMPAIGN, IL | CENTRAL ILLINOIS BANK AS TRUSTEE, THOMAS HARRINGTON, JR., BENEFICIARY, DBA MARKET WALNUT BUILDING | DEVONSHIRE REALTY P.O. BOX 140 CHAMPAIGN, IL 61824-0140 |
| 189. | 1045 | 10/01/98 | 7336 S STONY ISLAND CHICAGO, IL | NATHU J. PATEL & PARTNERSHIP | STONY CENTER I- NATHU J. PATEL & PARTNERSHIP C/O FOUNDERS BANK 3052 W. 111TH ST. CHICAGO, IL 60655 |
| 190. | 0238 | 09/01/98 | 816 S MORRISONCOLLINSVILLE, IL | NATIONAL LAUNDRY EQUIPMENT CORP | P.O. BOX 349 FENTON, MO 63026-0394 |
| 191. | 0947 | 08/26/04 | 52 COUNTRYSIDE PLAZA, RM B-03A COUNTRYSIDE, IL | 2315 SIMON PROPERTY GROUP LP | 7885 RELIABLE PKWY CHICAGO, IL 60686-0078 |
| 192. | 0316 | 08/22/57 | 400 S. MAIN ST. CREVE COEUR, IL | DR. FLOYD RASHID, JCT INC. | 2819 N. KNOXVILLE PEORIA, IL 61604 |

**Exhibit O-1**

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE- MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 193. | 0930 | 03/01/01 | 7100 TECKLER BLVD CRYSTAL LAKE, IL | FIRST MIDWEST TRUST CO., TRUST 4104 | C/O CENTURY 21 3717 W. ELM ST. MCHENRY, IL 60050 |
| 194. | 1157 | 01/01/99 | 11 E LIBERTY LANE DANVILLE, IL | MAJER MEKEL AND ESTELLE MEKEL | 6 CARRIAGE LANE DANVILLE, IL 61832-1607 |
| 195. | 0278 | 07/01/76 | 2802 N. MAIN DECATUR, IL | NORTHTOWN DEVELOPMENT BROKERS, INC. | 4306 LEONORE DRIVE DECATUR, IL 62526 |
| 196. | 0870 | 11/15/93 | 2530 W 94TH EVERGREEN PARK, IL | CLARKE WOLCOTT PROPERTIES, LLC | 1125 REMINGTON RD. SCHAUMBURG, IL 60173 |
| 197. | 0541 | 12/01/93 | 1103 SOUTHWEST AVE FREEPORT, IL | JIM BERGAGNA | 1531 W. STOVER ST. FREEPORT, IL 61032 |
| 198. | 1097 | 04/01/80 | 1611 GRAND AVE GALESBURG, IL | GERALD N. WEAVER | 6936 S. CHAPPARAL CIRCLE WEST AURORA, CO 80016-2187 |
| 199. | 0081 | 05/01/04 | 780 S. CHICAGO ST GENESEO, IL | LEE LOHAM, LOHAM COMPANIES | P.O. BOX 1230 MOLINE, IL 61266-1230; 3901 15TH ST. D MOLINE, IL 61265 (PHYSICAL ADDRESS) |
| 200. | 0587 | 02/01/59 | 1509 MADISON AVE GRANITE CITY, IL | HALL PROPERTIES, INC., JEFFREY SANDELMAN, VP, C/O KIN PROPERTIES, INC. | KIN PROPERTIES, INC. 185 NW SPANISH RIVER BLVD. SUITE 100 BOCA RATON, FL 33431 |
| 201. | 0266 | 01/01/93 | 880 S. MAIN ST. JACKSONVILLE, IL | MARX PROPERTIES | 3815 BARCLAY DR. QUINCY, IL 62305 |
| 202. | 0486 | 01/01/82 | 1526 NICHOLSON JOLIET, IL | GREGORY BROTHERS, INC. | 1921 WILCOX ST. CREST HILL, IL 60435 |
| 203. | 0277 | 11/01/75 | 332 TENNEY ST KEWANEE, IL | JOHN H. SPETS | P.O. BOX 442 KEWANEE, IL 61443 |
| 204. | 0189 | 10/01/98 | 836  2ND STREET LASALLE, IL | MARIE WEST | 2242 APLINGTON ST. LA SALLE, IL 61301 |
| 205. | 0423 | 11/01/75 | 900 WEST UNION LITCHFIELD, IL | TTT PARTNERS, LLC | 516 WEST UNION LITCHFIELD, IL 62056 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 206. | 0008 | 07/13/74 | 624 E JACKSON MACOMB, IL | CONSTANCE PURDUM, MIDAMERICA NATIONAL BANK | ATTN: TRUST DEPT. 130 NORTHSIDE SQUARE MACOMB, IL 61455 CONTACT: HERB STRONG |
| 207. | 0701 | 11/01/90 | 402 N MONROE MARION, IL | G AND W INC. | 1105 DAYBREAK MARION, IL 62959 |
| 208. | 0410 | 02/01/88 | 1316-20 DEWITT ST. MATTOON, IL | LARRY K. TAYLOR | #14 CHIMNEY VIEW LANE SPRINGFIELD, IL 62707 |
| 209. | 0188 | 05/01/68 | 3315 W. PEARL ST MCHENRY, IL | ALBERT S. BLAKE | 4014 PITZER RD. MCHENRY, IL 60050 |
| 210. | 0426 | 06/01/95 | 1314 MERIDEN MENDOTA, IL | GLOBAL USA INC | 7520 N LINDBERGH BLVD HAZELWOOD, MO 63042 CONTACT: CHRIS MCKANRY |
| 211. | 0557 | 10/01/92 | 4322 4TH AVE MOLINE, IL | TOMAS MORAN | 4320 4TH AVENUE MOLINE, IL 61265 |
| 212. | 1012 | 04/01/92 | 790 ROYAL ST GEORGE NAPERVILLE, IL | CRESS CREEK L.L.C. | C/O ARTHUR GOLDNER & ASSOCIATES, INC. 707 SKOKIE BLVD., SUITE 100 NORTHBROOK, IL 60062 |
| 213. | 0961 | 11/01/99 | 6076-6080 159TH STREET OAK FOREST, IL | GOLFVIEW PLAZA | KAMAL KISHORE 135 OGDEN AVENUE, WESTMONT, IL 60559 |
| 214. | 0883 | 12/18/94 | 6325 W NORTH AVE OAK PARK, IL | NOTHRIDGE SHOPPING CENTER | C/O BLAUROCK FAMILY PARTNERSHIP 630 S. WENONAH OAK PARK, IL 60304 |
| 215. | 0242 | 03/01/92 | 126 KIRKLAND CIRCLE OSWEGO, IL | DUKANE PROPERTIES, LLC | 1844 HUNTERS RIDGE LANE SUGAR GROVE, IL 60554 |
| 216. | 0060 | 05/01/84 | 1127 LASALLE ST. OTTAWA, IL | MR. WALTER E. BREIPOHL, THOMAS E. HAEBERLE | ILLINOIS VALLEY PROPERTIES REAL ESTATE MANAGEMENT PO BOX 1039 OTTAWA, IL 61350 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE- MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 217. | 0542 | 11/01/67 | 801 DERBY STREET PEKIN, IL | THE HERGET NATIONAL BANK OF PEKIN | TRUSTEE FOR TUN LEE TOSI 33 SOUTH 4TH ST. PEKIN, IL 61554 CONTACT: JEFFREY K. LANG, TRUST OFFICER |
| 218. | 0171 | 06/01/93 | 708 W. LOUCKS PEORIA, IL | JERALD & CARLINE BUYSSE | 116 E ELLINGTON DR. PEORIA, IL 61603-1002 |
| 219. | 0700 | 02/01/87 | 1440 NO 24TH ST QUINCY, IL | JTP PROPERTIES | PO BOX 367 QUINCY, IL 62306 TERRY TRAEDER |
| 220. | 0734 | 10/15/72 | 4120-22 11TH STROCK ISLAND, IL | ROBERT & PATRICIA NEYENS | 546  35TH AVE EAST MOLINE, IL  61244 |
| 221. | 1038 | 10/27/98 | 913 W ROLLINS RD ROUND LAKE BEACH, IL | EILEEN KOTY | 14 SOUTH LIBERTY BARRINGTON, IL 60010 CONTACT: BOB KOTY |
| 222. | 1029 | 12/01/00 | 850 BROOKFOREST AVE SHOREWOOD, IL | MONTANA INVESTMENTS, LLC | 3101 W. JEFFERSON ST. JOLIET, IL 60435 |
| 223. | 0696 | 01/01/87 | 2516 S GRAND AVE SPRINGFIELD, IL | A.S. NUDO | 1500 TAYLOR AVENUE SPRINGFIELD, IL 62703 |
| 224. | 0437 | 10/01/69 | 715 S BLOOMINGTON STREATOR, IL | WESTGATE, INC. | PO BOX 942 STREATOR, IL 61364 |
| 225. | 0163 | 04/01/93 | 4503 N ILLINOIS ST SWANSEA, IL | CHARLES L. STINNETT, JR. | PO BOX 1272 FORSYTH, MO 65653 |
| 226. | 1213 | 12/01/05 | 1920 N LEWIS AVE WAUKEGAN, IL | CBK EQUITIES L.P. | C/O DONALD MARINO PO BOX 52428 ATLANTA, GA 30355 |
| 227. | 0916 | 04/01/99 | 912 E 53RD ST ANDERSON, IN | LANDMARK ASSOCIATES, LLC | C/O LANDMARK ACCOUNTS INC. P.O. BOX 1012 ANDERSON, IN 46015-1012 |
| 228. | 0501 | 08/01/87 | 431 N. LINCOLN BEDFORD, IN | ROBERT C. FREEMAN | 3705 E. BLUE BIRD LANE BLOOMINGTON, IN 47401-9580 |
| 229. | 1214 | 08/01/78 | 3301 S. HWY 37 BLOOMINGTON, IN | CUPCAKE REALTY, LLC | 3115 S WALNUT STREET BLOOMINGTON, IN  47401 (OR 3115 S HWY 37) |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE- MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 230. | 0009 | 06/01/74 | 930 WASHINGTON ST COLUMBUS, IN | HILGER, FOX & HILGER LLP | C/O QRA INC. 2545 FOXPOINTE DR., STE D COLUMBUS, IN 47203 CONTACT: PAT ZEIGLER |
| 231. | 0040 | 12/01/77 | 2501 KRATZVILLE EVANSVILLE, IN | DAVID J. NELSON | SILCO, LLC 10035 OGLESBY DR. EVANSVILLE, IN 47720 |
| 232. | 0322 | 05/01/99 | 1915 COVERT EVANSVILLE, IN | ROBERT L. KOCK, PARTNER | FESK 4120 MULBERRY PLACE EVANSVILLE, IN 47714 |
| 233. | 0934 | 05/01/94 | 1912 BLUFFTON RD.FORT WAYNE, IN | WOODLAWN CENTER, LTD | PAYMENTS TO: PO BOX 971350 DALLAS, TX 75397; 40 NE LOOP 410, STE 102 SAN ANTONIO, TX 78216 CONTACT: RACHAEL HURST |
| 234. | 1241 | 07/01/98 | 3432 N ANTHONY BLVD FORT WAYNE, IN | SHAMBAUGH FAMILY LTD PTP | C/O PARKE GROUP (AGENT FOR SHAMBAUGH FAMILY PARTNERSHIP) 110 W. BERRY ST., SUITE 1812 FORT WAYNE, IN 46802 CONTACT: LINDA RITTER |
| 235. | 0301 | 07/01/02 | 1663 ROSSVILLE AVE. FRANKFORT, IN | CHARLES L. COOMER | 804 W. KYGER ST. FRANKFORT, IN 46041 |
| 236. | 1225 | 11/01/76 | 2087 E 37TH AVE HOBART, IN | JOHN R. BARNEY | BARNEY ENTERPRISES MANAGEMENT SERVICE, INC. 617 MERRILLVILLE RD. CROWN POINT, IN 46307 |
| 237. | 1025 | 08/25/87 | 4550 S EMERSON INDIANAPOLIS, IN | U GAS INVESTMENTS, INC. | 895 BOLGER COURT FENTON, MO 63026 |
| 238. | 1048 | 12/01/00 | 5301 W. 10TH ST INDIANAPOLIS, IN | SUZANNE GAMMON | LOR CORPORATION 6350 RUCKER ROAD, SUITE 101 INDIANAPOLIS, IN 46220 CONTACT: BETTINA E. PERRYMAN |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCEMENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 239. | 1066 | 09/01/96 | 3806 MADISON AVE INDIANAPOLIS, IN | GUARANTEE PROPERTIES LP | C/O ARMSTRONG DEVELOPMENTS, INC. G. WILLIAM ARMSTRONG 10654 SUNSET POINT LANE FISHERS, IN 46037 |
| 240. | 1182 | 06/01/74 | 700 W LINCOLN HWY MERRILLVILLE, IN | VIRDEN HOMAN FARMS | C/O ROBERT J. VIRDEN 109 W JACKSON ALBANY, MO 64402 |
| 241. | 0031 | 06/01/96 | 1111 E MCGALLIARD MUNCIE, IN | MUNCIE HOLDINGS | 131 ASHDALE AVE LOS ANGELES, CA 90049 CONTACT: JENNIFER E. MOORE |
| 242. | 1178 | 08/01/69 | 9446 CALUMET AVE MUNSTER, IN | GADDIS LAND ACCOUNT, S.R. BACHNAK | 1717 FISHER STREET MUNSTER, IN 46321 |
| 243. | 0279 | 08/01/68 | 900 SO 9TH ST RICHMOND, IN | PAUL W. LINGLE (CONTACT: KIRK COBY) | LINGLE REAL ESTATE 801 NORTH A STREET P.O. BOX 1948 RICHMOND, IN 47374 |
| 244. | 0523 | 11/01/89 | 107 N. GARDNER SCOTTSBURG, IN | C & S REAL ESTATE INVESTMENT LLC | 101 W TIPTON, SUITE C SEYMOUR, IN  47274 CONTACT: DARREN COLLETT |
| 245. | 1089 | 04/01/02 | 52565 US 33 NORTHSOUTH BEND, IN | NEW WINGS OF FAITH CHURCH, INC. | ATTN: DARRIN CHAPMAN P. O. BOX 8165 SOUTH BEND, IN  46660 |
| 246. | 1170 | 11/01/01 | 25295 STATE RD.#2 SOUTH BEND, IN | JSM 4JC INVESTMENT PROPERTIES, LLC | 2627 S MAIN STREET SOUTH BEND, IN 46614 CONTACT: JANELL MILLER |
| 247. | 1077 | 08/01/98 | 1425 FT HARRISON TERRE HAUTE, IN | DAVID SCHIMMEL | 136 LAKE SHORE TERRE HAUTE, IN 47803 |
| 248. | 0682 | 04/01/89 | US 543 WEST 50 VERSAILLES, IN | LULA SIZEMORE AND EDWIN SIZEMORE | 931 W HWY 50TH VERSAILLES, IN 47042 |
| 249. | 0169 | 01/01/56 | 1675 N 6TH ST VINCENNES, IN | NORMA D. RIEGLE | 1508 KIMMELL RD. VINCENNES, IN 47591 |
| 250. | 0487 | 06/01/87 | 908 8TH STREET COFFEYVILLE, KS | GEORGE RANDOLPH STANLEY | 2540  MINNESOTA JOPLIN, MO 64804 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|-----|------|--------------------------|------------------|-------------------------|------------------|
| 251. | 0424 | 08/01/03 | 2401 W. CENTRAL EL DORADO, KS | LEE AND BETTY LUINSTRA | 2405 W. CENTRAL EL DORADO, KS 67042 |
| 252. | 0683 | 06/01/69 | 919 8TH ST HUMBOLDT, KS | JOHN SCHULTZ | PO BOX 582 CHANUTE, KS 66720 |
| 253. | 0137 | 10/01/72 | 5420 STATE AVE. KANSAS CITY, KS | RALPH J. SCHLATTER | SCHLATTERS, INC. PO BOX 12488 OVERLAND PARK, KS 66828; 8730 GRANT OVERLAND PARK, KS 66212 |
| 254. | 1117 | 08/01/74 | 12640 W 63RD ST SHAWNEE, KS | ROBERT VIRDEN | VIRDEN HOMAN FARMS 109 W JACKSON ALBANY, MO 64402 CONTACT: REX A. HOMAN |
| 255. | 0119 | 09/01/91 | 1729 N TOPEKA BLVD. TOPEKA, KS | ROWCO INVESTMENTS, LLC | C/O FRAN YAEGER 2238 SW VILLAGE HALL ROAD TOPEKA, KS 66614-5000 |
| 256. | 0125 | 03/01/74 | 2740 KANSAS AVE TOPEKA, KS | ROBERT VIRDEN | VIRDEN HOMAN FARMS 109 W JACKSON ALBANY, MO 64402 |
| 257. | 0011 | 04/20/99 | 4830 E LINCOLN WICHITA, KS | DR. DON MILLER | PO BOX 782525 WICHITA, KS 67278-2525 |
| 258. | 0083 | 10/01/84 | 5010 S BROADWAY WICHITA, KS | BERBARD H. TRACHTMAN | THE HENRY COMPANY PO BOX 270349 SAN DIEGO, CA 92198 |
| 259. | 0115 | 07/01/99 | 10607 W MAPLE #100WICHITA, KS | ED NEVILLE | NEVILLE FAMILY TRUST III, RITA NEVILLE, TRUSTEE 9625 W. MAPLE WICHITA, KS 67209 |
| 260. | 0379 | 02/01/90 | 3635 W. DOUGLAS WICHITA, KS | MIKLOS LORIK | 2232 S. OSAGE WICHITA, KS 67213 |
| 261. | 0926 | 06/01/04 | 435 S. ELDORA WICHITA, KS | UNIVERSAL MOTOR FUELS, INC. | 2824 NORTH OHIO PO BOX 2920 WICHITA, KS 67201 CONTACT: DENNIS MALONEY |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 262. | 0138 | 11/01/88 | 2122 E. 9TH ST. WINFIELD, KS | T.E. BRANSCUM | PO BOX 651 WINFIELD, KS 67156 CONTACT: HELEN BRANSCUM |
| 263. | 0589 | 09/01/92 | 25 E DANIEL BOONE BARBOURVILLE, KY | DAVID WAYNE MILLER | 107 PITZER ST. BARBOURVILLE, KY 40906-1109 |
| 264. | 0154 | 12/01/96 | 510 GORDON AVE BOWLING GREEN, KY | HOUCHENS PROP. INC. | 700 CHURCH ST. BOWLING GREEN, KY 42101; PO BOX 90009 BOWLING GREEN, KY 42102 |
| 265. | 0503 | 07/01/90 | 3709 HWY 27 COLD SPRINGS, KY | NATIONAL CITY BANK | 155 E. BROAD STREET, 1ST FLR COLUMBUS, OH 43215-0055 CONTACT: CAROL SCOTT BOYD |
| 266. | 0504 | 07/01/74 | 324 PIKE STREET COVINGTON, KY | NANCY KUCHLE | 1128 CORAM ST. PARK HILLS, KY 41011-2056 |
| 267. | 1138 | 10/01/94 | 997 HUSTONVILLE RD DANVILLE, KY | BILL MCANLY REALTY | 1000 LEXINGTON RD. STE. #2 DANVILLE, KY 40422 CONTACT KELLY OR BETH |
| 268. | 0303 | 12/01/97 | 414 E DIXIE AVE ELIZABETHTOWN, KY | CHARLES R. CASPER, JR. | VICE PRESIDENT OF ADMINISTRATION ACCUMETRIC INC. 350 RING ROAD ELIZABETHTOWN, KY 42701 |
| 269. | 0116 | 03/01/67 | 4355 DIXIE HWY ELSMERE, KY | HADLEY INVESTMENTS LLC | 4401 DIXIE HWY ELSMERE, KY 41018 CONTACT: ALVIN K. HADLEY, MANAGER |
| 270. | 1259 | 05/24/96 | 8085 CONNECTOR DR FLORENCE, KY | FLORENCE ASSOCIATES, LLC, ATTN: SHARON GHEARING | C/O ASSOCIATED LAND MANAGEMENT 9349 WATERSTONE BLVD. CINCINNATI, OH 45249 |
| 271. | 0225 | 08/01/91 | 1060 US HWY 127 S. FRANKFORT, KY | HUGH W. HILDRETH AND NETTIE E. HILDRETH | 113 COUNTRYSIDE DRIVE LOUISVILLE, KY 40243 |
| 272. | 0940 | 09/01/74 | 1314 RUSSELL CAVE LEXINGTON, KY | GEORGE KAWAJA | 3579 OLYMPIA DRIVE LEXINGTON, KY 40517 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 273. | 0012 | 04/01/93 | 468 US 25 SOUTHLONDON, KY | ERNEST D. TACKETT | MCKINLEY CO., INC. P.O. BOX 1240 LONDON, KY 40743-1240 |
| 274. | 0484 | 01/01/91 | 412 S LAUREL RD LONDON, KY | ERNEST D. TACKETT | MCKINLEY CO., INC. P.O. BOX 1240 LONDON, KY 40743-1240 |
| 275. | 1171 | 03/01/72 | 7515 PRESTON HWY. LOUISVILLE, KY | JOHN B. TAYLOR, JR., PRESIDENT | TAYLOR PROPERTIES, INC. GLENWOOD ROAD LOUISVILLE, KY 40222 |
| 276. | 1172 | 06/01/83 | 1620 BANK STREET LOUISVILLE, KY | BILL BROWN | 2515 BRUNSWICK ROAD CHARLOTTESVILLE, VA 22903 |
| 277. | 1267 | 04/01/95 | 6600 TERRY RD LOUISVILLE, KY | JOSEPH RAYMOND WINRICH | MC & WIN PROPERTIES, LLC 2315 PIKES PEAK BLVD. LOUISVILLE, KY 40214 |
| 278. | 0092 | 03/01/04 | 1124 US 68 RM5 MAYSVILLE, KY | BLUEGRASS CENTER, LLC | C/O KRAVETZ REALTY GROUP, LLC 95 ALLENS CREEK ROAD, BLDG ONE ROCHESTER, NY 14618 |
| 279. | 1040 | 07/01/04 | 1811-B MONMOUTH ST NEWPORT, KY | JAIMIE NIEMCZURA | NEWPORT COMPANY PO BOX 399 NEWPORT, KY 41072; 1727 MONMOUTH ST. NEWPORT, KY 41071 |
| 280. | 0208 | 05/01/95 | 1920 W 4TH ST OWENSBORO, KY | DONALD YOUNG AND LINDA YOUNG | 1826 AIRPORT ROAD, OWENSBORO, KY 42301-9453 |
| 281. | 0412 | 03/01/94 | 887 S. HWY. 27 SOMERSET, KY | SOMERSET T PROPERTIES C/O LORI WALLACE | 4195 S HWY 27 SOMERSET, KY 42503 |
| 282. | 0857 | 01/01/02 | 204 VINE ST WILDER, KY | FRED MACKE, JR. | KEY STORE ASSOCIATES, LLC C/O C.A. WASSON CO. 645 HIGHLAND AVE., B6 FT. THOMAS, KY 41075 |
| 283. | 0371 | 01/01/99 | 1398 N MAIN ST WILLIAMSTOWN, KY | REAVIS B. STACEY | 1214-C NORTH MAIN ST. WILLIAMSTOWN, KY 41097 |

26

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 284. | 0282 | 12/01/98 | 1030 LEXINGTON ST WINCHESTER, KY | TOM PERRY | 3884 BECKNERVILLE ROAD WINCHESTER, KY 40391 |
| 285. | 0226 | 07/15/86 | 3710 S. MACARTHUR ALEXANDRIA, LA | LINDA DALE | PETRON, INC. P.O. BOX 8718 ALEXANDRIA, LA 71306 |
| 286. | 0684 | 08/01/97 | 250 VANDENBURG DRALEXANDRIA, LA | GLEN AND PATRICIA D'AMICO | C/O SOUTHERN EMBLEM 250 VANDENBURG DRIVE ALEXANDRIA, LA 71303 |
| 287. | 1177 | 12/01/02 | 5215 LEO ST. ALEXANDRIA, LA | BRYAN L. BOSSIER, SR. AND DEBRA BOSSIER NORMAN | PO BOX 7177 ALEXANDRIA, LA 71306 |
| 288. | 0885 | 07/01/98 | 13122 MORLAIX COURT BATON ROUGE, LA | KURZ & HERBERT COMMERCIAL REAL ESTATE, INC. | PO BOX 80301 BATON ROUGE, LA 70898 |
| 289. | 0284 | 10/01/87 | 2026 S COLUMBIA RD BOGALUSA, LA | J & S SCIANNA, LLC | 1428 BEAVER CIRCLE BOGALUSA, LA 70427 |
| 290. | 0658 | 12/01/92 | 2002 E. TEXAS, STE B BOSSIER CITY, LA | BUDDY SMITH | 2117 SHED ROAD, SUITE A, BOSSIER CITY, LA 71111; PO BOX 5770 BOSSIER CITY, LA 71171 |
| 291. | 0953 | 06/13/03 | VIKING DRIVE BOSSIER CITY, LA | GREG PAGE | EMERALD COMPANIES 400 TRAVIS ST., SUITE 402 SHREVEPORT, LA 71101 |
| 292. | 0632 | 10/01/90 | 1795 SO. MORRISON #1 HAMMOND, LA | DENISE S. BARRETT | 800 RUE DE LA PAIX HAMMOND, LA 70403 |
| 293. | 0967 | 07/10/97 | 1217 VETERANS HWY KENNER, LA | JOHN & BEVERLY FISCHER | 13565 THORNCREEK CIRCLE THORNTON, CO 80241 |
| 294. | 0306 | 01/01/87 | 1212 TEXAS AVE. NATCHITOCHES, LA | JIMMY D. LONG, JR. | 4133 HWY 6 NATCHITOCHES, LA 71457 |
| 295. | 0419 | 07/01/02 | 2850 HWY 28 EAST PINEVILLE, LA | CATAHOULA GROUP LLC | PO BOX 761 JONESVILLE, LA 71343 PHYSICAL ADDRESS: 322 BROOKS ROAD JONESVILLE, LA  71343 |

**Exhibit O-1**

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE- MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 296. | 0577 | 01/01/85 | 1725-E NORTH HEARNE SHREVEPORT, LA | MGK INVESTMENTS, LLC | 6909 QUERBES SHREVEPORT, LA 71106 |
| 297. | 0755 | 12/01/61 | 647 ANDOVER STREET LAWRENCE, MA | ANN BRIDE | HIGGINS ASSOCIATES 12 HIDDEN ROAD ANDOVER, MA 01810 |
| 298. | 0939 | 04/01/91 | 323 DALTON AVE PITTSFIELD, MA | MARK E. HADDAD | HADDAD'S RUG COMPANY 32 BANK ROW PITTSFIELD, MA 01201 CONTACT: ROBERT HOLMES OR PAUL HADDAD |
| 299. | 0252 | 07/01/97 | 205 CHANDLER STWORCESTER, MA | CHANDLER REALTY ADVISORS C/O ERIC BERTZ | 299 DAVIS STREET NORTHBOROUGH, MA 01532 |
| 300. | 1184 | 09/01/98 | ANDREWS MANOR SHOP. CAMP SPRINGS, MD | CONSORTIUM ONE- ANDREWS MANOR, LLC C/O FINARC MAGMT | 4733 BETHESDA AVENUE, SUITE 650 BETHESDA, MD 20814 ATTN: JACQUI WATERS, PROPERTY MANAGER |
| 301. | 1240 | 04/01/00 | 931 NATIONAL HWY LAVALE, MD | AFD HOLDING, LLC | ATTN: BILL TOMPKINS 951 NATIONAL HIGHWAY LAVALE, MD 21502 |
| 302. | 0318 | 06/01/97 | LEONARDTOWN RD (MECHANICSVILLE RETAIL CENTER) MECHANICSVILLE, MD | JOHN K. PARLETT, JR. | CMI ASSOCIATES, LLC 30071 BUSINESS CENTER DRIVE CHARLOTTE HALL, MD 20622 |
| 303. | 0905 | 02/15/98 | E MAIN & WARD STS SALISBURY, MD | BEDSWORTH LIFETIME TRUST C/O FAW CASSON & CO., LLP | P. O. BOX 718 OCEAN CITY, MD 21843 CONTACT: REGINA M. MONTAGNA, CPA (AGENT FOR TRUST) |
| 304. | 1022 | 08/20/74 | 3675 LEONARDTOWN RD WALDORF, MD | DONALD J. MARINO | CBIM EQUITIES, LP C/O DON MARINO PO BOX 52428 ATLANTA, GA 30355 |
| 305. | 0381 | 03/01/61 | 660 MINOT AVE AUBURN, ME | DAVID A. COHEN | 47 CAMINO BOTANICA SANTA FE, NM 87507 |

