IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MISSOURI
KANSAS CITY DIVISION

------------------------------------- x
: Chapter 11
In re: : Case No. 04-45814 (JWV)
:
INTERSTATE BAKERIES : Jointly Administered
  CORPORATION, et al., :
:
: **Hearing Date: December 5, 2008**
                 Debtors. : **Hearing Time:  9:00 a.m.**
: 
------------------------------------- x

**DECLARATION OF ROBERT A. CAMPAGNA, MANAGING DIRECTOR
WITH ALVAREZ & MARSAL NORTH AMERICA, LLC AND SENIOR VICE
PRESIDENT OF RESTRUCTURING OF INTERSTATE BAKERIES CORPORATION
IN SUPPORT OF AMENDED JOINT PLAN OF REORGANIZATION OF
INTERSTATE BAKERIES CORPORATION AND ITS AFFILIATED DEBTORS AND
<u>DEBTORS-IN-POSSESSION DATED OCTOBER 31, 2008</u>**

      **I, Robert A. Campagna, declare**:

      1.      I am a Managing Director with Alvarez & Marsal North America, LLC ("<u>A&M</u>") and, from August 2008 through the current date, I have served and continue to serve as the Senior Vice President of Restructuring of Interstate Bakeries Corporation ("<u>IBC</u>" or the "<u>Company</u>") and eight of its subsidiaries and affiliates, debtors and debtors-in-possession (collectively with IBC, the "<u>Debtors</u>")[1] in the above-captioned cases (the "<u>Chapter 11 Cases</u>") pursuant to an amended and restated agreement dated October 14, 2004 and approved by the Bankruptcy Court on October 25, 2004, between the Company and A&M.  A&M is a nationally recognized restructuring advisory firm with its principal office located at 600 Lexington Avenue,

---

1  The following subsidiaries' and affiliates' chapter 11 cases are jointly administered with IBC's chapter 11 case: Armour and Main Redevelopment Corporation ("<u>Armour & Main</u>"); Baker's Inn Quality Baked Goods, LLC; IBC Sales Corporation; IBC Services, LLC; IBC Trucking, LLC; Interstate Brands Corporation; New England Bakery Distributors, L.L.C. ("<u>New England Bakery</u>"); and Mrs. Cubbison's Foods, Inc. ("<u>Mrs. Cubbison's</u>").

6th Floor, New York, NY 10022.  I am an authorized representative of the Debtors.  I submit this declaration in support of confirmation of the Amended Joint Plan of Reorganization of Interstate Bakeries Corporation and Its Affiliated Debtors and Debtors-in-Possession dated October 31, 2008 (as it may be amended or modified, the "Plan") pursuant to section 1129 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The statements in this declaration are, except where specifically noted, based either on my personal knowledge, on information that I have received from the Debtors' employees or advisors working under my supervision, direction or control, or from the Debtors' business records maintained in the ordinary course of their business.  Accordingly, I am competent to testify thereto.

## I.  QUALIFICATIONS

2.  I have over 16 years of troubled company advisory experience.  I specialize in providing restructuring and business advice to troubled companies and creditor groups on financial, operational and strategic business issues.  My primary areas of focus include the development and evaluation of strategic business plans and cash flow projections, assessment of bankruptcy planning and strategy, assistance in the procurement of debtor-in-possession financing, preparation of liquidation analyses, and the development and negotiation of recapitalization strategies and refinancing plans, as well as plans of reorganization.

3.  I have served clients in troubled debt restructurings (both in and out of court), loan workouts, bankruptcies, corporate turnarounds and fraud investigations.  I have advised troubled companies, secured lenders, unsecured lenders, and unsecured creditors' committees in the telecommunication, bakery, furniture manufacturing, healthcare, retail,

hospitality, gaming and wholesale distribution industries.  I have also served in interim management and officer roles for client organizations during the restructuring process.