**Exhibit O-1**

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 306. | 0746 | 11/01/68 | 14 LEGION FIELD ROAD FRYEBURG, ME | THE TOWN OF FRYEBURG | 16 LOVEWELLS POND ROAD FRYEBURG, ME 04037 |
| 307. | 0825 | 05/15/89 | BRADLEY & PINE FRYEBURG, ME | ARTHUR HEATH AND MARTHA HEATH | FRYEBURG, ME 04037 |
| 308. | 0237 | 12/01/00 | 185 MAIN STREET SPRINGVALE, ME | LIONEL SEVIGNY | VILLAGE GREEN ASSOCIATES 631 HANSON RIDGE RD. SPRINGVALE, ME 04083 |
| 309. | 1194 | 07/17/00 | 410 KENNEDY MEM. DR WATERVILLE, ME | CHRISTINE A. SHELLY | 4837 S. 1ST ST. ARLINGTON, VA 22204 |
| 310. | 0324 | 05/01/00 | 669 ROOSEVELT TRAIL WINDHAM, ME | AL CUSHMAN | PO BOX 276 FRIENDSHIP, ME 04547 |
| 311. | 0202 | 05/01/91 | 824 N EUCLID BAY CITY, MI | JAMES ROWLEY | BROOKWAY LLC 5304 BROOKWAY DRIVE BAY CITY, MI 48706 |
| 312. | 0949 | 10/01/98 | 6870 S. TELEGRAPH DEARBORN HEIGHTS, MI | SAM SALMAN | TEL-WARREN VENTURES, LLC 3194 E. BRADFORD DR. BLOOMFIELD, MI 48301 |
| 313. | 0910 | 07/01/92 | 22341 KELLY RDEASTPOINTE, MI | PETER VITALE | PO BOX 183460 UTICA, MI 48318 |
| 314. | 1129 | 11/01/98 | 535 E.9 MILE RD. FERNDALE, MI | SAM KEMERKO | KEMERKO FERNDALE LLC PO BOX 250341 W. BLOOMFIELD, MI 48325 |
| 315. | 0191 | 04/01/94 | 3019 W PASADENA FLINT, MI | JOHN M. BOURBEAU | 129 NORTH GRAND TRAVERSE FLINT, MI 48503 |
| 316. | 1153 | 02/01/89 | 740 LAMOREAUX DR. GRAND RAPIDS, MI | BRIAN SIKMA | 5510 CASCADE RD SE, STE. 220 GRAND RAPIDS, MI 49546 |
| 317. | 1215 | 02/01/75 | 1029 E. MILLERS RD LANSING, MI | JOHN DOEZEMA | P.O. BOX 481 SPRING LAKE, MI  49456 |
| 318. | 0732 | 02/01/70 | 2625 THIRTEENTH ST. MENOMINEE, MI | RICHARD D. STURM | TST INVESTMENTS 3019 HARBOR WINDS DR. SUAMICO, WI 54173 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE- MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 319. | 0285 | 08/25/86 | 2063 E LAKETON AVE MUSKEGON, MI | WILMA L. SENG, TRUSTEE | WILMA L. SENG REVOCABLE TRUST 4445 S. 198TH AVE. HESPERIA, MI 49421 |
| 320. | 1001 | 02/01/98 | 3390 BAY ROAD SAGINAW, MI | DONALD J. MARINO | CBC EQUITIES, LTD. 4265 MARINA CITY DRIVE, STE 701 MARINA DEL REY, CA 90292 |
| 321. | 1026 | 01/01/97 | 14750 FORT STREET SOUTHGATE, MI | PETER BLOND | 2216  SW LONGWOOD DR PALM CITY, FL 34990 |
| 322. | 0176 | 06/01/71 | 3203 EASTERN AVE WYOMING, MI | ROBB FAMILY INVESTMENTS LLC | 4551 WHISPERWOOD CT, SE KENTWOOD, MI  49508 |
| 323. | 0847 | 07/07/04 | 5960 BURLINGAME SW WYOMING, MI | DAN HIBMA | 5960-B, LLC 1701 PORTER ST., SW WYOMING, MI 49509 |
| 324. | 0903 | 08/22/04 | 1633 28TH ST. S.W. WYOMING, MI | 1633  28TH STREET, LLC | C/O VILLAGE INN PLAZA 30840 NORTHWESTERN HWY, STE 130 FARMINGTON HILL, MI  48334 |
| 325. | 0863 | 01/01/92 | 1201 CLIFF ROAD BURNSVILLE, MN | THE STEVEN HOYT CO DBA HOYT PROPERTIES INC | 708 S THIRD ST STE 108 MINNEAPOLIS, MN  55415 |
| 326. | 0170 | 06/01/04 | 3803 THIRD AVE. NORTH MANKATO, MN | KENNETH W. AND SUSAN K. CHRISTENSON | 6300 SHAMROCK DRIVE MADISON LAKE, MN 56063 |
| 327. | 1281 | 05/22/89 | 121 SIOUX ROAD MANKATO, MN | JEROME RICHARD REVOCABLE TRUST C/O EDWARD RICHARD | 2701 PALM CIRCLE WEST GALVESTON, TX  77551 |
| 328. | 0972 | 05/25/87 | 2146 WHITE BEARMAPLEWOOD, MN | RAP HEART, LLC | 940 THIRD AVE., 3RD FLOOR NEW YORK, NY 10022 |
| 329. | 0101 | 10/01/97 | 2701 HWY 10 NORTH E MOUNDS VIEW, MN | EMPIRE ONE, LLC | C/O NEXUS COMMUNICATIONS 2210 E LAKE ST. MINNEAPOLIS, MN 55407 |
| 330. | 1257 | 03/01/02 | 39 FIRST AVE. SOUTH WAITE PARK, MN | AMY CHRISTENSEN | INDEPENDENCE CENTER, INC. 51 FIRST AVENUE SOUTH WAITE PARK, MN 56387 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 331. | 0199 | 11/01/02 | 1781 JEFFCO BLVD. ARNOLD, MO | MARK PERKINS | MARK C. PERKINS TRUST 343 BLUFF VIEW CIRCLE ST. LOUIS, MO 63129 CONTACT: MARK PERKINS |
| 332. | 0476 | 07/01/90 | 6254 U S HWY 61 & 67 BARNHARDT, MO | STOR-RITE, INC. | 5435 DOBER LANE ST. LOUIS, MO 63129 |
| 333. | 1163 | 12/01/93 | 1606 SOUTH 7 HWY BLUE SPRINGS, MO | GEORGE T. WARD | GEORGE WARD BUILDERS, INC. 1000 S. WOODS CHAPEL ROAD BLUE SPRINGS, MO 64015 GORDON P. BRAUN, GENERAL MANAGER |
| 334. | 0634 | 03/01/86 | 1220 11TH STREET BOONVILLE, MO | LARRY SIECKMANN | 25060 HIGHLAND SCHOOL RD. BOONVILLE, MO 65233 CONTACT LARRY OR BETTY |
| 335. | 0397 | 10/01/79 | 870 N KINGS HWY CAPE GIRARDEAU, MO | JIM CRAIN | 2322 KENNETH CAPE GIRARDEAU, MO 63701 |
| 336. | 1006 | 01/01/04 | 103 INDUSTRIAL DR. CARUTHERSVILLE, MO | ROBBIE MARTIN | ALATEN PROPERTIES PO BOX 2177 MUSCLE SHOALS, AL 35662 |
| 337. | 0383 | 10/01/84 | 801 N WASHINGTON ST CHILLICOTHE, MO | INEZ L. FRANKLIN | 2111 MEDOWLANE DRIVE CHILLICOTHE, MO 64601 OTHER CONTACT: DAN TURNER 1911 POLK CHILLICOTHE, MO 64601 |
| 338. | 0019 | 07/01/99 | 421 N. STATE ST. DESLOGE, MO | RANDY BLACK | 2557 JACQUES DRIVE, BRH 35 BONNE TERRE, MO 63628 |
| 339. | 0017 | 08/01/95 | 910 E. KARSCH BLVD. FARMINGTON, MO | RANDY AND/OR CONNIE BLACK | 2557 JACQUES DRIVE, BRH 35 BONNE TERRE, MO 63628 |
| 340. | 1009 | 06/20/91 | 8008 N. LINDEBERGH BLVD HAZELWOOD, MO | MARLA NORTH LINDBERG, LLC | C/O MARC GOLDFARB 2525 S BRENTWOOD BLVD., STE 103 ST. LOUIS, 63144 |
| 341. | 0711 | 02/01/61 | 307 N HWY 291 INDEPENDENCE, MO | JAMES AND DOROTHY KUHN | 14901 E. 34TH ST. INDEPENDENCE, MO 64055 |

31

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 342. | 1195 | 07/01/02 | 1433 NOLAND RD.INDEPENDENCE, , MO | CHARLIE FRANKLIN | 3600 S. NOLAND ROAD, STE. C INDEPENDENCE, MO 64055 |
| 343. | 0100 | 02/01/96 | 4722 N E VIVION RD KANSAS CITY, MO | SHELTON E. BOWER | B H & W ASSOCIATES 136 THE WOODLANDS KANSAS CITY, MO 64119 |
| 344. | 0158 | 03/01/91 | 5429 BLUE PARKWAY KANSAS CITY, MO | PAUL P. & ESTHER T. DUREKA | 8816 EAST 62ND ST. RAYTOWN, MO 64133-3720 |
| 345. | 0876 | 05/01/98 | CAVES SUITE 324,330 - IBC WHSE KANSAS CITY, MO | DEAN REALTY CO | ATTN: BRIAN K HEDRICK 10 E CAMBRIDGE CIRCLE DR. STE 300 KANSAS CITY, KS 66103 |
| 346. | 0545 | 07/01/02 | 19601 HWY 127 N LA MONTE, MO | HWY 127 N. ENTERPRISES, LLC, JERRY METCALF, PRESIDENT | PO BOX 696 CONCORDIA, MO 64020 CONTACT: STEVE KRAUSE |
| 347. | 0140 | 06/01/87 | 208 W. BLAND RD LEBANON, MO | DARRELL KAYS, PARTNER | SGK PARTNERSHIP PO BOX 1249 LEBANON, MO 65536; 1658 SOUTH CHAPEL DRIVE SPRINGFIELD, MO 65809 DARRELL KAYS/S. SWAIM |
| 348. | 0095 | 6/1/1997 | 925 WEST LIBERTY DR LIBERTY, MO | TIM HARRIS, PRESIDENT | STAR DEVELOPMENT CORP. 244 W. MILL ST., SUITE 101 LIBERTY, MO 64068 TOM SLOAN, PROPERTY MANAGER |
| 349. | 0592 | 08/01/91 | 1102 E FIRST ST MARYVILLE, MO | KERMIT AND MARY ANN LAGER | 35216 350TH ST. CONCEPTION JUNCTION, MO 64334 |
| 350. | 0442 | 09/01/97 | 1805 WEST BLVD MEXICO, MO | JAMES W. SPARGO | 1509 PINELAWN CT. MEXICO, MO 65265 |
| 351. | 0610 | 09/01/66 | 1510 NORTH MORLEY MOBERLY, MO | DEAN MILLER | MOBERLY MOTOR COMPANY INC. PO BOX 249 MOBERLY, MO 65270 |
| 352. | 0702 | 12/01/80 | W BUSINESS HWY 60 MOUNTAIN GROVE, MO | DORIL AND ELAINE LEASCHER | 303 E STATE STREET MOUNTAIN GROVE, MO  65711 |

**Exhibit O-1**

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 353. | 0111 | 11/01/91 | 222 O'FALLON PLAZA O'FALLON, MO | JIM BLECHLE, PRESIDENT | JAYRICH CORPORATION PO BOX 301 O'FALLON, MO 63366-0301 PHYSICAL ADDRESS: 120 O'FALLON PLAZA O'FALLON, MO 63366 |
| 354. | 1196 | 06/01/98 | 2801 OAK GROVE POPLAR BLUFF, MO | BOOTHEEL BANCORP, INC. | C/O SCOTT SPENCER 2911 NORTH WESTWOOD BLVD. POPLAR BLUFF, MO 63901 |
| 355. | 0037 | 06/01/75 | 6625 RAYTOWN ROADRAYTOWN, MO | RAYTOWN CENTRE SHOPS, LLC | P. O. BOX 88144 CAROL STREAM, IL  60188 |
| 356. | 0016 | 10/01/84 | 1381 S BISHOP AVE ROLLA, MO | THOMAS J. BAHR, C.P.A. | PO BOX 1006 ROLLA, MO 65402; 407 WEST FOURTH ST. ROLLA, MO 65401 |
| 357. | 0357 | 01/01/87 | 312 SOUTH KENTUCKY SEDALIA, MO | STEVEN FRITZ, ESQ. | LAW OFFICES OF STEVEN A. FRITZ 202 WEST FOURTH SEDALIA, MO 65301 |
| 358. | 0886 | 01/01/86 | 1219 E DIVISION SPRINGFIELD, MO | EMMA HUFF | 1449 EAST SNIDER SPRINGFIELD, MO 65803 |
| 359. | 0018 | 11/01/87 | 4530 LEMAY FERRY RD ST. LOUIS, MO | JOHN GREFFET OR JANENE BERRA | TERRA HOLDING CO., INC. 5091 BAUMGARTNER ROAD ST. LOUIS, MO 63129 CONTACT: JANENE BERRA OR JOLENE BLECHA |
| 360. | 0152 | 09/01/92 | 10159 WATSON ROAD ST. LOUIS, MO | RUSSELL BECKER | 8821 BRACKEN CIRCLE AFFTON, MO 63123-1110 |
| 361. | 0196 | 05/01/89 | 8411 GRAVOIS ST. LOUIS, MO | GENEVIEVE M. ENGER | 1393 BOWLES AVENUE, APT. 309 FENTON, MO 63026 |
| 362. | 0246 | 07/01/99 | 430 E. GRAVOIS ST. CLAIR, MO | ST. CLAIR R-XIII SCHOOL DISTRICT | 905 BARDOT STREET ST. CLAIR, MO 63077 |
| 363. | 0562 | 11/04/65 | 400 SO. BELT HWY ST. JOSEPH, MO | TIM FIELDS, O.D. | 2320 N. BELT HIGHWAY ST. JOSEPH, MO 64506 |

**Exhibit O-1**

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 364. | 0441 | 05/01/97 | 103 N MADISON WEBB CITY, MO | DR. CLYDE AND MARILYN YOUNG | 15118 SPRINGVIEW STREET TAMPA, FL  33624-2332 |
| 365. | 0593 | 10/01/03 | 803 E MAIN WEST PLAINS, MO | JOHN FELLER | 829 EAST MAIN WEST PLAINS, MO 65775 |
| 366. | 1090 | 06/01/00 | 550 CHOCTAW ST CLARKSDALE, MS | ROBBIE MARTIN | ALATEN PROPERTIES PO BOX 2177 MUSCLE SHOALS, AL 35662 |
| 367. | 0664 | 08/01/85 | 802 ALABAMA ST COLUMBUS, MS | VAGHN DEDEAUX | P.O. BOX 9371 COLUMBUS, MS 39703 |
| 368. | 0177 | 05/01/74 | 414 S CASS ST CORINTH, MS | E. MITCHELL HOUGH | PO BOX 1818 OZARK, MO 65721 |
| 369. | 0703 | 01/01/94 | 1515 HIWAY 82 EASTGREENVILLE, MS | MAY'S WHOLESALE DRY GOODS COMPANY | 618 WASHINGTON AVENUE GREENVILLE, MS 38701 |
| 370. | 0384 | 04/01/74 | 1200 SUNSET DRIVE GRENADA, MS | W. GLADWIN CARPENTER | PO BOX 246 GRENADA, MS 38902-0246 |
| 371. | 0342 | 08/01/95 | 450 DEDEAUX RD GULFPORT, MS | ANNA STEWART | 2305 ROBERT DRIVE GULFORT, MS 39503-3611 |
| 372. | 0413 | 08/01/95 | 324 RAYMOND RD JACKSON, MS | SUSAN DOWELL | 8450 SOUTHBRIDGE DR. #4 FORT MEYERS, FL 33912 |
| 373. | 0203 | 01/01/92 | 910 LOCUST ST MCCOMB, MS | KATHLEEN RUSSELL | KRMR INVESTMENTS, LLC PO BOX 409 HAZLEHURST, MS 39083 |
| 374. | 0427 | 09/01/88 | 4901 7TH ST MERIDIAN, MS | DON BOUNDS | PO BOX 3834 MERIDIAN, MS 39303 |
| 375. | 0206 | 05/01/90 | 204 DEVEREAUX DR NATCHEZ, MS | CHARLES M. LAIRD | PO BOX 1226 NATCHEZ, MS 39121 |
| 376. | 1108 | 6/1/2003 | 300 HERITAGE DR. OXFORD, MS | ROBBIE MARTIN | ALATEN PROPERTIES PO BOX 2177 MUSCLE SHOALS, AL 35662 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 377. | 0141 | 01/01/03 | 307 WALKER CIRCLE RICHLAND, MS | JACK D. HOLMES | M J INVESTMENTS, LLC PO BOX 180549 RICHLAND, MS 39218 PHYSICAL ADDRESS: 535 OLD HIGHWAY 49 SOUTH RICHLAND, MS 39218 |
| 378. | 1197 | 08/01/96 | 210 WILSON DR SENATOBIA, MS | ROBBIE MARTIN | MARTIN/AYCOCK PROPERTIES PO BOX 2177 MUSCLE SHOALS, AL 35662 |
| 379. | 0071 | 08/01/98 | 340 GOODMAN RD SOUTHHAVEN, MS | JOE POPPENHEIMER | 1018 GOODMAN ROAD HORN LAKE, MS 38637 |
| 380. | 0443 | 01/01/90 | 419 CROSSOVER ROAD TUPELO, MS | WILLIAM H. ALLEN, JR. | ALLEN AND DODGE PROPERTIES PO BOX 1688 TUPELO, MS 38802 |
| 381. | 0936 | 07/01/98 | 5548 CLIFF GOOKIN TUPELO, MS | ALATEN PROPERTIES | PO BOX 2177 MUSCLE SHOALS, AL 35662 |
| 382. | 0051 | 09/01/86 | 1211 MAIN STREET BILLINGS, MT | HARLEY G. HOVEN | 1211 MAIN ST. BILLINGS, MT 59105 |
| 383. | 0219 | 01/01/01 | 2750 OLD HARDIN RD, SUITE E BILLINGS, MT | CHRIS BAKWIN | PO BOX 1542 BOZEMAN, MT 59715 |
| 384. | 0325 | 08/01/94 | 3203 HENESTA DRIVE BILLINGS, MT | BOB & NATALIE JENKINS | CENTURY WAREHOUSING, INC. PO BOX 962 LIVINGSTON, MT 59047 |
| 385. | 0611 | 08/01/78 | 801 16TH ST. WESTBILLINGS, MT | WARREN T. GEORGE | PO BOX 22981 BILLINGS, MT 59104 PHYSICAL ADDRESS: 1200 BLAIR LANE #1 BILLINGS, MT 59102 |
| 386. | 0074 | 01/26/72 | 1525 N ROUSE STREET BOZEMAN, MT | CENTURY WAREHOUSING, INC. | CENTURY WAREHOUSING, INC. PO BOX 962 LIVINGSTON, MT 59047 |
| 387. | 0033 | 12/29/69 | 3730 HARRISON AVE BUTTE, MT | DRYDEN PROPERTIES | ATTN: GARY DRYDEN 139 SHIRLEY WAY ANACONDA, MT 59711 |

**Exhibit O-1**

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 388. | 0637 | 10/26/92 | 338 N CENTRAL CUT BANK, MT | ROBERT C. JENKINS | CENTURY WAREHOUSING, INC. PO BOX 962 LIVINGSTON, MT 59047 |
| 389. | 0546 | 09/01/91 | 720 N. SARGENT AVE GLENDIVE, MT | BLUE SKY INC. | ATTN: DENNIS J SNOW 444 SCHMIDT LANE GLENDIVE, MT 59330 |
| 390. | 0050 | 11/01/67 | 327 9TH ST GREAT FALLS, MT | REBECCA YOUNGSTROM | YOUNGSTROM PROPERTIES 2311 NE HANCOCK PORTLAND, OR 97212 |
| 391. | 0153 | 10/01/00 | 3400 10TH AVE SOUTH GREAT FALLS, MT | LES EASTMAN | 16903 INGLEWOOD ROAD, NE KENMORE, WA 98028 |
| 392. | 0182 | 07/15/81 | 600 NORTHWEST BYPASS GREAT FALLS, MT | JACK PALMER | C/O PALMER LEASING COMPANY PO BOX 251 LAKESIDE, MT 59922 |
| 393. | 1073 | 09/01/97 | 4414 N STAR BLVD GREAT FALLS, MT | BOB & NATALIE JENKINS | CENTURY WAREHOUSING, INC. PO BOX 962 LIVINGSTON, MT 59047 |
| 394. | 0685 | 09/01/71 | CEMETERY ROAD HARDIN, MT | JEAN DEVORE | PO BOX 336 HARDIN, MT 59034 |
| 395. | 0228 | 10/01/90 | 2ND & MONTANA HAVRE, MT | LEONARD MOTARI | 1523 MEADOWLARK DR. GREAT FALLS, MT 59404 |
| 396. | 0210 | 10/01/94 | 1736 N MONTANA AVE HELENA, MT | KERMIT J. MUELLER | PO BOX 4878 HELENA, MT 59604 |
| 397. | 0917 | 03/01/99 | 2155 HIGHWAY 2 WEST KALISPELL, MT | JACK HOWELL | 2769 PECKINS RD. HONOR, MI 49640-9536 |
| 398. | 0444 | 11/01/94 | 1533 US HWY 212 SOUTH LAUREL, MT | BOB & NATALIE JENKINS | CENTURY WAREHOUSING, INC. PO BOX 962 LIVINGSTON, MT 59047 |
| 399. | 1301 | 02/01/05 | 64 H STREET LEWISTOWN, MT | CENTURY WAREHOUSING, INC. | ATTN: BOB OR NATALIE JENKINS PO BOX 962 LIVINGSTON, MT 59047 |
| 400. | 0652 | 09/01/93 | 103 NORTH N ST. LIVINGSTON, MT | BOB & NATALIE JENKINS | CENTURY WAREHOUSING, INC. PO BOX 962 LIVINGSTON, MT 59047 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 401. | 0647 | 05/01/86 | 3407 BUTLER STREETMILES CITY, MT | DENNIS MULLER | PO BOX 1125 MILES CITY, MT 59301 |
| 402. | 0891 | 06/01/91 | 3490 S. RESERVE ST MISSOULA, MT | JOSEPH O. & JOHN N. ETCHART, THE N3 COMPANY | P.O. BOX 429 GLASGOW, MT 59230 |
| 403. | 0712 | 01/01/94 | E SHORE RT HWY 35 POLSON, MT | JEFF NELSON | 37167 HYW 35 POLSON, MT 59860 |
| 404. | 0748 | 06/01/91 | 621 E MAIN SIDNEY, MT | KENDAL KALLEVIG | 120 2ND AVE. SW SIDNEY, MT 59270 |
| 405. | 0368 | 09/01/85 | US HWY 91 WEST YELLOWSTONE, MT | DEEP WELL RANCH | ATTN: NEAL PRINGLE PO BOX 710 WEST YELLOWSTONE, MT 59578 |
| 406. | 0749 | 11/01/79 | 117 3RD AVE. SOUTH WOLF POINT, MT | ELDON DSCHAAK | 121 ANACONDA ST. WOLF POINT, MT 59201 |
| 407. | 1226 | 02/01/93 | 138 HWY 740 ALBEMARLE, NC | MS. ELLIE L. VALENSTEIN | LUCKY REALTY PO BOX 36509 CHARLOTTE, NC 28236-6509 |
| 408. | 1120 | 04/01/85 | 2000 S FAYETTEVILLE ASHEBORO, NC | KENNETH CORNWELL | 2013 SOUTH FAYETTEVILLE ST. ASHEBORO, NC 27203 |
| 409. | 1109 | 05/01/93 | RTE 6, HWY 105 BYPASS BOONE, NC | JAMES HODGES | 810 PARKCREST DR. BOONE, NC 28607 |
| 410. | 1130 | 06/01/00 | 1027 CHAPEL HILL RD BURLINGTON, NC | BURLINGTON RENTALS | 2333 S. CHURCH STREET BURLINGTON, NC 27215 |
| 411. | 0313 | 11/01/83 | 2448 FREEDOM DRIVE CHARLOTTE, NC | MARSH MORTGAGE | PO BOX 35329 CHARLOTTE, NC 28235 |
| 412. | 1233 | 09/01/96 | 803 W CONOVER BLVD W CONOVER, NC | PAUL WELLS | 5849 WELLS HOLLOW RD. HAMPTONVILLE, NC 27020 |
| 413. | 0881 | 10/01/96 | 802 E GEER ST. DURHAM, NC | C. B. DAUGHTRIDGE | FALLSTAR ASSOCIATES, LLC PO BOX 353 ROCKY MOUNT, NC 27802-0353 |
| 414. | 1091 | 08/01/03 | 403 WEST KINGS HWY EDEN, NC | DAVE SEXTON | PO BOX 2215 EDEN, NC 27289-2215 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE- MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 415. | 0468 | 06/01/94 | 2910 RAMSEY ST.FAYETTEVILLE, NC | CHARLES T. HAIGH | HAIGH & HOLLAND AGENTS, F. C. FRANKLIN MARITAL TRUST PO BOX 53951 FAYETTEVILLE, NC 28305 |
| 416. | 0919 | 06/01/03 | 3168 NATAL RD. FAYETTEVILLE, NC | DARWIN C. & SONJA G. PARRISH | 4203 INDIANA AVE. WINSTON-SALEM, NC 27105 |
| 417. | 0020 | 05/16/96 | 1204 N BERKELEY BLVD GOLDSBORO, NC | KEN FALLIN | 1206 H NORTH BERKELEY BLVD GOLDSBORO, NC 27534 |
| 418. | 0514 | 05/01/86 | OLD NORLINA HWY HENDERSON, NC | IRENE E. WHALEY C/O PATRICIA PULLEY | P.O. BOX 1788 HENDERSON, NC 27536; 309 YOWLAND ROAD HENDERSON, NC 27536 |
| 419. | 0660 | 09/01/94 | 116 DABNEY DR HENDERSON, NC | QUALITY CORNER CORPORATION | P.O. BOX 769 HENDERSON, NC 27536 CONTACT W.D. WESTER, JR. |
| 420. | 0485 | 04/01/79 | 2430 ONSLOW DR. JACKSONVILLE, NC | TERRELL & ASSOCIATES, INC. | 107 DOVER LANE JACKSONVILLE, NC 28540-4584 WILLIAM S. TERRELL |
| 421. | 0205 | 02/01/93 | HWY 21 SOUTH  (224 SOUTH BRIDGE ST) JONESVILLE, NC | LITTLE CREEK APTS OFFICE, KIRK, KIRK, & SHOOP | 203 SOUTH JONESVILLE BLVD. JONESVILLE, NC 28642-2301 CONTACT: DELBERT KIRK |
| 422. | 0168 | 04/01/90 | HIGHWAY 64 LEXINGTON, NC | NAB PARTNERS, LLC | 510 INDIAN WELLS CIRCLE LEXINGTON, NC  27295 |
| 423. | 0178 | 06/01/89 | 1397 E 5TH LUMBERTON, NC | DARWIN C. PARRISH | PO BOX 232 PFAFFTOWN, NC 27040 |
| 424. | 0691 | 04/01/85 | 2755 ROBERTS AVE. LUMBERTON, NC | CHARLES ATKINSON FAMILY TRUST | C/O BB & T WEALTH MANAGEMENT PO BOX 1727 WILMINGTON, NC 28402 |
| 425. | 0446 | 06/01/02 | 1068 HWY 64-264 MANTEO, NC | KOTARIDES ENTERPRISES, INC. | PO BOX 2056 NORFOLK, VA 23510 |
| 426. | 0120 | 05/01/96 | 2547 PINEY GREEN RD MIDWAY, NC | RANDOLPH THOMAS, PRESIDENT | 337-C-1 CENTER STREET JACKSONVILLE, NC 28546 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 427. | 0159 | 08/01/94 | 810 W LEBANNON MT AIRY, NC | PAUL B. WELLS | 5849 WELLS HOLLOW RD. HAMPTONVILLE, NC 27020 |
| 428. | 0121 | 11/01/96 | HIGHWAY 17 SOUTH NEW BERN, NC | TYSON & HINES INVESTMENTS, CHARLES F. TYSON | P.O. BOX 626 NEW BERN, NC 28560 |
| 429. | 0871 | 12/01/96 | 1101 TRANSPORT DRRALEIGH, NC | POPE INDUSTRIAL PARK I, FINLEY COMMERCIAL REALTORS, ATTN: DUKE FINLEY | P.O. BOX 97215 RALEIGH, NC 27624-7215 |
| 430. | 1198 | 01/01/82 | WILDER GROVE LANE RALEIGH, NC | T. ED BAILEY, WILDER GROVE ASSOCIATES | P.O. BOX 464 RALEIGH, NC 27602 CONTACT: JANE HOWE |
| 431. | 0432 | 07/10/87 | 537 WELDON RD. ROANOKE RAPIDS, NC | ALVIN W. LILES | 1976 EASTERN SHORES RD. LITTLETON, NC 27850 |
| 432. | 1110 | 11/01/90 | HWY 74 ROCKINGHAM, NC | J. CALVIN SUMMEY | HEARTHSIDE HOMES PO BOX 7 MAULDIN, SC 29662 CONTACT: BUDDY SUMMEY |
| 433. | 0661 | 09/01/96 | 4098 SUNSET AVE ROCKY MOUNT, NC | GEORGE GRIFFIN | ROCKY MOUNT STOP & SHOP INC. 4104 SUNSET AVENUE ROCKY MOUNT, N 27801 |
| 434. | 1216 | 06/01/96 | 922 BENVENUE RD ROCKY MOUNT, NC | FALLSTAR COMPANY | C/O C. B. DAGHTRIDGE 4419 MEADOWBROOK ROAD ROCKY MOUNT, NC 27801 |
| 435. | 1287 | 08/16/01 | 2841 N. CHURCH ST. ROCKY MOUNT, NC | CHAMBLISS & RABIL COMMERCIAL REALTY, C/O LEE MEARS | STATION SQUARE MALL 301 SOUTH CHURCH ST ROCKY, STE 10 MOUNT, NC 27804 |
| 436. | 0927 | 11/01/01 | 2222 STATESVILLE BL SALISBURY, NC | CHARLES JORDAN | 3301 CHAUCER DRIVE CHARLOTTE, NC 28210 |
| 437. | 0445 | 05/01/93 | HWY 17 NORTHSIDE DR SHALLOTTE, NC | INMAN INVESTMENTS, LLC | P.O. BOX 57 SHALLOTTE, NC 28459 |
| 438. | 0663 | 06/01/77 | HWY 301 S BUSINESS SMITHFIELD, NC | JOHANNA K. PARKER | 114 HAMILTON DR. SMITHFIELD, NC 27577 |