4. In addition to serving as Senior Vice President of Restructuring for the Debtors, my recent engagement experience includes Bush Industries, Inc., Fleming Companies, and 360networks, Inc., where I was senior lender adviser; Global Crossing Ltd., Doctors Community Healthcare, Bradlees, Sun Healthcare Group, Inc., and AM Cosmetics, where I served as debtor advisor; and Physicians Computer Network, where I conducted a fraud investigation.  Prior to joining A&M in 2003, I was a senior director with a start-up consulting firm where I assisted in the formation of its New York restructuring practice and before that, I was a senior director with the corporate restructuring practice of a "Big Five" accounting firm in New York.

5. I am a Certified Insolvency and Restructuring Advisor and Certified Public Accountant and I hold a bachelor's degree in business administration from Bucknell University.

6. A&M is a nationally recognized business turnaround and crisis management professional services firm that specializes in providing turnaround, crisis management and restructuring advisory services to public and private companies in financial and operational distress.  A&M professionals have extensive experience working with financially troubled companies and serving as crisis managers in large and complex restructurings both out of court and in chapter 11 cases.

7. I, as well as other A&M professionals, have been involved with the Debtors' reorganization since August 2004, therefore we are intimately familiar with the Debtors' capital structure, businesses, operations and affairs.  During that time, we have worked

closely with the Debtors to, among other things: (a) develop a comprehensive business plan, including operating and cash flow projections; (b) provide assistance to the Company in improving its cash management techniques, raising post-petition financing and strengthening its accounting processes and controls; (c) identify and implement opportunities for cost reductions, improvements in efficiency and improvements in profitability; (d) initiate new marketing and product development efforts designed to offset consistent revenue declines, (e) coordinate compliance with the various reporting requirements under the Bankruptcy Code; (f) formulate a plan of reorganization and the accompanying disclosure statement; (g) work with the Debtors to prepare a liquidation analysis; and (h) provide such other financial and business consulting services as required by the Debtors and their legal counsel.

## II.  INTRODUCTION

8.  During the course of the Chapter 11 Cases, the Debtors, along with A&M and their other advisors, analyzed the alternatives for their ongoing business operations. After careful review of the Debtors' historical and projected going-concern business results and review of estimated recoveries under various alternative scenarios, including complete and partial liquidation scenarios, the Debtors and their advisors concluded that the recovery to the Debtors' creditors will be maximized by the reorganization of the Company as contemplated in the Plan. The Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part. Based upon the recoveries estimated under the Plan and the liquidation analysis filed as Appendix B of the Disclosure Statement (the "Liquidation Analysis") prepared by management with the assistance of A&M (and the other analyses prepared by the Debtors with the assistance of their advisors), the values

4

of the Debtors' estates are considerably greater in the proposed reorganization than in a liquidation.

9.      I have extensive experience assessing, among other things, the liquidation value of both small and large companies engaged in a broad range of business activities including manufacturing companies such as the Company. I personally reviewed the Liquidation Analysis and the assumptions used in determining the recovery to various constituents and, in my opinion, they are consistent with the types of assumptions and factors considered in liquidation analyses of companies with operations similar to those of the Debtors.

### III.    DEVELOPMENT OF THE BUSINESS PLAN

10.     As part of the process to emerge from chapter 11, and immediately after the Company hired Craig D. Jung as its new Chief Executive Officer in February 2007, the Company undertook a thorough and detailed initiative to develop a five-year business plan. On June 28, 2007, the Company submitted its business plan (as further revised, the "Business Plan") to the Creditors' Committee, the official committee of equity security holders and the steering committee for the Prepetition Lenders for their review and input. The Business Plan contemplates implementing proven changes both in the manner by which the Debtors manufacture their products and, ultimately, deliver them to their consumers. The Business Plan forms the basis of the pro forma financial projections filed as Appendix C to the Disclosure Statement (the "Projections").

11.     Business plans are subject to a variety of risks and uncertainties. Like all business plans, the Business Plan may be affected by a number of factors both internal and external to the Debtors. Those factors, which are more generally described in Article VIII of the Disclosure Statement, involve the state of the global economy, including in particular, consumer spending, the costs for relevant commodities necessary to create the Debtors' products, the

5

movement of interest rates, the effects of war and other geopolitical developments, the availability of financing on acceptable terms, increased competitive pressures, the disruption of key vendor relationships, reliance on key personnel and regulatory changes.  Subject to these material uncertainties, IBC projects, as set forth in the Projections, that the Debtors' business will continue to recover and the EBITDA will grow to approximately $177 million by fiscal 2014. Moreover, IBC expects that its liquidity will be strong subsequent to its emergence from chapter 11.