**Exhibit O-1**

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE- MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 439. | 0520 | 05/01/02 | 803 JULIAN AVE. THOMASVILLE, NC | RAY W. EDWARDS, HOLLY HILL STATION, INC. | 2334 ENGLISH ROAD HIGH POINT, NC 27262-8056; SUE BRAMMER PO BOX 6535 HIGHT POINT, NC 27262 |
| 440. | 0373 | 03/27/80 | ROUTE 6, BOX 37 (HIGHWAY 130) WHITEVILLE, NC | JUANITA H. STANLEY | P.O. BOX 725 WHITEVILLE, NC 28472 |
| 441. | 0420 | 09/01/89 | W NC HWY 268 WILKESBORO, NC | KAREN HAMBY | PO BOX 761 LAUREL LANE BLOWING ROCK, NC  28605 |
| 442. | 0653 | 01/01/94 | HWY 64 WILLIAMSTON, NC | HELEN CAMPBELL | 13 HORIZON HILL RD. ASHEVILLE, NC 28804 |
| 443. | 1034 | 01/01/92 | 102 S KERR AVEWILMINGTON, NC | HERBERT FISHER, COASTAL REALTY COMPANY | 1608 MARKET STREET WILMINGTON, NC 28401 |
| 444. | 0937 | 02/01/97 | 101 POLO ROAD WINSTON-SALEM, NC | DARWIN C. AND SONJA G. PARRISH | P.O. BOX 232 PFAFFTOWN, NC 27040 |
| 445. | 0605 | 12/16/70 | 645 E. VILLARD DICKINSON, ND | RAKOWSKI TRUST, ATTN: GLADYS M. RAKOWSKI | 830 2ND AVENUE EAST, APT. 108 DICKINSON, ND 58601 |
| 446. | 0124 | 12/10/75 | 104 20TH AVE SW MINOT, ND | GARY LINDQUIST | P.O. BOX 1576 MINOT, ND 58702-1576 PHYSICAL ADDRESS: 1625 4TH STREET SW MINOT, ND 58701-6205 |
| 447. | 0750 | 12/01/00 | HWY 2 WEST RUGBY, ND | JAMES BAUER | 228 2ND STREET SE RUGBY, ND 58368 |
| 448. | 0579 | 1/21/1975 | 521 2ND ST. WEST WILLISTON, ND | OKSOL FAMILY TRUST | C/O FIRST NATIONAL BANK & TRUST CO., TRUSTEE PO BOX 1827 WILLISTON, ND  58802-1827 |
| 449. | 0173 | 08/01/94 | 504 GALVIN RD BELLEVUE, NE | EXCEL PROPERTIES LLC C/O EDUARDO J. ROMERO | P. O. BOX 7143 OMAHA, NE  68107 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 450. | 0307 | 9/27/1977 | 48TH & HARTLEY LINCOLN, NE | ROBERT AND MARIA RICHTER | 1224 PELICAN BAY LINCOLN, NE 68528 |
| 451. | 0143 | 02/01/84 | 1026 S 13TH ST NORFOLK, NE | NEBRASKSLAND PETROLEUM | PO BOX 602 NORFOLK, NE 68701 BRAD MERCHANT |
| 452. | 0055 | 09/01/02 | 13908 S PLAZA OMAHA, NE | M. P. INVESTORS PARTNERSHIP | C/O THE LUND COMPANY 120 REGENCY PARKWAY, SUITE 116 OMAHA, NE 68114 MARK S. COVERT, SENIOR PROPERTY MANAGER |
| 453. | 0070 | 10/15/71 | 1902 N. 90TH ST OMAHA, NE | MARATHON PROPERTIES, LLC | 11222 DAVENPORT ST. OMAHA, NE 68154 |
| 454. | 0808 | 02/01/97 | 43 WASHINGTON ST CONWAY, NH | GERARD L. COTE AND JOYCE A. COTE | 43 FAIRVIEW AVENUE CONWAY, NH 03818-6007 |
| 455. | 1228 | 03/01/87 | 2522-24 BURLINGTON BURLINGTON NJ | SILO MALL INC., PAUL G. CURCILLO | 550 PINETOWN ROAD P.O. BOX 165 FORT WASHINGTON, PA 19034 |
| 456. | 0908 | 10/01/79 | HWY 35 & 5TH AVE NEPTUNE CITY, NJ | HOWARD WALTER | 55 OCEAN AVE., APT 11C MONMOUTH BEACH, NJ 07750 |
| 457. | 1031 | 07/08/74 | 2576 TILTON RDPLEASANTVILLE, NJ | DONALD J. MARINO, CBP EQUITIES, LP | P.O. BOX 52428 ATLANTA, GA 30355 |
| 458. | 0489 | 09/01/91 | 1100 GATEWAY BLVD WESTVILLE, NJ | AN'S 1000 GATEWAY, LLC | 309 HIGHLAND AVE. PALISADES PARK, NJ  07650 CONTACT: JOHN AN |
| 459. | 0839 | 11/01/98 | 4600 U S HWY 50 EAST CARSON CITY, NV | 50 COMMERCE CENTER, LLC | PO BOX 2826 MINDEN, NV 89423 CONTACT: VICKI HONE |
| 460. | 0085 | 08/01/01 | 2180 PINION ROAD ELKO, NV | JULIE ANN DEBENHAM | 2960 C STREET, SUITE 202 ANCHORAGE, NV 99503 |
| 461. | 0830 | 01/01/03 | FOLDER NO. 2136-24 HENDERSON, NV | DAN ZACK | UNION PACIFIC RAILROAD COMPANY, REAL ESTATE DEPARTMENT 1800 FARNMAN ST. OMAHA, NE 68102 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 462. | 1173 | 07/10/00 | 1055 S ROCK BLVD. SPARKS, NV | DONALD W. BALDWIN | BALDWIN, INC. 865 SO. ROCK BLVD. SPARKS, NV 89431 SHERRY PRINGLE |
| 463. | 0144 | 11/01/92 | 1050-54 HARLEM RD CHEEKTOWAGA, NY | JUDITH CASTINE & PETER MARCHANT | 5572 WOODBINE CT. WILLIAMSVILLE, NY 14221 |
| 464. | 0259 | 06/01/02 | 5885 S TRANSIT RD LOCKPORT, NY | ROBERT MILLER CONSTRUCTION, INC. | 6404 ROBINSON RD. PO BOX 480 LOCKPORT, NY 14095 |
| 465. | 0866 | 11/01/00 | 157 BRACKEN ROAD MONTGOMERY, NY | JAMIL SIMON | APC CAPITAL PARTNERS, LLC 60 MADISON AVE, STE. 1215 NEW YORK, NY 10010 CONTACT: RONA TROKIE |
| 466. | 1002 | 11/01/60 | 3645 W HENRIETTA RD ROCHESTER, NY | J. KHEEL | 407 GOLDEN BEACH DRIVE GOLDEN BEACH, FL 33160 (WINTER ADDRESS); 245 E. 35TH, APT. 3F NEW YORK, NY 10016 (SUMMER ADDRESS) |
| 467. | 1055 | 02/01/74 | 160 SCHENECTADY WATERVLIET, NY | AJIT S. KHANUJA | 1444 MASSACHUSETTS AVE. STE 308 TROY, NY 12180 |
| 468. | 0286 | 12/01/98 | 3218-3240 TRANSIT RD WEST SENECA, NY | RUSSELL C. CHRISTOPHER, PRESIDENT | BLOSSOM COMMERCIAL DEVELOPMENT, INC. 9531 COBBLESTONE DR. CLARENCE, NY 14031 |
| 469. | 0369 | 06/01/81 | 27 S BROAD STWHITESBORO, NY | PAUL YARWOOD | COLONIAL SHOPPING CENTER LLC 8 SYMPHONY PLACE WHITESBORO, NY 13492 |
| 470. | 1102 | 01/01/98 | 552 CANTON BLVD. AKRON, OH | EASTGATE ELLET PLAZA | 526 CANTON ROAD AKRON, OH  44312 |
| 471. | 1265 | 10/01/89 | 1210 WASHINGTON BLVD BELPRE, OH | MOORE ENTERPRISES | 945 CHERRY TREE DRIVE BELPRE, OH 45714 CONTACT: MORELLA OR BERNARD H. MOORE |

Exhibit O-1

**SCHEDULE OF ASSUMED UNEXPIRED LEASES**

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 472. | 1147 | 04/15/95 | 2700 ATLANTIC BLVD CANTON, OH | JOHN F. STOFFER | 5399 JOSEPHINE CIRCLE NW N. CANTON, OH 44720; 2700 ATLANTIC BLVD. NE CANTON, OH 44705 |
| 473. | 0370 | 11/01/90 | 834 OHIO PIKE CINCINNATI, OH | TZG III, LLC | C/O ZIEGLER GROUP 1720 WILDCAT BLVD., STE 200 BURLINGTON, KY 41005 |
| 474. | 1158 | 06/01/88 | 6212 GLENWAY AVE CINCINNATI, OH | PARKCREST PARTNERS LLC | 7896 FINLEY LANE CINCINNATI, OH  45242 CONTACT: PAM MIDDENDORFF |
| 475. | 0179 | 05/10/76 | 2757 S. HIGH ST. COLUMBUS, OH | LEON SEATON | HWY. 104 W P.O. BOX 4085 DYERSBURG, TN 39024 |
| 476. | 0343 | 02/01/03 | N. 4TH & E. LINCOLN COLUMBUS, OH | JAMES GRIFFIN, BISHOP OF THE DIOCESE OF COLUMBUS | 198 E. BROAD STREET COLUMBUS, OH 43215 ATTN: REV. WILLIAM METZGER |
| 477. | 0422 | 08/01/01 | 1034 HARRISBURG PIKE BLVD COLUMBUS, OH | ADRIANNE SUTTON C/O LEON SUTTON | 2600 NETHERLAND AVE., SUITE 3102 RIVERDALE, NY 10463 |
| 478. | 0447 | 10/01/83 | 3654 CLEVELAND COLUMBUS, OH | MM & AA LLC C/O MCGUFFY MARKET | 1066 E HUDSON STREET COLUMBUS, OH  43211 |
| 479. | 0899 | 12/01/92 | 2901 E. 4TH AVE. COLUMBUS, OH | RALSTON INDUSTRIES, INC. | 2901 E. 4TH AVENUE COLUMBUS, OH 43219 |
| 480. | 1023 | 07/01/03 | 8846 STATE ROUTE 66 UNIT C DEFIANCE, OH | SHORT NORTH PROPERTIES, LTD. | P.O. BOX 338 DEFIANCE, OH 43512 CONTACT: TRICIA SPEISER |
| 481. | 0548 | 01/01/93 | 209 N WOOSTER AVE DOVER, OH | A. PAUL & CAROL J. GIANNOBILE | 5088 RACE ROAD NW DOVER, OH 44622 |
| 482. | 1234 | 01/01/71 | 4930 DIXIE HWY. FAIRFIELD, OH | W.H. LOVELL | 4126 BEDFORD AVE. WINTER HAVEN, FL  33884-5208 |
| 483. | 0088 | 01/01/96 | 1109 TIFFIN AVEFINDLAY, OH | GUY R. LYON TRUST, LYON ENTERPRISES | 1101 GRACELAND AVENUE FINDLAY, OH 45840 |

43

**Exhibit O-1**

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 484. | 0385 | 03/01/56 | 1200 DICKINSON ST FREMONT, OH | SPRING REALTY GROUP, ATTN BRIAN SPRING | 303- 14TH STREET N.E. CANTON, OH 44714 |
| 485. | 0561 | 07/01/88 | 1151 STONE DR C-3 HARRISON, OH | JOHN AND JULIE ENNEKING, ENNEKING UNLIMITED | 10958 MOCKERNUT DRIVE HARRISON, OH 45030 |
| 486. | 0364 | 02/01/80 | 3613 WILMINGTON PK KETTERING, OH | JAMES R. CHARLTON | 6804 WEMBLEY CIRCLE DAYTON, OH 45459 |
| 487. | 1125 | 02/18/74 | 1550 COLORADO ST LORAIN, OH | MAFA, INC. | BP TOWER 200 PUBLIC SQUARE, SUITE 28-4000 CLEVELAND, OH 44114 |
| 488. | 0165 | 07/01/88 | 354 N LAKE ST MADISON, OH | JAMES R. WEISS, EQUIGROWTH FINANCIAL PLANNING | 7446 TRUMAN COURT MENTOR, OH 44060 |
| 489. | 1252 | 02/23/56 | 1699 W 4TH ST MANSFIELD, OH | SPRING REALTY GROUP, ATTN BRIAN SPRING | 303- 14TH STREET N.E. CANTON, OH 44714 |
| 490. | 1272 | 11/01/02 | 1085-D READING RD MASON, OH | KINGS MASON PROPERTIES, LTD. | C/O HENKLE-SCHUELER & ASSOCIATES 3000-G HENKLE DRIVE LEBANON, OH 45036 ATTN: SHANNON MCCOWAN, PROPERTY MANAGER |
| 491. | 0174 | 03/01/87 | 967 STATE RT 28 MILFORD, OH | HARRY KAPOURALES | 3924 ORCHARD AVENUE CINCINNATI, OH 45236 |
| 492. | 0727 | 12/01/96 | 3766 MONTGOMERY NORWOOD, OH | LINDA GENTRY | 11833 MANGROVE LANE CINCINNATI, OH 45246 |
| 493. | 1011 | 05/01/93 | 6277 PEARL ROAD PARMA HEIGHTS, OH | HELEN ALEXY, AG & G COMPANY | 7444 N. LINDEN LANE PARMA, OH 44130-5805 |
| 494. | 0046 | 03/01/91 | 2337 GALLIA PORTSMOUTH, OH | LUCAS MANAGEMENT, LLC, ATTN: TOM MESSENGER | 276 KIMBERLY CIRCLE FAIRMONT, WV 26554 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 495. | 0145 | 04/07/81 | 1751 BRICE ROAD REYNOLDSBURG, OH | RYAN MASON DBA/ RYLEE LTD, C/O RYLEE PROPERTY MANAGEMENT | P.O. BOX 2201 WESTERVILLE, OH  43086 |
| 496. | 0526 | 12/01/93 | 2296 S YELLOW SPRINGS ROAD SPRINGFIELD, OH | ROBERT M. HOUGH, D/B/A WAYSIDE TAVERN | 549 W. POSSUM ROAD SPRINGFIELD, OH 45506 |
| 497. | 0233 | 05/01/72 | 4423 SUNSET BLVD.STEUBENVILLE, OH | RUTH PEARLMAN | 20346 VIA MANTUA NORTHRIDGE, CA 91326 |
| 498. | 0933 | 07/01/99 | 5405 TELEGRAPH TOLEDO, OH | EMCH HOLDINGS, LLC | 5405 TELEGRAPH, RD TOLEDO, OH  43612 |
| 499. | 0882 | 07/01/00 | 18807 MILES ROAD WARRENSVILLE HEIGHTS, OH | KEITH D. SCHWARTZ, NICOLE BRAYDEN REAL ESTATE | 18807 MILES ROAD WARRENSVILLE HEIGHTS, OH 44128 |
| 500. | 0036 | 09/01/95 | 11756 STATE RT 41 WEST UNION, OH | ROBERT CANTRELL | P.O. BOX 175 WINCHESTER, OH 45697 |
| 501. | 0146 | 01/26/99 | 630 N BROADWAY ADA, OK | RUFUS R. SWEENEY, JR., SWEENEY INVESTMENTS | 800 SOUTH RENNIE ADA, OK 74820 |
| 502. | 0327 | 06/15/79 | 3212 MAIN ST ALTUS, OK | L. LORENE WELLS | 3218 SOUTHRIDGE ESTATES FT. SMITH, AR 72916 CONTACT: SHANNON WELLS |
| 503. | 0791 | NO LEASE IN FILE | 211 OKLAHOMA BLVD. ALVA, OK | LYNN CHAFFEE, CHAFFEE PROPERTIES | 903 LOCUST ST. ALVA, OK 73717 |
| 504. | 0416 | 06/15/79 | 2416 N COMMERCE ST ARDMORE, OK | L. LORENE WELLS | 3218 SOUTHRIDGE ESTATES FT. SMITH, AR 72916 CONTACT: SHANNON WELLS |
| 505. | 0064 | 04/01/98 | 3813 E TUXEDO BLVD BARTLESVILLE, OK | DARRELL LUNSFORD AND CHRISTINE HUFFMAN, BCD PROPERTIES | 326 RIDGECREST COURT BARTLESVILLE, OK 74006 |
| 506. | 0614 | 07/01/83 | 215 NORTH 5TH CHICKASHA, OK | VERNICE SMITHEN | 112 MORNINGSIDE DRIVE CHICKASHA, OK 73018 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 507. | 0263 | 10/01/00 | 4309 S.E. 15TH ST DEL CITY, OK | CT DEL CITY, LLC | P.O. BOX 49993 LOS ANGELES, CA 90049 |
| 508. | 0753 | NO LEASE IN FILE | 3113 WESTSIDE DRIVE DURANT, OK | MILTON TAYLOR JR., JR'S USED TRUCKS | P.O. BOX 932 DURANT, OK 74702 PHYSICAL ADDRESS: 3113 WESTSIDE DRIVE DURANT, OK 74701 |
| 509. | 0262 | 10/01/79 | 5102 W OWEN K. GARRIOT RD. ENID, OK | L. LORENE WELLS | 3218 SOUTHRIDGE ESTATES FT. SMITH, AR 72916 CONTACT: SHANNON WELLS |
| 510. | 0332 | 12/01/88 | 1807 S.W. 11TH ST.LAWTON, OK | DONALD E. GASKINS | GASKINS & ASSOCIATES 4645 WEST GORE BLVD., SUITE G LAWTON, OK 73505 |
| 511. | 0029 | 03/01/00 | 1200 S. MAIN MC ALESTER, OK | FRANCIS D. STIPE, STIPE INVESTMENTS LLC. | P.O. BOX 728 MCALESTER, OK 74502 |
| 512. | 0479 | 11/06/72 | 830 "D" ST NE MIAMI, OK | KC JEFFRIES | 1903 WINDBERRY PATH ROUND ROCK, TX 78665 |
| 513. | 0448 | 12/01/74 | 1221 N. BROADWAY MOORE, OK | MR. STAVROS KOLKAS | 5816 NORTHWEST 90TH OKLAHOMA CITY, OK 73112 CONTACT: DEBI NEW |
| 514. | 0345 | 12/01/92 | EASTSIDE BLVD. MUSKOGEE, OK | BAILEY DAVIS | 701 INDEPENDENCE MUSKOGEE, OK 74403 |
| 515. | 0415 | 01/01/98 | 1101 W. OKMULGEE MUSKOGEE, OK | ASPEN LAND & EXPLORATION CO. (1/2 OWNER) | P.O. BOX 4335 TULSA, OK 74159 |
| 516. | 0034 | 05/01/88 | 5401 S WESTERN OKLAHOMA CITY, OK | WALKER-FRANKLIN PARTNERSHIP C/O SIDNEY FRANKLIN | 8388 DELL OAK COVE GERMANTOWN, TN 38139 |
| 517. | 0376 | 01/01/87 | 3025 N. MCARTHUR OKLAHOMA CITY, OK | PATRICK H. HENDERSON | 7509 NW 38TH ST. BETHANY, OK 73008 |
| 518. | 0619 | 04/01/90 | 3140 N.W. 23RD ST OKLAHOMA CITY, OK | GREGORY J. PANTAGES | 2980 19TH AVENUE SAN FRANCISCO, CA 94132 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 519. | 0861 | 06/01/93 | 6501 S. HIGH OKLAHOMA CITY, OK | VICKIE FREEMAN, BRISTOL PROPERTIES, INC. | 110 N.W. 132ND ST. OKLAHOMA CITY, OK 73114 |
| 520. | 1244 | 08/01/98 | 11651 E. 76TH ST N OWASSO, OK | RANDY AND CONNIE BLACK | 2557 JACQUES DRIVE, BRH35 BONNE TERRE, MO 63628 |
| 521. | 0386 | 03/01/77 | 1300 PRINCETON PONCA CITY, OK | GUY LEMONNIER, LEMONNIER CONSTRUCTION CO. | 2000 N. 14TH PONCA CITY, OK 74601 |
| 522. | 0549 | 02/01/92 | 4010 S. OLD SAPULPA (113TH STREET) PRATTVILLE (SAND SPRINGS), OK | PRATTVILLE SHOPPING CENTER, INC. | 3 1/2 WEST 41ST STREET SAND SPRINGS, OK 74063 CONTACT: CHARLIE OR BETTY |
| 523. | 0450 | 08/01/84 | 715 MILT PHILLIPSSEMINOLE, OK | MR. BERT HARDIN | PO BOX 1203 301 MILT PHILLIPS SEMINOLE, OK 74868 CONTACT: EDWARD HARDIN, JOE HARDIN |
| 524. | 0799 | 07/01/60 | 1405 HARVEY ROAD SEMINOLE, OK | SEMINOLE INDUSTRIAL FOUNDATION | P.O. BOX 1071 SEMINOLE, OK 74818 |
| 525. | 0123 | 11/01/00 | 1924 N. KICKAPOO SHAWNEE, OK | WARREN W. THOMAS, INTERVEST DEVELOPMENT LP. | 23 E. 9TH STREET, STE. 418 SHAWNEE, OK 74801 |
| 526. | 1253 | 07/22/86 | 624 E 6TH ST STILLWATER, OK | L. LORENE WELLS | 3218 SOUTHRIDGE ESTATES FT. SMITH, AR 72916 CONTACT: SHANNON WELLS |
| 527. | 0985 | 06/01/01 | 4380 S. 91ST EAST AVE TULSA, OK | MARY C. ALEXANDER TRUST C/O ROBERT O. LAIRD | 4200 EAST SKELLY DRIVE, SUITE 252 TULSA, OK 74135 |
| 528. | 0234 | 02/04/74 | 5804 N.W 63RD ST WARR ACRES, OK | THE HARROZ FAMILY 63RD ST. PARTNERSHIP NO. 1, LP | C/O MICKEY HOMSEY P.O. BOX 718 OKLAHOMA CITY, OK, 73101 |
| 529. | 0527 | 07/01/04 | 4231 OKLAHOMA AVENUE "B" WOODWARD, OK | GARY WHITCOMB, NELLIE WHITCOMB TRUST | P.O. BOX 1716 WOODWARD, OK 73802 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 530. | 0705 | 04/01/60 | 2705 12TH ST BAKER, OR | CAROL J. BEAVERS | 10029 STARDUST DRIVE BOISE, IDAHO 83701 |
| 531. | 0713 | 03/01/80 | EAST M & HALL ST LA GRANDE, OR | ROBERT AND BEVERLY MONCRIEFF | 19270 GREENHORN ROAD GRASS VALLEY, CA  95945 |
| 532. | 0346 | 08/01/89 | 2715 SW 4TH AVENUE ONTARIO, OR | GARY E. WOOD & DONALD G. HULL | P.O. BOX 939 ONTARIO, OR 97914 |
| 533. | 0692 | 01/01/82 | 338 S.E. 2ND ST ONTARIO, OR | IRENE KENNEY | D/B/A YENNEK RENTALS PO BOX 219 ONTARIO, OR 97914 CONTACT: NANETTE COX |
| 534. | 1010 | 10/01/76 | 3570 PORTLAND ROAD SALEM, OR | JOHN H. KOLB TRUST, GENEVIEVE KOLB, TRUSTEE | 1955 DALLAS HWY. NW, APT. 925 SALEM, OR 97304 |
| 535. | 0999 | 01/01/62 | RT 9 & 119N GREENSBURG, PA | LOUIS R. BATTISTELLA, ADAM EIDEMILLER, INC. | 56 SHERATON DR., SUITE 100 GREENSBURG, PA 15601 |
| 536. | 0887 | 07/25/79 | 600 S HENDERSON RDKING OF PRUSSIA, PA | RICHARD CARR, 600 HENDERSON ASSOCIATES, L.P. | 1125 ROSEGLEN ROAD GLADWYNE, PA 19035 |
| 537. | 1235 | 01/01/00 | 915 STRICKLER RD #7 MANHEIM, PA | RAPHO ASSOCIATES C/O HORST REALTY | 205 GRANITE RUN DRIVE, STE 280 LANCASTER, PA 17601 CONTACT: LINDA TUTTLE |
| 538. | 0599 | 06/03/71 | 1925 EDMOND HWY CAYCE, SC | CECIL G. FORD | 417 PRINCE WALES DRIVE COLUMBIA, SC  29209 |
| 539. | 0508 | 07/01/85 | HWY 501 E. CONWAY, SC | J. CHARLES RAY, RAY REALTY, INC. | P.O. BOX 416 CONWAY, SC 29526 |
| 540. | 1092 | 10/01/87 | 1007 MAULDIN RD GREENVILLE, SC | J. CALVIN SUMMEY, HEARTHSIDE HOMES | P.O. BOX 7 MAULDIN, SC 29662 CONTACT: BUDDY SUMMEY |
| 541. | 0598 | 06/01/80 | HIGHWAY 52 NORTH KINGSTREE, SC | R.M. ODOM | 1009 NORTH MAIN ST. DARLINGTON, SC 29532 |
| 542. | 0671 | 08/01/90 | 701 MEMORIAL PARK LANCASTER, SC | JEFFREY ALAN UNDERWOOD | 104 EAST ERWIN STREET WAHALLA, SC 29691 |

**Exhibit O-1**

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 543. | 0289 | 05/01/94 | 10TH AVE. & OCALA MYRTLE BEACH, SC | E.N. AND J. HERRING | 5704 LONG LEAF DRIVE MYRTLE BEACH, SC 29577 |
| 544. | 0254 | 06/01/89 | 844 JOHN CALHOUN DR ORANGEBURG, SC | EDWIN S. EARGLE II | 43 NORTHLAKE ROAD COLUMBIA, SC 29223 |
| 545. | 0597 | 03/01/96 | FORDVILLE ROAD RIDGELAND, SC | R. B. PREACHER, SR. | 617 BAILEY LANE RIDGELAND, SC 29936 |
| 546. | 0288 | 07/01/76 | 1287 FLINT ST. ROCK HILL, SC | BAXTER SIMPSON, JR. | 1324 EAST BLACK ST. ROCK HILL, SC 29730-5944 |
| 547. | 0126 | 09/01/99 | 409 E. 5TH NORTH ST SUMMERVILLE, SC | TIDELAND INDUSTRIAL PARK, LLC | 411 E. 5TH NORTH ST., #3 SUMMERVILLE, SC 29483 |
| 548. | 0517 | 08/14/95 | HWY US 76 EAST SUMTER, SC | BOBBY HANNA | 190 LIN RAN LANE SUMTER, SC 29153 |
| 549. | 1247 | 02/01/92 | 1300 W 41ST ST SIOUX FALLS, SD | SWIFT PROPERTIES | 405 N KIWANIS AVE SIOUX FALLS, SD  57104 |
| 550. | 0600 | 04/01/93 | 1649 S LEE HWY CLEVELAND, TN | BRANCH BANKING & TRUST COMPANY | 127 WEST WEBSTER STREET WHITEVILLE, NC  28472 |
| 551. | 0076 | 11/01/03 | 1975 N WASHINGTON COOKEVILLE, TN | DEALMAKERS | 233 WEST STEVENS STREET COOKEVILLE, TN 38501 |
| 552. | 1123 | 06/01/04 | 60 GERMANTOWN COURT, SUITE 105CORDOVA, TN | DRA CRT GERMANTOWN CENTER LP | C/O COLONIAL PROPERTIES TRUST 51 GERMANTOWN COURT, SUITE 102 MEMPHIS, TN 38018 |
| 553. | 0349 | 04/01/98 | 502 LANTANA RD CROSSVILLE, TN | RAYMOND K. MAYS AND KIERSTEN MAYS | 15 IRIS LANE CROSSVILLE, TN 38555 |
| 554. | 1292 | 04/01/80 | 3450  RINGGOLD RD. EAST RIDGE, TN | RICK COULTER AND KATIE BOYD | 4209 RINGGOLD ROAD CHATTANOOGA, TN 37412 |
| 555. | 0639 | 08/01/04 | 2805 ROANE STATE HIGHWAY HARRIMAN, TN | ROBERT BROWN | 2809 ROANE STATE HIGHWAY HARRIMAN, TN 37748 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCEMENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 556. | 0299 | 08/01/95 | 2684 W CENTRAL AVE JACKSBORO, TN | AYERS, CAMPBELL & WEIR | P.O. BOX 1467 LAFOLLETTE, TN 37766; CONTACT: PAUL PROVINS 2309 JACKSBORO PK, SUITE 1 LAFOLLETTE, TN 37766 |
| 557. | 0964 | 12/01/97 | 3315 HWY 45 JACKSON, TN | ALATEN PROPERTIES | P.O. BOX 2177 MUSCLE SHOALS, AL 35662 |
| 558. | 0365 | 03/01/87 | 2601 W. MARKET ST. JOHNSON CITY, TN | KATHRYN HALL, PRESIDENT, UNAKA REALTY CO., INC. | 1410 LESTER HARRIS ROAD JOHNSON CITY, TN 37601 |
| 559. | 1266 | 05/01/82 | 5644 FT. HENRY DR. KINGSPORT, TN | LOUIS MILHORN AND JOHN TODD PIERCE | 4336 FAIRLAWN DRIVE KINGSPORT, TN 37663 |
| 560. | 0090 | 08/01/01 | 2822 'SCHAAD ROAD KNOXVILLE, TN | MICHAEL E. SCHAAD, SCHAAD PROPERTIES | P.O. BOX 51058 KNOXVILLE, TN 37950-1058 |
| 561. | 0421 | 06/01/00 | 216 ANDREW JOHNSON KNOXVILLE, TN | JOHN K. CHESNEY | 165 BICENTENNIAL DR. JEFFERSON CITY, TN  37760 |
| 562. | 0986 | 12/01/01 | US HWY 70 & W BADDOR LEBANON, TN | DEALMAKERS | 233 WEST STEVENS STREET COOKEVILLE, TN 38501 |
| 563. | 0348 | 04/01/70 | 2424 E. BROADWAY MARYVILLE, TN | JERRY JO BRIDWELL | 1635 LAKEFRONT RD. LAKE OSWEGO, OR 97034 |
| 564. | 0417 | 08/01/96 | 3171 N THOMASMEMPHIS, TN | ALATEN PROPERTIES | P.O. BOX 2177 MUSCLE SHOALS, AL 35662 |
| 565. | 0571 | INFO NOT IN FILE | 7 W CALHOUN AVE MEMPHIS, TN | SUGAR SERVICES CORP. | P.O. BOX 2153 DEPT 3350 BIRMINGHAM, AL 35287-3350 |
| 566. | 1018 | 11/01/92 | 2535 COVINGTON PIKE MEMPHIS, TN | COLONIAL PARTNERS, LLC C/O MORRIS J. KRIGER | 355 SHADY WOODS COVE MEMPHIS, TN 38120 |
| 567. | 1175 | 03/10/88 | 4405 ELVIS PRESLEY MEMPHIS, TN | BOYD PROPERTIES | 1825 LITTLEJOHN ROAD MILLINGTON, TN 38053 |
| 568. | 0255 | 12/01/96 | 3789 E. ANDREW JOHNSON HIGHWAY MORRISTOWN, TN | BYERLEY RENTALS | P.O. BOX 692 MORRISTOWN, TN 37815 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 569. | 0183 | 03/01/99 | 903 MERCURY RD MURFREESBORO, TN | MS. FRANCES MCKNIGHT, MCKNIGHT ASSOCIATES | 1811 OXFORD DRIVE MURFREESBORO, TN 37129; 1314 MEDICAL CENTRAL PARKWAY |
| 570. | 0965 | 02/01/98 | 4111 CHARLOTTE AVE NASHVILLE, TN | WALNUT ST. PARTNERS | 9650 CALVIN AVE. NORTHRIDGE, CA 91324; CONTACT SON WILLIAM MANN 1359 BIRCH AVE ESCONDIDO, CA 92027 |
| 571. | 0387 | 06/01/97 | 637 COSBY HWY NEWPORT, TN | BYERLEY RENTALS | P.O. BOX 692 MORRISTOWN, TN 37815 |
| 572. | 0453 | 04/01/95 | 624 DOLLY PARTON PK SEVIERVILLE | WAYNE AYERS | 209 BIRCHWOOD LANE SEVIERVILLE, TN 37862 CONTACT: BARBARA AYERS |
| 573. | 0509 | 03/01/83 | 508 N MAIN SWEETWATER, TN | TMKT INVESTMENT | 111 WALNUT STREET SWEETWATER, TN 37874 |
| 574. | 0796 | 02/01/96 | 911 S COLLEGE ST WINCHESTER, TN | JOE PATTERSON | 911 SOUTH COLLEGE STREET WINCHESTER, TN 37398 |
| 575. | 1200 | 07/01/03 | 512 E. ST. ELMO AUSTIN, TX | COMMERCIAL SQUARE, LTD. | 8307 BAGBY DRIVE AUSTIN, TX 78724 CONTACT CAREY "REY" LEGETT, III |
| 576. | 0193 | 03/01/95 | 7970 COLLEGE BEAUMONT, TX | MARTHA ROYALL | 957 CENTRAL BEAUMONT, TX 77706 |
| 577. | 0754 | 05/01/90 | TENAHA HWY 1 CENTER, TX | BORDERS SELF STORAGE | P.O. BOX 247 CENTER, TX 75935 |
| 578. | 0672 | 08/01/03 | 11691 HWY 105 EAST CONROE, TX | JAMES OR JERRY HENRY, J & B AUTO SUPPLY | 11635 HWY. 105 EAST CONROE, TX 77306 |
| 579. | 0195 | 09/01/97 | 2964 LBJ FREEWAYDALLAS, TX | AM LBJ PLAZA, LLC | 400 NORTH ST PAUL STREET, STE 550 DALLAS, TX  75201 CONTACT: YANEYS LARA 5435 NORTH GARDLAND AVENUE, SUITE 140-312 GARLAND, TX 75040 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 580. | 0053 | 02/15/74 | 1821 BELT LINE RD GARLAND, TX | EMERY FAMILY PARTNERSHIP | 6310 MADISON LINCOLN, NE 68507; (OR) 7131 N. 40TH ST. PARADISE VALLEY, AZ 85253 |
| 581. | 0291 | 08/01/89 | 4917 STONEWALL ST GREENVILLE, TX | JWSP PROPERTIES C/O SUE ENGLISH | 4511 DEVON COURT HOUSTON, TX 77027 |
| 582. | 1148 | 05/01/78 | 836 PIPELINE ROAD HURST, TX | LYLE EMERY | 6310 MADISON LINCOLN, NE 68507 DONNA EMERY |
| 583. | 0730 | NO LEASE IN FILE | 204 KELLER RD MINERAL WELLS, TX | MEYERS LAND CO. | P.O. BOX 1237 MINERAL WELLS, TX 76067 |
| 584. | 0394 | 11/01/68 | 3901 HWY 75H SHERMAN, TX | RUSS SPEARS | 727 WESTWOOD DRIVE SHERMAN, TX 75092 |
| 585. | 0528 | 02/01/04 | 7590 NORTH GENERAL BRUCE DRIVE TEMPLE, TX | A.C. BOSTON | 12435 FM 2305 BELTON, TX 76513 |
| 586. | 0022 | 12/01/95 | 3102 NEW BOSTON RD TEXARKANA, TX | CURRIE AND WALKER, LLC, ATTN: JIM WALKER | 5366 ESTATE OFFICE DRIVE MEMPHIS, TN 38119 CONTACT: BRAD CURRIE |
| 587. | 0751 | 06/01/97 | 2718 S LAKE DR TEXARKANA, TX | FREEMAN ENTERPRISES | MONICA BROUSSARD #9 SWEETBRUSH TEXARKANA, TX 75503 |
| 588. | 0602 | 08/15/03 | 2906 N. CENTRAL EXWY WICHITA FALLS, TX | FIRST INTERNATIONAL BANK | ATTN: M DUMAN 1912 AVENUE K, STE 100 WICHITA FALLS, TX 75074 |
| 589. | 0492 | 12/01/02 | 2110 ORCHARD DR. BOUNTIFUL, UT | BLAINE MAJOR | 43 W. 3100 SOUTH BOUNTIFUL, UT 84010 |
| 590. | 0243 | 06/01/98 | 50 W 200 NORTH KAMUS, UT | BRE, LLC | 7359 N. TALL OAKS DR. PARK CITY, UT 84098 |
| 591. | 0951 | 01/01/86 | 1714 N. MAIN ST. LAYTON, UT | DGH ASSOCIATES LTD. | P.O. BOX 1330 SPRING VALLEY, CA 91979-1330 |
| 592. | 0418 | 12/01/81 | 460 W 500 SOUTH NEPHI, UT | UTAH FOAM, INC. | P.O. BOX 70838 SALT LAKE CITY, UT 84170 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 593. | 0292 | 01/01/88 | 2375 LINCOLN OGDEN, UT | RICHARD G. GEISLER, LARIAT CORPORATION | P.O. BOX 313 KAYSVILLE, UT 84037 |
| 594. | 0640 | 12/16/92 | 1085 WALL AVE.OGDEN, UT | JOYCE VAN WOERKOM | 3980 CASA GRANDE WAY SAN JOSE, CA 95118 |
| 595. | 0775 | 07/01/04 | 621 W 21ST ST OGDEN, UT | SCOULAR CO. | 2727 PENNSYLVANIA AVE. OGDEN, UT 84409 |
| 596. | 1159 | 03/01/04 | 3150 WALL AVENUE OGDEN, UT | C. SAMUEL GUSTAFSON, CAPITOL INDUSTRIES, INC. | P.O. BOX 65501 SALT LAKE CITY, UT 84165; 2880 SOUTH MAIN STREET SUITE #100 SALT LAKE CITY, 84115 |
| 597. | 1223 | 09/01/92 | 731 EAST 1000 SOUTH OREM, UT | C. ROBERT KALLAS, CSM, MALL MANAGER | 575 E. UNIVERSITY PARKWAY, SUITE N-260 OREM, UT 84097 |
| 598. | 0023 | 11/01/87 | 1900 W 4000 SOUTH ROY, UT | C.C. PARTNERSHIP C/O JAY NYE | 3800 S. 1900 WEST, #302 ROY, UT 84067 |
| 599. | 1145 | 07/01/98 | 50 E. 100 NORTH SPANISH FORK, UT | PRESTON HUGHES, P & M INVESTMENTS, LLC | 92 NORTH MAIN SPANISH FORK, UTAH 84660 |
| 600. | 0650 | 04/01/97 | 220 SOUTH  200 WEST #A TREMONTON, UT | OLD EPHRAIM EXPRESS | 220 S. 200 W TREMONTON, UT 84337-1808 |
| 601. | 0112 | 05/01/04 | 1793 W 7800 SOUTH WEST JORDAN, UT | AL BELT, JORDAN SQUARE S.C. C/O DIRECT MGMT RES. | P. O. BOX 400 WEST JORDAN, UT  84084 |
| 602. | 0067 | 11/01/89 | 1810 W 3500 SOUTH WEST VALLEY CITY, UT | TRI-STAR PLAZA | P.O. BOX 65305 SALT LAKE CITY, UT 84165 |
| 603. | 0673 | 10/04/93 | 518 SECOND AVE E. BIG STONE GAP, VA | LC COUGHLIN | 216 EAST 1ST ST. N. BIG STONE GAP, VA 24219 |
| 604. | 1248 | 08/01/93 | 199 SANDY COVET DANVILLE, VA | PAUL BENJAMIN WELLS | 5849 WELLS HOLLOW RD. HAMPTONVILLE, NC 27020 |
| 605. | 0621 | 05/15/87 | 901 S MAIN ST. EMPORIA, VA | G. WESLEY ALLEN | P.O. BOX 304 EMPORIA, VIRGINIA 23847 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|------|------|------|------|------|------|
| 606. | 0052 | 08/01/03 | 7599 CAROLLTON PIKE GALAX, VA | LARRY E. EDWARDS | 7526 CARROLLTON PIKE, SUITE 2 GALAX, VA 24333 |
| 607. | 0155 | 02/01/01 | 2410 GREENSBORO RD MARTINSVILLE, VA | F&Y INVESTMENTS LLC | P.O. BOX 9006 WINTER HAVEN, FL 33883 |
| 608. | 0030 | 11/01/96 | 7917 HALPRIN DR NORFOLK, VA | HASSELL & NORMA BARNES | PO BOX 61473 VIRGINIA BEACH, VA 23466 PHYSICAL ADDRESS: 624 MOSSY CUP DR VIRGINIA BEACH, VA 23462 |
| 609. | 0956 | 03/09/85 | 3555 S CRATER RD.PETERSBURG, VA | FRANKLIN PROPERTIES LLC | 3000 EARLS COURT, STE 1313 WILLIAMSBURG, VA 23185 |
| 610. | 0087 | 01/01/91 | 3545 VICTORY BLVD PORTSMOUTH, VA | FLOYD M. MARTIN, JR. | 5488 NANSAMOND PARKWAY SUFFOLK, VA 23435-2115 |
| 611. | 1202 | 09/01/91 | 3619 MECHANICSVILLE PIKE RICHMOND, VA | DUNN FAMILY LIMITED PARTNERSHIP | 8025 DIANE LANE RICHMOND, VA 23227 |
| 612. | 1262 | 11/01/89 | 12336 WARDS ROAD RUSTBURG, VA | KAYE M. HARTLESS | 15265 WARDS RD. LYNCHBURG, VA 24502 |
| 613. | 0239 | 12/01/91 | 706 CAVALIER BLVD SOUTH BOSTON, VA | 706 HAMILTON BLVD, LLC | 10341 GENT COURT MANASSAS, VA 20110 |
| 614. | 0431 | 02/01/86 | 2322 WASHINGTON AVE VINTON, VA | LINDA R. POOLE | 163 ROSELAND RD. GALAX, VA 24333 |
| 615. | 0065 | 06/01/99 | 5020 RICHMOND RD WARSAW, VA | PRITCHARD & FALLIN PROPERTIES, LLC | P.O. BOX 242 CALLAO, VA 22435 |
| 616. | 1139 | 04/21/97 | 714 OHIO BELLINGHAM, WA | JFJ COMPANY | P.O. BOX 917 BELLINGHAM, WA 98227 |
| 617. | 1056 | 02/01/90 | 3411 11TH ST. BREMERTON, WA | CHANDLER INVESTMENTS C/O ROSEN SUPPLY CO. | P.O. BOX 11185 TACOMA, WA 98411 HARVEY ROSEN |
| 618. | 0843 | 11/15/00 | 22461 72ND AVE S., BLDG. #3 KENT, WA | WALTON CALWEST HOLDINGS, LLC | DBA WALTON CWWA WEST VALLEY 2, LLC 4678 WORLD PARKWAY CIRCLE ST. LOUIS, MO 63134 |