12. I worked closely and in conjunction with the other members of the Debtors' senior management team in the development of the Business Plan and with respect to the assumptions underlying the Company's business strategy.  As a result of this analysis, I believe that the business strategies and assumptions embodied in the Business Plan are reasonable and appropriate to provide the foundation for the Plan.

## IV. DEVELOPMENT OF THE PLAN

13. The Plan represents the culmination of extraordinary efforts by the Debtors, the Prepetition Agent and certain of the Prepetition Lenders, the Creditors' Committee, certain major labor unions and other parties-in-interest to reach a fair and equitable resolution of the complex business and legal issues presented by the Chapter 11 Cases.  The terms of the Plan were based upon, among other things, the Debtors' assessment of their ability to achieve the goals of the Business Plan, to make the distributions contemplated under the Plan, and to pay their continuing obligations in the ordinary course of the Reorganized Debtors' businesses.

14. Throughout the Chapter 11 Cases, the Debtors have engaged in restructuring negotiations with their principal stakeholders.  As part of these discussions, the Debtors have provided substantial information to all constituencies, which has included numerous meetings among the Debtors, the steering committee for the Prepetition Lenders and

the Creditors' Committee. The Plan reflects the end product of those arms' length negotiations and reflects the agreement among all such parties-in-interest regarding the terms of the Debtors' restructuring.

15.     Having focused intensely on building consensus among their primary constituencies, the Debtors are now in a position to request confirmation of a plan of reorganization that is largely consensual. The Debtors proposed the Plan in good faith, with legitimate and honest purposes of reorganizing the Debtors' ongoing businesses and maximizing the value of each of the Debtors and the recovery to Claimholders under the circumstances of the Chapter 11 Cases.

## V.     THE PLAN IS FEASIBLE

16.     For purposes of determining whether the Plan satisfies the feasibility standards, with the assistance of the Debtors and their other advisors, I analyzed the Debtors' ability to meet their obligations under the Plan. The Projections reflect the Debtors' reasonable judgment as to the occurrence or nonoccurrence of certain future events and of expected future operating performance and business conditions, which are subject to change. The Debtors' management, with the assistance A&M, prepared the Projections for the fiscal years 2009 through 2014. The Projections have been prepared on a consolidated basis consistent with the Company's management reporting practices. The Projections, including any historical amounts included therein, are unaudited.

17.     The Business Plan and the Projections indicate that, after consummation of the Plan, the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations and to fund their operations, as contemplated by the Business Plan. The Business Plan is, of course, subject to the risks described in Article VIII of the Disclosure Statement.

18. In part due to the liquidity provided by the New Credit Facilities, the Debtors have projected that at each year-end through 2014, the Reorganized Debtors' unrestricted cash balance will range from approximately $41.8 million to $157.4 million, which the Debtors and I believe will provide sufficient liquidity to pay all obligations pursuant to the Plan, will be sufficient to allow the Debtors to operate their businesses going forward and provide appropriate flexibility such that the Debtors will be able to react to changing business conditions and economic or other conditions that may ultimately prove to be less favorable than projected.

19. Based upon the foregoing and my other work with the Debtors' senior management team and advisors throughout the Chapter 11 Cases, I believe that the Plan will maximize value for those stakeholders receiving distributions under the Plan. Moreover, based upon my review of the Projections, I believe that, as of the Effective Date and after taking into account the transactions contemplated by the Plan, the Reorganized Debtors will, subject to the risks described in the Disclosure Statement, (a) be able to meet their debts as such debts mature, (b) not be left with unreasonably small capital to operate their businesses as a result of the Plan or any transactions contemplated by the Plan, and (c) be solvent.