**Exhibit O-1**

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE- MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 619. | 0086 | 03/15/76 | HWY 29 SOUTH LONGVIEW, WA | A.T. AND VIRGINIA RENAUD | 101 SUNSET PL. LONGVIEW, WA 98632 |
| 620. | 0911 | 01/01/03 | 4020 EAST BROADWAY SPOKANE, WA | STACK INDUSTRIAL PROPERTIES, LLC | 2201 SIXTH AVENUE S SEATTLE, WA 98134 |
| 621. | 1263 | 04/16/90 | 208 W. FRANCIS SPOKANE, WA | B & G WYMAN ENTERPRISES, LLC | P.O. BOX 6262 SPOKANE, WA  99217 |
| 622. | 1057 | 04/06/71 | 1903 SOUTH 3RD AVE YAKIMA, WA | J AND P ALLIANCE | 9263 FARM TO MARKET ROAD BOW, WA 98232 |
| 623. | 0221 | 01/01/97 | 2432-36 LONDON ROAD EAU CLAIRE, WI | GEORGE D. PATHOS D/B/A PATHOS PROPERTIES | 2616 E. LEXINGTON BLVD. EAU  CLAIRE, WI 54701-6758 CONTACT: JIM PATHOS |
| 624. | 0194 | 12/01/66 | 326 MILITARY AVE GREEN BAY, WI | SEIDL FAMILY TRUST OF 1995 | P.O. BOX 157 LUXEMBURG, WI 54217 PHYSICAL ADDRESS: N6694 VALLEY ROAD |
| 625. | 0920 | 01/01/87 | 5340  W. LOOMIS RDGREENFIELD, WI | LOOMIS ROAD DBD, LLC | 2000 S. 4TH STREET MILWAUKEE, WI  53204 CONTACT: DAVID FERRON |
| 626. | 0035 | 07/01/82 | 3212 KENNEDY RD JANESVILLE, WI | KENNEDY ROAD, LLC | 7340 DARIN COURT DANE, WI, 53529 WILLIAM R. MCDONOUGH |
| 627. | 1113 | 11/01/97 | 2919 E AVENUE LACROSSE, WI | AUTO COLOR AND SUPPLY, INC. | 55 COPELAND AVE. LA CROSSE, WI 54603 |
| 628. | 0212 | 09/01/72 | 627 ATLAS AVE. MADISON, WI | CURTIS AND PATRICIA MARTIN | 609 MILLER AVE. MADISON, WI 53904 |
| 629. | 0293 | 05/01/92 | 814 KNAPP ST OSHKOSH, WI | HENKLE-HASSLER, LLC | 1720 WHITE SWANN DR. OSHKOSH, WI  54901 |
| 630. | 0537 | 08/01/55 | 1923 ERIE AVE SHEBOYGAN, WI | DONALD KULLMAN | 711 NORTH AVE. SHEBOYGAN, WI 53083 |
| 631. | 0218 | 11/01/97; | 5805 PACKER WAUSAU, WI | ISLAND CITY POINT, LLC | P.O. BOX 2033 WAUSAU, WI 54402-2033 |
| 632. | 0236 | 03/01/00 | 1512 S 84TH ST WEST ALLIS, WI | MANFRED NEUMANN | S43 W22570 BEEHEIM ROAD WAUKESHA, WI 53189 |

Exhibit O-1

## SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE- MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 633. | 0150 | 04/01/99 | 706 FAIRMONT FAIRMONT, WV | DEVAULT BROTHERS, LLC | 750 FAIRMONT FAIRMONT, WV 26554 CONTACT: CHARLIE DEVAULT |
| 634. | 0352 | 01/01/82 | 522 E. 29TH ST. HUNTINGTON, WV | SLATER CHARITABLE TRUST | C/O JP MORGAN BANK ATTN: CHUCK ROWLAND OH 1-1074 1111 POLARIS PKWY COLUMBUS, OH 43240 |
| 635. | 0098 | 07/22/74 | 1451 DORSEY AVE MORGANTOWN, WV | VIRDEN HOMAN FARMS | C/O ROBERT VIRDEN 109 W JACKSON ALBANY, MO  64402 CONTACT: REX A. HOMAN |
| 636. | 1114 | 03/01/92 | 2200 MAIN ST WHEELING, WV | JUSTUS, INC. | 1144 MARKET ST., SUITE 305 WHEELING, WV 26003 |
| 637. | 0780 | 10/27/71 | 441 WILLIAMS ST. BUFFALO, WY | CENTURY WAREHOUSING, INC. | PO BOX 962 LIVINGTON, MT 59047 |
| 638. | 0264 | 05/01/98 | 3320 CY AVENUE CASPER, WY | RONALD AND NORITA TRUSSELL | 2030 WELSH DRIVE CASPER, WY 82609 |
| 639. | 0319 | 11/01/97 | 5800 W. YELLOWSTONE HWY CASPER, WY | LARRY MARKLAND | 1610 NEWPORT STREET CASPER, WY 86209 |
| 640. | 0309 | 01/01/75 | 3406 PERSHING BLVDCHEYENNE, WY | HERMAN J. HEDRICK | 3415 RIDGE ROAD CHEYENNE, WY 82001-1735 |
| 641. | 0530 | 11/01/03 | 326 C-STREET CODY, WY | CENTURY WAREHOUSING, INC. | P.O. BOX 962 LIVINGSTON, MT 59047 |
| 642. | 0687 | 09/01/81 | 390 WILLOW DR EVANSTON, WY | MARVIN AND MARGARET BOLLSCHWEILER | 200 CEDAR ST. P.O. BOX 668 EVANSTON, WY 82931-0668 |
| 643. | 0025 | 07/01/98 | 3803 S DOUGLAS HWY GILLETTE, WY | ARLYN MAGNUSON | 8191 PHEASANT GILLETTE, WY 82718 |
| 644. | 0099 | 11/01/90 | 1210 S GREGORY LANE JACKSON, WY | NORRIS BROWN AND LAYNE BROWN | P.O. BOX 2972 JACKSON, WY 83001 |
| 645. | 0662 | 05/01/02 | 1414 S 2ND ST LARAMIE, WY | BELL LEASING CO. | P.O. BOX 1232 LARAMIE, WY 82070 |

**Exhibit O-1**

### SCHEDULE OF ASSUMED UNEXPIRED LEASES

| KEY | REID | LEASE COMMENCE-MENT DATE | LOCATION ADDRESS | CURRENT LANDLORD ENTITY | LANDLORD ADDRESS |
|---|---|---|---|---|---|
| 646. | 0731 | 06/01/96 | 335 S HURSCH ST RIVERTON, WY | BRECK AND SHANDA SKAGGS | 827 SKAGGS LANE RIVERTON, WY 82501 |
| 647. | 0622 | 06/16/04 | 1024 DEWAR DR ROCK SPRINGS, WY | HAFEY INVESTMENTS, LLC | 123 BROADWAY ROCK SPRINGS, WY 82901 |
| 648. | 0457 | 09/01/82 | 40 E 17TH ST SHERIDAN, WY | 17TH STREET LOT, LLC DBA LB PROPERTIES, LLC | 3 PHEASANT DRIVE SHERIDAN, WY 82801 |
| 649. | 0718 | 08/01/89 | 209 LAWSON AVE WORLAND, WY | ROY DECKER | P.O. BOX 72 WORLAND, WY 82401; 217 LAWSON AVE. WORLAND, WY 82401 |

**Exhibit O-2**

**THE TRAVELERS INDEMNITY COMPANY AND AFFILIATES INSURANCE POLICIES TO BE ASSUMED**

| POLICY YEAR | POLICY NUMBER | | LINE |
|---|---|---|---|
| 1/01/90 - 1/01/91 | 160T05759 | CSSC | WORKERS' COMPENSATION |
| 10/01/88 – 10/01/89 | 160T4629 | CSSC | WORKERS' COMPENSATION |
| 10/01/89 – 10/01/90 | 160T4629 | CSSC | WORKERS' COMPENSATION |
| 10/01/90 – 10/01/91 | 160T4629 | CSSC | WORKERS' COMPENSATION |
| 10/01/91 – 10/01/92 | 160T4629 | CSSC | WORKERS' COMPENSATION |
| 10/01/92 – 10/01/93 | 160T4629 | CSSC | WORKERS' COMPENSATION |
| 10/01/93 – 10/01/94 | 160T4629 | CSSC | WORKERS' COMPENSATION |
| 10/01/94 – 10/01/95 | 160T4629 | CSSC | WORKERS' COMPENSATION |
| 10/01/02 – 10/01/03 | 160T4629 | CSSC | WORKERS' COMPENSATION |
| 7/26/84 – 7/26/85 | 795P3493 | | GENERAL LIABILITY |
| 9/30/84 – 9/30/85 | 795P3481 | | GENERAL LIABILITY |
| | 795P347A | | GENERAL LIABILITY |
| | 795P3075 | | AUTOMOBILE |
| | 795P2865 | | GENERAL LIABILITY |
| | 795P2853 | | GENERAL LIABILITY |
| | 795P2841 | | GENERAL LIABILITY |
| | 795P320A | | WORKER'S COMPENSATION |
| | 795P3192 | | WORKER'S COMPENSATION |
| | 795P3180 | | WORKER'S COMPENSATION |
| 10/01/85 – 10/01/86 | 795P3524 | | GENERAL LIABILITY |
| | 795P3512 | | GENERAL LIABILITY |
| | 795P3500 | | GENERAL LIABILITY |
| | 795P3259 | | WORKER'S COMPENSATION |
| | 795P3247 | | WORKER'S COMPENSATION |
| | 795P3235 | | WORKER'S COMPENSATION |
| | 795P3223 | | WORKER'S COMPENSATION |
| | 795P3087 | | AUTOMOBILE |
| | 795P2889 | | GENERAL LIABILITY |

58

**Exhibit O-2**

**THE TRAVELERS INDEMNITY COMPANY AND AFFILIATES INSURANCE POLICIES TO BE ASSUMED**

| POLICY YEAR | POLICY NUMBER | LINE |
|---|---|---|
| | 795P2877 | GENERAL LIABILITY |
| 10/01/86 – 10/01/87 | 795P355A | GENERAL LIABILITY |
| | 795P3548 | GENERAL LIABILITY |
| | 795P3536 | GENERAL LIABILITY |
| | 795P3327 | WORKER'S COMPENSATION |
| | 795P3315 | WORKER'S COMPENSATION |
| | 795P3303 | WORKER'S COMPENSATION |
| | 795P3296 | WORKER'S COMPENSATION |
| | 795P3099 | AUTOMOBILE |
| | 795P2908 | GENERAL LIABILITY |
| | 795P2890 | GENERAL LIABILITY |
| 10/01/87 – 10/01/88 | 795P3597 | GENERAL LIABILITY |
| | 795P3585 | AUTOMOBILE |
| | 795P3561 | GENERAL LIABILITY |
| | 795P3352 | WORKER'S COMPENSATION |
| | 795P3340 | WORKER'S COMPENSATION |
| | 795P3339 | WORKER'S COMPENSATION |
| 10/01/88 – 10/01/89 | 795P3604 | GENERAL LIABILITY |
| | 795P3573 | GENERAL LIABILITY |
| | 795P3468 | WORKER'S COMPENSATION |
| | 795P3456 | WORKER'S COMPENSATION |
| | 795P3444 | WORKER'S COMPENSATION |
| 10/01/89 – 10/01/90 | 201T9205 | WORKER'S COMPENSATION |
| | 160T4629 | AUTOMOBILE |
| | 201T9242 | AUTOMOBILE |
| | 201T9254 | AUTOMOBILE |
| | 201T9266 | AUTOMOBILE |
| | 160T4629 | GENERAL LIABILITY |

**Exhibit O-2**

**THE TRAVELERS INDEMNITY COMPANY AND AFFILIATES INSURANCE POLICIES TO BE ASSUMED**

| POLICY YEAR | POLICY NUMBER | LINE |
|---|---|---|
| | 160T4629 | PRODUCT LIABILITY |
| | 160T4629 | WORKER'S COMPENSATION |
| | 201T9230 | WORKER'S COMPENSATION |
| 10/01/90 – 10/01/91 | 201T9205 | WORKER'S COMPENSATION |
| | 160T4629 | AUTOMOBILE |
| | 201T9242 | AUTOMOBILE |
| | 201T9254 | AUTOMOBILE |
| | 201T9266 | AUTOMOBILE |
| | 160T4629 | GENERAL LIABILITY |
| | 160T4629 | PRODUCT LIABILITY |
| | 160T4629 | WORKER'S COMPENSATION |
| | 201T9230 | WORKER'S COMPENSATION |
| 10/01/91 – 10/01/92 | 201T9205 | WORKER'S COMPENSATION |
| | 160T4629 | AUTOMOBILE |
| | 201T9242 | AUTOMOBILE |
| | 201T9254 | AUTOMOBILE |
| | 201T9266 | AUTOMOBILE |
| | 160T4629 | GENERAL LIABILITY |
| | 160T4629 | PRODUCT LIABILITY |
| | 160T4629 | WORKER'S COMPENSATION |
| | 201T9230 | WORKER'S COMPENSATION |
| | 160T9822 | GENERAL LIABILITY |
| 10/01/92 – 10/01/93 | 201T9205 | WORKER'S COMPENSATION |
| | 160T4629 | AUTOMOBILE |
| | 201T9242 | AUTOMOBILE |
| | 201T9254 | AUTOMOBILE |
| | 201T9266 | AUTOMOBILE |
| | 160T4629 | GENERAL LIABILITY |

Exhibit O-2

**THE TRAVELERS INDEMNITY COMPANY AND AFFILIATES INSURANCE POLICIES TO BE ASSUMED**

| POLICY YEAR | POLICY NUMBER | LINE |
|---|---|---|
| | 160T9822 | PRODUCT LIABILITY |
| | 160T4629 | WORKER'S COMPENSATION |
| | 219T4683 | WORKER'S COMPENSATION |
| | 221T355A | WORKER'S COMPENSATION |
| | 221T4926 | WORKER'S COMPENSATION |
| 10/01/93 – 10/01/94 | 201T9205 | WORKER'S COMPENSATION |
| | 160T4629 | AUTOMOBILE |
| | 201T9242 | AUTOMOBILE |
| | 201T9254 | AUTOMOBILE |
| | 201T9266 | AUTOMOBILE |
| | 160T4629 | GENERAL LIABILITY |
| | 160T4629 | PRODUCT LIABILITY |
| | 160T4629 | WORKER'S COMPENSATION |
| | 219T4683 | WORKER'S COMPENSATION |
| | 221T355A | WORKER'S COMPENSATION |
| | 221T4926 | WORKER'S COMPENSATION |
| 10/01/94 – 10/01/95 | 201T9205 | WORKER'S COMPENSATION |
| | 160T4629 | AUTOMOBILE |
| | 201T9242 | AUTOMOBILE |
| | 201T9254 | AUTOMOBILE |
| | 201T9266 | AUTOMOBILE |
| | 160T4629 | GENERAL LIABILITY |
| | 160T4629 | PRODUCT LIABILITY |
| | 160T4629 | WORKER'S COMPENSATION |
| | 219T4683 | WORKER'S COMPENSATION |
| | 221T355A | WORKER'S COMPENSATION |
| | 221T4926 | WORKER'S COMPENSATION |
| | 160T9822 | AUTOMOBILE |

61

**Exhibit O-2**

**THE TRAVELERS INDEMNITY COMPANY AND AFFILIATES INSURANCE POLICIES TO BE ASSUMED**

| POLICY YEAR | POLICY NUMBER | LINE |
|---|---|---|
| | 160T9822 | WORKER'S COMPENSATION |
| | 221T5818 | WORKER'S COMPENSATION |

Exhibit O-2

## AIG INSURANCE POLICIES TO BE ASSUMED

| | | INTERSTATE BAKERIES CORP. | | | | | |
|---|---|---|---|---|---|---|---|
| POLICY # | INSURED | WRITING CO. | LOB | BRC | PC | EFF. DATE | EXP. DATE |
| 4860757 | INTERSTATE BAK | N U F I CO OF PITTSBURGH PA | GL | 86 | 04 | 9708 | 9808 |
| 5616976 | INTERSTATE BAK | N U F 1 CO OF PITTSBURGH PA | GL | 02 | 35 | 0208 | 0409 |
| 5875412 | INTERSTATE BAK | COMMERCE AND INDUSTRY CO | GL | 94 | 57 | 9408 | 9508 |
| 5879796 | INTERSTATE BAK | COMMERCE AND INDUSTRY CO | GL | 94 | 57 | 9508 | 9608 |
| 7622764 | INTERSTATE BAK | N U F I CO OF PITTSBURGH PA | GL | 94 | 57 | 9108 | 9208 |
| 7624516 | INTERSTATE BAK | N U F I CO OF PITTSBURGH PA | GL | 94 | 57 | 9208 | 9308 |
| 7627434 | INTERSTATE BAK | N U F I CO OF PITTSBURGH PA | GL | 94 | 57 | 9308 | 9408 |
| 3607780 | INTERSTATE BAK | N U F I CO OF PITTSBURGH PA | FID | 02 | 35 | 0310 | 0410 |
| 4379279 | INTERSTATE BAK | NUFI CO OF PITTSBURGH PA | GL | 86 | 35 | 9108 | 9111 |
| 4382855 | INTERSTATE BAK | N U F I CO OF PITTSBURGH PA | GL | 86 | 35 | 9111 | 9211 |
| 4400949 | INTERSTATE BAK | N U F I CO OF PITTSBURGH PA | GL | 86 | 04 | 9211 | 9311 |
| 4420279 | INTERSTATE BAK | N U F I CO OF PITTSBURGH PA | GL | 86 | 04 | 9311 | 9411 |
| 4439883 | INTERSTATE BAK | N U F I CO OF PITTSBURGH PA | GL | 86 | 04 | 9411 | 9511 |
| 4455620 | INTERSTATE BAK | N U F I CO OF PITTSBURGH PA | GL | 86 | 04 | 9508 | 9608 |
| 4836913 | INTERSTATE BAK | N U F I CO OF PITTSBURGH PA | GL | 86 | 04 | 9608 | 9708 |
| 8075295 | INTERSTATE BAK | COMMERCE AND INDUSTRY CO | GL | 94 | 57 | 9608 | 9708 |
| 8079763 | INTERSTATE BAK | COMMERCE AND INDUSTRY CO | GL | 94 | 57 | 9708 | 9808 |
| 8566570 | INTERSTATE BAK | N U F I CO OF PITTSBURGH PA | GL | 86 | 35 | 9808 | 0108 |
| 8566570 | INTERSTATE BAK | N U F I CO OF PITTSBURGH PA | GL | 63 | 04 | 9808 | 0108 |
| 8738465 | INTERSTATE BAK | A.I. SURPLUS | GL | 02 | 35 | 0108 | 0208 |
| 8758042 | INTERSTATE BAK | LEXINGTON INSURANCE COMPANY | PROP | 70 | 93 | 0110 | 0210 |
| 4646134 | CONTINENTAL BA | N U F I CO OF PITTSBURGH PA ' | INL | 20 | J 93 | 9208 | 9308 |
| 8520900 | CONTINENTAL BA | LEXINGTON INSURANCE COMPANY | PRO | 70 | 93 | 9707 | 9710 |

## AIG INSURANCE POLICIES TO BE ASSUMED

| | | INTERSTATE BAKERIES CORP. | | | | | |
|---|---|---|---|---|---|---|---|
| POLICY # | INSURED | WRITING CO. | LOB | BRC | PC | EFF. DATE | EXP. DATE |
| 8520920 | CONTINENTAL BA | LEXINGTON INSURANCE COMPANY | PRO | 70 | 93 | 9710 | 9810 |
| 9189540 | CONTINENTAL BA | N U F I CO OF PITTSBURGH PA | PRO | 20 | 70 | 9208 | 9308 |
| 1428995 | DRAKE BAKERIES | N U F I CO OF PITTSBURGH PA | PRO | 01 | 50 | 9208 | 9308 |
| 1428996 | DRAKE BAKERIES | N U F I CO OF PITTSBURGH PA | PRO | 01 | . 50 | 9208 | 9308 |
| 3265136 | DRAKE BAKERIES | N U F I CO OF PITTSBURGH PA | GL | 01 | 50 | 9208 | 9309 |
| 4198238 | DRAKE BAKERIES | N U F I CO OF PITTSBURGH PA | WC | 01 | 50 | 9208 | 9308 |
| 4198239 | DRAKE BAKERIES | INS CO OF THE STATE OF PA | WC | 01 | 50 | 9208 | 9308 |
| 4227199 | DRAKE BAKERIES | N U F I CO OF PITTSBURGH PA | GL | 20 | 35 | 8905 | 9007 |
| 4361743 | DRAKE BAKERIES | N U F I CO OF PITTSBURGH PA | GL | 20 | 35 | 9007 | 9201 |
| 1391117 | HOLSUM BAKERY | N U F I CO OF PITTSBURGH PA | GL | 15 | 32 | 0204 | 0304 |
| 1452125 | HOLSUM BAKERY | N U F I CO OF PITTSBURGH PA | FID | 15 | 63 | 0301 | 0401 |
| 1648052 | HOLSUM BAKERY | N U F I CO OF PITTSBURGH PA | GL | 15 | 32 | 0404 | 0504 |
| 2808570 | HOLSUM BAKERY | N U F I CO OF PITTSBURGH PA | GL | 52 | 39 | 0005 | 0105 |
| 3019959 | HOLSUM BAKERY | N U F I CO OF PITTSBURGH PA | A&H | 52 | 39 | 0305 | 0405 |
| 3204752 | HOLSUM BAKERY | N U F I CO OF PITTSBURGH PA | GL | 15 | 32 | 0304 | 0404 |
| 3753939 | HOLSUM BAKERY | LEXINGTON INSURANCE COMPANY | PRO | 15 | ' 93 | 0401 | 0501 |
| 4053850 | HOLSUM BAKERY | LEXINGTON INSURANCE COMPANY | GL | 52 | 39 | 0405 | 0505 |
| 4855427 | HOLSUM BAKERY | LEXINGTON INSURANCE COMPANY | GL | 52 | 39 | 9705 | 9805 |
| 5607857 | HOLSUM BAKERY | A.I. SURPLUS | INL | 15 | 84 | 0301 | 0501 |
| 6614975 | HOLSUM BAKERY | LEXINGTON INSURANCE COMPANY | FID | 15 | 63 | 0401 | 0501 |
| 7395732 | HOLSUM BAKERY | LEXINGTON INSURANCE COMPANY | GL | 15 | 32 | 0004 | 0104 |
| 8562687 | HOLSUM BAKERY | LEXINGTON INSURANCE COMPANY | GL | 52 | 39 | 9805 | 9905 |
| 8587303 | HOLSUM BAKERY | LEXINGTON INSURANCE COMPANY | GL | 52 | 39 | 9905 | 0005 |