20. Finally, based on my analysis of, among other things, the Business Plan, the Projections, and the executory contracts and unexpired leases being assumed under the Plan, I am of the opinion, to a reasonable degree of certainty, that the Plan is feasible – that is, confirmation of the Plan is not likely to be followed by the liquidation of the Reorganized Debtors or by the need for a further reorganization of the Reorganized Debtors under chapter 7 of the Bankruptcy Code.

## VI. THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' CREDITORS AND INTEREST HOLDERS

21. The Company, with the assistance of A&M prepared the liquidation analysis attached to the Disclosure Statement as Appendix B (the "Liquidation Analysis"). The Liquidation Analysis was prepared to determine whether, under the "best interests test" contained in section 1129(a)(7) of the Bankruptcy Code, the holders of claims and interests that are Impaired under the Plan will receive or retain a value under the Plan that is at least equal to the amount that such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The information used by A&M and the Company in their analysis is information that debtors should typically rely upon in conducting analyses of this type.

### A. The Liquidation Analysis

22. To estimate what members of each Impaired class of claims or interests would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Company with the assistance of A&M and the Company's other advisors, determined the aggregate dollar amount that would be available if the Chapter 11 Cases were converted to a chapter 7 case. The net proceeds available to creditors consist of the net proceeds from the disposition of the assets and interests of the Debtors, augmented by any cash held by the Debtors. Appendix B to the Disclosure Statement contains an accurate summary and description of the Liquidation Analysis and of the estimates and assumptions underlying that analysis.

23. The Liquidation Analysis assumes, among other things, that the hypothetical liquidation under chapter 7 would commence under the direction of a court-appointed trustee and would continue for a period of time, during which time all of the Debtors' major assets would be sold or surrendered to the respective lien holders, and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with relevant

9

law. The liquidation analysis is based upon, among other things, the Debtors' unaudited financial statements as of September 20, 2008 and the Debtors' projected financial statements. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants.

24. The Liquidation Analysis does not purport to be a valuation of the Debtors' assets as a going concern, and there may be a significant difference between the Liquidation Analysis and the values that may be realized in an actual liquidation. The analysis assumes "liquidation values" based on appraisals, where available, and the Debtors' business judgment where appraisals are not available. The recoveries shown do not contemplate a sale or sales of business units on a going concern basis. It is possible that proceeds received from such going concern sale(s) would be more than in the hypothetical liquidation, the costs associated with the sale(s) would be less, fewer claims would be asserted against the bankruptcy estates and/or certain ordinary course claims would be assumed by the buyer(s) of such business(es).

25. Additionally, the Liquidation Analysis contains estimates of the amount of certain Allowed Claims upon conversion to chapter 7. In preparing the Liquidation Analysis, the Company with the assistance of A&M, and the Company's other advisors, projected the amount of Allowed Claims based upon a review of the Debtors' scheduled and filed proofs of claim and historical financial statements. The estimates of Allowed Claims set forth in the Liquidation Analysis do not include certain claims that likely would be incurred by the conversion of these cases to chapter 7 and thus I believe the Liquidation Analysis illustrates the greatest possible projected chapter 7 liquidation dividends to the holders of Allowed Claims.

26. The net proceeds available to creditors set forth in the Liquidation Analysis reflects reductions for certain liquidation fees and costs likely to be incurred in a

chapter 7 case. The estimate used in the Liquidation Analysis for these expenses includes estimates for certain legal, accounting, broker, and other professionals, but does not include potential fees and expenses payable to the chapter 7 trustee or various other parties and professionals who may or may not be entitled to "success fees" and may or may not be engaged by the chapter 7 trustee.

27.   Prepared on a consolidated basis, the Liquidation Analysis estimates that the Prepetition Lenders would receive a recovery of approximately 26.1% on their Claims after application of chapter 7 liquidation administration expenses and payment of claims arising under the DIP Facility (i.e., the Prepetition Lenders would receive $140.3 million, leaving a deficiency claim of $397.5 million). While not specifically broken out in the Liquidation Analysis, Armour & Main and New England Bakery do not have any assets, and therefore no recovery would be available to any creditors of such Debtors in a hypothetical chapter 7 liquidation. Furthermore, while Mrs. Cubbison's does have minimal assets, such assets would not be sufficient to satisfy administrative and priority claims against Mrs. Cubbison's, and therefore no recovery would be available to any of the voting classes under Mrs. Cubbison's Plan.