Exhibit O-2

## AIG INSURANCE POLICIES TO BE ASSUMED

| | | INTERSTATE BAKERIES CORP. | | | | | |
|---|---|---|---|---|---|---|---|
| POLICY # | INSURED | WRITING CO. | LOB | BRC | PC | EFF. DATE | EXP. DATE |
| 8714418 | HOLSUM BAKERY | N U F I CO OF PITTSBURGH PA | GL | 15 | 32 | 0104 | 0204 |
| 8732368 | HOLSUM BAKERY | N U F I CO OF PITTSBURGH PA | GL | 52 | 39 | 0105 | 0205 |
| 9736328 | HOLSUM BAKERY | N U F I CO OF PITTSBURGH PA | GL | 02 | 39 | 0205 | 0305 |
| 0001039 | INTERSTATE BRA | COMMERCE AND INDUSTRY CO | GL | 94 | 57 | 9808 | 9908 |
| 8758041 | INTERSTATE BRA | LEXINGTON INSURANCE COMPANY | PROP | 70 | 93 | 110 | 210 |
| 8785406 | INTERSTATE BRA | LEXINGTON INSURANCE COMPANY | PROP | 96 | 93 | 9507 | 9607 |
| 8785498 | INTERSTATE BRA | LEXINGTON INSURANCE COMPANY | PROP | 96 | 93 | 9510 | 9610 |
| 9520920 | INTERSTATE BRA | LEXINGTON INSURANCE COMPANY | PROP' | 70 | 93 | 9710 | 9810 |
| 1906000 | INTERSTATE BRA | LEXINGTON INSURANCE COMPANY | PROP | 70 | 93 | 0210 | 0310 |
| 1957965 | INTERSTATE BRA | A.I. SURPLUS | GL | 03 | 71 | 0202 | 1202 |
| 2057859 | INTERSTATE BRA | N U F I CO OF PITTSBURGH PA | GL | 63 | 32 | 9007 | 9107 |
| 2130694 | INTERSTATE BRA | N U F I CO OF PITTSBURGH PA | GL | 02 | 30 | 0207 | 0307 |
| 2860396 | INTERSTATE BRA | N U F I CO OF PITTSBURGH PA | GL | 02 | 30 | 0307 | 0407 |
| 2860722 | INTERSTATE BRA | N U F I CO OF PITTSBURGH PA | GL | 02 | 30 | 0407 | 0507 |
| 4920868 | INTERSTATE BRA | N U F I CO OF PITTSBURGH PA | PROP | 70 | 93 | 0310 | 0410 |
| 5693392 | INTERSTATE BRA | N U F I CO OF PITTSBURGH PA | FID | 02 | 35 | 0210 | 0310 |
| 7470599 | INTERSTATE BRA | N U F I CO OF PITTSBURGH PA | PROP | 70 | 93 | 0210 | 0310 |
| 7511549 | INTERSTATE BRA | COMMERCE AND INDUSTRY CO | GL | 94 | 57 | 9908 | 0208 |
| 8084434 | INTERSTATE BRA | COMMERCE AND INDUSTRY CO | GL | 94 | 57 | 9808 | 9908 |
| 8520919 | INTERSTATE BRA | N U F I CO OF PITTSBURGH PA | PROP | 70 | 93 | 9710 | 9810 |
| 8520998 | INTERSTATE BRA | N U F I CO OF PITTSBURGH PA | PROP | 70 | 93 | 9810 | 9910 |
| 8520999 | INTERSTATE BRA | N U F I CO OF PITTSBURGH PA | PROP | 70 | 93 | 9810 | 9910 |
| 8523562 | INTERSTATE BRA | LEXINGTON INSURANCE COMPANY | PROP | 70 | 93 | 9910 | 0010 |

**Exhibit O-2**

## AIG INSURANCE POLICIES TO BE ASSUMED

| | | INTERSTATE BAKERIES CORP. | | | | | |
|---|---|---|---|---|---|---|---|
| POLICY # | INSURED | WRITING CO. | LOB | BRC | PC | EFF. DATE | EXP. DATE |
| 8523563 | INTERSTATE BRA | LEXINGTON INSURANCE COMPANY | PROP | 70 | 93 | 9910 | 0010 |
| 8529915 | INTERSTATE BRA | LEXINGTON INSURANCE COMPANY | PROP | 70 | 93 | 0010 | 0110 |
| 8529916 | INTERSTATE BRA | LEXINGTON INSURANCE COMPANY | PROP | 70 | 93 | 0010 | 0110 |
| 8714308 | INTERSTATE BRA | N U F I CO OF PITTSBURGH PA | GL | 02 | 30 | 0107 | 0207 |
| 8742594 | INTERSTATE BRA | N U F I CO OF PITTSBURGH PA | FID | 02 | 35 | 0110 | 0210 |
| 8758042 | INTERSTATE BRA | LEXINGTON INSURANCE COMPANY | PRO | 70 | 93 | 0110 | 0210 |
| 8787444 | INTERSTATE BRA | LEXINGTON INSURANCE COMPANY | PRO | 73 | 93 | 9607 | 9707 |
| 8787530 | INTERSTATE BRA | LEXINGTON INSURANCE COMPANY | PRO | 73 | 93 | 9610 | 9710 |
| 3082031 | TCS CABLE, INC | N U F I CO OF PITTSBURGH PA | GL | 10 | 32 | 9008 | 9108 |
| 3085638 | TCS CABLE INC | N U F I CO OF PITTSBURGH PA | GL | 10 | 32 | 9201 | 9301 |
| 9321159 | CAN-AM CONSTRU | AM INT'L UNDRWRTRS & AIU INS C | GL | 88 | 32 | 9604 | 9704 |
| 00049000153 | PURITY BAKING | LONDON - NEW HAMPSHIRE | | 038 | 05 | 9602 | 9812 |

**Exhibit O-2**

## ALLSTATE POLICIES TO BE ASSUMED

| DESCRIPTION | POLICY PERIOD | POLICY NUMBER |
|---|---|---|
| WORKER'S COMPENSATION | 7/1/87 – 7/1/88 | WC0311095-0 |
| WORKER'S COMPENSATION | 7/1/87 – 7/1/88 | WC0311094-00 |
| WORKER'S COMPENSATION | 9/30/87 – 7/1/88 | WC0311096 |
| WORKER'S COMPENSATION | 7/1/88 – 7/1/89 | WC0311094-1 |
| WORKER'S COMPENSATION | 7/1/88 – 7/1/89 | WC0311095-1 |
| GENERAL LIABILITY | 9/30/87 – 7/1/88 | GL0311097 |
| GENERAL LIABILITY | 7/1/88 – 7/1/89 | GL0311097 |
| BUSINESS AUTO POLICY | 9/30/87 – 7/1/88 | BAP0311098 |
| BUSINESS AUTO POLICY | 9/30/87 – 7/1/88 | BAP0311099 |
| BUSINESS AUTO POLICY | 7/1/88 – 7/1/89 | BAP0311098-A |
| BUSINESS AUTO POLICY | 7/1/88 – 7/1/89 | BAP0311098-B |

Exhibit O-2

**REMAINING INSURANCE POLICIES TO BE ASSUMED**

| INSURER | COVERAGE TYPE | COVERAGE PERIOD | POLICY # | ADDRESS |
|---|---|---|---|---|
| FEDERAL INSURANCE COMPANY (CHUBB) | DIRECTORS & OFFICERS - D & O; OUTSIDE DIRECTORSHIP LIABILITY; FIDUCIARY | | 8115-5460 | EXECUTIVE PROTECTION DEPARTMENT 15 MOUNTAIN VIEW RD. WARREN, NJ 07059 |
| OLD REPUBLIC INSURANCE COMPANY | DIRECTORS & OFFICERS - D & O | | CUG26576 | CHICAGO UNDERWRITING GROUP 211 W. WACKER DRIVE CHICAGO, IL 60606 |
| NATIONAL UNION FIRE INSURANCE CO OF PITTSBURG, PA (AIG) | DIRECTORS & OFFICERS - D & O | | 561-69-76 | 175 WATER STREET NEW YORK, NY 10038 |
| TWIN CITY FIRE INSURANCE CO (THE HARTFORD) | DIRECTORS & OFFICERS - D & O | | NDA0211430-02 | HARTFORD FINANCIAL PRODUCTS 2 PARK AVENUE, 5TH FLOOR NEW YORK, NY 10016 |
| XL SPECIALTY INSURANCE COMPANY | DIRECTORS & OFFICERS - D & O | | ELU84646-01 | EXECUTIVE LIABILITY UNDERWRITERS ONE CONSTITUTION PLAZA, 16TH FL HARTFORD, CT 06103 |
| RLI INSURANCE COMPANY | DIRECTORS & OFFICERS - D & O | | EPG0002682 | 9025 NORTH LINDBERGH DRIVE PEORIA, IL 610615 |
| NATIONAL UNION FIRE INSURANCE OF PITTSBURG, PA (AIG) | CRIME INSURANCE | | 452-14-01 | 175 WATER STREET NEW YORK, NY 10038 |
| DISCOVER PROPERTY & CASUALTY INSURANCE CO | EXCESS GENERAL LIABILITY | 6/15/03- 7/01/04 | D002Q00080 | C/O JEFFREY FISHER, ESQ. 5 BATTERSON PARK FARMINGTON, CT 06032 |
| UNITED STATES FIDELITY & GUARANTY CO | PRIMARY  AUTOMOBILE | 6/15/03- 7/01/04 | D002A00151 | C/O JEFFREY FISHER, ESQ. 5 BATTERSON PARK FARMINGTON, CT 06032 |
| UNITED STATES FIDELITY & GUARANTY CO | PRIMARY AUTOMOBILE | 6/15/03- 7/01/04 | D002A00152 | C/O JEFFREY FISHER, ESQ. 5 BATTERSON PARK FARMINGTON, CT 06032 |
| UNITED STATES FIDELITY & GUARANTY CO | PRIMARY AUTOMOBILE | 6/15/03- 7/01/04 | D002A00153 | C/O JEFFREY FISHER, ESQ. 5 BATTERSON PARK FARMINGTON, CT 06032 |
| DISCOVER PROPERTY & CASUALTY INSURANCE CO | EXCESS GENERAL LIABILITY | 7/01/04- 7/01/05 | D002Q00109 | C/O JEFFREY FISHER, ESQ. 5 BATTERSON PARK FARMINGTON, CT 06032 |

Exhibit O-2

## REMAINING INSURANCE POLICIES TO BE ASSUMED

| INSURER | COVERAGE TYPE | COVERAGE PERIOD | POLICY # | ADDRESS |
|---|---|---|---|---|
| DISCOVER PROPERTY & CASUALTY INSURANCE CO | PRIMARY AUTOMOBILE | 7/01/04-10/01/04 | D002A00300 | C/O JEFFREY FISHER, ESQ. 5 BATTERSON PARK FARMINGTON, CT 06032 |
| DISCOVER PROPERTY & CASUALTY INSURANCE CO | PRIMARY AUTOMOBILE | 7/01/04-10/01/04 | D002A00301 | C/O JEFFREY FISHER, ESQ. 5 BATTERSON PARK FARMINGTON, CT 06032 |
| DISCOVER SPECIALTY INSURANCE COMPANY | PRIMARY AUTOMOBILE | 7/01/04-10/01/04 | D002A00302 | C/O JEFFREY FISHER, ESQ. 5 BATTERSON PARK FARMINGTON, CT 06032 |
| LUMBERMAN'S MUTUAL CASUALTY COMPANY & AFFILIATES | WORKERS' COMPENSATION; GENERAL LIABILITY; AUTO LIABILITY | 7/1/89-7/1/03 | MULTIPLE | 500 WEST MADISON STREET, SUITE 1100 CHICAGO, IL 60661 |
| ALLIED WORLD ASSURANCE COMPANY | PROPERTY | 10/1/04 | MULTIPLE | BERMUDA COMMERCIAL BANK BUILDING 43 VICTORIA STREET HAMILTON HM 12 BERMUDA |
| AMERICAN ALTERNATIVE INSURANCE CORP | PROPERTY | 10/1/04 | MULTIPLE | 555 COLLEGE ROAD EAST PRINCETON, NJ 08543 |
| ESSEX INSURANCE COMPANY | PROPERTY | 10/1/04 | MULTIPLE | TEN PARKWAY NORTH DEERFIELD, IL 60015 |
| LANDMARK INSURANCE CO | PROPERTY | 10/1/04 | MULTIPLE | 945 E PACES FERRY RD #1800 ATLANTA, GA 30326 |
| GREAT AMERICAN CUSTOM INSURANCE SERVICES | PROPERTY | 10/1/04 | MULTIPLE | 725 SOUTH FIGUEROA STREET SUITE 3400 LOS ANGELES, CA 90017 |
| MT HAWLEY INSURANCE COMPANY | PROPERTY | 10/1/04 | MULTIPLE | 9025 N LINDBERGH DRIVE PEORIA, IL 61615 |
| AMERICAN INSURANCE COMPANY/AMERICAN EMPIRE | PROPERTY | 10/1/04 | MULTIPLE | 580 WALNUT STREET CINCINNATI, OH 45202 |
| LLOYD'S OF LONDON | PROPERTY | 10/1/04 | MULTIPLE | MENDES & MOUNT 750 SEVENTH AVENUE NEW YORK, NY 10019 |
| SAFETY NATIONAL CASUALTY COMPANY | EXCESS WORKER'S COMPENSATION | 7/1/02 - 05 | MULTIPLE | 2043 WOODLAND PARKWAY ST. LOUIS, MO 63146 |

69

**Exhibit O-2**

## REMAINING INSURANCE POLICIES TO BE ASSUMED

| INSURER | COVERAGE TYPE | COVERAGE PERIOD | POLICY # | ADDRESS |
|---|---|---|---|---|
| AETNA | EXCESS | UNKNOWN | MULTIPLE | 151 FARMINGTON AVE HARTFORD, CT 06156 |
| EMPLOYERS' RE (SWISS RE) | EXCESS WORKER'S COMPENSATION | 1983 – 2002 | MULTIPLE | MYTHENQUAI 50/60 P.O. BOX 8022 ZURICH, SWITZERLAND |
| ZURICH US | UNDERGROUND STORAGE TANKS | 3/18/05 | MULTIPLE | 1400 AMERICAN LANE SCHAUMBURG, IL 60196 |
| FIREMAN'S FUND INS CO | ROLLING STOCK | 10/1/04 | MULTIPLE | 777 SAN MARIN DR NOVATO, CA 94998 |
| TIG INSURANCE COMPANY | UMBRELLA | 7/1/95 – 96 7/1/96 - 97 | XLB9231020 XLB9231247 | P.O. BOX 152870 IRVING, TX 75015 |
| FEDERAL INSURANCE COMPANY | UMBRELLA | 10/1/84 – 7/1/05 | 7906-07-04 | P.O. BOX 1615 WARREN, NJ 07061 |
| AMERICAN NATIONAL FIRE | UMBRELLA | 7/1/95 – 96 7/1/96 – 97 7/1/97 - 98 7/1/98 – 99 7/1/99 – 00 | TUE8918934 WXX-9-88-93-54 EXX-9-88-93-54-02 EXX-9-88-93-54 EXX-9-88-93-54-06 | 580 WALNUT ST. CINCINNATI, OH 45202 |
| FIREMEN'S FUND INSURANCE CO. | UMBRELLA | 7/1/95 – 96 7/1/96 – 97 7/1/97 – 98 7/1/98 – 99 7/1/99 – 00 7/1/00 – 01 7/1/02 – 03 7/1/03 – 04 7/1/04 – 05 | XXK82510637 XXK-00-7408-7834 XXK-000-7408-7834 XXK-00-6807-2057 XXK-000-6818-7632 XXK-000-9637-7924 XXK-85145878 XXK-85597573 XTM86276904 | 777 SAN MARIN DRIVE NOVATO, CA 94998 |
| AMERICAN ALLIANCE | POLLUTION | 4/30/95 – 96 4/30/96 – 97 4/30/97 – 98 4/30/98 – 99 4/30/99 – 00 4/30/00 – 01 4/30/01 – 02 | KST773-22-22-02 KST773-22-22-04 KST773-22-22-03 KST773-22-22-06 KST773-22-22-06 KST773-22-22-08 KST773-22-22-09 | 580 WALNUT ST. CINCINNATI, OH 45202 |

**Exhibit O-2**

## REMAINING INSURANCE POLICIES TO BE ASSUMED

| INSURER | COVERAGE TYPE | COVERAGE PERIOD | POLICY # | ADDRESS |
|---|---|---|---|---|
| COMMERCE & INDUSTRY (AIG) | POLLUTION | 8/28/95 – 96<br>8/28/96 – 97<br>8/28/97 – 98<br>8/28/98 – 99<br>8/28/99 – 00<br>8/28/00 – 01<br>8/28/01 – 02 | FPL5879793<br>FPL8075295<br>FPL8079763<br>FPL8084434<br>FLP8084434<br>FLP8084434<br>FPL7511549 | 70 PINE STREET<br>NEW YORK, NY 10270 |
| RELIANCE | FIDELITY | 10/1/97 – 98<br>10/1/98 – 99<br>10/1/99 – 00 | B2442517 | 3 PARKWAY, FL 5<br>PHILADELPHIA, PA 19102 |
| SECURITY INS CO OF HARTFORD | ROLLING STOCK | 11/20/97 – 98<br>11/20/98 – 99 | CCIM26686<br>OICIMJ13250 | 1145 NICHOLSON ROAD, UNIT 2<br>NEWMARKET, ON, L3Y 9C3 CANADA |
| TRANSCONTINENTAL INSURANCE CO | UMBRELLA | 7/1/97 – 98 | CPU167040951 | CNA PLAZA<br>333 S. WABASH<br>CHICAGO, IL 60685 |
| LUMBERMAN'S MUTUAL INS CO | UMBRELLA | 7/1/98 – 99<br>7/1/99 – 00<br>7/1/00 – 01 | 9SX119027 | 1 KEMPER DRIVE<br>LONG GROVE, IL 60049 |
| TRAVELERS INSURANCE CO | CRIME | 10/1/00 – 01 | 030BY103377776 | 385 WASHINGTON STREET<br>ST. PAUL, MN 55102 |
| OHIO CASUALTY | UMBRELLA | 7/1/00 – 01<br>7/1/01 – 02 | ECO 52508659<br>ECO 252508659 | 9450 SEWARD ROAD<br>FAIRFIELD, OH 45014 |
| NATIONAL UNION | UMBRELLA | 7/1/01 -02<br>7/1/02 -03<br>7/1/03 -04<br>7/1/04 – 05 | BE8714308<br>BE2130694<br>BE2860396<br>BE2860722 | 70 PINE STREET<br>NEW YORK, NY 10270 |
| KEMPER INSURANCE CO | UMBRELLA | 7/1/01 – 02<br>7/1/02 – 03 | 9SR131144 | 1 KEMPER DRIVE<br>LONG GROVE, IL 60049 |
| AMERICAN INTL SPECIALTY LINES (AIG) | POLLUTION | 2/8/02 – 2/8/12 | PLS1957965 | 70 PINE STREET<br>NEW YORK, NY 10270 |
| ST. PAUL INSURANCE CO | UMBRELLA | 7/1/03 – 04<br>7/1/04 – 05 | QI06800402<br>QI06800623 | 385 WASHINGTON STREET<br>ST. PAUL, MN 55102 |
| NATIONAL UNION | CRIME | 7/1/03 – 04 | 3607780 | 70 PINE STREET<br>NEW YORK, NY 10270 |
| ACE AMERICAN | UNDERGROUND STORAGE TANK | 3/18/05 – 06 | TSPG21829845 | 436 WALNUT STREET<br>PHILADELPHIA, PA 55102 |
| ILLINOIS UNION | UNDERGROUND STORAGE TANK | 3/18/05 – 06 | G21829857 | 437 WALNUT STREET<br>PHILADELPHIA, PA 55102 |
| ACE AMERICAN | WORKER'S COMPENSATION | 6/15/03 – 6/30/04<br>6/15/03 – 6/30/04<br>6/30/04 – 7/1/05<br>6/30/04 – 7/1/05 | WLRC435222255<br>SCFC435222206<br>WLRC43978962<br>SCFC43979267 | C/O JEFFREY FISHER, ESQ.<br>5 BATTERSON PARK<br>FARMINGTON, CT  06032 |

**Exhibit O-2**

## REMAINING INSURANCE POLICIES TO BE ASSUMED

| INSURER | COVERAGE TYPE | COVERAGE PERIOD | POLICY # | ADDRESS |
|---|---|---|---|---|
| AETNA | EXCESS WORKER'S COMPENSATION | VARIOUS | MULTIPLE | 151 FARMINGTON AVE HARTFORD, CT 06156 |
| ARABELLA MUTUAL | AUTO LIABILITY | 07/01/95-02 | X3P082945 | 30 ROCKEFELLER PLAZA, 11TH FLOOR NEW YORK, NY 10112 |
| CNA | UMBRELLA | MULTIPLE | VARIOUS | CNA PLAZA 333 S. WABASH CHICAGO, IL 60685 |
| CNA | WORKER'S COMPENSATION AND EXCESS WORKER'S COMPENSATION | 1970 – 77 | VARIOUS | CNA PLAZA 333 S. WABASH CHICAGO, IL 60685 |
| CONSTITUTION STATES & BOWRING NO. AMERICA | UMBRELLA | 10/1/86 - 07/1/88 | VARIOUS | PART OF MARSH MCCLENNAN 1166 AVENUE OF THE AMERICAS NEW YORK, NY 10036 |
| CRUM & FORSTER | UMBRELLA | 07/01/91 – 95 | VARIOUS | ATTN: PAULA WILEY POB 2942 SHAWNEE MISSION, KS 66201-1342 |
| EMPLOYERS INS OF WAUSAU | EXCESS WORKER'S COMPENSATION | 1973 – 1977 | VARIOUS | WAUSAU CLAIMS POB 4025 BEAVERTON, OR  97076 |
| FIREMAN'S FUND | UMBRELLA | 10/1/77 – 7/1/86 7/1/97 – 99 | VARIOUS XXK-000-8315-0714 | P. O. BOX 777 NOVATO, CA 94998 |
| FIRST STATES & BOWRING NO. AMERICA | UMBRELLA | 10/1/85 – 7/1/87 | VARIOUS | PART OF MARSH MCCLENNAN 1166 AVENUE OF THE AMERICAS NEW YORK, NY 10036 |
| FORUM INS & BOWRING NO. AMERICA | UMBRELLA | 10/1/84 – 85 | UB100854 | PART OF MARSH MCCLENNAN 1166 AVENUE OF THE AMERICAS NEW YORK, NY 10036 |
| GENERAL INSURANCE (GENESIS) | EXCESS WORKER'S COMPENSATION | 10/1/74 – 83 | VARIOUS | GENESIS UNDERWRITING MGMT CO. 1 NORTH WACKER DRIVE, SUITE 1750 CHICAGO, IL 60606 |
| GRANITE STATE INSURANCE | UMBRELLA | 10/1/83 – 84 | 6683-4162 | 70 PINE STREET NEW YORK, NY 10270 |
| HIGHLANDS INS & BOWRING NO. AMERICA | UMBRELLA | 10/1/84 – 86 | VARIOUS | PART OF MARSH MCCLENNAN 1166 AVENUE OF THE AMERICAS NEW YORK, NY 10036 |

**Exhibit O-2**

## REMAINING INSURANCE POLICIES TO BE ASSUMED

| INSURER | COVERAGE TYPE | COVERAGE PERIOD | POLICY # | ADDRESS |
|---|---|---|---|---|
| HOME INDEMNITY INSURANCE | AUTO & GENERAL LIABILITY | 10/1/80 – 84 | MULTIPLE | PART OF BERKSHIRE HATHAWAY 1400 KIEWIT PLAZA OMAHA NE 68131 |
| HOME INDEMNITY INSURANCE | WORKER'S COMPENSATION | 10/1/80 – 84 | MULTIPLE | PART OF BERKSHIRE HATHAWAY 1400 KIEWIT PLAZA OMAHA NE 68131 |
| INTEGRITY INSURANCE | UMBRELLA | 10/1/84 – 85 | XL209679 | 2121 E. CAPITAL DRIVE APPLETON, WI 54912 |
| INTERNATIONAL INSURANCE & LONDON AGENCY | UMBRELLA | 10/1/87 – 7/1/90 | VARIOUS | L'AVENIR,OPLADIN WAY BRACKNELL BERKSHIRE RG12 OPH, UK |
| INTERSTATE FIRE & CASUALTY | UMBRELLA | 10/1/86 – 7/1/89 | VARIOUS | 33 W. MONROE ST. CHICAGO, IL 60603 |
| MISSION INSURANCE & SAYRE & TOSO | UMBRELLA | 10/1/78 – 85 | VARIOUS | 2770 BIDDLE ROAD MEDFORD, OR 97504 |
| NATIONAL UNION FIRE | UMBRELLA | 7/1/89 – 91 | VARIOUS | 70 PINE STREET NEW YORK, NY 10270 |
| NATIONWIDE MUTUAL INSURANCE | AUTO & GENERAL LIABILITY | 10/1/84 – 7/1/87 | MULTIPLE | ONE NATIONWIDE PLAZA COLUMBUS, OH 43215 |
| NATIONWIDE MUTUAL INSURANCE | WORKER'S COMPENSATION | 10/1/84 – 7/1/87 | MULTIPLE | ONE NATIONWIDE PLAZA COLUMBUS, OH 43215 |
| NORTHBROOK INSURANCE (ALLSTATE) | AUTO & GENERAL LIABILITY | 7/1/87 – 89 | MULTIPLE | 3075 SANDERS RD., #G2H NORTHBROOK, IL 60062 |
| NORTHBROOK INSURANCE (ALLSTATE) | WORKER'S COMPENSATION | 7/1/87 – 89 | MULTIPLE | 3075 SANDERS RD., #G2H NORTHBROOK, IL 60062 |
| PACIFIC EMPLOYERS INSURANCE (INA) | UMBRELLA | 10/1/85 – 86 | XCC012074 | 436 WALNUT PHILADELPHIA, PA 19106 |
| ROYAL INDEMNITY | UMBRELLA | 10/1/84 – 85 | ED102893 | 9300 ARROWPOINT BLVD CHARLOTTE, NC 28273 |
| TWIN CITY FIRE (HARTFORD) | UMBRELLA | 10/1/85 – 7/1/89 | VARIOUS | ONE HARTFORD PLAZA HARTFORD, CT 06155 |
| ZURICH INTERNATIONAL INSURANCE | UMBRELLA | 10/1/86 – 7/1/87 | 73 628 86 C | 1400 AMERICAN LANE SCHAUMBERG, IL  60196 |

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---------|-----------|--------------|---------------|--------------|---------|------|-------|----------|
| 10029 | 6/28/2001 | 7-Eleven, Inc. | EDI Trading Agreement | 7-Eleven Inc EDI Business Mgr | 2711 N Haskell Ave | Dallas | TX | 752043 |
| 15002 | 2/1/2001 | AAFES Operations Center | Master Trademark License and Distribution Agreement | AAFES Operations Center SD-F/C (Ms Stolz), Contracting Branch | 2727 LBJ Freeway | Dallas | TX | 752341 |
| 6043 | 1/9/2000 | ABCD Sales | Broker Agreement | ABCD Sales Bob Wilkerson, President | 1680 Hwy 161 | Montgomery City | MO | 63361 |
| 15029 | 9/5/1990 | AC Nielsen Company | Agreement for NCH Manufacturer Service | AC Nielsen Company | 5513 N Cumberland Ave | Chicago | IL | 60656 |
| 6026 | 1/9/2000 | Acosta Sales | Broker Agreement | Acosta Sales | 3807 N 7th St | Phoenix | AZ | 85014 |
| 6028 | 1/9/2000 | Acosta Sales | Broker Agreement | Acosta Sales | PO Box 4918 | Diamond Bar | CA | 91765 |
| 6029 | 1/9/2000 | Acosta Sales | Broker Agreement | Acosta Sales | PO Box 5063 T A | Denver | CO | 80217 |
| 6068 | 1/9/2000 | Acosta Sales | Broker Agreement | Acosta Sales | PO Box 2537 | Spokane | WA | 99220 |
| 6055 | 8/22/2004 | Acosta Sales & Marketing | Broker Agreement | Acosta Sales & Marketing | 1170 Rittenhouse Rd | Norristown | PA | 19403 |
| 6045 | 5/1/2001 | Acosta Sales Co., Inc. | Broker Agreement | Acosta Sales Co., Inc. | 2800 Westoak Dr | Charlotte | NC | 28217 |
| 6037 | 1/9/2000 | Acosta/ PMI | Broker Agreement | Acosta/ PMI | PO Box 797 | Shawnee Mission | KS | 66201 |
| 12060 | 7/11/2004 | Advanced Organics Inc | Service Agreement | Advanced Organics Inc | 701 W Johnson St | Upper Sandusky | OH | 43351 |
| 6054 | 1/9/2000 | Advantage NW | Broker Agreement | Advantage NW | PO Box 23139 | Portland | OR | 97224 |
| 6067 | 1/9/2000 | Advantage NW | Broker Agreement | Advantage NW | 13610 1st Ave S | Seattle | WA | 98168 |
| 6069 | 1/9/2000 | Advantage Sales | Broker Agreement | Advantage Sales | PO Box 483 | Brookfield | WI | 53008 |
| 6061 | 4/9/2001 | Advantage Sales & Marketing | Broker Agreement | Advantage Sales & Marketing | 3233 South Loop 289 Ste 450 | Lubbock | TX | 79423 |

74

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| 6023 | 1/9/2001 | Advantage/ Bass Sales & Marketing | Broker Agreement | Advantage/ Bass Sales & Marketing | 5401 Cordova Ste 105 | Anchorage | AK | 995181 |
| 6052 | 12/16/2000 | Advantage/ ESM | Broker Agreement | Advantage/ ESM | 5219 Peters Creek Rd | Roanoke | VA | 24019 |
| 23001 | 6/10/2004 | Advanced Organics Inc | Service Agreement | Advanced Organics Inc | 701 West Johnson St | Upper Sandusky | OH | 43351 |
| 17016 | 7/1/1998 | Alan Pike | Distributor Agreement | Alan Pike | PO Box 2023 | Sault St Marie | MI | 49783 |
| 2033 | 11/29/2001 | Alaska Pride Baking Company LLC | License Agreement | Alaska Pride Baking Company LLC Jacquie Luke | 1001 E Bengar Blvd | Anchorage | AK | 99518 |
| 6024 | 1/12/2003 | Alliance Sales & Marketing | Broker Agreement | Alliance Sales & Marketing | 2151 Old Rocky Ridge Rd Ste 110 | Birmingham | AL | 35515 |
| 6057 | 3/7/2004 | Alliance Sales & Marketing | Broker Agreement | Alliance Sales & Marketing | 1120 West Butler Rd Ste M | Greensville | SC | 29607 |
| 6070 | 9/19/2004 | Alliance Sales & Marketing | Broker Agreement | Alliance Sales & Marketing | 7300 Carmel Executive Park Ste 200 | Charlotte | NC | 2820 |
| 361 | 8/21/2003 | American Express Travel Related Services Company Inc | Corporate Card Account Agreement for the United States | American Express Travel Related Services Company Inc Travel Group Service Center | Corporate Card Unit 20022 N 31st Ave | Phoenix | AZ | 85060 |
| IP002 | 1/12/2000 | American Bakers Cooperative, Inc. | Tradename Agreement | American Bakers Cooperative Inc | 222 Randolph Suite 202 | Clifton | NJ | 07011 |
| 4002 | 4/1/2004 | American Express Travel Related Services Company, Inc. | Guaranty of Payment Agreement for Basic Control Accounts with Limits | American Express Travel Related Services Company, Inc. Guaranty Unit | 20022 N 31st Ave | Phoenix | AZ | 85027 |
| 15001 | 4/15/2004 | American Heart Association, Inc. | Certification Mark License Agreement Food Products | American Heart Association, Inc.Certification Manager | 7272 Greenville Ave | Dallas | TX | 75231 4596 |
| 205 | 6/20/1983 | Arctic Sun Dist | Distributor Agreement | Arctic Sun Dist | 4721 E Bogard Rd | Wasilla | AK | 99654 |
| 205 | Unknown | Athens | Distributor Agreement | Athens | 1847 E 14th St | Oakland | CA | 946060 |