28.   Based on my experience, it is my belief that the methodology used to prepare the Liquidation Analysis appropriate and that the assumptions and conclusions set forth therein, including the estimates of the potential proceeds that would be realized from chapter 7 liquidations of the Debtors and available to satisfy claims and interests under the assumptions set forth therein, are fair and reasonable under the circumstances and represent a reasonable exercise of the Debtors' business judgment with respect to such matters.

B.   **The Best Interests Test**

29.   In conjunction with the Plan, the Debtors estimated creditor recoveries utilizing the face value of debt securities to be issued and cash distributions to be made pursuant

11

to the Plan. These estimated recovery values by class are set forth in the introductory "Claims Against and Interest in the Main Debtors" section of the Disclosure Statement, beginning on page xii therein. The classification and treatment of claims is further described in Section VII.C of the Disclosure Statement.

30. The Debtors and their advisors estimate that under the Plan, (i) holders of Class 7 Capital Lease Claims will receive value equal to approximately 100% of such Claims, (ii) holders of Class 8 Prepetition Lender Claims will receive value equal to approximately 50.5% of such claims; (iii) holders of Class 4 Trade Claims against each of Mrs. Cubbison's, Armour & Main and New England Bakery will receive value equal to approximately 100% of such claims; and (iv) holders of Class 5 General Unsecured Claims against each of Mrs. Cubbison's, Armour & Main and New England Bakery will receive value ranging between approximately 0.05% and 1.5% of such claims. Though holders of Class 9 General Unsecured Claims are not receiving any distribution under the Plan, confirmation of the Plan permits entry by the Court of the Intercreditor Settlement Order, which provides for the possibility of a recovery to general unsecured creditors—a possibility that would likely not exist under a hypothetical chapter 7 liquidation. Indeed, holders of Class 9 General Unsecured Claims would not receive a distribution under a hypothetical chapter 7 liquidation. Furthermore, based upon the estimates contained in the Liquidation Analysis and in light of the replacement liens and superpriority claims of holders of Class 8 Prepetition Lender Claims, even if all $120 million in face amount of preference claims were recovered at 100%, and another $50 million in professional fees were disgorged, the chapter 7 estates would need to recover at least another $377.1 million from available assets or prosecution of claims in order for the holders of Class 9 General Unsecured Claimants to have the opportunity for a distribution. Additionally, with respect to Class 10

Subordinated Securities Claims, Class 11 Interests in Brands Preferred Stock and Class 12 Interests in IBC, even though such holders are not receiving a recovery pursuant to the Plan, they would not be entitled to any recovery under a hypothetical chapter 7 liquidation. Thus, recoveries under the Plan with respect to all Classes of Claims and Interests would be at least as much as recoveries available in a hypothetical chapter 7 liquidation, whether such liquidation were conducted on a consolidated or un-consolidated basis.

31. In summary, the Liquidation Analysis indicates that, using a reasonable set of assumptions, the values that may be realized by each impaired class of claims in a hypothetical chapter 7 scenario are less than the value of the recoveries to these classes under the Plan. The Plan therefore is in the best interests of each of the classes of claims discussed herein.

## VII.   CONCLUSION

32. As evidenced by the foregoing, I believe that the Plan has been structured to accomplish the Debtors' goal of maximizing the returns available to stakeholders. The holders of Claims that are impaired under the Plan will retain or receive property that is at least equal to the amount that they would receive if the Debtors were liquidated under a hypothetical chapter 7. I believe that the significant settlements achieved and the support of an overwhelming majority of the Prepetition Lenders and the Creditors' Committee further reflect the overall fairness and reasonableness of the Plan and that the Plan has been proposed in good faith and for proper purposes. Furthermore, I believe that the Plan will position the Reorganized Debtors to operate successfully upon their emergence from chapter 11.

33. I hereby reserve my right to amend the testimony set forth herein as necessary at the Confirmation Hearing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 3, 2008

/s/ Robert A. Campagna
Robert A. Campagna

14