75

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| 15053 | 10/1/2001 | Aurora Power Resources Inc | Natural Gas Sales Agreement | Aurora Power Resources Inc | 1029 W Third Ave Ste 220 | Anchorage | AK | 99501 |
| 509 | 1/4/1990 | Automotive Rentals | Lease Agreement | Automotive Rentals, Inc. | 9000 Midlantic Dr PO Box 5039 | Mt Laurel | NJ | 08054 |
| 11034 | 10/15/2003 | Bank of America / Fleet Capital Corp | Lease Schedule 36104-00001 | Bank of America / Fleet Capital Corp | One Financial Plaza | Providence | RI | 02903-2448 |
| 11035 | 10/23/2003 | Bank of America / Fleet Capital Corp | Lease Schedule 36104-00002 | Bank of America / Fleet Capital Corp | One Financial Plaza | Providence | RI | 02903-2448 |
| 11036 | 10/27/2003 | Bank of America / Fleet Capital Corp | Lease Schedule 36104-00003 | Bank of America / Fleet Capital Corp | One Financial Plaza | Providence | RI | 02903-2448 |
| 11037 | 11/12/2003 | Bank of America / Fleet Capital Corp | Lease Schedule 36104-00004 | Bank of America / Fleet Capital Corp | One Financial Plaza | Providence | RI | 02903-2448 |
| 11038 | 12/18/2003 | Bank of America / Fleet Capital Corp | Lease Schedule 36104-00005 | Bank of America / Fleet Capital Corp | One Financial Plaza | Providence | RI | 02903-2448 |
| 11039 | 12/19/2003 | Bank of America / Fleet Capital Corp | Lease Schedule 36104-00006 | Bank of America / Fleet Capital Corp | One Financial Plaza | Providence | RI | 02903-2448 |
| 11040 | 12/19/2003 | Bank of America / Fleet Capital Corp | Lease Schedule 36104-00007 | Bank of America / Fleet Capital Corp | One Financial Plaza | Providence | RI | 02903-2448 |
| 11041 | 12/20/2003 | Bank of America / Fleet Capital Corp | Lease Schedule 36104-00008 | Bank of America / Fleet Capital Corp | One Financial Plaza | Providence | RI | 02903-2448 |
| 11042 | 12/20/2003 | Bank of America / Fleet Capital Corp | Lease Schedule 36104-00009 | Bank of America / Fleet Capital Corp | One Financial Plaza | Providence | RI | 02903-2448 |
| 11043 | 12/20/2003 | Bank of America / Fleet Capital Corp | Lease Schedule 36104-00010 | Bank of America / Fleet Capital Corp | One Financial Plaza | Providence | RI | 02903-2448 |
| 11033 | 10/15/2003 | Bank of America / Fleet Capital Corp | Master Equipment Lease Agreement No 36104 | Bank of America / Fleet Capital Corp | One Financial Plaza | Providence | RI | 02903-2448 |
| 6020 | 4/14/2000 | Bayless & Associates | Contract Region Manager Agreement | Bayless & Associates | 12015 Manchaca Rd | Austin | TX | 78748 |

76

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| | 7/1/2002 | Beeline Distributing | Distributor Agreement | Beeline Distributing | 130 S Beeline | Payson | AZ | 85541 |
| | Unknown | Best Express | Distributor Agreement | Best Express | 1730 Sabre St | Hayward | CA | 94545 |
| SMH006 230-006248 | 2/18/1999 | Bestfoods Baking Distribution Company | Distribution Agreement | Bestfoods Baking Distribution Company | 55 Paradise Lane | Bay Shore | NY | 11706 |
| | Various | BISYS | All Contracts relating to administration of employee benefit plans for Interstate Brands Corporation and its affiliates | BISYS | 200 Dryden Rd | Dresher | PA | 19025 |
| 6050 | 2/12/2001 | BMRF Company Inc. | Broker Agreement | BMRF Company Inc. | 3948  Sunbeam Rd. #3 | Jacksonville | FL | 32257 |
| KL00000 05 | 9/3/2002 | BNY Capital Resources Corporation | Master Equipment Lease Agreement | BNY Capital Resources Corporation | 8400 East Prentice Ave. Suite 240 | Greenwood Village | CO | 80111 |
| KL00000 04 | 9/3/2002 | BNY Capital Resources Corporation | Master Guarantee | BNY Capital Resources Corporation | 8400 East Prentice Ave. Suite 240 | Greenwood Village | CO | 80111 |
| KL00000 06 | 9/3/2002 | BNY Capital Resources Corporation | Schedule 1 | BNY Capital Resources Corporation | 8400 East Prentice Ave. Suite 240 | Greenwood Village | CO | 80111 |
| KL00000 07 | 9/3/2007 | BNY Capital Resources Corporation | Schedule 2 | BNY Capital Resources Corporation | 8400 East Prentice Ave. Suite 240 | Greenwood Village | CO | 80111 |
| KL00000 08 | 10/11/2002 | BNY Capital Resources Corporation | Schedule 3 | BNY Capital Resources Corporation | 8400 East Prentice Ave. Suite 240 | Greenwood Village | CO | 80111 |
| KL00000 09 | 10/11/2002 | BNY Capital Resources Corporation | Schedule 4 | BNY Capital Resources Corporation | 8400 East Prentice Ave. Suite 240 | Greenwood Village | CO | 80111 |
| KL00000 10 | 10/11/2002 | BNY Capital Resources Corporation | Schedule 5 | BNY Capital Resources Corporation | 8400 East Prentice Ave.Suite 240 | Greenwood Village | CO | 80111 |
| KL00000 11 | 12/16/2002 | BNY Capital Resources Corporation | Schedule 6 | BNY Capital Resources Corporation | 8400 East Prentice Ave. Suite 240 | Greenwood Village | CO | 80111 |

77

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| | Unknown | Brent & Joy Distributing | Distributor Agreement | Brent & Joy Distributing | 3260 W 3000 North | Moore | ID | 832551 |
| | Various | Broadspire Services Inc. | All Risk Management Services Agreements | | 1601 SW 80th Terrace | Plantation | FL | 33324 |
| 492 | 2/2/2004 | C&C Snacks Distributing | Distributor Agreement | C&C Snacks Distributing | 1430 Bessemer Dr | El Paso | TX | 79936 |
| SK155 | 1-Mar-02 | California Pretzel Co., Inc. | San Francisco French Bread-California Pretzel Co., Inc. Co-Packing Agreement | California Pretzel Co., Inc. | 2235 West Goshen Avenue | Visalia | CA | 93291 |
| 14100 | 8/18/2003 | Candice Davis | Distributor Agreement | Candice Davis | 8480 Woodridge Street | Davidson | MI | 48 |
| 17027 | 10/6/2003 | Candy Mountain Distributing | Distributor Agreement | Candy Mountain Distributing | 111 E. Daily | Rawlins | WY | 82201 |
| | 4/2/1998 | Carlos Haro Villanes | Distributor Agreement | Carlos Haro Villanes | 2636 Denna Ave | Nogalas | AZ | 85 |
| 10097 | 8/28/2002 | Caseys General Store | EDI Trading Agreement | Casey's General Stores, Inc. EDI Business Manager | One Convenience Blvd | Ankeny | IA | 5002 |
| 424 | 11/1/1992 | Castle Valley Distributing | Distributor Agreement | Castle Valley Distributing | 2913 W Hilltop Rd | Price | UT | 845 |
| | Various | Ceridian Benefit Services | All Contracts relating to administration of employee benefit plans for Interstate Brands Corporation and its affiliates | Ceridian Benefit Services | PO Box 10989 | Newark | NJ | 073 |
| | Various | CIGNA | All Contracts relating to administration of employee benefit plans for Interstate Brands Corporation and its affiliates | CIGNA | 7400 W 110th St Suite 400 | Overland Park | KS | 66210 |
| | Various | CIGNA Behavioral Health Care Inc | All Contracts relating to administration of employee benefit plans for Interstate Brands Corporation and its affiliates | CIGNA Behavioral Health Care Inc | PO Box 1450 NW 7307 | Minneapolis | MN | 55485 |

78

Exhibit O-3

**EXECUTORY CONTRACTS TO BE ASSUMED**

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---------|-----------|--------------|---------------|--------------|---------|------|-------|----------|
| 6081 | 1/4/2001 | Citicorp Del-Lease, Inc. | Equipment Lease Agreement and Leasing Schedule as Modified by the Stipulation Entered between the parties and approved by the Bankruptcy Court | Citicorp Del-Lease, Inc. | 450 Mamaroneck Ave | Harrison | NY | 10528 |
| 6081 | 7/16/2001 | Citicorp Del-Lease, Inc. | Equipment Lease Agreement and Leasing Schedule as Modified by the Stipulation Entered between the parties and approved by the Bankruptcy Court | Citicorp Del-Lease, Inc. | 450 Mamaroneck Ave | Harrison | NY | 10528 |
| 6081 | 5/8/2003 | Citicorp Del-Lease, Inc. | Equipment Lease Agreement and Leasing Schedule as Modified by the Stipulation Entered between the parties and approved by the Bankruptcy Court | Citicorp Del-Lease, Inc. | 450 Mamaroneck Ave | Harrison | NY | 10528 |
| 80 | 4/19/2004 | Citrix Systems Inc | Citrix Open License Agreement | Citrix Systems Inc Customer Service | 6400 Northwest Sixth Way | Fort Lauderdale | FL | 33309 |
| 1008 | 5/2/2004 | Citrix Systems Inc | Preferred Support Services Agreement | Citrix Systems Inc Tom Nicholas | 161 N Clark 42nd Flr | Chicago | IL | 60601 |
| 14095 | 7/1/1998 | Clifford Leibold | Distributor Agreement | Clifford Leibold | 5896 Birchcrest | Saginaw | MI | 48603 |
| | Unknown | Coastal Pacific Food Distributors | Distributor Agreement | Coastal Pacific Food Distributors | PO Box 79175 | Baltimore | MD | 21279 |
| 4009 | 11/11/1911 | Comdata Business Fleet Services | Comchek/Mastercard Fleet Card Agreement | Comdata Business Fleet Services | 5301 Maryland Way | Brentwood | TN | 37027 |
| 4008 | 4/5/2004 | Comdata Network Inc | MasterCard Corporate Card Agreement | Comdata Network Inc | 5301 Maryland Way | Brentwood | TN | 37027 |
| 5076 | 11/1/2001 | Commercial Energy of Montana | End User Natural Gas Purchase Agreement | Commercial Energy of Montana | 118 E Main St | Cut Bank | MT | 59427 |

79

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| SK157 | 27-Mar-98 | Consolidated Biscuit Company | Interstate Brands Corporation-Consolidated Biscuit Company Contract Packing Agreement | Consolidated Biscuit Company | 312 Rader Road | McComb | OH | 458580 |
| 207 | 12/20/1982 | Copper Basin Dist, Inc | Distributor Agreement | Copper Basin Dist, Inc | PO Box 364 | Glen Allen | AK | 99588 |
| 5110 | 8/12/2003 | Cornerstone Energy Inc | Base Agreement for Use with Summit Energy Customers | Cornerstone Energy Inc Mike Squires | 11011 Q St Ste 106A | Omaha | NE | 68137 |
| 6025 | 6/2/2003 | Cross International Sales & Marketing | Broker Agreement | Cross International Sales & Marketing Lidia Cross | 22332 N 82nd Ln | Peoria | AZ | 85383 |
| 6034 | 1/9/2000 | Crossmark | Broker Agreement | Crossmark | 2435 Kimberly Rd Ste 300 S | Bettendorf | IA | 52722 |
| 6041 | 1/9/2000 | Crossmark | Broker Agreement | Crossmark | PO Box 8032 | Plymouth | MI | 48170 |
| 6021 | 4/14/2000 | D/P Universal Sales, Inc. North | Contract Region Manager Agreement | D/P Universal Sales, Inc. North H. Richard Ellingson | 3948 Sunbeam Rd Ste 7 | Jacksonville | FL | 32257 |
| 6022 | 4/14/2000 | D/P Universal Sales, Inc. South | Contract Region Manager Agreement | D/P Universal Sales, Inc. South H. Richard Ellingson | 3948 Sunbeam Rd Ste 7 | Jacksonville | FL | 32257 |
| 416 | 6/1/1999 | Daiichya Love's Bakery Inc | Distributor Agreement | Daiichya Love's Bakery Inc | 911 Middle St | Honolulu | HI | 96818 |
| 14090 | 5/17/1999 | Dan Doolan | Distributor Agreement | Dan Doolan | 6234 Willowdale Ct | Burton | MI | 48509 |
| SK209 | | Demonja Distributing | Distributor Agreement | Demonja Distributing | 474 H Avenue | Limon | CO | |
| 10095 | 1/27/2003 | Demoular/Market Basket | EDI Trading Agreement | Demoular Market Basket | 875 East Street | Tewksbury | MA | 01876 |
| 11006 | 8/31/2004 | Dominick's Finer Foods, LLC | Private Label Manufacturing and Supply Agreement | Dominick's Finer Foods, LLC Jewel Hart Vice President Bakery Safeway, Inc. | 5918 Stoneridge Mall Rd | Pleasanton | CA | 94588 |

80

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| SMH001 700- SMH001 701 | 10/9/02 | EFS National Bank | EFS National Bank Authorization, Settlement and payment Merchant Agreement | | 2525 Horizon Lake Drive, Suite 120 | Memphis | TN | 38133 |
| 15098 | 1/20/2004 | Environmental Management Services Inc | Consulting Agreement | Environmental Management Services Inc | 56 E 15th Ave | Eugene | OR | 97401-4053 |
| 567 | 2/2/2004 | ERP Solutions Inc | Software License Agreement | ERP Solutions Inc | 100 Crescent Court, Seventh Floor | Dallas | TX | 75201 |
| | Various | ESIS, Inc | All Risk Management Services Agreements | | 436 Walnut Street | Philadelphia | PA | 19105 |
| SMH000 469- SMH000 476 | 2/20/81 | Eurpac Service Incorporated | Military Sales - Overseas Broker Representation Contract | | | Greenwich | CT | |
| | Various | EyeMed Vision Care | All Contracts relating to administration of employee benefit plans for Interstate Brands Corporation and its affiliates | EyeMed Vision Care | 4000 Luxottica Place | Mason | OH | 45040 |
| SK9 | November [x], 1997 | Federated Group, Inc. | Federated Group License | N/A | - | - | - | - |
| 4145 | 9/1/1999 | Feed Commodities LLC | Service Agreement | Feed Commodities LLC | 2006 Portland Ave | Tacoma | WA | 98421 |
| 14104 | 9/13/2004 | Fick Distributing | Distributor Agreement | Fick Distributing | 2200 Gravel Creek Rd | Northland | MI | 48461 |
| 10092 | 7/16/2004 | Food Lion LLC | EDI Trading Agreement | Food Lion, LLC Legal Dept | 2110 Executive Dr | Salisbury | NC | 28147 |
| 10093 | 8/30/2004 | Food Lion LLC | Food Lion & IBC Sales Corporation Pay By Scan Process Protocol Agreement | Food Lion LLC Legal Dept | 2110 Executive Dr | Salisbury | NC | 28147 |

81

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
|  | Various | Frontier Trust Company | All Contracts relating to administration of employee benefit plans for Interstate Brands Corporation and its affiliates | Frontier Trust Company | PO Box 10699 | Fargo | ND | 58106-0699 |
| 16154 | 5/27/2002 | Full Circle Sales | Distributor Agreement | Full Circle Sales | 4752 N Camino DeLa Codorniz | Tucson | AZ | 85745 |
|  | 7/1/2003 | GE Capital | Lease #4202600001 | General Electric Capital Corporation | 1010 Thomas Edison Blvd SW | Cedar Rapids | IA | 52405 |
|  | 7/29/2003 | GE Capital | Lease #6769352003 | General Electric Capital Corporation | 1010 Thomas Edison Blvd SW | Cedar Rapids | IA | 52405 |
|  | 3/29/2004 | GE Capital | Lease #6769352004 | General Electric Capital Corporation | 1010 Thomas Edison Blvd SW | Cedar Rapids | IA | 52405 |
|  | 7/29/2003 | GE Capital | Lease #6971421002 | General Electric Capital Corporation | 1010 Thomas Edison Blvd SW | Cedar Rapids | IA | 52405 |
|  | 2/24/2004 | GE Capital | Lease #7281062001 | General Electric Capital Corporation | 1010 Thomas Edison Blvd SW | Cedar Rapids | IA | 52405 |
|  | 3/29/2004 | GE Capital | Lease #7292823001 | General Electric Capital Corporation | 1010 Thomas Edison Blvd SW | Cedar Rapids | IA | 52405 |
|  | 7/30/1996 | GE Fleet Services | Truck Lease |  | 2988 Campus Drive | San Mateo | CA | 94403 |
| 14114 | 1/5/2004 | Grand Hill Distributing | Distributor Agreement | Grand Hill Distributing | 2944 Pineridge Drive | Craig | CO | 81625 |
| 208 | 4/2/1983 | Great Alaskan Food Company | Distributor Agreement | Great Alaskan Food Company | 1851 Fox Avenue | Fairbanks | AK | 99701 |
| 239 | 3/5/1990 | Hanel Distributing Co | Distributor Agreement | Hanel Distributing Co | 3536 South Highway 17 | Alamosa | CO | 81101 |
| 21035 | 7/30/2004 | Hasler Financial Services, LLC | Lease Agreement | Hasler Financial Services, LLC | 3400 Bridge Pkwy Ste 201 | Redwood City | CA | 94065 |

82

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| SK25 | 21-Jul-87 | Heileman Baking Company ("Licensee") (now assigned to Metz Baking Company) | Metz 1987 License | Metz Baking Company Attn: General Counsel | 520 Lake Cook Road, Suite 520 | Deerfield | IL | 60015 |
| 13011 | 5/1/1996 | Hostess Cake Distributors of South Florida Inc | Distributor Agreement | Hostess Cake Distributors of South Florida Inc | 1385 SW 12th Ave | Pompano Beach | FL | 33069 |
| 622 | 7/22/2002 | Incident Reports, Inc | Application Services Level Agreement | Incident Reports Inc. | 4094 Majestic Ln Ste 267 | Fairfax | VA | 22033 |
| | Various | ING Life Insurance and Annuity Company | All Contracts relating to administration of employee benefit plans for Interstate Brands Corporation and its affiliates | ING Life Insurance and Annuity Company | 151 Farmington Avenue, TN11 | Hartford | CT | 06156 |
| 6027 | 2/11/2002 | Interlink Marketing Group | Broker Agreement | Interlink Marketing Group | 5700 Stoneridge Mall Rd Ste 220 | Pleasanton | CA | 94588 |
| 6035 | 11/17/2002 | Interlink Marketing Group | Broker Agreement | Interlink Marketing Group | 5700 Stoneridge Mall Rd Ste 220 | Pleasanton | CA | 94588 |
| IP006 | 2/28/2000 | International Foods Company | Master Trademark License, Technical Assistance and Distribution Agreement | International Foods Company | 3 Helmy Badawy Street | Cairo | Egypt | |
| 10050 | 12/1/1996 | Iron Mountain | Records Management and Service Agreement | Iron Mountain | 6301 Winchester Ave Ste 611A | Kansas City | MO | 64197 |
| 6038 | 1/9/2000 | J Dall Thomas | Broker Agreement | J Dall Thomas Dean Thomas | 1235 Sams Ave | Harahan | LA | 70123 |
| 14098 | 5/17/1999 | James Kruszka | Distributor Agreement | James Kruszka | 6230 E Court Street | Burton | MI | 48509 |
| 14099 | 7/1/1998 | Jeff Griffin | Distributor Agreement | Jeff Griffin | 10988 Henderson Road | Corunna | MI | 48817 |
| 26005 | 5/17/1999 | Jim and Betty Southard dba Southard Distributors, Inc. | Distributor Agreement | Jim and Betty Southard dba Southard Distributors, Inc. | 100 Stout Drive | Elk City | OK | 73648 |
| 428 | 3/1/1998 | JKD Distributing | Distributor Agreement | JKD Distributing | PO Box 724 | Snowville | UT | 84336 |

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| 14102 | 10/8/2002 | John Francisco | Distributor Agreement | John Francisco | 13516 North Road | Fenton | MI | 48430 |
| 5001 | 7/1/1984 | John Hancock | Application for Group Annuity Contract | John Hancock | John Hancock Place PO Box 111 | Boston | MA | 02117 |
| 5002 | 10/1/1984 | John Hancock | Application for Group Annuity Contract | John Hancock | John Hancock Place PO Box 111 | Boston | MA | 02117 |
| 5003 | 11/1/1985 | John Hancock | Application for Group Annuity Contract | John Hancock | John Hancock Place PO Box 111 | Boston | MA | 02117 |
| SMH005 995-006055 | 8/1/2004 | Johnson County Community College | Agreement | | 12345 College Boulevard | Overland Park | KS | 66210-1299 |
| 14097 | 5/14/2000 | Jon Macintosh | Distributor Agreement | Jon Macintosh | 8304 Jaclynn | Flushing | MI | 48021 |
| SK218 | - | Juan Rodriguez | Distributor Agreement | Juan Rodriguez | 131 E Oak St. #C38 | Uvalde | TX | 78801 |
| 14088 | 8/2/2002 | Kevin Shirley | Distributor Agreement | Kevin Shirley | 4480 S. Hillcrest Circle | Flint | MI | 48507 |
| SK133 | 6/19/2003 | Kronos Inc. | Kronos Inc. Depot Repair Maintenance Agreement | Kronos Incorporated Attn: Director of Corporate Customer Service | 297 Billerica Road | Chelmsford | MA | 01824 |
| SK133 | 9/13/2003 | Kronos Inc. | Kronos Inc. Software Maintenance Agreement | Kronos Incorporated Attn: National Field Service Manager | 297 Billerica Road | Chelmsford | MA | 01824 |
| 10015 | 6/19/2003 | Kronos Incorporated | Kronos Sales Agreement and Software License | Kronos Incorporated | 297 Billerica Rd | Chelmsford | MA | 01824 |
| | Unknown | L & M Distributors | Distributor Agreement | L & M Distributors | 6150 Rio Vista Lane | Carson City | NV | 89701 |
| 6031 | 12/9/2000 | L.H. Gamble | Broker Agreement | L.H. Gamble | 3615 Harding Ave | Honolulu | HI | 96816 |
| SK187 | 9/1/1998 | Larry R. Gosack DBA Lemhi Distributing | Distributor Agreement | Lemhi Distributing | 909 Main Street | Salmon | ID | 83467 |
| SK222 | 10/16/1989 | Las Vegas Wholesale | Distributor Agreement | Las Vegas Wholesale | 407 Railroad | Las Vegas | NM | 87701 |

84

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| IP008 | 12/27/1996 | Lewis Brothers Baking Inc | License Agreement | Lewis Brothers Bakeries Inc. R. Jack Lewis, Jr. | 500 N. Fulton Ave. | Evansville | IN | 47710-1571 |
| 14178 | 9/20/2004 | Leyva Enterprises | Distributor Agreement | Leyva Enterprises | PO Box 611 | Keyenta | AZ | 86033 |
| SK223 | - | Lonnies Snacks | Distributor Agreement | Lonnie Stevenson (Lonnies Snacks) | 1606 1/2 Main Street | Roswell | NM | 88203 |
| 16005 | 1/1/1999 | Lou Misterly Brokerage | Warehouse and Distribution Services Agreement | Lou Misterly Brokerage | 210 Ranger | Brea | CA | 92821 |
| | Various | Malnove Packaging Systems | All Contracts relating to the lease of packaging equipment at the Company's bakeries | Malnove Packaging Systems | 3623 S 138 St | Omaha | NE | 68144 |
| 6065 | 6/3/2001 | Mancini Sales & Marketing | Broker Agreement | Mancini Sales & Marketing | 219 Wren Ln | Aylett | VA | 23001 |
| 370 | 3/31/1997 | Marie Callender Pie Shops Inc | Trademark License Agreement | Marie Callender Pie Shops Inc James W. Stryker | 27081 Aliso Creek Road, Suite 200 | Aliso Viejo | CA | 92656 |
| | Various | Marshall & Ilsley Trust Company, N.A. | All Contracts relating to administration of employee benefit plans for Interstate Brands Corporation and its affiliates | Marshall & Ilsley Trust Company, N.A. | 221 W College Ave PO Box 1056 | Appleton | WI | 54912-1056 |
| 10091 | 10/28/2003 | Meijer Stores Limited Partnership, Meijer Inc., Meijer Distribution Inc | Scan Based Trading Agreement | Meijer Stores Limited Partnership, Meijer Inc., Meijer Distribution Inc | 2929 Walker NW | Grand Rapids | MI | 43544 |
| | Unknown | MexBread | Distributor Agreement | MexBread | 6774 Calle De Linea #104 | San Diego | CA | 92154 |
| 14089 | 3/21/2002 | Michael Doolan | Distributor Agreement | Michael Doolan | 2608 Flushing Road | Flint | MI | 48504 |
| 433 | 1/4/1993 | Miera Distributing Co | Distributor Agreement | Miera Distributing Co | PO Box 2227 | Wendover | NV | 89883 |
| SK27 | 1-Apr-01 | MJC SF LLC ("Licensee") | MJC SF LLC License Agreement | MJC SF LLC Attn: Joel Kleinfeld | 2725 Oakdale Avenue | San Francisco | CA | 94124 |
| 6063 | 6/4/2001 | Monroe & Associates | Broker Agreement | Monroe & Associates | 1870 Bitters Rd | San Antonio | TX | 78248 |

85

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| 14302 | 7/1/1998 | Montana-Dakota Utilities Company | Gas Transportation Agreement | Montana-Dakota Utilities Company | PO Box 5650 | Bismarck | ND | 585010-5650 |
| 990 | 10/1/2001 | Motion Industries Inc | Purchasing Arrangement Terms and Conditions | Motion Industries Inc | PO Box 1477 | Birmingham | AL | 35201 |
| 243 | 5/1/1990 | Mountain Valley Distributors Inc | Distributor Agreement | Mountain Valley Distributors Inc | PO Box 1174 | Gunnison | CO | 81230 |
| 625 | 7/13/2004 | MSC Industrial Direct Company | Extension of Current Agreement/Endorsement of MSC | MSC Industrial Direct Company | 75 Maxess Road | Melville | NY | 11747 |
| 6032 | 1/9/2000 | MSM Solutions | Broker Agreement | MSM Solutions | 7109 Hickman Rd | Des Moines | IA | 50322 |
| 6042 | 1/9/2000 | MSM Solutions | Broker Agreement | MSM Solutions | 5435 Feltie Rd | Minnetonka | MN | 55501 |
| 6044 | 1/9/2000 | MSM Solutions | Broker Agreement | MSM Solutions | PO Box 2423 | Fargo | ND | 58108 |
| 6047 | 1/9/2000 | MSM Solutions | Broker Agreement | MSM Solutions | 9427 F St | Omaha | NE | 68127 |
| SMH004 641- SMH004 667 | 1/1/2002 | NCH NuWorld Marketing Limited | Agreement for NCH Manufacturer Services | NCH Promotional Services | 75 Tri-State International, Suite 400 | Lincolnshire | IL | 60069-4459 |
| SK172 | 9/22/2003 | Neely Distribution | Distributor Agreement | Neely Distribution | 470-670 Reservoir Way | Susanville | CA | 96130 |
| | Unknown | Nite Owl Distributors | Distributor Agreement | Nite Owl Distributors | PO Box 1712 | Bishop | CA | 93515 |
| 17038 | 12/16/1988 | Northern Sales Company of Alaska Inc | Distributor Agreement | Northern Sales Company of Alaska Inc | PO Box 021707 | Juneau | AK | 99802 |
| | Various | Northern Trust Bank of Florida NA | All Contracts relating to administration of employee benefit plans for Interstate Brands Corporation and its affiliates | Northern Trust Bank of Florida NA | 700 Brickell Ave | Miami | FL | 33131 |

86

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| 23005 | 8/16/2004 | Ohio Gas Company | Special Arrangement for Firm Gas Transportation Service | Ohio Gas Company | 200 West High St | Bryan | OH | 43506 |
| SK141 | 8/25/2003 | Oracle Corporation | Oracle Corporation Service Agreement | Oracle Corporation*Note no notice provision exists. Address comes from the Miscellaneous provision of an amendment to the agreement. | 1610 10 Desperes Road, Suite 120 | St. Louis | MO | 63131 |
| SMH005 744- SMH005 749 | 1/9/1997 | Orbit Software Group, Inc. | Enterprise License Agreement | | 1300 Clay Street, Suite 600 | Oakland | CA | 95012 |
| 5090 | 1/1/2004 | Otter Tail Energy Services Co | Natural Gas Sales Transaction Agreement | Otter Tail Energy Services Co | 224 E Washington | Fergus Falls | MN | 56538-0496 |
| 5091 | 1/1/2004 | Otter Tail Energy Services Co | Natural Gas Sales Transaction Price Addendum | Otter Tail Energy Services Co | 224 E Washington | Fergus Falls | MN | 56538-0496 |
| 5133 | 1/1/2004 | Otter Tail Energy Services Co | Otter Tail Energy Services Natural Gas Sales Transaction Agreement | Otter Tail Energy Services Co | 224 E Washington | Fergus Falls | MN | 56538-0496 |
| 6254 | 10/15/2001 | Packard Wholesale & Dist. | Distributor Agreement | Packard Wholesale & Dist. | Verl Packard PO Box 185 | Moab | UT | 84532 |
| 14096 | 7/1/1998 | Paul Enos | Distributor Agreement | Paul Enos | 6265 Humphrey | Flushing | MI | 48433 |
| 22015 | 11/8/1999 | Penske Truck Leasing | Vehicle Lease Service Agreement | Penske Truck Leasing | Route 10 Green Hills Box 563 | Reading | PA | 19603 |
| | 2/1/1998 | PFS Distributing | Distributor Agreement | PFS Distributing | 7671 N John Hancock | Tucson | AZ | 85741 |
| | 12/1/1997 | Pilkington Distributors | Distributor Agreement | Pilkington Distributors | 4339 W Adamson | Showlow | AZ | 85901 |
| 6071 | 4/5/1999 | Premier Concepts | Broker Agreement | Premier Concepts | PO Box 1278 | Bentonville | AR | 72712 |
| 6062 | 1/9/2000 | Profit Planners | Broker Agreement | Profit Planners | 2000 North Loop West, #120 | Houston | TX | 77018 |

87

Exhibit O-3

**EXECUTORY CONTRACTS TO BE ASSUMED**

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| 15017 | 6/8/1992 | Promotion Management Inc | Agreement for PMI Coupon Management Services | Promotion Management Inc | 113 McHenry Rd Ste 293 | Buffalo Grove | IL | 600080 |
| 17100 | Various | Prudential Group Insurance | All Contracts relating to administration of employee benefit plans for Interstate Brands Corporation and its affiliates | Prudential Group Insurance | 290 W Mt Pleasant Ave | Livingston | NJ | 070391 |
| 17101 | 1/1/2004 | Quality Bakers of America Cooperative Inc | Membership Agreement | Quality Bakers of America Cooperative, Inc | 70 Riverdale Ave | Greenwich | CT | 06831 |
| 17101 | 11/24/2003 | Quality Bakers of America Cooperative, Inc | Quality Bakers of America Cooperative, Inc Limited Sunbeam License for Affiliate Member | Quality Bakers of America Cooperative Inc | 70 Riverdale Ave | Greenwich | CT | 06831 |
| 6056 | 1/9/2000 | R.P. Associates | Broker Agreement | R.P. Associates | 1105 Lincoln Hgwy | North Versailles | PA | 15137 |
| 6253 | 3/6/1986 | R.S. Miller Distributing | Distributor Agreement | R.S. Miller Distributing | PO Box 725 | Logan | UT | 843210 |
| 244 | 6/17/1991 | Ray Nelson | Distributor Agreement | Ray Nelson | 3466 E Highway 50 | Salida | CO | 812010 |
| 1021 | 1/1/1984 | Raymond M Rushing | Salesman Owned Equipment Agreement | Raymond M Rushing | 3170 Whitten Rd | Jackson | MS | 39212 |
| 7055 | 1/22/2003 | Recycle to Conserve, Inc. | Service Agreement | Recycle to Conserve, Inc. | 1163 Belmont Street | Ontario | CA | 91761 |
| 6060 | 6/3/2000 | Reese Brokerage Co. | Broker Agreement | Reese Brokerage Co. | 340 Shipley Fairy Rd | Blountville | TN | 37617 |
| 22102 | 11/3/1998 | Regal Foods LLC | Distributor Agreement | Regal Foods LLC | 1200 E International Airport Rd | Anchorage | AK | 995181 |
| 6033 | 4/4/2004 | Reliance Food Brokerage Ohio | Broker Agreement | Reliance Food Brokerage Ohio | 11136 Reading Rd | Sharonville | OH | 45241 |
| 17067 | 1/22/2001 | Ricardo M Rodriguez dba R&R Distributing | Distributor Agreement | Ricardo M Rodriguez dba R&R Distributing | 1702 Primrose | Mission | TX | 78572 |
| 14103 | 9/13/2004 | Robert Doolan | Distributor Agreement | Robert Doolan | 1817 S Reese Road | Reese | MI | 48757 |

88

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| 6064 | 12/12/2001 | Robins Brokerage | Broker Agreement | Robins Brokerage | PO Box 1506 | Salt Lake City | UT | 84110 |
| 6019 | 1/11/2000 | Robins Brokerage Company | Broker Agreement | Robins Brokerage Company | PO Box 1506 | Salt Lake City | UT | 84110 |
| 22028 | Various | Rock Tenn Converting Company | All Contracts relating to the lease of packaging equipment at the Company's bakeries | Rock Tenn Converting Company | 504 Thrasher st | Norcross | GA | 30071 |
| 4019 | 8/1/2004 | Rockwell Automation, Inc | Suggested Pricing Agreement | Rockwell Automation Inc Brian Koscielski | 8407 Bond | Lenexa | KS | 66215 |
| 6256 | 4/19/1993 | Rocky Mountain Produce Company, dba RMC Foods | Distributor Agreement | Rocky Mountain Produce Company, dba RMC Foods | 825 North Industrial Road | St. George | UT | 84770 |
| | 1/1/1974 | Roman Meal Company | License Agreement and Advertising Continuity Plan - Billings | | PO Box 11126 | Tacoma | WA | 98411 |
| 400 | 1/1/1974 | Roman Meal Company | License Agreement and Advertising Continuity Plan - Bismark | Roman Meal Company | PO Box 11126 | Tacoma | WA | 98411 |
| | 8/5/1985 | Roman Meal Company | License Agreement and Advertising Continuity Plan - Boise | | PO Box 11126 | Tacoma | WA | 98411 |
| 395 | 1/1/1974 | Roman Meal Company | License Agreement and Advertising Continuity Plan - Cincinnati | Roman Meal Company | PO Box 11126 | Tacoma | WA | 98411 |
| | 8/19/1985 | Roman Meal Company | License Agreement and Advertising Continuity Plan - Grand Junction | | PO Box 11126 | Tacoma | WA | 98411 |
| 397 | 1/1/1974 | Roman Meal Company | License Agreement and Advertising Continuity Plan - Grand Rapids | Roman Meal Company | PO Box 11126 | Tacoma | WA | 98411 |
| 11015 | 12/18/2002 | Roman Meal Company | License Agreement and Advertising Continuity Plan - Henderson | Roman Meal Company | PO Box 11126 | Tacoma | WA | 98411 |

89

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| 381 | 1/1/1974 | Roman Meal Company | License Agreement and Advertising Continuity Plan - Kansas City | Roman Meal Company | PO Box 11126 | Tacoma | WA | 98411 |
| 399 | 1/1/1974 | Roman Meal Company | License Agreement and Advertising Continuity Plan - Minot | Roman Meal Company | PO Box 11126 | Tacoma | WA | 98411 |
| | 9/26/1983 | Roman Meal Company | License Agreement and Advertising Continuity Plan - Springfield | | PO Box 11126 | Tacoma | WA | 98411 |
| 1015 | 4/27/1989 | Ronald S Caira | Salesperson Owned Equipment Agreement | Ronald S Caira | 1804 Springs Inn Road | Clarksville | TN | 37043 |
| 439 | 1/7/1985 | Roosevelt Distributing | Distributor Agreement | Roosevelt Distributing | 130 N Skyline Dr | Roosevelt | UT | 84066 |
| 263 | 3/28/2003 | SAP America Inc | SAP America Inc Software End User License Agreement | SAP America Inc | 3999 West Chester Pike | Newton Square | PA | 19073 |
| 391 | 11/19/2002 | SBC Services, Inc | License Agreement | SBC Services Inc | PO Box 6018 | Youngstown | OH | 44501 |
| 6053 | 1/2/2004 | Schraad & Associates | Broker Agreement | Schraad & Associates | PO Box 18495 | Oklahoma City | OK | 73154 |
| 216 | 2/5/2001 | Sea Breeze Distributing | Distributor Agreement | Sea Breeze Distributing | 1211 Virginia Ave | Lynn Haven | FL | 32444 |
| 16006 | 5/19/2004 | Service Warehouse Corporation | Services Agreement | Service Warehouse Corporation Wilson S Stober Goodin Abernathy & Miller LLP | 8900 Keystone Crossing Ste 1100 | Indianapolis | IN | 46240 |
| 835 | 6/1/1991 | Shurfine Central Corporation | Shurfine Central Corporation Master Perishable Supplier License Agreement | Shurfine Central Corporation | 2100 N Mannheim Rd | Northlake | IL | 60164-5862 |
| | Unknown | Silveria Distributors | Distributor Agreement | Silveria Distributors | 13195 Tierra Oaks Dr | Redding | CA | 96003 |
| 15012 | 12/15/2001 | Spectra Marketing Systems Inc | Spectra Master License Agreement | Spectra Marketing Systems Inc | 200 W Jackson Blvd Ste 2800 | Chicago | IL | 60606 |

90

**Exhibit O-3**

**EXECUTORY CONTRACTS TO BE ASSUMED**

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| 10090 | 9/8/2003 | Speedway SuperAmerica | Electronic Data Interchange Invoice Agreement | Speedway SuperAmerica | 500 Speedway Dr | Enon | OH | 45323 |
| IP004 | 5/30/1980 | Sun-Maid Growers of California | License Agreement--Sun-Maid Bread Products & English Muffins | Sun-Maid Growers of California | 7273 Murray Drive Suite 18 | Stockton | CA | 95210 |
| 6058 | 8/22/2004 | Superior Sales Enterprises | Broker Agreement | Superior Sales Enterprises | 219 Polo Dr | North Wales | PA | 19454 |
| SK275 | 11/10/1999 | Supervalu Inc. | Bakery Services Agreement, as Amended | Supervalu Inc. | 11840 Valley View Road | Eden Prairie | MN | 55344 |
| 11020 | 8/1/2004 | Svenhard's Swedish Bakery | Svenhard's Swedish Bakery Exclusive Distributorship Agreement | Svenhard's Swedish Bakery | 335 Adeline Street | Oakland | CA | 94607 |
| | 2/1/1999 | T.E.A. Distributors | Distributor Agreement | T.E.A. Distributors | 421 York St | Gulf Breeze | FL | 32561 |
| 4116 | 5/1/2003 | TALX Corporation | Employer Service Agreement | TALX Corporation William W Canfield | 10101 Woodfield Lane | St Louis | MO | 63132 |
| 4020 | 11/27/2001 | TaxAutomation Inc | Software License Agreement | TaxAutomation Inc | 3020 N Military Trail Ste 275 | Boca Raton | FL | 33431 |
| 5004 | Various | The Cottonwood Group | All Contracts relating to administration of employee benefit plans for Interstate Brands Corporation and its affiliates | The Cottonwood Group | 6900 College Blvd Suite 300 | Overland Park | KS | 66211 |
| 5004 | 12/1/1976 | The Life Insurance Company of Virginia | Request for Change of Group Annuity Policy | The Life Insurance Company of Virginia | PO Box 27601 | Richmond | VA | 23261 |
| 629 | 11/00/2002 | The NPD Group Inc | SnackTrack Subscription Agreement | The NPD Group Inc | 900 W Shore Rd | Port Washington | NY | 11050 |
| 6030 | 1/9/2000 | The Produce Connection | Broker Agreement | The Produce Connection Joel Robertson | 6835 Shilo Rd, Ste C-13 | Alpharetta | GA | 30005 |

91

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| 707 | 8/1/2000 | The viaLink Company | Master Services Agreement | The viaLink Company J. Andrew Kerner | 13155 Noel Rd Suite 800 | Dallas | TX | 752401 |
| 17073 | 6/12/1996 | The WE Long Company | License Agreement | The Long Company Vice President - Purchasing | 300 W Washington | Chicago | IL | 60600 |
| 17004 | 1/1/1992 | The WE Long Company - Independent Bakers Cooperative | License Agreement | WE Long Company - Independent Bakers Cooperative | 300 W Washington St | Chicago | IL | 60601 |
| 11048 | 10/18/2000 | Travelers Casualty and Surety Company | General Contract of Indemnity | Travelers Casualty and Surety Company | One Tower Square | Hartford | CT | 061832 |
| 247 | 10/6/2003 | Tri County Distributors | Distributor Agreement | Tri County Distributors | 3115 Beechwood | Grand Junction | CO | 81506 |
| 11030 | 8/16/2004 | United States Bakery | Supply Agreement | United States Bakery M Robert Albers | PO Box 14769 | Portland | OR | 97214 0769 |
| 4026 | 3/29/2004 | Vanguard National Alliance Inc | Vanguard National Alliance Customer Supply Agreement | Vanguard National Alliance Inc | 85 Speen St Ste 201 | Farmingham | MA | 01701 |
| 702 | 12/5/2003 | Velosant LP | Software License Agreement (Domestic) | Velosant LP | 27 Congress St | Salem | MA | 01970 |
| 6258 | 1/7/1985 | Vernal Distributing Co. | Distributor Agreement | Vernal Distributing Co. | PO Box 125 | Vernal | UT | 84078 |
| | Various | Vision Service Plan | All Contracts relating to administration of employee benefit plans for Interstate Brands Corporation and its affiliates | Vision Service Plan | PO Box 60000 | San Francisco | CA | 94160 |
| 10089 | 8/19/2004 | Wakefern Food Corporation | EDI Trading Agreement | Wakefern Food Corporation/Mike Blundi | 600 York St | Elizabeth | NJ | 072071 |
| 5128 | 10/1/1999 | Wasatch Energy Corporation | Natural Gas Sales Agreement | Wasatch Energy Corporation | PO Box 699 | Farmington | UT | 840251 |
| | Unknown | Wedemeyer | Distributor Agreement | Wedemeyer | 314 Harbor Way | South San Francisco | CA | 94080 |

92

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| IBC0343 - IBC0353 | 1/22/96 | Western Family Foods, Inc. | License Agreement | | P.O. Box 4057 | Portland | OR | 97208- |
| 491 | 1/2/1995 | William E Vlassis Jr | Distributor Agreement | William E Vlassis Jr | 1591 Kingston Rd | Saginaw | MI | 48609 |
| SMH006 543-006549 | 7/17/2003 | | Broker Agreement | Barry T. Johnson, Advantage Sales & Marketing | 5064 Franklin Drive | Pleasanton | CA | 94588 |
| SMH006 550-006556 | 11/10/1999 | | Broker Agreement | Bill Bass, Advantage/Bass Sales & Marketing | 5401 Cordova, #105 | Anchorage | AK | 9951 12711 |
| SMH006 599-006604 | 12/13/1999 | | Broker Agreement | Bob Mills, Advantage NW | 9503 E. Montgomery | Spokane | WA | 99206 |
| SMH006 726-006732 | 7/17/2003 | | Broker Agreement | Bob Mills, Advantage Safeway Team | 4457 Willow Road, Suite 110 | Pleasanton | CA | 94588 |
| SMH006 636-006641 | 6/14/2001 | | Broker Agreement | Bob Wilkerson, ABCD Sales | 1680 Hwy 161 | Montgomery City | MO | 63361 |
| SMH006 818-006823 | 12/13/1999 | | Broker Agreement | Carl Wells, Big Sky | 511 13th Avenue | Great Falls | MT | 59404 |
| SMH006 587-006592 | 12/13/1999 | | Broker Agreement | Dale Admire, Premier, Inc. | PO Box 1278 | Bentonville | AR | 72711 12782 |
| SMH006 829-006833 | 2/15/2001 | | Broker Agreement | Darrle Reese, Reese Brokerage Co. | 2820 Brainsford Avenue | Nashville | TN | 37209 |
| SMH006 557-006562 | 12/13/1999 | | Broker Agreement | Dean Hampton, Advantage Crown South | 18851 Bardeen Avenue | Irvine | CA | 92612 |
| SMH006 623-006628 | 12/13/1999 | | Broker Agreement | Dean Thomas, J. Dall Thomas | 1235 Sams Avenue | Harahan | LA | 70123 |
| SMH000 6794-006799 | 12/13/1999 | | Broker Agreement | Don Sommer, Sommer, Leeper & DeRose | 2056 Central Avenue | Albany | NY | 12205 |
| SMH006 806-006811 | 12/13/1999 | | Broker Agreement | Doug Geske, Advantage Sales | PO Box 483 | Brookfield | WI | 53008-0483 |
| SMH006 673-006678 | 12/13/1999 | | Broker Agreement | Doug Tinney, Merkert American | 2147 Riverchase Office Park | Birmingham | AL | 35244 |

93

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| SMH006 642-006647 | 12/13/1999 | | Broker Agreement | Ed Royal, Reese Brokerage Co. | 1394 John Ridge Drive | Collierville | TN | 38017 |
| SMH006 509-006510 | 3/1/2002 | | Broker Agreement | Finnegan International Sales | PO Box 460, 34985 Persimmon Avenue | Yucaipa | CA | 92399 |
| SMH006 511-006516 | 4/6/2000 | | Broker Agreement | Gene Bayless, Bayless & Associates | 12015 Manchaca Road | Austin | TX | 78748 |
| SMH006 691-006697 | 3/3/2004 | | Broker Agreement | Harold Sargent, Alliance Sales & Marketing | 1120 W. Butler Road, Suite M | Greenville | SC | 29607 |
| SMH006 679-006684 | 12/13/1999 | | Broker Agreement | Jack Wynn, Advantage NW | PO Box 23139 | Portland | OR | 97220 |
| SMH006 605-006610 | 7/24/2002 | | Broker Agreement | John Massa, Advantage Sales & Marketing | 10300 Alliance Road, Suite 400 | Cincinnati | OH | 45242 |
| SMH006 611-006616 | 7/24/2002 | | Broker Agreement | John Massa, Advantage Sales & Marketing | 10300 Alliance Road, Suite 400 | Cincinnati | OH | 45242 |
| SMH006 648-00653 | 4/9/2001 | | Broker Agreement | Karl Rivers, Advantage Sales & Marketing | 3223 South Loop 289, Suite 450 | Lubbock | TX | 79423 |
| SMH006 705-006710 | 12/13/1999 | | Broker Agreement | Ken Atkinson, Douglas Sales Company | 140-N West Ethel Road | Piscataway | NY | 08854 |
| SMH006 760-006766 | 5/22/2003 | | Broker Agreement | Lidia Cross, Cross International Sales & Marketing | 22332 N. 82nd Lane | Peoria | AZ | 85383 |
| SMH006 661-006666 | 6/12/2001 | | Broker Agreement | Louis Bart, Profit Planners | 2000 N. Loop West #210 | Houston | TX | 77018 |
| SMH006 733-006739 | 3/28/2003 | | Broker Agreement | Lynn Pagliei, Superior Sales Enterprises | 219 Polo Drive | North Wales | PA | 19454 |
| SMH006 617-006622 | 8/21/2000 | | Broker Agreement | Paul Bell, Bell Sales & Marketing | 765 Fawnelm Road | Severn | MD | 21144 |
| SMH006 537-006542 | 2/20/2001 | | Broker Agreement | Paul King, The Pickrell Kraig/Greeson Co. | PO Box 1069 | Louisville | KY | 40201 |
| SMH006 800-006805 | 12/13/1999 | | Broker Agreement | Ralph Powell, R.P. Associates | 1105 Lincoln Highway | North Versailles | PA | 15137 |

94

**Exhibit O-3**

## EXECUTORY CONTRACTS TO BE ASSUMED

| PDF NO. | START DATE | COUNTERPARTY | CONTRACT NAME | NOTICE PARTY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|---|
| SMH006 563-006567 | 8/24/2000 | | Broker Agreement | Rex Collins, Advantage West | 245 E. Watkins St. | Phoenix | AZ | 85004 |
| SMH006 848-006853 | 5/6/2002 | | Broker Agreement | Richard Avery, Advantage Sales & Marketing | 12005 Ford Road, Suite 190 | Dallas | TX | 75234 |
| SMH006 522-006528 | 12/2/1999 | | Broker Agreement | Richard Ellingson, D/P Universals, Inc. South | 3948 Sunbeam Road, Suite 7 | Jacksonville | FL | 32257 |
| SMH006 517-006521 | 4/6/2000 | | Broker Agreement | Richard Ellingson, D/P Universals, Inc. South | 3948 Sunbeam Road, Suite 7 | Jacksonville | FL | 32257 |
| SMH006 788-006793 | 12/13/1999 | | Broker Agreement | Richard Radisill, Leeper & DeRose | 6806 New Brook Avenue | East Syracuse | NY | 13057 |
| SMH006 667-006672 | 6/6/2001 | | Broker Agreement | Robert Monroe, Monroe & Associates | 1870 Bitters Road | San Antonio | TX | 78248 |
| SMH006 812-006817 | 12/13/1999 | | Broker Agreement | Roger Schumacher, MSM Solutions | 5453 Feltl Road | Minnetonka | MN | 55343 |
| SMH006 685-006690 | 6/12/2001 | | Broker Agreement | Rudy Dye, Schraade & Associates | PO Box 18495 | Oklahoma City | OK | 73154 |
| SMH006 568-006573 | 12/13/1999 | | Broker Agreement | Russ Toms, Advantage Sales | 48 West Seegers Road | Arlington Heights | IL | 60005 |
| SMH006 574-006579 | 12/13/1999 | | Broker Agreement | Tom Koch, Koch & Associates | 505 Freyer Drive NE | Marietta | GA | 30066 |
| SMH006 754-006759 | 12/13/1999 | | Broker Agreement | Vernon Tom, L.H. Gamble | 3615 Harding Avenue | Honolulu | HI | 96816 |
| SMH006 593-006598 | 12/13/1999 | | Broker Agreement | Walt Gallagher, Advantage Sales | 231 West 800 South | Salt Lake City | UT | 84101 |
| | 05/24/1978 | Lee & Associates | Agreement | Leo Pearlstein | 145 S Fairfax Avenue, Suite 301 | Los Angeles | CA | 90036 |
| | 11/14/2003 | ITT Industries, Inc | Settlement Agreement And Mutual Release | Legal Department | 1133 Westchester Avenue | White Plains | NY | 10604 |
| | 11/14/2003 | Home Depot U.S.A., Inc | Settlement Agreement And Mutual Release | Legal Department | 2455 Paces Ferry Road NW | Atlanta | GA | 30339 |

95

**APPENDIX B**

**CHAPTER 7 LIQUIDATION ANALYSIS**

## Chapter 7 Liquidation Analysis

The Debtors have prepared this Liquidation Analysis (the "Liquidation Analysis") based on a hypothetical liquidation under Chapter 7 of the Bankruptcy Code. It is assumed, among other things, that the hypothetical liquidation under Chapter 7 would commence under the direction of a Court-appointed trustee and would continue for a period of time, during which time all of the Debtors' major assets would be sold or surrendered to the respective lien holders, and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with relevant law.

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a Chapter 7 case is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual Chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual Chapter 7 liquidation.

The Liquidation Analysis is a hypothetical exercise that has been prepared for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be realized if the Debtors were liquidated in accordance with Chapter 7 of the Bankruptcy Code. The Liquidation Analysis is used to satisfy the "best interest of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, because it indicates whether the members of an Impaired Class will receive at least as much under the Plan as they would in a liquidation under a hypothetical chapter 7 case.

THE LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THE LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED IN AN ACTUAL LIQUIDATION. THIS ANALYSIS ASSUMES "LIQUIDATION VALUES" BASED ON APPRAISALS, WHERE AVAILABLE, AND THE DEBTORS' BUSINESS JUDGMENT, WHERE APPRAISALS ARE NOT AVAILABLE. THE RECOVERIES SHOWN DO NOT CONTEMPLATE A SALE OR SALES OF BUSINESS UNITS ON A GOING CONCERN BASIS. WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM SUCH GOING CONCERN SALE(S) WOULD BE MORE THAN IN THE HYPOTHETICAL LIQUIDATION, THE COSTS ASSOCIATED WITH THE SALE(S) WOULD BE LESS, FEWER CLAIMS WOULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES AND/OR CERTAIN ORDINARY COURSE CLAIMS WOULD BE ASSUMED BY THE BUYER(S) OF SUCH BUSINESS(ES). Prior to a liquidation, the Debtors would revisit opportunities for the sale of all or parts of the Debtors business as a going concern. However, based upon the prior comprehensive sale process that was conducted, such opportunities, should they exist, are not expected to result in a material change to the recoveries outlined herein.

The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. Limited independent appraisals were obtained in preparing the Liquidation Analysis. NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR

WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED
IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.
This Liquidation Analysis assumes that a liquidation of the Debtors would occur over
approximately fourteen (14) months.  It is assumed that the Chapter 7 trustee would arrange for
the Debtors to terminate ongoing business and focus efforts to sell substantially all remaining
assets in an orderly manner.

The Liquidation Analysis should be read in conjunction with the following notes and assumptions:

**Notes to Liquidation Analysis**

1. *Dependence on assumptions*.  The Liquidation Analysis depends on estimates and
   assumptions.  The Liquidation Analysis is based on a number of estimates and
   assumptions that, although developed and considered reasonable by the management and
   the advisors of the Debtors, are inherently subject to significant economic, business,
   regulatory and competitive uncertainties and contingencies beyond the control of the
   Debtors or their management and advisors.  The Liquidation Analysis is also based on the
   Debtors' best judgment of how numerous decisions in the liquidation process would be
   resolved.  Accordingly, there can be no assurance that the values reflected in this
   Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a
   liquidation and actual results could vary materially and adversely from those contained
   herein.

2. *Additional unsecured claims*.  The cessation of business in a liquidation will trigger
   certain claims that otherwise would not exist under the Plan absent a liquidation.
   Examples of these kinds of claims include various potential employee claims (for such
   items as severance and potential WARN Act claims), executory contract and unexpired
   lease rejection damages, and potential multi-employer pension plan withdrawal liabilities.
   Some of these claims could be significant and will be entitled to priority in payment over
   general unsecured claims. Those priority claims would be paid in full from the liquidation
   proceeds before the balance would be made available to pay general unsecured claims or
   to make any distribution in respect of equity interests.  Other than potential severance,
   lease rejection, and multi-employer pension plan withdrawal claims, no attempt has been
   made to estimate other additional unsecured claims that may result from such events
   under a Chapter 7 liquidation scenario because no funds are estimated to be available to
   general unsecured creditors.

3. *Dependence on unaudited financial statements*.  This Liquidation Analysis contains
   numerous estimates that are still under review and it remains subject to further legal and
   accounting analysis.  It is based upon the Debtors' unaudited financial statements as of
   September 20, 2008 and the Debtors' projected financial statements.

4. *Preference or fraudulent transfers*.  No recovery or related litigation costs attributed to
   any potential avoidance actions under Chapter 5 of the Bankruptcy Code, including
   potential preference or fraudulent transfer actions, are assumed within this Analysis due
   to, among other issues, anticipated disputes about these matters. However, as noted in
   Section VI.H.6 of the Disclosure Statement, the Debtors have filed a pending adversary
   action asserting alleged preference claims in the aggregate amount of approximately $96
   million, and have entered into Tolling Agreements with various parties that involve
   aggregate potential preference liability of about $22 million.

5. *Chapter 7 liquidation costs and length of liquidation process.* The Debtors have assumed that all operations would cease immediately and a limited group of personnel would be retained in order to pursue orderly sales of substantially all the remaining assets, collect receivables, arrange distributions, and otherwise administer and close the estates. Thus, this Liquidation Analysis assumes the liquidation would be completed within 14 months. In an actual liquidation the wind down process and time period(s) could vary thereby impacting recoveries. For example, the potential for priority, contingent and other claims, litigation, rejection costs, and the final determination of allowed claims could substantially impact both the timing and amount of the distribution of the asset proceeds to the creditors. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Chapter 7 trustee, including, but not limited to, expenses affiliated with selling the Debtors' assets, will be entitled to payment in full prior to any distribution to Chapter 11 administrative and other priority claims. The estimate used in the Liquidation Analysis for these expenses includes estimates for certain legal, accounting, broker, and other professionals, but does not include potential fees and expenses payable to the Chapter 7 trustee or various other parties and professionals who may or may not be entitled to "success fees" and may or may not be engaged by the Chapter 7 trustee.

6. *DIP Lenders and Prepetition Lenders.* The Liquidation Analysis assumes DIP Lenders are paid in full on their estimated claims resulting from funded debt and letters of credit. The Liquidation Analysis further assumes that the Prepetition Lenders will (a) have an allowed claim equal to all funded debt plus outstanding letters of credit, and (b) either have a lien on, or will be allowed a priority claim under section 507(b) of the Bankruptcy Code against, the remaining liquidation proceeds. Ultimately, this will require complex analysis of relevant facts and legal issues, many of which are expected to be disputed. The ultimate outcome of these disputes may materially change the results shown in the Liquidation Analysis. However, even under a "best case scenario" for general unsecured creditors (not shown in this Liquidation Analysis), the anticipated remaining liquidation proceeds, after payment of liquidation expenses, the DIP Lenders, and at least an estimated "undisputed" payment for the allowed secured claim of the Prepetition Lenders, are not currently anticipated to result in any distribution to holders of General Unsecured Claims.

7. *Chapter 11 Administrative and Other Priority Claims.* No distribution is shown in the Liquidation Analysis for estimated administrative or other claims arising from the Chapter 11 cases and entitled to priority under section 507 of the Bankruptcy Code. However, if the anticipated dispute with the Prepetition Lenders resulted in funds becoming available to pay Chapter 11 Priority Claims, including Chapter 11 Administrative Claims, then section 726 of the Bankruptcy Code generally would require such claims to be paid in full before any payment to holders of General Unsecured Claims.

8. *General Unsecured Claims.* No distribution is shown in the Liquidation Analysis for estimated General Unsecured Claims. However, if the anticipated dispute with the Prepetition Lenders resulted in funds becoming available to pay General Unsecured Claims, after payment in full of Chapter 11 Administrative and Other Priority Claims, then a pro rata distribution to General Unsecured Claims may be available under relevant

law. Note that estimated General Unsecured Claims in the Liquidation Analysis are significantly higher than the amounts estimated in the Plan due to, among other claims, the anticipated assertion of withdrawal liability claims by the multi-employer pension plans to which the Debtors contribute. This estimated increase in unsecured claims will materially decrease any percentage recoveries to unsecured creditors in a Chapter 7 liquidation.

**Interstate Bakeries Corporation**
**Liquidation Analysis**
**As of October 29, 2008**

| $'s in millions | | Balance Sheet Fcst 01/10/09 | | | Potential Recovery | |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash | (a) | $ | 35.0 | 100% | $ | 35.0 |
| Restricted Cash | (a) | | 21.1 | 100% | | 21.1 |
| Accounts Receivable | (b) | | 117.5 | 79% | | 92.7 |
| Inventory | (c) | | 55.9 | 39% | | 21.8 |
| Other current assets | (d) | | 41.9 | 19% | | 8.1 |
| | | | 271.3 | | | 178.8 |
| Real Estate & PPE | (e) | | 465.1 | 78% | | 362.7 |
| Less: Environmental Reserve | | | | | | (1.4) |
| Intangibles | (f) | | 158.3 | 27% | | 43.0 |
| Other assets | (g) | | 28.8 | 23% | | 6.5 |
| | | | 652.2 | | | 410.7 |
| Excess LOC Recovery | (h) | | 49.9 | 50% | | 24.9 |
| **Total Assets** | | $ | 973.4 | | $ | 614.4 |
| | | | | | | |
| **Expenses** | | | | | | |
| Chapter 7 Liquidation Administrative Expenses | (i) | | | | | (180.5) |
| **Total Net Proceeds Available for Distribution** | | | | | $ | 433.9 |
| **DIP Lenders' Claims** | | | | | | |
| Amount Paid to DIP Lenders | | | | | | (293.6) |
| **Remaining Proceeds** | | | | | $ | 140.3 |
| **Pre-Petition Secured Lenders' Claims** | | | | | | |
| Pre-Petition Secured Lenders' Claims | (j) | | | | | (537.8) |
| Recovery % | | | | | | 26.1% |
| **Remaining Proceeds** | | | | | $ | - |
| **Other Claims** | | | | | | |
| Administrative Claims | | | | | | (149.6) |
| Severance Claims | | | | | | (61.0) |
| General Unsecured Claims Excluding Pre-Petition Secured Lenders' Deficiency Claim | | | | | | (1,052.3) |
| Subordinated MEPPA Claim (50% considered pari passu) | | | | | | (463.3) |
| | | | | | | (1,726.2) |
| **Remaining Proceeds** | | | | | $ | - |

**AS DESCRIBED IN GREATER DETAIL IN THE INTRODUCTION TO THIS LIQUIDATION ANALYSIS, THE LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF GENERATING A REASONABLE GOOD-FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE WHEN COMPARED TO RECOVERIES UNDER THE PLAN. THE LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THE LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED IN AN ACTUAL LIQUIDATION. WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM SUCH GOING CONCERN SALE(S) WOULD BE MORE THAN IN THE HYPOTHETICAL LIQUIDATION, THE COSTS ASSOCIATED WITH THE SALE(S) WOULD BE LESS, FEWER CLAIMS WOULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES AND/OR CERTAIN ORDINARY COURSE CLAIMS WOULD BE ASSUMED BY THE BUYER(S) OF SUCH BUSINESS(ES).**

(a) <u>Cash & Restricted Cash:</u> Cash represents the estimated cash in the bank at the initiation of the liquidation.

(b) <u>Accounts Receivable:</u> Accounts receivable reflects a 79% recovery of forecasted AR balances. Recovery is based on the AR metrics used to calculate the AR component of the Company's borrowing base under the DIP Credit Agreement.

(c) <u>Inventory:</u> Inventory recovery values are based upon an appraisal report dated December 5, 2007. Recovery rates are based upon estimated net orderly liquidation values.

(d) <u>Other Current Assets:</u> Estimated recoveries are based upon assessed collectability / realization of various deposits and prepaid assets.

(e) <u>Real Estate & PP&E:</u> Estimated recoveries were based upon several factors.

    i. Appraisal reports dated as of December 1, 2007 were used for 154 properties. The aggregate market value of those appraisals was $382 million ($363.9 million when adjusted for properties sold since the date thereof). These market value appraisals represented the value opinion after analysis of Cost Approach, Sales Comparison Approach, and Income Capitalization Approach for each property. This included the majority of the Debtors' most valuable properties (properties with values estimated in excess of $500,000). Appraised values were reduced by 5% for estimated commissions and selling expenses. The appraisal report also estimated values under a Liquidation Value Approach based upon a shortened marketing period of 3 months or less. The liquidation values were estimated at 80% of the market values resulting in an estimated recovery value of $276.6. NO UPDATED APPRAISALS HAVE BEEN OBTAINED SINCE THE DECEMBER 1, 2007 APPRAISAL REPORTS WERE RECEIVED. AS SUCH, THE APPRAISALS DO NOT REFLECT RECENT NEGATIVE TRENDS IN THE RESIDENTIAL AND COMMERCIAL REAL ESTATE MARKETS IN THE UNITED STATES. THIS REPRESENTS A SIGNIFICANT RISK TO ACHIEVING THE VALUES REFLECTED IN THE LIQUIDATION ANLAYSIS. Although the wind down period is estimated to take place over 14 months, in light of the recent negative trends noted above, the Debtors have elected to use the appraised liquidation values in this Liquidation Analysis. To the extent the appraised liquidation values can not be realized, this represents a significant risk to the Liquidation Analysis as presented.

    ii. For remaining properties (163) that were not recently appraised, the Company estimated values based upon older appraisals where available, supplemented by limited market analyses. The aggregate low and high values with respect to these properties were estimated at $20.5 to $23.9 million. Applying the same 80% "liquidation factor" and 5% estimated commissions and selling expenses noted in (i) above, the recovery value was estimated to be between $15.6 and $18.1 million. NO ADJUSTMENT HAS BEEN MADE TO THE ESTIMATED VALUES FOR THESE PROPERTIES BASED UPON RECENT NEGATIVE TRENDS IN THE RESIDENTIAL AND COMMERCIAL REAL ESTATE MARKETS IN THE UNITED STATES. THIS REPRESENTS A SIGNIFICANT RISK TO ACHIEVING THE LIQUIDATION VALUES REFLECTED IN THE LIQUIDATION ANLAYSIS. Although the wind down period is estimated to take place over 14 months, in light of the recent negative trends noted above, the Debtors have elected to use the liquidation values in this Liquidation Analysis. To the extent the liquidation values can not be realized, this represents a significant risk to the Liquidation Analysis as presented.

     iii.   Equipment and rolling stock values were based upon an appraisal dated as of November 1, 2007. The recovery represents the average of the net forced (low) and net orderly liquidation values (high) per the appraisal (after consideration of selling expense). The aggregate low and high end recovery values of these assets were estimated at $64.7 to $73.8 million.

     iv.   Appraised values for real estate have been reduced by $1.4 million for potential environmental remediation issues based on the Debtors' reserves for such matters pursuant to their books and records as of September 20, 2008.

(f) <u>Intangibles:</u>  Recovery rates were based upon a March 31, 2008 "refresh" of a valuation report originally dated November 30, 2006. The report estimated the following values under the following alternative disposal approaches:

     i.   Forced Liquidation Value: $42.5 to $43.5 million

     ii.   Orderly Disposal Value: $176.5 to $210.1 million

The Debtors have elected to use the average of the low and high forced liquidation value of $43.0 million, based upon the assumed liquidation process timeline. To the extent $43.0 million can not be realized, this represents a significant risk to the Liquidation Analysis as presented.

(g) <u>Other Assets:</u>  Represents the Debtors' estimated recovery values of miscellaneous assets.

(h) <u>Estimated LOC Recovery:</u>  Upon liquidation, this Liquidation Analysis assumes all outstanding pre-petition and DIP letters of credit (LOCs) are drawn, and that 50% of LOCs drawn in excess of the underlying workers compensation, auto and general liability reserves reflected in the Debtors' unaudited September 20, 2008 balance sheet are recovered.

(i) <u>Chapter 7 Liquidation Administrative Expenses:</u>  Net expenses associated with the liquidation process. The expenses include estimated professional fees but **<u>exclude</u>** Chapter 7 trustee and other potential fees.

(j) <u>Prepetition Secured Lenders' Claims:</u>  The claims related to the Prepetition Credit Facility include $453.9 and $83.9 million in estimated outstanding funded debt and future funding related to outstanding letters of credit, respectively. The recovery percentage noted for the Prepetition Secured Lenders' Claims does not include any downward adjustment associated with the passage of time between the initiation of the liquidation and the actual date upon which proceeds would be received.

**APPENDIX C**

**PRO FORMA FINANCIAL PROJECTIONS**

### PRO FORMA FINANCIAL PROJECTIONS AND ASSUMPTIONS

In connection with the solicitation of certain votes on the Plan, and for purposes of demonstrating the feasibility of the Plan, the following financial projections (the "Projections") were prepared by the Debtors. The Projections reflect the Debtors' judgment as to the occurrence or nonoccurrence of certain future events and of expected future operating performance and business conditions, which are subject to change.  The management of the Debtors has prepared the Projections for the fiscal years 2009 through 2014.  Included in the FY2009 projected amounts are actual unaudited results through the four fiscal periods ended September 20, 2008.  The Projections have been prepared on a consolidated basis consistent with the Company's management financial reporting practices and include all Debtor and non-debtor entities.  The Projections, including any historical amounts included therein, are unaudited.

**THE PROJECTIONS, INCLUDING THE UNDERLYING BUSINESS AND ECONOMIC ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED.**

**THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION, WARRANTY OR GUARANTY BY THE DEBTORS OR ANY OTHER PERSON AS TO THE ACCURACY OF THE PROJECTIONS OR THAT THE PROJECTIONS WILL BE REALIZED.**

The Projections were not prepared with a view towards complying with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants (the "AICPA") and as such, do not and are not required to conform with the AICPA descriptions and recommendations regarding presentation and disclosure of prospective financial information.  The Projections have not been compiled, or prepared for examination or review, by the Debtors' independent auditors, who accordingly assume no responsibility for them.  The Projections should be read in conjunction with the assumptions, qualifications and footnotes to the Projections set forth herein, the historical consolidated financial information (including the notes and schedules thereto) included in our Annual Report on Form 10-K filed with the Securities and Exchange Commission (the "SEC") for the fiscal years ended May 31, 2008, June 2, 2007, June 3, 2006, May 28, 2005 and May 29, 2004, our quarterly filing on form 10-Q for the fiscal quarter ended August 23, 2008 and the unaudited actual results reported in the monthly operating reports of the Debtors filed with the Bankruptcy Court.

The Projections assume certain specific economic and business conditions will occur in the future, including general assumptions based upon future macroeconomic indicators (including various commodity market indicators for raw material purchased by the Company, such as forecasts of acres to be planted in specific crops and projected crop yields), growth rates for product categories, and consumer product trends in general.  The Projections were prepared by management in good faith based upon assumptions believed to be reasonable at the time made, but no assurance can be given that such assumptions will prove to be accurate forecasts of the future.

While presented with numerical specificity, the Projections are based upon a variety of assumptions and are subject to significant business, economic, and competitive uncertainties and contingencies, many of which are beyond the control of the Debtors.  Consequently, the inclusion of the Projections herein should not be regarded as a guaranty by the Debtors (or any other person) that the Projections will be realized,

C-1

and actual results may vary materially from those presented below.  The Projections have been prepared on a basis similar to the internal management reporting currently utilized by the Debtor. The Projections reflect an anticipated emergence from Chapter 11 as of the close of business on January 10, 2009.  The Projections do not, however, consider the potential effects of the application of "fresh start" accounting as required by the AICPA Statement of Position 90-7,"Financial Reporting by Entities in Reorganization Under the Bankruptcy Code", that may apply on the Effective Date.

Under Internal Revenue Code section 382, a corporation that has a "net unrealized built-in gain" immediately before it undergoes an ownership change generally is entitled to utilize its NOL carryovers to offset certain built-in gains recognized after the ownership change without regard to the annual limitation that may otherwise restrict the corporation's ability to utilize its NOL carryovers.  In general, a corporation has a net unrealized built-in gain immediately before an ownership change if, at that time, the fair market value of the corporation's assets exceeds the aggregate adjusted tax basis of such assets.  Although the matter is not free from doubt, the Projections assume that the Debtors will have a certain amount of net unrealized built-in gain with respect to the ownership change that will occur in connection with the issuance of New Common Stock pursuant to the Plan.  If this assumption is inaccurate, the Reorganized Debtors' tax expense may be materially greater than the tax expense shown in the Projections; provided, however, if an Alternative Taxable Structure or an Alternative Simplification Structure are implemented, the Reorganized Debtors' tax expense may be materially less than the tax expense shown in such Projections.

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995:  These Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.  "Forward-looking statements" in these Projections include the intent, belief or current expectations of the Debtors and members of their management team with respect to the timing of, completion of and scope of the current restructuring, reorganization plan, strategic business plan, bank financing and debt and equity market conditions and the Debtors' future liquidity, as well as the assumptions upon which such statements are based.  While management believes that its expectations are based on reasonable assumptions within the bounds of its knowledge of its business and operations, prospective investors are strongly cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.  Important factors currently known to management that could cause results to differ materially from those contemplated by the forward-looking statements in these Projections include, but are not limited to, those risks and uncertainties set forth in Article VIII of the Disclosure Statement and other adverse developments with respect to the Debtors' liquidity position or operations of the various businesses of the Reorganized Debtors, adverse developments in the capital markets or public or private markets for debt or equity securities, or adverse developments in the timing or results of the Debtors' current strategic business plan (including the current timeline to emerge from chapter 11) and the possible negative effects that could result from potential economic and political factors around the world.

**THE COMPANY DOES NOT, AS A MATTER OF COURSE, PUBLISH OR DISCLOSE ITS FINANCIAL PROJECTIONS.  ACCORDINGLY, THE COMPANY DOES NOT INTEND, AND DISCLAIMS ANY OBLIGATION TO, (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS AT ANY TIME IN THE FUTURE, (B) INCLUDE UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION, OR (C) OTHERWISE MAKE UPDATED INFORMATION OR PROJECTIONS PUBLICLY AVAILABLE.**

**THE SUMMARY PRO FORMA FINANCIAL PROJECTIONS AND RELATED INFORMATION PROVIDED, THOUGH PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE COMPANY'S CONTROL. THE COMPANY CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS AND RELATED INFORMATION OR AS TO THE COMPANY'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS AND RELATED INFORMATION, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. PARTIES IN INTEREST MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS.**

**Unaudited/Not in Accordance with GAAP**
**Interstate Bakeries Corporation**
**Consolidated Statement of Operations**

| ($s in Millions) | Notes | Forecast | | | | | |
|---|---|---|---|---|---|---|---|
| | | FY2009 5/29/09 | FY 2010 5/29/10 | FY 2011 5/29/11 | FY 2012 5/28/12 | FY 2013 5/28/13 | FY 2014 5/28/14 |
| Net Sales | | $ 2,765.9 | $ 2,772.8 | $ 2,876.1 | $ 2,923.8 | $ 3,040.3 | $ 3,131.5 |
| Cost of Goods Sold | | 1,371.8 | 1,318.7 | 1,339.4 | 1,335.7 | 1,368.1 | 1,411.2 |
| **Gross Profit** | | **1,394.1** | **1,454.1** | **1,536.8** | **1,588.1** | **1,672.2** | **1,720.3** |
| Selling & Delivery | | 1,149.7 | 1,127.7 | 1,172.7 | 1,191.1 | 1,233.8 | 1,272.3 |
| Workers' Compensation | | 65.1 | 67.2 | 70.6 | 71.3 | 73.5 | 75.6 |
| Advertising & Marketing | | 40.1 | 52.7 | 54.6 | 55.6 | 57.8 | 59.5 |
| General & Administrative | | 109.1 | 121.3 | 129.8 | 129.4 | 130.7 | 133.4 |
| Gain Sharing | | - | - | - | 1.3 | 3.7 | 2.9 |
| **EBITDA** | | **30.1** | **85.2** | **109.0** | **139.4** | **172.7** | **176.6** |
| Depreciation Expense | | (54.0) | (52.3) | (55.2) | (58.2) | (60.2) | (60.2) |
| Restructuring Costs | (a) | 1.7 | (4.7) | (1.3) | (4.5) | - | - |
| Reorganization Costs | (b) | (40.5) | - | - | - | - | - |
| Interest Expense | (c) | (68.5) | (60.0) | (61.1) | (64.1) | (64.3) | (58.7) |
| Other Income | | 0.1 | - | - | - | - | - |
| Taxes | (d) | 0.5 | (2.0) | (0.4) | (0.8) | (14.5) | (31.9) |
| **Net Income / (Loss)** | | **$ (130.7)** | **$ (33.9)** | **$ (8.9)** | **$ 11.8** | **$ 33.7** | **$ 25.9** |

**Unaudited/Not in Accordance with GAAP**
**Interstate Bakeries Corporation**
**Consolidated Balance Sheet**

| ($s in Millions) | Notes | Forecast | | | | | |
|---|---|---|---|---|---|---|---|
| | | FY2009 05/29/09 | FY 2010 5/29/10 | FY 2011 5/29/11 | FY 2012 5/28/12 | FY 2013 5/28/13 | FY 2014 5/28/14 |
| Assets | | | | | | | |
| Current Assets: | | | | | | | |
| Unrestricted Cash and Cash Equivalents | (e) | $ 63.2 | $ 41.8 | $ 50.9 | $ 75.1 | $ 122.5 | $ 157.4 |
| Restricted Cash | (f) | 239.6 | 246.6 | 246.6 | 246.6 | 246.6 | 246.6 |
| Accounts Receivable (Net of bad debt and reserves) | (g) | 138.7 | 132.4 | 137.8 | 139.6 | 145.2 | 149.6 |
| Inventories | | 65.9 | 63.0 | 65.5 | 66.4 | 69.0 | 71.1 |
| Other Current Assets | (h) | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 | 41.9 |
| Total Current Assets | | 549.2 | 525.7 | 542.6 | 569.6 | 625.2 | 666.6 |
| Net Property and Equipment | (i) | 452.6 | 468.6 | 466.3 | 456.7 | 430.0 | 431.4 |
| Other Assets | (j) | 210.0 | 202.0 | 194.0 | 186.0 | 178.0 | 173.1 |
| Total Assets | | $ 1,211.9 | $ 1,196.3 | $ 1,203.0 | $ 1,212.4 | $ 1,233.2 | $ 1,271.0 |
| Liabilities & Stockholders Equity | | | | | | | |
| Current Liabilities: | | | | | | | |
| Post-Emergence Revolver | | - | - | - | - | - | - |
| Accounts Payable | | 77.4 | 74.4 | 77.0 | 77.9 | 80.6 | 82.7 |
| Accrued Expenses | (k) | 170.3 | 170.3 | 170.3 | 171.7 | 174.1 | 173.2 |
| Total Current Liabilities | | 247.7 | 244.7 | 247.3 | 249.5 | 254.7 | 255.9 |
| Liabilities Subject To Compromise | (l) | - | - | - | - | - | - |
| Long-term Liabilities: | | | | | | | |
| Long-Term Debt | | | | | | | |
| Term Loan Facility | (m) | 341.3 | 342.2 | 333.3 | 319.0 | 290.9 | 290.9 |
| New Third Lien Term Loan | | 146.7 | 158.4 | 171.1 | 171.1 | 171.1 | 171.1 |
| New Convertible Secured Notes | | 174.9 | 183.6 | 192.8 | 202.5 | 212.6 | 223.2 |
| Capital Leases | | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 |
| Other Liabilities | (n) | 176.5 | 176.5 | 176.5 | 176.5 | 176.5 | 176.5 |
| Deferred Income Taxes | | 69.5 | 69.5 | 69.5 | 69.5 | 69.5 | 69.5 |
| Total Long-term Liabilities | | 911.3 | 932.6 | 945.7 | 941.0 | 923.0 | 933.6 |
| Stockholders' Equity: | (o) | 52.8 | 18.9 | 10.0 | 21.8 | 55.5 | 81.4 |
| Total Liabilities and Stockholders' Equity | | $ 1,211.9 | $ 1,196.3 | $ 1,203.0 | $ 1,212.4 | $ 1,233.2 | $ 1,271.0 |

**Unaudited/Not in Accordance with GAAP**
**Interstate Bakeries Corporation**
**Consolidated Statements of Cash Flow**

| ($s in Millions) | | Forecast | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1/11/2009 5/30/2009* | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 |
| **Net Income / (Loss)** | $ | (10.9) $ | (33.9) $ | (8.9) $ | 11.8 $ | 33.7 $ | 25.9 |
| Depreciation | | 19.7 | 52.3 | 55.2 | 58.2 | 60.2 | 60.2 |
| Amortization of Deferred Financing Costs | | 3.1 | 8.0 | 8.0 | 8.0 | 8.0 | 4.9 |
| Change in Accrued Restructuring Costs | | (4.0) | - | - | - | - | - |
| Change in Working Capital | | (20.9) | 6.1 | (5.2) | (0.6) | (3.1) | (5.2) |
| **Operating Cash Flow** | | (13.0) | 32.6 | 49.0 | 77.4 | 98.8 | 85.8 |
| Capital Expenditures | | (36.7) | (69.9) | (63.8) | (63.5) | (61.6) | (61.6) |
| Asset Sales | | 20.9 | 1.6 | 10.8 | 15.0 | 28.1 | - |
| **Investing Cash Flow** | | (15.8) | (68.3) | (53.0) | (48.5) | (33.5) | (61.6) |
| Transfers to Restricted Cash | | - | (7.0) | - | - | - | - |
| PIK Interest Accrual | | 8.7 | 22.9 | 23.9 | 10.3 | 10.1 | 10.6 |
| Post Emergence Debt Paydown | | (3.8) | (1.6) | (10.8) | (15.0) | (28.1) | - |
| **Financing Cash Flow** | | 4.9 | 14.4 | 13.0 | (4.7) | (18.0) | 10.6 |
| **Net Cash Flow** | $ | (23.9) $ | (21.4) $ | 9.1 $ | 24.2 $ | 47.4 $ | 34.9 |
| **Beginning Unrestricted Cash Balance - Bank** | $ | 87.1 $ | 63.2 $ | 41.8 $ | 50.9 $ | 75.1 $ | 122.5 |
| Net Increase / (Decrease) in Cash | | (23.9) | (21.4) | 9.1 | 24.2 | 47.4 | 34.9 |
| **Ending Unrestricted Cash Balance - Bank** | $ | 63.2 $ | 41.8 $ | 50.9 $ | 75.1 $ | 122.5 $ | 157.4 |

* Post-emergence cash flow

1. **Notes**

The Projections have not been audited, reviewed or compiled by the Company's independent accountant, who accordingly assume no responsibility for them.  They were not prepared with a view toward complying with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants ("AICPA") and, as such, do not and are not required to conform with the AICPA descriptions and recommendations regarding presentation and disclosure of prospective financial information.  The Projections reflect an anticipated emergence from Chapter 11 as of the close of business on January 10, 2009.  They do not, however, reflect the impact of implementing fresh start accounting as will likely be required pursuant to Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code" issued by the AICPA.  As a result of these and other factors, the projections are not prepared in accordance with Generally Accepted Accounting Principles ("GAAP").

As discussed in the Disclosure Statement, the Projections assume that on the Effective Date (i) the Equity Investors (a) invest $44.2 million in cash in the Reorganized Company in exchange for 4,420,000 shares of New Common Stock, and (b) purchase $85.8 million in New Convertible Secured Notes; (ii) GECC and GECM agree to structure, arrange and syndicate the $125.0 million ABL Facility; (iii) Silver Point and Monarch Master Funding Ltd agree to structure, arrange and syndicate the $344.0 million Term Loan Facility (subject to adjustment pursuant to the terms of the Commitment Letter); and (iv) the Prepetition Lenders will convert their Allowed Prepetition Lender Claims into $142.3 million of the New Third Lien Term Loan (subject to adjustment pursuant to the terms of the Commitment Letter), $85.8 million of New Convertible Secured Notes and Series E Warrants with a strike price of $0.01 and representing 1.5% of the fully-diluted equity interests of Reorganized IBC (calculated as of the Effective Date).  Pursuant to the Investment Agreement, Equity Investors will also receive Series A Warrants with a strike price of $12.50 and representing 13.5% of the New Common Stock on a fully-diluted basis (calculated as of the Effective Date and taking into account dilution from the conversion of all the New Convertible Secured Notes to be issued on the Effective Date, but not accounting for any other dilution).  In addition, Equity Investors will be issued Series D Warrants with a strike price of $12.50 and representing 1.5% of the fully-diluted equity interests of Reorganized IBC (calculated as of the Effective Date).  On the Effective Date, the lenders under the Term Loan Facility (or their Permitted Affiliates) will be issued 4,420,000 shares of the New Common Stock, Series B Warrants with a strike price of $12.50 and representing 1.917% of the New Common Stock on a fully-diluted basis (calculated as of the Effective Date), and Series C Warrants with a strike price of $10.00 and representing 2.837% of the New Common Stock on a fully diluted basis (calculated as of the Effective Date).  The Projections do not contemplate any conversions of the New Convertible Secured Notes into common stock, the exercise of any of the Series A, B, C, D or E Warrants, or the issuance of stock appreciation rights.

Specific Note References:

(a) Restructuring Costs:  Include amounts associated with past, ongoing, and future operational restructuring activities.

(b) Reorganization Costs:  Include amounts associated with Chapter 11 related legal and other professional fees expected to be incurred during the bankruptcy process through emergence and an additional $5.0 million of such fees to be incurred and paid after emergence.

(c) Interest Expense:  Includes interest and fees associated with the Company's DIP Credit Agreement and Prepetition Credit Facility through emergence.  Includes post emergence interest and fees amortization of deferred financing costs associated with commitment fees

and expenses incurred related to the post emergence capital structure as set forth in the Disclosure Statement.

(d) Tax Expense:  Tax Expense is limited to federal income tax expense calculated based upon the assumptions and analysis described above and in Article IX of this Disclosure Statement – 'Certain U.S. Federal Income Tax Consequences Of The Plan' and the Debtors' best estimate of the amount and timing of such taxes.

(e) Cash and Cash Equivalents:  The estimated cash effects of emergence are assumed to take place on the close of business on January 10, 2009 and are summarized as follows:

- Funding of the $344.0 million Term Loan Facility.
- Investment by the Equity Investors of $85.8 million and $44.2 million relating to the New Convertible Secured Notes and New Common Stock, respectively.
- The trustee of the rabbi trust holding certain assets of the SERP (estimated at $6.5 million) remits such funds to the Reorganized Debtors.
- Repayment of the estimated DIP Credit Agreement debt outstanding of $138.0 million.
- Transaction fees and expenses under the plan are estimated to be $40.1 million, $12.3 million of which are to be paid prior to emergence, leaving a final estimated payment of $27.8 million at emergence.
- Estimated payment of $13.2 million for Administrative and Cure Claims.
- Estimated payment of $9.0 million for Chapter 11 professional fees on emergence.
- Employee related payment of $3.5 million.
- Transfer of $239.6 million to restricted cash to cash collateralize outstanding letters of credit.
- Estimated payment of $5.9 million for the Creditors Trust and fees.

*$'s in millions*

| Sources of Cash | | |
|---|---|---|
| Unrestricted Cash as of Close of Business 1/10/09 | $ | 22.4 |
| Restricted Cash | | 21.1 |
| Term Loan | | 344.0 |
| Secured Convertible Debt Investment - Equity Investors | | 85.8 |
| Common Equity Investment - Equity Investors | | 44.2 |
| Transfer of Cash Held in Rabbi Trust | | 6.5 |
| | | 523.9 |
| Uses of Cash | | |
| Repayment of DIP Credit Facility | $ | 138.0 |
| Transaction Fees & Expenses | | 27.8 |
| Administrative Claims | | 13.2 |
| Professional Fees | | 9.0 |
| Employee Related Payments | | 3.5 |
| Restricted Cash for LCs | | 239.6 |
| Cash to Creditors' Trust & Fees | | 5.9 |
| | | 436.9 |
| Unrestricted Cash Balance at Emergence | $ | 87.1 |

(f)  Restricted Cash is posted to cash collateralize outstanding Letters of Credit.

(g)  Accounts Receivable includes all receivables net of bad debt reserves.

(h)  Other Current Assets include deferred taxes and pre-paid items such as insurance, utilities, rent and other miscellaneous items.

(i)  Net Property and Equipment has been valued at its net book value.  Depreciation and amortization in fiscal years 2009-2014 have been calculated based on those book values using methods consistent with past company practices.  The Company intends to obtain independent appraisals for determining fair value of these assets as part of its efforts to assign fair values in "fresh start" accounting as of the Effective Date.  The nature, value and length of depreciable or amortizable lives resulting from the appraisals could differ materially from the historical net book values.

(j)  Other Assets primarily includes intangibles and other miscellaneous items.

(k)  Accrued Expenses includes amounts for restructuring expenses, pension liabilities, workers' compensation obligations, auto and general liability obligations, employee related expenses and other miscellaneous accruals.  All liabilities associated with the ABA Defined Benefit Plan are considered Liabilities Subject to Compromise and have been eliminated upon emergence.  The dispute regarding the nature of the plan is currently the subject of litigation as more fully discussed in Section VI.H.8 of the Disclosure Statement.

(l)  The Projections account for the elimination of Liabilities Subject to Compromise at emergence as a credit to the Stockholders' Equity, with the exception of the portion of the Prepetition Lender Claims that were exchanged for the $142.3 million New Third Lien Term Loan and $85.8 million of New Convertible Secured Notes.  The estimation standards and accounting recognition of claims may differ from the amount of claims allowed for Plan purposes.  Actual allowed unsecured claims may be materially different.

(m) Reflects $344.0 million in proceeds from the new Term Loan Facility adjusted for the accrual of PIK interest and repayments from the proceeds of asset sales, as required under the terms of the credit agreement.

(n)  Other Liabilities include the long-term portion of accruals related to worker's compensation obligations, auto and general liability obligations, retiree medical benefits, and other miscellaneous items.  All liabilities associated with the ABA Defined Benefit Plan are considered Liabilities Subject to Compromise and have been eliminated upon emergence.  The dispute regarding the nature of the plan is currently the subject of litigation as more fully discussed in Section VI.H.8 of the Disclosure Statement.

(o)  The actual amount of emerged company Stockholders' Equity will be subject to future adjustment pending future Bankruptcy Court actions, the determination of Reorganization value under "fresh start" accounting, the ultimate settlement of Liabilities Subject to Compromise, further developments with respect to Disputed Claims and/or other events.

**APPENDIX D**

**HISTORICAL FINANCIAL RESULTS**

[THIS PAGE INTENTIONALLY LEFT BLANK]

**HISTORICAL FINANCIAL RESULTS**

The following table highlights certain selected consolidated financial information derived from our audited consolidated financial statements as of and for each of the five fiscal years in the period ended May 31, 2008, and should be read together with our audited consolidated financial statements, which are included in our Annual Reports on Form 10-K filed with the United States Securities and Exchange Commission (the "SEC") for the fiscal years ended May 31, 2008, June 2, 2007, June 3, 2006, May 28, 2005 and May 29, 2004.  The information in the table below contains summary financial data which is not necessarily indicative of the results of our future operations.  For a more comprehensive description of our current financial condition and operating results, the information in the table below and the aforementioned Annual Reports on Form 10-K should also be read together and in connection with our other periodic reports filed with the SEC, including our latest quarterly Form 10-Q for the first quarter of fiscal 2009 filed on October 7, 2008.

### INTERSTATE BAKERIES CORPORATION
### FIVE-YEAR SUMMARY OF FINANCIAL DATA

| | Fifty-Two Weeks Ended | | Fifty-Three Weeks Ended | Fifty-Two Weeks Ended | |
|---|---|---|---|---|---|
| | May 31, 2008 (1) | June 2, 2007 (3)(4) | June 3, 2006 (5) | May 28, 2005 (7)(8) | May 29, 2004 (9) |
| | *(dollars and shares in thousands, except per share data)* | | | | |
| **Statements of Operations** | | | | | |
| Net sales | $  2,798,337 | $  2,917,268 | $  3,060,473 | $  3,403,505 | $  3,467,562 |
| Cost of products sold (exclusive of depreciation and amortization) (2) | 1,440,609 | 1,489,019 | 1,552,731 | 1,724,054 | 1,733,303 |
| Operating income (loss) | (64,572) | (39,641) | (56,368) | (335,536) | (18,326) |
| % of net sales | (2.3)% | (1.4)% | (1.8)% | (9.8)% | (0.5)% |
| Income (loss) before cumulative effect of accounting change | $  (143,684) | $  (112,848) | $  (127,300) | $  (379,280) | $  (33,370) |
| Cumulative effect of accounting change (6) | — | — | (1,017) | — | — |
| Net income (loss) | $  (143,684) | $  (112,848) | $  (128,317) | $  (379,280) | $  (33,370) |
| % of net sales | (5.1)% | (3.9)% | (4.2)% | (11.1)% | (1.0)% |
| Income (loss) per share before cumulative effect of accounting change: | | | | | |
| Basic and diluted | $  (3.18) | $  (2.50) | $  (2.82) | $  (8.43) | $  (0.74) |
| Common stock dividends per share | — | — | — | — | 0.21 |
| Weighted average common shares outstanding: | | | | | |
| Basic and diluted | 45,195 | 45,171 | 45,124 | 45,010 | 44,868 |
| **Balance Sheets** | | | | | |
| Total assets | $  958,357 | $  1,081,392 | $  1,253,055 | $  1,398,650 | $  1,673,797 |
| Long-term debt, excluding current maturities (10) | — | — | — | — | 10,362 |
| Stockholders' equity (deficit) | (461,714) | (318,741) | (240,583) | (116,924) | 261,708 |

D-2

_____

(1)        Fiscal 2008 operating loss includes net restructuring charges of approximately $5.7 million relating to a sales reorganization to improve the structure and efficiency of the sales and route delivery of our baked goods and the closure of four bakeries and the consolidation of related depots and routes in conjunction with exiting the Southern California bread market; and property and equipment impairment of approximately $10.5 million related to the closing of the four bakeries.

(2)        Depreciation and amortization excluded from cost of products sold amounted to approximately $50.4 million, $51.0 million, $59.7 million, $70.2 million, and $71.6 million in fiscal 2008, 2007, 2006, 2005, and 2004, respectively.

(3)        Fiscal 2007 operating loss includes net restructuring credits of approximately $4.1 million relating to gains realized on the sale of restructuring related assets partially offset by costs related to certain closings and restructurings of bakeries, depots and bakery outlets; and a machinery and equipment impairment of approximately $1.4 million.

(4)        Fiscal 2007 stockholders' deficit reflects a reduction of approximately $33.4 million related to a change in accounting for pension and other postretirement obligations due to our adoption of the recognition and disclosure requirements of Statement of Accounting Standards No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans* .

(5)        Fiscal 2006 operating loss includes net restructuring credits of approximately $27.2 million relating to gains realized on the sale of restructuring related assets partially offset by costs related to certain closings and restructurings of bakeries, depots and bakery outlets; and a machinery and equipment impairment of approximately $4.8 million.

(6)        In fiscal 2006, as a result of adopting FIN 47, we recorded a cumulative effect of an accounting change of approximately $1.0 million, or $0.02 per share, and a liability of the same amount as the related asset values were fully depreciated as of June 3, 2006.

(7)        Fiscal 2005 operating loss includes goodwill and other intangible asset impairments of approximately $229.5 million; restructuring charges of approximately $54.3 million relating to the closures of five bakeries, a general workforce reduction and other cost reductions; settlement of class action litigation of approximately $8.7 million; and a net curtailment loss from the suspension of our Supplemental Employee Retirement Plan of $10.3 million.

(8)        Fiscal 2005 net loss includes a tax valuation allowance adjustment of $5.6 million related to deferred tax assets originating in prior years.

(9)        Fiscal 2004 operating loss includes restructuring charges of approximately $12.1 million relating to the closures of three bakeries, severance costs in connection with the centralization of certain finance and data maintenance administrative functions and the relocation of certain key management employees in conjunction with our new more centralized organizational structure and settlement of class action litigation of approximately $3.0 million.

(10)       At May 31, 2008, we included our Senior Secured Credit Facility in liabilities subject to compromise. See Note 7. Debt to our consolidated financial statements regarding this reclassification. In all prior years presented, we have reflected the total amount due under our Senior Secured Credit Facility as amounts payable within one year due to our default under this facility. See Note 1. Voluntary Chapter 11 Filing to our consolidated financial statements regarding going concern considerations.

D-3